1                                        **Volume 21**

2                                        **Page 4182 – 4405**

3                      **UNITED STATES DISTRICT COURT**

4                     **NORTHERN DISTRICT OF CALIFORNIA**

5              **BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE**

6    ------------------------------)
                                   )
7    MARYLON BOYD, individually    )
     and as Executor of the Estate )
8    of CAMMERIN BOYD, deceased,   )
     et al.,                       )
9                                  )
                      Plaintiffs,  )
10                                 )
          v.                       )  No. C 04–5459 (MMC)
11                                 )
     CITY AND COUNTY OF            )
12   SAN FRANCISCO, et al.,        )
                                   )
13                 Defendants.     )  San Francisco, California
                                   )  Tuesday, September 18, 2007
14   ------------------------------)

15

                          **TRANSCRIPT OF PROCEEDINGS**
16
     <u>APPEARANCES</u>:
17

18   For Plaintiffs:          DALE K. GALIPO
                              21800 Burbank Boulevard
19                            Suite 310
                              Woodland Hills, California 91367
20
     For Defendants:          Office of the City Attorney
21                            City and County of San Francisco
                              1390 Market Street
22                            Suite 600
                              San Francisco, California 94102
23                      BY:   BLAKE P. LOEBS
                              SCOTT WIENER
24                            ERIN BERNSTEIN

25

1   Tuesday, September 18, 2007

2                                                              (9:00 a.m.)

3          (In open court; jury not present)

4          DEPUTY CLERK:  Please come to order.

5          THE COURT:  Should we have Mr. Jason get back on the

6   stand?

7          Let's call the jury in.

8          MR. WIENER:  Your Honor, the revised instructions are

9   down there.

10         THE COURT:  On Miss Lucero's desk?

11         MR. WIENER:  Yes.

12         THE COURT:  Okay.

13         (Off the record)

14         (The jury entered the courtroom)

15         THE COURT:  Good morning, ladies and gentlemen.

16  Please be seated.  Mr. Jason's cross-examination will be

17  continuing this morning.

18         And the witness remains under oath.

19         After Mr. Jason, I think we may have some readings,

20  I'm not sure, of two witnesses, and then there'll be another

21  witness immediately after.  So we're trying to move right along

22  as best we can.

23         Okay.  And we also did some more work regarding

24  instructions yesterday afternoon after you left.  So we're not

25  losing that time.

1            Okay.  Mr. Galipo, you're on.

2            MR. GALIPO:  Thank you.

3    CROSS EXAMINATION (cont'd)

4    BY MR. GALIPO:

5    Q.  Good morning, Mr. Jason.

6    A.  Good morning.

7    Q.  Regarding the trajectory analysis, first of all, you would

8    agree that the shooter would have to be in a position in order

9    to be able to visualize the areas of contact on Mr. Boyd's

10   body?

11   A.  Well, not all the areas.

12   Q.  Well, at least the entrance wounds?

13   A.  Yes.  The abdominal wound and the thigh wound, yes.

14   Q.  And you also agree that if one was to -- strike that.

15            For purposes of your analysis, you followed the

16   trajectories within the body as described by Dr. Smith.  Is

17   that fair?

18   A.  Did I follow it?

19   Q.  You accepted them as true?

20   A.  Yes.

21   Q.  And if one -- and those trajectories within the body were

22   on a straight line within the body.  There was no ricochet off

23   bone or anything like that?

24   A.  Oh, I see what you mean.  Yes.  That's correct.

25   Q.  So if one was to follow, for example, the trajectory from

Jason - Cross

1    the entrance wound on the abdomen to its resting place and had

2    a straight line between those two points, if that straight line

3    was then extended on the right side of the body, that would

4    show the trajectory of the bullet as it approached the body; is

5    that correct?

6    A.  Yes.

7    Q.  And if one was to extend out, for example, that trajectory,

8    you would agree that based on our discussion yesterday, that

9    that trajectory could not -- first of all, obviously it

10   couldn't go into the door, correct?

11          MR. LOEBS:  I object to the question in terms of based

12   on our discussion yesterday as being argumentative.

13          MR. GALIPO:  I'll take that out of the question, if

14   necessary.

15          THE COURT:  I'm not sure I understand the nature of

16   the objection.

17          MR. LOEBS:  Argumentative in terms of whether it's his

18   opinion or based on discussions yesterday as opposed to

19   opinions he's reached in this case.

20          THE COURT:  I'll overrule.  Go ahead.

21   A.  Are you asking if the door could not conflict with an

22   incoming trajectory to the body, is that -- does that answer

23   your question?

24   Q.  Yes.  And also the extension of the door.  If one was to

25   draw a line from the right side, the trajectory out, that

1  couldn't conflict with the extension of the door if someone was

2  to draw an imaginary line extending the door?

3  A.  Yeah, I think one of your earlier questions you asked would

4  the entrance sites for both the thigh wound and the side wound

5  would have to be exposed to the shooter, would be visible

6  essentially to the shooter.

7  Q.  Okay.  If -- do you think, Mr. Jason, if I gave you this

8  ruler, you could in general show me the trajectory that the

9  bullet to the abdomen would have had to take as it approached

10  the abdomen, given the trajectory in the body?

11        MR. LOEBS:  Object to the question as being vague and

12  ambiguous; an incomplete hypothetical; calls for speculation;

13  lack of foundation.

14        THE COURT:  I'll overrule.  The witness can indicate

15  whether he can or cannot extend that out in some way in

16  Mr. Galipo's body.

17  Q.  Would you be able to do that, Mr. Jason?

18  A.  I think so.

19  Q.  Okay.  You often see in cases with trajectory analysis that

20  you've seen before where they have a mannequin where there's

21  rods placed that are sticking out of the mannequin showing the

22  trajectory, correct?

23  A.  Yes.  And that's like the graphic that I made represents

24  that.

25        MR. GALIPO:  May I step down to the side and have the

Jason – Cross

```
 1   witness --
 2             THE COURT:  You don't want him to put it through your
 3   body.
 4             MR. GALIPO:  No, I'd prefer not.
 5             THE COURT:  All right.  Okay.  Well, yes, if you could
 6   do that, Mr. Jason.
 7             MR. GALIPO:  If you'll stand to my right side since
 8   the wound is on my right side.
 9             THE COURT:  I think you may have to stand in front, as
10   Mr. Kubo is indicating, so that neither of you is between the
11   jurors and the demonstration.
12   BY MR. GALIPO:
13   Q.  Okay.  So why don't you do it and explain what you're doing
14   as you do it.
15   A.  The entrance wound is --
16   Q.  That's okay you can touch.  I'll put my hand behind my
17   back.
18   A.  It's between the 9th and 10th rib, and, of course, you have
19   a different dimension than the decedent, but somewhere like
20   around here, and a component of the direction of the wound path
21   is relative to the body, downward, and front to back.  Which
22   means it's going across his body, not just this way, but into
23   his body that way (indicating), so I can only indicate really
24   one of those components.  And about a 10 to 15-degree angle in
25   the body is something like this.  It comes in through the two
```

Jason - Cross

1  ribs and then goes through the body, and it stops in the left

2  external oblique muscle, which is somewhere -- if it came in

3  here, it stopped or ended up over here, something like that.

4  Q.  On the left side?

5  A.  Yes.

6  Q.  And, by the way, you did have a chance to look at the x-ray

7  of where the projectile came to rest, correct?

8  A.  I did.

9  Q.  And in your recollection it was at about the height of the

10  belly button?

11  A.  Well, the belly button doesn't show up on the x-rays, so I

12  don't know.

13  Q.  Do you recall giving prior deposition testimony that it was

14  at the height of the belly button?

15        MR. LOEBS:  Objection, improper use of prior

16  deposition testimony.

17        THE COURT:  I'll overrule, but I'll ask Mr. Jason to

18  come back to the stand.  If you're through with your

19  demonstration.

20        MR. GALIPO:  There's one more point.

21        THE COURT:  You can't be cross-examining him down

22  there while you're doing that.

23        MR. GALIPO:  I'll conclude the examination.

24  Q.  What I'm looking for, Mr. Jason, is if one was to extend

25  out this as the trajectory, a generalization, how would the

1   bullet have to come?

2   A.   Something like that (indicating).

3   Q.   Okay.   That would be the extension out, the bullet would

4   have to come at this angle?

5   A.   Yes, that's generally the angle.

6           MR. GALIPO:   Okay.   Indicating he's extending out from

7   my right side, your Honor?

8           THE COURT:   Yes.

9           MR. GALIPO:   Thank you, Mr. Jason.

10  Q.   Now given that, would you agree, Mr. Jason, that if

11  somebody was seated on the floorboard in the area between the

12  front of the seat and the door, their body could not be in a

13  position so that the yardstick, as we saw it extended, would be

14  going into the door?

15  A.   Well, the door could not be in the way, I think I can say

16  it that way.

17  Q.   Well, another way to say it is, just for visual purposes,

18  the yardstick could not have been going towards or into the

19  door?

20  A.   It could not conflict with the -- the trajectory could not

21  conflict with the door.

22  Q.   And also the yardstick could not, if the body was angled,

23  conflict with a linear extension of the door, correct?

24  A.   Well, I'm not sure.   I think my answer is sufficient, that

25  the door couldn't be in the way.   I agree with you, if that's

Jason – Cross

1    what you're asking me.

2    Q.  The other point I'm getting at is, if -- yesterday we did

3    some linear extensions of the door and we talked about that the

4    shooter would have to be on, I think it was the west side of

5    that line, correct?

6    A.  On one side of the line, yes.

7    Q.  And so you would agree that if one was to extend out the

8    yardstick in the example we did, that yardstick could not cross

9    that line, even if it was -- even if the line was an extension

10   of the door?

11        MR. LOEBS:  I object as vague and ambiguous as to what

12   line, what hypothetical.

13        THE COURT:  I'll sustain.  Are you just asking him

14   whether somebody can't be on the side of the door since the

15   bullet didn't go through it?

16        MR. GALIPO:  Not exactly, your Honor.

17        THE COURT:  Okay.

18        Okay, which exhibit is up on the easel?

19        MR. GALIPO:  Your Honor, this is V5-02.

20        THE COURT:  V5-02.

21        MR. GALIPO:  Yes, your Honor.

22        THE COURT:  Okay.

23   BY MR. GALIPO:

24   Q.  Now, this is the --

25        MR. LOEBS:  Your Honor, I can't see it.

1          THE COURT:  Well, Mr. Loebs --

2          MR. LOEBS:  I don't know how to position myself, if I

3    can.

4          THE COURT:  One of the problems is if you stand in

5    front of it, Mr. Galipo, it will be hard for anybody to see it.

6    It can be angled a little bit maybe just -- well, I was going

7    to say the other way perhaps so that you could get away from it

8    a bit.

9          Can the jurors see that, though, if it's angled that

10   way?  That's fine.  Okay.  Go ahead.

11         MR. GALIPO:  Okay.

12         THE COURT:  If necessary, Mr. Loebs will have to move

13   out of where he usually sits for a moment or two.

14         MR. LOEBS:  I don't mind that.

15   BY MR. GALIPO:

16   Q.  First of all, the angle of the door in this depiction,

17   V5-02, is different from the angle of the door in the

18   Exhibit 184 we looked at yesterday.  Is that correct?

19   A.  That's correct.

20   Q.  Okay.  Now, whatever the angle of the door is, in this

21   picture it -- obviously if you follow it with the yardstick to

22   the top, one can see where it would be.  If it was angled

23   towards the separation between the two lines, it would have a

24   different projection.

25         But my question is:  Would you agree that the

 1   trajectory as you showed with the yardstick on my right side

 2   could not, if one was to continue to extend the yardstick,

 3   could not cross wherever that line was?

 4              MR. LOEBS:  Objection, vague.

 5              THE COURT:  Overruled.

 6   A.  I'm not really sure what you're saying.  I think you're

 7   saying the door, you're asking me if the door -- the door had

 8   to be clear of the trajectory.  And I agree with that.

 9   Q.  Right.  And "clear of the trajectory" means not only clear

10   in the area of the door, but it has to be clear in the

11   extension of the door, correct?  Because if you're going to hit

12   the spot where you have the person sitting, and there's no

13   bullet defects in the door, then it would have to be clear of

14   the extension of the door?

15   A.  Well, I really don't understand what you're asking me about

16   the extension of the door.  The door cannot be in the way of

17   the bullet trajectory at the time of the shooting.

18   Q.  Right.  Which would mean that if one was to draw a line

19   between the muzzle of the gun of the shooter and the entry

20   point on the right side, that line could not cross the extended

21   line of the door.  Is that correct?

22   A.  I don't think I agree with you, from my understanding.  But

23   I've said the door cannot be in the way.  I don't know....

24   Q.  Okay.  Now, I want to show you what you've depicted as U-5.

25   First of all, in looking at this, Mr. Jason, and showing the

Jason – Cross

1   entry point that you just showed on my body, do you believe

2   this yellow dot accurately reflects the entry point on -- of

3   the wound on Mr. Boyd?

4   A.  Generally, yes, it does.

5   Q.  Well, when you say "generally," would you agree it's too

6   low?

7   A.  No.

8   Q.  And do you think the second yellow dot accurately reflects

9   an entry point of an inch or two above the kneecap?

10  A.  I think it accurately reflects the general location of the

11  entry in the decedent's left thigh.

12  Q.  Okay.  Now, the trajectory, wherever that point is, would

13  be as you showed on my body with the yardstick on my right

14  side.  Correct?

15  A.  Yes.

16  Q.  So if you went up to this model and took that yardstick and

17  did the same trajectory on his right side, if that yardstick

18  went into the door, the trajectory would not work; isn't that

19  true?

20          MR. LOEBS:  Objection, vague; incomplete hypothetical.

21          THE COURT:  I'll overrule.  I think that's

22  understandable.

23  A.  If the trajectory -- well, as looking at this picture the

24  way it is now, someone standing where the photographer is, from

25  the point of view of the photographer, could shoot somebody

Jason – Cross

1    without any conflict with the door.

2    Q.  But you also have to account for the trajectory across the

3    body, correct?

4    A.  Yes.

5    Q.  Okay.  So if you went up to this model the same way that

6    you went up to me and put a yardstick out his right side

7    showing the trajectory of the bullet within the body, that

8    yardstick could not hit the door in order for the trajectory to

9    work, correct?

10   A.  Yes.  Yes, generally, yes.

11   Q.  Wouldn't you agree, Mr. Jason, that this person's body is

12   not turned enough in order for the yardstick, if it was

13   attached to the right side, not to hit that door?

14   A.  Well, first of all, this isn't a picture of the actual

15   event.  This is just an example of an experiment where someone

16   sat in a car and showing the right side and showing the inner

17   part and the top part of the left thigh; so it's exposed to a

18   shooter while the door is open and someone's seated there.

19   That's really the point of this.  This isn't an exact replica

20   of the event.

21   Q.  Exact replica aside, would you agree the trajectories could

22   not work as the person in this picture is positioned?

23   A.  No, I don't agree.

24   Q.  You think the way this person is positioned in this

25   picture, if you took a yardstick and extended it out his right

Jason - Cross

1    side, how you did with me before the jury, that yardstick would

2    not hit the door?

3    A.   That's correct.

4    Q.   And you think it would end up on the left side of the

5    person as pictured here and not in the middle of their back?

6    A.   Yes, I positioned that person there.

7    Q.   Let me ask you a few more questions about this, and I'll

8    move on.

9            If one was to see the trajectory of the leg shot in

10   this picture, one was -- assuming you had the marking in the

11   right place, one would conclude, in general, linearly, the

12   entrance wound to the area of the exit and then where it hit

13   the left hand?

14           MR. LOEBS:  Your Honor, object to Mr. Galipo's use of

15   the yardstick pointing up, which is not part of his question,

16   and it gives a false impression as to the question he's asking

17   the witness.

18           THE COURT:  Independent of wherever the yardstick was

19   held.

20           MR. GALIPO:  Right.  I'm not trying to -- however, it

21   would, if you want to put it down, that's fine.  I'm only going

22   with the angle of the picture.  However --

23           MR. LOEBS:  Your Honor, object to Mr. Galipo's

24   representation.

25           THE COURT:  I think you might have to ask him, when

Jason – Cross

1   you're checking the dots, so to speak, is that the correct

2   angle.

3   BY MR. GALIPO:

4   Q.  When you're connecting the dots, is that the correct angle

5   with the leg shot?

6   A.  It's generally the -- it's generally correct to the wound

7   path, yes.

8   Q.  So if one was to extend out from the point of entry that

9   you have wherever that line goes, then you would have the

10  extended trajectory of that shot, correct?

11          MR. LOEBS:  Same objection as to Mr. Galipo's use of

12  the ruler again pointing up as opposed to the direction the

13  witness has indicated.

14          THE COURT:  I'll sustain.  Because you're suggestion

15  is that that is the angle, and I don't think the witness has

16  acknowledged that the angle you used was the correct one that

17  crosses the door.

18  Q.  Would you agree, whatever the extension of that line would

19  be, would be the trajectory as it approached the leg?

20  A.  Well, the extension of the wound path as indicated in that

21  picture would come essentially straight at me.  Is that what

22  you're asking?  It wouldn't hit the door.

23  Q.  It would come straight at you?

24  A.  Yes, essentially straight.

25  Q.  Which my next point is, and if you extended out the

Jason – Cross

1  trajectory from the right side, it would go to a different

2  place, correct?

3  A.  No, it would also go to me.

4  Q.  So you think if one was to take a yardstick and extend out

5  the right side, as you did in the example with me, that would

6  go to you, where you are on the witness stand?

7  A.  Yes.  That's how I designed this.  That's how I set this

8  up, to illustrate this, that the right side is exposed to a

9  shooter, and the left leg is exposed to a shooter.  And those

10  are general.  That's not the same person.  That's a similar

11  person.  I think it's fairly accurate.  I think it's

12  substantially similar to what could have happened there.

13  Q.  Okay.  With reference to the first shot, how high are you

14  assuming the muzzle was?

15  A.  Relative to the street, 57 inches, or --

16         MR. LOEBS:  Object to the question as asking for an

17  assumption as opposed to Mr. Jason's findings.  And it's

18  argumentative.

19         THE COURT:  I'm not sure if I heard exactly -- just a

20  second.

21         MR. GALIPO:  I can reask the question.

22         THE COURT:  It was how high is he assuming the muzzle

23  was?

24         MR. GALIPO:  Correct.

25         THE COURT:  All right.  Are you objecting he didn't

1  make an assumption at all?

2          MR. LOEBS:  That he made a finding.

3          THE COURT:  Well, I'll overrule.  The witness is

4  capable of saying he didn't make any assumption if he did not.

5          THE WITNESS:  I measured Officer Paine's shooting

6  height.  And I determined that to be 51 inches from the ground.

7  If he's on the sidewalk, that's 6 inches higher than the

8  surface of the street.  So 57 inches above the surface of the

9  street.

10 BY MR. GALIPO:

11 Q.  Okay.  You measured Officer Paine to be five foot 11 and

12 three-quarters.  Is that correct?

13 A.  Yes.

14 Q.  And you in fact made four measurements.  At an erect

15 position, you measured 65 inches.  Is that correct?

16 A.  You're talking about muzzle height?

17 Q.  From the muzzle height, you measured 65 inches?

18 A.  Let me look at my notes on that and I'll tell you.

19 Q.  I have a copy of your handwritten, if that will help.

20 A.  Okay.  Thank you.

21 Q.  You're welcome.  Showing you a copy of your notes, can you

22 tell me what your measurement was -- first of all, does that

23 confirm that your measurement of Officer Paine was 5-11 3/4?

24 A.  Yes, it does.

25 Q.  And the measurement in the erect position, the height of

Jason – Cross

1   the muzzle of the gun, what was your measurement?

2   A.  In the erect position, 65 inches.

3   Q.  And if you added 6 to that, obviously it would be at 71

4   inches, correct?

5   A.  Yes.

6   Q.  Which is one inch less than 6 feet?

7   A.  Correct.

8   Q.  And you would agree that it's your opinion that it would be

9   highly unlikely that the muzzle of the gun could have been that

10  high to get these trajectories with Mr. Boyd in a seated

11  position?

12  A.  It's –– yes.  The evidence, physical evidence is consistent

13  with a lower shooting height.

14  Q.  And the physical evidence is not consistent with a shooting

15  height of that approximation, would you agree?

16  A.  Of 71 inches?

17  Q.  Correct.

18  A.  Yes.  I think it's more consistent with a lower height,

19  lower elevation.

20  Q.  And when you say it's not consistent, that's given ––

21  assuming Mr. Boyd's in a sitting position and the trajectories?

22         MR. LOEBS:  Objection, misstates his testimony.  He

23  didn't say not consistent.

24         THE COURT:  I will overrule.  It's in the form of a

25  question.

1    A.   Could you restate that, please?

2    Q.   Sure.  When you say that –– strike that.

3         It is your testimony, is it not, that a shooting

4    height of 71 inches is not consistent with the physical

5    evidence of the trajectories with Mr. Boyd in a seated

6    position?

7    A.   I think the lower height is more consistent.

8    Q.   Did you do any angle calculations at the higher height?

9    A.   I didn't do them at every height.  I did them at 51 inches

10   relative to the sidewalk and found that that was consistent

11   with the wound paths.

12   Q.   What's your second measurement that you have, erect, 65

13   inches?  What's your next one?

14   A.   I have erect, 65 inches.  Combat distance, 58 inches.

15   Q.   Okay.  So a combat stance of 58 inches, again you'd have to

16   add 6 inches to that, correct?

17   A.   Yes.

18   Q.   What's your next measurement?

19   A.   55 –– I call it relaxed.

20   Q.   Okay.  And then the 51 inches was the lowest measurement?

21   A.   Yes.

22   Q.   And what did that measurement represent?

23   A.   Crouched with relaxed position.

24   Q.   Okay.  And the angle degrees that you calculated for us

25   last Thursday were with the lowest measurement, correct?

1    A.   The angles.

2    Q.   The trajectories that you calculated for us on Thursday,

3    you used the 51-inch height?

4    A.   I used the 51 inches for my calculations, yes.

5    Q.   Now, is it your testimony that you think that was the

6    height of the muzzle of the gun at the time of the first shot?

7    A.   It's consistent -- the evidence is consistent with that,

8    yes.

9    Q.   And is it your opinion that the height of the gun rose

10   after the first shot?

11   A.   That the muzzle of the gun rose slightly, yes.

12   Q.   What was your opinion that the height of the gun was at the

13   second shot?

14        MR. LOEBS:   Objection as to vague as to whether we're

15   talking about height on the pavement or the sidewalk.

16   Q.   From the ground?

17   A.   We're talking about the muzzle height?

18   Q.   Correct.

19   A.   Slightly higher.

20   Q.   How much?

21   A.   Less than a half inch.

22   Q.   And is it your opinion that the gun rose again on the third

23   shot?

24   A.   Yes.

25   Q.   And how much did it rise at that time?

Jason - Cross

```
1   A.   Less than a half inch, maybe less than a quarter inch.

2   Q.   Do you know if this weapon was in double action or single

3   action mode?

4   A.   It was in -- after the first shot it was certainly in

5   single action mode.

6   Q.   Right.  And some of the pressure would be released after

7   the first shot, correct?

8   A.   Some of the pressure?

9   Q.   Well, you would expect less of a -- I don't know what the

10  proper term is -- less of a kickback, if you will, after the

11  first shot when you're continuing to fire the weapon?

12  A.   No, no, no.  That has no relation.  Whether you fire a gun

13  single action or double action has no relation to the recoil.

14  There's no relation.

15  Q.   Okay.  What's your understanding as to how many hands

16  Officer Paine had on the weapon at the time he shot?

17  A.   There's no physical evidence to provide that information.

18  Q.   Well, when you were talking to him about how he holds his

19  gun and he was showing you, did he show you whether he had it

20  in one hand or two?

21  A.   He demonstrated two hands.

22  Q.   Okay.  Now, the two points that we saw on U-5, the distance

23  between the entry wound on the leg and the entry wound on the

24  right abdomen, you would agree that that would be more than a

25  foot apart?
```

Jason - Cross

```
1    A.   The entry wound on the leg and the entry wound on the

2    abdomen.   In what dimension are we talking, vertical distance

3    or horizontal distance?

4    Q.   Horizontal.

5    A.   I don't think it's more than a foot, necessarily.

6    Q.   What would be your estimate?

7    A.   It depends how the body's rotated.   If you rotate it

8    enough, sufficiently, as I'm indicating, just using my body, at

9    some point you could get the entry wound on the torso almost

10   maybe directly above in the vertical axis, above the thigh

11   entry.   So there'd be very little horizontal distance.   And

12   then just the vertical distance -- it's hard to say.

13   Q.   How about with respect to the photo we just looked at at

14   U-5.   In that position, what would be your estimate on the

15   horizontal?

16   A.   I'm not sure.   10 inches?   In the picture the way I had it,

17   without any movement associated with the body, it could be a

18   foot.

19   Q.   So if -- and is it your testimony that the first shot was

20   to the leg?

21   A.   The physical evidence is consistent with that.

22   Q.   Is the physical evidence also consistent with the first

23   shot being to the abdomen?

24   A.   If the first shot was to the abdomen, then the hand would

25   then have to move lower -- or then -- no, the hand could have
```

1    been where it was.  It's possible that the first shot was to

2    the abdomen.

3    Q.  Okay.  If the first shot was to the leg, which is your

4    opinion?

5    A.  Yes.

6    Q.  Then you have the second shot being to the abdomen?

7    A.  Yes.

8    Q.  And then the third shot being out the windshield?

9    A.  Yes.

10   Q.  So the shooter would have to be moving from right to left

11   in between the first shot and the second shot in that analysis,

12   and I mean the muzzle of the gun would be going from the right

13   where you have the leg shot somewhat to the left to get the

14   abdomen shot; is that correct?

15        MR. LOEBS:  Your Honor, objection to Mr. Galipo

16   demonstrating with his hand while the witness is not watching

17   and mistakenly imparting the question to the jury.

18        THE COURT:  I wasn't watching either.

19        MR. GALIPO:  I'll reask the question?

20        THE COURT:  Okay.

21   Q.  Mr. Jason?

22   A.  Yes.

23   Q.  The muzzle of the gun to go from right to left to some

24   degree, if the first shot was to the leg in the scenario you

25   have in U-5 and the second shot was to the abdomen, would you

1  agree?

2  A.  Well, it depends, once again on the low rotation of the

3  body, how they align.  But there could be some movement of the

4  muzzle or not.  Excuse me, we're talking about left to right.

5  Very little.  There'd have to be some rotation up and down.

6  Q.  Then if the third shot was to the windshield, the gun would

7  have to rotate back to the right, correct?

8  A.  Back to the right?  No, it could just climb, just higher.

9  Q.  You looked at photographs of the shot to the windshield,

10  correct?

11  A.  Yes.  Well, that -- in U-5, I believe that's the exhibit

12  you were showing, I believe you can see the shot.

13          MR. GALIPO:  Your Honor, my next in order is?  Is it

14  190 --

15          DEPUTY CLERK:  Four.

16          THE COURT:  Three.  Because we've never used 193.  It

17  just sat there.  We started to use it twice.  And we haven't

18  used it yet.  First it was going to be (a), (b), then it was

19  going to be whatever.

20          MR. LOEBS:  I think these are also marked elsewhere in

21  the defendants' submission.

22          THE COURT:  Do you want to check that?

23          MR. LOEBS:  It's on the back of the exhibit as with

24  the other ones, just need to flip it over.  I think.

25          THE COURT:  You believe that it is on the back of this

1    exhibit?

2              MR. LOEBS:  I believe so.  I didn't check.

3              THE COURT:  Can we check it and see.

4              MR. GALIPO:  There's nothing on the back.

5              MR. LOEBS:  It is part of our pretrial submissions.

6              THE COURT:  If it isn't on the back of his copy, then

7    we don't know.  If he knew quickly, that would be fine.

8    Otherwise, 193 is what?

9              MR. GALIPO:  It's a photograph of the bullet strike to

10   the windshield.

11             (Plaintiffs' Exhibit 193 marked for identification)

12   BY MR. GALIPO:

13   Q.  Can you take a look at that, please, Mr. Jason?

14   A.  Yes, there are two photos here.

15   Q.  And do both photos show the bullet strike to the windshield

16   that you believe was caused by the third shot?

17   A.  Yes, they do.

18   Q.  Is the bullet strike to the windshield also consistent,

19   Mr. Jason, with a shot coming from the rear of the vehicle

20   through one of the windows and out the windshield?

21   A.  It's possible, yes.

22   Q.  And does that photograph accurately show the -- at least

23   from that position, the area of the windshield that was hit by

24   the bullet?

25             MR. LOEBS:  Objection, lack of foundation.  For this

```
1    witness.  But we have no objections to these documents coming

2    in through other witnesses based on prior stipulation.

3              MR. GALIPO:  That's fine.  I'll move to admit this

4    document, your Honor.

5              THE COURT:  I don't know whether it's in already or

6    not.

7              MR. GALIPO:  It's not.

8              THE COURT:  Is there an objection or not to the photo?

9              MR. LOEBS:  No objection to the photograph.  But as to

10   this witness laying the foundation for the photograph.

11             THE COURT:  But you don't object to it being admitted?

12             MR. LOEBS:  Correct, pursuant to previous stipulation.

13             THE COURT:  I'll admit 193, to the extent that the

14   question asked the witness what in fact was at the scene,

15   unless the witness has drawn a conclusion from the evidence

16   that that was a bullet hole that he saw in the car.

17             (Plaintiffs' Exhibit 193 received in evidence)

18             MR. GALIPO:  Thank you.  May I publish this for the

19   jury quickly?

20             THE COURT:  So I'll sustain the objection to the

21   question.  But the exhibit you can walk in front of the jury.

22             (Mr. Galipo showing photographs)

23   BY MR. GALIPO:

24   Q.  Now, your opinion is that the trajectory of the first shot

25   was between 5 and 10 degrees downward, or the shot to the leg?
```

Jason - Cross

1   A.  Yes.

2   Q.  And then your opinion is the trajectory of the shot to the

3   abdomen was 10 to 15 degrees downward?

4   A.  Yes.

5          MR. LOEBS:  Objection, vague.

6          THE COURT:  Overruled.

7   Q.  What's your opinion as to the trajectory of the third shot

8   through the windshield?

9   A.  Very low angle of depression.  Maybe one or two degrees.

10  Q.  So it's your opinion that the trajectory of the first shot

11  and the angle of the gun at time of discharge was between 5 and

12  10 degrees downward; and the second shot was 10 to 15 degrees

13  downward; and then the third shot was 1 to 2 degrees downward.

14  Is that your testimony?

15  A.  Something like that, yes.

16  Q.  And all these shots you believe happened within a second.

17  Is that your testimony or not?

18  A.  I don't think I've testified to the timing.  Are you giving

19  me an assumption?

20  Q.  No, I'll withdraw that last question.

21          Now, in terms of the timing, would you agree, assuming

22  Officer Paine fired three shots, you don't know if the first

23  shot hit Mr. Boyd or not?

24  A.  The evidence is consistent with the first shot hitting him

25  in the leg; second in the abdomen; and the third going through

Jason - Cross

1    the windshield.

2    Q.  Mr. Jason, it's also possible that the first shot didn't

3    hit him; isn't that true?

4    A.  It's possible.

5    Q.  And in terms of the order of the shots, possibly it could

6    have happened in any order; isn't that true?

7    A.  Excuse me, I'm trying to think this out.

8    Q.  All right.  I got that impression.

9    A.  Yes, yes.  My answer is yes.

10   Q.  Okay.  Let's go on to a few questions about the blood

11   spatter.  As of the time of your first deposition on May 8th,

12   2007, the only place that you observed what you believed to be

13   high velocity blood spatter related to this case was on the

14   bolt cover; is that correct?

15   A.  At that time, yes.

16   Q.  And as of the time -- and that was after you wrote your

17   report in this case, at the time of your deposition, correct?

18   A.  Yes.

19   Q.  And as of the second volume of your deposition on May 22nd,

20   2007, the only place that you noticed what you believed to be

21   high velocity blood spatter again was on the bolt cover; is

22   that correct?

23   A.  At that time, yes.

24   Q.  And I asked you about that in your deposition, where in the

25   car you believed there is high velocity blood spatter, correct?

1    A.   I don't remember specifically.  But at that time that was

2    the area that I knew about that had high velocity blood

3    spatter.

4              MR. GALIPO:  I'd like to mark, your Honor, 194 as the

5    next in order, please.  And this does have a defense exhibit

6    number on the back.  I'm happy to use it.  It came in my

7    original book, and I was unsure, but --

8              THE COURT:  What's the number?

9              MR. GALIPO:  The number on the back is E6-54.

10             THE COURT:  E6?

11             MR. GALIPO:  54.

12             THE COURT:  There's no E6.

13             MR. GALIPO:  I'm sorry, B6-54.

14             THE COURT:  There's no B6 that's in.  There are a lot

15   of photographs that were identified as part of a series from

16   Mr. Jason.

17             MR. GALIPO:  I can mark it anew, whatever the Court

18   would like.

19             THE COURT:  We don't have it at the moment as a

20   defense exhibit in, so you may as well.

21             MR. LOEBS:  For our purposes, being able to find it

22   and know what he's talking about, your Honor.

23             THE COURT:  Well, is it the same as your 54, B6?

24             MR. LOEBS:  Premarked in that way, I believe it is.

25   It's just easier for me to see what he's talking about.

Jason - Cross

1          THE COURT:  Would you show it to counsel?

2          MR. GALIPO:  I already did.

3          THE COURT:  Is it B6?

4          MR. LOEBS:  B6-54, yes.

5          THE COURT:  Why don't we use it out of that series.

6          MR. GALIPO:  That's fine.

7          THE COURT:  These are all like B6 and a dash and then

8    54.  Or V5, dash, 02.  It's instead of using six B's or six

9    V's.

10          MR. GALIPO:  That's fine, your Honor.

11   BY MR. GALIPO:

12   Q.  Mr. Jason, do you have that exhibit in front of you?

13   A.  Yes, I have B, as in boy, 6-54.

14   Q.  What does that exhibit show?

15   A.  This is a picture that I took of the -- of what's been

16   referred to as the bloody napkin.

17   Q.  And on that picture you see some areas that you believed to

18   be at least medium velocity blood spatter, correct?

19          MR. LOEBS:  Objection, misstates the witness's

20   testimony; argumentative.

21          THE COURT:  It was in the form of a question.

22   Overruled.

23   A.  There could be.

24   Q.  And that's because you see some small specks of blood in

25   that picture, correct?

Jason - Cross

1   A.   Yes.

2   Q.   And you can visually see that on that picture without a

3   magnifying glass; is that true?

4   A.   Some of them, yes.

5               MR. GALIPO:  I move to admit this exhibit, your Honor.

6               THE COURT:  Is there any objection to B6-54?

7               MR. LOEBS:  No.

8               THE COURT:  That exhibit is admitted.

9               (Defendants' Exhibit B6-54 received in evidence)

10              MR. GALIPO:  May I quickly publish it to the jury,

11  your Honor.

12              THE COURT:  Yes, you may.

13              (Photograph published to the jury)

14  BY MR. GALIPO:

15  Q.   You don't associate, do you, the medium -- strike that.

16              You don't associate the marks on this bloody napkin

17  that are consistent with medium velocity blood spatter with the

18  shooting by Officer Paine, do you?

19              MR. LOEBS:  Objection, your Honor, misstates his

20  testimony; didn't say consistent, he said possibly; it's

21  argumentative.

22              THE COURT:  Well, it assumes -- the question itself

23  assumes consistency.  I'll sustain.

24  Q.   Are these small spots of blood on this exhibit, B6-54, in

25  your opinion, at least consistent with medium velocity blood

Jason – Cross

1   spatter?

2   A.   They could be, yes.  Yes, they are.

3   Q.   Okay.  Now, do you, in your analysis of this case,

4   associate the small marks of blood on the napkin that you

5   believe are at least consistent with medium velocity blood

6   spatter with the shooting of officer -- shooting by Officer

7   Paine of Mr. Boyd?  Do you think they happened at that time?

8   A.   I'd have to say that all the blood on the napkin I don't

9   think is associated with the shooting incident.  There may be

10  some areas on that napkin that were exposed to blood that was

11  projected or transferred during the shooting event.  But not

12  all of it.

13  Q.   Did you measure those small specks of blood on the napkin?

14  A.   I believe I did.

15  Q.   Are they less than 1 millimeter?

16  A.   Let me look at my notes on that.

17          MR. LOEBS:  Is it okay if I get Mr. Jason some water?

18          THE WITNESS:  I've got some.

19          THE COURT:  He's got some there.

20  A.   I've got the notes.  No, I have no measurements noted.

21  Q.   Would you agree that high velocity blood spatter is

22  normally associated with 1 millimeter markings or less -- the

23  size, 1 millimeter or less?

24  A.   That is -- blood deposits of sub-1 millimeter, and others,

25  are generally associated with a high-energy type projection of

Jason – Cross

1   blood, which is consistent with a gunshot wound.

2   Q.  And in looking at the last exhibit, which I'll let you look

3   at again, B6-54, can you tell by looking at it whether those

4   specks of blood, the smallest ones, are more or less than

5   1 millimeter?

6   A.  It's hard to tell on a material like this because it's so

7   absorbent and the blood migrates out from the point of contact,

8   so the original size and the size we are looking at may be

9   different.

10  Q.  Would you agree that high velocity blood spatter normally

11  has a mist-like appearance?

12  A.  There can be misted blood from a gunshot wound, yes.

13  Q.  Do you see anything that looks like a mist-like appearance

14  on the bolt cover in this case?

15  A.  The bolt cover?

16  Q.  I'm switching to the bolt cover.

17  A.  Oh, I'm sorry.  The bolt cover.  What's your question?  I'm

18  sorry.

19  Q.  Did you see anything in this case that looks like a

20  mist-like appearance of very small particles of blood on the

21  bolt cover?

22  A.  Yes.

23  Q.  Can you see that in the photograph we looked at yesterday

24  with the naked eye?

25  A.  No.

Jason - Cross

1   Q.  Isn't it true that normally, if one was looking at a

2   pattern of high velocity blood spatter, they could see it with

3   the naked eye?

4        MR. LOEBS:  Objection.  Calls for speculation; lack of

5   foundation.

6        THE COURT:  I'll overrule.

7   A.  Depending on the substrate, the material that it's on,

8   sometimes on dark clothing you can't see blood, but if it's on

9   a contrasting surface, you can generally see that, yes.

10  Q.  But in this case you could not see it with the naked eye,

11  correct?

12       MR. LOEBS:  Objection, misstates his testimony.

13       THE COURT:  Overruled.  That's in the form of the

14  question.

15  A.  You can see it on the bolt cover.

16  Q.  Yesterday, did you tell us that you could not see high

17  velocity blood spatter on the -- at least on the photograph

18  that we looked at on the bolt cover?

19  A.  On that printout of the photograph, yes.

20       MR. GALIPO:  Next in order would be -- this has a,

21  again, number on the back.  I'm happy to use that.

22       THE COURT:  What number do you have?

23       MR. GALIPO:  B6-279.

24  Q.  Is that an item you looked at in this case?  What is that?

25  A.  That is a left leg prosthesis.

Jason - Cross

```
 1   Q.  And does it have what happens to be a bullet defect in part
 2   of it?
 3   A.  Yes.
 4   Q.  And what part appears to have a bullet defect?
 5   A.  The upper area above the knee or the knee joint, in a white
 6   neoprene type garment -- I'm not sure what it's called.
 7   Q.  Is it your understanding that bullet defect was caused by
 8   the lower bullet wound to the leg?
 9   A.  Yes.
10   Q.  When I say "lower," you understand I'm speaking
11   anatomically?
12   A.  Yes.
13   Q.  You did rely on the measurements in Dr. Smith's medical
14   report, correct?
15   A.  I did, yes.
16   Q.  And showing you Page 1 of the report, for reference, does
17   Dr. Smith do a measurement of the -- from the sole of the foot
18   to that entrance point in terms of inches?
19   A.  Yes, I see that.
20   Q.  And what is the measurement?
21   A.  It's 27.75 inches.
22   Q.  27.75.  You measured the rocker panel to be 18 inches off
23   the floor, correct?
24   A.  It was 18 or 19.
25   Q.  I'm not talking about Dr. Smith's measurement of 19.  I'm
```

Jason – Cross

1   talking about your measurement.

2   A.  I measured the outer edge of it, but it is the lower edge,

3   as 18, yes.

4   Q.  And this bolt cover sits on the floorboard, correct?

5   A.  Yes.

6   Q.  And it's your testimony that you believe the left hand of

7   Mr. Boyd was within a couple of inches of that bolt cover,

8   correct?

9   A.  Yes.

10  Q.  But not touching it most likely, correct?

11  A.  Some portion of his hand could be touching it.

12  Q.  Well, that would put his hand only about 20 or 21 inches

13  off the ground, correct?

14  A.  The height to the -- what I measured as the bottom of the

15  rocker panel, that's not the level of the surface of the

16  carpeted area.

17  Q.  Let's assume --

18  A.  That's higher.

19  Q.  Let's assume that surface is 19 inches, not 18.

20  A.  I think it's higher than that.

21  Q.  So it's your testimony that you believe it's -- from the

22  ground to the floorboard is more than 19 inches?

23  A.  Well, the floorboard -- we're talking about floorboard or

24  rocker panel, there's a difference.  The rocker panel is a

25  little bit lower than the actual floor, maybe half an inch.

1    Q.  I understand about a half an inch, but haven't you been

2    using 19 inches in your calculations, and then you estimated

3    that the wound was about 4 inches up, so 19 plus 4 was 23

4    inches?  Weren't you using those types of calculations?

5    A.  Yes, I was.

6    Q.  So you would have the hand, if those calculations are

7    correct, about 21 inches off the floor, correct?

8              Taking the 19 inches for the floorboard and you have

9    the hand approximately 2 inches above the bolt cover, which is

10   on the floorboard?

11             MR. LOEBS:  Objection.  Misstates the testimony;

12   argumentative; and it's compound.

13             THE COURT:  Well, if you say and you have -- if you're

14   saying the witness has said that?

15             MR. GALIPO:  Yes.

16             THE COURT:  I'll sustain as to the form of that.

17             MR. GALIPO:  Sure.

18   BY MR. GALIPO:

19   Q.  Assuming that the floorboard is 19 inches off the ground

20   and his hand is a couple of inches above the bolt cover which

21   is on the floorboard, wouldn't that put his hand about 21 or 22

22   inches off the ground?

23   A.  Something like that.

24   Q.  And the distance from the sole of the foot to the defect in

25   the prosthetic is 27.75 inches?

Jason − Cross

1          MR. LOEBS:  Objection, vague as to the nature of the

2    measurement.

3          THE COURT:  I will overrule.  The witness can explain

4    if he needs to.

5    A.  If he was standing erect, not seated.  But that dimension

6    is with the leg erect, not bent at the knee.

7          MR. GALIPO:  The next two exhibits, your Honor, also

8    have numbers on the back that I'm happy to use.

9          THE COURT:  Is it part of the same series of

10   photographs apparently taken by this witness.

11         MR. GALIPO:  These are --

12         MR. LOEBS:  No.

13         MR. GALIPO:  Part of another set.

14         THE COURT:  Okay.  What's the letter?

15         MR. GALIPO:  W-14 and W-15.  I don't know if we have

16   these.  I don't believe so.

17         THE COURT:  Just single W, right?

18         MR. GALIPO:  Yes.

19         THE COURT:  We have Ws in, but I don't think that one.

20   We stopped with 13.

21         DEPUTY CLERK:  Yes, they're in.

22         THE COURT:  Miss Lucero shows 14 and 15 in.  We both

23   show September 11 with Dr. Smith as the witness, but I showed

24   18, 46, 54, 57, 21 to 23, 7 to 13, 43, 33.

25         MR. GALIPO:  Your Honor, if I could show him these if

1    they're not in --

2              THE COURT:  Miss Lucero thinks they are.  But this is

3    out of the Ws?

4              MR. GALIPO:  Yes.

5              THE COURT:  Just in case, we'll say 14 and 15.  Is

6    there any objection to them?

7    BY MR. GALIPO:

8    Q.  Mr. Jason, looking at Exhibits W-14 and W-15 --

9              THE COURT:  Is there any objection to those being

10   admitted, if they weren't already?

11             MR. LOEBS:  No, your Honor, pursuant to our prior

12   stipulation related to these being photographs taken by

13   Dr. Smith.

14             THE COURT:  So they'll be in one way or the other.

15   Okay.

16             (Defendants' Exhibits W-14 and W-15 received in

17   evidence)

18   BY MR. GALIPO:

19   Q.  What are those, Mr. Jason?

20   A.  These are pictures that I did not take of a garment that's

21   associated with the prosthesis.  I think it's called a stump

22   sock, but I'm not really sure.

23   Q.  And it has what appears to be blood on it, correct?

24   A.  Yes.

25   Q.  All -- it also has what appears to be at least one or more

Jason - Cross

1   bullet defects in it, correct?

2   A.  Yes.

3   Q.  Now, you at some point in your analysis of this case looked

4   at the projectile that you understood to be taken from the left

5   hand, correct?

6   A.  Yes, I did.

7   Q.  And you noted white fibers on it, visually, when you looked

8   at it?

9   A.  I did.

10  Q.  And do you know what those -- strike that.

11          And your impression was that those white fibers may be

12  consistent potentially with this white stump sock that you're

13  referring to?

14  A.  Yes.

15  Q.  Do you know if any testing ever confirmed that or not?

16  A.  I know that that is not the case.

17  Q.  Okay.  And you understood that Mr. Boyd was wearing a

18  do-rag at some point when he was in the car, correct?

19  A.  I did not know that.

20  Q.  Do you recall us at the time of your deposition discussing

21  that he had a white do-rag on?

22          MR. LOEBS:  Object to the question in terms of

23  Mr. Galipo testifying to the facts of the case.

24          THE COURT:  Sustain as to the form.

25  Q.  Were you ever told in this case at any time in the

Jason - Cross

1    two-and-a-half years you've been working on it --

2            MR. LOEBS:  Object to the form of the question as to

3    what he was told this is related to the facts of the case.

4    It's not a proper hypothetical.

5            THE COURT:  Sustained.

6    Q.  Do you have any information --

7            MR. LOEBS:  Your Honor, same objection.

8            MR. GALIPO:  Your Honor?

9            THE COURT:  Overruled.

10   Q.  Do you have any information as to whether or not Mr. Boyd

11   was wearing a white do-rag when he was in the SUV?

12           MR. LOEBS:  Objection, vague as to time.

13           THE COURT:  Overruled.

14   A.  I believe you asked me that question during the deposition.

15   Q.  Okay.  And did you have any information as to what color it

16   was?

17   A.  No.

18   Q.  Have you ever examined or seen this white do-rag?

19   A.  I have never examined the -- a do-rag.

20   Q.  Would you agree that in terms of analyzing the potential

21   graze wound to the head, you did not have as part of your

22   analysis the potential head covering he was wearing?

23   A.  If there was a head covering, I'm not aware of it; and I

24   did not examine any head covering.

25   Q.  Where was -- strike that.

Jason - Cross

1          When did you examine the bullet and see these white

2    fibers on it?  When was that?

3    A.  I examined the evidence on the 2nd of November, 2006.

4    Q.  And you referred --

5    A.  Excuse me, sir.

6    Q.  I'm sorry, go ahead.

7    A.  On the 1st of November, I examined -- the 1st of November

8    and 2nd of November of 2006.

9    Q.  And you referred in one of your answers to Mr. Loebs'

10   questions, I think there was part of it, and if Faye Springer

11   did a fiber analysis that showed that there were fibers

12   consistent or indistinguishable from the jeans and from the

13   boxer shorts, would that further confirm your opinion that the

14   shot through the leg went into the hand.  Do you remember that

15   question?

16   A.  By Mr. Loebs?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Okay.  Did you have an understanding as to when Faye

20   Springer did this analysis, before or after you observed these

21   white fibers on the projectile in November of 2006?

22   A.  I believe it was after that.

23   Q.  The shot at Scott Street, was your original opinion that

24   the angle of that bullet was 20 degrees upward, approximately?

25   A.  That was my original estimation.

Jason - Cross

1    Q.  What's your opinion on that now?

2    A.  It's more likely a higher elevation than that.

3    Q.  The shot at Broderick, were you provided with any bullet

4    evidence or casing evidence to try to establish that that shot

5    took place based on physical evidence?

6    A.  Well, I'm -- could you ask that again, please.

7    Q.  Sure.  Were you ever provided with any bullet evidence that

8    you understood related to a shot on Broderick?

9    A.  Yes.

10   Q.  You were?  And I'm not talking about Scott Street now, I'm

11   talking about Broderick.

12   A.  Oh, I'm sorry.  Let me get my streets right.  Broderick.

13   You mean --

14   Q.  Would it refresh your recollection to look at your report

15   in that regard?

16   A.  Yes, it would.

17   Q.  Okay.  If you turn to Page 3 of your report under Finding

18   9, if you could take a look at that and see if that refreshes

19   your recollection.

20   A.  Okay.  Yes.

21   Q.  Okay.  Have you had a chance to look at that?

22   A.  Yes.  Oh, you're talking about a shot by the decedent?

23   Q.  Correct.

24   A.  Yes, I'm sorry, I misunderstood.

25   Q.  Okay.  Was there any physical evidence in terms of a

Jason - Cross

1    bullet, a bullet strike, a casing, that you were provided that

2    could help you substantiate that shot?

3              MR. LOEBS:  Objection, vague as to the physical

4    evidence, unless it's limited to just the things Mr. Galipo

5    referred to.

6              THE COURT:  I will overrule.  The witness can explain.

7    A.  The evidence -- there is no physical evidence of the

8    bullet, of a bullet.  The only evidence was the 9 or the police

9    dispatch tape, on which a shot was reported.

10   Q.  Okay.  I'd like to talk to you next about the photographs

11   you took from what you understood to be Mr. Campos's apartment.

12   When approximately did you do that?

13   A.  23 March, 2007.

14   Q.  And you understood Mr. Campos was residing in Unit 618 at

15   the time of this incident?

16   A.  Let me look that up.

17   Q.  I don't know if it helps you looking -- I don't know, it

18   might be too far away.  I'll put up the exhibit.  This is

19   V5-02.  But do you have some notes on that?

20   A.  Yes, I believe it was 618.

21   Q.  Okay.  And you understood -- you took the pictures from the

22   third floor window, correct?

23   A.  Yes.

24   Q.  Why did you take the pictures from the third floor window?

25   A.  Because I was asked to use that window as the subject of

Jason – Cross

1    that photography project.

2            MR. GALIPO:  Your Honor, my next in order?

3            THE COURT:  Is this one that's been marked by anyone

4    else?

5            MR. GALIPO:  No.  But it's a -- two pictures that can

6    be (a) and (b) of the same number.

7            THE COURT:  What about 194; is that where you are,

8    Miss Lucero?

9            DEPUTY CLERK:  Yes.

10           THE COURT:  Thank you.  194(a) and (b).

11           MR. LOEBS:  One of the exhibits is not only marked but

12   has been admitted.  The other one has been premarked.  So I

13   think it's -- if I could have a minute with Mr. Galipo.

14           MR. GALIPO:  I think it's a different view.  If it's

15   duplicative -- I'd rather just keep moving on.

16           MR. LOEBS:  What we're talking about has been admitted

17   as evidence.

18           THE COURT:  If you know what it is, that's fine.  But

19   for the moment -- all right.

20           Miss Bernstein, you have something you think

21   replicates these two?  Could counsel just look at them together

22   and see whether they're the same or you agree they're the same,

23   even if they aren't the same.

24           (Pause in proceedings)

25           MR. GALIPO:  Okay, your Honor, at Mr. Loebs' request,

Jason - Cross

1    we still have 194, and it's just going to have 194 without the

2    (a) and (b).  And the other one is Y5-01.  That he believes is

3    already in -- actually now that I look at it -- no, that's all

4    right.  Y5-01 which he believes is already in evidence.

5            THE COURT:  Okay.  It's one photograph that's new.

6    Under those circumstances, there really isn't any much reason

7    to split it up.  But go ahead now that you've done that.

8            (Plaintiff's Exhibit 194 marked for identification)

9    BY MR. GALIPO:

10   Q.  Looking at 194, Mr. Jason, does that appear to be a picture

11   from the outside of where Unit 618 would be?

12   A.  Yes.

13   Q.  And does that show the third-story window?

14   A.  Yes.

15   Q.  And looking at Y5-01, is that a picture looking out from

16   that third-story window that would encompass part of the area

17   where the, as you understand it, the shooting incident took

18   place?

19   A.  Yes.

20   Q.  I think you previously told us that your opinion in this

21   case is that Officer Paine was in the area of 618 on the ground

22   level when he fired the shots; is that correct?

23   A.  Well, the physical evidence is consistent with the shooting

24   location at that point.

25   Q.  So Mr. Campos's window, if you could tell by looking at the

Jason - Cross

1   photos, would be directly above where Officer Paine was at when

2   he shot?

3   A.  I'm saying it's a consistent shooting location, right below

4   that window.  Consistent with the physical evidence.

5   Q.  Given your taking of the pictures and going up to that

6   apartment on the third floor, do you believe that Mr. Campos

7   would have had a good view?

8   A.  Of what?

9   Q.  Of the incident at the time Mr. Boyd was shot.

10  A.  He could have had a very good -- he had a good view of the

11  street and the SUV.  He could have, yes.

12  Q.  Okay.  Now, and looking at 180(a), which is a blowup of 180

13  which is in evidence, would that be the side of the vehicle,

14  the driver's side that Mr. Campos would have been looking at

15  from his window?

16  A.  Yes.

17  Q.  Now, I want you to assume these facts:

18          Assume that from Mr. Campos's window, Mr. Campos could

19  not see the floorboard area in front of the seat.  I want you

20  to assume that fact to be true.

21  A.  Okay.

22  Q.  Okay.  Does that tell you anything about the positioning of

23  the vehicle relative to Mr. Campos's unit at 618 if Mr. Campos

24  from his third-story window could not see the floorboard area

25  in front of the seat?

```
 1            MR. LOEBS:  Object to the question, lack of

 2    foundation; calling for speculation; incomplete hypothetical.

 3            THE COURT:  Are you saying -- are you asking him to

 4    assume Mr. Campos could or couldn't see the floorboard?

 5            MR. GALIPO:  Correct, your Honor.  And if necessary, I

 6    can cite the trial testimony that I ordered.

 7            THE COURT:  All right.  And it's could or couldn't.

 8            MR. GALIPO:  Could not --

 9            THE COURT:  Okay.

10            MR. GALIPO:  -- see the area of the floorboard or

11    carpeting in front of the driver's seat from his window.

12            THE COURT:  And then what's the question?

13    BY MR. GALIPO:

14    Q.  Assuming that to be true, does that tell you anything about

15    the positioning of the door relative to Unit 618 at the time

16    the shots were fired?

17            MR. LOEBS:  Vague; incomplete hypothetical; calls for

18    speculation; lack of foundation.

19            THE COURT:  Overruled.

20    A.  It's hard to make an assumption.  Is it because he couldn't

21    see -- you're talking about the floorboard of the vehicle in

22    front of the driver's seat, not the other part; is that right?

23    Q.  Anything from the front of the driver's seat forward he

24    could not see, I want you to assume that to be true, from his

25    viewpoint.
```

Jason - Cross

1              MR. LOEBS:  Objection, your Honor, lack of foundation.

2              THE COURT:  I'll overrule.

3    A.   Is this because the decedent was in the way of his vision

4    of the floorboard?  Is that part of the question?

5    Q.   I want you to assume from the time the door, the vehicle

6    stopped and the door opened, up until the time Mr. Boyd fell to

7    the ground, whether Mr. Boyd was in that area or not,

8    Mr. Campos could not see the floorboard area in front of the

9    seat from his viewpoint?

10             MR. LOEBS:  Lack of foundation, calls for speculation.

11             THE COURT:  It may.  Because this isn't a fixed item

12   of some sort.  It's a -- you're asking him to assume a human

13   being's perceptions at a particular point which could vary in

14   any manner.  I'm going to sustain.

15   Q.   Let me ask you this:  Assuming that Mr. Campos at the time

16   the shots were fired could see both of Mr. Boyd's hands.  Do

17   you have that fact in mind?

18   A.   Yes.

19   Q.   Assuming that to be true, do you have an opinion as to

20   whether or not Mr. Boyd's hands could have been in front and

21   under the driver's seat of the vehicle at the time the shots

22   were fired?

23             MR. LOEBS:  Objection, vague and ambiguous as to the

24   use -- and compound as to front and under.

25             THE COURT:  I think it's the same problem.  In other

Jason - Cross

1   words, if you're asking someone to assume that something is

2   blocking someone's vision or something -- or they're standing

3   in a particular place where their vision is blocked, but if you

4   say someone didn't see or could see, I think that's

5   problematic.  There are too many factors that can come into

6   play.  So I would sustain.

7   BY MR. GALIPO:

8   Q.  Based on your viewing the view on the third story in

9   Mr. Campos's unit and looking at the picture that you took of

10  that view, do you have an opinion as to whether or not, if

11  Mr. Campos observed when Mr. Boyd moved to the left the first

12  time, towards the vehicle, he did not -- his hands did not go

13  inside the vehicle at all, do you believe that's something

14  Mr. Campos would have been able to see from his window?

15          MR. LOEBS:  Objection, lack of foundation; calls for

16  speculation.

17          THE COURT:  Sustained as to the form at least.  It's

18  really asking him to comment on the credibility of the witness.

19          MR. GALIPO:  That's fine.

20  Q.  Now, did you also give opinions about the viewpoints of

21  other witnesses?  Did you do an analysis on that in your

22  report?

23  A.  No.

24          MR. LOEBS:  Objection, compound.

25          MR. GALIPO:  Well, I'll withdraw.

Jason - Cross

1   Q.  In your report, one of the three areas that you were asked

2   to be looked into is what various witnesses could see from

3   their point of view.  Correct?

4   A.  I think that's listed in my report, yes.

5   Q.  And that's something you were asked to do in this case,

6   correct?

7   A.  Just for one witness.

8   Q.  Only for one witness?

9   A.  One witness, yes.

10  Q.  Isn't, on Page 3 of your report, your third primary task to

11  determine what would have been observed by witnesses, plural?

12  A.  Yes, that's what it says.

13  Q.  Well -- strike that.

14          Didn't you attempt to determine in your review of this

15  case whether different witnesses would have been able to see

16  Mr. Boyd at the time of the shooting if he was down in the

17  position that you described, showed us in U-5?

18          MR. LOEBS:  Objection, vague as to the term "different

19  witnesses."

20          THE COURT:  Overruled.

21  A.  I did not do that, no.

22  Q.  You don't have any opinions, for example, on whether people

23  looking out their windows from various sides of the street

24  would have been able to see Mr. Boyd if he was in the position

25  that you're showing in U-5?

Jason - Cross

1   A.  No.  The only person I did that -- the only location I did

2   that was in Campos's apartment.

3   Q.  I'd like to talk for a moment about the casings.

4   A.  About the what, sir?

5   Q.  About the casings.  You looked at the casings, didn't you,

6   sir?

7   A.  Yes.

8           MR. GALIPO:  We have an exhibit, we have a blowup of

9   Exhibit F-8.

10          THE COURT:  F-8.  Has that blowup been marked in any

11  way?

12          MR. GALIPO:  It doesn't look like it.  I'm happy to

13  mark it now.  F-8(1).

14          THE COURT:  F-8(1).  Just so that we keep this clear

15  at this point as to what we have, given there were some

16  questions about it.

17          (Defendants' Exhibit F-8(1) marked for identification)

18  BY MR. GALIPO:

19  Q.  Do you have a copy of this anywhere handy?

20  A.  Yes, I do.  I have it right here in front of me.

21  Q.  I'll try to stand to the side.  Now, Item Number 15 that we

22  see where I'm pointing at, that's a casing; is that correct?

23  A.  That represents a location of a casing, yes.

24  Q.  And did you indicate yesterday that casings from these

25  types of weapons eject to the right?

Jason - Cross

1    A.   Yes.

2    Q.   And did you say to the right and backwards?

3    A.   Generally to the right and backwards.  There's some

4    variation, depending on the condition of the gun and the

5    extractor, ejector.

6    Q.   Did you associate casing 15 with Officer O'Malley's shot?

7    A.   That has been identified, yes.

8    Q.   Now --

9            THE COURT:  Just so we're clear, this is Sergeant

10   Riggle's sketch?

11           MR. GALIPO:  Diagram.

12           THE COURT:  Or diagram.

13           MR. GALIPO:  Yes, your Honor.

14           THE COURT:  Okay.

15   Q.   Although we can't see 618 on this diagram, it would be in

16   the area to the north of this empty parking space I'm pointing

17   to here; is that correct?

18   A.   That's correct.

19   Q.   Okay.  Now, when you started looking at this case, you were

20   looking for any casings around the area of 618; is that true?

21   A.   Well, I never actually looked for casings at the scene.

22   Q.   You were looking for evidence in terms of the diagram or

23   photographs of casings that would be around that area?

24           MR. LOEBS:  Objection, vague as to "around."

25           THE COURT:  Overruled.

Jason – Cross

1    A.   I looked at all the locations of the casings.  I'm not sure

2    what you're asking.  I looked at every location and considered

3    them all.

4    Q.   Okay.  If I understood your testimony correctly on

5    Thursday, you're associating the casing which is identified by

6    Number 6 and the casing identified by Number 11 with Officer

7    Paine's casings?

8    A.   6 and 11, yes.

9    Q.   And did you calculate the distance of those casings from

10   where Officer Paine would be on the north side of that parking

11   space by 618?

12   A.   I didn't calculate the distance formally, but I took note

13   of it.

14   Q.   Okay.  And you did that in part by the widths of the

15   parking spaces, correct?

16   A.   Yes.

17   Q.   The distance of the one casing's approximately 24 feet; is

18   that right?

19             MR. LOEBS:  Objection, which casing we're referring

20   to, your Honor.

21   Q.   The furthest casing would be Number 6; is that correct?

22   A.   The furthest casing from the location of 618?  Is that what

23   you're asking?

24   Q.   Yes.

25             MR. LOEBS:  Objection, vague.

Jason - Cross

```
1              THE COURT:  Overruled.
2    A.  Let's see.  20-something feet, yes.
3    Q.  Casing 11 is approximately 16 to 18 feet; is that correct?
4    A.  Approximately.
5    Q.  That would be on the other side of two parked cars; is that
6    correct?
7    A.  That's correct.
8    Q.  Now, you mentioned a third casing, correct?
9    A.  Yes.
10   Q.  And you were provided with information that that casing --
11            MR. LOEBS:  Your Honor, object to this.  We may need
12   to be heard out of the presence of the jury.
13            THE COURT:  Pardon?
14            MR. LOEBS:  We may need to be heard out of the
15   presence of the jury.
16            THE COURT:  Well, if the witness didn't rely on
17   something in forming his opinion, what somebody may have said
18   to him really is irrelevant.
19   BY MR. GALIPO:
20   Q.  Let me ask another question.  You calculated the distance
21   of the third casing that you associate with Officer Paine to be
22   12 feet from his location; is that correct?
23   A.  I didn't calculate any distances.  You're talking about the
24   third casing now?
25   Q.  Yes.  You estimated it to be 10 to 12 feet from his
```

Jason – Cross

1  location, correct?

2  A.  Did I do that formally?

3  Q.  At the time of your deposition.  Do you recall?

4  A.  I don't recall.  But 10 to 12 feet seems a bit far from my

5  understanding of where it was located.

6  Q.  What is your estimate of the distance of the third casing

7  you associate with Officer Paine to his location?

8  A.  Maybe 8 feet away.

9  Q.  And where was that casing and what do you base that

10  distance on?

11      MR. LOEBS:  Your Honor, object.  We asked this very

12  question of a witness who was testifying, and Mr. Galipo

13  objected on the grounds of hearsay.

14      MR. GALIPO:  No, I didn't object.

15      MR. LOEBS:  Now he's trying to elicit this

16  information.  I'm confused as to --

17      THE COURT:  Your confusion is not a legitimate

18  objection.  So I'll overrule on those grounds.  And the history

19  of objections, I'll overrule on also.

20      And what you're left with is you're asking him did he

21  calculate in some way the location of a particular casing, or

22  has he done so now, or are you asking him did he do so before

23  or is he doing it now?

24      MR. GALIPO:  He's already given us an 8-foot --

25      THE COURT:  I don't want to hear a history.  Are you

Jason - Cross

1   asking him what his opinion is here in court, or are you asking

2   him what he said at some earlier time?

3          MR. GALIPO:  What his opinion is here in court, and I

4   just want to let the Court know, I know the Court's working on

5   a lot of things at the same time, but he already answered 8

6   feet.

7          THE COURT:  Well, I'm not working on a lot of things

8   at the same time.  I'm trying to rule on your objection.  So --

9   or Mr. Loebs' objection.  The only thing that was unclear to me

10  is whether you were trying to get his current opinion.

11         MR. GALIPO:  Yes.

12         THE COURT:  Okay.  Well, then ask him a question.

13  BY MR. GALIPO:

14  Q.  What is your current opinion about the distance of the

15  third casing from where Officer Paine was located?

16  A.  About 8 to 10 feet.

17  Q.  Eight to ten feet.  And you're basing that on information

18  that was provided to you that a casing was found on the

19  windshield area of this vehicle parked in the parking space

20  adjacent to the empty parking space; is that correct?

21  A.  Yes.

22  Q.  Okay.  And you noted that in your notes, correct?

23  A.  Yes.

24  Q.  You included that on a modified -- on a diagram that --

25  strike that.

Jason - Cross

1          You made notes also on Officer Riggle's diagram, and

2    you included in there that additional casing, correct?

3    A.   That's correct.

4    Q.   Which you listed as Item Number 16?

5    A.   That's correct.

6    Q.   Okay.  Now, and that particular casing, at least on

7    information you were provided, was on an area of the windshield

8    by the window wiper of that vehicle?

9    A.   Yes.

10   Q.   And that vehicle on the information you were provided

11   including the photos of the scene was backed into that space.

12   Is that correct?

13   A.   Yes.

14   Q.   Now, given your testimony that casings eject upward and to

15   the back, what is your opinion as to how that casing ended up

16   on the windshield of that car?

17   A.   Well, there are many possibilities.  One is that if a

18   shooter was located to the rear of the car, that is the way

19   it's parked, that is on the sidewalk, adjacent to the car, and

20   slightly to the left of the car as we're looking at it, below

21   the car as we're looking at it, an ejected casing could land on

22   the roof of the car and roll forward and be caught -- down the

23   windshield and be caught in that little recessed area where the

24   windshield wipers stay when they're not being used.  It's

25   actually quite common that casings collect there.

Jason – Cross

1    Q.  Well, Mr. Jason --

2          MR. LOEBS:  Excuse me, your Honor, Mr. Galipo's

3    cutting off Mr. Jason's answer.

4          THE COURT:  I think his last words, "it's actually

5    quite common that casings collect there."

6          MR. GALIPO:  I thought he was done.  I apologize.

7    Q.  Okay.  Your testimony that casings eject upwards and

8    backwards, how would then, if Officer Paine was standing on the

9    sidewalk, that casing land on the hood of that vehicle --

10   A.  Well --

11   Q.  -- if the casing went upwards to the right and backwards?

12         MR. LOEBS:  Loebs, argumentative.

13         THE COURT:  Overruled.

14   A.  First of all, there's a great variation in ejection

15   patterns.  You won't find even with the same gun, the same

16   ammunition, from one box, you won't find the casings all

17   landing in one particular area.  There'll be a distribution

18   that would be, some would be forward of the ejection port, some

19   would be rear of the ejection port.  They all may be to the

20   right of the ejection port.

21         But if you had a shooter who was holding his gun

22   aiming it diagonally across the street, not straight across the

23   street, it easily accommodates an ejected casing to hit the

24   roof of that car again, and roll wherever it wanted to roll.

25   Q.  Your testimony is, in your opinion, Officer Paine fired

Jason - Cross

1    from the same weapon from the same Position 3 consecutive

2    shots, and one of the casings ended up on the windshield of the

3    vehicle parked next to the space, approximately 8 feet away,

4    according to your estimate, and another casing ended up 16 to

5    18 feet away on the other side of two parked cars.  And the

6    third casing ended up 24 feet away on the sidewalk?

7    A.  Yes.  Well, I'm sorry, if you're asking me a question about

8    it, I'd say the physical evidence is consistent.  The casing

9    locations are consistent with the shooting locations I

10   described near 618.

11   Q.  Now, we talked about, yesterday, someone falling to the

12   ground, the minimum time for someone 6 feet to fall flat to the

13   ground is a half a second.  Minimum time, correct?

14   A.  Minimum time.

15   Q.  In looking at the crime scene photographs, did you look at

16   the resting position of the prosthetics of Mr. Boyd relative to

17   the car?

18   A.  I never actually saw them exposed.  They were covered by a

19   tarp.

20   Q.  Okay.  Well, with respect to the tarp that you understood

21   to be covering them, did you see where that tarp was in

22   relation to the car of his prosthetics?

23   A.  There were two tarps.  One had the body; one had the

24   prosthetics.  And I did note them.  Yes.

25   Q.  And would you agree that the tarp related to the

Jason - Cross

1    prosthetics was positioned in line with the rear door on the

2    driver's side of the vehicle?

3    A.  I only had the information that was provided in the sketch

4    and in the photos, if that's what you're asking me.  Whatever

5    they show, that's what I believe to be what I rely on.

6    Q.  In looking at those photos in that sketch -- strike that.

7          You indicated that this sketch was fairly accurate,

8    correct?

9    A.  Well, I think it is generally accurate, yes.  Comparing it

10   to the pictures.

11   Q.  And Item 13 in this sketch relates to the prosthetics,

12   correct?

13   A.  Yes, that relates to that, yes.

14   Q.  And do you know, Mr. Jason, if Mr. Boyd was in the area

15   that you have shown in U-5 when he was shot, how his

16   prosthetics ended up in the area of the rear passenger door on

17   the driver's side?

18          MR. LOEBS:  Objection.  Lack of foundation; calls for

19   speculation.

20          THE COURT:  Yes.  The question, "do you know," I'll

21   sustain.

22   Q.  Now, regarding X5-02, let me ask you a few follow-up

23   questions.  You remember Exhibit 184 and 185, we talked about

24   yesterday?

25   A.  Yes, I do.

Jason - Cross

```
1    Q.  You submitted those to Mr. Loebs at some point in time

2    after your deposition.  Is that correct?

3           MR. LOEBS:  Objection, misstates the witness's

4    testimony.

5           MR. GALIPO:  It's a question.

6           MR. LOEBS:  Your Honor, it's argumentative.

7           THE COURT:  No, I'll overrule.  Because it is in the

8    form of a question.  If the witness says, No, I didn't say

9    that, that's fine.

10          THE WITNESS:  I don't know when they were submitted.

11   BY MR. GALIPO:

12   Q.  Okay.  Would it help to refresh your recollection to look

13   at a discussion about when you were going to do that in your

14   deposition?

15          MR. LOEBS:  Objection, vague as to "do that."

16          MR. GALIPO:  Make the depiction of the scene.

17          MR. LOEBS:  Same objection, your Honor.

18          THE COURT:  Overruled.  Although you did ask him about

19   this yesterday and tried to refresh his recollection yesterday.

20          MR. GALIPO:  I'll briefly try one last time.

21          THE COURT:  Okay.

22          MR. GALIPO:  And then move on.

23   Q.  Would it potentially refresh your recollection as to when

24   you did it by looking at a discussion in that regard in your

25   deposition?
```

```
 1              MR. LOEBS:  Objection, vague as to "when you did it."

 2              THE COURT:  By "did it," do you mean --

 3              MR. GALIPO:  184 and 185.

 4              THE COURT:  But did what; drew them, gave them to

 5     someone, which?

 6              MR. GALIPO:  No, first of all --

 7              THE COURT:  Just ask the question.

 8              MR. GALIPO:  Okay.

 9              THE COURT:  Okay.

10     BY MR. GALIPO:

11     Q.  Would it refresh your recollection to look at a discussion

12     in your deposition about when you were planning on doing a

13     depiction of the scene with regards to whether or not you gave

14     them to Mr. Loebs before or after your deposition?

15              MR. LOEBS:  Your Honor, same objection as to what he

16     means by "them, depiction of the scene"; it's compound.

17              THE COURT:  People always ask would it help to look at

18     something.  I don't know how they know till they look at it.

19     Why don't you just show him something and say, Does it refresh

20     your recollection as to whether you gave these before or after

21     your deposition, whatever the question is.

22              MR. GALIPO:  That's fine.

23     BY MR. GALIPO:

24     Q.  Do you have a copy of your deposition with you?

25     A.  No.
```

1    Q.   I have the original here.  I think I gave you a copy.  I

2    don't know if I can open this.

3              THE COURT:  Give it to the clerk.  She'll open it.

4              MR. GALIPO:  And then if I can use --

5              THE COURT:  What I have is -- I'm not sure, but I have

6    a dated transcript from May 22 and one from May 8th.  The

7    smaller is May 22.  Which are you trying to refer to?

8              MR. GALIPO:  The first one, May 8th.

9              THE COURT:  And do you have a page you want to show

10   him?  Just show it to him.  Or some series of pages, whatever

11   it is.

12             Miss Lucero, do you have both volumes there?

13             MR. GALIPO:  I have the right volume.

14             THE COURT:  You can use that for now, and then give it

15   back to Miss Lucero at some point.

16   BY MR. GALIPO:

17   Q.   Okay.  I'm going to show you Page 20, actually starting on

18   19.  If you just start on Page 19, Line 19, and read to

19   yourself that section and going onto the next page.

20             THE COURT:  You want him to look at Pages 19 and 20?

21             MR. GALIPO:  Correct.

22             THE COURT:  And anything else?

23             MR. GALIPO:  No, that's all.

24             THE COURT:  Okay.

25             MR. LOEBS:  Your Honor, I don't have the question in

1    mind.

2            THE COURT:  He's not reading.  He just wants the

3    witness to look at the deposition, discussion on 19 near the

4    bottom over to 20 and wherever it keeps going to.

5            MR. LOEBS:  I'm not sure as to what he's asking.

6            THE COURT:  He's trying to see if this refreshes the

7    witness's recollection as to something that will then be asked

8    after the witness looks at it.

9    BY MR. GALIPO:

10   Q.  Have you had a chance to look at that, Mr. Jason?

11   A.  Yes, I have.

12   Q.  Does it refresh your recollection as to when −− strike

13   that.

14           Does it refresh your recollection as to whether you

15   provided Mr. Loebs what we looked at yesterday as Exhibit 184

16   before or after the date of your deposition?

17   A.  No.

18           THE COURT:  "When" would have been okay, too.

19   Q.  Okay.  Does it refresh your recollection as to when you

20   provided Exhibit 184 to Mr. Loebs?

21   A.  No, it doesn't.

22           THE COURT:  The answer is going to be the same.  I

23   just didn't want you to think you couldn't say "when."  What

24   you can't say is "that."

25           MR. GALIPO:  Okay.  Thank you.

Jason – Cross

```
 1              THE COURT:  Okay.

 2   Q.  Why did you provide Exhibit 184 to Mr. Loebs?

 3   A.  I don't remember providing that, 184 and 185?

 4   Q.  The one we looked at yesterday that has a slightly

 5   different angle to the door.

 6   A.  They're actually two different drawings, two different

 7   graphics.  They're not the same.

 8   Q.  What was your purpose in providing either one or both of

 9   them to Mr. Loebs?

10   A.  I provided them to him -- I don't remember specifically

11   sending those graphics or giving it to him in any form because

12   those are, as I said, incomplete.  But I did show him during

13   this two-and-a-half years various sort of works in progress.

14   Hey, this is what I'm doing, I'm going to have the car out here

15   and show this view, and that sort of thing.  Just showing him

16   work that I've been doing.  But it wasn't completed, what you

17   saw in 184 and 185 was not completed work.

18   Q.  All right.  Regarding the clothing, did you look at the

19   actual jeans in this case?

20   A.  Yes, I did.

21   Q.  Did they have blood on them?

22   A.  Yes.

23   Q.  On the front and on the back?

24   A.  They had blood on the -- I have some notes on it.  I could

25   look it up.
```

Jason – Cross

1    Q.  Please do.

2          THE COURT:  Then after the jeans question, you should

3    be looking for a place to break because we'll have been going a

4    little over an hour and a half.

5    A.  Yes, I have here noted "jeans with belt" -- that's how they

6    were described on the evidence bag -- "dried blood apparently

7    inside of left leg and outside area near left front pocket."

8    Q.  Okay.  Any other blood that you noted on the jeans?

9    A.  No.  The jeans are black, so it's hard to see dried blood

10   on black.  But I did see some.

11   Q.  In your review of Dr. Smith's report, you noted a tan

12   cheesecloth that had blood on it?

13   A.  I don't know anything about a cheesecloth.

14   Q.  Do you recall in your review of Dr. Smith's report

15   reference to other articles of clothing in the car including

16   jeans that Mr. Boyd wasn't wearing that had blood on them?

17         MR. LOEBS:  Objection, your Honor.  Complete

18   misrepresentation of the record, and there's absolutely no

19   foundation.

20   BY MR. GALIPO:

21   Q.  Well, you've already told us you relied on Dr. Smith's

22   report, correct?

23   A.  Yes.  I have it here.

24   Q.  Okay.  Do you recall the description of some blood on other

25   clothing that was found in the car?

1   A.   I recall that there was other clothing.  I don't remember

2   blood being described on the other objects.

3   Q.   You have the report handy?

4   A.   Yes, sir.

5            MR. GALIPO:  May I approach, your Honor?

6            THE COURT:  Yes.

7   Q.   Is it okay if I look at your copy just for a moment,

8   Mr. Jason?

9   A.   Yes.  I have another copy here, so you can take that.

10  Q.   Okay, sure.  Looking at --

11           MR. LOEBS:  Your Honor, if I could see what Mr. Galipo

12  is --

13           MR. GALIPO:  This is Dr. Smith's report.

14           MR. LOEBS:  Did we mark that as an exhibit?

15           THE COURT:  I don't know that it's been marked.  The

16  witness had it in his file and was looking at it.  You can --

17  show him what you're looking at Mr. Galipo just for a moment,

18  and show Mr. Loebs so he knows exactly what it is you're

19  looking at.

20           THE WITNESS:  That was handed to me by Mr. Galipo

21  previously.

22           THE COURT:  Oh, it's not the witness's.  That's why

23  maybe he has two copies.  Yours and his.  All right.  So he's

24  now giving you your copy back.  Okay.  Of whatever it is.

25

Jason - Cross

```
1    BY MR. GALIPO:

2    Q.  Are you looking at your copy of the report?

3    A.  Yes, sir.

4    Q.  Does it refresh your recollection as to whether there were

5    any jeans found in some other bags in the car that had blood --

6            MR. LOEBS:  Your Honor, object to this.  This is

7    completely improper for Mr. Galipo to be testifying about this

8    subject.  If we could be heard outside of the presence of the

9    jury, if necessary, but this is completely improper.

10           THE COURT:  I don't really know what the inquiry is at

11   this point.  I suppose we could send the jury out.  But....

12           MR. LOEBS:  Lack of foundation; calls for speculation.

13           THE COURT:  That's the objection.  I gather --

14           MR. GALIPO:  Let me rephrase the question.

15   BY MR. GALIPO:

16   Q.  In looking at page -- are you looking at -- on the page

17   that references the date of 5/11/2004 in the second paragraph?

18           MR. LOEBS:  Your Honor --

19           THE COURT:  Let me put it this way:  Dr. Smith's

20   report is hearsay.  All right?  So whatever's in it is

21   irrelevant and objectionable unless this witness formed some

22   opinion about something that he used Dr. Smith's report to

23   assist him with and relied on in some fashion.  So, could be

24   all kinds of things that Dr. Smith said he looked at or did or

25   whatever, but that's just the report.  It's hearsay.
```

Jason - Cross

```
1              MR. GALIPO:  That's fine.

2              MR. LOEBS:  And I request that the question be

3    stricken because there's an implication.

4              THE COURT:  I don't even remember the exact form of

5    the question, ladies and gentlemen.  But you've been instructed

6    earlier and will be again that insinuations or suggestions in

7    questions are not evidence.  Only testimony.

8    BY MR. GALIPO:

9    Q.  In reviewing the blood evidence in this case, Mr. Jason,

10   did you look at Dr. Smith's report to see if there were any

11   items of clothing found in the car that had blood on them?

12   A.  No, I looked at the clothing that was worn by Mr. Boyd.

13   Q.  Did you look at other items of clothing that were in

14   evidence that were found in the car to see if they had blood on

15   them as a potential source for any of the blood evidence you

16   found in the car?

17   A.  No, I didn't.

18   Q.  So as you sit here now, you don't know whether any of the

19   other items of clothing booked in evidence have blood on them

20   or not?

21   A.  I didn't look at the other items.  I just looked at the

22   clothing that he was wearing.

23   Q.  That's fine.  You would agree that the trajectory evidence

24   is consistent with Mr. Boyd being seated in a near-seated

25   position?
```

Jason - Cross

1    A.   Yeah, seated or -- when you're going to sit down on the

2    rocker panel, you get from -- start at, pick a number, five

3    inches from where your bottom is going to touch the rocker

4    panel, and you go to four inches and you go to three inches,

5    two inches, one-and-a-half inches, a hundredth of an inch.  So

6    yes, at some point he's essentially sitting, whether or not

7    he's in contact.

8    Q.   So you would agree that in terms of the trajectories,

9    they're consistent with someone in the process of sitting down?

10   A.   Sitting or near seated with the left hand near the floor.

11   Q.   Okay.  Now, with regards to this --

12            THE COURT:  Mr. Galipo, you apparently haven't been

13   looking for a place to break.

14            MR. GALIPO:  I think we can do it right now.  I have

15   about 15 more minutes, but I'd rather just take a short break.

16            THE COURT:  I think that would be preferable.

17            Ladies and gentlemen, let's break until 11:00 and come

18   back.  Please remember my admonition.  Thank you.

19            (The jury exited the courtroom)

20            (In open court; jury not present)

21            THE COURT:  We're in recess.

22            MR. LOEBS:  May I be heard on this issue?

23            THE COURT:  Which issue?

24            MR. LOEBS:  That has to do with the insinuation about

25   the blood on the jeans suggesting they're found in the car.

4253

```
1   That was blood found on the officer's jeans that was booked
2   separately into evidence, and his implication that that was in
3   the vehicle is completely false.  His question, he had no
4   foundation for it, no basis for it.  He knew that was
5   incorrect.
6           MR. GALIPO:  No, I didn't know.
7           MR. LOEBS:  And he didn't ask Dr. Smith that question.
8           THE COURT:  Blood was found on the officer's jeans?
9           MR. LOEBS:  Yes, one of the officers that moved the
10  body away from the scene.
11          THE COURT:  I don't know why you're getting so excited
12  here, but obviously you feel there's some inference the jurors
13  might draw that's unfavorable.  Is it officer -- it's not
14  Officer Paine's jeans?
15          MR. LOEBS:  No.
16          THE COURT:  It's some other officer who's not here?
17          MR. LOEBS:  Yes.
18          THE COURT:  Okay.  Well, I think that if the
19  suggestion was that there were other bloody items in the car
20  that could have been bloodied in the course of the shooting,
21  that would not be a proper inquiry to suggest that that was the
22  case, and there is at least an inference to that extent.  And
23  there's been no reason for this witness to look at other
24  evidence if it was jeans from officers not standing nearby.
25          I could understand if somebody was trying to determine
```

1    how close an officer was to maybe take their jeans, that that

2    might suggest that they were standing close and somehow were

3    spattered by blood from the shooting.  The officer's pants that

4    were collected, do you know which officer that was, Mr. Loebs?

5            MR. LOEBS:  Yes.  It's officer, I believe, it's

6    Damato, or if I recall who pulled his body away and that's how

7    he got the blood on his jeans.

8            THE COURT:  Is there any indication that that officer

9    was part of the shooting in any way?

10           MR. LOEBS:  No.  He witnessed some of the events, but

11   he was not, you know, in any way close proximity to Cammerin

12   Boyd.

13           THE COURT:  Do you know why they took his jeans?

14           MR. LOEBS:  Just because they had blood on it from the

15   individual, he pulled them away.  But the suggestion that it

16   was in the vehicle.

17           THE COURT:  We got your point.

18           MR. GALIPO:  I can just say that they were included in

19   the clothing in the autopsy report.  I had no idea they were an

20   officer's jeans.  So...

21           THE COURT:  Let me ask this:  Mr. Jason read

22   apparently Dr. Smith's report, didn't he?

23           MR. LOEBS:  Yes.

24           THE COURT:  All right.  Does he know the source of the

25   other pair of jeans from Dr. Smith's report; in other words,

1  does the report itself show that those jeans were taken from an

2  officer who removed the body or moved the body?

3           MR. LOEBS:  The report itself doesn't specify.  It

4  specifies how the bag of clothing they were in when they were

5  brought to him, but it's not -- it certainly doesn't say it was

6  clothing that was worn.  It doesn't say it was clothing in the

7  SUV.

8           THE COURT:  It doesn't say it's clothing taken from

9  the officer either apparently?

10          MR. LOEBS:  No, it doesn't.

11          THE COURT:  And how was Mr. Galipo to know that?

12          MR. LOEBS:  Through discovery.  We've been going on

13  this case for years.

14          THE COURT:  Are you saying that it was made clear

15  during discovery?

16          MR. LOEBS:  Yes.

17          THE COURT:  He'll say he didn't know that.

18          MR. LOEBS:  They looked at all the evidence, and it's

19  clearly marked on the evidence.

20          THE COURT:  One of the problems is "they" is not

21  necessarily Mr. Galipo.

22          MR. LOEBS:  He did.

23          THE COURT:  All right.  All I'm saying is I'm not

24  going to adjudicate whether he asked it in bad faith.  I do

25  think that it's legitimate to clarify, if you can, the source.

1    Either by agreement or by some other way of not either having

2    to call whoever booked the evidence in, the officer whose pants

3    were removed from him.  I don't know what they sent him home

4    in, or whatever else they did.  So....

5         MR. GALIPO:  If that is the source, which I never

6    knew, I'm willing to enter a stipulation, because I had no

7    information, personally, that those were the officer's jeans.

8         THE COURT:  I'm not finding that Mr. Galipo

9    misrepresented something to the jury.  So if you can arrive at

10   either a stipulation or just an agreement that it can be

11   elicited in some way from a witness, that's fine.  As well.

12        MR. GALIPO:  We'll work something out.

13        MR. LOEBS:  I think we'll be able to arrive at a

14   stipulation.

15        THE COURT:  I don't find this question was asked in

16   bad faith.  There's a lot of evidence out there, and there was

17   more than one attorney who was dealing with it on behalf of the

18   plaintiffs.  So let's just take a break, okay?

19        MR. LOEBS:  It is a long case.  I'm extremely tired.

20   So I just maybe got a little overexcited about that issue,

21   because I knew the evidence on this issue perhaps better than

22   Mr. Galipo.  So we will be able to work something out.

23        THE COURT:  I mean, not everybody has the command of

24   the evidence that you do, Mr. Loebs.  I have a feeling that you

25   can put your hands on basically everything and say where it

came from.  But not everybody is quite picturing it in that
fashion.

   Just very briefly, Mr. Wiener, I've gone over the
instructions.  Much better, but there are a couple of points I
do want to take up.  They're not so much legal as just in the
manner in which the recording of what we talked about came out.
It wasn't exactly as I was thinking it would.

   MR. WIENER:  There was one thing that I did change I
wanted to alert the Court about in the tactical, the Billington
instruction.

   THE COURT:  Yeah, you changed a couple of things
there.  One was or -- and you may be correct in that.  You left
out "solely", though, and do want to talk about that.  In any
event, let's take a break.  We broke with the jury at a quarter
to.

   Miss Lucero, can you tell the jurors they can have
five minutes, because we delayed here, and the reporter needs a
break, too.

   Okay.

   (Morning recess)

   (In open court; jury not present)

   THE COURT:  Okay, we're back on track.

   MR. GALIPO:  With the Court's permission, right when
we start off, Mr. Loebs wants me to put that stipulation on the
record, and I'm going to.

 1                  THE COURT:  That's fine.  Thank you.

 2                  (The jury entered the courtroom)

 3                  THE COURT:  Everyone's back.

 4             Mr. Jason, you may resume the stand.

 5             I think there's a brief stipulation that the parties

 6        will be putting on the record at this point.

 7                  MR. GALIPO:  After discussion between counsel, it's

 8        agreed that a separate pair of jeans that did have blood on it

 9        was supplied to Dr. Smith for evaluation and is mentioned in

10        his report.  But that blood on those jeans came from an

11        officer, an officer's jeans who was involved in pulling the

12        body away from the scene.  And as part of our stipulation, I

13        did not know that fact because it's not indicated in

14        Dr. Smith's report.  But that is the source of the blood on the

15        other pair of jeans.

16                  MR. LOEBS:  That's agreed, your Honor.

17                  THE COURT:  In other words, that those jeans were not

18        in the vehicle at the time of the shooting?

19                  MR. GALIPO:  Correct.

20                  THE COURT:  The blood got on it at a later time.

21             Okay.  All right.  Thank you very much.  We'll keep

22        going.

23                  MR. GALIPO:  Thank you.

24        BY MR. GALIPO:

25        Q.  I want to conclude, Mr. Jason, by talking about the blood

Jason - cross

```
1  evidence, and in doing that, I'd like to put up a few exhibits
2  that we talked about previously.  One is X5-02.  Can you see
3  this exhibit from where you're at, Mr. Jason?
4  A.  Yes, I can.
5  Q.  Now, the blood that I'm -- in the area that I'm pointing to
6  on the floorboard, to the side of the bolt cover, in this area
7  here (indicating), do you see the blood that I'm referring to?
8  A.  I do.
9  Q.  You would consider that to be transferred blood, wouldn't
10 you?
11 A.  I think most of it, if not all of it, is transferred.
12 Q.  Some of the blood that I'm pointing to comes toward the
13 front of the vehicle; is that correct?
14 A.  Yes.
15 Q.  And then you also see at least in part transferred blood on
16 the bolt cover, correct?
17 A.  Yes.
18 Q.  And is it your opinion, Mr. Jason, that the transferred
19 blood that we see in this photograph could have been there
20 before Mr. Boyd was shot by Officer Paine?
21 A.  Excuse me, did you ask me if it's possible?
22 Q.  Yes.
23 A.  Yes, it's possible.
24 Q.  Okay.  And you've already told us that you believe the
25 bloody napkin was there before Officer Paine shot Mr. Boyd, at
```

Jason – cross

1    least somewhere in the car?

2    A.  Yes.

3    Q.  And it's your opinion that the blood on the napkin did not

4    come from the shooting of Mr. Boyd by Officer Paine; is that

5    correct?

6    A.  Not all of it, is my opinion.  Some of it may have, a

7    little corner that's exposed.  But I think most of the blood,

8    especially the big areas of deposit, are not associated with

9    this shooting event.

10   Q.  Let me ask you this, Mr. Jason.  Assume the following

11   facts:  Assume, hypothetically, that Mr. Boyd's hand was struck

12   by the bullet before he exited the car.  Can you at least make

13   that assumption?

14   A.  Yes.

15        MR. LOEBS:  Objection, vague as to use of the term

16   "exit."

17   Q.  Before he got out of the car, before he opened the door and

18   got out of the car on Larch Way?

19        THE COURT:  Okay.

20   A.  I didn't understand that.  I thought you meant before he

21   fell out –– I'm sorry, ask me again, please.

22   Q.  Sure.  Just hypothetically, assume that Mr. Boyd's hand was

23   struck by one of the bullets fired at the car before he opened

24   the door and got out of the car.  Just for purposes of a

25   hypothetical.  Can you have that hypothetical in mind?

Jason – cross

1          MR. LOEBS:  Objection, vague; lack of foundation;

2     calls for speculation.

3          THE COURT:  I'll sustain on lack of foundation.

4     Q.  Is the blood on the napkin that you observed consistent

5     with coming in contact with a bloody hand?

6     A.  It could be.

7     Q.  Is the blood transfer that we see in this photograph

8     consistent with being in contact with a bloody hand?

9     A.  That the transfer was made by a bloody hand?  Yes.

10    Q.  Is it also consistent with any other part of the body

11    that's bleeding that comes in contact?

12         MR. LOEBS:  Objection, vague as to "any other part."

13         THE COURT:  Overruled.

14    A.  Yes.

15    Q.  Okay.  In terms of you had discussed in your testimony on

16    Thursday -- I'm looking for the right term -- there's back

17    spatter, correct?

18    A.  There is a thing called back spatter, yes.

19    Q.  And that would come from an entrance wound?

20    A.  That's correct.

21    Q.  And then from an exit wound, what is it referred to as?

22    A.  Forward spatter.

23    Q.  Forward spatter.

24         Okay.  Now, let's talk about the exit wound to the

25    thigh.  Do you have that in mind?

Jason – cross

1   A.  Yes.

2   Q.  Do you have an opinion whether that would have created some

3   forward spatter in this case?

4   A.  It would, yes.  It would, however, in this case, it would

5   be probably less than -- less than would be expected from a

6   body that's not clothed and not wearing what I would call a

7   compression garment, this tight neoprene whatever it was that

8   he was wearing.

9   Q.  Do you see any evidence in this exhibit of anything that

10  you associate with forward spatter from the exit wound to the

11  thigh?

12  A.  No.

13  Q.  Now, you have in your depiction in U-502 Mr. Boyd sitting

14  on that area of the floorboard, correct?

15          MR. LOEBS:  U-502?  I'm not sure.

16          THE COURT:  I think it's just U-5.

17          MR. GALIPO:  Yes, you're right.  I've got so many

18  numbers in my head.  U-5, yes.

19  Q.  You have him sitting in that position in between the front

20  of the seat, in that area, correct?

21  A.  In that area that's there, yes.

22  Q.  His right side in that picture you have closer to the door?

23          MR. LOEBS:  Objection, vague.

24          THE COURT:  As to closer than what?

25  Q.  Let me get it.  Here it is.  You have him as positioned as

Jason – cross

1   we see it in this photograph, correct?

2   A.  I do, yes.

3   Q.  Now, the speed of the bullet that hit him in the abdomen

4   would have been greater than the speed of the bullet that hit

5   him in the hand, correct?

6   A.  Yes.

7   Q.  That's because the speed of the bullet to the hand was

8   decreased when it went through the thigh?

9   A.  Yes.

10  Q.  Okay.  And let's assume he wasn't wearing a shirt at the

11  time he was shot.  Do you have that in mind?

12  A.  Yes, sir.

13  Q.  Did you see any blood evidence in the car that would relate

14  to him being in the position you have in U-5 where blood would

15  have been left from the abdomen somewhere in the car?

16      MR. LOEBS:  Objection, your Honor, incomplete

17  hypothetical; argumentative; lacking foundation.

18      THE COURT:  I'm not sure I understand the question.  I

19  will overrule unless you want to reframe it.

20      MR. GALIPO:  I'll break it down.

21      THE COURT:  Okay.

22  Q.  Okay.  Well, first of all, would you expect there to be at

23  least some projected blood from the entrance wound on the

24  abdomen given that the velocity of the bullet when it hit the

25  abdomen was greater than the velocity of the bullet when it hit

1   the hand?

2          MR. LOEBS:  Object to the question as being vague and

3   compound.

4          THE COURT:  I think that it is compound.  In other

5   words, he might or might not expect spatter, and if he did, he

6   might or might not expect it for the reasons you said.  So...

7          MR. GALIPO:  I'll break it down.

8          THE COURT:  Okay.

9   BY MR. GALIPO:

10  Q.  Do you -- would you expect to have high velocity blood

11  spatter from a bullet striking the abdomen as we have in this

12  case?

13         MR. LOEBS:  Objection, vague as to "have in this

14  case."

15         THE COURT:  I will overrule.

16  A.  I would expect there to be some, yes.

17  Q.  Did you see any evidence of any high velocity blood spatter

18  that you associated with the abdomen wound in any of the photos

19  that you looked at?

20  A.  No, but I wouldn't expect to find it in that configuration.

21  I would only -- that back spatter would only travel a few

22  inches, and there wouldn't be very much.

23  Q.  Okay.  You indicated three to five inches in your

24  deposition, correct?

25  A.  That's the maximum distance.

Jason - cross

1    Q.   Now, would you expect that wound to bleed immediately, the

2    abdomen wound?

3    A.   There would be blood, yes.

4    Q.   Did you see any evidence of drip blood in the car from that

5    wound?

6    A.   No.

7    Q.   Did you see any evidence of drip blood from any of the

8    photos directly below where the driver's door area is from that

9    wound?

10   A.   It would be very hard to tell because that's black asphalt.

11   I did not note any, but I don't have good pictures of that

12   area.  I didn't have good pictures to examine.

13   Q.   Okay.  Is it your opinion that some of the blood evidence

14   in this case came from the exit wound of the thigh wound?

15   A.   No.

16   Q.   Is there anything that you saw in looking at the photos of

17   the blood that led you to believe that's evidence of forward

18   spatter from the exit wound to the thigh?

19            MR. LOEBS:  Objection, vague.  As to forward spatter

20   from the exit wound.

21            THE COURT:  Overruled.

22   A.   I think you're asking me the same question, do I believe

23   any of this blood evidence is from forward spatter from the

24   exit wound?  Is that what you're asking me?

25   Q.   Let me make sure I have it right.  Forward spatter comes

Jason – cross

1    from the exit wound, correct?

2    A.   That's correct.

3    Q.   So yes, I'm wondering if -- I understand your testimony

4    that you believe the blood evidence we're seeing in this photo

5    is not from forward spatter from the thigh exit, correct?

6    A.   Correct.

7    Q.   I'm wondering, you looked at the car yourself on at least

8    two occasions, correct?

9    A.   Yes.

10   Q.   Did you see anything anywhere that you believed was

11   evidence of forward spatter blood evidence from the exit wound

12   to the thigh?

13   A.   No.

14   Q.   And when you looked in the car, did you see any evidence of

15   any back spatter blood that you associated with the entrance

16   wound to the abdomen?

17   A.   No.

18   Q.   Now, in this case, looking at the transferred blood that we

19   see in X5-02, there's some different distinct patterns that can

20   be seen in this photograph; is that correct?

21   A.   Well, there are different shapes, yes.

22   Q.   One pattern of the transferred blood appears to go in the

23   direction of -- going from the front of the seat towards the

24   front of the vehicle, as I'm moving my pen; is that correct?

25   A.   I would have to disagree.  You really can't tell

Jason - cross

1    directionality.  There's a linear distribution of blood, but

2    you can't tell if it's upward or downward, as we're looking at

3    the picture.

4    Q.  Okay.  But you can tell it either had to be from -- looking

5    at the picture, from up to down or down to up?

6    A.  I'm sorry, say that again.

7    Q.  You've indicated, if I understood your testimony correctly,

8    that this transfer would be made by direct contact with, for

9    example, the hand?

10   A.  Yes.

11          MR. LOEBS:  Objection, vague.

12          THE COURT:  Overruled.

13   Q.  Okay.  So when you say you can't tell directionality, is

14   what you're saying you can't tell if it went in this picture

15   from top to bottom or bottom to top in terms of which way the

16   object was moving on the surface?

17   A.  That's correct.

18   Q.  But you can tell that at least in looking at this photo

19   it's of a vertical nature, that particular pattern?

20   A.  Well, there's a linear distribution, so it's consistent

21   with the hand or some bloody object moving upward or downward

22   along that linear distribution.

23   Q.  Okay.  And that's the -- so that linear distribution is an

24   up or down, correct?

25   A.  It's -- the physical evidence is consistent with that.  The

Jason - cross

1    blood deposits are consistent with that movement, yes.

2    Q.  You then have a separate linear distribution of the

3    transfer that goes side to side; is that correct?

4    A.  Yes.

5    Q.  Now, in this case, your opinion is that Mr. Boyd's hand was

6    approximately a couple inches above that bolt cover when it was

7    by the bullet; is that your opinion?

8    A.  Some portion of the hand.  The part that was struck by the

9    bullet.  And his thumb was also lacerated by the bullet, so I

10   believe some of those bloody areas were above the bolt cover.

11   Q.  So to be more specific, your opinion is that the area of

12   his hand that was struck by the bullet would have been

13   approximately two inches above the bolt cover?

14   A.  I don't say two inches.  Several inches, I'm not sure how

15   high.

16   Q.  It has to be close enough -- strike that.

17          If you believe there's high velocity blood spatter on

18   the bolt cover, it would have to be close enough to get the

19   blood spatter, correct?

20   A.  Yes.

21   Q.  Are you comfortable with between three and five inches, or

22   do you have another estimate in mind?

23   A.  Within two to five inches, would probably be a reasonable

24   distance.

25   Q.  But in your opinion, the area of the hand struck by the

Jason - cross

1   bullet was not touching the bolt cover at that time; is that

2   your opinion?

3   A.  When you say "the area of the hand."

4   Q.  The area of the hand that was struck by the bullet, in your

5   opinion, was not in physical contact or touching the bolt cover

6   at the time it was struck; is that your opinion?

7   A.  It's hard to define.  Some portion of the hand could be in

8   contact with the --

9   Q.  I'm talking about the area that was struck by the bullet.

10  A.  The bullet, the defect, the hole that lacerated the area in

11  the thumb?

12  Q.  Yes.

13  A.  I don't think they were in contact with the bolt cover.

14  Q.  That's your opinion, correct?

15  A.  Yes.

16  Q.  So if the hand was in that position when it was struck by

17  the bullet, the hand, after it was struck, would have had to

18  have gone down, at least the bleeding portion of the hand would

19  have had to have gone down to the surface of the floorboard; is

20  that correct?

21  A.  Yes.

22  Q.  It then would have had to make some movement of either up

23  to down or down to up on this photograph to make the -- that

24  linear blood pattern; is that correct?

25  A.  Yes.

Jason - cross

1    Q.  It then would have had to make some movement side to side

2    to make this other pattern, including the transfer blood, on

3    the bolt cover?

4    A.  Well, you're indicating with your hand something different.

5    I agree that there was some side to side, if I look at this

6    picture, movement across the bolt cover.

7    Q.  Okay.  So it's your opinion that when Mr. Boyd was struck

8    by the bullet, the portion of his hand struck would have been

9    above the bolt cover.  Am I correct so far?

10   A.  Yes.

11   Q.  His hand then, including the bleeding portion, had to go

12   down to the floorboard.  Correct?

13   A.  Yes.

14   Q.  Then it's your opinion that his hand went from basically

15   the area in front of the seat towards the front of the vehicle?

16   A.  Once again, I don't know if he started slightly behind or

17   below and moved upward, or it started above and moved downward.

18   Q.  Okay.  One of the two.

19   A.  Yes.

20   Q.  His hand then would have had, after making that movement,

21   had then to go side to side, and in this photograph, towards

22   the exit or the bolt cover; is that correct?

23   A.  The physical evidence is consistent with that motion, yes.

24   Q.  Well, in order for his hand to leave all this transfer that

25   we see, he'd have to, after being shot, make contact with the

Jason - cross

1    floorboard and at least have two different motions, correct?

2    A.  Two different directional vectors, yes.

3    Q.  And it's your opinion that he did all that as he was

4    falling to the ground after being shot in the abdomen?

5    A.  It's my opinion that it's consistent with that, yes.

6    Q.  Let me ask you this, Mr. Jason:  In looking at this

7    picture, it's your -- strike that.

8            Do you see any blood from the area of this bolt cover

9    going to the right?

10   A.  Yes.

11   Q.  You see blood in between where I am and towards the rocker

12   panel?

13   A.  Show me where you're indicating, please?

14   Q.  Well, you see at some point where the carpeting material

15   ends?

16   A.  Yes.

17   Q.  When you say "rocker panel," at least as you've been using

18   the term, are you referring to this lighter gray area?

19   A.  Yes, the unupholstered area, the uncarpeted area, yes.

20   Q.  First of all, do you see any blood on the rocker panel?

21   A.  I do not.

22   Q.  Wouldn't you expect if this bleeding hand is leaving the

23   car as you described and is coming across the rocker panel that

24   there would be blood on the rocker panel?

25   A.  Not necessarily.  But it depends, because the -- first of

Jason - cross

1    all, the bolt cover is raised.  So the hand would have to be

2    higher than the level of the rocker panel when it's coming

3    across the bolt cover.  And it could have been pulled across at

4    a higher -- starting to come at an increasingly higher angle.

5    Q.  Is it your opinion that --

6            MR. LOEBS:  Your Honor, objection.  I think the

7    witness hadn't finished his answer.

8            THE COURT:  Not clear if you had finished, Mr. Jason.

9    Have you?

10            THE WITNESS:  Um, yes.  I'm sorry, yes.

11            THE COURT:  Okay.  Then go ahead.

12   BY MR. GALIPO:

13   Q.  Is it your opinion that after the hand passed the bolt

14   cover it stopped bleeding?

15   A.  No.  If it was bleeding before, it would have continued to

16   bleed.

17   Q.  Did you look when you examined the car in person to see

18   whether there was blood anywhere on that rocker panel?

19   A.  Yes.

20   Q.  Could you see any?

21   A.  No.

22   Q.  Did you look to the side to see if any blood was on the

23   side of the rocker panel?

24   A.  Yes.

25   Q.  Did you see any?

1  A.  I did not.

2  Q.  Did you look to see, in looking at any of the evidence,

3  whether there was any trail of blood leaving the open driver's

4  door area where you believe he was up to the area where his

5  body came to rest?

6  A.  On the asphalt?  I only have the crime scene pictures, and

7  they don't provide that detail.

8  Q.  Do you recall at the time of your deposition telling me

9  that you thought some of the blood evidence was from the thigh?

10  A.  I don't recall that.  I said it's possible some of it's

11  from the thigh.

12  Q.  Are you now saying it's not possible?

13  A.  I'm saying it's possible.  It's hard to make out, all of

14  the discrete deposits there, particularly the nature of the

15  carpeting, which interrupts the pattern or the shape.  So it's

16  possible that some of it was from the thigh.  But I think there

17  would be very little blood from the thigh, because of the fact

18  that he was wearing clothing, loose clothing, and that would

19  attract a lot of it.  The forward spatter doesn't come out as

20  an individual particle, it comes out in a cone shape, and if

21  the clothing is a little bit distant from the skin surface, not

22  much of that cone will get out the hole with the bullet.

23  Q.  Well, it's true, is it not, Mr. Jason, that high velocity

24  blood spatter in general comes out in some cone shape?

25  A.  Yes, it begins as a cone.  Depending on the source, but

Jason – cross

1    yes.

2    Q.  And, therefore, it leaves a specific pattern on the object

3    it strikes; isn't that true?

4    A.  It can.  Depending on the distance and some other factors.

5    Q.  You don't see in this case what you would characterize as a

6    classic example of high velocity blood spatter with a fine mist

7    and a pattern, do you?

8    A.  I do see elements of it, yes.

9    Q.  Elements?

10   A.  Elements, yes.  If this were a white metal or cardboard

11   surface all around where you could actually see all the blood

12   that was distributed, I think you'd have a much more clear

13   view.

14   Q.  There was also some blood on a couple of the wires

15   underneath the seat; is that true?

16   A.  Yes.

17   Q.  You don't characterize that as high velocity blood spatter,

18   do you?

19   A.  No.

20   Q.  Well, how did you think the blood got on the wires?  Was it

21   dripped?

22   A.  Possibly.  But I think the hand -- the evidence is

23   consistent with the hand, the bloody hand touching the wires.

24   The wire was not, as is shown here, the wire is actually out on

25   top of the bolt cover or in front of the bolt cover in most

1    contemporaneous pictures.

2    Q.  The little specks that that you see on that blowup of the

3    bolt cover, do you specifically even know if those little

4    specks are blood?

5    A.  They're consistent with blood.

6    Q.  Well, there was no testing done of those specks to

7    determine whether they are blood, would you agree?

8    A.  On those individual specks, no, they're too important as

9    evidence to remove.

10   Q.  Was there any testing on the blood on the bolt cover, if

11   you're aware?

12           MR. LOEBS:  There's a stipulation to the blood on the

13   floor.

14           THE COURT:  Well, in any event.

15           MR. GALIPO:  But not the bolt cover.

16           THE COURT:  I thought you were just asking him about

17   the bolt cover.

18           MR. GALIPO:  That's all I was.

19           THE COURT:  But then it sounded like you were now

20   going to the bolt cover, but I think you were already at the

21   bolt cover.

22           MR. GALIPO:  I'm talking about the bolt cover.

23           THE COURT:  Okay.

24           MR. GALIPO:  I'll move on.

25           THE COURT:  I'm not sustaining any objection.  I just

1    maybe misunderstood your question.

2    BY MR. GALIPO:

3    Q.  Do you know specifically whether any blood test was taken

4    of the blood on the bolt cover?

5    A.  I believe there was blood test of the blood surrounding the

6    bolt cover.

7              MR. GALIPO:  If I could just have a minute to look at

8    my notes, your Honor.

9    Q.  Medium velocity blood spatter is considered between

10   1 millimeter and 3 millimeters, correct, generally?

11   A.  In general.  But there'll be other sizes.  You never get

12   one size from any type of projection.  You get a variety of

13   sizes.  But if you have certain ones like very small ones,

14   those are high energy, the high energy mechanism is involved.

15   Q.  You would agree that medium velocity stains are not

16   associated with a bullet strike?

17   A.  Are you talking about the size of them, when you say

18   "medium"?

19   Q.  Without getting into the specifics, it's really a matter of

20   how much energy is being produced, correct?

21   A.  Well, the -- no, the energy isn't produced.  The amount of

22   energy involved in the interaction of the bullet, the

23   projectile and the human tissue, you will have -- will have a

24   relationship with the type of spatter, the size and

25   distribution.

Jason - cross

1    Q.  And the amount of energy is related to the speed of the

2    impacting bullet, correct?

3    A.  It is, yes.

4    Q.  And normal speed is in excess of thousand feet per second?

5    A.  This bullet is about 1100 feet per second.

6    Q.  For anything a hundred feet per second or over, that would

7    create potentially high velocity blood spatter?

8    A.  That could, yes.

9    Q.  Less than a hundred feet per second you're talking about

10   medium velocity blood spatter?

11   A.  Yes.

12   Q.  And you would agree if it's less than a hundred feet per

13   second, it's most likely not a bullet?

14          MR. LOEBS:  Objection, vague.

15          THE COURT:  Overruled.

16   A.  No, the minimum size, the smallest size of the spatter will

17   help determine what the mechanism was, because in a gunshot,

18   even on a very high velocity gun, .223 round, hitting my hand,

19   will produce -- if I was up against the wall, my hand was

20   against the wall, a large amount of spatter.  There would be

21   big drops, there would be small ones, there would be bits of

22   tissue, there'd be a big combination.  But you'd have very,

23   very small ones.  And the very, very small ones, the

24   sub-1 millimeter, you'd say, Ah, it was a high energy mechanism

25   associated with this.

Jason - cross

1    Q.  I understand.

2    A.  But you'll have medium velocity sized spatters as well.

3    Q.  But you would agree if the speed of the impacting object

4    was less than a hundred feet per second, you would not expect

5    high velocity spatter?

6    A.  Well, once again, we don't really use speed any more

7    because you can have a power tool to cause this, like a drill

8    or electric saw, people have been injured.  So there's not a

9    real velocity component, it's just the energy.

10   Q.  Let me ask you this last question:  You would agree that

11   you don't see any specific pattern of these high velocity blood

12   particles that you're referring to on the bolt cover?

13   A.  I do see a pattern of high -- consistent with high velocity

14   or high energy impact spatter.

15   Q.  Can you show us the pattern on this exhibit?

16   A.  Yeah, there's one that's distinct on there.  You want me to

17   come down?

18   Q.  Sure.

19            THE COURT:  If you have a pointer.

20            THE WITNESS:  (Indicating)

21            THE COURT:  Yes.

22            THE WITNESS:  There's a linear distribution of very

23   small particles in this area where I'm indicating here.

24   BY MR. GALIPO:

25   Q.  Can you see them as you're looking at this photograph?

Jason – cross

1    A.   Yes.

2    Q.   And that's the pattern that you were referring to?

3    A.   Yes.

4            MR. GALIPO:   Thank you.   That's all I have, your

5    Honor.

6            Thank you.   Redirect, Mr. Loebs?

7    REDIRECT EXAMINATION

8    BY MR. LOEBS:

9    Q.   Mr. Jason, you were asked on cross-examination some

10   questions about your meetings with me related to this case.   Do

11   you remember that?

12   A.   Yes.

13   Q.   And the number of meetings and the period of time in which

14   you worked on this case.   Do you have that in mind?

15   A.   Yes.

16   Q.   Is there anything unusual at all in your meeting with an

17   attorney to discuss the case?

18   A.   No.

19   Q.   And those meetings are in part you educating me as to the

20   basis for your opinions?

21   A.   Some of it, yes.

22   Q.   Okay.   And also you needed to review some evidence and the

23   vehicle; is that correct?

24   A.   Yes, and you were the one that gets me into the property

25   room and so on.

Jason - Redirect

1    Q.   Okay.  And with respect to your opinions in this case, are

2    they your own, or is it something I told you to say?

3    A.   They're my own opinions.

4    Q.   And the basis for your opinions, you have been and are

5    prepared to discuss that with the jury?

6    A.   Oh, yes.

7    Q.   Now, you were asked some questions, maybe for a couple of

8    hours yesterday, about some exhibits that have been marked for

9    identification but are not in evidence, 184 and 185.  Do you

10   have those exhibits in mind?

11   A.   I do.

12   Q.   And at the time of your deposition -- or, excuse me, when

13   you were being asked questions, you were asked if you could

14   discuss the differences between those exhibits and the final

15   exhibit you prepared with respect to your opinions in this

16   case.

17   A.   Yes.

18   Q.   I know you talked about some of the things in terms of the

19   colors and other things like that.  In reviewing those -- first

20   of all, what were 184 and 185, just in general?

21   A.   Those were just interim preliminary drawings that I had

22   been working on.  It was not the completed drawings.  So there

23   were -- it was just a start.  And actually I looked up last

24   night to see if I could find those because I usually don't keep

25   them because they have no real significance.  They're just, you

Jason - Redirect

1    know, they are just in-between things, as I'm progressing.

2           I did find one with the car in the -- the SUV on Larch

3    Way with all doors closed.  That's just part of my process.  I

4    start dealing with certain things and I work on them.

5    Q.  Specifically talking about the 184 and 185, are those even

6    the same version?

7    A.  No, those are two separate scenes, they represent two

8    separate states of work.

9    Q.  Now, other than just talking about the differences in

10   colors and those sorts of things, were there other differences

11   in there in terms of the dimensions between themselves and each

12   other and your final work?

13   A.  Oh, yes.  When I went there last night, there were some

14   things that were very significant, like the width of the

15   sidewalk on the south side was totally inaccurate.  That's

16   something I corrected later on.  It's hard to get that

17   dimension because there's a curbed area to the sidewalk, so I

18   had done something wrong, I later corrected that.  The police

19   car -- police cars shown behind the SUV, I believe were in

20   different locations.  One of them even had the -- had emergency

21   lights on top of the police car.  One of the light bars was

22   actually on the windshield.  It was just some error that I'd

23   made.  There were also -- I know a tree, at least one tree was

24   in the wrong location.  I believe there were other elements

25   like -- subtle elements, but significant ones, about the

Jason - Redirect

```
1   location of the parking stalls relative to the doors.

2   Q.  How about with respect to like in terms of just comparing

3   just in general these versions with your final version, how

4   about the locations of the apartments?  Are those different as

5   well?

6   A.  Yeah, the apartments, first of all, the apartment numbers

7   aren't indicated on the 184 and 185.  At all.  So it's really

8   hard to tell what apartment you're dealing with.

9   Q.  And the various cars in relation to each other, those are

10  in different locations than your final product?

11  A.  Yeah, the cars, the parked cars were changed quite a bit,

12  not just the color but the size of them.  I think the

13  orientation of one of them.  I can't remember now.  There were

14  a lot of differences.

15  Q.  How about the orientation of the SUV in relation to other

16  vehicles?  Is that different as well?

17  A.  Yes, the SUV is in different locations on 184 compared to

18  185, and then compare both of them to my final product and,

19  yes, they're different.

20  Q.  Let me just ask you this then about 184 and 185:  Do those

21  exhibits have any significance at all to your opinions or

22  testimony in this case?

23          MR. GALIPO:  I'll object as vague and ambiguous as to

24  "significance"; calls for speculation.

25          THE COURT:  I'll overrule.  Overruled.
```

Jason - Redirect

1   A.   No, they don't.

2   Q.   Are those exhibits -- we're talking about 184 and 185.   Are

3   those a fair and accurate representation by you of the scene?

4   A.   They're not a fair and accurate representation, no.

5   Q.   Now, you did do something that you believe to be a fair and

6   accurate representation as best you can determine from the

7   photographs, from measurements, from exhibits to the scene?

8   A.   That's correct.

9   Q.   We've marked as V5-02 the large version of that, and I

10  think V5-02(a) as the small version, at least the close-up.   Is

11  that -- do you have that in mind?

12  A.   I don't know the numbers myself, but I'll accept that.

13          THE COURT:   I think 5-01 is the broader blowup.   5-02

14  is the more close-up blowup.   And then there should be a

15  5-01(a) and 5-02(a) that are the smaller pictures from which

16  the blowups were made respectively.

17  BY MR. LOEBS:

18  Q.   V5-02 is the more close picture; is that correct?

19          MR. GALIPO:   I'll object as lacking foundation as to

20  the angle of the door when compared to the crime scene photos.

21          THE COURT:   I don't think the witness has tried to use

22  the angle as definitive here, but if there's any question about

23  it, Mr. Loebs should clear that up.

24  Q.   Looking at V5-02, the blowup of this smaller version, the

25  same thing, do you have this exhibit in mind?

Jason - Redirect

1    A.   Yes.

2    Q.   And did you prepare this?

3    A.   Yes.

4    Q.   And what does this represent?  What is it?

5    A.   That's an overhead view of Larch Way with the vehicles in

6    place as indicated on the Sergeant Riggle crime scene diagram.

7    Q.   And how did you put this exhibit together?

8    A.   I first went to the scene and took measurements, took

9    photos, then I reviewed the crime scene pictures and the

10   diagram I just described, and using all of that, and several

11   more trips back there, to that location, to verify things or

12   double-check things or get additional measurements, I was able

13   to essentially draw this in the computer.

14   Q.   And with respect to the vehicles in relation to each other,

15   is it intended to be proportional?

16   A.   Yes.

17   Q.   And you did do that?

18   A.   Proportional, yes.

19   Q.   Now, with respect to the door that we see open on the SUV,

20   I want you to assume that before the crime scene photographs

21   that you looked at were taken, that the door had been closed to

22   secure the weapon that was found inside the door; and just for

23   the purpose of the photographs, the door was opened by the

24   photographer, pictures were taken, just for the purpose of

25   taking pictures without the intention to duplicate in any way

Jason - Redirect

1   the position of the way the door was at the time of the

2   incident; and then later on the vehicle was removed.  Do you

3   have those facts in mind?

4   A.  Yes.

5   Q.  When you were attempting to do your best to try to prepare

6   a diagram of the scene with respect to the door being open and

7   closed on the SUV, as shown in Exhibit V5-02, were you

8   intending to depict the door as it was shown in the crime scene

9   photographs?

10  A.  No.

11  Q.  And you have given some opinions about the door and the

12  door angle, correct?  You talked about that somewhat yesterday?

13  A.  Yes.

14  Q.  With respect to the door as is shown in this exhibit, what

15  in general on the SUV is that intending to depict?

16  A.  That the door is open.  I can't say how much it was open

17  during the shooting incident.  But I know the door was open to

18  some degree.  And that just shows the door being open.

19        MR. LOEBS:  Your Honor, we offer Exhibit V5-02 and

20  V5-01 and the smaller versions V5-02(a) and V5-02(b) in

21  evidence.

22        THE COURT:  V5-01 and 502 were admitted earlier

23  without objection.  But at that time Mr. Galipo thought that

24  the -- there was a different original version from which it was

25  made.  If there is any objection at this time, I'll -- I'd like

Jason - Redirect

1     to hear what the objection is.

2              MR. GALIPO:  Foundational objection regarding the

3     angle of the door.

4              THE COURT:  Because it's been made clear to the jury

5     that the angle of the door was not intended in the picture to

6     be the same as the angle of the door at the time of the

7     shooting but just to show a door open, and that all of the

8     other dimensions have been described as having been calculated,

9     I'm going to overrule the objection and allow the exhibit.  And

10    I don't think there's any confusion because it's made -- been

11    made clear what part of it is not intended to be calculated.

12             MR. GALIPO:  Another foundational objection is we

13    don't even know if the door can open as far as is shown in that

14    photo.

15             THE COURT:  Well, that's nothing that I frankly can

16    recognize as a recognizable objection, shall we say, but more

17    of an argument, so -- overruled.

18             (Defendants' Exhibits V5-02(a) and V5-02(b) received

19    in evidence)

20    BY MR. LOEBS:

21    Q.  Very quickly, Mr. Jason, just in general you talked

22    yesterday about when you were asked to estimate how far this

23    door was opened, you said about 70 degrees?

24    A.  Yes.

25             THE COURT:  In the picture.

Jason – Redirect

1    Q.  Yes, in the picture.

2    A.  Yes.

3    Q.  Do you have an understanding as to whether this specific

4    SUV that you looked at, whether that door when it's fully

5    opened is open at about 70 degrees?

6    A.  Yes.

7    Q.  And what's your understanding?

8    A.  I measured the door at full rotation as about 70, 72

9    degrees, fully open.  That's relative to the long axis of the

10   vehicle.

11   Q.  Now, just real quickly, we have the other Exhibit V5-01

12   that we showed somewhat more briefly.  Can you explain what

13   this is in relation to Exhibit V5-02?

14   A.  Well, that's the same scene that you saw previously, it's

15   just looking at it from a wider point of view so you see the

16   entire Larch Way Street.  There are missing cars in there

17   because I only have data on cars in the immediate area.  I

18   don't have any other data.

19   Q.  So we're talking about to the left of the last police car,

20   all this area, you weren't intending to depict that as

21   completely empty at the time of the incident?

22   A.  That's correct.  I don't know what was parked there.

23   Q.  And similarly to the right of the last blue car, you

24   weren't intending to depict that area as empty either; is that

25   correct?

Jason - Redirect

1    A.  I depicted it empty, but I don't have it -- because I don't

2    have any data as to what was or wasn't there.

3    Q.  Okay.  And this would otherwise be just a larger version of

4    the same thing that Exhibit V5-02 is in terms of the work you

5    did in measurements, correct?

6    A.  Yes.

7              THE COURT:  Just describing it for the record, then

8    the witness, as I understand it, is not trying to depict the

9    state of the automobiles on the south side of the street.  The

10   side of the street away from where the shooting occurred?

11             THE WITNESS:  Yes.

12             THE COURT:  And he's not trying to depict the state of

13   the other automobiles to the east of the area where the

14   shooting occurred; in other words, going down towards Laguna on

15   the same side of the street?

16             THE WITNESS:  Yes, ma'am.

17   BY MR. LOEBS:

18   Q.  Did you depict at least one vehicle on the south side?

19   A.  Yes, because that was in Sergeant Riggle's sketch.

20   Q.  And we talked before about some work you did on

21   Exhibit F-9.  You talked somewhat about this shadow SUV shown

22   in the middle and what the yellow line's intended to represent.

23   A.  I did.

24   Q.  Other than that, the yellow line and the shadowed SUV,

25   would this be -- F-9, would this be the same information as

Jason – Redirect

1   contained on V5-02; in other words, the same diagram, you just

2   added this additional information?

3   A.  Yes.

4   Q.  And just really quickly, with respect to Exhibit F-9, what

5   you were intending to depict with this exhibit in terms of the

6   shadow SUV and the yellow line and the position of the door,

7   you weren't intending to depict that as a reconstruction of the

8   crime scene, correct?

9        MR. GALIPO:  I'll object as vague and ambiguous.

10        MR. LOEBS:  I'll rephrase.

11   Q.  Let me ask this:  With respect to the shadow vehicle and

12   the line through the SUV, is this otherwise the same as

13   Exhibit V5-02?

14   A.  Yes.

15        MR. LOEBS:  Your Honor, we offer Exhibit F-9 into

16   evidence.

17        THE COURT:  Was that not admitted earlier?

18        MR. LOEBS:  I know it was discussed.  I can't

19   remember.

20        THE COURT:  I'll look and see.  This was F-9?

21        MR. LOEBS:  F-9.

22        THE COURT:  So that would be an added exhibit.

23        F-9 was not admitted.  Is there an objection?

24        MR. GALIPO:  Yes, your Honor.  Specifically with

25   regards to the angle.

1          THE COURT:  The door again?

2          MR. GALIPO:  Of that door.  I have a protractor here

3    if you want to look at it.

4          THE COURT:  Can we clarify again that the witness was

5    not trying to replicate the angle of the door during the course

6    of the shooting?

7    BY MR. LOEBS:

8    Q.  Were you intending to replicate the angle of the door as it

9    was photographed by the inspectors of the crime scene through

10   this exhibit?

11   A.  No, I was not.  I did not.

12         THE COURT:  Or to my understanding, in any other way.

13   In other words, does this refresh some calculation on his part.

14   Q.  With respect to the door being opened, does it reflect --

15   as it's depicted in this exhibit, does it reflect in any way

16   your opinion as to the ability of the door to open, regardless

17   of how it's photographed at the crime scene?

18   A.  The fact that the door does open that way, that's about the

19   extent of it.  Not the actual angle.  I don't know what the

20   angle was during the shooting.

21   Q.  Okay.

22         MR. GALIPO:  Well --

23         THE COURT:  But you can come back and do it with a

24   protractor afterwards.

25         MR. GALIPO:  Thank you.

1          THE COURT:  If you want to object, no foundation, the

2     door's not based on any calculation, you can do that.  But it's

3     clear to the jury that that is the case, and the rest of it is

4     relevant in that respect, and I'll overrule.

5          So F-9 will be admitted.

6          (Defendants' Exhibit F-9 received in evidence)

7     BY MR. LOEBS:

8     Q.  Just a few more questions about some of these graphics.

9     Looking at V5-02 in doing this work, you talked before about

10    some of the other work you'd done to illustrate your opinions,

11    how precise can we be in drawing any very specific conclusions

12    using this diagram with measurements and so forth?

13         MR. GALIPO:  I'll object as vague and ambiguous as to

14    what conclusions.

15         THE COURT:  I'll overrule.

16    A.  This can be used to visually represent or visually

17    understand the relationship of the different objects, the

18    parked cars, the buildings, the sidewalk and so on.  And the

19    location of the SUV.  I hate to say lesser things about my own

20    work, but as the Judge pointed out, what this really is is sort

21    of a jazzed-up crime scene sketch.  And it represents the crime

22    scene with the data that's available in a more detailed and

23    accurate form than the actual crime scene sketch, which is not

24    to scale, and this is.  But it's not -- you can't be splitting

25    hairs in there about what -- about the fine dimensions.  It's

1    just a sketch.  A fancy one, but it's a sketch.

2    Q.  Let me ask you a couple of questions about the door angle

3    issue.  In your work in this case, how did you approach your

4    task with respect to having -- trying to evaluate the shooting

5    incident and the relationship between the individual in the SUV

6    and the way in which the door was opened?

7    A.  Well, looked at the physical evidence and then, starting

8    with the -- not that I started this way, but going to the

9    foundational elements, is the blood evidence in the car.  And

10   then the wounds on the decedent.  And there are only certain

11   physical characteristics of the car that are consistent with

12   his wound, his wound paths, and the blood distribution.

13   Q.  Now, did you do an analysis of this case with respect to

14   two possible positions in which the door could be open in terms

15   of being fully opened and opened detent at 55 degrees?

16        MR. GALIPO:  I'll object as vague as to point in time

17   and not disclosed under 26.  I'm not sure I understand the

18   question.

19        THE COURT:  I'm not sure I understand the question.

20   Did you do an analysis of the case?

21   Q.  Is part of your analysis in this case as part of his body

22   position in the car when the shots were fired, did you look at

23   the degree at which the door could be opened to accommodate

24   those shots?

25   A.  Yes.

Jason - Redirect

1   Q.  That's part of the work you did in this case?

2   A.  Yes.

3   Q.  You talked about the door having different detents.  What

4   do you mean by that?

5   A.  Well, there are -- you might think of the door having four

6   positions.  One is closed.  And then you can open it to the

7   first detent, where the lock open -- not lock, but stop.  And

8   that's at 30 degrees.  And then there's another detent where it

9   will naturally mechanically come to rest, and that's at 55

10  degrees.  And then you have the fully opened position, which is

11  the fully opened rotation which is all the way open, which is

12  about 70 degrees.

13  Q.  With respect to your work in this case, I want you to

14  assume, hypothetically again, that when you were looking at the

15  crime scene photographs -- you testified before that showed the

16  door at the 55-degree angle; is that correct?

17  A.  It seemed to me that it was a 55-degree angle, yes.

18  Q.  And I want you to assume that that door had been, before it

19  was photographed and after the shooting took place, had been

20  closed, and then opened again just for photographic purposes

21  without any intention to have it represent the position the

22  door was at the time the shooting took place.  Do you have that

23  in mind?

24  A.  Yes.

25  Q.  With that understanding, how much value would you put into

Jason - Redirect

1    the angle at which the door was photographed at the crime

2    scene, in terms of the position it was at the actual time the

3    shooting event occurred?

4              MR. GALIPO:  I'm going to object to the question as

5    compound and vague.

6              THE COURT:  I'll overrule.  You're asking him whether

7    that had any significance to his opinion?

8              MR. LOEBS:  Yes.

9              THE COURT:  All right.

10   A.  No, no.  We don't know where the door was.  No one knows.

11             MR. GALIPO:  I'll object and move to strike that

12   nobody knows how far the door was open.

13             THE COURT:  Well, if anybody knows and they've

14   testified to it, fine.  If not, then there's an absence of that

15   in that connection.  Go ahead.

16   BY MR. LOEBS:

17   Q.  With respect to your work in this case, as to the way in

18   which a person can sit in a vehicle and the way in which an

19   individual can be shot while seated in the location you've

20   described -- do you have that in mind?

21   A.  Yes.

22   Q.  Did you do an evaluation as to whether, given the different

23   configurations of the street and the buildings and where the

24   SUV was located, did you do an evaluation as to whether those

25   injuries could have been sustained from the door opened at,

Jason - Redirect

1    let's say, the second detent at 55 degrees from an individual,

2    say, generally on the -- in the area of the northern sidewalk

3    north of the SUV?

4    A.  You're asking me if that could occur, if the injuries could

5    occur while the door's open at 55 degrees?

6    Q.  Yes.

7    A.  From a shooter on the sidewalk on the north side?

8    Q.  Yes.

9    A.  Yes.

10   Q.  And in terms of what that would mean in terms of the

11   shooter's location, if the door's open less, then that would

12   somewhat limit where the shooter would have to be in order to

13   accommodate those shots, would you agree?

14        MR. GALIPO:  I'll object as leading; and vague and

15   ambiguous as phrased.

16        THE COURT:  I will overrule.

17   A.  Yes.  The door rotation, the amount of rotation of the

18   door -- and I should mention, we don't know -- I talk about the

19   detents, 30, 55 and 70, the door could be between detents.  So

20   we don't really know what angle it was.

21        The rotation of the door will restrict the area from

22   which a shooting could occur to strike the decedent.

23   Q.  If the door is open more, then the area in which the

24   individual who fired the shots could be, at least in terms of

25   the restrictions of Larch Way and incident to the scene as you

Jason – Redirect

1   examined it, could have been in a somewhat broader area?

2   A.  The further the door's rotated open, the more latitude you

3   have to find a spot that would accommodate those trajectories.

4   Q.  Let's talk about with -- and we're talking about in this

5   case, let's take, for example, if the door were at the second

6   detent, okay?

7   A.  Okay.

8   Q.  Where, in general, in that position, was the individual

9   that fired those shots in general on this exhibit if the door

10  was open at the second detent?

11          MR. GALIPO:  I'll object.  There's no foundation.

12  A.  On the north sidewalk, somewhere near the red car.

13  Q.  This red car?

14  A.  That red car.  Somewhere either behind that red car or

15  slightly to the right as we're looking at the picture.

16  Q.  And if the door was more fully opened, closer to the full

17  range of the door, around 70 degrees or so, in general where

18  could the individual who fired the shots be located, with that

19  in mind?

20  A.  It gives more latitude from the position behind the red car

21  to the east somewhat, to where the black number indicator is.

22  Some point in there.

23  Q.  Around by the black number 618?

24  A.  Yes.

25  Q.  So hypothetically, let's say Officer Paine testified that

Jason - Redirect

1    when he fired the shots, that he was standing on the sidewalk,

2    the north part of the sidewalk, around the area of 618, as

3    depicted on Exhibit V5-02, do you have an opinion as to whether

4    that would be consistent with the door being opened to an

5    amount that it can be open and those shots being fired by

6    Officer Paine striking Mr. Boyd while he's seated on the

7    floorboard or rocker panel of the SUV?

8         MR. GALIPO:  I'll object as an incomplete hypothetical

9    and also improperly referring to trial testimony.

10        THE COURT:  Sustained.

11   Q.  Hypothetically, I want you to assume that the shooter was,

12   the person who fired the shots, was in the location here behind

13   around 618.  Do you have that in mind?

14   A.  Yes.

15   Q.  With that hypothetical in mind, that individual fired the

16   shots at Mr. Boyd, would that be consistent with your analysis

17   as to Mr. Boyd's trajectory of his wounds and being seated in

18   the rocker panel with his hand to the left side of his left

19   thigh, as you've described?

20        MR. GALIPO:  Objection, incomplete hypothetical as to

21   the angle of the door.

22        THE COURT:  Overruled.  It's per cross-examination.

23   A.  Yes, it is consistent, that shooting location is consistent

24   with the physical evidence and in terms of the wound, wound

25   paths, and the blood evidence.

Jason - Redirect

1    Q.  Now, in terms of this case, are you giving any opinion

2    yourself as to what was the more likely position in terms of

3    how far the door was open in terms of whether it was 55 degrees

4    or 70 degrees?

5    A.  No, I do not know how far the door was open, other than to

6    say the door had to be open sufficiently to allow someone to be

7    seated, as I've indicated in the other exhibit, and to allow

8    the trajectories to -- the bullet trajectories to get into the

9    car, or into the decedent.

10   Q.  So really the significance of how far the door is opened,

11   whether it was 55 or 70, that just relates to where along the

12   northern sidewalk the individual who fired the shots would be

13   located; is that correct?

14          MR. GALIPO:  Objection, leading.

15          THE COURT:  I'll overrule, and I'll tell you why in a

16   minute.  You can answer the question.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  Ordinarily, I don't believe that

19   leading will lie as an objection to expert testimony, on the

20   theory that the expert knows more than the lawyer who's asking

21   the questions and can't be talked into an answer.  Okay.

22          THE WITNESS:  Remember that, Mr. Loebs.

23          MR. LOEBS:  I'll stipulate to that theory.

24          THE COURT:  To the extent someone's asking them on

25   factual matters, of course, then the objection could still lie.

```
 1     But if it's as to their opinion --

 2              MR. LOEBS:  This actually might be a good time for our

 3     break, your Honor.

 4              THE COURT:  Once again, ladies and gentlemen, take an

 5     hour's break.  Thank you very much.  Remember my admonition.

 6              (The jury exited the courtroom)

 7              THE COURT:  That doesn't necessarily mean it's an

 8     effective way to cross-examine or to examine.  All right.

 9              (Luncheon recess, 12:13 p.m.)

10              DEPUTY CLERK:  Please come to order.

11              THE COURT:  Okay.

12              (The jury entered the courtroom)

13              (In open court; jury present)

14              THE COURT:  Good afternoon, ladies and gentlemen.  I

15     notice it's kind of cold in here this afternoon.  Is there

16     anyone who wants to get a jacket or something?

17              Okay.  Well, then, Mr. Jason.

18              JUROR NO. 6:  It gets colder every day.

19              THE COURT:  Okay.  Mr. Jason's back in the stand.

20     BY MR. LOEBS:

21     Q.  During direct and cross-examination you were asked some

22     questions about a model that you used with the vehicle to

23     reflect some of your opinions in this case.  Do you recall

24     discussing that?

25     A.  Yes.
```

Jason - Redirect

1    Q.  And I believe there was some exhibits produced by

2    Mr. Galipo, 192(a) through (c) related to your work with

3    respect to the model.  Do you have those in mind?

4    A.  I believe so, yes.

5    Q.  What were those in general, 192(a) through (c)?

6    A.  Can I be just shown those for sure?

7              DEPUTY CLERK:  I do not have (c).

8              THE COURT:  (c) ultimately was not used.  No, (a, (b)

9    and (c) were used.  (d) wasn't used.  So there's three, (a),

10   (b), (b).  They should all be similar in nature, photos of the

11   model.

12             DEPUTY CLERK:  I do not have (c).

13             MR. LOEBS:  Through (c).  I believe one was withdrawn.

14             THE COURT:  (c) was withdrawn.

15             MR. LOEBS:  As being similar to one of the others.

16             MR. GALIPO:  I thought it was (d), the fourth one.

17             THE COURT:  (d) was not used.  But there was -- I had

18   that there was (a), (b) and (c).

19             MR. GALIPO:  That's what I thought.

20             THE COURT:  And the clerk only has (a) and (b).

21             DEPUTY CLERK:  I only have (a) and (b), your Honor.

22             THE COURT:  Mr. Galipo, do you know where (c) went?

23             MR. GALIPO:  I will look through my belongings and see

24   if I have it.

25             THE COURT:  Right now we just have (a) and (b), and I

Jason – Redirect

1    don't remember what (c) was vis-a-vis -- let's see.

2              MR. LOEBS:  In terms of our time, I don't have that

3    much left?

4              THE COURT:  Okay, well -- (c) was the same idea as

5    (b), generally.  But -- anyway, keep going.  Whatever you've

6    got.

7              MR. LOEBS:  May I approach, your Honor?

8              THE COURT:  Yes, sure.

9    BY MR. LOEBS:

10   Q.  Looking at these photographs, 192(a) and (b).

11   A.  Yes.

12   Q.  What are those?

13   A.  They are pictures of the actual SUV that was involved in

14   this incident, and there seated inside is the person I used as

15   a model, similar height and weight.

16   Q.  Are those intended to reflect by you your opinion in this

17   case regarding that individual and how they'd fit in the SUV

18   and represent in that regard the trajectories?

19   A.  No.

20   Q.  You did do -- you did take a photograph that does reflect

21   those opinions, correct?

22   A.  Yes.

23   Q.  And that is Exhibit U-5?

24   A.  Yes, that is.

25   Q.  And you talked a fair amount, I believe, yesterday and then

Jason - Redirect

1  today about Exhibit U-5 and what you did in order to illustrate

2  your opinions in this case?

3  A.  Yes.

4  Q.  And you mentioned something about a bullet hole in the

5  windshield that you believed was Officer Paine's third shot?

6  A.  Yes.

7  Q.  Is that visible in Exhibit U-5?

8  A.  Yes, it is.

9  Q.  Can you point that out using -- or me, telling me where to

10  go?

11          (Witness coming down from stand)

12  A.  It's right here where I indicated above the model's head,

13  and to the left of the steering wheel there's a defect that's

14  the actual bullet hole.  It's kind of hard to see, the window's

15  so dusty, the windshield is so dusty.

16  Q.  In fact, there were some photographs introduced by

17  Mr. Galipo that showed that windshield from the front.  Do you

18  have those in mind?

19  A.  Yes, I do.

20  Q.  And is that the same bullet hole?

21  A.  Yes, it is.

22  Q.  And this bullet hole, which direction was it going in terms

23  of the windshield; was it going from inside out or outside in?

24  A.  From inside out.

25  Q.  How confident are you of that?

Jason - Redirect

1    A.  I'm very confident of that.

2    Q.  Now, in coming up with your opinion, you said that that --

3    what did you say in terms of that bullet strike with respect to

4    someone being generally in the position of a photographer being

5    able to cause all three of these shots?

6    A.  It's consistent with someone shooting all three shots could

7    certainly have been shot, and they're almost aligned, very

8    closely aligned, horizontally.  There's not much dispersion

9    between them, really.

10   Q.  Let's say, hypothetically, someone is about 24 feet away

11   firing these shots.  How much change in the muzzle would there

12   be between these three shots as depicted generally in

13   Exhibit U-5?

14   A.  At 24 feet, one degree change in elevation of a gun, up or

15   down, one degree, results in a five-inch difference in point of

16   impact.  So if you move the gun just one degree, which is a

17   very small amount, like I'm indicating here, I can barely

18   indicate one degree without -- I hope I can be understood.

19   But, first of all, will result in a five-inch difference down

20   there.  At the target, at 24 feet.

21   Q.  Now, you've fired weapons yourself?

22   A.  Yes.

23   Q.  In terms of the weapon being in generally the same location

24   when it's fired, what's your opinion in this case as to whether

25   a weapon within a few degrees of the first shot through the

Jason - Redirect

1    third shot would be consistent with what you found in terms of

2    the trajectories and the wound paths?

3    A.   They are consistent.  I'm sorry, what was your question?

4    Q.   Just in terms of the -- let's say the spread, for lack of a

5    better term, of where you believe the bullets went, how

6    consistent, if at all, is that with a muzzle being in generally

7    the same location when the shots were fired?

8    A.   It's very consistent.

9    Q.   You were asked some questions about the angle that you used

10   for the door in this photograph, do you remember that?

11   A.   Yes.

12   Q.   And you said that was 55 degrees?

13   A.   Yes.  Yes, it is 55 degrees.

14   Q.   That is the second detent?

15   A.   Yes.

16   Q.   Why did you use that angle for this photograph?

17   A.   Just to be conservative, to show that the door could be

18   opened just that much and still someone could be seated in

19   there and be exposed to shots from the location of the -- where

20   the photographer is, essentially.

21   Q.   Okay.  And so if we imagine through this photograph the

22   door opened fully, that would create a greater range the

23   shooter could be in to accommodate the shots; is that correct?

24   A.   Yes.

25   Q.   So by doing this work, did you intend to represent that

1    that is the exact angle the door was in when the shots were

2    fired?

3    A.  No.

4         MR. LOEBS:  Your Honor, I'll ask that U-5 be admitted

5    in evidence.

6         THE COURT:  U-5?  Wasn't that admitted earlier?  Let

7    me look and see.

8         MR. GALIPO:  All the blowups now into evidence, your

9    Honor.

10        THE COURT:  Pardon me?

11        MR. LOEBS:  We have a small version, I believe, that's

12   U-5.

13        THE COURT:  We can discuss whether the blowups should

14   or shouldn't go in the jury room.  I guess it hasn't been

15   admitted.  Is there an objection to U-5?

16        MR. GALIPO:  Not to the photograph, no.  Not to it

17   being admitted.

18        THE COURT:  Is there a small version?

19        MR. LOEBS:  Yes.

20        THE COURT:  U-5 will be the photograph.  U-5(1) will

21   be the blowup, and that's U-5(1) is the blowup which is the

22   photo itself, and at some point we'll discuss what should be

23   available to the jury.  Some of the larger diagrams of the

24   scene might be helpful to have in the jury room so they can all

25   be looking at it at once.  Possibly also some of these

1   photographs.

2           For now I'm admitting the small version.

3           (Defendants' Exhibit U-5 received in evidence)

4           MR. LOEBS:  We're calling it U-5?

5           THE COURT:  Is it the same as U-5?

6           MR. LOEBS:  Yes, but it's a small version that would

7   be more --

8           THE COURT:  That's fine, you can mark it -- I'd do it

9   on probably the back.

10          MR. LOEBS:  It is the back.  U-5(a)?

11          THE COURT:  No, just U-5.  The blowup is now U-5(1).

12  In fact, all the blowups, I was trying to make paren one, but

13  because we had the confusion about the V5-01, 02, the blowups

14  are actually the primary exhibit in that group.

15  BY MR. LOEBS:

16  Q.  Mr. Jason, referring to U-5(1), the blowup, you mentioned

17  something before about, I believe in your cross-examination,

18  about this being a dynamic event?

19  A.  Yes.

20  Q.  What does that mean?

21  A.  It means there's motion involved.  The decedent wasn't

22  stationary, and there could have been movement during the

23  shooting.

24  Q.  So this photograph just depicts one -- what would be one

25  moment, correct?

1    A.   Yes.

2    Q.   And you're saying that the individual could have been

3    turning to the left, could have been turning to the right,

4    could have been moving, at the time the shots were fired?

5            MR. GALIPO:   Objection as leading; no foundation.

6            THE COURT:   I'll sustain as to that question.

7    Q.   Mr. Jason, in terms of your opinions with respect to

8    whether the individual could have been moving at the time the

9    shots were fired, what's your opinion in that regard?

10   A.   The individual could have been moving.

11   Q.   How about with respect to the left hand, could the

12   individual's left hand have been moving at the time it was

13   struck by a bullet?

14   A.   Yes.

15   Q.   Now, if you were asked some questions about the abdominal

16   shot as is depicted on this Exhibit U-5, do you recall that?

17   A.   I'm sorry?

18   Q.   You were asked some questions by Mr. Galipo about the

19   abdominal injury depicted on 5-01?

20   A.   Yes.

21   Q.   And Mr. Galipo had a ruler or yardstick that he was using

22   to help illustrate the angle?

23   A.   Yes.

24   Q.   Is there a front-to-back component in this abdominal injury

25   as well?

1    A.  Yes, there is.

2    Q.  What is that?

3    A.  It means the bullet was not only traveling across the body

4    right to left, but inside the body more or less diagonally.

5    Q.  And in your opinion, based upon your view of the autopsy

6    report by Dr. Smith and your review of the photographs on

7    autopsy and your review of Dr. Smith's description of the path

8    of the bullet, would that be consistent with one individual

9    with the muzzle of the gun essentially in the same location

10   creating these shots with the door open as indicated in U-5?

11   A.  Yes.

12   Q.  Now, you were asked some questions about whether -- let me

13   ask you this:  In terms of whether this U-5 approximates

14   exactly the view that the individual firing the shots would

15   have had, is this somewhat closer than the individual would

16   have been in terms of the vantage point?

17   A.  Well, it's not 24 feet away.  We're talking about the

18   location of the sidewalk area.  22 feet 7 inches from the side

19   of the car.  So this is a much closer representation, yes.

20   Q.  Okay.  Now, you were asked some questions about whether the

21   bullet that traveled through this area of the windshield,

22   whether you have any evidence that was located at the crime

23   scene.  Do you remember discussing that?

24   A.  Yes, yes.

25   Q.  Is it unusual at all not to be able to locate each piece of

1    physical evidence at a crime scene?

2            MR. GALIPO:  I'll object, vague and ambiguous as to

3    "each piece of physical evidence."

4            THE COURT:  Overruled.

5    A.  It's not unusual that all projectile fragments or

6    projectiles are recovered, or are not recovered.  In this case,

7    a hollow-point bullet, as this was, going through a windshield,

8    is most often stripped of its jacket, the copper jacket

9    surrounding the lead core.  And then there's also likely to be

10   some distortion of the bullet.  Now you have a lead core

11   traveling, which might hit a wall or curb or some other object

12   or car or something, and get further deformed, flattened.  And

13   then not even be recognized as a bullet unless you really know

14   what you're looking for.

15   Q.  In this case, in terms of your opinion, does the -- as far

16   as you understand, that this bullet that went through this

17   windshield wasn't recovered, at least reportedly recovered,

18   does that affect your opinions at all in this case?

19   A.  No.

20   Q.  Why not?

21   A.  Well, the physical evidence is consistent with the three

22   shots having been fired from the sidewalk location.  And two of

23   the bullets were recovered, and one wasn't, but there's

24   evidence of where the bullet struck.

25   Q.  Now, you were asked some questions about whether you

Jason - Redirect

1  thought this shot, this shot through the windshield, whether

2  this could have come from a different angle, and that is, could

3  have gone through maybe the driver's side passenger window.  Do

4  you recall that question?

5  A.  Yes.

6  Q.  And just in terms of a possibility, would that be in the

7  range of possibility?

8  A.  It's possible, yes.

9  Q.  Okay.  Now, the -- we see in this photograph that the

10 driver's side passenger window or the driver's side back seat

11 window, for lack of a better term, is broken; is that your

12 understanding?

13 A.  Yes.

14 Q.  Do you have an understanding as what could have caused that

15 to happen?

16        MR. GALIPO:  I'm going to object.  This calls for

17 hearsay.

18        THE COURT:  The form of the question, I'll sustain

19 objection to.

20 Q.  Do you have any opinion as to what could have caused,

21 assuming that this windshield was shattered at the time of the

22 incident, what could have caused that?

23        MR. GALIPO:  Objection, no foundation.

24        THE COURT:  Sustained.

25 Q.  Mr. Jason, I want you to assume that at some point during

Jason - Redirect

1   this -- the course of this event, that this windshield that we

2   see depicted on Exhibit U-5(1) was broken.  Do you have that in

3   mind?

4   A.  It's not a windshield.

5   Q.  I'm sorry?

6           THE COURT:  Window.

7   Q.  Window was broken.  Do you have that in mind?

8   A.  Yes.

9   Q.  Have you done any work in this case to evaluate what the

10  cause of that could have been?

11  A.  Yes.

12          MR. GALIPO:  I'll object as no foundation.  And calls

13  for --

14          THE COURT:  What's the lack of foundation?  So far he

15  hasn't been asked for his opinion again.  He's trying to lay

16  the foundation.  He asked, Did you do any work?  He said, Yes.

17  Now he's going to, I guess, say what he did.

18          MR. GALIPO:  That's fine.

19          THE COURT:  Overruled.

20  BY MR. LOEBS:

21  Q.  What work did you do in order to evaluate what the cause of

22  that, the window being broken could be?

23  A.  What possible cause?

24  Q.  Yes, what work did you do in that regard?

25  A.  I examined the car door and interior and exterior, and

Jason - Redirect

1  looked at the bullet impact marks and the -- and tried to

2  determine the angle of entrance into the car.

3  Q.  And based on that, did you formulate any opinions as to

4  what the possible cause of that window being broken could be?

5  A.  Yes.

6  Q.  And what is that opinion?

7  A.  The bullet strikes, there are I believe two bullet strikes

8  directly on the door.  The bullet has entered, and I'm not sure

9  what they hit inside, but you could have enough essentially

10  vibration or shock from the bullets impacting the door to break

11  the glass.  And there's one bullet, that one impact mark that's

12  to the right of the picture that's not seen where the bullet

13  travels through the body, and if it continues on its course, it

14  will probably strike the window mechanism, the supporting

15  mechanism for the glass.  And that I have seen cases where

16  that's enough to break the tempered glass.  That's tempered,

17  under stress, and it can be broken by an impact like that.

18  Q.  What difference does that make if it's tempered glass?

19  A.  Well, there's tempered glass and laminated glass.  The

20  windshield is laminated glass; the side ones are tempered.  And

21  it just -- that type of glass when it gets broken collapses,

22  generally, the entire glass pane will get crazed and come apart

23  as opposed to the windshield where the hole will be localized

24  to the defect area.

25  Q.  Now, you were asked some questions, I believe, that were

Jason - Redirect

```
1   brought to your attention in the cross-examination regarding

2   what an individual on, let's say, the right side of this door,

3   as shown in V5, would have been able to observe if he was

4   looking on the right side of the door and looking at this

5   individual as you have seated on U-5(1), do you recall that

6   discussion?

7            MR. GALIPO:  I'll object as vague and ambiguous as

8   phrased.

9            MR. LOEBS:  I'll rephrase.

10           THE COURT:  Okay.

11  Q.  Do you recall Mr. Galipo asking you some questions, I think

12  it was yesterday, about what an individual standing on the

13  other side of this door might have been able to see in terms of

14  the way you have this model placed?

15  A.  Oh, I think you were saying right before, but...

16  Q.  I misspoke.  It would be the left side.

17  A.  Okay.  Yes.

18  Q.  Now, in -- specifically you were asked questions about what

19  Officer Warnke might have been able to see at the time the

20  shots were fired if Mr. Boyd was in generally the position that

21  you have with this model.  Do you recall that?

22  A.  Yes.

23  Q.  What is your opinion in that regard?

24  A.  The bottom of the window ledge, of the door, I believe it's

25  43, 44 inches, so anybody taller than that would probably be
```

Jason – Redirect

1    able to see into the car, could be through the window opening,

2    to see the model's face.

3    Q.  Okay.  So the question, I believe, had to do with if

4    Officer Warnke hypothetically was standing some distance back

5    to the left of the driver door with the door between him and

6    say Mr. Boyd situated as you have the model, would that officer

7    be able to see any portion of Mr. Boyd's face if the model was

8    situated in this situation?  Is that what you understood the

9    question to be?

10   A.  If he's taller than 43 inches, I expect him to be able to,

11   yes.

12   Q.  And is that essentially self-evident from this photograph?

13          MR. GALIPO:  I'll object as vague and ambiguous; an

14   incomplete hypothetical, with respect to how far Officer Warnke

15   is back.

16          THE COURT:  Overruled.

17   A.  It is self-evident, I think, yes.

18   Q.  Let's see specific then as to how far he would be back and

19   let's assume that Officer Warnke is five-nine.  If he was

20   five-nine and if he was generally, using Exhibit V5-02,

21   somewhere in the back area of this stall by 616, somewhere

22   around here, do you have that in mind?

23   A.  Yes.

24   Q.  If the door was between him and Mr. Boyd, do you have that

25   in mind?

1    A.  Yes.

2    Q.  Would, in your opinion, Officer Warnke be able to see some

3    portion of Mr. Boyd's face as he's seated on the rocker panel

4    as you have the model depicted in V5-01?

5    A.  I believe so.

6    Q.  Now, you were asked quite a few questions about the blood

7    evidence that you examined.

8    A.  Yes.

9    Q.  Now --

10   A.  Could I correct something?

11   Q.  Sure.

12   A.  It's 45 to 46 inches, the level of the window opening.

13   Q.  So we're talking about this level from the ground up to the

14   level of the window opening?

15   A.  Yes.

16   Q.  And that's at 45 to 46 inches?

17   A.  Yes.

18   Q.  So the individual would have to be, their eye height would

19   have to be at that height or higher to be able to see through

20   the window and into the -- the head of the individual?

21   A.  Yes.

22   Q.  And five-nine would be enough?

23   A.  Yes.

24   Q.  I have some questions about the -- your work with respect

25   to the analysis of the blood, the blood evidence in this case.

Jason – Redirect

```
 1   In your opinion, do you believe that it would be sufficient in

 2   order to evaluate whether there was or was not high velocity

 3   impact spatter to merely look at the crime scene photographs?

 4   A.  I think you should examine the car in this case.

 5   Q.  Why?

 6   A.  Because that type of spatter is very small and is not

 7   always visible in photographs.

 8   Q.  With respect to this case in particular, did you think that

 9   it was important to examine the vehicle to determine whether

10   there was any blood relevant to your evaluation?

11   A.  Yes.

12   Q.  And did you do that?

13   A.  Yes, I did.

14   Q.  And the photographs you took, what was the process you took

15   in taking those photographs to show the blood patterns that you

16   found of significance?

17   A.  Well, the blood that I saw I documented as best I could

18   using high resolution camera and different exposures because

19   some of it was hard to see.  Even some of the pictures I took

20   you couldn't really see it clearly than the other ones I did.

21   And then when I printed the pictures, I changed -- I adjusted

22   the exposure to maximize the contrast so you can really see

23   them as well as possible.

24   Q.  And why did you do that?

25   A.  Visibility.
```

1    Q.   In terms of reaching opinions regarding blood spatter, you

2    were asked some questions about -- Mr. Galipo asked you some

3    questions about whether Mr. Firestone -- or Dr. Firestone had

4    any opinions contrary to yours or whether you ever learned that

5    he had any opinions contrary to yours regarding blood spatter.

6    Do you recall that?

7    A.   Yes.

8    Q.   Now, I want you to assume, hypothetically, that

9    Dr. Firestone never, not one time, ever went to the SUV and

10   looked at it himself with his own eyes.  With that assumption

11   in mind, do you have an opinion as to what ability

12   Dr. Firestone would have to be able to discern whether there

13   was high velocity impact spatter here or not?

14          MR. GALIPO:  I'll object as calling for speculation as

15   phrased.

16          THE COURT:  I assume this is not limited to

17   Dr. Firestone but anyone who had only a certain body of

18   information.

19          MR. LOEBS:  Yes.

20          THE COURT:  With that understanding, I'm overruling.

21   A.   I think -- I'm sorry, I don't remember the particular

22   question.

23   Q.   In this case, how important is it in your mind to actually

24   go and look at the vehicle rather than just look at some

25   photographs?

Jason - Redirect

1   A.  It's very important.

2   Q.  Why?

3   A.  Because the type of evidence, the blood evidence, is very

4   small and you really need to look for it with -- I use a high

5   density light and magnification, and I don't think you can

6   really offer an opinion on the blood evidence in this case

7   without looking at the car.

8   Q.  Now, in terms of the blood evidence that you found, there

9   was some questions that Mr. Galipo asked about the pattern and

10  the directionality of the blood that was inside the SUV.  Do

11  you have that in mind?

12  A.  Yes.

13  Q.  Now, based on your review and looking at the blood that was

14  in the SUV, what is your opinion as to whether that blood would

15  be consistent with an injury to the left hand as you've

16  described?

17  A.  It is consistent, yes.

18  Q.  How so?

19  A.  The blood distribution, the -- of blood.  The presence of

20  the blood on the bolt cover in the very small droplets, that

21  linear pattern is consistent with perhaps the lacerated area of

22  the thumb.  Then the blood from -- the transfer blood area --

23  the transfer blood deposits are consistent with a bloody hand

24  moving back and forth and left and right on the carpeted

25  surface.

Jason – Redirect

1  Q.  How about in terms of the amount of blood you saw inside

2  the SUV, do you have an opinion as to whether that amount of

3  blood can be left, let's say, in one or two seconds after an

4  individual sustained the types of injuries you understand

5  Mr. Boyd sustained to his left hand from a gunshot?

6  A.  I believe it is consistent.  Particularly -- in particular

7  consideration of the laceration of his thumb, which is not just

8  the standard bullet wound, but when you have an irregular entry

9  wound caused by a deformed bullet, maybe a destabilized bullet,

10 so there would be, I expect, a lot of blood.

11 Q.  You were asked some questions about whether you could

12 determine how long the blood had been there.  Do you recall

13 that?

14 A.  Yes.

15 Q.  Is that something that in doing blood spatter analysis you

16 can ever determine?

17 A.  Well, you can determine -- if the blood is wet or dry, you

18 can get some indication of how long it's been there.  But once

19 it's dried, I don't know of any analysis that would allow that

20 determination.

21 Q.  So with respect to your opinion with regard to this blood

22 being consistent with the left hand being in the area you

23 described, is that your opinion in this regard, that that would

24 relate to this event?

25         MR. GALIPO:  I'm going to object as vague and

```
 1    ambiguous as phrased.
 2              MR. LOEBS:  I'll rephrase, your Honor.
 3              THE COURT:  Is it just the "relate to this event"?
 4              MR. LOEBS:  I'll rephrase it.  As I heard it, I didn't
 5    like it either.
 6              THE COURT:  All right.
 7    Q.  Mr. Jason, do you have an opinion in this case as to
 8    whether the blood evidence that you found inside the SUV has
 9    any relationship to the gunshot wounds that Mr. Boyd sustained?
10    A.  Yes, they are consistent with the gunshot wounds that he
11    sustained.
12    Q.  And consistent with a high-velocity impact?
13              MR. GALIPO:  I'm going to object as vague as to
14    which -- which blood evidence.
15              THE COURT:  Overruled.
16    A.  Yes, it is consistent with the high-velocity impact
17    spatter.
18    Q.  And when you talked about the -- we'll get to that in a
19    minute.  But let me first ask you in terms of the pattern that
20    the blood left, looking at Exhibit X5-02, do you recall being
21    asked some questions about that?
22    A.  Yes.
23    Q.  And you were asked some questions about whether you found
24    any blood in this exhibit to the right of the bolt cover; is
25    that correct?
```

Jason - Redirect

1    A.   Yes, on the rocker panel and the carpeted area to the right

2    of the bolt cover as we're looking at it.

3    Q.   Did you find any?

4    A.   No.

5    Q.   With respect to the work that you did with the model and

6    how you had him positioned on the vehicle, where would his left

7    leg be in relation to an area that might -- this area, Exhibit

8    X5-02?

9              MR. GALIPO:  I'm going to object as vague as to point

10   in time to the person falling out of the car.

11             THE COURT:  Overruled.

12   A.   His leg would be on top of the covering, the rocker panel.

13   And part of his leg and buttocks would be on the carpeted

14   floorboard.

15   Q.   Okay.  So in terms of the area of X5-02 that we see here,

16   that's where you don't see any -- or you didn't find any blood,

17   are you saying that that area very likely could have been where

18   his left leg was?

19             MR. GALIPO:  I'll object as leading and vague as to

20   point in time.

21             THE COURT:  Overruled.

22   A.   Yes.

23   Q.   And in terms of the point in time, we're talking about at

24   the time that the injury to the left hand was sustained.  Do

25   you have that in mind?

1    A.   Yes.

2    Q.   Now, there was -- I wanted you to assume there's some

3    testimony that at some point after the left hand was inside the

4    vehicle, gunshot wound sustained to the abdomen, that Mr. Boyd

5    moved his left hand to cover the area of the abdominal wound.

6    Do you have that in mind?

7    A.   Yes.

8    Q.   How would that relate at all to any pattern of blood that

9    you might expect to see in the SUV in terms of on the rocker

10   panel or otherwise?

11   A.   Well, you would expect with the left hand to the left of

12   the body as seated in the rocker panel and as shown in U-5, if

13   the hand was struck, it could be moving while it was struck or

14   just before it was struck, and then after it was struck, and it

15   might be moved in reaction to being struck as if it was bitten

16   and pulled back or pushed forward, so there would be a blood --

17   I would expect to find transfer blood as seen there.  As

18   consistent with that type of injury.  And then if he raises his

19   hand up across the bolt cover and up above his thigh, reaching

20   over to his right side, everything's consistent with that.

21   Q.   Now, with respect to your analysis regarding Mr. Boyd's

22   position in the vehicle when the wounds were sustained, do you

23   recall before you also created a diagram to illustrate your

24   testimony in that regard, or a graphic?

25   A.   Yes.

 1              MR. LOEBS:  And we've shown this, this is Exhibit W-8.

 2              THE COURT:  I'm sorry, which is that again?

 3              MR. LOEBS:  W-8.

 4              THE COURT:  W-8.

 5  Q.  And you talked awhile ago about what the upper left-hand

 6  corner, it is in terms of the wounds in the anatomical

 7  position.  Do you have that in mind?

 8  A.  Yes.

 9  Q.  And Mr. Galipo was asking you to do some measurements on

10  him and some illustrations on him.  Is this, regardless of what

11  you did with Mr. Galipo, is this still your understanding of

12  the trajectory of the wounds sustained by Mr. Boyd?

13  A.  Yes.

14  Q.  In terms of your work on Exhibit W-8 when you're talking

15  about the wounds being sustained through the abdominal injury

16  and the left leg and the left hand, how does this exhibit

17  explain your opinions in that regard?

18              MR. GALIPO:  I'm going to object -- I withdraw the

19  objection.

20              THE COURT:  Okay.  You may answer.

21              THE WITNESS:  Thank you, Ma'am.

22              This, the graphic shows the body of someone with those

23  type of wound paths now seated in a dynamic position.  And it

24  shows that the leg wound aligns with the hand wound.  You see

25  the green rod, which represents the leg trajectory, aligning

Jason - Redirect

1    with the yellow hand injury.  And then the blue rod on the left

2    side is indicating the wound path of the abdominal gunshot

3    wound.

4    BY MR. LOEBS:

5    Q.  Now, you were asked some questions by Mr. Galipo with

6    respect to the abdominal injury to Mr. Boyd, whether that would

7    necessarily, if the individual, Mr. Boyd, were seated, mean

8    that the bullet would have to go through the door first before

9    causing an injury.  Do you recall that -- those questions?

10        MR. GALIPO:  I'm going to object.  The question is

11   vague and ambiguous depending on the position of the shooter.

12        THE COURT:  Overruled.

13   A.  I didn't quite understand the question.

14   Q.  I'll rephrase.  The questions that you were asked by

15   Mr. Galipo as to whether to sustain the abdominal injury with

16   the individual seated as you've described, whether it would

17   necessarily mean that the bullet would have to go through the

18   door first to cause the injury in the abdominal area.  Do you

19   remember that discussion?

20   A.  Yes.

21   Q.  Does this exhibit, W-8, illustrate your opinion in that

22   regard?

23        MR. GALIPO:  I'm going to object.  This exhibit was

24   not meant to illustrate any opinions as previously discussed.

25        THE COURT:  I don't know what that objection means.

1    Overruled.

2    A.   This does -- one of the elements that this graphic

3    demonstrates, shows, is that a wound path into the abdomen does

4    not have to go through the door, if that's the question.

5    Q.   And that's your opinion in this regard?

6    A.   It is my opinion.

7    Q.   And with respect to these wound paths coming from the same

8    focal point, that is, the abdominal injury, the left leg

9    injury, based upon your understanding of the autopsy report by

10   Dr. Smith, does this exhibit reflect your opinions in that

11   regard?

12            MR. GALIPO:  I'll object as no foundation, your Honor.

13            THE COURT:  I'm trying to see.  This exhibit has not

14   been admitted.  Your question is what?

15            MR. LOEBS:  His opinions regarding the trajectories

16   coming from the same focal point.

17            THE COURT:  I'll overrule.

18   A.   Yes, it does.  The same area of origin, or point of origin.

19   Q.   And with respect to what you've illustrated in this

20   graphic, that would be -- for the abdominal injury, that would

21   be consistent with your understanding of the trajectory through

22   Mr. -- into Mr. Boyd's body; is that correct?

23   A.   Yes.

24            THE COURT:  Are you offering this exhibit?

25            MR. LOEBS:  Yes, your Honor.

Jason – Redirect

1        THE COURT:  This witness created this exhibit?

2        MR. LOEBS:  Yes.

3        THE COURT:  Is there an objection to W-8?

4        MR. GALIPO:  Without making a speaking objection, your

5   Honor, yes.  Based on our prior discussions, that we're not

6   meant to duplicate this event.

7        THE COURT:  When you say "prior discussions,"

8   something that's happened in front of the jury?

9        MR. GALIPO:  I'm not sure.

10       THE COURT:  Because I'm not sure what you mean by

11  "prior discussion."  Whether you're talking about the -- some

12  of the witness's testimony, whether there's something that

13  happened.

14       MR. GALIPO:  I'll be more specific.

15       THE COURT:  Is it something I should send the jury out

16  for?

17       MR. GALIPO:  No, I'd rather not have to do that.

18  Maybe we can take it up on break, if that's okay.  The

19  admission of it.

20       THE COURT:  I don't remember specifically discussing

21  the exhibit, we may have, and so I'm a little concerned about

22  what the nature of the objection would be.  Can you hold off on

23  the admission of this?

24       MR. LOEBS:  Yes.

25       THE COURT:  And we'll take it up at the break.

Jason - Redirect

1           MR. LOEBS:  Yes, we can.

2           THE COURT:  Okay.

3   BY MR. LOEBS:

4   Q.  Mr. Jason, with respect to your opinions regarding the

5   trajectories from Officer Paine's point of view, in terms of

6   the -- your analysis of where -- your analysis with respect to

7   where he could have been to have caused these injuries.  Do you

8   have that in mind?

9   A.  Yes.

10  Q.  In terms of the height of the muzzle, height of the gun

11  that you used, you already explained how you arrived at that?

12  A.  Yes.

13  Q.  And if that height is 51 inches, then you would add 6

14  inches because he was on the sidewalk?

15  A.  Yes.

16  Q.  And with respect to the trajectory from that location to

17  the left leg, the left leg is parallel to the ground and the

18  entry wound would be 24 inches off the ground and the exit

19  wound having a downward trajectory of 5 to 10 degrees, do you

20  have any opinion as to, with respect to that shot, how that

21  would reflect, how that would relate to the trajectory from a

22  bullet fired by Officer Paine in a location you've described?

23          MR. GALIPO:  I'll object as Mr. Loebs indicated the

24  exit wound was in the back of the thigh, that mischaracterizes

25  the evidence.

Jason - Redirect

```
1              THE COURT:  All right.  That's the one objection?

2              MR. GALIPO:  That's the one objection, unless he wants

3     to describe --

4              THE COURT:  That's the objection?

5              MR. GALIPO:  Yes.

6              THE COURT:  I'll sustain as to that part.  You'll have

7     to reframe the question.

8     BY MR. LOEBS:

9     Q.  Mr. Jason, in terms of your understanding the entry wound

10    and the exit wound of the left leg, and you understood Dr. --

11    you accepted Dr. Bonnell's representation that would be at a 5

12    to 10-degree downward angle if the individual was seated with

13    the leg parallel to the ground?

14    A.  Yes.

15    Q.  With that understanding, how does that relate to a

16    trajectory fired from a muzzle height of 57 inches, 24 feet

17    away?

18    A.  57 inches, relative to the surface of the street there, I

19    did some calculations on it, and that would be a shot fired at

20    a 6.5-degree angle of depression.  That means the gun would be

21    depressed by approximately 6.5 degrees, to a line with that

22    impact.

23    Q.  Now, you were asked some questions about the abdominal

24    injury and your understanding as to the downward trajectory

25    with respect to the abdominal injury.  Do you recall that?
```

1    A.  Yes.

2    Q.  How does that relate to your opinions with respect to the

3    trajectory from this weapon, assuming it was 24 feet away at a

4    height of about 57 inches?

5              Let me ask this first:  What would be the height of

6    the entrance wound of the abdominal injury with the individual

7    seated?

8    A.  Relative to the ground, about 30 inches.  Remember, the

9    thigh wound is at 24, and the torso injury would be about 30

10   inches above the ground.

11   Q.  In terms of your opinion with regard to the trajectory with

12   the gun at the height and the distance we just described, what

13   is your opinion in that regard?

14   A.  Well, a shot from 51 inches -- from 57 inches high at 24

15   feet would result in a 4.3-degree downward trajectory, that is

16   angle of depression, 4.3 degrees to the abdomen.  But now we

17   have a wound path through the body which is estimated at 10 to

18   15.  So to accommodate that, we have this one trajectory coming

19   in, but we have a 10 to 15 degree in the body.  So it's

20   consistent with the body being, the torso being rotated to the

21   right, to the decedent's right slightly, about 6 to 11 degrees.

22   When he aligns this way.  Then the trajectory of the bullet

23   coming in at 4.3 degrees would create a wound path of

24   approximately 10 to 15 degrees.

25   Q.  Okay.  So the 10 to 15-degree angle we're talking about is

1  the body in anatomic position?

2  A.  Yes.

3  Q.  And in terms of how someone might be actually seated on the

4  floorboard of this vehicle, their body can be somewhat

5  different than an absolute anatomic position?

6  A.  Their body can be rotated to the right slightly in

7  different ways.  But in this case it's to the torso being

8  rotated to the right.

9  Q.  In W-8, did you intend in your depiction here to

10 approximate that degree of rotation?

11 A.  Generally.

12 Q.  So if someone was sitting in a fairly cramped space and

13 turning to the left looking for something under the seat, might

14 their body angle out to the right, as you've described?

15         MR. GALIPO:  I'm going to object as leading, your

16 Honor.

17         THE COURT:  Overruled.

18 A.  Yes.  Yes, the body could be rotated that way.

19 Q.  And with respect to the shot to the windshield, what was

20 the angle of trajectory of that shot, assuming again the muzzle

21 height was 57 degrees, 24 feet away?

22 A.  Not degrees, but 57 inches.

23 Q.  Inches, my fault.

24 A.  24 feet away.  We have 51 inches muzzle height and the

25 bullet defect in the window, in the windshield, is at 52

Jason – Redirect

1    inches.  So there'd be a slight elevation, maybe one degree.

2    Q.  Okay.  In terms of your opinion with respect to this

3    difference in elevation between the bullets being fired by

4    muzzle and generally in the same location, how much adjustment

5    would the muzzle of the gun have to make from that distance

6    away to cause those shots?

7    A.  For all three shots, we're talking about a range of

8    vertical movement of about within 5.5 degrees, which is a tiny,

9    tiny bit.

10   Q.  Now, how about if we had an individual that was standing

11   with a muzzle height as you've described, 57 inches, 24 feet

12   away, what would the individual have to do in order to create

13   the trajectory through the abdominal injury that would match

14   the 15- to 10-degree downward trajectory?

15   A.  He would have to lean to the right in the direction of the

16   shooter.

17   Q.  Lean to the right?

18   A.  Yes.

19   Q.  Okay.  At about 10 to 15 degrees?

20         MR. GALIPO:  I'll object as leading, your Honor.

21         MR. LOEBS:  Let me strike that.

22   Q.  About what would the angle be if he was leaning to the

23   right?

24   A.  About 10 to 15 degrees.

25   Q.  And why do you have that opinion?

Jason – Redirect

1    A.   That would create a wound path of 10 to 15 degrees which

2    would be in alignment with a shooting height of 51 inches.

3    Q.   Assuming that the -- for the sake of discussion, that if

4    the individual, Mr. Boyd, was standing, how high off the ground

5    was the abdominal injury?

6    A.   If he was standing, it would be about 50.5 inches.  And

7    we're talking about the shooting height being 51 inches, so

8    it's essentially a flat shot.  So if he was shot while he was

9    standing from 51 inches height, that shot would go straight

10   through him.  Or straight into him.  That is, parallel to the

11   ground.  So to get a 10 to 15-degree downward, anatomically

12   downward trajectory, he has to lean 10 to 15 degrees to his

13   right.

14   Q.   Now, you were asked some questions about how long it would

15   take someone to fall if they were standing.

16   A.   Yes.

17   Q.   And you answered those questions in terms of, you said you

18   used a phrase like "a sack of potatoes," something in that

19   regard?

20   A.   I did use that term, yes.

21   Q.   And what's your understanding if someone's standing with

22   their hands up and they start to fall like a sack of potatoes,

23   what their hands would do?

24   A.   Their whole body would fall sort of in sync.  Everything

25   goes down at the same time.  The hands don't precede the body.

Jason - Redirect

1    The head.  Everything goes down.

2    Q.  You were asked some questions about shell casings?

3    A.  Yeah.

4    Q.  And with respect to -- let's talk first about the locations

5    where you understand Officer Paine's shell casings to be.

6    A.  Yes.

7    Q.  One would be Number 6; is that correct?

8    A.  6, yes.

9    Q.  Another one would be Number 11?

10   A.  11, yes.

11   Q.  And then the other one that Mr. Galipo asked you about was

12   in perhaps the windshield of a car?

13   A.  Yes.

14   Q.  And about where is that on this diagram?

15   A.  It's, if you move your pointer up higher, next car.

16   Q.  Here (indicating)?

17   A.  Yes.  On that windshield of that car, as indicated there.

18   Q.  And is the car two below the Number 11, correct?

19   A.  Yes.

20   Q.  Okay.  And what, if anything, did you conclude regarding

21   the location of the shell casings in terms of your evaluation

22   of Officer Paine's position when, as you believe it was, the,

23   with the shots were fired?

24   A.  The position was consistent with the physical evidence.

25   Q.  Yes, as you understand.

1    A.  The shell casings, taking into consideration the casings

2    are striking onto hard surfaces, car bodies, concrete, asphalt,

3    perhaps the side of a building, and then rolling, and people

4    are running around and kicking things or potentially kicking

5    things, there's no real inconsistency with the location

6    compared to the shooting -- that is, the casing locations

7    compared to the shooting locations.

8    Q.  How much weight do you put on the location of a shell

9    casing to determine where a person was when a shot was fired?

10   A.  There are general indications.  For example, if you found

11   the casings on the other side of the street, you'd wonder about

12   that.  There may be explanations for it, but that may be

13   something to look at.  But in general you can learn some things

14   about the shooting location from the casing locations,

15   especially when it's on a soft surface like grass.

16   Q.  Now, with respect to Officer O'Malley's shell casings,

17   what, if any, information did it give you about what you

18   understood to be or in your analysis determine to be his

19   location when he fired his shot on Larch?

20   A.  Well, the casing is in the little doorway there.  If you

21   want to indicate it, it's Number 15.  And it is, in the general

22   area where he might have fired.  How it got there, I don't

23   know.  It could have been kicked or rolled.

24   Q.  In terms of your evaluation with respect to Officer

25   O'Malley's shot, talked about Exhibit F-9, in terms of your

Jason - Redirect

1   analysis in terms of where he must have been to make this shot

2   over -- first of all, what is this angle through the vehicle?

3   A.  The angle?

4   Q.  Yes.

5   A.  38 degrees.

6   Q.  And what does this information tell you about where

7   O'Malley, Officer O'Malley must have been in order to make this

8   shot?

9   A.  If you follow the yellow, yellow rod back north, it

10  indicates -- in general, I don't want to say this is the exact

11  location of that rod, that that points exactly to where it

12  would have been, but that general area points to where it would

13  have been behind that red car -- I can't read that parking

14  space number there.

15  Q.  2040?

16  A.  I'll accept that.

17  Q.  Okay.  Just a couple more things.  You were asked some

18  questions about whether you had any physical evidence regarding

19  the first shot fired at Broderick Street as indicated on

20  Exhibit T-5?

21  A.  Yes.

22  Q.  You didn't find any -- you're not aware of any bullets that

23  were recovered as a result of that shot; is that correct?

24  A.  That's correct.

25  Q.  Do you have any physical evidence that relates to that

1    shot?

2    A.   The physical evidence is in the form of the audio

3    recording, and you can hear an impulse sound that's consistent

4    with a gunshot.   Just before the officer says, "Shots fired,

5    shots fired."

6    Q.   And that audio recording is the CAD dispatch tape?

7    A.   Yeah, SFPD dispatch tape, yes.

8    Q.   One last area of questions.   You were asked some questions

9    about whether you did any evaluation in terms of Mr. Boyd's

10   position based upon the location of his prosthetic legs were

11   after the shooting event occurred.   Do you recall those

12   questions?

13   A.   Yes.

14   Q.   I want you to assume hypothetically that after the shooting

15   event occurred, Mr. Boyd was moved away from the vehicle.   Do

16   you have that in mind?

17   A.   Yes.

18   Q.   With that in mind, what relevance, if any, to you would be

19   the location of Mr. Boyd's prosthetic legs after he was moved

20   following the shooting event?

21   A.   I don't know.   I don't know.

22   Q.   Did you use that in evaluating your opinions in any way in

23   this case?

24   A.   No.

25   Q.   Is that in part that you understood that he had been moved?

Jason - Redirect

```
1   A.  He had been moved, yes.

2           MR. LOEBS:  Thank you.  That's all the questions I

3   have, your Honor.

4           THE COURT:  Any recross?

5           MR. GALIPO:  Yes, your Honor.

6   RECROSS EXAMINATION

7   BY MR. GALIPO:

8   Q.  Good afternoon, Mr. Jason.

9   A.  Good afternoon.

10  Q.  With regards to the last question about the prosthetics?

11  A.  Yes.

12  Q.  Did you at least in looking at the crime scene photos see

13  where that tarp ended up in relation to the vehicle?

14  A.  Yes, I did.

15  Q.  Does it appear to be consistent with Sergeant Riggle's

16  diagram in that regard?

17  A.  I believe so, yes.

18  Q.  I want you to assume, hypothetically, that Mr. Boyd's body,

19  after coming to rest on the ground, was pulled directly north

20  of the vehicle.  Do you have that in mind?  It was pulled in a

21  north direction?

22  A.  This is a hypothetical?

23  Q.  Hypothetical.

24          MR. LOEBS:  If I could have a moment to reorient so I

25  can see what you're doing.
```

Jason - Recross

1          MR. GALIPO:  Oh, of course.

2   A.   Yes, I have that in mind.

3   Q.   And further assume that when the body was pulled in a north

4   direction, the legs immediately separated and ended up where we

5   see Number 13 in the diagram.  Do you have that fact in mind?

6          MR. LOEBS:  Objection, your Honor, lack of foundation

7   as to "immediately separated."  Immediately separated, and

8   vague.

9          MR. GALIPO:  Separated from his upper body.

10         THE COURT:  No.  Are you objecting to the use of the

11  word "immediately" --

12         MR. LOEBS:  Yes.

13         THE COURT:  -- "separated"?

14         MR. LOEBS:  Yes, and lack of foundation and being

15  vague.  Calls for speculation.

16         THE COURT:  Is there some witness who described the

17  speed with which the separation occurred?

18         MR. GALIPO:  I don't think any particular velocity was

19  used, but I think there was testimony that they started pulling

20  him, and the legs stayed there and the upper body came out.

21         THE COURT:  Again, ladies and gentlemen, I'll overrule

22  the objection.  You're going to put the question to the witness

23  again.  And I'll just indicate again, ladies and gentlemen,

24  that you will be the ultimate determiners of what the

25  underpinnings are of any hypothetical question that's given to

1    a witness.  You'll have to decide whether the evidence actually

2    supports that hypothetical.

3              Okay, go ahead.

4              MR. GALIPO:  Thank you.

5    BY MR. GALIPO:

6    Q.  Again, with the hypothetical, you see Number 13, you

7    understand that relates to the prosthetics, correct?

8    A.  Yes.

9    Q.  Okay.  If that was the area where the prosthetics were, and

10   the body was pulled in a north direction and the prosthetics

11   essentially stayed in that area, would that be information that

12   would be important to you in analyzing where Mr. Boyd was at

13   the time the shots were fired?

14             MR. LOEBS:  Objection, lack of foundation; vague as to

15   what he meant by the "prosthetics were."

16             THE COURT:  Overruled.  If the witness has any

17   difficulty with the meaning of a question, just indicate such,

18   Mr. Jason.

19   A.  You're asking about the location of the prosthetics, as how

20   that would relate to my determining the location of where the

21   decedent was when he was shot.  It's generally consistent with

22   it in view of the -- your hypothetical that he was pulled away

23   and his legs separated somehow.  I don't really know how -- the

24   mechanism involved there.

25   Q.  Assuming the prosthetics, after he fell to the ground, in

Jason - Recross

1  the area of 13 towards the passenger door on the driver's side

2  of the vehicle, do you think that's consistent with your

3  position of having him seated in between the seat and the

4  floorboard when he was shot?

5        MR. LOEBS:  Objection, vague as to area of 13; and

6  vague as to the time; it calls for speculation; and lack of

7  foundation.

8        THE COURT:  Overruled.

9  A.  I don't -- I'm not sure how he fell out of the car.  If he

10 fell with his head towards the front of the vehicle and laid

11 alongside the vehicle and was pulled from behind, that's where

12 the prostheses would be if they came off, I would assume it's

13 consistent with that.

14 Q.  What if he fell with his head to the north and had his feet

15 closer to the vehicle, would that change your opinion?

16 A.  It would depend on how he was pulled and in what direction.

17 I don't know anything about that.

18 Q.  Okay.  Now, regarding Officer O'Malley's shot, you

19 basically had two points with which to make your trajectory,

20 correct?  One was the damage point in the vehicle?

21 A.  I really had three points.

22 Q.  Damage point in the vehicle was one.

23 A.  There's two there.

24 Q.  Two damage points in the vehicle.

25 A.  Right.

Jason - Recross

1    Q.  And then the location of the shot in the window.

2    A.  The bullet, location, yes.

3    Q.  Now, the only variable would be where the car was at,

4    correct?

5    A.  The only variable.  I'm not sure what you mean.

6    Q.  Is it your testimony that the car could have only been in

7    one place no matter where the shooter was to make that

8    trajectory?

9    A.  One general location.  Because those two defects in the

10   car, the interior and the exterior, when you put a rod through

11   there, it's a really tight fit.  It gives you a very good

12   indication of the angle through the car.

13   Q.  Did you take a picture of that for us?

14   A.  I think I did.

15   Q.  You did take a picture of that?

16   A.  I think so.

17   Q.  Okay.  Now, regarding the casing found on the front

18   windshield of the vehicle that I'm pointing to, do you have

19   that casing in mind?

20   A.  Yes, that was one of Officer Paine's casings.  Yes.

21   Q.  You have indicated already, I think, that based on your

22   knowledge of the ejection patterns of these casings, they eject

23   upward and to the right.  Is that correct?

24   A.  Upward and to the right.  And slightly to the rear

25   generally, but they could have a forward component.

Jason - Recross

1   Q.  Is a casing in your mind found on a front windshield of

2   that car consistent with Officer Paine being 12 feet from the

3   decedent at the time he fired the shot?

4   A.  12 feet.  That could be, yeah.

5   Q.  Okay.

6   A.  That would place him out away from the -- up off the

7   sidewalk and about halfway to the car where the number -- I

8   think it says 140 on there, could you point to that?

9   Q.  Well, it would place him approximately in the middle of

10  that parking space, correct (indicating)?

11  A.  12 feet would actually place him further to the south.

12  Q.  And if someone was standing in that direction and the

13  casing ejected upward and to the right and slightly to the

14  back, one place it could land would be the top of that

15  windshield, correct?

16  A.  That's true.

17  Q.  Now, with respect to the position that you have in U-5 of

18  this model that we've all seen sitting and reaching under the

19  seat, would you agree, based on your analysis of this case, for

20  Mr. Boyd to have been sitting on the running board and reaching

21  in the area under the seat at the time the shots were fired,

22  that would be the only position in the car he could have been

23  seated?

24  A.  Well, first of all, there's no running board.  I assume

25  you're talking about the rocker panel.

Jason - Recross

1   Q.  Floorboard.

2   A.  Floorboard.  You're asking me if that's the only location

3   or only orientation?

4   Q.  Well, actually both, I'll break it down.  First of all,

5   that's the only location in the car looking at U-5 that he

6   could have been seated to get the trajectory having his body

7   turned reaching under the seat; isn't that true?

8   A.  That's the general location that he would have had to have

9   been in, yes.

10  Q.  Couldn't have been anywhere else if he was seated, would

11  you agree?

12  A.  If the door was open, rotated fully, there is some left and

13  right latitude.  He could be -- somewhere in that general

14  location, if that's what you're asking.

15  Q.  He couldn't have been seated in front of the -- to the side

16  of the seat, correct?

17  A.  No.

18  Q.  Is that correct?

19  A.  That's correct.

20  Q.  So if he wasn't in this general position to sustain the

21  trajectories in the seated position, he had to be in some other

22  position, would you agree?

23          MR. LOEBS:  Objection, your Honor, calls for

24  speculation; lack of foundation.

25          THE COURT:  I'll overrule.

Jason - Recross

1    A.  Could you ask it again, please?

2    Q.  Sure.  If he was not seated in between the front of the

3    seat and this area that we see in U-5, with his body turned as

4    we see here, then he had to be -- to get those trajectories,

5    let's assume that we knew he wasn't in that position,

6    hypothetically, then he couldn't have been seated in the car at

7    the time he sustained the shots; isn't that true?

8    A.  I'm having trouble with this question.  I'm saying this

9    position is consistent with the evidence.  I don't really

10   understand what you're asking.

11   Q.  What I'm getting at, Mr. Jason, is the only place that he

12   could have been seated in the car to get these trajectories and

13   be reaching in the area of the front of the seat is the area we

14   see in U-5?

15   A.  If part of your hypothetical is that he's reaching under

16   the seat as indicated, well, yes, that's the position he's

17   shown in.

18   Q.  Right.  And if he wasn't seated in that position, and I

19   mean in the position forward of the seat, in order for him to

20   sustain the trajectories, he had to be in some other position,

21   outside the vehicle?

22        MR. LOEBS:  Your Honor, I object.  The question is

23   lacking foundation.

24        THE COURT:  Overruled.

25   A.  I don't understand what you're saying.  You're saying if he

1  wasn't seated like this, how could he have been shot?  Is that

2  what you're asking me?

3  Q.  You already told me that the trajectories would be

4  consistent with him being out of the vehicle shot, going down,

5  having the leg bent and picking up the other shot, you have

6  told me that already yesterday, correct?

7        MR. LOEBS:  Objection, your Honor, to Mr. Galipo's

8  representation of his body movements.

9        THE COURT:  I don't know how he moved yesterday.  All

10  right.  Skipping the body movements, do you have all those

11  parts of the question in mind; and if you do, did you testify

12  to such on cross-examination?

13        THE WITNESS:  I think there was some hypothetical

14  points to that, to the question yesterday.  What I'm saying is

15  that the physical evidence and specifically the blood evidence

16  is consistent with him being seated like that or near seated

17  like that, but with his left hand in that general area where

18  it's indicated.

19  BY MR. GALIPO:

20  Q.  Mr. Jason, excluding what you think is high velocity blood

21  spatter, would you agree that the trajectories are consistent

22  with him being standing outside of the car, being shot first in

23  the right side, going down, and picking up the shot to the leg

24  and then to the hand in the process of going down?

25        MR. LOEBS:  Object to the question as being vague; and

1    incomplete hypothetical; and compound.

2              THE COURT:  Overruled.

3    A.  I think it's -- first of all, you said to forget the blood

4    evidence.  The high velocity blood evidence, right?

5    Q.  Correct.

6    A.  Okay.  Because also the evidence, the blood evidence, the

7    projected blood on the front of the seat which essentially

8    points back to that same location.  Are we forgetting that one

9    too?

10   Q.  For this hypothetical, yes.

11   A.  So without -- if there were no blood evidence, could he

12   have been shot while standing?  Let's just take those shots

13   individually.  The torso shot?  He could have been standing and

14   been shot that way.  If his body was rotated, as I said tilted

15   to the right to some degree, by 10 to 15 degrees.  And then the

16   leg shot, you still want the leg shot to align with the hand

17   shot?

18   Q.  Yes, I'm assuming in this scenario as he's going down, the

19   leg bends, and I'm bending my leg, the shot goes through his

20   leg and hits his hand and he's going down?

21             MR. LOEBS:  I object to the demonstration by

22   Mr. Galipo as to the degree which his leg was bent and the

23   location of the hand.

24             THE COURT:  Was that part of your question or not, the

25   specific movement?

Jason – Recross

1          MR. GALIPO:  It didn't need to be.

2          THE COURT:  Ignoring the movements and keeping the

3   question in mind, can you respond, Mr. Jason?

4   A.  So the question is then, is it possible for his body to

5   align in such a way to allow the shot through the thigh to his

6   hand if he had started out standing.

7   Q.  Yes.

8   A.  Yes, it is possible, absent the blood evidence, yes.

9   Q.  And now the blood, you would agree there was some blood in

10  the car before the shooting, correct?  You already told us

11  that?

12         THE COURT:  You can't say "you already told us that."

13  Q.  Strike that.

14         You agree the bloody napkin was in the car before the

15  shooting, correct?

16  A.  That's –– yes.

17  Q.  You would agree that you can't say whether the transferred

18  blood was in the car before the shooting or not?

19  A.  The transferred blood, no, I can't say that.

20  Q.  So getting back to my question, the only place in the car

21  that Mr. Boyd could have been sitting to explain the blood

22  evidence and the trajectory and him reaching in an area towards

23  underneath the front of the seat is in the general area you

24  have shown in U-5?

25  A.  That depiction is consistent with the physical evidence.

Jason - Recross

1   Q.  And if he wasn't sitting in this general area in the area,

2   then you would agree he couldn't have been reaching under the

3   seat when he was shot, and sitting down in the car?

4   A.  I'm sorry, you lost me on that one.

5   Q.  If he wasn't sitting in the general area we see the model

6   in in U-5.

7   A.  Yes.

8   Q.  If he wasn't sitting in that general area, he could not

9   have been reaching underneath the front of the seat of the

10  vehicle and sustained the trajectories we have in this case?

11  A.  If he was standing --

12  Q.  No.  If he wasn't seated in this specific area.

13  A.  Yeah.

14  Q.  As opposed to anywhere else in the car, he couldn't have

15  sustained the trajectories and been reaching under the front of

16  the seat, given the configurations of the car?

17          MR. LOEBS:  Objection, vague as to his specific --

18  Q.  The one shown in U-5.

19  A.  All I have to say is that this position and orientation is

20  consistent with the evidence.  I'm not -- I don't know what

21  you're asking for.

22  Q.  Okay.  Mr. Jason, let me try to break it down.  He had to

23  be turned to his right in order to go the trajectory to the

24  right side, correct?

25  A.  Yes.

Jason - Recross

1    Q.  He couldn't have been sitting here -- he had to be turned

2    to his left -- I apologize, I'm sorry.  He couldn't have been

3    sitting here and be turned to his right towards the door

4    because his left side would have been to the shooter, correct?

5    A.  Correct.

6    Q.  Okay.  And he couldn't have been sitting to the side of

7    this seat and turned to his right and be reaching under the

8    seat because he'd be reaching towards the back door, correct?

9    A.  Correct.

10   Q.  Okay.  So the only place that he could have been sitting in

11   the car turned to his right to get potentially the projectile

12   to his right side and still be reaching under the seat is the

13   general area we see in the model in U-5?

14        MR. LOEBS:  Objection.  I think he meant to say

15   turning to his left.

16   Q.  Turning to his left, I apologize.

17   A.  Isn't that what I'm showing in that picture?

18   Q.  What I'm trying to get at, Mr. Jason, if he wasn't sitting

19   in that area, the area shown in U-5, based on your analysis of

20   this case, he couldn't have been -- sustained the bullet

21   trajectories you have, and be seated in the car, and be

22   reaching underneath the seat?

23        MR. LOEBS:  Object as to vague.

24        THE COURT:  Overruled.

25   A.  First of all, whether he's reaching under the seat or it's

Jason - Recross

1    just his hand is located where it's located.

2    Q.  Right.

3    A.  Okay.  So you're saying -- you're not asking me.  You want

4    me to confirm that this is the only location he could be in,

5    configuration, orientation, is that what you're asking me?

6    Q.  That's my question.  If you can tell me another place that

7    he could have been sitting in this car and turned far enough to

8    his left to get the bullet trajectory and be reaching towards

9    the either underneath the seat or in the -- in that area,

10   please tell me what the position is.

11   A.  There may be other positions that I haven't contemplated.

12   But this one is consistent with the evidence.  And that's where

13   I'll stand.

14   Q.  As you sit here today, can you think of any other position?

15            MR. LOEBS:  Objection, your Honor, argumentative.

16            THE COURT:  Sustained.

17   Q.  Now, do you know, Mr. Jason, if Officer Paine has him

18   sitting in this position?

19            MR. LOEBS:  Objection, your Honor, that's an

20   inappropriate question of this witness.

21            THE COURT:  You're asking if this witness has been

22   advised as to what Officer Paine said the decedent's position

23   was?

24            MR. GALIPO:  Correct.

25            MR. LOEBS:  Objection, hearsay.

Jason - Recross

```
1          THE COURT:  Sustained, unless the witness based his
2   opinion on some out-of-court statement.
3   Q.  Well, in doing -- strike that.
4          Okay.  Looking again at V5-02, you told us that that
5   door was approximately 70 degrees?
6   A.  The door on the SUV in that graphic, yes.
7   Q.  And you also told us, I think, the first -- you refer to it
8   as a detent?
9   A.  Detent, yes.
10  Q.  Okay.  The first one is 30 degrees; is that correct?
11  A.  Yes.
12  Q.  The second one is 55 degrees?
13  A.  Yes.
14  Q.  And in that original diagram that we talked about, 184, I
15  think we calculated yesterday 58 degrees?
16  A.  I'll accept that.
17  Q.  Now, would you come up here and mark where 30 degrees and
18  where 55 degrees are on the diagram?
19  A.  Yes.  I'd like to use my own protractor, if I might.
20  Q.  Absolutely.
21  A.  Let me get down so I don't block the jurors' view.
22  Q.  Okay.
23  A.  Again, I'm placing this line, this axis along the long axis
24  of the car as best I can.  What do you want me to show first?
25  Q.  Let's show 30 degrees.  Can you move the bottom of it up to
```

1    the driver's side of the vehicle?

2              THE COURT:  For the record, the witness's protractor

3    is of a different sort than counsel's.

4              MR. GALIPO:  There's no question of that.

5              THE COURT:  His protractor is adjustable in some way

6    and not fixed in one position.

7    Q.  Is that 30 degrees?

8    A.  Let me double-check.  That's 30 degrees indicated and that

9    would be the rotation of the door.

10   Q.  Okay.  You would agree, if the door was open to 30 degrees

11   at the time of the shooting and we extended this protractor out

12   to the sidewalk, then Officer Paine could not have made this

13   shot standing in the area of 618; would you agree?

14   A.  Yes.

15   Q.  Let's go to 55 degrees.

16   A.  Okay, let's place it on the graphic again.

17   Q.  You believe that's 55 degrees?

18             THE COURT:  If possible, can you angle that a little

19   bit?  There's all sorts of people in the courtroom trying to

20   see what's going on.  Too far.

21             MR. GALIPO:  Is that good?

22             THE COURT:  Better.

23   A.  That's 55 degrees, as I indicated.

24   Q.  Let me show you again, 55 degrees.

25             Okay.  Now, at 55 degrees you would agree Officer

1   Paine could not make the shot from 618?

2   A.  Somewhere from --

3   Q.  Hold it in the area.  If you extend that line out, we're

4   coming to an area behind parking space 2037, are we not?

5   A.  So you're saying somewhere in this area?  Where I'm

6   indicating between 618 and to the right of 620, is that what

7   you're --

8   Q.  My first question is, if we extend the line out as you have

9   it, we're into the next -- as we meet the sidewalk, we're into

10  the next parking space, behind the next parking space, correct?

11  A.  Yes, we are.

12  Q.  And unless the shooter was on the left of that diagram or

13  the west of this line, assuming you had a 55-degree angle, the

14  shooter could not have made the shot with Mr. Boyd positioned

15  in the area where the model is in your car?

16          MR. LOEBS:  Objection as to "west of this line,"

17  vague.

18          MR. GALIPO:  To the left of it?

19          THE COURT:  Okay.

20  Q.  Do you agree?

21  A.  No.  You can still shoot, get a shot from there.

22  Q.  Without hitting the door?

23          MR. LOEBS:  Your Honor, he's interrupting the

24  witness's testimony.

25  Q.  I apologize.

Jason – Recross

1   A.  I'm not sure where you're indicating.  You're saying from

2   here to here can he get a shot in?

3   Q.  Correct.  Without hitting the door.

4   A.  Not the way this is laid out, no.

5   Q.  And you laid this out to scale, you've already told us this

6   diagram's to scale?

7           MR. LOEBS:  Objection, argumentative.

8           THE COURT:  Overruled.

9   A.  Yes.

10          THE COURT:  Assuming that was a question.

11          MR. GALIPO:  That's fine.

12          THE COURT:  Thank you, Mr. Jason.  You may resume the

13  stand.

14  BY MR. GALIPO:

15  Q.  How close -- were you the photographer on the picture in

16  U-5?

17  A.  Yes.

18  Q.  How close were you when you took that picture to the

19  driver's side door?

20  A.  I don't know exactly.  Maybe 10 feet, 12 feet.

21  Q.  Any reason why you didn't take a picture from 24 feet so

22  you could duplicate the angle that you believe Officer Paine

23  had?

24          MR. LOEBS:  Objection.

25  A.  I wasn't trying to show the exact field of view from 24

1    feet.  Just -- with the lenses you're using, it's hard to

2    duplicate that, the human vision.  I'm just trying to show the

3    area of the body that would be exposed while seated on the

4    floorboard that way.

5    Q.  With reference to the body moved -- moving, Mr. Loebs asked

6    you if the body could be moving.  Would you agree that with

7    respect to the orientation of Mr. Boyd's body, with regard to

8    the shot to the abdomen, he would have had to have been turned

9    further to the left than he would have had to sustain the

10   trajectory through the leg?

11   A.  Could you ask that again?  I'm sorry.

12   Q.  Sure.  Would you agree that with respect to the body,

13   Mr. Boyd would have had to have been turned further to his left

14   with respect to the shooter to sustain the trajectory to the

15   abdomen as opposed to the trajectory to the leg?

16        MR. LOEBS:  Objection, vague; incomplete hypothetical;

17   calls for speculation.

18        THE COURT:  Overruled.

19        MR. LOEBS:  Your Honor, if I may, that completely

20   blocks my view if I'm sitting there.

21        THE COURT:  If we're going to keep using these, they

22   should go back where they were so that counsel at least can

23   stay at counsel table.

24        MR. GALIPO:  That is fine.

25

Jason - Recross

```
1    BY MR. GALIPO:

2    Q.  Do you have the question in mind, Mr. Jason?

3    A.  I think I do.  Let me attempt to answer it.  Can you leave

4    that V5 -- I think that's U-5.

5    Q.  You want me to leave this up?  Sure.  Will that help you?

6    A.  I think you said the body would have to be rotated more

7    towards the left than indicated in that picture?

8    Q.  Well, first of all, do you think the body would have to be

9    rotated toward to the left, as we see it in U-5, to get the

10   trajectory through the upper body?

11   A.  No.  But it could be.  Doesn't have to be.

12   Q.  Looking at the amount of rotation in the upper body in U-5

13   and comparing it to the angle of the door, and then looking at

14   your animation, does it look to you that the body in W-8 is

15   turned more to the -- more at an angle than it is in U-8?

16        MR. LOEBS:  Object to the question as being vague.

17   Q.  Okay, let me start again.  Looking at the angle that you

18   have the upper body in W-8, does it appear to be turned more at

19   an angle than what you show the model to be in?

20        THE COURT:  Don't cover them up then if you want him

21   to compare them.

22   Q.  In U-5, looking at the two?

23   A.  These are not supposed to be identical.  They're just

24   general representations.

25   Q.  My question is, Mr. Jason, does the body appear to be more
```

Jason - Recross

1    at an angle in W-8, the upper body, than it does in U-5?

2    A.  No, I don't think so.

3    Q.  All right.  By the way, in this picture -- where would the

4    right hand be, and I'm referring to W-8?

5    A.  I don't have any data where the right hand was.  I just

6    removed it from the graphic.

7    Q.  You would agree that in your analysis, the right hand could

8    not be in an area that would affect the bullet strike to the

9    left hand?

10   A.  That's correct.

11   Q.  It would have to be out of the way?

12   A.  That's a good point.  Other than that, I don't know where

13   it was.

14   Q.  With respect to the importance of seeing the -- strike

15   that.

16         Is it your testimony that the window shattered on that

17   car not from bullet strikes but from hitting the -- bullets

18   hitting the door?

19   A.  It's certainly possible, yes.

20   Q.  Well, it's possible.  But given the fact that you have an

21   idea as to how many rounds were fired at the vehicle, do you

22   think it's more likely that a bullet hit one of the windows?

23         MR. LOEBS:  Objection, your Honor.  Argumentative.

24   And lack of foundation.

25         THE COURT:  I will overrule.  Jurors can ignore the

1    style.

2    A.  This is not a probability issue.  It's not saying if you

3    took a hundred cars and fired a thousand bullets at them you'd

4    have this happen.  Could it happen in this case?  Yes, it's

5    very likely.

6    Q.  So when Mr. Loebs was asking you the question, you weren't

7    telling us that that's how you think it happened, you're just

8    saying it's possible?

9    A.  Yes, I'm saying that is possible that the window broke

10   from -- as the result of an impact from one of, one, two, three

11   bullets that struck either the door or into the body and

12   continued on to the door.  Maybe the window itself.

13           MR. GALIPO:  I'll be done within three minutes, your

14   Honor.  That's good news for everybody.

15           I just need to mark one more exhibit, and whatever the

16   next one is, I'll go (a) and (b).

17           THE COURT:  We'll now have 195(a) and (b), unless they

18   turn out to be the same as exhibits that were already marked.

19   In which case they won't be.  Okay.

20           (Plaintiffs' Exhibits 195(a) and (b) marked for

21   identification)

22           MR. LOEBS:  Can I see those again?

23           MR. GALIPO:  Sure.

24   BY MR. GALIPO:

25   Q.  Showing you what's been marked as 195(a) and (b), do those

1   appear to be photos of the vehicle showing some of the bullet

2   strikes?

3   A.  Yes.

4   Q.  With regards to the bullets, seeing the vehicle in this

5   case, is part of your opinion regarding you could not see any

6   high velocity blood spatter in any pictures?

7   A.  Part of the work that I do is I would examine a vehicle in

8   this type of situation to look for any type of evidence.

9   Q.  In this case you couldn't see any high velocity blood

10  spatter in any crime scene photos; is that correct?

11  A.  True.

12  Q.  So do you know what happened to this vehicle between the

13  time the crime scene photos were first taken and the time you

14  first saw it in 2006?

15  A.  I know that it was in the property of the police

16  department, in custody of them -- the property department.

17  Q.  Would it be true that at least a couple years passed in

18  between the date of this incident and the time you saw the

19  vehicle?

20  A.  Yes.

21  Q.  Okay.  Lastly, Exhibit 184.

22  A.  Oh, okay.

23  Q.  And I just have this question for you.

24  A.  Yes.

25  Q.  How did you determine what angle to put the door at when

Jason - Recross

1   you prepared that exhibit and gave it to Mr. Loebs?

2   A.  I don't remember.  At that time, it wasn't important to me.

3   I just had the door open.  I don't remember establishing any

4   particular angle at that time.

5   Q.  And the fact that it turned out to be 58 degrees, very

6   close to the 55 degrees at the second detent, you think that

7   was just coincidental?

8   A.  It could be.  It could have been deliberate.  I just knew

9   the door was open.  I still don't know how far the door was

10  open at the time of the shooting.

11  Q.  And do you have any idea how that photograph ended up in

12  the exhibit books in this case?

13  A.  The graphic?

14  Q.  Yes.

15  A.  No, I don't.

16          MR. GALIPO:  That's all I have.

17          THE COURT:  Any further direct, Mr. Loebs?

18          MR. LOEBS:  No.

19          THE COURT:  Thank you, Mr. Jason.  You're excused at

20  this time.  And I suggest that you leave as quickly as possible

21  before they think of something else.

22          (Laughter)

23          THE WITNESS:  Good idea, your Honor.

24          THE COURT:  Thank you very much.

25          THE WITNESS:  You're welcome.

1              (The witness exits the stand)

2              THE COURT:  At long last we've concluded the testimony

3     of Alexander Jason.  He have been there so long I no longer

4     think of him as Jason Alexander, which is I think of some

5     benefit anyway.

6              Now, ladies and gentlemen, we do have possibly some

7     kind of an interlude here between the witnesses.  I'm not sure

8     exactly what for.

9              MR. GALIPO:  I think it would be a good time for a

10    break.  We have one quick issue to take up with the Court.

11             THE COURT:  Okay.  Well, then I'm giving the jury 20

12    minutes, and we'll proceed hopefully for no more than five.

13             (The jury exited the courtroom)

14             (In open court; jury not present)

15             THE COURT:  The jurors have exited the courtroom.

16             What's this brief issue?

17             MR. GALIPO:  Very quickly, your Honor, Mr. Loebs and I

18    have been talking about exchanging stipulations.  He had a

19    piece of evidence regarding Officer O'Malley that he

20    inadvertently forgot to ask, and my tendency is to want to

21    agree so we don't have to recall Officer O'Malley.  I have

22    Peter Barnett out in the hall.  He was the gentleman who took

23    the photographs at the private autopsy showing the exit wound

24    to the thigh.  As the Court will recall, I attempted to move

25    that in evidence since the witnesses had looked at that, but

1    there was a foundational objection.  So I was hoping that we

2    can work out that stipulation so I can send Mr. Barnett on his

3    way and not have him to take the stand for three minutes to

4    say, Yes, I took the picture.

5         THE COURT:  What's the situation, though?  Is there an

6    agreement?

7         MR. LOEBS:  This was raised to me two seconds before

8    the return from break on lunch.  And I told Mr. Galipo that I'm

9    concerned on working on my direct, redirect of Mr. Jason, I

10   don't have time to consider that.  And now we're just finished,

11   so I haven't had any additional time to consider his request.

12   Rather than just make a snap judgment, I'd like to have a few

13   minutes to consider that.

14        THE COURT:  Why is that witness here?

15        MR. LOEBS:  I don't know.  Seems like something that

16   would be appropriate in their direct case rather than something

17   they'd bring up in the middle of ours.

18        MR. GALIPO:  I called him because I didn't realize

19   there was going to be an issue regarding the autopsy

20   photographs that were --

21        THE COURT:  But let's face it, I mean, that's not part

22   of the defendants' case that you overlooked something.

23        MR. GALIPO:  I understand that, your Honor.  I was

24   just trying to let the Court know because what I was going --

25   if we could reach an agreement both ways on the stipulations,

4363

1    we're fine.  If not, I was going to ask the Court if I could

2    have two minutes to put him on to open up for that one limited

3    purpose of getting at least a photograph of the exit wound.

4          THE COURT:  Well, it does leave him to some amount of

5    questioning also, and what he did and how he took them and how

6    he happened to be there.  Who is he?  Why was he in the

7    autopsy?

8          MR. GALIPO:  He's a criminal -- I think he's a

9    criminalist and a private investigator who does work.

10         THE COURT:  Hired by the plaintiff?

11         MR. GALIPO:  Correct.

12         THE COURT:  And given access.

13         MR. GALIPO:  Yes.

14         THE COURT:  I don't know.  There could be questioning.

15   I don't know if you intend to question him or not about this.

16         MR. LOEBS:  Your Honor, he hasn't had his deposition

17   taken, he's not on their witness list, I have no idea what he's

18   going to say, he has expertise in different things that relate

19   to being a criminalist.  I don't know, I know that there are

20   many things in those autopsy photographs that are vastly

21   different than the autopsy photographs that Dr. Smith took.

22         THE COURT:  Like what?

23         MR. LOEBS:  The injury to the head.  The head wound,

24   for example, it's all gouged out.  It's gouged out in the later

25   autopsy photographs.  I think there are other injuries on the

4364

1   shoulder that are gouged out. The wound to the leg is actually

2   opened up in the later autopsy photographs.

3           THE COURT: In other words, you're suggesting there

4   may have already been some work done on the decedent's body

5   before these pictures were taken?

6           MR. LOEBS: Yes.

7           THE COURT: I'm sure they didn't allow him to mutilate

8   the body himself.

9           MR. LOEBS: There was a woman who we did depose who

10  did the autopsy, and she described what she did and part of

11  what she did is opening up the -- and there are all sorts of

12  different -- I don't want to say damage, to be indelicate to

13  Mr. Boyd, but all sorts of different defects throughout the

14  photographs. So there's a huge concern regarding foundation

15  of -- and throwing it at me right now.

16          THE COURT: It isn't just open and shut. And I'm not

17  going to grant a request to put him on in the middle of their

18  case. I will tell you that, unless it was just absolutely

19  clear that nobody had any disagreement about it. Since there

20  is a disagreement, it seems to me at this point that you would

21  have to figure out some way to either work it in in the

22  rebuttal or otherwise.

23          MR. GALIPO: Okay, your Honor. And just so it's

24  clear, it's one picture of the thigh only. Just so Mr. Loebs

25  knows. I'll show him the picture. Thank you.

```
1            THE COURT:  You can show Mr. Loebs the picture and see
2    if it makes any difference to him what you want to use.
3            MR. GALIPO:  Sure.  That's fine.  I will, your Honor.
4            THE COURT:  Why don't you show it to him now.
5            MR. GALIPO:  I will.
6            THE COURT:  You're looking for it.  Okay.
7            MR. GALIPO:  One second, I'm going to get Mr. Barnett.
8            (Pause)
9            MR. GALIPO:  Okay.  Here; and here's a second one.
10           (Pause)
11           MR. GALIPO:  Apparently we're unable to reach an
12   agreement at this time, your Honor.
13           THE COURT:  Do you want to just excuse that person?
14           MR. GALIPO:  I have no choice, and he may be
15   unavailable tomorrow, which is a big concern of mine, but I'll
16   try to figure out what I'm going to do.  I'm just letting the
17   Court know that's the situation.
18           THE COURT:  Okay.  All right.  Then where are we with
19   either -- the so-called cross-examination of the videotaped
20   witnesses?
21           MR. GALIPO:  I'm not going to do that at this time.
22           THE COURT:  You're not?
23           MR. GALIPO:  No, your Honor.  They can go right to
24   their next witness.
25           THE COURT:  Then that's Dr. Keram.  And we broke at
```

1    about 2:45, so we've now lost about 10 minutes off the jury's

2    20-minute break, and it seems we ought to take a break at this

3    point.  So we will.

4            MR. WIENER:  3:05, your Honor?

5            THE COURT:  I try not to short-change the reporter, so

6    I guess 10 after.

7            And, Miss Lucero, can you tell the jurors that as

8    well.  We're losing a lot of time every day from our regular

9    hours.  We're not getting very much time out of any given day.

10           (Afternoon recess)

11           DEPUTY CLERK:  Please come to order.

12           THE COURT:  Okay, let's bring in the jury.

13           (The jury entered the courtroom)

14           (In open court; jury present)

15           THE COURT:  All right.  The jurors are back.  And

16   ladies and gentlemen, we do have another witness then to call

17   at this time.

18           Is this going to be your witness, Mr. Wiener?

19           MR. WIENER:  Yes, your Honor.  The defendants call

20   Dr. Emily Keram.

21           (Witness sworn)

22           DEPUTY CLERK:  Please be seated.

23           State your full name for the record, and spell your

24   last name, please.

25           THE WITNESS:  Emily Alyssa, A-l-y-s-s-a, Keram,

```
 1   K-e-r-a-m.

 2   EMILY ALYSSA KERAM,

 3        called as a witness by the Defendants,

 4        having been duly sworn, testified as follows:

 5   DIRECT EXAMINATION

 6   BY MR. WIENER:

 7   Q.  Good afternoon, Dr. Keram.

 8   A.  Good afternoon.

 9   Q.  What is your profession?

10   A.  I'm a psychiatrist.

11   Q.  Are you a medical doctor or an M.D.?

12   A.  Yes, I'm an M.D.

13   Q.  And where do you currently work as a psychiatrist?

14   A.  I work half time at an outpatient clinic in Santa Rosa,

15   California that's a satellite of the San Francisco VA.  So half

16   time I'm employed at the VA.  And the other half I do a variety

17   of things.  I have a very small practice of my own where I see

18   my own patients.  I do this type of medical/legal evaluation.

19   I teach in the UCSF psychiatry and the law program.  We teach

20   two psychiatrists each year who are interested in becoming

21   forensic psychiatrists, and that's a year-long training

22   program.

23   Q.  We'll get back to the specifics.  Just wanted to get a

24   general overview.

25   A.  Okay.
```

Keram – Direct

1   Q.  And, Dr. Keram, as part of your practice as a psychiatrist,

2   have you developed an expertise in law enforcement contact with

3   people who are mentally ill or under the influence of drugs?

4   A.  Yes, I have.

5   Q.  And as part of your work as a psychiatrist, have you

6   developed an expertise in people who attempt to provoke the

7   police to shoot them as a form of suicide?

8   A.  Yes, I have.

9          MR. GALIPO:  I'm going to object as lacking foundation

10  that she has developed an expertise based on the state of the

11  evidence so far.

12         THE COURT:  Okay.  Well, at this point it's

13  preliminary, and at some point if someone forgets to ask her

14  questions about the subject, if you feel it's appropriate to

15  object to her lack of expertise, you can do that.  Overruled.

16  Q.  Is this also known as "suicide by police" or "suicide by

17  cop"?

18  A.  Yes, it is.

19  Q.  Okay.  Have you formulated, without stating it, have you

20  formulated an opinion about whether Cammerin Boyd committed

21  suicide by police on May 5th, 2004?

22  A.  Yes, I have.

23  Q.  We'll get back to that.

24  A.  Uh-huh.

25  Q.  I want to ask you some questions about your background and

1   professional areas.  Could you just describe for the jury your

2   educational background starting with college and going up

3   through your residency and fellowship?

4   A.   Sure.  I attended and graduated from Duke University with a

5   bachelor of science in zoology.  I graduated a little bit

6   early, in December of 1981.  I then attended the University of

7   North Carolina at Chapel Hill's School of Medicine, and I

8   graduated there with a medical degree, an M.D.  I graduated in

9   1988.

10          I then did a year-long internship that is required for

11  anybody who wants to be a psychiatrist.  You do general

12  internal medicine, neurology and also some psychiatry.  Then I

13  did a residency also at UNC also in psychiatry, and I wanted to

14  be a forensic psychiatrist, so I did a year-long fellowship in

15  forensic psychiatry with the United States Department of

16  Justice in Butler, North Carolina, and finished that in 1992.

17  Q.   Are you board-certified?

18  A.   Yes, I am.

19  Q.   In what area or areas?

20  A.   Board-certified in psychiatry and neurology, and then I

21  also have a subspecialty board certification in forensic

22  psychiatry.

23  Q.   Okay.  Could you briefly tell the jury what is board

24  certification?

25  A.   That is a process by which any psychiatrist or any of the

Keram - Direct

1   medical specialties or subspecialties can demonstrate a level

2   of proficiency that's certified by a board.  So you do, in

3   addition to having to undertake the training that I've

4   undertaken in a recognized, accredited program, you also take

5   an examination within the field or the subspecialty.  And in

6   addition, I've also done -- acted as an examiner for the

7   general adult psychiatry boards and written questions for the

8   psychiatry subspecialization boards.

9   Q.  Are you licensed as an M.D.?

10  A.  Yes, I am.

11  Q.  In the State of California?

12  A.  Yes.

13  Q.  Can you give the jury a general overview of your history as

14  a practicing clinical psychiatrist since you became a

15  psychiatrist until today, and again just an overview?

16  A.  Sure.  After I finished my fellowship and residency, I

17  moved to California in July of 1992.  And I started a private

18  practice in Santa Rosa.  And I did that private practice for

19  four years.  Most of my time was spent treating patients, but I

20  also did legal-medical evaluations, civilian, criminal during

21  that four-year period.

22          In 1996, in August, the VA opened the Santa Rosa

23  community-based outpatient clinic, and I was hired to be the

24  first director of that clinic, and I ran that clinic both as an

25  administrator, and then I also supervised the staff there and

1   saw my own patients there for four years.

2           In 2000, UCSF started their own fellowship training

3   program in forensic psychiatry, and I was recruited to join the

4   faculty there; so I left the VA and joined the full-time what

5   we call paid faculty at UCSF, and helped get the fellowship

6   going.  Taught in the fellowship full-time for four years.

7   During those four years I continued to see patients both on an

8   outpatient basis and also attending on the inpatient unit at

9   UCSF.  And, of course, continued to do research and teaching

10  and medical/legal civil and criminal cases.

11          Then I left the full-time faculty in -- at UCSF, I got

12  really worn out by commuting from Santa Rosa.  I went back to

13  the VA in May of 2004.  So since 2004, I've been there half

14  time and doing my other practice work the other half.

15  Q.  You mentioned that over the years that you have actually

16  provided clinical treatment to patients under your psychiatric

17  care?

18  A.  Yes.

19  Q.  Can you just give the jury an overview of the type of

20  psychiatric care that you have provided to patients, what kinds

21  of patients you see, how you treat them?

22  A.  It's different in the different settings, and I'll just

23  concentrate on after I finished my training.  The first four

24  years I was in my own private practice, the majority of my

25  patients were female.  Over that four-year period I saw

1    approximately 300 or so patients.  The majority of the

2    diagnoses I was treating were depression and anxiety.  Some

3    posttraumatic stress disorder.  Some substance abuse.

4            Then when I went to the VA, obviously my -- the type

5    of patient I saw changed.  First of all, most of the patients

6    at the VA were male.  And approximately, I think, 65 to 75

7    percent over that initial time I was there were veterans who

8    had combat trauma, PTSD.  I also saw a large amount of

9    substance abuse diagnoses, depression, anxiety, schizophrenia,

10   bipolar disorder.  Pretty much the full gamut of psychiatric

11   illness.  And I continue to see that type of patient at the VA

12   now.

13           While I was at UC full-time, I saw more acute patients

14   on the inpatient unit, people who had primarily depression and

15   were suicidal but also had psychotic illnesses like

16   schizophrenia and needed to be hospitalized for their safety.

17   Q.  And a little later on we'll talk about your specific

18   specialization in suicide by police, but we'll get to that.

19           How many patients are currently under your care as a

20   psychiatrist?

21   A.  Over 300.

22   Q.  Can you estimate how many patients you've treated over your

23   career as a psychiatrist?

24   A.  Over a thousand.

25   Q.  Have you ever supervised other psychiatrists?

```
1    A.  Yes, I have.  I have supervised psychiatrists when I ran
2    the VA clinic.  For the first four years it was up and running,
3    I had three psychiatrists who worked for me.  I also supervised
4    psychologists and nurses.  And then while I was at UCSF, I
5    supervised medical students and residents who were on the
6    inpatient unit.  So I supervised psychiatrists in that direct
7    patient care setting, and also, of course, supervised the
8    fellows' cases in medical/legal evaluations, both criminal
9    evaluations and civil evaluations.  And then also helped
10   oversee research projects that they took on if they took on an
11   area of interest that was within my specialization.
12   Q.  You mentioned that you have provided care to patients who
13   are suicidal?
14   A.  Yes.
15   Q.  Could you give an overview of your experience in treating
16   suicidal patients?
17   A.  I think most psychiatrists treat patients who have suicide
18   because most of us treat -- or who have suicidal thoughts or
19   ideas or even suicidal attempts because most of us treat
20   patients who have risk factors for suicide.  So you know that's
21   something that all of us start to do early on in our training,
22   treat suicidal patients.  And that would have been beginning in
23   1988.
24          You know, through the present time I continue to treat
25   patients who are suicidal, in- and outpatient settings, at this
```

 1    point.  If one of my patients becomes acutely suicidal, in

 2    other words, if either they think they won't be able to

 3    maintain themselves safely as an outpatient or I think that

 4    they may not, even if they disagree, then I will work to have

 5    them hospitalized usually at the San Francisco VA.

 6    Q.  Now, you mentioned before that you're board-certified not

 7    just in psychiatry and neurology but also in something called

 8    forensic psychiatry.  Can you just explain to the jury what is

 9    forensic psychiatry?

10    A.  Forensic psychiatry is any type of mental health or mental

11    illness issue that arises within a legal context.  So it's

12    actually a very broad field.  We do everything from this type

13    of evaluation, a medical/legal evaluation, in civil cases or

14    criminal cases.  We consult to legislators who may be writing

15    or revising laws that have to do with mentally ill people,

16    either involuntary commitment or looking at insanity defense,

17    or new areas of law like sexually violent predators and how

18    they should be managed.

19         We do research in the areas that comprise forensic

20    psychiatry and -- we treat people who are incarcerated.  So

21    that's mental health treatment in a custodial setting.  We may

22    also provide consultation or training to law enforcement

23    agencies or governmental agencies.

24    Q.  And in forensic psychiatry, it is a board-certified area of

25    medicine?

1   A.   Yes.

2   Q.   You've been doing forensic psychiatry for how many years?

3   A.   I started my fellowship in July of 1991.  So all the cases

4   I did in that next year would have been supervised.  And then

5   I've developed my own practice in forensic psychiatry the

6   following July 1992.

7   Q.   And the areas of forensic psychiatry that you explained to

8   the jury a minute ago, have you worked in those areas as a

9   forensic psychiatrist?

10  A.   I have never done legislative consultation, but the other

11  areas, yes, I have.

12  Q.   So you've worked on, for example, cases relating to an

13  insanity defense.

14  A.   In fact, I'm a coauthor of the national practice guidelines

15  in how to conduct insanity defense evaluations.  I can speak a

16  little bit more about that if you'd like.

17  Q.   Those are guidelines that you helped draft?

18  A.   Yes.

19  Q.   Those are guidelines for other psychiatrists to use?

20  A.   Psychiatrists and also psychologists, and -- in some

21  jurisdictions, psychologists perform insanity defense

22  evaluations.

23  Q.   Does insanity also cover the evaluation of the

24  psychological state of deceased persons?

25  A.   Yes, there are a number of contexts in which that situation

1    would arise.

2    Q.  We'll get back to that area, of how you would conduct that

3    area of evaluation.

4           You have mentioned that you did some teaching for

5    other psychiatrists.

6    A.  Yes.

7    Q.  Can you just explain to the jury your teaching experience

8    in terms of teaching other psychiatrists?

9    A.  As a faculty member of the psychiatry and law program, when

10   I was on the full-time faculty I was responsible for teaching

11   the entire criminal section of our didactic curriculum and also

12   several of the civil topics as well.  I continue to teach in

13   the psychiatry and law program, although not the full spectrum

14   that I was before.

15          I also organize and teach what we call a mock trial

16   for our fellows to give them experience in learning how to

17   write reports and testify.

18          The teaching that I've done hasn't been at UCSF, it's

19   been at professional meetings and also for law enforcement

20   agencies.  I can speak about those if you like.

21   Q.  Why don't we first talk about your teaching at professional

22   meetings.

23   A.  I've given presentations, both at the American Psychiatric

24   Association, and then my sort of home professional

25   organization, which is the American Academy of Psychiatry and

1   the Law.  And the topics that I've taught on include how to

2   develop training curriculum for teaching law enforcement

3   officers how to interact with patients who may be emotionally

4   disturbed or abusing substances.  I've given several talks on

5   suicide by police, different aspects of that phenomenon.

6           I've also given talks in those professional

7   organizations on ethical considerations that forensic

8   psychiatrists should bear in mind when they're doing

9   consultations to law enforcement agencies or teaching or

10  working with a law enforcement agency.

11          Participated as a debater in a debate about forensic

12  psychiatrists not participating in law enforcement

13  interrogations.  I think those are the majority of the topics.

14  Q.  And you mentioned that you provided training to law

15  enforcement agencies, correct?

16  A.  Yes.

17  Q.  And can you just give the jury an overview of the training

18  that you have provided to law enforcement agencies?

19  A.  Uh-huh.  At the FBI academy, I've delivered a paper that I

20  wrote, coauthored, on suicide by police.  I was -- one of my

21  areas of interest in forensic psychiatry is in risk assessment

22  and risk management.  So I also helped develop through

23  trainings and discussion a manual that was public -- that the

24  FBI published on workplace violence assessments.

25          In addition, I was asked to serve as a member of a

1    committee for POST.

2    Q.   You can say what POST is.

3    A.   The California legislature sets up various commissions, and

4    one of the commissions is called POST.  It's the Police

5    Officer's Standards and Training Commission.  It's a commission

6    that is charged with developing all of the different subject

7    areas that law enforcement officers need to be proficient in,

8    and then developing training standards for those areas.

9            And back in about 2000 or 2001, the legislature passed

10   a law that required that POST develop training curricula in

11   mental health for law enforcement officers.  So I was asked to

12   join that committee.  And we developed -- we worked for about a

13   year and we developed a training program to teach law

14   enforcement officers how to interact with emotionally

15   disturbed, developmentally disabled, substance-abusing people.

16   And I've trained on those topics, and also suicide by police,

17   in a large number of -- well, a number of jurisdictions

18   throughout California.  I guess large is a relative term.

19           Right now in -- I teach in the San Francisco crisis

20   intervention training, which is a quarterly training that the

21   San Francisco Mental Health Board provides to the San Francisco

22   Police Department.  So I've been doing that for about

23   six-and-a-half years.  Since the first -- I was involved in the

24   curriculum for that.

25           I also have taught in the San Diego Police Department,

1    the Sonoma County law enforcement agencies -- I did that as a

2    joint training with mental health clinicians; with Oakland

3    Police Department, and a few other agencies as well.

4    Q.  Okay.  Now, have you -- as a psychiatrist, have you

5    published any articles or research?

6    A.  Yes.

7    Q.  Can you give the jury an overview of your publication

8    history?

9    A.  Yes.

10   Q.  Not every single article but maybe the number and the areas

11   you've published in.

12   A.  I've published over a half a dozen articles as the primary

13   or sole author.  Most of those in peer-reviewed journals.  I've

14   published a paper on suicide by police; a paper and developing

15   curriculum for, as I said before, you know, how to teach law

16   enforcement officers mental health issues; wrote up an

17   editorial on medical ethics and terrorism investigations.

18          That type of thing.

19   Q.  Have you participated in other publications, even if you

20   weren't the lead author on psychiatric research?

21   A.  Yes.

22   Q.  And are you involved with any professional committees or

23   organizations as a psychiatrist?  You mentioned a few, but if

24   you could give a brief overview of that.

25   A.  As I said, my home organization is the American Academy of

1    Psychiatry and the Law, and I've served on a lot of different

2    committees there.  Currently I'm the chair of the Law

3    Enforcement Liaison Committee.  I've also chaired the

4    membership committee there, and served on actually the

5    executive council, which is about a half a dozen people, served

6    as both the council and the secretary, and one year I served as

7    the program chair, organized the annual meeting.  That's a

8    scientific meeting that we have.

9    Q.  Now, Dr. Keram, I want to ask you some questions just

10   generally about suicide by police or suicide by cop, not

11   referring to Cammerin Boyd, but just what it is.

12   A.  Uh-huh.

13   Q.  So what is "suicide by police"?

14   A.  Suicide by police is an event in which a person poses a

15   threat of serious bodily injury or death to a citizen or law

16   enforcement officer with the intent of posing serious physical

17   danger to them, by law enforcement.

18   Q.  How long has the profession been aware of this phenomena?

19   A.  The phenomenon of suicide by police was first recognized in

20   the 1980s.  So both law enforcement, medical, pathologists,

21   were aware for the past 23 years or so.  Law enforcement began

22   to do research into suicide by police and publish articles, in

23   the '80s, and you started to see the medical community begin to

24   see research and publish in suicide by police beginning in the

25   I believe the early '90s on through to this day.

1    Q.  And what's the earliest example of suicide by police you've

2    become aware of?

3    A.  When we were writing the insanity defense, one of the

4    things we were doing was write the entire history of the

5    insanity defense, so looking back at the case law of insanity,

6    we found a case, the shooting actually occurred in 19 -- I'm

7    sorry, 1798, that was an example of an attempted suicide by

8    police.  That's the earliest one that we found.  It's been a

9    phenomena that's been around for quite a long time.

10   Q.  Is this phenomenon, suicide by police, is this something

11   that's generally recognized to exist by the psychiatric

12   profession?

13   A.  Yes.

14   Q.  Okay.  And is it recognized to exist by treating

15   psychiatrists; in other words, clinical psychiatrists?

16   A.  Yes.

17          MR. GALIPO:  No foundation; calls for speculation.

18          THE COURT:  Overruled.

19   Q.  You said it began to be studied at some point in the

20   mid-1980s?

21   A.  Yes.

22   Q.  Has a literature, whether it's a medical literature or a

23   nonmedical literature developed around the concept of suicide

24   by police?

25   A.  Yes.

Keram – Direct

1   Q.  First, let's talk about the medical literature.  Can you

2   just give the jury an overview of the medical literature of

3   suicide by police, not saying what the conclusions are of each

4   publication but just an overview of that literature?

5   A.  In the earliest cases where it's mentioned as a concept,

6   it's not the primary focus of the paper.  The paper is talking

7   about perhaps law enforcement deaths, officer-involved

8   shootings or victim-precipitated homicide.  That was in the

9   '50s.  So the earliest papers don't call it "suicide by

10  police."  They mention it as a subset of the thing being

11  studied.

12          The earliest medical literature that alludes to the

13  phenomena directly began to be published in the '90s, and

14  there's -- there's perhaps a half a dozen to a dozen papers

15  published in peer-reviewed journals then.

16  Q.  When you say "peer-reviewed journals," what do you mean by

17  that?

18  A.  I'm a peer reviewer for our journal, the Journal of the

19  American Academy of Psychiatry and the Law.  So what we as peer

20  reviewers is, we are sent papers generally within our area of

21  expertise.  If we're not, we generally send them back.  And the

22  purpose of peer review is to make sure that the journal is not

23  publishing opinion, that we are in fact publishing facts,

24  studies that can be replicated with the same findings.

25          So peer review consists of making sure if there's any

1    statistical analysis in a paper, that the statistics were

2    analyzed properly, so we have an independent statistician

3    review the data that was collected.

4           There are some descriptive studies which won't have a

5    statistical analysis in them.  As a peer reviewer, I look at

6    the methodology, making sure that good epidemiological

7    principles were applied to the methodology, that the question

8    that's posed can really be answered the way the study was set

9    up, and that the reasoning or logic that was used in arriving

10   at conclusions is sound.

11          Once I turn in my peer review –– it's also sent out to

12   a number of peer reviewers –– I will criticize the paper, it

13   will go back to the author.  At that point the author will make

14   the changes that we recommend they make or they may let it lie

15   but if they do revise the paper they'll send it back to us for

16   either revision or acceptance again.

17   Q.  So when you read in the newspaper about studies in the New

18   England Journal of Medicine or Journal of the American Medical

19   Association, are those examples of peer-reviewed medical

20   journals?

21   A.  Yes, they are.

22   Q.  Putting aside the medical journals, have there been

23   articles or studies relating to suicide by police or suicide by

24   cop in law enforcement-related journals?

25   A.  Yes, there have been.  Quite a few actually.  And some of

1  those journals are peer-reviewed.  They're in the field of

2  criminology.  And some of them will be sort of in more -- I

3  don't know what terminology to use.  Sort of like newspapers

4  for law enforcement officers, you know, specific to the

5  profession but not peer-reviewed.

6  Q.  Any estimate of how many articles in the subject or studies

7  have been published in the law enforcement journals or papers?

8  A.  Hundreds of them.

9  Q.  Now, are you familiar with the studies that have been done

10  related to suicide by police?

11  A.  Yes.

12  Q.  And what's the largest study in terms of how big was the

13  largest study in terms of cases studied?

14  A.  The largest study that's been published to date, although

15  there's another one in the pipeline, but the largest one that's

16  been published to date was conducted in the Los Angeles County

17  Sheriff's Department.  The researchers looked at 10 years of

18  officer-involved shootings, there were 437 shootings that

19  occurred during that period.  And so that was the biggest group

20  of officer-involved shootings that was looked at in which they

21  applied a definition of "suicide by police" to see what

22  percentage were and looked at that subpopulation within the

23  larger group.

24  Q.  And as part of that study, for example, did they draw

25  conclusions about characteristics of suicide by police, or

1   people who engage in that?

2   A.  Yes.

3   Q.  And we'll get back to some of those specifics.

4   A.  Sure.

5   Q.  Is there training for law enforcement officers for suicide

6   by police?  Does that exist?

7   A.  Yes.

8   Q.  And is that in California?

9   A.  Yes.

10  Q.  And are there states outside of California that have

11  agencies that provide training on suicide by police?

12  A.  Yes.

13  Q.  You referred to POST before, Peace Officer Standards and

14  Training.  Does POST in California have a curriculum for

15  suicide by police?

16  A.  Yes, they do.  They've developed what they call a

17  telecourse; in other words, a course that's on the videotape

18  format, in 1999 called "Suicide by Cop" and any law enforcement

19  agency in -- it was obviously developed for California, but any

20  law enforcement agency throughout the United States can request

21  the telecourse be sent to them.

22  Q.  Okay.  Now, in your view, is it important to train officers

23  related to suicide by police?

24  A.  Yes.

25  Q.  Why is that?

1   A.   The primary hope in developing training curricula is that

2   we may be able to tell the officers something in the training

3   that they could use to prevent the incident.  We can talk

4   about, you know -- the reason I say "hope" is that the

5   incidents tend to unfold very rapidly and often they can't --

6   there's not a lot of options that they have.  But, again, the

7   primary reason is to prevent the incidents.

8   Q.   Okay.  Are there episodes of suicide by police where the

9   officers cannot prevent it from happening?

10  A.   Certainly.

11         MR. GALIPO:  Objection, calls for speculation; no

12  foundation.

13         THE COURT:  I'm sorry, I missed that.  I'm just going

14  to take a look.

15         I'll sustain.

16  Q.   In your professional experience with suicide by police,

17  which we'll discuss in a moment, have you encountered either

18  personally or through the literature situations where in your

19  professional -- or where it appeared to you that the officers

20  were unable to prevent a suicide by police from occurring?

21         MR. GALIPO:  Same objection:  Calls for speculation;

22  no foundation.

23         THE COURT:  I don't know why it's relevant.  I'll

24  sustain.

25  Q.   Now, what percentage of officer-involved shootings -- or

1    let me ask you this:  In terms of the percentage of

2    officer-involved shootings that are believed to be suicide by

3    police, or attempted suicide by police, has that been studied

4    in terms of putting a percentage on that?

5    A.  Yes, that was something that some authors looked at.  The

6    Hudson study is the study in the LA County Sheriff's Department

7    I mentioned before.

8    Q.  That's 10 years of officer-involved shootings?

9    A.  Correct.

10   Q.  What percentage of officer-involved shootings are believed

11   to be suicide by police?

12        MR. GALIPO:  I'll object.  There's no foundation.

13   Also, calling for speculation as to who believes that.

14        THE COURT:  You mean who studied that?

15        MR. WIENER:  I asked for her opinion, your Honor.

16        MR. GALIPO:  Same objection.

17        THE COURT:  If her opinion is based on a study, then

18   what you're really asking is what the study determined.

19        What was the nature of the objection?

20        MR. GALIPO:  I can't remember the specific question.

21   But calling for speculation; no foundation, the way it was

22   phrased.

23        THE COURT:  Well, I'll sustain the objection.  You

24   need to lay some foundation here as to whether the witness has

25   an independent opinion based on work she's done, whether she's

```
 1   just studied this; if so, what the studies show -- something

 2   other than just sort of out of the blue.

 3   BY MR. WIENER:

 4   Q.  Okay.  Dr. Keram, yes or no, do you have an opinion about

 5   the percentage of officer-involved shootings that are suicide

 6   by police or attempted suicide by police?

 7   A.  Yes, I do.

 8        MR. GALIPO:  I --

 9   Q.  And without saying what the opinion is, how have you

10   developed that opinion, based upon what?

11   A.  Based on my review of the literature, and also a research

12   study that we conducted at UCSF as well.

13   Q.  And what is the percentage of officer-involved shootings

14   that in your opinion are either suicide by police or attempted

15   suicide by police?

16        MR. GALIPO:  I'll object.  There's no foundation as to

17   all officer-involved shootings.

18        THE COURT:  Are you asking her what the study showed?

19        MR. WIENER:  Based on her own study.

20        THE COURT:  Okay, based on her own studies and

21   whatever else that she read, what did they show?

22        MR. WIENER:  Okay.

23        THE COURT:  All right.  Because in any given

24   population they'd have other showings.

25
```

1    BY MR. WIENER:

2    Q.  Based on what you've done and the literature that you've

3    reviewed and relied on as a professional area, what is your

4    opinion in terms of the percentage of officer-involved

5    shootings?

6           THE COURT:  It's the same question.  It's -- you're

7    asking as a totality in the whole world all the time what's the

8    percentage that occurs.

9           MR. WIENER:  I'll make it more specific, your Honor.

10          THE COURT:  As opposed to when they did their study,

11   what it showed.

12   BY MR. WIENER:

13   Q.  What did the Hudson study show -- is the Hudson study the

14   LA County Sheriff's Department study, is that one of the

15   studies that you rely on for your opinion on this subject?

16   A.  Yes.

17   Q.  And what did the Hudson study show in terms of the

18   percentage of officer-involved shootings that are believed to

19   be suicides by police or attempted suicides by police?

20   A.  Overall the study found that 11 percent of officer-involved

21   shootings in that 10-year period were suicide by police.  They

22   also looked at the percentage of shootings each year that were

23   suicides by police and what they found was that that number

24   increased over time, that the number in the last year was 26

25   percent.  The authors had two reasons why they thought that the

1   numbers were increasing over time.

2   Q.   What were those reasons?

3   A.   One was that when they looked at the information that they

4   were given to review from year to year, the information in each

5   case was larger as time went on.  And that was something that

6   was certainly found in our study as well.  So that there was

7   more known about the factors that led to the shooting.

8            And the other was that presence of increased mandatory

9   lengths of criminal sentences was also thought to be a factor

10  that increased the number of officer-involved shootings that

11  were thought to be suicides by cop -- by police, excuse me.

12  Q.   Why would that be significant?

13  A.   Because one of the known risk factors for suicides by

14  police is people not wanting to go back to prison.

15  Q.   Okay.  Now, in terms of the Hudson study, why don't you

16  briefly tell the jury, since this was the largest study, what

17  the methodology was, how they conducted that study?

18  A.   Uh-huh.  The first thing they did was develop what we call

19  selection criteria, which means what are they going to require

20  be found in a file in order for that file to be -- that

21  shooting to be considered by -- to be considered a suicide by

22  police.  So that's the first thing that they developed.

23           And they applied those requirements to the 437

24  shootings and found out 44 of the shootings met those

25  requirements.

```
 1           Then they looked at those 44 shootings to find out
 2   things like what was the threat that the -- I'll call them the
 3   precipitator, because some of the people survived the shootings
 4   and some didn't, so rather than call them decedents or -- I'll
 5   call them the precipitator of the lethal force.  So they looked
 6   to see what the action was of the precipitator that ended with
 7   law enforcement using lethal force.
 8           They looked at demographics, so age, gender.  They
 9   looked at substance abuse history, psychiatric history.  They
10   looked at what risk factors for suicide the person might have
11   had.  There was a lot of studies about the mechanics of the
12   incident.  The -- at the time that law enforcement was actually
13   on scene before the lethal threat was actually presented to
14   them.  There were probably a hundred or so variables that they
15   included.
16   Q.  Now, why might -- in your experience, why might someone
17   choose to commit suicide by police rather than some other form
18   of suicide like jumping off a bridge or poisoning oneself or
19   the other methods that we may be familiar with?
20           MR. GALIPO:  Objection.  Calls for speculation; no
21   foundation.
22           THE COURT:  Overruled.
23   A.  People choose suicide by police for a variety of reasons,
24   and those reasons have been described in the peer-reviewed
25   literature.  So I rely both on my review of the literature but
```

1    also on what some of my patients have told me who have thought

2    about attempting a suicide by police, and in fact one of my

3    patients went through with an attempt.

4         Some people will choose suicide by police because they

5    have religious convictions against suicide, so they feel if

6    they can get somebody else to kill them, they feel they

7    preserve their afterlife in heaven.  Other people may choose

8    suicide by police -- this is what one of my patients told me,

9    he looked at me and he said, "Dr. Keram, you're an idiot, they

10   have the guns and if they shoot, it's because they think I'm

11   going to hurt them enough that they want to shoot me, they'll

12   do the job right."

13        So some people, my patient told me, he told me that he

14   might, his words, screw it up, that he might not be successful

15   in the way that he did it or he might chicken out, so he relied

16   on the officer to do the job for him properly.  Other people,

17   both in the literature and the information my patients give me,

18   choose to commit suicide because they hate the police and they

19   want to inflict psychological damage on the police.

20        I have I had a patient who's since passed on, not from

21   suicide by police but other reasons, tell me that he wanted the

22   police to shoot and kill him because he hated the police.  He

23   was a member of the Hell's Angels, and he had felt throughout

24   his riding clear that the police had harassed him

25   unnecessarily, had used excessive force against him,

1   essentially that the police were thugs, and you know, he wanted

2   to engage in a sort of cat-and-mouse psychological game with

3   them as his method of suicide.

4           Other reasons why people choose the police to shoot

5   and kill them is the methods of suicide that has been

6   recognized in the literature include not wanting to go back to

7   prison for a lengthy prison sentence; preserving the

8   possibility for a family member to prevail in civil litigation

9   following the suicide; there are people who are delusional and

10  they wanted the police to kill them for delusional reasons.

11  Actually that case in 1798 I found was a result of that.  In

12  other words, delusional having ideas that are not really based

13  in reality.

14          I think those are the majority of the reasons.

15  Q.  Now, you've touched on this and we'll get to it officially.

16  I want to talk about your experience in the area of suicide by

17  police.  Can you describe to the jury your experience in terms

18  of treating patients who have either attempted it or thought

19  about it, just an overview for the jury?

20  A.  Yeah.  You know, it's always a shock to meet a patient

21  who's suicidal and you want to very much talk about it, and in

22  order to do it you have to understand what their thinking is.

23  So even though it's uncomfortable, you have to really talk to

24  them about what their suicidal plan is, even though it's

25  anxiety provoking for you.

Keram - Direct

1              The first patient that I discussed this with was a

2       Vietnam veteran who had been chronically suicidal.  He had been

3       in Vietnam, done a number of things as a 18- or 19-year-old

4       that he felt he couldn't live with.  And he told me that he --

5              MR. GALIPO:  I'll object as calling for hearsay and

6       violating the psychiatrist/patient privilege.

7              THE COURT:  I think the patient has to raise the

8       privilege, not a third party.  But the patient is not being

9       identified by name in any way.

10             What was the rest of the objection, other than

11      psychiatrist/patient privilege?

12             MR. GALIPO:  Hearsay, your Honor.

13             THE COURT:  Hearsay.  Well, an expert witness can rely

14      on hearsay that would otherwise not be admissible if it's the

15      type of thing that an expert ordinarily would rely on in

16      forming an opinion.  It isn't clear whether you're asking this

17      witness to simply recount anecdotes or whether there is an

18      opinion here that this is supporting, so I'll sustain the

19      objection to that extent.

20             MR. WIENER:  Your Honor, I was intending to be more

21      general than perhaps -- my question was interpreted.  I'll

22      rephrase the question.

23             THE COURT:  Okay.  Give it a try.

24      BY MR. WIENER:

25      Q.  Let me ask you more specifically.  Have you treated

1    patients as a psychiatrist who have attempted or contemplated

2    suicide by police?

3    A.  Yes.

4          THE COURT:  Just looking for a yes or no.

5          MR. WIENER:  Yes.

6    Q.  And how many patients have you treated?

7    A.  Specifically expressing a desire to commit suicide by

8    police?

9    Q.  Ranging the gamut from trying it all the way down to

10   talking about it a lot or talking about it a little.

11   A.  Half a dozen to a dozen.

12   Q.  Have you had any patients who have actually attempted

13   suicide by police?

14   A.  I have had patients practice an attempt.

15   Q.  Okay.  And practicing, we'll get to that concept.  Is that

16   a form of planning?

17   A.  Yes.

18   Q.  And you had patients who have attempted suicide by police?

19   A.  Yes.

20   Q.  Have you done any trainings of law enforcement officers in

21   the area of suicide by police?  You touched on this a little

22   bit, but if you could just explain that to the jury.

23   A.  Yes, I have.

24   Q.  Can you explain it, please?

25   A.  Quarterly I give training in suicide by police in the

1    San Francisco crisis intervention training, and I've trained in

2    other jurisdictions as well.

3            It's a training that I wrote the curriculum for

4    myself.  And the training encompasses the definition of

5    "suicide by police."  A summary of relevant literature, both

6    from the medical and law enforcement communities.  A discussion

7    of the psychodynamics, the reason why people choose suicide by

8    police.  A discussion of the effects on all the involved

9    parties.  What the case law is to date.

10           That's -- you know.

11   Q.  And you mentioned you did a training at the FBI academy in

12   this area?

13   A.  Correct.  I was delivering a paper that I had written.

14   Q.  And Sonoma County as well?

15   A.  Yes.

16   Q.  Now, have you published in the area of suicide by police?

17   A.  Yes, that paper that I presented at the FBI academy.

18   Q.  And you said you're currently engaging in another study or

19   there's a study under way?

20   A.  That study has been completed by one of my fellows who

21   graduated the program, is supposed to be the primary author on

22   that.  It hasn't been written up yet.

23   Q.  You were a supervisor?

24   A.  Yes.

25           MR. WIENER:  Your Honor, don't know how -- if the

1    Court wants me to go past 4 o'clock.  I can, or now would be a

2    good time to break if the Court wants to end at 4:00 precisely.

3    I intend -- I'm happy to do it either way.

4         THE COURT:  Well, if this is a breaking point, maybe

5    we should just break and let the jurors actually leave at a

6    time they've been told they would be leaving.  But has rarely

7    been the time they've actually left.

8         What I'm concerned about is how much longer we're

9    going to be with the evidentiary portion of the case.

10        We have a short day tomorrow, ladies and gentlemen.

11        And to your purposes also, Dr. Keram, because I don't

12   know how long you'll be on the stand, because we have a

13   criminal case calendar tomorrow afternoon of considerable

14   length, actually.  We're going to proceed from about 9:00 to

15   2:00, I would say, which is with a couple of 15-minute or so

16   breaks.  I don't know how much we'll get through tomorrow.  But

17   hopefully without too many interruptions if we can.

18        Ladies and gentlemen, we're getting close.  I'm going

19   to try and get another update from counsel.  In the meantime,

20   thank you very much for your attention.  We'll see you tomorrow

21   at our regular time, 9 o'clock.  Slightly different schedule,

22   however, after that.

23        (The jury exited the courtroom)

24        THE COURT:  Dr. Keram, you may step down.

25        Will you be calling other witnesses after Dr. Keram?

1              MR. WIENER:  Don Cameron.

2              THE COURT:  How long do you anticipate that witness

3      will be?

4              MR. WIENER:  Including Mr. -- Mr. Loebs can answer

5      that.

6              MR. LOEBS:  Mr. Cameron?  Probably a couple of hours.

7              THE COURT:  On direct?

8              MR. LOEBS:  I'm just thinking of my total time in

9      terms of direct, and then any redirect, I was thinking about

10     the two hours.

11             THE COURT:  Well, I don't see how we're going to

12     finish our case tomorrow.  That's for sure.  As to the

13     defendants' case.  And that means we are not going to be able

14     to complete this trial in the week that we told the jury we

15     would be completing it.

16             Miss Lucero's been keeping time and she's gotten a

17     much greater number of hours than I had understood, and so

18     somewhere I've lost count.  If you have been keeping some kind

19     of a rough tally at your respective tables, I'd like her to

20     tell you so you have some idea of how much time you have left,

21     regardless of what you think you have left to use.

22             For the plaintiff?

23             DEPUTY CLERK:  47 hours and 49 minutes.

24             And defendants are at 50 hours, 50 minutes.

25             MR. WIENER:  Five-oh, one-five?

4399

 1              THE COURT:  Five-oh, five-oh.

 2              MR. WIENER:  We have 50 hours and 9 minutes for us.

 3              THE COURT:  Okay.  I don't know what the discrepancy

 4    is or what gives rise to it.  In my instance -- let's see, we

 5    just broke at 4:00.  So just a second.  Let me see.  As I say,

 6    I haven't been tallying up quite the number -- somewhere along

 7    the way I'm behind both of you.  So obviously my record is not

 8    correct.

 9              MR. WIENER:  Our numbers did sync with Miss Lucero's

10    about a week ago.  They were exact.

11              THE COURT:  Mine was syncing pretty close.  Let me

12    check here.

13              MS. BERNSTEIN:  We have no -- no time on Monday.  And

14    we used a little more than two hours today.

15              THE COURT:  About 2-10.  Something like that.

16              MR. WIENER:  Which should put it a little other 50.

17              THE COURT:  Actually, somewhere I've lost you.  So I

18    was going along with Miss Lucero, but somewhere I strayed off

19    the track.  The difference that you have, you have 50 hours 9

20    minutes, so you're about 40 minutes off?

21              MS. BERNSTEIN:  Yes.

22              THE COURT:  And that's a significant amount of time.

23    I can say that I ordinarily would be relying on Miss Lucero.

24    I'm not sure if she's kept something running that you cut off.

25    There was one time when there was a lengthy objection that we

4400

1    did not stop the clock.  I do not know if you were always

2    stopping when we went in-camera.  We did not always do that.

3    That may be the 30 minutes or so differential.

4            If it looked like someone was really wasting our time,

5    I kept the clock running.  Beg your pardon?

6            MS. BERNSTEIN:  Do you recall what date that might be?

7    We were in sync as of Thursday and we used no time Monday.  So

8    unless it was today --

9            THE COURT:  No, it wasn't today.

10           MS. BERNSTEIN:  Then I don't see how we could have

11   gotten off.

12           MR. GALIPO:  Related to Exhibit 184 and 185, if I

13   recall.

14           MR. WIENER:  Which would have been Mr. Galipo's.

15           THE COURT:  That would have been yesterday.

16           MR. GALIPO:  That's how my time got so big.

17           THE COURT:  But that would have been yesterday.  You

18   say you were together with her yesterday?

19           MR. WIENER:  As of Thursday, end of today?

20           THE COURT:  No, no, no.  Thursday.

21           MS. BERNSTEIN:  We used no time yesterday, your Honor.

22           THE COURT:  Well, we did have the objection to 184,

23   185, but I'm not sure.

24           MR. WIENER:  That was Mr. Galipo's time.

25           THE COURT:  But then the objection was made, and I

1   don't know what happened at that point.

2          MR. GALIPO:  I didn't make the objection.

3          THE COURT:  He didn't make the objection, and I don't

4   know if that was the one I was thinking about, in any event.

5   But I can tell you that in all likelihood I'm going to stay

6   with the Court clerk and that there has been an awful lot of

7   time spent with Mr. Jason, well beyond maybe what you had

8   anticipated.

9          If we can go through it and look through it, and if

10  you want to talk to Miss Lucero about how you calculated, Miss

11  Bernstein, to see -- she has an accurate calculator of the

12  time, it's only a question of whether she punches it in or

13  stops it at a certain point.  So you felt that you were

14  together as of the end of last week?

15         MS. BERNSTEIN:  Yes, your Honor.

16         THE COURT:  And that you did not understand that you

17  used any time on Monday?

18         MS. BERNSTEIN:  That's correct.

19         THE COURT:  And that's true.  No witnesses were called

20  or examined by the defendants on Monday.  So I'm not sure where

21  that went, but I'll leave you to consult with her and see.  As

22  I say, it's 30 minutes.  I wouldn't try to cut it down to the

23  exact wire no matter what you do.  Okay?

24         And as far as you're concerned, Mr. Galipo, has anyone

25  been keeping track of your hours with you, even Ms. Boyd or

1   anyone?

2           MR. GALIPO:  We've been trying.  I thought -- well, I

3   trust Miss Lucero, whatever she's doing.  I didn't realize I

4   got that high.  But I spent a lot of time with Mr. Jason, so

5   that probably explains it.

6           THE COURT:  As I say, I've lost the groove here

7   somewhere along the way.

8           Okay.  So -- but I'm very concerned.  We're going to

9   tell these people they have to come back on Monday.  Unless we

10  can use Friday in some fashion.  And if they were available on

11  Friday.  And even then it's not going to be really too good.

12  So --

13          MR. GALIPO:  I myself --

14          THE COURT:  -- I'm not happy about that.

15          MR. GALIPO:  I myself obviously would be available

16  Friday, and I'm hoping that my cross-examination of both

17  experts will be an hour and a half or less.  Now I don't know

18  why, where that leaves us.  I don't know how long the direct's

19  going to be.  But I just have to wait and see.

20          THE COURT:  They're proposing a very lengthy direct.

21  At least on Dr. Keram.  You've got three hours right there.

22  The way we've been going, we've hardly gotten four-and-a-half

23  hours out of some of these days.  So I'll -- I don't see it

24  wrapping up this week.

25          So as I say, I'm not happy about it.

1          A lot of time has been spent essentially repeating

2     matters.  I'm not attributing those repeated matters to one or

3     the other of you at this point.  It's just a lot going over the

4     same old thing.

5          Particularly with Mr. Jason.

6          So, at this stage, I think we're going to tell the

7     jurors counsel aren't going to finish this week.  In all

8     likelihood.  Because we have tomorrow, that's going to take as

9     long as it takes.  And even if you were through tomorrow, which

10    I don't envision, when are arguments going to be conducted?  So

11    I'm going to finish the instruction conference this afternoon,

12    and then we'll determine how we're going to proceed.  If it

13    were possible to argue and instruct on Friday, they could at

14    least go out and maybe they could then deliberate on Monday as

15    needed.  But....

16          MR. GALIPO:  I think that should be our goal at least.

17          THE COURT:  But I can tell you I don't even think

18    that's going to work.  We have our regular calendar on Friday

19    morning.  So we couldn't do it anyway until late in the game on

20    Friday.  So that really doesn't work.  I think you're talking

21    about Monday, and our commitment to these people has been

22    broken.

23          Okay.  We'll go off the record and we'll finish up the

24    instructions, and that will be it for the day.

25          (Adjourned to September 19, 2007 @ 9:00 a.m.)

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   ALEXANDER JASON (cont.)

 4   Cross By Mr. Galipo . . . . . . . . . . . .4184

 5   Redirect By Mr. Loebs  . . . . . . . . . .4279

 6   Recross By Mr. Galipo  . . . . . . . . . .4337

 7   EMILY ALYSSA KERAM

 8   Direct By Mr. Wiener . . . . . . . . . . .4367

 9

10                    DEFENDANT EXHIBITS

11   Exhibit No.                         Received

12    B6-54 . . . . . . . . . . . . . . . .  4212

13    W-14 and W-15 . . . . . . . . . . . .  4220

14    V5-02(a) and V5-02(b) . . . . . . . .  4286

15    F-9  . . . . . . . . . . . . . . . .  4291

16    U-5  . . . . . . . . . . . . . . . .  4306

17                    PLAINTIFF EXHIBITS

18   Exhibit No.                         Received

19    193  . . . . . . . . . . . . . . . .  4207

20

21

22

23

24

25
</pre>

4405

1

2                        CERTIFICATE OF REPORTER

3

4          I, Connie Kuhl, Official Reporter for the United

5    States Court, Northern District of California, hereby certify

6    that the foregoing proceedings in Case No. C 04-5459 (MMC),

7    Marylon Boyd, et al., City and County of San Francisco, et al.,

8    were reported by me, a certified shorthand reporter, and were

9    thereafter transcribed under my direction into typewriting;

10   that the foregoing is a true record of said proceedings as

11   bound by me at the time of filing.

12         The validity of the reporter's certification of said

13   transcript may be void upon disassembly and/or removal from the

14   court file.

15

16   _____

17              Connie Kuhl, RMR, CRR

18           Thursday, December 20, 2007

19

20

21

22

23

24

25