1                                          Volume 22

2                                          Page 4406 - 4611

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5             BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

6    ------------------------------)
                                   )
7    MARYLON BOYD, individually    )
     and as Executor of the Estate )
8    of CAMMERIN BOYD, deceased,   )
     et al.,                       )
9                                  )
                     Plaintiffs,   )
10                                 )
         v.                        )   No. C 04-5459 (MMC)
11                                 )
     CITY AND COUNTY OF            )
12   SAN FRANCISCO, et al.,        )
                                   )
13                   Defendants.   )   San Francisco, California
                                   )   Wednesday
14   ------------------------------)   September 19, 2007

15

                       TRANSCRIPT OF PROCEEDINGS
16
     APPEARANCES:
17

18   For Plaintiffs:          DALE K. GALIPO
                              21800 Burbank Boulevard
19                            Suite 310
                              Woodland Hills, California 91367
20
     For Defendants:          Office of the City Attorney
21                            City and County of San Francisco
                              1390 Market Street
22                            Suite 600
                              San Francisco, California 94102
23                      BY:   BLAKE P. LOEBS
                              SCOTT WIENER
24                            ERIN BERNSTEIN

25

4407

1    Wednesday, September 19, 2007

2                                                    (9:00 a.m.)

3              (In open court; jury not present)

4              MR. WIENER:  I think we resolved the time issue.

5              THE COURT:  Miss Lucero just stepped out, but I intend

6    to ask the question about it.

7              MR. WIENER:  Okay.

8              (The jury entered the courtroom)

9              THE COURT:  Good morning, ladies and gentlemen.

10             Mr. Kubo, thank you very much.  I think it was your --

11             JUROR:  Girlfriend.

12             THE COURT:  -- who catered us this morning.

13             Ladies and gentlemen, I want to talk to you for a

14   moment about our schedule.  I assume, being generally

15   perceptive people, you have noticed that somewhere along the

16   way we seem to have lost some steam here in getting to our

17   final destination in timely fashion.  It is almost a certainty

18   that the evidence will finish this week, but what I was

19   concerned about is that we had intended to complete the trial

20   this week, and from what I can tell at this point, it appears

21   that we may have to go into next week, and I want to find out

22   how that affects various members of the juror in particular.

23   And also to see whether you would prefer, if we can use Friday,

24   to use Friday of this week, or whether your situations are such

25   that you would find that difficult to do.

1      I think at the beginning we had indicated that if the

2 jury were deliberating, that we would require attendance on

3 Friday.  I don't think you'll be deliberating on Friday --

4 there's a possibility, but, frankly, I think it would be more

5 likely that it would be arguments or finishing arguments on

6 Friday and possibly instruction.  What I'm perceiving is that,

7 in all likelihood, at least Monday of next week would have to

8 be used.  Maybe not more than Monday, but at least Monday.

9      Now, with that kind of situation, let me just ask if

10 there's anyone who has a particular commitment in the coming

11 week that's going to be affected by the delay or extension on

12 the trial.

13      JURORS:  (Shaking heads)

14      JUROR NO. 6:  Next week?

15      THE COURT:  Next week.

16      JUROR NO. 8:  And including Friday.

17      THE COURT:  Right now, we're just talking about Monday

18 because I picture that the jury, even in the best of

19 circumstances, would probably be deliberating on Monday.

20 Everything could pick up and move along in some zippy fashion,

21 but I can't predict that at this time.  I feel very badly about

22 this, particularly because you as a jury have been, in my

23 experience, just about the best jury we've ever had in terms of

24 punctuality, in terms of good humor, in terms of your

25 congeniality amongst yourselves.  You've been a model jury, and

1    I just wish I could duplicate you for every trial, and I'd like

2    to do something to be rewarding instead of imposing upon you

3    another burden, from our standpoint, not keeping our commitment

4    to you.

5           So the first question was about Monday.  The next

6    question is whether it would be appropriate to use Friday if we

7    can.  If you feel that that would be a benefit, and I think you

8    may have blocked that out in some way, you know, based on what

9    I told you earlier, but if for any reason our going over to

10   Monday makes it better for us not meeting on Friday, then we

11   would consider not meeting on Friday.

12          Otherwise, what I'm going to try and do is those

13   matters we hold on Friday is moving them to some point that is

14   less intrusive as far as our trial, either get them early, all

15   packaged up earlier in the morning and start our trial maybe at

16   9:30 instead of at 9:00, or try to move them to other days.  Do

17   anything we can.  We can't move the criminal calendar.  But to

18   do anything that we can on the civil matters that are scheduled

19   for Friday to try to get them out of the way of this trial.

20          And I didn't want to ask Miss Lucero to start making

21   those efforts if anyone felt that Friday would be a problem for

22   them.  So --

23          JUROR NO. 1:  (Raises hand)

24          THE COURT:  Let's see where we are.

25          Miss Chan, yes.

4410

```
1              JUROR NO. 1:  I have alternative child care, and they
2    leave next weekend back to Phoenix.
3              THE COURT:  In other words, someone's been watching
4    your children.
5              JUROR NO. 1:  Yes.
6              THE COURT:  And is there anyone that could cover for,
7    you know, the short term that we're talking about?
8              JUROR NO. 1:  I would have to ask.
9              THE COURT:  Okay.  Well, in your situation Friday
10   would be better.  Anything we can do Friday?
11             JUROR NO. 1:  Yes.
12             THE COURT:  And as I say, I had intended that we use
13   Friday -- I was expecting that we would go to the jury, the
14   case would go to you toward the middle to end of this week and
15   you would be deliberating perhaps on Friday, and then we'd be
16   using Friday, but you still might have to come back Monday.
17   That's what I wanted to just see if --
18             JUROR NO. 6:  So if we come Friday, we'll still come
19   back Monday?
20             THE COURT:  You'd still probably have to come Monday.
21   I'm not positive.  I mean, it's a gamble in the sense that
22   maybe we could wrap it up this week.  As I say, at the end of
23   today, we're going to have the best idea of where this is going
24   to finish up.  But the -- we would have to start with respect
25   to Friday at least trying to make those arrangements, probably
```

1    as soon as possible.  So I think we should have Miss Lucero try

2    to do that.

3           The worst thing is that it will be an effort that will

4    not be fruitful.  But we're going to try to do that, and then

5    I, just as I say, I'm encouraging counsel to consider

6    shortening wherever they can without feeling they're doing a

7    disservice to their respective clients in that regard.  And

8    just try to keep as much as we can to the schedule.

9           So that's where we are at the moment.  And if you want

10   to think about it and after the break give us any additional

11   information, that would be helpful.

12          And we will do everything we can to accommodate you,

13   Miss Chan.

14          The one thing I don't think you would want, at this

15   point, having spent six weeks in this trial, or we would want,

16   is to lose you over a day's overlap, so to speak.  You've just

17   put so much into this.  It would just be very disturbing if you

18   couldn't see it through to conclusion.

19          So, okay.  Keeping all that together and again with

20   the Court's apologies for the situation, we're going to put

21   Dr. Keram back on the stand and see how we're doing at that

22   point.

23          This witness was previously sworn, need not be

24   resworn.  As soon as she's up here, you can begin, Mr. Wiener.

25          MR. WIENER:  Thank you.

1          THE COURT:  And also, Doctor, somewhere along the way

2     here we've had the microphone fixed so that it can actually be

3     moved at its base also.  I saw you might have had to lean a bit

4     yesterday.  If you want to pull it towards you, you don't

5     actually have to pull yourself to it, you can pull it toward

6     you.  It's movable.

7          THE WITNESS:  Thank you.

8          THE COURT:  Go ahead, Mr. Wiener.

9          MR. WIENER:  Thank you, your Honor.

10    DIRECT EXAMINATION (cont'd)

11    BY MR. WIENER:

12    Q.  Good morning, Dr. Keram.

13    A.  Good morning.

14    Q.  Before we pick up where we left off, I just wanted to ask

15    you a brief question:  Yesterday you had given, I think, one or

16    maybe two examples of, generically without using the name, of

17    something that a past patient had told you.  In the psychiatric

18    or the medical profession generally, do physicians who engage

19    in research use examples in that manner, and can you describe

20    what the rules are?

21    A.  Yes, yes.  Generally, for rules that we follow, whether

22    we're publishing a study where it's a case description and

23    we're giving factual information about a specific person; or

24    we're teaching, whether, you know, we're giving a training in

25    the medical profession or outside the medical profession, or

1    whether we're testifying in this type of setting, the rules

2    that we adhere to are set by what are called institutional

3    review boards.  Those are boards that are set up by the

4    universities where we do research.  And they set out guidelines

5    that we adhere to for preserving patient anonymity and govern

6    what types of information we can give, obviously we're all very

7    concerned about patient confidentiality.

8         So, for example, if I were discussing somebody where

9    they might be the only person who could be identified as the

10   subset of people, let's say I was, you know -- I have a patient

11   who's the mayor of the town that I live in, that type of thing,

12   we wouldn't do.  But if I have a patient who, you know, there's

13   about 3,000 people in our clinic, and a large number of them

14   have PTSD and have been door gunners, hundreds of them, in

15   Vietnam, that type of thing, you would never be able to

16   identify him, you don't know where he lives or, these are from

17   Marin up to the Oregon border.  You wouldn't be able to figure

18   out who he was, that would adhere to the guidelines.

19        THE COURT:  I want to clear up PTSD.  Is it

20   posttraumatic stress disorder?

21        THE WITNESS:  Yes.

22   Q.  I want to ask you some questions about how psychiatrists go

23   about analyzing and evaluating the psychological state of mind

24   of people who are now dead.  In other words, going back to

25   before they passed away and analyzing their state of mind

Keram – Direct

1    despite the fact that they are no longer with us.  Okay?

2    A.  Uh-huh.

3    Q.  When did -- is that sometimes referred to as a

4    psychological autopsy?

5    A.  Yes.

6    Q.  When did researchers begin to describe a scientific method

7    for analyzing the mental state or psychological state of

8    deceased people?

9    A.  In the 1950s.  And it began in LA County.  At that time, LA

10   County had a large number of, a series of drug-related deaths,

11   and the coroner, or I don't know if it was the medical

12   examiner, was interested in determining whether or not these

13   were suicides.  So the coroner's office, the law enforcement

14   agencies and a suicide prevention group got together and

15   developed a way of analyzing in a very rigorous manner all of

16   the cases to determine what the state of mind of the person was

17   at around the time that they died.  So that was the beginning

18   of this type of investigation.

19   Q.  And is this method of evaluating the mental state of

20   deceased persons, is that something, a method that's generally

21   accepted in the psychiatric profession?

22   A.  Absolutely.

23   Q.  Okay.  And can you -- is there a literature surrounding

24   psychological autopsies, or is it just generally the evaluation

25   of the mental psychological state of deceased persons?

Keram – Direct

1    A.   Yes, there's a large literature in the medical literature

2    on that.   There's hundreds of articles that have been

3    published.   In addition, there are other groups besides the LA

4    County group that has set protocols, and the protocols are

5    really, for all practical purposes, identical.   And those

6    include the CDC, Centers for Disease Control, the United States

7    Armed Forces, and other research groups.

8    Q.   Can you describe the general methodology that you use or

9    that is used in the profession to evaluate the psychological

10   state of people who are deceased, not focusing specifically on

11   suicide by police for the moment, but just the general

12   methodology?

13   A.   Sure.   What you're trying to do is recreate the mental

14   state of a person who you can't interview anymore.   At a

15   specific point in time.   And the way we go about doing that is

16   by collecting as much information about that person as is

17   possible.   Not just in the hours or days before the event that

18   you're interested in, but going back as far as you can.

19        And so what we do is we collect information, lots of

20   different types of information.   We try to collect occasional

21   records, occupational records.   If they've ever been arrested,

22   we look at arrest records, the entire criminal history.   We

23   look at medical records, mental health records.   We look at

24   really at anything we can find.   We may have a private

25   investigator interview family members, depending on, you know,

1   if it's an insurance issue.  We may review depositions if it's

2   a legal issue.

3         So we're trying to find out as much about that person

4   as we can to determine whether or not there is mental state

5   evidence in all of that information.  So if the issue is a

6   suicide, what we're looking for is whether or not there is the

7   presence of known risk factors for suicide.  And then the other

8   question would be, if those are present over the long term, we

9   call those chronic risk factors for suicide, the question

10  becomes, why now?  Why would the person suicide now?  So we

11  look for what are known as acute risk factors, and then we

12  examine the behavior of the person around the time of their

13  death to see if that's indicative of actual intent for suicide

14  at the time.

15  Q.  In this process, this methodology of evaluating the mental

16  state of deceased people, can you give some examples of the

17  types of cases or situations in which psychiatrists engage in

18  that analysis?

19  A.  Probably the first two were -- where this became more

20  generalized outside of the area of a coroner's investigation

21  were in testamentary capacity; that is, you know, you always

22  see them on television, you know:  I, being of sound mind and

23  body, write my will.  The sound mind part comes if somebody

24  contests a will after somebody died, did the person really have

25  a sound mind at the time they wrote their will.  So there's a

1    protocol that's set for evaluating the person's mental state.

2    You know, was there any undue influence?  Did they know who

3    their heirs would be?  That type of thing.

4         The other would be insurance investigations where

5    somebody has died, and perhaps there's a suicide clause in the

6    contract that would include beneficiaries being paid if the

7    person suicided.  So assignments, either an insurance company

8    or a beneficiary's attorneys, will consult us to do this exact

9    same type of investigation to determine whether or not the

10   person was suicidal.

11        There are many other types of examples that are very

12   interesting.  When the Armed Forces started their suicide

13   protocol -- their psychological autopsy protocol in the wake of

14   an accident that took place on the U.S.S. Iowa in the late

15   1980s where a seaman essentially blew up a gun on a ship, about

16   seven or eight soldiers were killed, and they wanted to know

17   what had led to this behavior.  So that began, you know, what's

18   been a 20-year process of psychological autopsies.

19   Q.  Okay.  Moving specifically to suicide by police, I want to

20   talk to you about what one does, what a psychiatrist does, in

21   determining whether a particular episode counts or was a

22   suicide by police or an attempted suicide by police.  Can you

23   just tell me, first of all, what does one look at in order to

24   assess whether an episode was a suicide by police or attempted

25   suicide by police?

Keram - Direct

```
1   A.   The first part of that I've already discussed.  We collect

2   all of the information that we can about the person, starting,

3   you know, from their -- as early as we can go back onwards.  So

4   that's the same reference that I talked about before,

5   educational, occupational, mental health, medical, so forth.

6             Then we rely on the literature, the peer-reviewed

7   studies that have been published, that discuss what we refer to

8   as indicators of behaviors consistent with suicide by cop, to

9   see whether or not those are present in the behavior of the

10  individual at the time of his death.  We do the same type of

11  analysis in looking at the "why now" question -- why would he

12  precipitate this now?

13            But what distinguishes suicide-by-cop psychological

14  autopsies from other types is relying on the peer-reviewed

15  medical literature about the behavior of the individual

16  associated with suicide by cop.

17  Q.   You mentioned risk factors.

18  A.   Uh-huh.

19  Q.   What risk factors do you look for and why?

20  A.   In suicide by cop specifically?

21  Q.   Yes.

22  A.   For people who are suicides, the reasons they might choose

23  suicide by cop includes things like long prison sentences.  So

24  we look for that possibility.  We look for the possibility of

25  civil litigation for the beneficiaries.  We look for that
```

1   evidence.  There's hostility towards law enforcement.  This was

2   mentioned in a study in the mid-'90s, looked for people who

3   wanted to do psychological harm to officers.  And in addition

4   to those risk factors, we look at specific behaviors that are

5   consistent with people who choose this method of suicide, and I

6   can discuss those if you like, those specific behaviors.

7   Q.  Sure.  And what are those specific behaviors?

8   A.  Okay.  First of all, if you're going to choose suicide by

9   cop as a method of suicide, deliberately, then you have to come

10  to law enforcement attention.  And so the way that people who

11  commit a suicide by cop come to law enforcement attention is

12  similar and has been identified in the literature.  People may

13  call the police themselves, and that's been described in

14  literature, and I was involved in a case where that occurred.

15  Or they may engage in what some researchers call outrageous --

16  an outrageous act, but I prefer to call abnormally abnormal

17  behavior.  It was abnormal for somebody to rob a convenience

18  store, but it is -- most of us will never do that, so it's

19  abnormal.  It's abnormally abnormal after you rob a convenience

20  store to wait for the police to show up.

21          It is abnormal for somebody to be involved a law

22  enforcement pursuit.  But it is abnormally abnormal to not

23  attempt to evade in the pursuit.  To stay in the same area.  Or

24  to, if the police lose you on the pursuit or break off the

25  pursuit, to then reengage the contact with the police.  It is

1    abnormally abnormal to engage in behaviors that would reliably

2    cause citizens to call the police or report you, in a small

3    geographic area.  So it's abnormal to be engaged in repeat

4    episodes that would, over say a brief period of time.  But it

5    is abnormally abnormal once the police are called not to

6    either, you know, pull over when they signal, or to then engage

7    in a pursuit where you're not trying to evade.  I was involved

8    in a case where that was the case, and I can discuss the facts

9    of that if you'd like.

10           So the way the actual law enforcement contact begins

11   is similar from case to case.

12           Then generally the behavior, once law enforcement is

13   engaged, again, indicates a desire of not to be caught, and

14   also indicates -- you see very frequently noncompliance with

15   law enforcement commands.  That's another hallmark indicator.

16   It's very, very rare for people to be noncompliant with law

17   enforcement commands.  You know, the average citizen and the

18   average law enforcement officer in the course of their day

19   doesn't run into that.

20           Then breaking down the incident to the beginning and

21   then the end, if you look at the immediate, what I would call

22   predeath behaviors, you tend to see an escalation, people who

23   want to commit a suicide by cop know that they have to present

24   a risk of either serious bodily injury or lethal force to the

25   police in order to be shot.  So you see an escalation in that

Keram - Direct

1   level of threat if the initial attempts are unsuccessful.

2            And then, finally, the last thing that you see is

3   generally the incidents evolve extremely rapidly.  It's very,

4   very rare for them to last long enough for negotiators to be

5   called and arrive on the scene.  In the studies that we've

6   looked at, the length of time from the time that law

7   enforcement is contacted until shots are fired and the person

8   is incapacitated lasts somewhere between 5 to 15 minutes.

9   Q.  So in terms of presenting a lethal threat to the police

10  would be a way of increasing the risk of you being shot?

11  A.  Yes, and that also occurs in fairly typical ways that have

12  been discussed in the literature, and we can discuss those if

13  you like.

14  Q.  We'll get back to that.

15  A.  Okay.

16  Q.  Are you familiar with the term "practicing" in terms of

17  suicide by police?

18  A.  Yes.

19  Q.  And can you describe to the jury what that is and what

20  significance it has?

21  A.  People who commit suicide in general may engage in

22  behaviors, practicing their suicides.  The significance is that

23  the person is doing two things:  One is decreasing their

24  anxiety, it's almost like a dress rehearsal.  And the other is

25  just like a dress rehearsal:  They are making sure that nothing

Keram – Direct

1    will go wrong.  So, you know, people may drive out to the coast

2    if they're planning to drive over a cliff and do research on

3    the Internet about what efforts you need to make to kill

4    yourself and so forth.

5          We find practicing in suicide by police cases as well

6    where in the hours or days or sometimes weeks before the fatal

7    event, the person may bring themselves to law enforcement

8    attention in a less drastic way, not present necessarily a

9    threat of lethal force, although sometimes they do as a way of

10   doing two things:  One is learning about law enforcement -- and

11   we know what they're doing from interviews of survivors --

12   learning about law enforcement procedure to determine what they

13   need to do in order to be successful in their suicide.  And

14   also decreasing their anxiety through the event to make sure

15   that they can go through it to the end.

16   Q.  Okay.

17   A.  I did also have a patient talk to me about practicing, but

18   if you prefer to stay away from patients, that's fine.

19   Q.  Oh, it's really up to you if you think it's significant.

20   A.  Well, it's illustrative because often -- as I got into this

21   field, you know, some of the things that I've heard seemed

22   somewhat strange or odd or unusual until the people who were

23   involved actually started to explain them to me.  So one of my

24   patients told me that he was actually involved in several

25   episodes of practicing for his suicide by cop.  He had decided

Keram - Direct

1    that the way he would come to law enforcement attention would

2    be to shoplift from a business and then get caught and engage

3    in an action that would -- well, that police would be called

4    and that he would engage in an action that would precipitate

5    the use of lethal force.

6            So he had actually, you know, gone to this business

7    several times and shoplifted successfully and felt, you know,

8    much less anxious in doing it.  You can imagine how I felt in

9    hearing this.  You know.  It's very anxiety provoking.  And you

10   know, successfully shoplifted, and once he felt less and less

11   anxious about it, his next plan was to go get caught and have

12   the police come.

13   Q.  Okay.  Now, in evaluating whether an episode is a suicide

14   by police or attempted suicide by police, do you -- how do you

15   evaluate whether the person interacting with the police

16   actually had a suicidal intent; in other words, that that's

17   what they wanted to do, how do you go about doing that?

18   A.  As I mentioned before, you look for, in the -- you know,

19   suicide's been studied for a long, long time, and so -- and in

20   many different countries.  And so we have an understanding

21   about what we call both static and dynamic or chronic and acute

22   risk factors for suicide.  Static or chronic risk factors would

23   be things that don't necessarily change over time.  Such as

24   gender, for example.  So we look for that type, you know, does

25   the person fit the demographic of somebody who is at risk for

1    suicide because of these chronic or static risk factors.

2          Then we also look at the acute or dynamic, the sort of

3    "why now" risk factors for suicide.  And particularly because

4    there's a suicide police investigation that you asked me about,

5    we would rely on the literature of that as taking a subset of

6    those risk factors that are applied -- known to be more likely

7    to occur in suicides by police, things like the risk of prison

8    sentence, risk of, I don't know, animosity towards the police,

9    family benefitting from civil litigation -- there are others as

10   well, desire to go out in a blaze of glory, that type of thing,

11   to see whether or not there's evidence in the behavior at the

12   time, and also in the history that apply to that specific

13   incident.

14   Q.  Now, when someone commits or attempts to commit a suicide

15   by police, is there always a clearly and directly stated

16   intent; in other words, saying, I want you to shoot me, or

17   something that's very obvious?

18   A.  No.

19   Q.  Okay.  And has the manner in which suicidal intent is

20   expressed, has that been studied?

21   A.  Yes.

22   Q.  And was that study that large study over 10 years that you

23   talked about?

24   A.  It was mentioned in that study and other studies as well.

25   Q.  In what percentage -- under the research that's been done,

1    in what percentage of suicides by police does the person leave

2    a suicide note?

3    A.   2.2 percent of suicide-by-police cases, a suicide note

4    discussing the suicide-by-police plan is disclosed.

5             MR. GALIPO:   Your Honor, apologize again for the

6    record, vague as to all suicides or of that particular study.

7             MR. WIENER:   I'm referring to --

8             MR. GALIPO:   All suicide by cops everywhere in the

9    world or referring to that one study?

10            THE COURT:   It seems a bit broad.  Also, this is just

11   asking for data, this really isn't relevant.  We can go through

12   the entire field that this witness may have studied.  The

13   question is, what are her opinions and to the extent whatever

14   she studied relates to them, not just to go through the whole

15   history of studies in the area, how many of this, how many of

16   that.

17            So I'm going to sustain the objection.  Particularly

18   in the interest of time.

19            MR. WIENER:   Okay.

20   BY MR. WIENER:

21   Q.   Dr. Keram, do you have an opinion about the percentage of

22   people --

23            THE COURT:   No, not about the percentage.  What's her

24   opinion that's relevant to this case, and if the percentages of

25   people around the world who commit suicide by cop has some

1    bearing on it, then maybe you can elicit it.

2    Q.  Okay.  Do you have an opinion about whether everyone who

3    commits suicide by police leaves a suicide note?

4    A.  Yes, I do.

5    Q.  And what's your opinion in that regard?

6    A.  My opinion is that the overwhelming majority, 97.8 percent,

7    do not leave a suicide note communicating their intent.

8    Q.  Do you have an opinion about whether all people who attempt

9    or commit suicide by police tell their family ahead of time

10   that they're planning to do that?

11   A.  Yes, I do.

12   Q.  What's your opinion in that regard?

13   A.  Again, the overwhelming majority do not communicate their

14   intent to commit a suicide by police to their family.  Only 6.5

15   percent do, which means that 93.5 do not.

16          Excuse me, I'm not good at math.

17   Q.  And that's based on the studies that have been done?

18   A.  Yes.

19   Q.  Do you have an opinion about whether all people who attempt

20   or commit suicide by police tell the police ahead of time to

21   shoot them.  In other words, explicitly say, "Shoot me"?

22          THE COURT:  You know, I'm going to interrupt.  The

23   issue here is whether this witness has an opinion about whether

24   there was a state of mind held by Mr. Boyd at the time of the

25   shooting that's consistent with wanting to have the police

Keram – Direct

1   shoot him.  To the extent that certain facts pertain or don't

2   pertain in our case, when the witness thinks they are or are in

3   the significant in that regard, she can explain why she thinks

4   they are or are not significant.  In other words, if there's no

5   suicide note, does that affect her opinion in this care.  If

6   the answer is no, the reason why.  In many cases, people don't

7   leave suicide notes.

8          But to again simply go through this long event of

9   everyone in the world again and simply put it in the context

10  of, Do you have an opinion about..., the Court feels is not an

11  appropriate use of the expert witness.

12         So I'm sustaining the objection.

13         MR. WIENER:  Yes, your Honor.

14  BY MR. WIENER:

15  Q.  Okay, now, Dr. Keram, you have become familiar with this

16  case relating to Cammerin Boyd; is that right?

17  A.  Yes.

18  Q.  And you've reviewed background material to become familiar?

19  A.  Yes.

20  Q.  Do you, based on your experience with suicide by police, do

21  you have an opinion about whether Cammerin Boyd committed

22  suicide by police on May 5th, 2004?

23  A.  Yes, I do.

24  Q.  And what is that opinion?

25  A.  It's my opinion that Mr. Boyd did commit a suicide by cop

Keram – Direct

1    on May 5th, 2004.

2    Q.   Now, I'm going to pose some hypothetical questions to you

3    and ask you your opinion, assuming those hypotheticals to be

4    true.   I want you to assume that Cammerin Boyd lost his legs,

5    the lower portion of his legs, in an accident following a

6    high-speed chase with the California Highway Patrol; I want you

7    to further assume that that accident changed his life from a

8    promising athlete to someone who was no longer a promising

9    athlete and began to commit crimes and start time in jail, and

10   actually fought a lawsuit related to that accident alleging

11   that the police were at fault.   I want you to assume those

12   facts.

13           THE COURT:   You know, she's already said she has an

14   opinion.   Wouldn't it be easier to ask her what her opinion is

15   based on?

16           MR. WIENER:   And not proceed by hypothetical, your

17   Honor?

18           THE COURT:   I think that you could probably do that in

19   this case.   Rather than have to recount the entire record in

20   the case.   In other words, you can draw the witness's attention

21   to things if she needs that done.   You know, this is the

22   history part of it and you can ask her about it.   Certain

23   things are not in dispute here; for example, that he did lose

24   his legs in a high-speed chase.

25           MR. WIENER:   I just wanted to make sure to focus her

1    on specific areas.

2              THE COURT:  But it's going to take you a long time to

3    lay out six weeks of testimony.

4              MR. WIENER:  I'm not going to be laying out six weeks

5    of testimony, and I won't be wasting time, but I think it is

6    important to focus on different aspects of the case.

7              THE COURT:  Why don't you start by asking the witness

8    whether the history then of his leg loss had a bearing, and

9    then you can ask her about --

10             MR. WIENER:  I can do that, your Honor.

11             THE COURT:  Okay.

12   BY MR. WIENER:

13   Q.  In evaluating whether Cammerin Boyd committed suicide by

14   police, did you consider his -- whether he held animus towards

15   the police?

16   A.  Yes, I did.

17   Q.  Or hatred.  And as part of considering that, did you

18   consider the 1993 accident in which he lost his legs after a

19   high-speed chase with the California Highway Patrol?

20   A.  Yes, I did.

21   Q.  And did you consider that he fought a lawsuit afterwards

22   blaming the police for the loss of his legs?

23   A.  Yes, I did.

24   Q.  And did you consider the change in his life going from a

25   promising athlete to someone who was now disabled and who then

1    began to commit crimes; did you consider that?

2    A.  Absolutely.  Because one of the risk factors for suicide in

3    general is poor coping with a significant life event.  So you

4    know, there are many below-the-knee double-amputees who have

5    promising futures prior to the accident, or whatever led to it,

6    who are able to sort of reconstitute themselves and, you know,

7    go to work or raise a family, you know, sustain a long-term

8    injury, that type of thing, have a good positive trajectory for

9    their life, not be involved in criminal activity.  So that was

10   certainly a risk factor for suicide in general, the lack of

11   good coping ability.

12           And then the suicide-by-police piece would be, you

13   know, the animosity toward the -- the possibility for animosity

14   toward the police.  Other general risk factors for suicide that

15   stem from that event are poor physical health, that's a

16   recognized risk factor for suicide, and Mr. Boyd had long-term

17   problems with stump infections, with an osteomyelitis, which is

18   a bone infection, and with fistulas from being in a seated

19   position for too long, an infection in his buds.

20           And also the last piece for -- I shouldn't say risk

21   factor for suicide, but -- well, yeah, risk factor for suicide

22   in general, and suicide by cop specifically, was this issue of

23   facing a potentially long prison sentence because there's an

24   abundance of information in the medical record from the

25   incarcerations that he had both in jail and in prison.

Keram - Direct

1   Q.  Doctor, I'd like to get back to that.

2   A.  I'm sorry.

3   Q.  I'd like to focus you on the 1990 -- we'll only proceed one

4   piece at a time, if that's okay.

5   A.  Okay.

6   Q.  Is this 1993 accident, losing your legs, blaming the

7   police, and having a major impact on your life, is that the

8   kind of event that could contribute to the -- to animus against

9   the police sufficient ultimately to lead to a suicide by

10  police?

11  A.  It's something certainly that you would consider,

12  absolutely.

13  Q.  And in your opinion, is that something that could

14  contribute to that kind of animus?

15  A.  Absolutely, yes.

16  Q.  Now, again remaining on animus towards the police, if based

17  on Mr. Boyd's history of arrests, of criminal convictions, of

18  spending time in jail and in prison, and specifically having a

19  very bad time in prison in terms of his legs, is that the kind

20  of life experience that could contribute to animus against the

21  police leading to a suicide by police?

22  A.  Yes, absolutely.

23  Q.  Okay.  People who commit suicide by police, in your

24  experience, do you have an opinion about how common is it for

25  people who commit suicide by police to have a criminal record?

1   A.   In the Hudson study, two-thirds of people who committed

2   suicide by police were found to have a criminal history.   In

3   the study that we conducted at UCSF, we found a similar

4   percentage.

5   Q.   Mr. Boyd's lawsuits against the police alleging he had been

6   mistreated by the police and filing, suing those lawsuits, is

7   that the kind of behavior that could contribute to the animus

8   necessary to pursue suicide by police -- I'm not saying by

9   itself, but in the context?

10          MR. GALIPO:   Your Honor, is it possible that we could

11  try to elicit the opinions and reasons for them rather than

12  going over, with leading questions, every specific item?

13          THE COURT:   Now, is that a question?  Or an objection?

14          MR. GALIPO:   It's an objection, your Honor, to the

15  leading nature of the questions and that certain things are

16  possible as opposed to the basis for her opinion.

17          THE COURT:   In the first place, the form of the

18  question is objectionable.  If you're asking someone

19  essentially a question that could be answered by a lay witness,

20  if somebody lost their legs in a car chase, would that be

21  possible grounds to be angry at whoever chased them?  Yes, you

22  don't need an expert to tell you that.  So that kind of a

23  question is objectionable.  I think we should get to the

24  witness's opinion and whatever events she relied on in forming

25  her opinion in that respect.

1          Okay.  I'm sustaining Mr. Galipo's objection.

2    BY MR. WIENER:

3    Q.  Do you believe that Cammerin Boyd had animus or hatred

4    towards the police that, in your opinion, would be sufficient

5    to meet that aspect of suicide by police?  You've already

6    described that that is something to consider?

7    A.  Yes.

8          THE COURT:  Well, what is she drawing her conclusion

9    from?

10         MR. WIENER:  I was about to ask her that?

11         THE COURT:  In other words, you're going to have to

12   ask her then to make factual determinations in the form of your

13   question.

14         MR. WIENER:  That's why I was trying to proceed by

15   hypothetical.

16         THE COURT:  No, your earlier hypotheticals were with

17   respect to matters not in dispute.  This is a matter that is in

18   dispute.  It is not in dispute he lost his legs in the car

19   chase.  His specific state of mind as to how angry he was at

20   the police at any given point may well be in dispute.  This

21   witness is not in a position to draw those conclusions, at

22   least from what you've asked thus far.

23         MR. WIENER:  I'll proceed by hypothetical, which had

24   been my intent, your Honor.

25         THE COURT:  You'll proceed, and we'll see if it's

Keram – Direct

1    productive.

2    BY MR. WIENER:

3    Q.   Okay.   I want you to assume the following facts:

4           I want you to assume that someone had had significant

5    negative interactions with the police leading to spending time

6    in prison, leading to the loss of legs, and that that person

7    had filed various lawsuits against the police blaming the

8    police for or alleging that they had engaged in misconduct

9    against this person.   I want you to further assume that the

10   person, several weeks before their death, was found to have in

11   their car rap lyrics advocating for shooting police officers

12   along with a newspaper clipping with a photo of an officer who

13   had been recently murdered.

14          Assuming those facts to be true, could that lead to

15   the type of animus that would cause one to choose suicide by

16   police as opposed to some other form of suicide?

17   A.   Yes, certainly.

18   Q.   Can you explain why you believe that?

19   A.   It's a two-step process that could lead to that.   One is

20   the blaming of law enforcement for the loss of a perceived

21   successful future.   Particularly if that was never resolved

22   through normal channels such as a lawsuit.

23          And then because of the blame, the desire for

24   retaliation, and again, you know, retaliation can take the form

25   of a lawsuit in a normal sense, you know, people seek to be

Keram – Direct

1    made whole, is the legal term for it.  So if that is cut off,

2    then they seek retaliation in other ways such as -- and, again,

3    a patient of mine discussed this with me and it's also in the

4    literature -- the desire to retaliate against law enforcement

5    by inflicting psychological harm in the conduct of a suicide by

6    police, specifically the way the suicide by the police --

7    suicide by police would unfold.  It does create an opportunity

8    for the subject to play a sort of cat-and-mouse game, as my

9    patient put it to me, with the police at the time of the event

10   that is very, very harmful to the police.

11   Q.  In terms of the.  Hypothetically, the rap lyrics advocating

12   the murder of a police officer along with a clipping of a photo

13   of a recently murdered police officer, is that something that

14   would, in your view, assuming that to be true, would contribute

15   to that type of animus?

16   A.  It's evidence of that type of animus, yes.

17   Q.  Now, I want you to -- you mentioned before pending criminal

18   charges as being a risk factor?

19   A.  Yes.

20   Q.  I want you to assume that --

21       MR. GALIPO:  Your Honor, apologize, but I think

22   hypotheticals that are going over every bit of information as

23   opposed to asking the witness the reasons for her opinions

24   based on the materials she reviewed, I think it's

25   inappropriate.

1          THE COURT:  I'm going to sustain the objection.  I'm

2     sustaining the objection.

3     BY MR. WIENER:

4     Q.  Do you have an opinion about whether Cammerin Boyd's -- the

5     criminal charges pending at the time of his death from the year

6     before and that had been set for trial, do you have an opinion

7     about whether that provides evidence that this was a suicide by

8     police?

9     A.  Yes.  It absolutely provides evidence that this was a

10    suicide by police.  It's -- in the Hudson study, the percentage

11    of suicides by police, the decedents who were found to be

12    facing a lengthy prison sentence at the time they committed the

13    suicide by police was 8.7 percent.  So it's a known, recognized

14    risk factor.

15          In addition, in law enforcement trainings by law

16    enforcement officers who have been on scene, the statements

17    such as, "I'm never going to be taken alive, I'm not going back

18    to prison, prison's not a pretty place, I'm not going there"

19    have all been reported.  So the potential for facing a long

20    prison sentence is a well-recognized risk factor for suicide by

21    police.

22    Q.  How about in Mr. Boyd's case, having had a very bad time in

23    prison when he had been there previously, does that contribute

24    to your opinion about the significance of a pending criminal

25    charge?

Keram - Direct

1    A.   Yes.  Absolutely.  Mr. Boyd, relying on Mr. Brass's report,

2    Mr. Boyd was facing a lengthy prison sentence.  Somewhere

3    between about 15 and 25 years.  I reviewed his medical records

4    from the county jail in San Francisco and also in Alameda

5    County as well as the California Department of Corrections,

6    those are the prison medical records, and there are many, many,

7    many examples of contact with the medical office for treatment

8    of stump infections and problems resulting from his spending so

9    much time sitting.  So he's had a very difficult course in

10   prison and in the jail related to his inability to care

11   properly for his stumps.

12           In addition, and I think probably most significantly,

13   at one point he had a much more significant infection which

14   led, I think, that time to a bone infection.  He was taken from

15   the prison to a hospital outside of the prison, and the doctor

16   wrote in his letter, in his note --

17           MR. GALIPO:  I'll object as hearsay, your Honor, what

18   the doctor wrote.

19           THE COURT:  Actually, I don't know what was in the

20   note.  So if it's something that is of particular concern, then

21   we may have to send the jury out.  This is -- I'm sorry, go

22   ahead.

23           MR. GALIPO:  I apologize.  I don't know specifically

24   what's in this specific note either.

25           THE COURT:  All right.  It may be something that the

1  witness cannot testify to.  When a doctor is testifying about a

2  medical opinion for treatment purposes, they often can rely on

3  the records of other doctors.  But this is not for treatment

4  purposes, and it is not an opinion of the sort that ordinarily

5  would give rise to allowing that type of hearsay evidence to be

6  admitted.

7        So I will sustain the objection.

8  BY MR. WIENER:

9  Q.  Okay.  Putting that aside, was there any further

10 explanation you needed to give about the significance of

11 Mr. Boyd's troubles in prison, or had you completed your

12 response?

13 A.  There was also the fact that it limited his ability -- in

14 prisons, the most desirable housing is up (indicating), and he

15 was always given a lower bunk on the lowest floor.  And that's

16 considered to be very undesirable housing.

17 Q.  Okay.

18       MR. GALIPO:  I apologize, your Honor, I'm going to

19 object and move to strike that that's considered to be --

20 lacking foundation that that's undesirable housing.

21       THE COURT:  Well, I'll sustain, unless you can lay a

22 foundation that the witness is familiar with the prison

23 hierarchy concerning bedding.

24       MR. GALIPO:  All the housing may be undesirable.

25       THE COURT:  Okay.

1        THE WITNESS:  That's not in dispute.

2        MR. WIENER:  I think that is undisputed.  I'll go on

3  to another matter, your Honor.  It's not significant enough.

4        THE WITNESS:  But I can give examples that form the

5  basis of that opinion.

6  BY MR. WIENER:

7  Q.  It's okay.  I think we can move on.

8  A.  Okay.

9  Q.  Now, did you review the toxicology reports in this case in

10  terms of -- about Mr. Boyd being under the influence of

11  amphetamines and MDA at the time of his death?

12  A.  Yes, I did.

13  Q.  Now, do you, in your opinion, does that type of -- being

14  under the influence of drugs, in terms of, in Mr. Boyd's case,

15  does that contribute to your opinion that this was a suicide by

16  police; and if so, why?

17  A.  It does.  For a few reasons.  First of all, again, matching

18  the facts of this case with what's known in the literature

19  about decedents in suicide-by-cop cases.  In the Hudson study,

20  about two-thirds of people were found to have either a

21  substance abuse history or to be intoxicated at the time they

22  precipitated the shooting.  In our study, it was close to a

23  hundred percent.

24        Secondly, there are disinhibiting facts of the

25  substances he ingested.  "Disinhibiting" meaning ordinarily you

Keram – Direct

1    might not necessarily engage in those behaviors, but it takes

2    the brakes off so that, you know, people call it either liquor

3    courage or drugging up, that type of thing, so it makes it more

4    likely that he would engage in that type of behavior.

5    Q.  Did you see Dr. Mendelson's opinion about something called

6    "post-intoxication depression," when you're coming down?

7    A.  Yes, I did.

8    Q.  Is that significant, in your opinion?

9    A.  Yes, certainly.  Again, you know, there can be

10   disinhibition in the post-intoxication phase, but also because

11   of the depression, and this is well described in the

12   literature, and certainly my clinical practice I've seen it

13   many, many times, in the post-intoxication phase of stimulants

14   such as those found in Mr. Boyd's system, the level of

15   depression that people have can be associated with intensely

16   suicidal thoughts.  And actions, in fact.

17   Q.  Now, if you assume that Mr. Boyd did not receive a formal

18   psychiatric diagnosis before he died, and whether that was a

19   diagnosis of depression or anything -- first, let me ask you,

20   is suicide an actual diagnosis?

21   A.  No.

22   Q.  So you would never actually diagnose someone,

23   quote-unquote, with suicide?

24   A.  No.

25   Q.  Suicide is a behavior?

1   A.   Correct.

2   Q.   Now, if you assume that Mr. Boyd was not diagnosed

3   psychiatrically before he passed away, does that defeat your

4   opinion that or does that change your opinion about whether

5   Mr. Boyd committed a suicide by police?

6   A.   No, not at all.  And I can discuss that.

7   Q.   Can you explain why?

8   A.   If you look at the literature of suicide and psychiatric

9   diagnosis, what is found is that approximately, depending on

10  the studies, and there are extremely large studies, somewhere

11  between 10 to about 33, 34 percent of people who suicide have

12  absolutely no psychiatric diagnosis.  And those studies were

13  conducted in a very considered way looking back at huge amounts

14  of information and doing lots of interviews of people who knew

15  those -- the person who had suicided to look for any type of

16  symptoms that would be indicative of a mental health diagnosis.

17  So, you know, up to a third of people who suicide in fact don't

18  have any psychological suicide diagnosis.

19  Q.   Assuming that Mr. Boyd was not under psychiatric care at

20  the time that this event happened, does that affect your

21  opinion about whether this was a suicide by police, if he was

22  not under any psychiatric care at the time?

23  A.   No.  Not at all.  And I can discuss that as well.

24  Q.   Please.

25  A.   The literature shows that over three-quarters, and

1   sometimes about 77 percent of people who suicide are not in

2   psychiatric treatment at the time of their death.  Or within

3   the last year or ever.

4   Q.  Okay.  Now, again, if we assume that Cammerin Boyd was not

5   clinically depressed at the time that he -- that this incident

6   happened, if we assume that, does that affect your opinion

7   about whether this was a suicide by police?

8   A.  No, it doesn't.

9   Q.  Why not?

10  A.  Because when you look at males who suicide, a diagnosis of

11  depression is not the predominant finding.  It's the diagnosis

12  of substance use that's the predominant finding.  If they do

13  have a psychiatric diagnosis at all.

14  Q.  Now I want to ask you questions about practicing related to

15  Cammerin Boyd.  Are you familiar with what we'll call the

16  Oakland incident from May 2nd, 2004?

17  A.  Yes, I am.

18  Q.  Three days before the death.  So I want you to assume that

19  three days before the fatal confrontation --

20          MR. GALIPO:  Your Honor, I apologize, but again, going

21  through an assumption about the Oakland incident, if she has an

22  opinion related to that, I would ask that she give it.

23          THE COURT:  This is more of a factual nature, and I'll

24  overrule the objection.  I'm going to assume the doctor's

25  relying on this in some way.  Okay.

Keram – Direct

1    Q.  So three days before the fatal confrontation in

2    San Francisco, you assume that Mr. Boyd initiated a high-speed

3    vehicle pursuit in Oakland in a crowded pedestrian area.  I

4    want you to assume that the police pursued him and then

5    terminated the pursuit because it was going too fast.

6           I want you to assume that 15 to 20 minutes later,

7    Mr. Boyd came back to the same area and initiated a new

8    high-speed pursuit with the police, and that that pursuit was

9    then terminated again because it was too fast.  I want you to

10   then assume that the police saw Mr. Boyd again, his vehicle

11   stopped, assume that he got out of the car and got down to the

12   ground, and the officers went to arrest him.  I want you to

13   assume that during the course of the -- his being taken into

14   custody, he said to the -- repeatedly told the officers to kill

15   him or shoot him.  And then I want you to assume that when at

16   the police station after being arrested, he again told a police

17   lieutenant or the police lieutenant heard him saying, "Kill me"

18   or "shoot me."

19          In your view, would that constitute practicing; and if

20   so, why?

21   A.  It's my opinion that that may have constituted practicing.

22   And the reason is, what you see in that Oakland incident, those

23   behaviors, if they occurred, are very similar and in some cases

24   identical to the behaviors that you see in the San Francisco

25   incident.  You see the deliberate attempt to come to law

1    enforcement attention by doing something that is obviously

2    unlawful.

3              So in San Francisco, you see the interaction with Miss

4    Williams.  You see the interaction with Miss Hogan.  So two

5    events that would obviously be expected to have somebody call

6    the police.  You had the initiation of a pursuit.  And you see,

7    again, through the time of his interaction with the two women

8    and the pursuit, him staying in the same area.  In fact, the

9    pursuit stays in the same area.  It goes back to where it

10   started.  So you see very similar behaviors.  You also see the

11   noncompliance with law enforcement commands.

12   Q.  Focusing on Oakland.

13   A.  They're in both incidents.  That's what I'm saying, is the

14   similarities indicate and support that the Oakland incident was

15   a practice run.

16   Q.  Now, with respect to the Oakland incident, did you find it

17   significant that he came back to the same area after eluding

18   police?

19   A.  Yes, absolutely.

20   Q.  And why is that significant?

21   A.  Because, as I said before, people who are going to commit a

22   suicide by police have to come to law enforcement attention.

23   And if they're not successful in maintaining that, or getting

24   that attention or maintaining it, they will reinitiate it.

25   Q.  How about the statements to the Oakland officers about

Keram - Direct

1    "kill me" or "shoot me," is that significant, and why?

2    A.   Number 1 is it indicates a suicidal intent, that's the

3    obviously most important.   Number 2, it indicates a suicidal

4    intent to have the police kill you and sort of a testing of how

5    to communicate with the police to make that happen.

6    Q.   Now, does someone have to, in your view, say, tell the

7    police to kill them or shoot them in order for it to be a

8    suicide by police?

9    A.   Oh, no, no, absolutely not.   In fact, in the Hudson study,

10   over a -- 42 percent of the decedents in that study did not

11   make any statements to the police about a suicidal intent or a

12   desire to be shot by them.

13   Q.   Now, I want to -- as another hypothetical --

14   A.   Can I say one more thing about that?

15   Q.   Sure.

16   A.   The other reason why in this case that's not significant

17   that he didn't make statements to the police in the final event

18   has to do with one of the motives for suicide by police in this

19   case, which is the, you know, the preservation of the idea that

20   this wasn't a suicide with the risk -- with the risk factor for

21   suicide by police in this case, one of them being the issue of

22   the family prevailing in civil litigation.

23   Q.   Now, I want you to assume that in the months leading up to

24   the fatal incident that Mr. Boyd, several months before and

25   then in the days leading up to, made various statements about

Keram – Direct

1    the police trying to kill him, or the police trying to get him.

2    Again, three months before, within days leading up to and on

3    the day of the fatal incident.  Do those statements have

4    significance to you; and if so, why?

5    A.  Yes, they do.  Obviously, when I have the concern that one

6    of Mr. Boyd's reasons for committing a suicide by police might

7    be to allow his family to prevail in civil litigation, I have

8    to have something to base that upon.  And that fact, that he

9    mentioned that to people, that the police were out to kill him,

10   is one of the foundations for my opinion that one of his

11   reasons for choosing suicide by police was allowing his family

12   to prevail in civil litigation.  He is instilling in their

13   minds the idea that the police are going to kill him.

14   Q.  Okay.

15   A.  And that it's not a suicide, that it's aggression directed,

16   initiated and directed by the police.

17   Q.  Now, I want you to assume that after making these

18   statements -- and do you need a cup of water?

19   A.  Do you mind?

20   Q.  Go ahead.

21   A.  Thank you.

22   Q.  Okay.  Now, I want you to assume that after making these

23   statements about the police trying to kill him, that I want you

24   to assume that on the day of the fatal incident that his family

25   members are attempting to get him out of town, that they're

Keram – Direct

1    trying to purchase a red-eye ticket to the East Coast to

2    Atlanta for that very evening, and that they -- that his mother

3    has told him to get his things out of his rental SUV so that

4    they can return the SUV to the rental agency.  I want you to

5    further assume that Mr. Boyd goes outside and, instead of

6    coming back with his items, drives the SUV away and disappears,

7    much to the surprise of his family.

8         I want you to assume that he then drives into

9    San Francisco, the jurisdiction where he says the police are

10   trying to kill him, that he drives within a block of a police

11   station in the Tenderloin.  That he does donuts in the streets

12   right by the Tenderloin.  That he then pulls over a woman

13   trying to sell him drugs, comes up to his car, he grabs her,

14   she pulls away, he pulls a gun out on her, and she runs away.

15        I want you to further assume that he then drives a

16   short distance and pulls up to another woman, Tatanika Hogan,

17   and points a gun at her head, tells her that he's going to kill

18   her, tries to get her into his car, and she gets away.

19        I want you to assume those facts.  Do those have

20   significance, in your opinion, that Cammerin Boyd was

21   attempting to commit suicide by police?

22   A.  Yes, absolutely, they do.

23   Q.  Can you explain why?  And we can break it down to each of

24   the components.

25   A.  Sure.  I'm just going to go through it step by step.

1    Q.  Okay.

2    A.  The first of it, the spinning of the doughnut.

3    Q.  Actually the first of it was leaving the office.

4    A.  I'm sorry, of course.

5    Q.  I'll just ask the question, in terms of the family trying

6    to get him out of town and he's supposed to come back from the

7    SUV and he drives away instead, into San Francisco.

8    A.  Right.

9    Q.  What significance, if any, do you attribute to that?

10   A.  He is seeking out the law enforcement agency that he

11   communicated to his family was going to -- wanted to kill him.

12   And so, you know, he is going to have contact with an agency

13   that he had previously told his family was going to shoot -- or

14   wanted to shoot and kill him.

15   Q.  And how about the significance of when the family's telling

16   him to do one thing, trying to get him out of town, him leaving

17   instead?

18   A.  There is the -- the concern that that raised for me was

19   that it was evidence of the "why now" issue, of why he chose

20   that particular time.

21   Q.  Now --

22   A.  To start the event that would lead to his death.

23   Q.  Now, moving on to the second aspect, the Tiffany Williams

24   portion in the Tenderloin, what significance, if any, do you

25   attribute to Mr. Boyd's behavior during that episode, assuming

1    that those facts are true?

2    A.  Assuming that those facts are true, the spinning of the

3    doughnut occurred in an area that's about a block from a police

4    station.  So it's a dangerous vehicular maneuver near where you

5    would expect the police presence.

6              Then no police presence occurs, you know, quickly.

7    And so he escalates his behavior to involve an actual person,

8    and has a contact with her that would lead somebody to call --

9    that may lead somebody to call police.  That does not occur.

10   And, in fact, that escalation involved, you know, both

11   attempting to pull her into the car and then backing up against

12   traffic on a one-way street.  So you see an escalation in

13   behavior with an unsuccessful attempt to come to law

14   enforcement attention.

15   Q.  How about the use of a gun on someone -- not the firing but

16   the pulling a gun on someone within a block of a police

17   station?

18   A.  The reason why that is significant is one of the tasks of

19   somebody who wants to commit a suicide by police is to put into

20   the police, law enforcement's mind, the knowledge that they

21   have a weapon.  So that's why that's significant.  The police

22   may not know whether or not the weapon is loaded or whether or

23   not it's functional, but they know that the person does have a

24   weapon.

25   Q.  Now moving on to Tatanika Hogan, again do you assume that

1   within a few blocks of a police station and close to the

2   Tiffany Williams episode, he pulls alongside of her, puts a gun

3   to her head, says he's going to kill her, attempts to kidnap

4   her, and then chases her when she gets away, what significance,

5   if any, do you attribute to that episode in terms of suicide by

6   police?

7   A.   It's significant for several reasons.  I had mentioned that

8   the literature supports that people who want to commit a

9   suicide by police have to draw themselves to police attention,

10  and that if they're not successful, they'll make repeated

11  efforts.  So you have another effort to come to police

12  attention by upping the ante, brandishing a weapon and making a

13  verbal threat to somebody that you're going to kill them.

14        And then you are -- the other significant fact in that

15  is that he stayed in the area where you would expect there to

16  be a police presence, and in fact chased her or followed her,

17  if you want to say that, to a block where there had been a

18  patrol car with two officers present for approximately 20

19  minutes.  So, you know, the possibility that the knowledge of

20  the Tenderloin police station was augmented by knowledge of

21  this patrol unit out on the street where he followed the --

22  followed Miss Hogan.

23  Q.   So following Miss Hogan up to the point where Officer Mason

24  was?

25  A.   Right, and that's significant because he, you know, he

Keram – Direct

1    threatened to kill her with the weapon.  So assuming that that

2    is communicated to the police, not only do they know now that

3    he had a gun, but they also know that he intends to use it.  Or

4    that he's saying that he intends to use it.

5    Q.   Okay.  Now a new hypothetical.  I want you to assume that

6    after Mr. Boyd chases Miss Hogan and then turns around and

7    drives away from her, when they reach the police, that he then

8    stays in the same general area.  I want you to assume that the

9    police, after Officer Mason radios in the Hogan incident, the

10   police identify his vehicle, his SUV, and that a pursuit

11   begins.  I want you to assume that the pursuit goes to rather

12   high speeds, including driving fast the wrong way down a

13   one-way street, Turk Street, almost hitting a bicyclist.  I

14   want you to assume at one point Mr. Boyd jumped over the median

15   at Divisadero.  And I also want you to assume that on two

16   separate occasions during this high-speed chase, Mr. Boyd

17   reaches out of the window of his SUV with his gun and fires at

18   the police officers with his gun.

19           Assuming that hypothetical to be true, what

20   significance, if any, does that have for your opinion that this

21   was a suicide by police?

22   A.   It is significant, and again for several reasons.  First of

23   all, you see no attempt to leave the area.  So it's very

24   consistent with people who commit suicides by cop in that he

25   stays in an area where there is police presence between the

Keram – Direct

1   time he leaves Ms. Hogan and the time the pursuit is initiated.

2          Secondly, that he's not compliant -- well, actually,

3   let me back up one step.  He begins to accelerate before

4   Officer Elieff turns on his lights and sirens or makes, you

5   know, any indication that he wants to pull Mr. Boyd over.  So

6   there's an escalation in behavior that's likely to result in

7   police attention there as well.  Obviously, he doesn't know if

8   anybody's put out his vehicle description or anything like

9   that.

10         During the --

11  Q.  Again, if you would just limit it to the facts that I have

12  given you in the hypothetical.

13  A.  I'm sorry.  Okay.  Assuming that fact is true too, he then

14  engages in a pursuit and does not pull over when there's a

15  light and siren car behind him.  And then when there's two, the

16  jumping over the median, again let's the law enforcement

17  officers know that he's engaging in very dangerous behavior.

18         The first shot that's fired, again, is an escalation

19  of threat, allows the officers to know that not only does he

20  have a gun and not only has he threatened to use it, but now

21  they know that it's functional -- then that because it's

22  loaded, so they know it's loaded and functional.  And they know

23  that from the second shot as well.

24         Was that the end of the hypothetical that you gave me?

25  Q.  Yes.  And does the fact that he actually shot at the police

1    twice during the chase, hypothetically, assuming that to

2    believe true, is that significant?

3    A.  Certainly it is probably the most significant fact in that

4    part of the scenario because it shows that he is willing to use

5    lethal force against law enforcement officers.  In the Hudson

6    study, three officers were shot and wounded, in the officers

7    who were involved in three separate incidents.  So we see that

8    if decedents in these cases are not successful in their initial

9    attempts, that they may engage in really seriously lethal

10   threat against law enforcement officers.

11          MR. GALIPO:  Your Honor, move to strike the latter

12   part of her answer as being nonresponsive to the question.

13          THE COURT:  Well, I'd overrule on nonresponsive

14   grounds since this is direct examination.  If the question is

15   appropriate or the material is appropriate to be elicited, it

16   can simply be elicited in the follow-up question.

17          I'll overrule.

18   BY MR. WIENER:

19   Q.  Now, an additional hypothetical.  I want you to assume that

20   the vehicle pursuit itself ends as follows:  That Mr. Boyd,

21   instead of going onto a freeway and driving away from

22   San Francisco, that instead he leads the police to a housing

23   project that is a few blocks away from the Tatanika Hogan

24   kidnapping attempt.  I want you to assume that he stops and

25   then starts again and ultimately comes to a rest -- to rest in

1    the middle of the housing project and does not exit on the

2    other side to keep going on the chase.  He just stops.  And I

3    want you to assume that as he is coming into the projects that

4    he is shouting something to the effect that the police are

5    trying to kill him, or something similar to that.

6              Now, again focusing just on that hypothetical and

7    those facts, are they significant to your opinions regarding

8    suicide by police; and if so, why?

9    A.  Yes, they are significant.  If you wouldn't mind, I don't

10   want to miss any of the pieces that you gave me, so if you

11   would just break it down.

12   Q.  Sure.  Not going onto, say, a freeway to get away and

13   instead staying in the same vicinity and actually ending the

14   pursuit several blocks away from where the Hogan kidnapping

15   attempt happened.  What significance does that have?

16   A.  I had mentioned before that he stayed in the same area.  He

17   didn't make the attempts to flee that one would expect if

18   somebody was trying to evade law enforcement officers.  Staying

19   on surface streets and, in fact, you know, smaller surface

20   streets.

21   Q.  Now, how about shouting something to the residents in the

22   area, something to the effect of "The police are trying to kill

23   me," or something similar, does that -- would that statement

24   have any significance?

25   A.  Yes, it absolutely does.  Mr. Boyd has two tasks, if you

1    will.  He has to create, assuming that I'm correct in all of

2    the foundations that I have, that one of his motivations is to

3    allow his family to prevail in civil litigation, he has two

4    tasks:  He has to create in the mind of the witnesses the

5    perception that this is an unwarranted, excessive use of force;

6    that he was doing nothing wrong at the time that he'll

7    precipitate the lethal force.  And at the same time he also has

8    to create the perception of lethal force so that the law

9    enforcement officers will shoot him.

10         So the statements to the witnesses as he's driving

11   along Larch are intended to satisfy that first task, to create

12   in the mind of the witnesses that's -- that he's doing nothing

13   wrong and that the police are out to get him, shoot and kill

14   him.

15   Q.  Now, a new hypothetical on Larch Way, again just to the

16   facts in this hypothetical, that after eventually stopping his

17   car, finally stopping his car on Larch, he gets out of the SUV,

18   that he initially puts his hands up, that he then lowers his

19   hand from an upright position.  Assume that there are police

20   officers around by this time who are pointing guns at him, so

21   he puts his hands up and then puts them down; that at some

22   point he gestures to his waistband area, that he takes off his

23   shirt, either waves it around or throws it around.  That he

24   then, he's being commanded to get down to the ground, but

25   instead of doing that, his hands are not always up; walks to

1    the back of the SUV, and then walks back to the open door area;

2    that he sits down in the floorboard area, either sitting or

3    just about seated at the edge of the floorboard, and that he

4    repeatedly reaches into the interior of the car, into the

5    floorboard area.

6         Assuming those facts to be true, is that significant

7    to your opinion in terms of suicide by cop?  And if you need to

8    break it down, we can definitely do that.

9    A.  Yes, it is significant.  Because those behaviors do

10   indicate an intent to commit a suicide by cop, and if you don't

11   mind, I'll ask you to break it down.  I don't want to --

12   Q.  After he gets out of the car, putting his hands up, he's

13   being demanded, "Put your hands up, get down to the ground,"

14   puts his hands up but doesn't keep them up, lowers them down

15   again.  What significance, if any, does that have?

16   A.  It has significance because it represents three known

17   things that occur in suicide-by-police events.  Number 1:  It's

18   very common for people to be ambivalent during the final

19   moments of the suicide-by-police event, and in fact at any type

20   of suicide.

21        You know, suicide is not a walk in the park.  It's a

22   very frightening experience for almost everybody.  And so

23   there's -- in people's minds, there's a should I or shouldn't I

24   debate going on oftentimes, even though they may be convinced

25   that at the end they will do it.  So you often -- and in fact

Keram – Direct

```
1   this is described in the literature, that people who are
2   committing a suicide by police may at first appear to
3   surrender.
4            The other thing that the surrendering or the raising
5   of the hands does is fix in the witness's minds that he was
6   surrendering to police.  And which then again, of course, puts
7   in the witness's minds the perception of this is an unfair
8   shooting, that he's being compliant.
9            And then the third thing has to do with what I
10  mentioned before:  The issue of inflicting psychological harm
11  on the police officers and engaging in this sort of very tense,
12  Is it going to end, is it not going to end?  Is it going to end
13  successfully, or is the person going to push it, type of thing.
14  Q.  How about gesturing to the waistband area, does that have
15  any -- let's -- gesturing to the waistband and also taking off
16  his shirt.  Do those facts, assuming them to be true,
17  hypothetically, have any significance in your opinion that this
18  was a suicide by police?
19  A.  Yes, taking off the shirt shows the witnesses that Mr. Boyd
20  is demonstrating that he is not carrying a weapon on him.
21  Gesturing to the waistband is actually seen in other
22  suicide-by-cop events that have been -- suicide-by-police
23  events that have been described, witnesses often feel that the
24  person is trying to gesture that they don't have a weapon,
25  whereas law enforcement officers feel that the witnesses are
```

1   gesturing or reaching for a weapon, and that that's a gesture

2   that indicates that the threat is about to be escalated.  And,

3   in fact, you know, survivors of suicide-by-police incidents

4   describe that.

5   Q.  Describe doing what?

6   A.  Reaching for waistbands as an attempt to induce officers to

7   shoot them.

8   Q.  Now, focusing on a situation where he gets out, he walks to

9   the back of the SUV, and instead of getting down to the ground,

10  goes back to the open door area where -- the same door area

11  from which he had fired at the police, and -- and sits on the

12  floorboard either all the way seated or almost there, and then

13  reaches into the vehicle several times.

14          Assuming those facts to be true, hypothetically, what

15  significance, if any, does that have to your opinion?

16  A.  That's significant because it -- it indicates either

17  escalation of the risk that -- of lethal force, that the

18  officers then perceive Mr. Boyd was not successful in drawing

19  fire when he dropped his hands to his waistband, there are many

20  suicides by cop that end when that occurs.  So what he's done

21  is gone back to the place where the police officers know

22  there's a functional loaded weapon that he is willing to use.

23  And then reaching into the car plants in the officers' minds

24  the fear that he's reaching for it.

25  Q.  How about the multiple nature of it, reaching in and coming

1  back out again, showing your hands, then reaching in again;

2  what significance, if any, does that, the repeated nature of

3  doing that, have to you?

4        MR. GALIPO:  I'll object as vague and ambiguous as to

5  "reaching in and coming back out, again reaching in"?

6        THE COURT:  Overruled.

7  A.  That, again, is seen in other instances of suicide by

8  police.  If the person is not successful in drawing law

9  enforcement fire, they'll engage in the behavior again.

10 Q.  Now, I also now want you to assume that during this

11 encounter, for example, when Mr. Boyd first got out of the car,

12 assume that he didn't come out, full guns blazing with a gun

13 pointing at the officers to present that kind of very, very

14 direct and open threat with a gun.  If you assume that he

15 didn't do that, does that mean it wasn't a suicide by police?

16 A.  No, it doesn't mean that.  I had outlined different reasons

17 why Mr. Boyd, you know, in my opinion, committed a suicide by

18 police.  One of them is the potential prison sentence.  But the

19 other is the preservation of the family's ability to prevail in

20 civil litigation, and obviously if he had done that, that would

21 have diminished the chances of that happening.

22 Q.  To be a suicide by police do you have to come out with a

23 gun pointed at the officers?

24 A.  No, not at all.

25 Q.  Have there been studies on that?

1    A.  Yes, in fact, I think if I remember correctly, about

2    16.5 percent of people in the Hudson study actually, you know,

3    came out with a gun pointed at the officers and maintained that

4    pointing at the officers despite the officers telling them not

5    to do that.

6    Q.  So the other 80 percent did not do that?

7    A.  More than 80 percent, yes.

8    Q.  Doctor, did you in coming to your opinion that Cammerin

9    Boyd was committing suicide by police and again assuming the

10   hypotheticals to be true, did you consider alternative

11   possibilities in terms of Mr. Boyd's mental state other than

12   suicide by police?

13   A.  Certainly.

14   Q.  What did you consider and what was your conclusion in

15   accepting or rejecting those?

16   A.  In looking at the totality of everything that I reviewed,

17   it also --

18   Q.  And I want you to just focus not on the totality of what

19   you reviewed but on my hypothetical.

20   A.  I'm sorry.

21   Q.  Because we want to make sure it's evidence at this trial.

22   Okay?

23   A.  Right, of course, I'm sorry.  So going back then, focusing

24   on what you reviewed --

25   Q.  On what I --

Keram – Direct

1    A.   I'm sorry, what you presented to me as a hypothetical.

2    What I also considered was the possibility that because he had

3    ingested the substances that were found in his system that

4    he -- that his mental state was such that he was really not

5    able to think clearly enough to have formed an intent to engage

6    in behavior that would bring him to his goal.  And the reason I

7    rejected that was because of how methodical and goal-oriented

8    all of his behavior was from the very beginning of the incident

9    all the way through to the end with all those multiple examples

10   in the hypotheticals that you gave me.

11   Q.   So is it your view that suicide by police is the most

12   likely and the best explanation for this behavior?

13   A.   Yes, it's my opinion that Mr. Boyd's death is most

14   consistent with a suicide by police.

15              MR. WIENER:  Okay.  One moment, your Honor.

16              (Pause)

17              THE COURT:  We should probably be looking for a good

18   place to break, too.

19              MR. WIENER:  I think this would be a good breaking

20   point, your Honor.

21              THE COURT:  Ladies and gentlemen, we're going to take

22   our regular 15-minute recess at this time.  Please remember my

23   admonition.

24              (The jury exited the courtroom)

25              (In open court; jury not present)

```
1              THE COURT:  All right.  Anytime you'd like to step

2    down, Dr. Keram, is fine.

3              THE WITNESS:  Thank you.

4              THE COURT:  I wanted to go briefly just to the

5    question of time.  I understood you to say yesterday,

6    Ms. Bernstein, that you have been keeping time from the outset

7    and tracking Miss Lucero's time.  Is that correct or not?

8              MS. BERNSTEIN:  I have been, your Honor.

9              THE COURT:  In other words, every day you've been

10   keeping time --

11             MS. BERNSTEIN:  Yes, your Honor.

12             THE COURT:  -- during the course of the trial?

13             MS. BERNSTEIN:  Yes, your Honor.

14             THE COURT:  And that your time that you've got on the

15   end of the day on Thursday was the same or within a few minutes

16   of what Ms. Lucero stated on the record on Thursday?

17             MS. BERNSTEIN:  Yes, your Honor.

18             THE COURT:  And what was that time again that she

19   stated?

20             MS. BERNSTEIN:  That time was, I believe, 47 hours and

21   56 minutes.

22             THE COURT:  47 --

23             MS. BERNSTEIN:  47 hours.

24             THE COURT:  -- and 56 minutes.  Okay.  And then the

25   only other place that there may have been a point of
```

1    discrepancy is when we had a long hearing regarding the matter,

2    and Miss Lucero was going to check, I think, to see whether

3    that long hearing was on Monday, but I don't know whether she

4    did.

5              DEPUTY CLERK:  I haven't had a chance.

6              THE COURT:  Haven't had a chance yet.  Okay.  So

7    that's the only other place then where there may have been

8    something that went awry.  I wasn't sure if I misunderstood

9    that you were keeping time all along and if you were relying

10   only on her last statement on Thursday.  And then moving from

11   that point forward, I wanted to hear what the time was just to

12   make sure that it wasn't something like 4:15 that could have

13   been considered 4:50 or vice versa.  Do you know what I mean?

14   Heard by the reporter as one versus the other.

15             But okay.  Then there's just that one other matter,

16   and we'll check that out and try and get back to you as quickly

17   as possible.

18             MS. BERNSTEIN:  Thank you.

19             THE COURT:  Thank you.  We're in recess.

20             (Morning recess)

21             (In open court; jury not present)

22             THE COURT:  The 40-minute differential may be on

23   Monday, and the long hearing we had about the 183, 184, 185

24   situation.  So if it is, you may be back to Miss Lucero's

25   calculation.  Just letting you know that.  In other words, that

```
 1    she is correct.

 2                (The jury entered the courtroom)

 3                (In open court; jury present)

 4                THE COURT:  Thank you, ladies and gentlemen.  We'll

 5    now continue with Dr. Keram's direct examination.

 6    BY MR. WIENER:

 7    Q.  Dr. Keram, I just have a few more questions, and I'll be

 8    done with my examination.  First of all, just backing up a

 9    little bit, the hypothetical, the statement by Mr. Boyd about

10    the police, "They're going to kill me, they're going to kill

11    me," when he drove onto Larch Way.  I now want to ask you,

12    hypothetically, if when Mr. Boyd drove onto Larch Way, he was

13    making statements like, "Shoot me if you want," or asking the

14    police to kill him --

15    A.  Uh-huh.

16    Q.  -- does that have any significance in your opinion?  And

17    you've already talked about the significance of the Oakland

18    incident.

19    A.  Right, yeah.  If that were the case, then, you know, it's

20    obviously evidence that he does want the police to shoot him.

21    Q.  Okay.  Now, I want you to assume that before the reaching

22    motion in the car right before Mr. Boyd was shot, do you have

23    that in mind?

24    A.  Yes.

25    Q.  I want you to assume that before, right before he did the
```

1  final reaching into the car that he took a deep breath and had

2  a look of determination on his face.

3  A.  Uh-huh.

4  Q.  If you assume that to be true, does that have significance

5  in terms of taking a deep breath and the look of determination

6  before the final reach into the car, and then -- yes, go on?

7  A.  Yes.  When I taught at the FBI academy, another one of the

8  instructors gave a course on what he called predeath behaviors.

9  He was -- he's now retired, but at the time he was the

10 commander of the LA County Sheriff's Department's Hostage

11 Negotiation Team.  So he had responded to, 10 or 15 years he

12 had done that at that time, many hundreds of call-outs for

13 suicides in progress or incidents that ended in a person being

14 shot by the police.  He described these three predeath

15 behaviors.

16      MR. GALIPO:  Your Honor, apologize.  I'm going to

17 object as nonresponsive and calling for hearsay.

18      THE WITNESS:  This was also published.

19      THE COURT:  There's a question about how much of what

20 a witness relies on that is hearsay can be actually described

21 in detail in the record as opposed to simply a legitimate basis

22 for the witness's opinion.

23      MR. WIENER:  I could narrow it, your Honor.

24      THE COURT:  Then I'll sustain the objection.  Perhaps

25 you could narrow it.

1    BY MR. WIENER:

2    Q.  Yeah, and again, without getting to the details, just based

3    on your experience and -- your professional experience and your

4    familiarity with the literature, does taking a deep breath and

5    having a look of determination on your face, do you assume

6    those to be true with respect to Mr. Boyd before the final

7    reaching into the car before he was shot, why is it that you

8    think that that is significant?

9    A.  Because it's consistent with predeath behaviors.  Behaviors

10   that typically precede the actual final push towards

11   precipitating the use of lethal force in these incidents.

12   Q.  And does it have -- does it reflect anything about

13   Mr. Boyd's state of mind, taking a deep breath and having a

14   look of determination?

15   A.  Yes, I meant to convey that, that he's made a final

16   decision, that he's going to go through with it.

17   Q.  Now I want you to assume that after Mr. Boyd is shot that

18   he has a look of surprise on his face.  Does that have any

19   bearing on your opinion of suicide by police -- let me rephrase

20   that.

21          Does that mean that this is not a suicide by police,

22   that he had a look on his face of surprise?

23   A.  Absolutely not.  I would expect that anybody who was shot,

24   whether or not it was a suicide or a suicide by police or

25   whether or not, you know, whether anybody experienced pain of

1  that magnitude that they would have a look of shock or surprise

2  on their face.  Even when they go to the doctor's office for a

3  shot, we do, you know, so you can imagine what being shot by a

4  firearm would, you know, bring about a very dramatic facial

5  expression of surprise or shock.

6  Q.  Does that mean that the person actually necessarily did not

7  mean to be shot and now was surprised that they were shot?

8  A.  No.

9  Q.  So how would you -- what would that look on someone's face,

10 in Mr. Boyd's situation, assuming the hypothetical to be true,

11 what would that mean?

12 A.  I think the best explanation for it is that he was in a lot

13 of pain.  You know.  That is a reflection of a physiological

14 event.

15          MR. WIENER:  Your Honor, I have no further questions.

16          Thank you, Doctor.

17          THE COURT:  Thank you.  Then we'll turn to

18 cross-examination.

19          MR. GALIPO:  Thank you.

20 CROSS EXAMINATION

21 BY MR. GALIPO:

22 Q.  Good morning, Doctor.

23 A.  Good morning.

24 Q.  How many times have you testified in court before on the

25 specific issue of suicide by cop?

1   A.  Once.

2   Q.  What year was that in?

3   A.  I think it was 2001.

4   Q.  Approximately six years ago?

5   A.  Correct.

6   Q.  That involved a case involving a gentleman named Michael

7   Staff?

8   A.  That's correct, yes.

9   Q.  And that person had a weapon in their hands and was coming

10  at the police with the weapon?

11  A.  No, that's not correct.  First of all, he never came at the

12  police.  Secondly, the first several times that he, what I

13  believe attempted to be shot, he didn't have anything in his

14  hands; and, finally, I think if he had anything in his hand he

15  had a cell phone.  He didn't have a weapon.

16  Q.  It's your testimony he was unarmed when he was shot?

17              MR. WIENER:  Objection.  Relevance.

18              THE WITNESS:  I haven't reviewed my testimony.

19              MR. WIENER:  Relevance.

20              THE COURT:  Overruled.  The witness has discussed a

21  number of anecdotal events and bases for her opinion.  So

22  overruled.

23  BY MR. GALIPO:

24  Q.  He had been hospitalized for psychiatric -- a psychiatric

25  condition, correct?

Keram - Cross

1    A.  That's correct, yes.

2    Q.  And he had been released from the hospital and was off of

3    his necessary medication; is that correct?

4    A.  You know, I'm sorry, I haven't reviewed this case in six

5    years.  And I don't recall whether or not he had been

6    prescribed medication and then stopped.  It's entirely

7    possible, I just don't recall.

8    Q.  Do you recall discussing that case with attorney Vickie

9    Sarmiento at the time of your deposition on April 20th of 2007?

10   A.  Yes, she asked me several questions about that case, I

11   believe.

12   Q.  Do you have any record or information that Cammerin Boyd

13   ever saw any doctor at any time for psychiatric problems?

14   A.  Well, I requested psychiatric records, and the defense made

15   a motion to obtain those records, which to my understanding you

16   opposed, and that prevailed.

17   Q.  Let me just be more direct.

18   A.  Pardon me?

19   Q.  Are you aware in talking to defense counsel or anyone else

20   that Cammerin Boyd ever had any psychiatric treatment anywhere?

21   A.  Well, other than what I was told when I was asked for the

22   records, that the motion had been made which you opposed, there

23   is a referral in the CDC records to psychiatry, but those

24   mental health records are not included in the medical records.

25   Typically they're kept separate.  So they may have been -- they

1    may have been not included in the medical records as a result

2    of the motion, I don't know.

3    Q.  Did you read the depositions of the family members?

4    A.  Yes, I did.

5    Q.  Did you see anywhere in their depositions that he had ever

6    gone to a psychiatric doctor ever in his life?

7    A.  No, I did not.

8    Q.  Did you assume that to be true?

9    A.  I have not reason to believe otherwise.

10   Q.  Okay.

11   A.  That they may not -- I had no reason to believe that his

12   family would have known whether or not he had mental health

13   treatment, for example, in CDC or in jail or prison or

14   whatever.  I believe that they testified to the best of their

15   knowledge.

16           THE COURT:  CDC meaning what, California Department of

17   Corrections?

18           THE WITNESS:  Yes, when he was in prison.  And when he

19   was in prison he was referred to a psychiatrist.

20   BY MR. GALIPO:

21   Q.  Let's talk about that for a moment.

22   A.  Uh-huh.

23   Q.  You reviewed some of those records?

24   A.  I reviewed the medical records.

25   Q.  Related to his prison stay?

Keram - Cross

1    A.  Yes.

2    Q.  And you indicated that he had some medical complications

3    while he was there?

4    A.  Yes.

5    Q.  Did you ever see anything in those records that indicated

6    he was suicidal?

7    A.  No, there's nothing in the records that indicates that he's

8    suicidal.

9    Q.  Did you look for that?

10   A.  Of course, yes.

11   Q.  Did you see in any medical records that Mr. Boyd ever,

12   according to the records, made a suicidal ideation?

13   A.  The records that would reflect that would be in the

14   psychiatric -- in any psychiatric records, which, as I said, I

15   don't have.  There are -- when somebody enters CDC, just you

16   know, they'll give them a screen and ask if they have suicidal

17   ideation, and he has always said no.

18   Q.  Is there any record you have ever seen, any place, any

19   year, that indicated that Mr. Cammerin Boyd had suicidal

20   ideations?

21          MR. WIENER:  Objection.  Vague as to "record."  I

22   don't know if it's limited to medical records.

23          MR. GALIPO:  Let me limit it to medical records at

24   this time.

25          THE COURT:  Okay, fine.

Keram - Cross

1    A.   No, there's nothing in the medical records that would

2    indicate that he had suicidal ideation.

3    Q.   Any knowledge that you had prior to May 2nd, 2004, which

4    I'll talk about in a moment, the Oakland incident, that he had

5    ever attempted to commit suicide?

6    A.   No, there's nothing in the records that indicates a suicide

7    attempt.

8    Q.   The incident with his -- in which he lost his legs happened

9    in 1993.

10   A.   Yes.

11   Q.   Did he attempt suicide between 1993 and 2000?

12   A.   No.

13   Q.   Any attempt at suicides at any time that you're aware of

14   before May of 2004?

15   A.   No.

16   Q.   And this includes the time that he was in jail?

17   A.   Yes, correct.  Of course that's something that I looked

18   for.  But as I said earlier, people who commit suicide, about a

19   third of them don't have a psychiatric history.

20   Q.   The other two-thirds do?

21   A.   Correct.

22   Q.   So if this was a suicide-by-cop case, this would be in the

23   minority on that issue?

24           MR. WIENER:  Objection, lack of foundation.

25           THE COURT:  Overruled.

Keram - Cross

1    A.   I'm trying to think of whether or not -- yes, it would be

2    in the minority.  About two-thirds of people in the Hudson

3    study who were thought to have committed a suicide by police

4    had a psychiatric or a substance abuse history.  About a third

5    did not.

6            MR. WIENER:  Your Honor, the foundational objection

7    has to do with the fact that she didn't get the psych records,

8    so she didn't have all that information.

9            THE COURT:  Ladies and gentlemen, ordinarily there is

10   what's called a psychiatric patient privilege, and unless the

11   patient puts their mental state in issue, ordinarily one cannot

12   obtain those records.  In this instance, the patient did not

13   put their mental state in issue.  The mental state is being

14   raised by the other side.  And so those records ordinarily

15   wouldn't be available for that reason.

16           I think you'd agree with that.

17           THE WITNESS:  Yes, although I have done other cases,

18   this --

19           THE COURT:  Leaving out whatever your previous

20   experiences were.

21           THE WITNESS:  Sure.

22           THE COURT:  The objection is overruled.  This witness

23   has testified at great length about statistics.  It is

24   legitimate to cross-examine her about them.

25           MR. GALIPO:  Thank you.

1  BY MR. GALIPO:

2  Q.  Do you have the name of any doctor or medical facility

3  where you believe Cammerin Boyd received psychiatric treatment?

4  A.  Other than the notation that he was referred to a

5  psychiatrist in the CDC, I would have no way of knowing where

6  he may have received psychiatric treatment.

7  Q.  And that referral you're talking about, was that back in

8  like 1996?

9  A.  I'd have to look in the records.

10  Q.  You obviously never met Cammerin Boyd.

11  A.  No, I never did.

12  Q.  Usually it's helpful to meet someone to come up with a

13  diagnosis, would you agree?

14  A.  It's helpful to do that, yes.

15  Q.  Now, you work with various police agencies?

16  A.  I've worked -- I provide training to various police

17  agencies, yes.

18  Q.  Including the city -- the police department for the City

19  and County of San Francisco?

20  A.  That's correct, yes.  The Mental Health Board hires me to

21  provide that training.

22  Q.  Did you testify that you provide training on the issue of

23  suicide by cop?

24  A.  Yes, that's correct.

25  Q.  Do you know if you ever provided such training to either

```
1    Officer O'Malley or Officer Paine?

2    A.  No, I have no way of knowing that.

3    Q.  Now, you mentioned some factors, one would be animosity

4    towards police officers?

5    A.  Yes.

6    Q.  Would you agree that a lot of people don't like police

7    officers for various reasons?

8    A.  Yes, I would agree with that.

9    Q.  And that doesn't mean that because someone doesn't like the

10   police they want to be killed by the police, does it?

11   A.  No, absolutely not.

12   Q.  You mentioned in general setting up a situation where this

13   could be civil litigation for the family related to the

14   shooting on Larch Way.  Do you recall that testimony?

15   A.  Yes.

16   Q.  First of all, did you have information that the --

17   Mr. Boyd's family, parents, for example, were in financial

18   straits that they needed to have a lawsuit?

19   A.  No.  No.  That wasn't the basis for that opinion.  It was

20   the pattern of suing the police in past actions.  That was the

21   basis for that.

22   Q.  Well, let me ask you this:  If you know, was there a

23   pending case against the Oakland Police Department at the time

24   of his death?

25   A.  I don't know -- are you referring to something that would
```

Keram - Cross

```
1    have stemmed from the May 2nd --

2    Q.  No.

3    A.  -- occurrence?

4    Q.  No.

5    A.  Something before.  No, I'm sorry, I don't recall from the

6    records.  I know that there was some type of pending case, but

7    I don't remember where it was from.

8    Q.  Well, you would agree that if someone had a pending case

9    and then they get killed, they can't pursue that case or

10   receive any money under the law?

11          MR. WIENER:  Objection, your Honor, calls for a legal

12   conclusion; lacks foundation.

13          MR. GALIPO:  I'll establish foundation.

14          THE COURT:  Overruled.

15   Q.  You may answer if you know.

16   A.  I don't know the law about that, no.

17   Q.  So you don't know in California, for example, if someone

18   had a personal injury case and they died, whether that case

19   dies with them, if you will?

20   A.  No, I don't know the answer to that.

21   Q.  Regarding the Oakland incident, is it your testimony that,

22   based on your review of the records, that Mr. Boyd was telling

23   the police to the effect of "Kill me," or "You can kill me,"

24   after he was handcuffed?

25          MR. WIENER:  Objection, your Honor, improper use of a
```

Keram - Cross

1   hypothetical, it was posed as a hypothetical.

2          THE COURT:  To the extent the witness offered an

3   opinion of what happened or what might have happened at the

4   time of the events in question --

5          MR. GALIPO:  Let me --

6          THE COURT:  -- you can ask her if somebody said

7   something at a particular time, would that change your opinion.

8   That's essentially a hypothetical.  If it's in the record as to

9   the timing.  If it's not in the record, then maybe just

10  question as to whether the timing is or isn't relevant.

11          I will overrule.

12  Q.  Let me go back for a moment.  At some point you wrote a

13  Rule 26 report in this case, correct?

14  A.  Correct.

15  Q.  And you had read various depositions before writing that

16  report?

17  A.  Yes, I did.

18  Q.  Including depositions of police officers and percipient

19  witnesses?

20  A.  Yes.

21  Q.  And you relied on the information in those depositions to

22  give your report?

23          MR. WIENER:  Objection, irrelevant; foundation.  This

24  is trial, it's not about the depositions.  And hearsay, your

25  Honor.

Keram - Cross

```
 1            THE COURT:  I have to think about it.  For
 2   cross-examination purposes, if the witness is -- they're not
 3   relying on it here in court -- I'll sustain the objection.
 4   BY MR. GALIPO:
 5   Q.  Are your opinions any different now than they were at the
 6   time you wrote your Rule 26 report?
 7   A.  No.
 8   Q.  You also gave your opinions at deposition, correct?
 9   A.  Correct, yes.
10   Q.  When you gave your opinions in your report, was the
11   information that you had to base it on documents you were
12   provided?
13            MR. WIENER:  Objection, your Honor.
14            THE COURT:  I will overrule as to that general
15   question.
16   A.  I'm sorry, can you reask the question?
17            THE COURT:  The only question is, did you base your
18   opinion before the trial on documents you were provided.
19   Q.  Just a yes or no.
20   A.  I based it on my review of those documents, yes, my
21   opinions, yes.
22   Q.  You didn't base your opinions at least at the time of your
23   report in hypotheticals?
24   A.  No, not the hypotheticals that were posed to me, no.
25   Q.  And then at your deposition you answered to the best of
```

1    your ability whatever question was asked you?

2    A.  Correct, yes.

3    Q.  I want you to assume these facts:  Assume that -- strike

4    that.

5            Let me go back to the Oakland incident.  You made an

6    assumption in your analysis that the same vehicle was involved

7    in the first go-round and the second go-round that you

8    described when you described him being in one pursuit and then

9    a second pursuit?

10           MR. WIENER:  Objection, lacks foundation.  I don't

11   know if he's asking her to assume something or not.

12           THE COURT:  I think the question started to get a

13   little confusing.  Are you asking her whether she understood

14   there were two different vehicles or the same vehicle, or you

15   want her to assume they're different or the same?

16   BY MR. GALIPO:

17   Q.  Okay.  In answering the hypothetical question about the

18   Oakland incident that Mr. Wiener asked you, did you assume in

19   answering that question that it was the same vehicle in the

20   Oakland, May 2nd, 2004, incident from the first pursuit to the

21   second pursuit?

22   A.  When you say the first and second pursuit, do you mean

23   within the Oakland pursuits?

24   Q.  Yes, within that short timeframe.

25   A.  So where both pursuits occurred in Oakland on the 2nd, one

```
 1    right after the other -- I want to make sure we're not talking
 2    about the San Francisco.
 3    Q.  Do you have any idea about the minutes in between or you're
 4    not sure?
 5              MR. WIENER:  Your Honor, he should proceed by
 6    hypothetical.
 7              THE COURT:  I will overrule.  Is the timing -- do you
 8    want to find out if the timing is important or the difference
 9    in vehicles?
10              MR. GALIPO:  Yes, both.
11              THE COURT:  Okay, fine.  All right.
12              THE WITNESS:  So you're asking me two questions, one
13    about the time and one about the vehicle?
14    BY MR. GALIPO:
15    Q.  Yes.
16    A.  In the hypothetical, Mr. Wiener did not indicate that there
17    were two different vehicles, so I assumed that it was the same
18    vehicle.
19    Q.  And how about with regard to the timing.  Did you have any
20    understanding when you answered the question as to how much
21    time there was in between?
22    A.  I believe Mr. Wiener said there was 20 minutes in between,
23    if I recall correctly.
24    Q.  Now, let's assume that when his vehicle was finally --
25    strike that.
```

Keram – Cross

1           Do you have any information that before being

2   ultimately stopped by the police in Oakland, he was committing

3   any criminal activity that day in Oakland.

4           MR. WIENER:  Objection, hearsay, hypothetical.

5           MR. GALIPO:  I'll go by hypothetical.

6           THE COURT:  You don't necessarily have to.  That

7   question is almost ambiguous and almost calls for a legal

8   conclusion as well.

9   Q.  Let's assume that Mr. Boyd was unarmed on May 2nd, 2004.

10  A.  Uh-huh.

11  Q.  Had not waved a gun at anyone and was at some point stopped

12  by the Oakland police.  Do you have that in mind so far?

13  A.  Yes.

14  Q.  And let's assume that he was asked to get out of the car

15  and eventually get down on the ground, and he complied.  Do you

16  have those facts in mind?

17  A.  Yes.

18  Q.  And prior to being handcuffed, let's assume that he was

19  roughed up a little bit by the Oakland police officers which

20  led to some injuries that he had on his body before the

21  shooting events.

22          MR. WIENER:  Objection, lacks foundation; and there's

23  no good faith basis for that hypothetical, your Honor.  No

24  testimony to that fact.

25          THE COURT:  Well, the roughed-up part.

```
1              MR. GALIPO:  I can establish some foundation perhaps.
2              THE COURT:  I think there may be testimony there was a
3     struggle of some sort perhaps in the earlier event.  But I
4     don't know that anybody said that anybody roughed anybody up.
5     I'm going to sustain the objection.
6     BY MR. GALIPO:
7     Q.  You read Dr. Smith's deposition, correct?
8     A.  Yes.
9     Q.  You read the autopsy report, correct?
10    A.  Yes.
11    Q.  By the way, you didn't see any finding by Dr. Smith that
12    this was suicide by cop, did you?
13             MR. WIENER:  Objection, your Honor, hearsay.
14             THE COURT:  I think it would be argumentative.  Is
15    there any indication that a coroner or medical examiner would
16    ever be asked to make that kind of a statement?
17    Q.  Let me ask it in a different way.  Is there any
18    recommendation that you're aware of by Dr. Smith for a
19    psychological autopsy to be done?
20    A.  No.
21    Q.  Did you note in reviewing the report of Dr. Smith that
22    there was some injuries on Mr. Boyd that had coagulin or
23    scabbing on them indicating that they predated the May 5th
24    event?
25    A.  Based on my recollection as I sit here, I don't recall
```

1    that.  It's entirely possible.  I haven't looked at the autopsy

2    in a few weeks.  If you like, you could point me to where it

3    is.  I have no reason to doubt what you're saying.  I just

4    don't recall it sitting here.

5    Q.  Well, let me ask you this:  The comments that you attribute

6    to Mr. Boyd after he was handcuffed in the Oakland incident, do

7    you have an understanding he was upset at that time?

8           MR. WIENER:  Objection, your Honor, he should proceed

9    by hypothetical.

10          THE COURT:  Overruled.  In other words, the witness

11   has given her opinion based on certain hypotheticals.  In

12   giving that opinion she may have filled in certain blanks

13   essentially with assumptions on her part.  Overruled.

14   A.  I'm sorry, could you ask the question again?

15   Q.  Based on the hypothetical that you were asked by Mr. Wiener

16   about the events in Oakland and then Mr. Boyd making certain

17   comments to the police to the effect "you can kill me" or words

18   to that effect, after he was handcuffed, did you have an

19   understanding in answering that question one way or the other

20   whether he was upset at the time, Mr. Boyd?

21   A.  Depends on what you mean by "upset."

22   Q.  How about angry?  Is that a better word, angry, for you?

23   A.  You know, I would say he was agitated.  You know.

24   Q.  Okay.  Did you have any belief as to why he was agitated

25   after he was handcuffed?

1          MR. WIENER:  Objection, hearsay.

2          THE COURT:  Overruled.

3  A.  Well, the officers felt that he may have been intoxicated.

4  He didn't have a toxicology test after the arrest, so we don't

5  know whether or not he was.  So that was one possibility.

6          You know.  That was the possibility that I considered

7  about what was responsible for his agitated behavior.

8  Q.  Let's assume that his legs became separated or were pulled

9  off during that event.  Do you think that might have caused

10  some agitation?

11  A.  Yes.

12  Q.  How about being handcuffed?  Do you think to some people

13  that might cause some agitation?

14  A.  Yes.  To some people that would definitely cause agitation.

15  Q.  Now, do you have -- strike that.

16          Hypothetically, assuming there was a close

17  relationship between the two daughters of Mr. Boyd and

18  Mr. Boyd, do you have those facts in mind?

19  A.  Yes.  As a hypothetical, yes.

20  Q.  As a hypothetical?

21  A.  Yes.

22  Q.  Do you have any information or facts that's inconsistent

23  with that?

24  A.  No.

25  Q.  Is it your belief that Mr. Boyd wanted to be killed and

1    leave his daughters without a father?

2            MR. WIENER:  Objection, argumentative.

3            THE COURT:  Well, I'll overrule.

4    A.  It's my belief that Mr. Boyd suicided, and therefore, you

5    know, he would have known that he was leaving his daughters

6    without a father, yes.  Many people who suicide have young

7    children and they know that they're leaving those young

8    children without a parent.

9    Q.  Now, let's go to the May 5th, 2004 incident.  First of all,

10   regarding the drugs, let's assume that Mr. Boyd believed he was

11   getting an ecstasy pill, but it turned out that it wasn't the

12   best ecstasy pill in the world; instead of having I think it's

13   MDMA, it had MDA with a little bit of methamphetamine in it.

14   Do you understand that?

15   A.  Yes.

16   Q.  Is it your opinion that if someone was taking an ecstasy

17   pill they would want to commit suicide afterwards?

18   A.  I'm sorry, ask that again.

19           MR. WIENER:  Objection, incomplete hypothetical; and

20   it's vague.

21           THE COURT:  I'm not sure I understood the question.

22   I'll sustain.

23   Q.  You, I think, gave some testimony about the drugs he had in

24   his system.

25   A.  Yes, I mentioned he had drugs in his system.

Keram - Cross

```
1    Q.   Is that part of the basis for your opinion?
2    A.   I'm not sure how to answer that.  I was certainly aware of
3    that.   To the extent that it may have disinhibited his
4    behavior, you know, leading to him actually engaging in the
5    event, then, yes, it would have been something I considered in
6    forming my opinion.
7    Q.   Well, okay.  So you did consider that?
8    A.   To the extent that it may have disinhibited his behavior,
9    you know, and I can't say with medical certainty that it did
10   disinhibit his behavior.
11   Q.   Well, let's -- do you have any understanding as to what the
12   amounts of drugs were in his system?
13   A.   Yes.
14   Q.   And let's just assume that he took what he believed to be
15   an ecstasy pill.  Are you familiar with an ecstasy pill, at
16   least from a medical background?
17   A.   Yes, I have certainly a number of patients who have used
18   ecstasy.
19   Q.   Okay.  And is it your testimony that taking an ecstasy pill
20   is a precursor to then wanting to commit suicide?
21   A.   In the post-intoxication phase with ecstasy, you can see
22   people develop suicidal ideation, and also with MDA.
23   Q.   Well, you mention the post-intoxication --
24   A.   I'm sorry, with methamphetamine.  Yes, I'm sorry.
25   Q.   You're talking about -- are you talking about
```

1    post-intoxication depression?

2    A.  Yes.

3    Q.  Okay.  Where did you pick that up from?  Dr. Mendelson's

4    report?

5    A.  Oh, no, that's described in the ecstasy literature.

6    Q.  You would agree that at least in terms of Dr. Mendelson's

7    report, he couldn't say whether he was or was not experiencing

8    post-intoxication depression because he doesn't know when the

9    drugs were taken?

10           MR. WIENER:  Objection, your Honor, it's hearsay in

11   terms of referring to Dr. Mendelson's report.

12           THE COURT:  I'll sustain.

13   Q.  Do you have -- do you know when the drugs were taken by

14   Mr. Boyd?

15   A.  No, not with specificity, I don't.

16   Q.  Do you have any basis for saying that, based on the amount

17   or timing that he took the drugs, he was experiencing

18   post-intoxication depression?  Do you have any scientific basis

19   or medical basis for saying that in this case?

20   A.  No, no.

21   Q.  Now --

22   A.  Not to any degree of medical certainty, no.

23   Q.  Let me ask you about --

24   A.  Reasonable degree of medical certainty.

25   Q.  You were asked some questions about a contact with a person

1    named Tiffany Williams; is that correct?

2    A.   Yes.  Well, I think the -- the hypothetical -- the question

3    may have been placed to me in the form of a hypothetical.

4    Q.   I don't know if the name was mentioned or not in the

5    hypothetical, so....

6    A.   Yeah.

7    Q.   First of all, in terms of donuts in the street, that was

8    important to your opinion?

9    A.   That was certainly something I considered in terms of

10   drawing yourself to police attention.

11   Q.   What donuts are you referring to?

12   A.   The donut in the intersection that he made.

13   Q.   Let's assume that Tiffany Williams observed him making a

14   U-turn in the intersection as opposed to doing donuts in the

15   intersection.  Do you have those facts in mind?

16           MR. WIENER:  Objection, it lacks foundation as to

17   "her."

18           MR. GALIPO:  I'll rephrase it if I need to.

19           THE COURT:  Okay, rephrase it.

20           MR. GALIPO:  Sure.

21   Q.   Let's assume that Mr. Boyd was not making donuts, in the

22   middle of an intersection.  That he made a U-turn in the

23   intersection.

24           MR. WIENER:  Lacks foundation, your Honor.

25           THE COURT:  Is there any testimony from any witness in

```
 1   connection with the Tiffany Williams event that there was a

 2   single change that could be described as a U-turn?

 3           MR. GALIPO:  Her testimony in the videotape.

 4           MR. WIENER:  Her testimony was donuts, plural, and she

 5   described them as 360s.

 6           THE COURT:  Why don't you just ask whether it would

 7   have been made a difference if it were a U-turn or not, and if

 8   there's U-turn testimony, then the jurors can consider that.

 9           MR. GALIPO:  Thank you.

10   BY MR. GALIPO:

11   Q.  Would your opinion be different if instead of doing 360

12   donuts in the intersection, he simply turned his vehicle around

13   by making a U-turn in the intersection?

14   A.  And that's the only difference but everything else is the

15   same?

16   Q.  Let me ask you this way:  Is making a U-turn in an

17   intersection in your mind consistent with committing suicide?

18   A.  If somebody called me up out of the blue and said, Somebody

19   made a U-turn, is that a predicator for suicide, I would say

20   no.  No.

21   Q.  You answered a question about a contact Mr. Boyd had with

22   some lady, young lady who, I believe, approached his car, and

23   he grabbed her and at some point she saw a gun.  Do you

24   remember that?

25   A.  Yes.
```

Keram - Cross

1  Q.  Do you have an understanding whether or not the shooting at

2  Larch Way happened -- it was dark out or light out?

3          MR. WIENER:  Objection, hearsay.

4          THE COURT:  Is your question do you have some

5  understanding of the timing and the lighting?

6          MR. GALIPO:  Yes.

7          THE COURT:  Overruled.

8  A.  Yeah, I know what the various witnesses said.

9  Q.  What is your understanding, without getting into specifics,

10  as to whether it was dark outside or still light out?

11          MR. WIENER:  Objection, hearsay.  He should proceed by

12  hypothetical, your Honor.

13          THE COURT:  I'll sustain.

14  Q.  Let's assume that at the time of the shooting incident, on

15  Larch Way, it was light outside still.  Do you have that fact

16  in mind?

17  A.  Yes.

18  Q.  And let's assume that the contact between Mr. Boyd and

19  Tiffany Williams as described by Ms. Williams happened at

20  nighttime, that the person was wearing a red baseball cap with

21  some logo on the front, and the person was driving a burgundy

22  vehicle.  Do you have those facts in mind?

23          MR. WIENER:  Objection, your Honor.  This lacks

24  foundation and it's also argumentative.  In terms of asking her

25  to make a credibility determination.

```
1              MR. GALIPO:  I haven't finished my question.
2              THE COURT:  I don't know what the question is.  I'll
3    overrule the objection.  You haven't finished.
4    Q.  Do you have those facts in mind?
5    A.  Yes, taking those hypotheticals.
6              MR. GALIPO:  I'll withdraw the hypothetical and ask it
7    in a simpler way.
8              THE COURT:  Okay.
9    Q.  When you answered that question, you were assuming that the
10   incident between Mr. Boyd and this person actually happened as
11   described?
12   A.  It was posed to me as a hypothetical.
13   Q.  You were assuming that it happened as described?
14   A.  In the hypothetical, yes.
15   Q.  You yourself don't know whether it happened or not.  Is
16   that true?
17             MR. WIENER:  Objection, your Honor.  Relevance.
18             THE COURT:  You're asking her was she there and had
19   personal information?
20             MR. GALIPO:  I'll withdraw the question.  I doubt she
21   was there.
22             THE COURT:  Okay.  She was asked to assume certain
23   facts.  She wasn't asked to make a credibility determination or
24   determine whether those facts are actually correct.  But
25   assuming that those are facts, what's her opinion based on.
```

```
1    BY MR. GALIPO:

2    Q.  With regards to a contact with another woman, I want you to

3    assume that Mr. Boyd told the other woman to leave her keys in

4    her car, and he told her to get in his car and he wanted to get

5    in her car.  Do you have those facts in mind?

6          MR. WIENER:  Objection, this lacks foundation as to

7    Miss Hogan's testimony.

8          THE COURT:  This may be an inference that you want

9    someone to draw from the behavior, but it's not actually a fact

10   in evidence.  All that's in evidence is purportedly what was

11   said from Miss Hogan.

12   Q.  I'll rephrase.  Let's assume that a woman was told by

13   Mr. Boyd to leave her keys in her car and the woman had the

14   impression that Mr. Boyd wanted to switch cars with her.

15         MR. WIENER:  Objection, lacks foundation.  She never

16   said that.

17         THE COURT:  All right.  I'll sustain.  If you want to

18   ask, would it make any difference if this was a carjacking or a

19   car trade, instead of an attempted kidnap or something like

20   that, you could ask the witness that.

21         MR. GALIPO:  That's fine.  Let's do it that way.

22   Q.  Would it make a difference in your analysis if instead of

23   some kidnapping or carjacking, it was an attempted trade of

24   vehicles?

25   A.  That's the only difference in the whole event is that this
```

1   one interaction was an attempted carjacking.

2   Q.  Was an attempted trade of vehicles, would that in your mind

3   be consistent with suicide by cop, wanting to trade vehicles?

4   A.  Am I only looking at whether or not somebody wanted to

5   trade a vehicle?

6   Q.  Yes.

7   A.  And I'm not looking at anything else, again somebody calls

8   me up and says, Somebody says they want to trade vehicles, is

9   that consistent with suicide by cop?

10  Q.  Correct.

11  A.  I would tell them that I needed to know other information

12  before I can form an opinion about that.

13  Q.  Okay.  Now, I want to get to Larch Way.

14  A.  Uh-huh.

15  Q.  Let's assume that before Mr. Boyd got to Larch Way a police

16  officer shot at him and the bullet struck his car.  Do you have

17  those facts in mind?

18  A.  Yes.

19  Q.  In your mind, might that be a reason that Mr. Boyd told

20  residents at Larch Way that the police were trying to kill him?

21  A.  Yes.  It may be.

22  Q.  And did you consider that in your analysis?

23  A.  Yes.

24  Q.  Now, let's assume the following facts:  Let's assume on

25  Larch Way at some point Mr. Boyd was told to stop his vehicle

Keram - Cross

1    and he eventually stopped.  Do you have that in mind?

2    A.  Yes.

3    Q.  On Larch Way.

4    A.  Yes.

5    Q.  Let's further assume that Mr. Boyd was told to put his

6    hands out the open driver's window of the vehicle and he did.

7    Do you have that in mind?

8    A.  Yes.

9    Q.  Let's further assume that Mr. Boyd was told to get out of

10   the vehicle and he did.

11   A.  Yes.

12   Q.  Let's further assume Mr. Boyd was told to put his hands up

13   and he did.  Do you have that in mind?

14   A.  Yes.

15   Q.  Let's further assume that Mr. Boyd got out of the car and

16   did not have a gun in his hands and did not have anything that

17   appeared to be a gun on his person.  Do you have that in mind?

18   A.  Yes.

19   Q.  Now, with regard to that activity that I just described in

20   my hypothetical, in your mind, is that consistent or indicative

21   of suicide by cop?

22        MR. WIENER:  Objection, incomplete hypothetical --

23   apologize to startling you, your Honor.

24        THE COURT:  I was trying to follow the question and

25   you jumped up.

```
 1            MR. WIENER:  Objection, it's vague; incomplete

 2   hypothetical as to whether he was consistently following the

 3   commands.

 4            MR. GALIPO:  No, whether consistently, suicide by

 5   cop --

 6            THE COURT:  Let's not get into a discussion here.

 7   Would you just start your question over, okay, if you can?

 8            MR. GALIPO:  I'll try.

 9            THE WITNESS:  This is why I had Mr. Wiener break his

10   down.

11            THE COURT:  What I want to avoid here is each side

12   making a closing argument during the hypotheticals to this

13   witness.  All right.  I endeavored to stop that general format

14   with Mr. Wiener, and you also should not try and restate the

15   whole record.  You can ask the witness questions about would it

16   make any difference "X" and "Y" to the case, or "Z" -- but go

17   ahead with your hypothetical instead, and we'll see.

18   BY MR. GALIPO:

19   Q.  I'll back up one step.  Assume hypothetically that Mr. Boyd

20   was in his car on Larch Way before getting out, and police

21   officers were shooting at the car from both sides.  Do you have

22   that in mind?

23   A.  Wait, I'm sorry.

24            THE COURT:  Why don't we say they're shooting at him,

25   so you don't get into a problem of --
```

1          MR. GALIPO:  That's the problem with doing the hypos

2    as opposed to her review of the information.

3          THE COURT:  I'm just saying that, you know, to avoid

4    Mr. Wiener jumping up and scaring me again.

5          MR. GALIPO:  Okay.

6          THE COURT:  In other words, if you don't get too

7    detailed, there's less of a chance he's going to jump up.

8    BY MR. GALIPO:

9    Q.  In this case, without getting into specifics, do you have

10   an understanding that shots were fired at the SUV while it was

11   on Larch Way before he got out?

12   A.  Yes.

13   Q.  In your opinion, did Mr. Boyd do anything to make the

14   police fire at him so that they would kill him while he was in

15   the vehicle?

16          MR. WIENER:  Objection, hearsay.

17          THE COURT:  If there is behavior that you feel would

18   bear on her opinion, you can put it before her by way of an

19   assumption, or if you want to just ask her, is there anything

20   that she's been told in the hypotheticals that suggests it; and

21   if she says no, then you can add things to it if you want to.

22   But I'm going to try and give you some idea here so we don't

23   get too hung up and bogged down.

24          MR. GALIPO:  That's fine.  Okay.

25

1    BY MR. GALIPO:

2    Q.  Do you have my hypothetical?  Hypothetically, if the police

3    were shooting at Mr. Boyd's vehicle on Larch Way, before he got

4    out.

5    A.  Uh-huh.

6    Q.  Do you have any opinion that he did anything to incite that

7    to happen while he was on Larch Way?

8           MR. WIENER:  Objection, hearsay; incomplete

9    hypothetical.  Is he asking her to assume that, or is he asking

10   her what happened?

11          THE COURT:  I'm going to sustain as to the form of the

12   question.

13          MR. GALIPO:  I'll try it a different way.

14          THE COURT:  I think that there may be a way -- I think

15   I understand what you're trying to ask.  But you know, I think

16   that you would have to ask it differently than you're asking

17   it.  All right, sustained.

18   BY MR. GALIPO:

19   Q.  You have an understanding that after the vehicle was on

20   Larch Way and before Mr. Boyd got out of the vehicle that

21   police were shooting at his vehicle with him in it.  Is that

22   correct?

23   A.  Am I in the hypothetical or not?

24   Q.  Just your general understanding without getting into

25   specifics or the facts.

1    A.   Yes.

2    Q.   Do you think Mr. Boyd was wanting to commit suicide by cop

3    at that time while he was sitting in the vehicle and the

4    officers were shooting at him?

5    A.   I think that he wanted to commit a suicide by police, you

6    know, my belief is that he did, you know, at the time that he

7    started the whole event, so it would have continued all the way

8    through to the end, recognizing that there might have been some

9    ambivalence about it, but that he was suicidal throughout the

10   events.

11   Q.   So at the time that he was in the car and the officers were

12   shooting at him, do you think that he did anything at that

13   moment to precipitate that?

14        MR. WIENER:  Objection, your Honor.  It's hearsay; and

15   it's also beyond direct examination.  Should proceed by

16   hypothetical, your Honor.

17        THE COURT:  It's coming out like a question of a lay,

18   factual determination, is the best way I can characterize what

19   you seem to be trying to elicit.  You may not be trying to

20   elicit that, but then you have to frame your question

21   differently.  Sustained.

22   BY MR. GALIPO:

23   Q.   Okay.  You said suicide by police is an intent to provoke

24   lethal force by the police.  It's the intent by the person to

25   provoke the police to use lethal force against them?

1   A.   The intent is present in that, yes.

2   Q.   And lethal force you understand was being used on Mr. Boyd

3   on Larch Way while he was in the car before he got out,

4   correct?

5   A.   Correct.

6   Q.   I'm asking you, is it your opinion that he intended the

7   police to use that lethal force against him on Larch Way while

8   he was seated in the car?

9   A.   You know, I think that he had the intent at that time.  As

10  I said, I think he had the intent all the way through the

11  entire event.

12  Q.   So that would include while he was sitting in the car and

13  they were shooting at him?

14  A.   Correct.  You know, he had the intent all the way through.

15  Q.   Okay.

16  A.   I'm trying to be as precise as possible here, and I'm only

17  limiting it to his state of mind, not anything else.  In my

18  response to that.

19  Q.   Let me ask you this:  Assume that after shots were fired at

20  the car, Mr. Boyd got out of the car, raised his hand, took his

21  shirt off, put his hands back up in the air, and said, "Please

22  don't kill me, I don't want to die."  Do you have those facts

23  in mind?

24  A.   Yes.

25  Q.   Is that in your mind consistent with somebody who wants to

1    be killed by the police if they tell the police, "Please don't

2    kill me, I don't want to die"?

3    A.  You can't say based on those facts alone whether or not

4    this is indicative of a suicide by police attempt.  There are

5    other suicide-by-police events that have those facts and

6    similar facts.  So without looking at more -- again, I usually

7    like to take this as sort of sitting in my office, somebody

8    calls me up and says, Here's what you know about the case and

9    this is all you know.  Is this a suicide by police or not?  And

10   this is all you know.  You can't say one way or the other.

11   Because you don't have all the facts.

12   Q.  Did you ever see a case in that study, that Hudson study,

13   where the person told the police, Please don't kill him, and

14   they killed him anyways?

15             MR. WIENER:  Objection, hearsay, your Honor.

16             THE COURT:  I'm sorry?

17             MR. GALIPO:  She relied on the study.

18             THE COURT:  What was the ground of the objection?

19             MR. WIENER:  Hearsay.

20             THE COURT:  No, overruled.  Hudson has been discussed

21   in great detail by the witness on direct examination.

22   Overruled.

23   A.  There was no mention of that action in any of the decedents

24   in the Hudson study.  I'm trying to recall the other studies.

25   I'm reviewing this in my head here.

1    Q.  You would agree --

2           MR. WIENER:  Objection, she wasn't finished.  He cut

3    her off.

4           MR. GALIPO:  I apologize.

5           MR. WIENER:  She just said she's thinking in her head.

6    Q.  Let me know when you're complete.

7    A.  Right.  I can't recall, as I'm sitting here, having read

8    that anybody made that comment in any of the suicide-by-police

9    literature.

10   Q.  You would agree that asking the police not to shoot you is

11   normally, in your opinion, contrary to wanting to be shot by

12   them?

13          MR. WIENER:  Objection, incomplete hypothetical.

14   Q.  Would you agree, Doctor?

15   A.  I think outside the context of a potential

16   suicide-by-police evaluation, normally one would consider that.

17   However, because there are instances in which, you know, people

18   may be ambivalent or playing cat and mouse with the police or

19   having other reasons for making that statement that there's

20   certainly very credible reasons that people could make that

21   statement in suicide-by-police cases.

22   Q.  But you've never seen one?

23   A.  The only reason I'm hesitating is there are a couple of

24   earlier studies that relied on a large number of reports that I

25   haven't reviewed recently that may have discussed that.

Keram – Cross

1    Q.   You have reviewed suicide-by-cop cases where the person

2    basically is getting in a shootout with the police with the gun

3    in their hand, correct?  You've reviewed cases like that,

4    correct?

5    A.   I'm trying to think outside of the literature if I've ever

6    had a case myself, either in the research that I've done or in

7    civil litigation or with one of my patients, where somebody --

8    how did you put it?

9    Q.   How about include the literature.

10   A.   Oh, including the literature, absolutely, yeah.

11   Q.   In fact, in the literature, it's described where the people

12   are asking the police to kill them?

13   A.   Yes.

14          MR. WIENER:  Objection, your Honor, incomplete

15   hypothetical, as to what percentage.

16          MR. GALIPO:  I didn't ask the percentage.

17          THE COURT:  Anyway.  Overruled.

18   A.   Yes, it's described in the literature that people have

19   asked the police to shoot them in suicide-by-police scenarios.

20   Q.   And they come out towards the police with a weapon in their

21   hands and they charge the police, things of that nature,

22   correct?

23   A.   In the Hudson study, I believe it was 57 percent of people

24   had a weapon in their hand that they did not drop after the

25   police told them to drop it.

Keram - Cross

1    Q.  We don't have that situation in this case, would you agree,

2    that someone had a weapon in their hand, the police told them

3    to drop it and they failed to do so?

4    A.  No, it's more similar to the 43 percent of cases where

5    people did not have a weapon in their hand.

6    Q.  Let me ask you this:  Did you mention in direct examination

7    that there's a lot of police agencies or organizations that are

8    publishing articles on suicide by cop?

9    A.  No, that's not what I stated.

10   Q.  Okay, I misunderstood you.  Where are the source of these

11   articles as you understand them currently?

12   A.  There are things like, you know, there are magazines like

13   *Police Chief* and other things like, you know, *First Responder*

14   type magazines where I've seen these published.

15   Q.  Don't you think that the argument of suicide by cop is a

16   convenient argument for police to make when they shoot an

17   unarmed man --

18           MR. WIENER:  Argumentative.

19           MR. GALIPO:  I'm not done with my question.

20           MR. WIENER:  It's beyond argumentative, your Honor.

21           THE COURT:  It gets argumentative because the --

22   without going into why, it's argumentative.  I'll sustain.

23           MR. GALIPO:  I'll ask another question.

24           THE COURT:  If I tell you why it's argumentative, it

25   will make your argument.  Okay.  All right.

1   BY MR. GALIPO:

2   Q.  With regard to the Hudson study, you're saying a large

3   number of the people in that study were unarmed and shot and

4   killed by the police?

5   A.  43 percent -- well, also, you have to understand something

6   in the Hudson study, and I think I may have given a

7   misimpression.  In the Hudson study not everybody who was shot

8   was actually killed.  It was about 50/50.  Okay.  So I just

9   want to clarify that.

10  Q.  How many people did you say were in that study,

11  400-something?

12  A.  437 total.

13  Q.  So if someone took the appropriate percentage, you might

14  have 150 to 200 people in that study that were unarmed and shot

15  by the police?

16  A.  There were 437 total, and I think 44 of them were thought

17  to be suicides by police by the study's selection criteria.

18  Q.  And who did the study; was it the sheriff's department?

19  A.  No, it was actually kind of interesting.  An emergency room

20  from the university who got interested in the topic and looked

21  for an agency that would help him to review their records.

22  Q.  How many hours would you say altogether you've worked on

23  this case?

24  A.  Somewhere in the neighborhood of a hundred hours.

25  Q.  A hundred hours.  What do you charge per hour for your

Keram - Cross

1    time?

2    A.   $400 an hour.

3    Q.   400 an hour.  So you've already -- you're about $40,000?

4    A.   I think that I've billed, I must have counted my hours

5    wrong.  I haven't billed for my last piece of work here, but I

6    think I've billed somewhere around $29,000.

7    Q.   And you've been paid that so far?

8    A.   I received -- I've received about $21,000 so far, I think.

9    Q.   You're waiting for some of the balance?

10   A.   For one of the bills I sent out, yes, hasn't been paid yet.

11   And I haven't finished billing.

12   Q.   I want to give you some hypotheticals after Mr. Boyd took

13   his shirt off and raised his hands.  Let's assume,

14   hypothetically, that he was leaning back against the open door

15   area of the car with his hands up, and he was shot.  Do you

16   have that in mind?

17   A.   Yes.

18   Q.   Is that consistent with suicide by cop in your opinion?

19   A.   Are you asking me just to consider only that one --

20   Q.   Everything you know about Mr. Boyd starting from 1993 all

21   the way up until Larch Way.  Do you have that in mind?

22   A.   Yes.

23   Q.   And he's out of the car now.  We already talked about the

24   hypothetical where he steps out of the car, puts his hands up,

25   takes his shirt off.  There's some mention about him taking

1    some steps towards the rear of the vehicle and then back to the

2    open driver's door area.  Do you have the point in time I'm

3    referring to now?

4            Now, let's assume that he then leans back against the

5    car somehow with his hands up.

6    A.  Uh-huh.

7    Q.  Do you have those facts in mind?

8    A.  Yes.

9    Q.  And let's assume in that position he's shot?

10   A.  And he's been in that position long enough for the officers

11   to know that he has his hands up, that he hasn't just, you

12   know, turned around and kind of in that position (indicating).

13   Q.  Right.

14   A.  And the officers have registered that his hands are up and

15   he's not moving.

16   Q.  Well, one would hope so.  He's in that position for at

17   least several seconds.

18   A.  Uh-huh.

19   Q.  Do you have that in mind?

20   A.  Uh-huh.

21   Q.  Is that a yes?

22   A.  Yes.  I'm sorry.

23   Q.  We'll see "uh-huh" later on, we won't know what you meant.

24           Assuming those facts to be true, do you think him

25   having his hands up and getting shot is consistent with suicide

1   by cop?

2         MR. WIENER:  Objection, it's vague; incomplete

3   hypothetical; and hearsay, because it asks her everything she's

4   reviewed as opposed to what she's assuming here in court.

5         THE COURT:  Do you want her to assume everything she's

6   been asked to assume on the record and then add that?

7         MR. GALIPO:  Yes.

8         THE COURT:  Without restating, can you answer the

9   question?

10         THE WITNESS:  If I assume that the officers registered

11   that his hands were up and they shot him at that time, he was

12   not moving, he had not just come to that position and he wasn't

13   appearing to start to move, then I would say no, that that's

14   not consistent with a suicide by police, if you only look at

15   that particular point in time.

16   BY MR. GALIPO:

17   Q.  For purposes of your analysis --

18   A.  It doesn't mean that that behavior wouldn't be exhibited

19   during the course of a suicide by police.  Because it certainly

20   has been and it's been described.

21   Q.  For purposes of your analysis, you're not trying to

22   determine what the officers were thinking, are you?

23   A.  No.

24         MR. WIENER:  Objection, relevance, your Honor.

25         THE COURT:  Overruled.

Keram - Cross

1   Q.   You said that it depends on whether it registered to the

2   officer or not?

3   A.   Right.

4   Q.   You're not really considering what is registering or not to

5   them, are you?

6   A.   No, but let me think about why I asked that.  I guess I

7   wanted -- because people do surrender for a variety of reasons

8   in the course of suicide-by-police incidents, you know, whether

9   they're playing cat and mouse with the police or whether

10  they're ambivalent or other reasons.  I guess I wanted to know

11  whether or not he was fixed in that position for some period of

12  time, when he was shot, whether or not it was long enough, you

13  know, for the -- for him not to be coming right out of a

14  position where he was lunging for something, which is, you

15  know, common in these incidents, or wasn't -- you know, the

16  officer didn't foresee that he was about to go for his -- he

17  was looking for things like that.

18  Q.   Okay.

19  A.   Because surrendering is actually described in the

20  literature.  Putting hands up is actually described in the

21  suicide-by-cop literature and has been present in other cases

22  that I've done.

23  Q.   Doctor, I'm going to try to finish my exam of you within 10

24  or 15 minutes, so I want to just stick to some specific

25  questions, if you could try to keep them in mind.

Keram - Cross

1          MR. WIENER:  Objection, your Honor, she's responding

2     to his very broad questions.

3          THE COURT:  Well, I'll overrule, and hold Mr. Galipo

4     to his statement in his last, I guess, statement on the record.

5          MR. GALIPO:  I guess I will have to.

6          THE COURT:  You don't have to --

7          THE WITNESS:  I'm just trying to be as complete in my

8     answers as I can be.

9          THE COURT:  Ordinarily I might sustain your objection,

10    but then if I do, then we have lost his commitment to be

11    through quickly, so overruled.

12          MR. WIENER:  Partial objection, your Honor.

13          THE COURT:  All right, overruled.

14    BY MR. GALIPO:

15    Q.  Hypothetically, everything you've been asked to assume

16    during the course of your examination today, and now we're up

17    to the time he's outside the open driver's door area of the

18    car, leaning back with his hands up, let's say at least three

19    seconds.  Do you have those facts in mind?

20    A.  Yes.

21    Q.  Is that consistent with, in your mind, Mr. Boyd wanting to

22    be shot by the police at that time?

23    A.  Again, you don't know.  Because -- you know, it depends on

24    what he did before and after.  If that was the only thing that

25    he had ever done.

1    Q.  Well, everything up to that point that you've been asked to

2    assume so far, you now have him standing in the open driver's

3    door area of the car leaning back with his hands up?

4    A.  Uh-huh.

5    Q.  Do you consider someone in this scenario standing, leaning

6    back with their hands up, exhibiting signs of wanting to be

7    shot by the police at that time?

8    A.  I would say that you can't determine his long-term intent

9    over the course of that episode.

10   Q.  At that moment?

11   A.  At that point in time.

12   Q.  At that time?

13   A.  At that time, he may still intend to commit a suicide by

14   police.  If he allows, you know, if he keeps his hands in the

15   air and continues to follow commands for the rest of the

16   incident, that allows him to be taken into custody safely,

17   then, you know, then you would say something else.  But you

18   know, subsequent behavior -- you can comment on his behavior,

19   but you can't comment on his intent in your hypothetical.

20   That's the best way to answer it.

21   Q.  So you don't know his intent?

22         MR. WIENER:  Objection, vague.

23         THE COURT:  Do you mean at that very moment that

24   you've described with the hands up?

25         MR. GALIPO:  Yes.

Keram – Cross

1   A.  At that very moment, my belief is that he had the intent

2   all the way through the episode, and I can't say, based on what

3   you told me, that he changed his intent.

4   Q.  Didn't you tell us in your testimony that the person has to

5   do something to incite the police to shoot him at that moment?

6   A.  Yes.

7   Q.  What if a person is standing, leaning back with their hands

8   up, would a person be doing that to incite the police to shoot

9   them at that moment?

10         MR. WIENER:  Objection, incomplete hypothetical.

11         THE COURT:  Overruled.

12   A.  I think I've answered your question.

13   Q.  That's a new one, I think.

14         MR. WIENER:  He's interrupting her, your Honor.

15         THE COURT:  Go ahead and answer it once more in case.

16   A.  You're asking about behavior, and I'm talking about intent.

17   Q.  No.  Doctor, I'm trying to stick with my 15 minutes.

18   Here's what I'm asking.  I'm trying to make this simple.

19         MR. WIENER:  And, your Honor, my objection is only

20   that -- I'm glad that it's 15 minutes.

21         MR. GALIPO:  Well, it's not.

22         MR. WIENER:  Doesn't mean he should be instructing the

23   witness not to fully answer his question.

24         THE COURT:  Please pose a question.  And don't argue

25   with the witness about whether she has or hasn't answered it.

1    If you don't feel the answer is responsive, you can ask that it

2    be stricken as nonresponsive.  If you just want to follow up

3    with another question, you may do that as well.

4    BY MR. GALIPO:

5    Q.  Okay.  You told us that the person to be wanting to commit

6    suicide by cop needs to take some type of action at that moment

7    to incite the police to use deadly force against him, correct?

8    A.  Yes.

9    Q.  I'm asking you standing up, leaning back with your hands

10   up, at that moment is he doing anything to incite the police to

11   shoot him?

12   A.  No, if that's what's happening in that moment -- that

13   moment is not a moment in which he is provoking lethal force.

14   Q.  And if the incident happened that way, hypothetically, you

15   would not say this was suicide by cop, would you?

16   A.  Again, prefacing it with him not giving a perception that

17   he was moving or about to move.

18   Q.  The hypo I gave you.

19   A.  That he is just standing still with his hands raised.

20   Q.  In that hypo.

21   A.  Like I said, barring him giving any indication or

22   perception that somebody would have that, you know, he had just

23   gotten into that position or he was coming out of that

24   position, I can't think of at least at this point of, you know,

25   something that would suggest that that was a suicide by cop if

1    he was just shot while his hands were up.

2    Q.  Okay.  Now, same hypothetical, everything up to that point,

3    instead his hands are up, but he's moving down into a seated

4    position with his hands up.  Do you have that in mind?

5    A.  Yes.

6              MR. WIENER:  Objection, lacks foundation.

7              MR. GALIPO:  Mario Roger's testimony, your Honor.

8              THE COURT:  Again, ladies and gentlemen, we've had a

9    lot of testimony from a variety of witnesses.  In the interest

10   of time, and keeping my instructions to you earlier about

11   hypotheticals, I'll overrule the objection.

12   BY MR. GALIPO:

13   Q.  Do you have that in mind?

14   A.  Yes.

15   Q.  Assuming that everything from before his hands are up but

16   now from a standing or leaning back position, he's now

17   beginning to move into a seated position, do you think that is

18   a suicide by cop?

19   A.  Yes, I think that's more indicative of suicide by police in

20   this instance than the previous hypothetical.

21   Q.  And that would be with his hands visible to the police

22   officers?

23   A.  Yes, and my reason is that he -- the officers have -- know

24   that he has had a weapon; that the weapon is operational and

25   functional, as I keep saying.  And so him moving downwards, you

1   know, places the likelihood that he can reach for that weapon,

2   it becomes a higher possibility.  So just only knowing, you

3   know, up to that and not anything that happens afterwards, I

4   would say that my anxiety level or my concern that this may be

5   moving towards a suicide by police is heightened at that point.

6   Q.  Did you have opinion as to whether Officer Paine shot

7   Mr. Boyd because he thought Mr. Boyd wanted to commit suicide

8   by cop?

9           MR. WIENER:  Objection, beyond the scope of direct.

10          THE COURT:  And I think this witness's expertise and

11  disclosure of opinions.  Sustained.

12  Q.  You took into consideration various information trying to

13  figure out what the intent of Mr. Boyd was, correct?

14  A.  Yes.

15  Q.  I want you to assume this hypothetical.  Assume that

16  Mr. Boyd was a double amputee, had prosthetics.  And the police

17  were telling him to put his hands up and get down on the

18  ground, essentially at the same time.  Do you have these facts

19  in mind?

20  A.  Uh-huh.

21  Q.  And Mr. Boyd told them, he can't, or words to that effect,

22  he has prosthetic legs.  And Mr. Boyd starts going down to a

23  seated position, and I also want you to assume that because of

24  his disability, he needs to have some assistance to get down.

25  Do you have those facts in mind?

Keram – Cross

1    A.  Yes.

2    Q.  Do you think that maybe in this case Mr. Boyd's getting to

3    the seated position in the way I described may have had

4    something to do with his disability?

5         MR. WIENER:  Objection.  It lacks foundation.  And

6    it's beyond her expertise in terms of whether he could or could

7    not get down.

8         THE COURT:  I'll sustain.  You'll have to first lay a

9    foundation that the witness in some fashion either used that

10   particular fact -- in other words, if you want her to assume

11   that he was getting in a particular position and he had

12   difficulty, does that affect her opinion in some way.

13   BY MR. GALIPO:

14   Q.  Did you take into consideration his disability in forming

15   your opinions in this case?

16        MR. WIENER:  Objection, vague.

17        THE COURT:  Overruled.

18   A.  Yes.

19   Q.  In what way?

20   A.  In several ways.  One obviously was the impact on the event

21   on his life's trajectory.

22   Q.  Let me rephrase because I'm afraid I'm going to have a real

23   long answer.  I'm afraid the question was too broad.

24        In terms of his movements around the car, did you take

25   into consideration his disability in that regard, right before

1    the shots?

2    A.  Yes.

3    Q.  In what way?

4    A.  I thought about -- I have a number of amputees, double

5    amputees in my practice, World War II vets and Vietnam vets,

6    and Korea, and I thought about their ability, they had similar

7    individuals, bilateral below-the-knee amputations, and I

8    thought about their limitations in terms of their activities or

9    actions when they're wearing bilateral prostheses.

10   Q.  A few more hypotheticals and I'll try to conclude.

11   Everything that you --

12   A.  I'm really not being complete in my answer.  You know, my

13   patients are able to get up and down from a similar height and

14   some get down to play with their kid, that type of thing.  So I

15   guess I had that in mind when I found out about his actions.

16   Q.  By the way, did you think that Mr. Boyd was telling the

17   police he can't get down, he has prosthetic legs, that's

18   consistent with him wanting the police to shoot him?

19            MR. WIENER:  Objection, it's argumentative.

20            THE COURT:  Overruled.

21   A.  Again, just based on that alone, you can't say one way or

22   the other.  You really need to look at more information to form

23   an opinion about that.

24   Q.  Do you think Mr. Boyd telling the police, "I don't have

25   anything, I'm unarmed," is consistent with him telling the

```
1    police he wants them to shoot him?

2    A.  Well, again, he may be playing a cat-and-mouse game with

3    the police.  May want the police to feel that the event is

4    ending successfully.  May want the police to feel that he's

5    unarmed.  You know, people can say that when they're not and so

6    forth.  I can't tell.  I can't form an opinion just based on

7    that.  I'd need to know more information.

8    Q.  In your opinion, hypothetically, everything being given on

9    the case in terms of hypotheticals today, if Mr. Boyd in

10   standing in the open driver's door area of the car, turned to

11   his left and his left hand went towards the side of the car,

12   you think that in this case is consistent with him wanting to

13   be killed by the police?

14           MR. WIENER:  Vague as to side of the car.

15           THE COURT:  You were doing this in a standing

16   position, did you mean it to be standing?

17           MR. GALIPO:  Yes.

18           THE COURT:  Okay.  Overruled.

19   A.  I'm sorry, and the question is, is that consistent with a

20   suicide by police?

21   Q.  With him wanting to be killed by the police at that moment.

22   A.  Again, you can't say just based on that alone, that it's

23   not inconsistent because he's starting an action.  But you

24   can't make a determination with medical certainty based on that

25   alone.
```

Keram - Cross

1   Q.   Regarding the potential prison sentence, you would agree

2   there's a lot of people that don't want to go back to prison?

3   A.   Correct.

4   Q.   They don't commit suicide, all of them, do they?

5   A.   Correct.

6   Q.   And whether or not there was a plea bargain on the table,

7   you don't know, correct?

8   A.   I don't know that, no.

9   Q.   Whether or not he could have pled to a misdemeanor, you

10  don't know?

11  A.   I have no knowledge about that.

12  Q.   And the case had been pending for some time, hadn't it?

13  A.   The case had been pending about an average amount of time

14  for the cases that I've been involved in with similar types of

15  charges.  So when you say "some time," that's kind of a

16  relative....

17  Q.   A year, a year and a half, something like that.

18  A.   A year, yeah.

19  Q.   So you think he picked this particular day after a year to

20  want to commit suicide?

21  A.   Well, as I said, I think the timing is significant, you

22  know, the "why now" is significant because of the potential for

23  the prison term.  I think there is another "why now," which has

24  to do with the phenomenon, the anniversary phenomenon.  That we

25  see that people that have had a significant life event, a very

```
 1   traumatic life event, have difficulty usually around the
 2   anniversary of that life event.
 3            So he lost his legs in April of 1993, and the event,
 4   this event took place in May, May 4th.  So within a few weeks
 5   of the anniversary of that.  You know, at the same time, also,
 6   the robbery -- I'm sorry, the charges that he was facing on
 7   this -- on the pending charge took place right around the
 8   anniversary, within days.  And people as they approach their
 9   anniversary for the few weeks before of the traumatic event and
10   then they pass it, they may become suicidal, and my Vietnam
11   vets, what are they, 30, 40 years out, have this happen.  So
12   that's another potential question for the "why now" of it.
13   Q.  He would have had 11 anniversaries from the 1993 event
14   before May 2004?
15   A.  Absolutely.  And the reason why that is significant is that
16   he has not accomplished an upward trajectory in his life.  His
17   life is following a downward trajectory with arrests and, you
18   know, the potential for a long prison sentence.  The time of it
19   doesn't matter because, as I said, you know, I see this in my
20   Vietnam vets.  They become more suicidal after the Tet
21   offensive.  I will tell you that February each year is a very
22   difficult time for my Vietnam vets who were in any of the Tet
23   offensive, not just the '68 Tet.
24   Q.  You don't have any information that he had any arrests, do
25   you, from 1997 up until 2003?
```

1    A.  No, I don't.  I don't believe I do, no.

2    Q.  You mentioned about --

3    A.  I think you meant to say 2003 --

4    Q.  You mentioned about staging the scene or wanting to wait 5

5    or 15 minutes to a lot of people out there?

6    A.  I'm sorry, say that again.

7    Q.  Did you say something about wanting to wait 5 or 15 minutes

8    for a lot of officers to arrive?

9    A.  No, I didn't say that.

10   Q.  Let me ask you this:  If your testimony is that you think a

11   person would do something, make a movement like reaching for a

12   weapon, for example, to incite the police to shoot, is that

13   what your thinking is in this case?

14   A.  Yes.

15   Q.  Assuming that the person did that with all kinds of

16   witnesses present, how would that make for a good civil

17   litigation case?

18            MR. WIENER:  Argumentative.

19            THE COURT:  No, I'll overrule.

20   Q.  In other words, if the person wanted to make a good civil

21   litigation case and they reach underneath the seat of the car

22   with all these people present, how would that make a good case

23   for them in your mind?

24   A.  Well, first of all, I think the primary reason -- this is

25   one reason among many for Mr. Boyd to have engaged in a suicide

Keram - Cross

1    by police.  You know, the other reasons have to do with not

2    getting his life together, with facing a long prison sentence,

3    with medical illness, so this is one factor among many.

4    Q.  I'm talking about that factor right now.

5    A.  Uh-huh.  You know you're asking me to comment on, you know,

6    whether or not he has a good understanding of how to create a

7    good civil case.

8    Q.  Well, I guess in part, because one of the main reasons that

9    I wrote down that you said is so that the family could prevail

10   in future civil litigation.

11   A.  No, I did not say that that was one of the main reasons.  I

12   said that was one of the possible reasons.  And it's certainly

13   one of the reasons that I believe is present in this case.  But

14   it's one among several.

15   Q.  I thought the two main reasons you gave was hostility or

16   animosity towards the police; and wanting the family to prevail

17   in civil litigation.  Isn't that what your testimony was?

18   A.  I believe what I testified to and what I intended to

19   testify is that the reasons that Mr. Boyd committed a suicide

20   by police had to do with him not -- with him facing a long

21   prison sentence, not getting his life together, animosity

22   toward the police resulting in him wanting to inflict

23   psychological damage, and the potential for his family to

24   prevail in civil litigation.

25            I think the reason you may have the impression the

Keram - Cross

```
 1   prevailing in civil litigation is a major factor is that

 2   Mr. Wiener asked me several questions that I explained by that

 3   particular focus.  But there are many reasons, as I just

 4   outlined.

 5   Q.  In fairness to you, you did mention the other reasons.

 6          Let me just ask you this last question, and I probably

 7   went over my 15 minutes, but to keep this moving along for all

 8   of us:  Regarding the psychological damage, wanting to give a

 9   police officer psychological damage.

10   A.  Uh-huh.

11   Q.  In this case, your understanding is only one officer shot,

12   correct?

13   A.  One officer shot --

14          MR. WIENER:  Objection, lacks foundation.

15          MR. GALIPO:  I'll withdraw it.

16   Q.  Is it your testimony that a person would want to look like

17   they're reaching for a weapon by putting their hand underneath

18   the seat of the car so they could be shot and killed for the

19   purpose of having the officer that shoots him have some

20   psychological harm?

21   A.  That's one of the reasons, yes.

22   Q.  And they would trade their life in to do that?

23          MR. WIENER:  Objection, argumentative.

24          THE COURT:  Well, I'll overrule.  The witness is

25   capable of answering without just a yes or no.
```

1    A.   The trading of the life has to do, I think, with the prison

2    sentence and the inability to get the life together in a

3    positive upward direction.  The other factors are all secondary

4    to the sort of things that he can accomplish in the primary

5    act.

6              So, for example, my patient, a different patient than

7    I've discussed so far, who wanted to commit a suicide by police

8    for the simple reasons of wanting to die, when I asked him why

9    he picked the police, he said, you know -- and I'm just going

10   to use the expletives, he said, Fuck the police, I hate the

11   police.  I want to fuck up as many of them as I can on my way

12   out.  So it's a secondary goal.

13   Q.   Dr. Keram, there's a lot of people that have ongoing

14   criminal charges, correct?

15   A.   Absolutely.

16   Q.   And there's a lot of people that face potential long

17   sentences, correct?

18   A.   Yes.

19   Q.   They don't go killing themselves every day, do they?

20   A.   No.  What we're looking at here is somebody who has a lot

21   of different factors all together.  Not just one factor.

22   Q.   I understand.  In your opinion, how did, based on your

23   analysis of Mr. Boyd's mental state, how did he know that he

24   was going to be shot and killed as opposed to shot and injured?

25              MR. WIENER:  Lacks foundation, your Honor, she never

1    said that.

2             THE COURT:  Pardon me?

3             MR. WIENER:  She never said that he knew he would be

4    injured as opposed to killed.

5             THE COURT:  Overruled.

6    Q.  How did he know he wouldn't just be shot in the leg, for

7    example, and have further physical disability the rest of his

8    life?

9    A.  People who engage in suicides by cop or suicides by police

10   don't know exactly what they need to do in order to be -- to

11   accomplish that goal.  And so if they're not successful by

12   doing A, they'll do B, B presenting a higher level of threat;

13   if they're not successful with B, they'll do C.  So you know, I

14   mean, this sounds bizarre, but once you're more familiar with

15   the literature, you can accept it.

16            There are instances in which people have been exactly

17   as you said, wounded and continued to escalate, firing upon

18   police officers, for example, their level of threat, until they

19   are shot and killed or, to their knowledge, incapacitated, and

20   they don't know if they're going to die.

21   Q.  In this case, do you have an opinion that Mr. Boyd knew

22   whether or not he was going to be shot and injured or shot and

23   killed?

24   A.  My opinion is that he intended to prevent -- present

25   lethal -- threat of lethal force until he was shot and killed

Keram - Cross

1    or incapacitated.

2    Q.  And that's based on assuming facts as to what happened at

3    the scene, in part?

4    A.  No, I mean, I think he had that intent before he got to the

5    scene.  I think he had the intent to provoke the use of lethal

6    force by law enforcement before he got to the scene.

7    Q.  You would agree, Doctor, you weren't at the scene, correct?

8    A.  Absolutely.

9    Q.  And would you agree that what happened actually at the

10   scene would be important to know in terms of what he wanted?

11        THE COURT:  Are you asking her whether she had to be

12   there in order to form an opinion?

13        MR. GALIPO:  No.

14   Q.  I'm asking you --

15        THE COURT:  Because she's been given a hypothetical of

16   things that happened at the scene.

17   Q.  What I am asking you, is it your testimony that it doesn't

18   matter what happened at the scene, he wanted to be killed and

19   that's the end of the story?

20   A.  I didn't --

21        MR. WIENER:  Objection, argumentative, your Honor.

22        THE COURT:  It is argumentative.  I'll overrule, and

23   you can explain.

24   A.  You know, I'm sorry, but I'm not -- I don't understand

25   where you're going.  I don't understand what you're asking me.

1   Q.  Do the facts in terms of the hypotheticals you've been

2   given, are they important to you as to what happened at the

3   scene in giving your final opinions?

4   A.  Are you asking me does -- did the hypotheticals that I was

5   given about what happened at the scene lead me to certain

6   opinions?

7   Q.  Doctor, you understand that the hypotheticals are just

8   assuming certain facts are true as to what happened at the

9   scene.  Correct?

10  A.  Yes.

11  Q.  Different hypotheticals might have different facts?

12  A.  Different opinions, yes, yes, yes.

13  Q.  Might assume different facts?

14  A.  Yes.

15  Q.  I'm wondering, in your opinion, that this was a suicide by

16  cop --

17  A.  Uh-huh.

18  Q.  -- is it important to you what his actual actions were in

19  terms of what he said, and what he did, and whether he was

20  reaching under the seat and things of that nature?

21  A.  Yes, those are all things that I would consider.

22          MR. GALIPO:  Thank you.  That's all I have.

23          THE COURT:  Okay.  How much redirect do you think

24  you've got?

25          MR. WIENER:  Five minutes, your Honor.

```
 1              THE COURT:  If it's going to be brief, I think we
 2    should conclude the witness.  So I'll let you go on with your
 3    redirect at this time.
 4              MR. WIENER:  Okay.
 5    REDIRECT EXAMINATION
 6    BY MR. WIENER:
 7    Q.  Good afternoon.  Just a few follow-up questions.
 8              First of all, in referring to a percentage from the
 9    Hudson study, I want to clear up something that I think may
10    have been a discrepancy on direct and cross.  In terms of the
11    percentage of people who present a gun pointing at the police
12    officers during a suicide by cop and didn't put the gun away
13    after being told to do so, what percentage was that?
14    A.  I may have misstated that.  The percentage of people who
15    had a gun -- I confused that, I'm sorry -- is 16.5 percent.  I
16    said the wrong number on cross-examination.  I think I said 54
17    percent.  So the vast majority of people who do present a gun
18    and are then told, you know, to drop it and then they drop it.
19    I'm sorry.
20    Q.  You don't need to apologize.  I'm just clarifying it.
21    A.  Yeah.
22    Q.  So Mr., I believe, Galipo asked you some questions about
23    law enforcement journals and implied that this is some sort of
24    cop-created phenomenon.  You testified before that there are
25    medical journals that are published, 6 to 12 peer-reviewed
```

Keram - Redirect

1    studies on this?

2    A.  Yes.

3    Q.  Do police officers write medical journal articles or

4    physicians?

5    A.  It's primarily physicians.  Some of the studies may have a

6    law enforcement officer as a coauthor.

7    Q.  But those are peer-reviewed medical articles?

8    A.  Absolutely.

9    Q.  They're not law enforcement journals?

10   A.  No.

11   Q.  Regarding the potential sentences and whether it would be a

12   lot of years or pled out to something lesser, would you defer

13   to Tony Brass in terms of his opinions about the likelihood of

14   that happening?

15   A.  Yes.  That's not within my area of expertise.

16   Q.  And so you would defer to Tony Brass in terms of the

17   likelihood of pleading out a serious gun offense?

18   A.  Absolutely.

19   Q.  And in terms of the criminal exposure Mr. Boyd was facing,

20   we talked about the pending charge as of going into the day of

21   the incident, did you also consider the possibility of being

22   charged with the attempted murder of a police officer before he

23   got to Larch Way based on that conduct?

24   A.  Yes, that was mentioned in Mr. Brass's report.

25   Q.  That's not a misdemeanor?

```
1    A.  No.

2              MR. WIENER:  Thank you.  Nothing further.

3              THE COURT:  Any recross, Mr. Galipo?

4    RECROSS EXAMINATION

5    BY MR. GALIPO:

6    Q.  The only other question I have, is it your opinion that the

7    drugs were affecting him mentally at the time this happened or

8    not?

9    A.  I don't think you can say with absolute certainty because

10   you don't know his past history of exposure with absolute

11   certainty.  It's my opinion that if the drugs were affecting

12   him at the time, that the way in which they affected him was to

13   disinhibit the behavior.  Behavior that he might not have gone

14   for, so to speak, might not have engaged in if he weren't

15   intoxicated.

16             MR. GALIPO:  Thank you.  That's all I have.

17             THE COURT:  Anything further from the defendants?

18             MR. WIENER:  No, your Honor.

19             THE COURT:  Thank you very much, Dr. Keram.  You're

20   excused at this time.

21             THE WITNESS:  Thank you.

22             (The witness exits the stand)

23             THE COURT:  We'll need to take a break, ladies and

24   gentlemen.  How much witnesses do you have to call?

25             MR. WIENER:  One.
```

1        THE COURT:  Is it possible our schedule may be moving

2   along at a faster pace than I anticipated when I addressed you

3   this morning -- but I don't want to be too optimistic about

4   that.  Why don't we give the jurors 20 minutes now as a break,

5   and I want to take just a moment, after Miss Lucero lets them

6   out, to speak to you about the time elements.

7        (The jury exited the courtroom)

8        (In open court; jury not present)

9        THE COURT:  I had asked Miss Lucero to check and see

10  where that missing 40 minutes may have come from.  When we had

11  the discussion on Monday by way of the defendants' objection to

12  the plaintiffs' questioning concerning 184 and 185, I did

13  indicate that I felt that that time should be attributed to the

14  defendants, and not to the plaintiffs, since it was

15  precipitated by an error on the defendants' side either through

16  paralegal or some other staff member.

17        Miss Lucero, have you determined whether or not that

18  40 minutes that you have that Ms. Bernstein did not have in

19  terms of cross-examination on that date or direct examination

20  on that date, is attributable to that break in those times?

21        DEPUTY CLERK:  It would fit that time, yeah.

22        THE COURT:  I don't know that my direction to Miss

23  Lucero was actually stated on the record or just stated soot

24  voce, but that was what I was thinking about earlier when I

25  indicated there was one objection that I said was to be placed

1    on essentially the defendants' tab, and I think that actually

2    we told the defendants that, but I don't know if the court

3    reporter is able to find that in her notes.

4            If that is the case, as I say, Miss Lucero never makes

5    a mistake, then you have 40 minutes less than Miss Bernstein

6    calculated.

7            MR. WIENER:  And your Honor, we collectively, the

8    three of us, have no recollection of the Court indicating that

9    that would be taken from our time, and we would object to that

10   being taken from our time.  Just like Mr. Galipo when we had to

11   leave early several days because he ran out of witnesses, he

12   was not tagged with that time; so we would object to the Court

13   making that ruling, if that ends up being the ruling.

14           THE COURT:  I don't consider it a goose-and-gander

15   situation, and that's never really good argument anyway.  But

16   to the extent that we can check the record to see, if you feel

17   you were misled in some way, I will consider that.  I'm

18   satisfied Miss Lucero is correct and Miss Bernstein's

19   calculations are different because either of her

20   misunderstanding as to what was being counted or otherwise.

21           But that there's been no error on Miss Lucero's part.

22   So the only question is whether in this instance it would be

23   inequitable for you to be charged with that time if you were

24   operating under a misunderstanding as to whether you would be

25   in some fashion involved in examination without keeping that in

```
 1   mind.

 2            I'll ask the court reporter to assist us at her

 3   earliest convenience in that regard and I'll speak to her the

 4   moment we take a break.

 5            MR. WIENER:  One comment.

 6            MR. LOEBS:  One comment?

 7            THE COURT:  It has to be very brief.

 8            MR. LOEBS:  Mr. Galipo knew about that discrepancy

 9   well in advance of him offering that in evidence to the

10   witness.  He knew about it well in advance.  He could have

11   bought it up.

12            THE COURT:  He may have known about it.  But the

13   problem is that it was created by the defendants who misled the

14   Court, Mr. Galipo, a witness, and everyone else.  Not

15   intentionally perhaps, but nonetheless, that is what the

16   genesis of that entire segment of lost time was.  If -- so as I

17   say, I think it's legitimate to charge the defendants.  It was

18   my intent to do so, and if they were not so notified, and in

19   some way relied on the absence of such notification, I'll

20   consider that as an equitable matter.

21            As I said, I'll see the court reporter briefly off the

22   record.

23            (Recess)

24            (In open court; jury not present)

25            THE COURT:  Very briefly for the record before the
```

1    jurors come in, the court reporter cannot find anything on the

2    record in which I informed the defendants that the time was

3    going to be attributed to them.  With that understanding and

4    their statement that they were relying on the full amount of

5    time left without that subtraction, so to speak, it will not

6    count toward their time.

7                So Miss Lucero will take the 34 minutes or whatever

8    the difference was off.

9                MR. WIENER:  Thank you, your Honor.

10               THE COURT:  I hope you don't use it.

11               (The jury entered the courtroom)

12               (In open court; jury present)

13               THE COURT:  Ladies and gentlemen, we have another

14   witness.

15               Mr. Loebs, you'll be calling that witness?

16               MR. LOEBS:  Yes, they're in the hall.

17               THE COURT:  Okay.  Sir, if you'll come up to the stand

18   to be sworn before you're seated.

19               (Witness sworn)

20               DEPUTY CLERK:  Please be seated.

21               State your full name for the record, and spell your

22   last name, please.

23               THE WITNESS:  My name is Don Stuart, S-t-u-a-r-t,

24   Cameron, C-a-m-e-r-o-n.

25   ///

```
 1   DON STUART CAMERON,

 2          called as a witness by the Defendants,

 3          having been duly sworn, testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. LOEBS:

 6   Q.  Good afternoon, Mr. Cameron.

 7   A.  Good afternoon.

 8   Q.  Sir, what is your occupation?

 9   A.  I own and operate Cameron Consulting, and Cameron

10   Consulting is a physical skills and classroom teaching firm

11   that provides instruction to policing agencies, college

12   districts, security firms, private corporations and the United

13   States military.  And when I say "physical skills," what I'm

14   talking about is what an enforcement person does physically

15   towards their job.  I teach police offices firearms, I teach

16   the use of impact weapons for layperson terms, nightsticks, I

17   teach them physical methods of arrest, how to control people,

18   how to take people down, how to handcuff people, how to search

19   people.  And I do the classroom backup for those areas because

20   basically they have to know when they can use force, and then

21   we show them how to use the force.  They have to know the right

22   circumstances to use the force.

23          I'm also an adjunct faculty member at several criminal

24   justice training centers including Contra Costa County

25   Sheriff's Department, Sacramento training center, and the Napa
```

Cameron – Direct

1   Valley Criminal Justice Training Center.

2   Q.  Mr. Cameron, before we get into the details, I just want to

3   ask you just very generally do you also do consulting work with

4   respect to your understanding of police practices and

5   procedures?

6   A.  Yes, sir, I do.

7   Q.  And did you do work in this case in that regard?

8   A.  Yes, sir, I did.

9   Q.  And without getting into any of your opinions at this time,

10  did you formulate some opinions in this case regarding police

11  practices and procedures?

12  A.  Yes, I did.

13  Q.  Okay.  I asked you what your current occupation is, and you

14  said you work for Cameron Consulting?

15  A.  That's correct, I do.

16  Q.  And that's you?

17  A.  That's me.

18  Q.  You were talking about what "physical skills" mean when you

19  were talking about the teaching that you do.  What is that?

20  A.  Physical skills basically are the physical aspects of law

21  enforcement.  So like I mentioned, firearms, use of impact

22  weapons, physical methods of arrest, vehicle stops, vehicle

23  extractions, building searches, SWAT team tactics.

24  Q.  Before we get into the actual teaching that you do, let's

25  talk a few moments about your background that gave you the

1    ability to be able to impart to others your knowledge about

2    tactics, laws of arrest, physical skills, all right?

3    A.  All right.

4    Q.  What initially gave you some expertise and understanding

5    about what police officers do or should do?

6    A.  I was a police officer for just under 16 years with the

7    Berkeley Police Department.

8    Q.  How many years?

9    A.  Just under 16.

10   Q.  And as a police officer what did you do as a police

11   officer, just in general?

12   A.  I was a patrol officer; I was a field training officer; I

13   was a patrol sergeant; I was acting launch commander; I was in

14   charge of training as a sergeant.

15          I was a background investigator.  I worked

16   plainclothes narcotics.  I worked crimes against persons.

17   Q.  Were you out in the field making arrests?

18   A.  Yes, sir, I was.

19   Q.  You were doing that about 16 years?

20   A.  About 16 years.

21   Q.  What's the next work that you had or if you could expand on

22   that work that gave you some expertise or understanding of

23   police procedures and practices?

24   A.  Well, I have a background in the marshal arts for the last

25   56 years, and when I went into law enforcement, they didn't

1    give us a lot of physical training.  They assumed that we knew

2    how to arrest people.  And, in fact, a lot of the officers

3    didn't.  So based on my martial arts background, I started

4    training officers, first Berkeley and then in the Bay Area, and

5    it kind of ballooned into a business where I trained officers.

6    And at about that same time POST, the Peace Officers Standards

7    and Training was formed, and they were looking for subjects to

8    teach to the officers, and a natural for me was physical

9    methods of arrest.

10   Q.  We're talking about POST.  What is POST?

11   A.  POST is actually an acronym for the California Commission

12   on Peace Officers Standards and Training, and it's a regulatory

13   commission through the State of California that mandates police

14   training, regulates police training, certifies police training,

15   certifies police instructors, and then they're the overseer of

16   the POST basic course, instructor level courses and the service

17   courses.

18   Q.  And you said you had some involvement with working with

19   POST?

20   A.  Yes, sir, I did.

21   Q.  Could you explain what that is?

22   A.  I'm one of the subject matter experts on the areas of laws

23   of arrest, use of force, physical methods of arrest, crowd

24   control.  And what that means is the way the basic course is

25   broken down, it's broken down into 43 Learning Domains.

```
1    Q.  Learning domains.

2    A.  And a Learning Domain basically is a functional area of law

3    enforcement that the Commission has picked out and they say for

4    an officer to do their job, they have to be able to do this.

5    So they have report writing.  They have courtroom testimony.

6    They have dealing with diversities.  They have laws of arrest,

7    use of force, firearms.  They go through the whole gamut.  If

8    it's a classroom portion, it's paper and pencil.  If it's a

9    physical area that I teach, they either have to demonstrate

10   proficiency on the range, they have to demonstrate proficiency

11   with their weapon, they have to demonstrate proficiency with

12   handcuff and takedowns, that type of thing.

13   Q.  Laws of arrest and how to make felony stops, that sort of

14   thing?

15   A.  Yes, sir.

16   Q.  Is that part of the area --

17   A.  That's one of the areas I teach.

18   Q.  And you were talking a moment before how you first got

19   involved working with POST.  Can you explain that?

20   A.  Like I mentioned, POST was a brand-new thing that had just

21   been commissioned by the State legislature and basically in its

22   infant state, they were trying to say exactly what is POST

23   going to do.  And the idea obviously was always that it was

24   going to regulate police training so that all of the training

25   in the State of California would be standardized.
```

1          So if I went to San Diego Police Department at an

2     academy, it had the same format, basic format, as if I went to

3     the Eureka Police Department.  They set a minimum number of

4     hours for each subject matter and every academy has to teach

5     the minimum number, but the academies can opt to teach more

6     than that, but they have to have the minimum and they have to

7     have the minimum of testing.

8     Q.  So POST relates to the standards that the individual police

9     academies in different cities in California have to meet in

10    order to train their police officers; is that correct?

11    A.  That's correct.

12    Q.  And you first said you first became involved with POST when

13    it was first created?

14    A.  Yes, I did.

15    Q.  What was your involvement in that respect; how did you

16    become involved?

17    A.  At that time, I had been teaching police officers the

18    physical skills of impact weapons.

19    Q.  I'm sorry?

20    A.  Physical skills and impact weapons.

21    Q.  Impact?

22    A.  Nightsticks.

23    Q.  Okay.

24    A.  And because I was teaching that, POST came to me and some

25    of the other instructors in the state that did that and said,

1   could I look at some criteria and put together some criteria of

2   what the officers at a minimum need to do to make arrests.  So

3   basically we sat down and started writing standards.  And I

4   have been writing standards ever since.

5   Q.  You say "writing standards."  What do you mean, what are

6   you referring to?

7   A.  It's the Learning Domains.  In other words, as a group of

8   subject matter experts, and usually it runs from about 10 to 20

9   maximum, and POST will bring us up to a location, they'll say,

10  you know, this is what we're looking at.  Okay, at the

11  beginning, they weren't looking at anything really, and we were

12  putting it together.  Now they look at the things and they say,

13  you know, there's new case law, we need to fit that in.

14  There's new standards, we need to fit that in.  There's new

15  equipment, we need to fit that in.

16        So the subject matter experts will examine the old

17  Learning Domain.  If it stands on its own, then we're okay.  If

18  it doesn't stand on its own, then we change it.  But then

19  obviously from us it goes to proofread; from proofread it goes

20  to legal; and from legal it comes back to us to make sure that

21  they proofread it correctly; and then, finally, it goes to the

22  Commission.

23  Q.  So whether you're talking about the POST Learning Domains,

24  these would be essentially the instructional materials that are

25  necessary for certifying police officers and police academies

1   throughout California?

2   A.  Yes, sir.

3   Q.  And you said you had some involvement in helping create

4   those?

5   A.  Yes, sir.

6   Q.  Could you explain to the jury what involvement you had in

7   creating the Learning Domains?

8   A.  Each domain, like I mentioned, has a subject matter expert,

9   and they're not the same subject matters experts because you

10  can't be an expert on everything.  So the areas I deal with are

11  physical methods of arrest, laws of arrest, crowd control, use

12  of force, once in a while I'll be on firearms, but usually they

13  meet at the same time the physical methods of arrest meet, and

14  I like the physical methods of arrest a little bit better.

15          And then other subject matter experts will be doing,

16  for example, report writing.  Or they'll do cultural

17  diversities.  Or they'll be doing chemical a little.  So

18  they'll be doing other things for their committees.  The

19  committees don't meet all the time.  If there's something new,

20  we meet right away.  But we usually meet every two years, and

21  that's sometimes a one-day session, and we'll just look at the

22  standard and say, that standard's still appropriate.  We'll

23  look at it and go, Whew, this one's out of date, spend three

24  days to two weeks rewriting it.

25  Q.  And when you work on rewriting the POST standards with

```
1    respect to use of force, that would then change what would be

2    the standard of certification for academy throughout

3    California?

4    A.   That's correct, provided it's passed by legal.  If we see

5    something that's illegal, we're in trouble.  But if it goes to

6    legal and it comes back to us, then it goes to the Commission.

7    Q.   You mentioned use of force.  Does that include use of

8    lethal force as well?

9    A.   Yes, it does.

10   Q.   Are you saying you had a hand in writing the domain for --

11   as it relates to use of force?

12   A.   Yes.

13   Q.   What role did you have relating to those Learning Domains

14   that relates to use of lethal force?

15   A.   Basically the same.  We look at --

16   Q.   When you say "we," I'm talking about you, Mr. Cameron.

17   A.   Well --

18   Q.   What role did you have?

19   A.   It's the subject matter.  Experts.  In other words, we

20   break down into various committees.  And we say these things

21   need to be approved, these things need to be changed, and then

22   we'll write them down and -- I'll write them down.  Usually

23   have somebody writes better than I do or has a computer that's

24   more proficient than I am and will put those things together.

25   So we literally will take it from the basic use of force, the
```

Cameron - Direct

1    basic concept of use of force, up to and including the use of

2    deadly force.

3    Q.  Did you yourself work on writing the Learning Domains that

4    are currently in effect for the use of lethal force throughout

5    the State of California?

6    A.  Yes, I did.

7    Q.  We've heard some mention of different Learning Domain

8    numbers.  In fact, Learning Domain Number 20 came up earlier in

9    testimony.  What is that domain?

10   A.  That's the use of force.

11   Q.  And when you're talking about your work in writing or

12   helping to write that, are you talking about that?

13   A.  Yes, I am.

14   Q.  What in your background and experience gave you the ability

15   to write the Learning Domain that's used for training all

16   police officers in California?

17   A.  Basically I guess it's my training and experience and my

18   reputation as an instructor.  I've been training police

19   officers now for the last 38 years.  So I've trained a lot of

20   police officers.  Not only in California, I've trained some in

21   the other states.  But I've trained probably thirty to 40,000

22   police officers.  So I have a reputation as a trainer.  I'm

23   interested in training.  I want to make sure that the training

24   is correct, that the officers do the right thing, that the

25   agencies train them correctly.  So with that representation,

Cameron – Direct

1  POST chose me as one of the subject matter experts.

2  Q.  In addition to the Learning Domains, are there also some

3  type of examination that relates to certification for POST

4  certification?

5  A.  Right.  The LD tests, they're called.

6  Q.  LD for Learning Domain?

7  A.  Learning Domain.  And like I mentioned, there's a paper and

8  pencil test that's through a scantron, and then my areas,

9  because they're all physical skills, with the exception of a

10  use of physical force that's a classroom session and it's a mat

11  session.  Like throwing mats.

12  Q.  Hands-on?

13  A.  Hands-on.  Then we test physically and we have a criteria

14  that's verbal commands, awareness, balance, technique, use of

15  force, escalation, deescalation.  And those are our criteria.

16  Q.  When we're talking about physical force, do you also do

17  work related to weapons?

18  A.  Yes.

19  Q.  Firearms?

20  A.  Yes, sir.

21  Q.  What expertise or experience do you have in working with

22  firearms and training police officers and people through POST

23  in the use of firearms?

24  A.  I'm a Federal Bureau of Investigation certified firearms

25  instructor.  I have been since 1974.  I train firearms

1    instructors, survival shooting instructors, basic academy

2    cadets.

3    Q.  We talked a bit about Learning Domain Number 20.  Have you

4    also worked on other domains for certification for all police

5    officers in California?

6    A.  Yes, I have.

7    Q.  Can you explain what those are?

8    A.  I've written LD-33, which is physical methods of arrest.

9    LD-24, which is crowd control.  We talked about LD-20, use of

10   force.  I've worked on the less lethal device committee, but

11   less lethal doesn't have its own Learning Domain.  And less

12   lethal obviously means use of electric stunning devices or

13   what's referred to as the Taser.  Use of impact munitions.  Use

14   of supplementary weaponry that's considered less lethal.

15   Q.  Perhaps we mentioned this briefly before, but in addition

16   to working on writing these Learning Domains, when they

17   initially came out, you said you also do work to make sure

18   they're updated and current in terms of the -- what's necessary

19   to train officers today?

20   A.  Yes, that's correct.  They will call a committee back

21   together, like I said, if they think there's something -- when

22   I say "they," I'm talking about the Commission -- if they think

23   there's something new, brand-new case law that's going to

24   affect the use of force, they'll call us together or they'll

25   call us together right then.  Depending on the domain, we'll

1    get together every year, year and a half.  We never go more

2    than two years.

3    Q.  Now, with respect to the teaching that you've done in terms

4    of use of force including lethal force, can you explain to the

5    jury some of the police organizations or peace officers

6    organizations to which you have actually talked?

7    A.  I basically teach in three venues.  I teach academy

8    students.  I teach in-service officers, which means officers

9    that are already hired.  And I teach instructor level people

10   that are going to go back and either teach at the academies or

11   in their own agencies.

12            I've taught at the Alameda County Sheriff's

13   Department, San Francisco Police Department, Orange County

14   Sheriff's Department; Los Angeles County Sheriff's Department;

15   Berkeley Police Department.  Pretty much all the agencies here

16   in the Bay Area.  And then the central area, down Monterey,

17   Pacific Grove, that area.  Then down south.

18   Q.  And that includes teaching in basic academy, officers that

19   are in service and teaching the instructors themselves?

20   A.  Yes, and in-service officers.

21   Q.  And in-service officers.  For how long have you been

22   engaged in this type of teaching with respect to use of force

23   and in particular lethal force?

24   A.  I have been involved in use of force training for 38 years.

25   I have been involved in the use of deadly force training since

1    1974.

2    Q.  Now, with respect to your knowledge of any changes or

3    developments with respect to what the appropriate training

4    would be for the use of force or lethal force, what do you do,

5    if anything, to stay current as to your knowledge and

6    understanding as to -- just so that you can impart it to the

7    people you teach, in terms of use of force, particularly the

8    use of lethal force?

9    A.  Basically we have a network of instructors that do what I

10   do.  Some only teach lethal force.  In other words, firearms.

11   Others teach physical methods of arrest.  Most teach physical

12   methods of arrest and use of impact weapons.  A lot do all

13   three.  Some are SWAT instructors.

14          I belong to the ASLE, A-S-L-E, the American Society

15   for Law Enforcement Trainers.  I belong to the International

16   Association of Chiefs of Police.  And through those

17   associations they send us out training bulletins, model

18   policies, that type of thing to keep us abreast of what's

19   happening within the industry.

20          And I also do research on my own.

21   Q.  Do the training that you have and the teaching that you've

22   done, does that also relate to how an officer makes an arrest?

23   A.  Oh, yes.

24   Q.  Maybe you could describe in general the broad area in which

25   it relates to the work that you've done and the teaching in the

1  areas that would encompass?

2  A.  Well, like I mentioned, you don't really do an officer a

3  service if, Number 1, you tell them when they can use force but

4  you don't show them how to use force.  And the other end of

5  that is if you show them how to use force but you don't tell

6  them when they can use the force, you don't do them a service.

7  So you have to combine the two.  You say these are the various

8  levels you can use under these circumstances.

9       Then when you leave the classroom, you take them to

10  whatever the training facility is, a firing range, a matted

11  area, that area that has striking dummies, and you say, based

12  on this scenario, give them scenarios, high degree of

13  reasonable suspicion of probable cause, based on these we put

14  out scenarios to them, what level of force can you use and show

15  me how you're going to use that level of force.

16       So we take them actually through the scenarios and we

17  grade them on it.

18  Q.  And when you say "we," that's something you do personally.

19  A.  That's something I do personally.  It's just -- I'm usually

20  teaching with other instructors.  I'm usually the lead

21  instructor.  I always include that as we.

22  Q.  Okay.  How about police pursuits; do you have any

23  understanding about how police pursuits should be done and any

24  expertise in that area?

25  A.  I understand police pursuits, but I don't teach vehicle or

1    emergency vehicle operation.

2    Q.   How about in terms of commands that would be issued by

3    officers when they're making arrests?  Is that something that

4    you have experience in with respect to your teaching?

5    A.   Yes, we have the cadets do that constantly, and in-service

6    people, and obviously instructors because they're going to

7    teach.

8    Q.   In terms of, for example, how you use the radio when

9    there's an emergency, is that something that you're familiar

10   with in your experience as -- in the teaching you've described?

11   A.   Yes, sir.

12   Q.   Now, I want to take a few minutes and talk about the use of

13   lethal force just in general as a concept before we talk about

14   some of the specifics in this case.  And I'll -- when I get to

15   the specifics in this case, I'll do that through a

16   hypothetical?

17   A.   All right.

18   Q.   Now, first, do you have an understanding based on your work

19   and your years of experience as to when it's appropriate for an

20   officer as you teach officers to use lethal force?

21   A.   Yes, sir.

22   Q.   Okay.  And just in general, what are the circumstances in

23   which you would teach officers that it's appropriate to use

24   lethal force?

25   A.   Well, obviously depending on the level, it's all the same.

1    I teach a first-party threat of imminent death or serious

2    bodily injury.

3    Q.  You say you teach a "first-party threat"?

4    A.  Yes.

5    Q.  What is that?

6    A.  First-party threat means a threat to the officer.

7    Q.  So you said "a first-party threat."  That would be a threat

8    to the officer?

9    A.  Right.  Then we -- I teach a second-party threat, which is

10   again a -- an imminent threat of serious bodily injury to

11   others, not just the others but ourselves.

12        Then I teach a third-party threat.

13   Q.  Let's talk about the first-party threat with respect to the

14   officer's use of force.  Can you explain what you teach and

15   instruct through POST and individually how that relates to when

16   an officer can use force?

17   A.  Okay, I teach what I refer to as the light officer

18   standard.  But it's actually an objective, reasonable officer's

19   standard.  That simply means given a specific set of

20   circumstances, what an officer of light training and experience

21   use the same level of force, make the same decision, use the

22   same level of force.

23   Q.  You say you call that an objective standard?

24   A.  Objective reasonable standard.

25   Q.  What do you mean by that?

Cameron - Direct

1    A.   That simply means that, again, an officer has to make an

2    objective, not a subjective; in other words, it's based on the

3    information they had at the time they made that decision.   It's

4    not based on anything later on which we refer to as 20/20

5    hindsight.

6    Q.   How does that relate to the teaching you do 20/20 hindsight

7    in evaluating an officer's use of force at the moment it's

8    used?

9    A.   Well, officers are oftentimes put in tense,

10   rapidly-evolving situations.   They require instantaneous

11   decision-making.   So they can't take time to analyze what's

12   going on; they have to react based on what they've been trained

13   to do.

14          Consequently, if you tell the officers they're not

15   going to judge you on what you found out later on, they're

16   going to judge you on the information you had at the time, and

17   then an officer of similar experience and training were placed

18   in the same situation, would they choose the same course or a

19   similar choice of action.

20   Q.   And that's something that's important to the teaching that

21   you do with police officers?

22   A.   I think it is, yes.

23   Q.   And why is that?

24   A.   Because an officer had to say they're going to be

25   second-guessed every time they use any level of force, whether

1    they use their hand, impacted weapons, whatever they use, then

2    they're not going to use force, particularly deadly force.  And

3    the result is that either themselves or another person is going

4    to get injured or killed.

5    Q.  Why is that?

6    A.  Because if I wait too long to use force, then I'm playing

7    catch up.  And you know a lot of times I can't catch up.

8    Q.  And is that -- when you say a lot of times you can't catch

9    up, we'll talk about that in a minute.  Is that part of the

10   reason that officers go through the training they do to try to

11   be able to evaluate those emergency decisions?

12   A.  Oh, yes.

13   Q.  Can you explain that?

14   A.  Certainly.  In other words, particularly at the academy

15   level, but you've got to reiterate it with the in-service

16   people, they don't know anything about force, really, for the

17   most part.  They don't know what their authorization to use

18   force is.  They don't know what type of force they can use.

19   They don't know how to use the force.  So it's important for

20   them to understand the concept of force, but it's also

21   important for them to understand that if they don't use force

22   at this point, basically things are going to end up, in most

23   cases, get worse for them, for the citizenry.

24   Q.  You said for them and the citizenry?

25   A.  Uh-huh.

1    Q.   Before going on to talking about the third-party and the

2    second-party threat and the third-party threat, you said

3    something about how it's difficult to catch up if they don't

4    make a decision when they need to make it.

5    A.   That's correct.

6    Q.   What do you mean by that?

7    A.   It depends on what level of force they're using.  If, for

8    example, I were doing a probable cause arrest, and to make an

9    arrest I put my hand on you, that's a given fact.  So if I put

10   my hand on you and I say, You're under arrest, and you start to

11   tighten up on me and I don't do anything to stop you from

12   tightening it, then it starts to escalate.  Then you start to

13   pull away.  I don't do anything.  So now you can -- you start

14   trotting away.  And I don't do anything.

15           Whereas, in the onset, if I put my hand on you and you

16   tighten up and I put you in a control hold and say, Relax, and

17   I exert a little pain influence over you, and I say, I'll stop

18   hurting you if you relax and calm down.  Then I'm not catching

19   up.  I'm initiating the arrest I originally had the authority

20   to do.

21   Q.   When you're training officers with respect to force,

22   strictly lethal force, do you involve yourself at all in the

23   reaction time issues?

24   A.   Yes, I do.

25   Q.   Do you have any expertise as to that?

1   A.  Yes, sir, I do.

2   Q.  Can you tell us how, if at all -- first, what is reaction

3   time?

4   A.  Reaction time is the time -- it deals with brain lag.

5   Reaction time, all of those buzz words.  But basically it means

6   how long it takes you to perceive a threat and react to the

7   threat.  Okay.  A lot of the studies I won't say are flawed,

8   but, for example, in a shooting situation, if I had the

9   officers on the range and I had what's called a Pro Timer, and

10  a Pro Timer is simply a stopwatch, when I set the button it

11  sets off the buzzing signal and it's sound-sensitive.  So when

12  the officer shoots their gun, it shuts off the stopwatch and

13  you know how long it took the officer to react.

14          But it's a little bit flawed because in those

15  scenarios, if I have a Pro Timer in my hand and the officer has

16  a gun in their hand, then that they're going to shoot the gun.

17  So they've already anticipated they're going to shoot the gun.

18  In a live situation they never know what, when they're going to

19  have to shoot the gun.  So they tend to be slower in a live

20  situation than they do in a training environment.

21  Q.  When you were talking about timing with a stopwatch, where

22  they say, Okay, we're going to check your reaction time, have

23  your gun out and ready, and we say "go" and have you shoot?

24  A.  We actually go on a buzzer.

25  Q.  And they try to shoot as close as they can to the buzzer.

1    And you say that's not very realistic in terms of an officer in

2    the field in terms of issues related to reaction time?

3    A.   It's not.  I mean, it gives them a general, general idea of

4    how long it takes somebody to react, but it takes them longer

5    on the street to react because on the street they never know

6    when they're going to shoot.

7    Q.   They don't have a buzzer saying --

8    A.   There's no buzzer.

9    Q.   Is it because essentially their mental process is figuring

10   out what to do?

11   A.   Exactly.  In that case, with the buzzer, they don't have to

12   perceive anything.  They don't have to look at anything, they

13   don't have to have any feedback to the brain sending the

14   impulse out to shoot.  All they have to know is when it buzzes,

15   I pull the trigger.

16   Q.   How does this relate to the training you do with police

17   officers, the reaction time issue, why does that matter?

18   A.   It's important for them to understand reaction time because

19   they're always going to be playing catch up.  In other words, I

20   may have my gun out.  And you don't have a gun out.  But all of

21   a sudden -- you being the police officer.  I may have my gun

22   out.  The individual I'm dealing with may not have a gun out,

23   or they may have their hand behind their back.  Or they may

24   have their back to me with their hands out of my view, and

25   suddenly the person has a gun, turns around very quickly.  If I

1    wait until I see the gun, the best I can ever do is I can tie

2    him.  In other words, we can shoot at the same time.  And in a

3    gun fight, a tie is no good.

4    Q.  So you actually do specific training with officers as to

5    whether they believe someone might be doing something

6    associated with trying to get a weapon as to whether they

7    should wait to see that weapon before they fire?

8    A.  Oh, yeah.  We do what's called simunition training.  And

9    simunition training is mark the bullets that go in the gun,

10   except we change the barrel for obviously safety reasons, and

11   then the officers wear protective suits, both the officer and

12   the individual playing the suspect or the suspects, and we put

13   them through various scenarios, a lot based on Lewinski

14   studies, a lot based on factor studies, a lot based on our own

15   studies.  And we'll have the suspect with their back to the

16   officer, the officer giving the suspect demands, and all of a

17   sudden the suspect will turn, and if the officer waits to see

18   the gun, they'll either lose or the best they can do every time

19   is tie.

20   Q.  Which is a loss?

21   A.  A tie is a loss.

22   Q.  And you mentioned the Lewinski studies.  Does that relate

23   to your opinions with respect to reaction time?

24   A.  Yeah.  Basically what Lewinski did is take suspects in all

25   positions and postured shooting over their shoulder, left hand,

Cameron – Direct

```
1    right hand, running suspects, shooting with their right hand,

2    to see how long it took the suspect to shoot and the officer to

3    react.  And probably 99 percent of the studies the officer

4    always lost.  In other words, if the officer waited until the

5    suspect drew their gun back, the officer would lose.

6    Q.  What percent?

7    A.  About 99 percent of the time.  If the officer reacted when

8    the suspect started to turn, then the officer could win.

9    Q.  And that's part of the training you do with police

10   officers?

11   A.  Oh, yes.

12   Q.  So, for example, let's say that an individual has maybe

13   just committed a bank robbery with a weapon and they're

14   standing out with their hands up and the officer is attempting

15   to facilitate arrest.  Standing up, seeing there's no gun in

16   their hand.  And let's say they make a move to inside their

17   jacket.  How would reaction relate to the way you would train

18   an officer in terms of what they should do to respond to that?

19   A.  It would be based on the reaction time that they already

20   would have been trained in.  And then we say, Are those

21   movements consistent with a movement that can produce a gun?

22   And if those movements are consistent with a movement that can

23   produce a gun, then you have to make the shooting decision.  I

24   can't tell you as the instructor to shoot every time.  But I

25   can give you information to make an intelligent decision.
```

```
 1    Q.  Now, when you're training police officers, do you talk with

 2    them about the different situations that might develop and how

 3    they might have a belief, whether someone is armed or is not

 4    armed, and how that might relate to how much of a chance, for

 5    lack of a better term, they're going to give the individual in

 6    terms of any movement they make?

 7    A.  That's correct.

 8    Q.  So let's say just, hypothetically, we have a situation

 9    where an individual has been involved in a high-speed pursuit

10    and the pursuit started because the individual was threatening

11    a woman with a gun.  And during that pursuit, that individual

12    fired twice at the pursuing police officers with his weapon.

13    And then at some point towards the end of the pursuit, that

14    individual was outside of the vehicle and his hands could be

15    seen.

16           In terms of that factual scenario and the training you

17    might do with police officers, what will you train them in

18    terms of how they should be reacting to any movement by that

19    individual from his hands in a raised position?

20           MR. GALIPO:  I'm going to object as vague as to the

21    type of movement.

22           THE COURT:  Overruled.

23    A.  Again, it depends on what the officer perceives.  In other

24    words, if I told you to do something, for example, I say,

25    again, "Get down on the ground," and you keep showing me the
```

1   hands and you start tipping forward and slowly go down on the

2   ground, that's fine, because you're doing what I asked you to

3   do.

4           On the other hand, if I tell you to go down on the

5   ground and you have the hands up in front of you and those

6   hands go anywhere else, down here, down here, toward the

7   waistband, towards the back (indicating), then again, from my

8   perspective as an instructor, I say, Remember the lag time

9   studies we talked about?  Are his movements consistent with the

10  movements that could produce a gun?  And if a gun is produced

11  and you wait to see it, what's the best you can do?  And

12  hopefully they remember their training and say, The best I can

13  do is die.

14  Q.  And, again, with your hypothetical, say, an individual has

15  their hands up, they're being told to get to the ground,

16  they're being told to keep their hands up, and instead, they

17  had move either one or both hands to their waistband?

18  A.  That's a shooting decision.  Again.  And again, I talk

19  about the lag time and tell the officers that they better not

20  wait to see a gun.

21  Q.  Let's say same situation, individual moves his hands down

22  to the waistband and starts moving them upward?

23  A.  Same thing.

24  Q.  When you say "same thing," what you mean by that?

25  A.  At that point an officer should make a shooting decision

1   because again the shooting decision is made based on the

2   information the officer had at the time.  All right.  In that

3   scenario that you presented, with the hypothetical you

4   presented, the officer doesn't know where the gun is, and if

5   they wait to see where the gun is, again, the best they can do

6   is a tie.

7   Q.  Now, when you said that the officers need to rely on the

8   information that they have at hand, that they know, did you say

9   something similar to that?

10  A.  Yes, I did.

11  Q.  With respect to what you teach officers as to what they can

12  rely on, does it relate to just things that they personally

13  observed?

14  A.  No, oh, no, not at all.

15  Q.  Can you explain that?

16  A.  Certainly, the whole concept of police work, and that's the

17  reason police originally got radios is that they communicate

18  with one another.  If you couldn't rely on what another officer

19  said or you couldn't rely on what your dispatcher told you over

20  the air, then police officers would rarely arrest anyone

21  because they'd have to on view everything.

22  Q.  On view?

23  A.  On view.  In other words, you'd have to see the crime.

24  There'd be a lot of injured police officers and a lot of

25  injured civilians if you had to rely on the fact that I have to

1   see the knife or see the gun, see you attacking the person

2   before I can take any action.  That's the whole concept of why

3   police have sophisticated communications so that they can

4   communicate with one another.

5   Q.  You're saying that -- let's say in a police pursuit if one

6   officer hears over the radio that the individual that's being

7   pursued has fired at police officers in the pursuit, whether

8   that officer then later encounters that individual, you're

9   saying they can have that in their memory bank as far as what

10  that individual's done?

11  A.  Certainly, that's all part of the information that they've

12  achieved or got.

13  Q.  Now, going back to what you were talking about in terms of

14  first-party, second-party and third-party threat, can you

15  explain to me what you would teach to officers as to what the

16  standard would be when they could use lethal force when they

17  themselves as a first party feel that they're threatened?

18  A.  It's based on the information they have at the time.  Would

19  an objectively reasonable officer consider that the person

20  posed a threat or imminent threat of death or serious bodily

21  injury to the officer?  So they have to make the fair

22  preposition -- or proposition.

23  Q.  And with respect to second-party threat that would be the

24  threat to someone else?

25  A.  It's the same standard, right.

Cameron – Direct

1   Q.  But it has to do with somebody else.

2   A.  Right, somebody else.

3   Q.  And as to the third-party threat, I understand that's a

4   little bit different than two concepts you just talked about?

5   A.  It is.

6   Q.  What do you mean by the "third-party threat"?

7   A.  Basically two prongs.  The first prong is the fleeing felon

8   rule.  In other words, for the fleeing felon rule to be

9   invoked, the person obviously has to be a dangerous felon, and

10  they have to be fleeing from the officer.

11  Q.  Have to be a dangerous felon and they have to be fleeing?

12  A.  From the officer.  And they can be fleeing on foot or in a

13  vehicle.  It makes no difference.  And the same standard

14  applies.  If the officer, based on the information that he or

15  she has, would consider that the person posed an imminent

16  threat of death or serious bodily injury to others because of

17  their getting away, then the officer again can use deadly

18  force.

19  Q.  With respect to the fleeing felon rule as far as you teach

20  police officers, do they have to have the same sort of belief

21  as to the imminent threat of the individual or does it relate

22  to the individual's escape?

23  A.  It's based on the severity of the crime and the

24  circumstances that the officer originally responded to.  It's

25  based on a threat to the officer or others.  It's based on why

1    the person is trying to flee or evade arrest.  It's based on

2    time considerings, that may change, the circumstance that the

3    officer's facing at the time.  And obviously it's based on if

4    the officer has other alternatives.

5    Q.  Let me see if I can give you an example and see if this

6    works with respect to the fleeing felon rule if we can

7    illustrate it.  It's an officer, hears over the radio or

8    observes in person a bank robbery has occurred and someone has

9    been injured or killed in the course of the bank robbery, and

10   the suspect is seen leaving the bank by the police officer.

11   And the suspect is then, is armed but maybe he takes the gun,

12   throws it away in the car, then gets in the car and begins to

13   drive off.

14        Would the fleeing felon rule apply in any way to that

15   scenario?

16   A.  Yes, sir.

17   Q.  How so?

18   A.  Because -- that's why it's not in any of the courts, I

19   don't think, but we say project, what the officer's doing is

20   projecting, the person who committed that type of crime

21   involved in the possible injury to somebody, and they're now

22   trying to flee the scene, there's nothing that's going to stop

23   them from continuing to commit crime.  And that's the

24   projection.

25   Q.  In that situation, would it be appropriate for an officer

1   to use lethal force to stop that individual from escaping?

2   A.  Yes, it would.

3   Q.  Even if the individual wasn't pointing a gun at anyone but

4   was getting in a car and driving off?

5   A.  That's correct.

6   Q.  Okay.  Now, you said there was another aspect to the

7   third-party threat.  I think we talked about the fleeing felon

8   rule.  What other aspect are you referring to?

9   A.  Hot pursuit.

10  Q.  What do you mean by that?

11  A.  With a fleeing felon you don't have to have a vehicle.  You

12  can be on foot.  Hot pursuit you have to have a vehicle.  And

13  it's when officers attempt to initiate a stop and someone

14  initiates a hot pursuit trying to get away from the officer and

15  they don't yield to the officer's red lights and siren.  And

16  the officer can say, If I don't terminate this pursuit at this

17  point, it may result in injury or death to citizens, my

18  standards.

19  Q.  You're saying hot pursuit is the same thing as high-speed

20  pursuit?

21  A.  It is a high-speed pursuit.  I mean, I've seen low-speed

22  pursuits, but it's high speed.

23  Q.  You're saying that an officer as you've trained them in

24  throughout California through POST, can use lethal force to

25  stop someone that's engaged in a high-speed pursuit and failing

1  to yield to the police?

2          MR. GALIPO:  Vague as to point in time as to when he

3  trained on a hot pursuit.  Before or after the date of this

4  incident.

5          THE COURT:  No, I'll overrule.

6          You may answer.

7  A.  Okay.  I trained the officers in that concept.  I have

8  always trained in the fleeing felon concept.

9  Q.  We're talking about the hot pursuit concept, you identified

10 that as being somewhat different?

11 A.  That's correct.

12 Q.  With respect to the hot pursuit concept in terms of how

13 you've trained officers, how does that relate to the situation

14 I've just described where there is a hot pursuit, the

15 individual is failing to yield, and the officer believes that

16 if he doesn't use lethal force to stop that pursuit, it may

17 endanger the lives of others.  How do you train officers with

18 respect to that situation?

19 A.  They actually -- that's why I listed them together.  They

20 actually overlap.  Because technically the person's using a

21 vehicle as a potential deadly weapon.  So you do have a fleeing

22 felon.

23 Q.  Okay, I see.  So in that circumstance that I just

24 described, with someone in a vehicle in a hot pursuit, failing

25 to yield to police officers, and the officer reasonably

1    believes that the vehicle if it continues in the pursuit may

2    kill innocent bystanders, you train officers that it would be

3    appropriate to use lethal force to stop that pursuit?

4    A.  I do, yes, sir.

5    Q.  Again, that would be regardless of whether the individual

6    had a gun or was using a gun?

7    A.  That's correct.

8    Q.  And would that also be regardless of whether that

9    individual had committed any type of violent crime before the

10   pursuit started?

11   A.  That's correct.

12   Q.  One quick question before I get into hypotheticals related

13   to the facts of this case:  You have experience with firearms.

14   A.  Do I have experience in firearms?

15   Q.  Yes, sir.

16   A.  I'm a firearms instructor.

17   Q.  Do you have experience in rapid fire shooting?

18   A.  Yes, sir.

19   Q.  In your experience do the bullets tend to rise in rapid

20   firing situation?

21   A.  Yes, they do, because of the recoil.

22   Q.  Now, I'm going to ask you some questions related to --

23   hypothetical questions related to this incident.

24             MR. GALIPO:  I apologize for a late objection, but

25   I'll object as vague as to the bullets rising, what that means.

1    Q.   When you're talking about the recoil and the shots rising,

2    what are you referring to?

3    A.   When you fire, particularly with a semi-automatic pistol,

4    even if you have a really good, solid base, the gun tends to

5    come back and move slightly up.  Okay.  The more stable my base

6    is, the less rise I have.  But as I shoot, if I start low,

7    they're going to start going higher with each shot.

8    Q.   When you say going up higher, that would be the

9    trajectories of the bullets?

10   A.   That's correct.

11   Q.   I want to ask you some questions related to this --

12   hypothetical questions.  I want you to assume that in

13   San Francisco there was a situation in which a call went out on

14   the police radio that a woman had been threatened with a gun.

15   And an officer's hearing this call, attempted to respond where

16   he thought the individual might be.  That the call described

17   the individual threatened a woman with a gun as a black male

18   wearing a white do-rag driving a black Blazer.  Do you have

19   that in mind?

20   A.   Sure.

21   Q.   Further assume that an officer spotted a vehicle of that

22   description and pulled in behind the vehicle, and before the

23   officer put his lights and sirens on, the vehicle took off in

24   San Francisco.

25   A.   Okay.

1    Q.  And then the officer then put out a description and started

2    a pursuit of the vehicle.  Do you have that in mind?

3    A.  Yes, sir, I do.

4    Q.  And that the pursuit went through different parts of

5    San Francisco, and at some point other officers joined in the

6    pursuit as the pursuing officer was calling out the directions

7    of the pursuit.  Do you have that in mind?

8    A.  Yes, sir, I do.

9              THE COURT:  If you're going to put a board on the

10   easel in that area, put it back a bit so Mr. Galipo will have a

11   decent line of sight.

12   Q.  Using Exhibit T-5, have you seen this before, Mr. Cameron?

13   A.  Yes, sir, I have.

14   Q.  Okay.  Just to help facilitate the hypothetical question

15   and understanding the nature of the pursuit, I'm going to use

16   this diagram of the pursuit in San Francisco.

17   A.  Okay.

18   Q.  Do you have that in mind?

19   A.  I have that in mind.

20   Q.  So when the officer first picks up the vehicle that matches

21   the description that was given out over the radio, it starts

22   about in this location on 8th Street.  Do you have that in

23   mind?

24   A.  Yes, sir.

25   Q.  Are you familiar with San Francisco?

Cameron – Direct

1    A.  I was born and raised in San Francisco.

2    Q.  And the pursuit goes through Haight Street, goes through

3    Divisadero, and at that point a second vehicle joins the

4    pursuit.

5    A.  I believe so, yes.

6    Q.  And then the vehicle continues in a high-speed chase to the

7    area of Broderick Street.

8    A.  Yes, sir.

9    Q.  All right.  And then I want you to assume at that location

10   that the pursuing officer is shot at by the driver of the

11   vehicle.  That the driver of the vehicle with his right hand

12   puts his gun out of the window and fires at the pursuing

13   vehicle, and the officer announces over the radio, "Shots

14   fired, shots fired, he shot at me."  Do you have that in mind?

15   A.  Yes, sir I do.

16   Q.  And that officer continues in the pursuit as there's a

17   vehicle behind him, going to Grove Street and then turning up

18   to Scott Street, at which time the driver of the vehicle fires

19   a second round at the pursuing vehicles.  Do you have that in

20   mind?

21   A.  Yes, sir.

22   Q.  I want to stop at this point and ask you a question about

23   Code 33.  Do you understand what that is?

24   A.  I certainly do.

25   Q.  What is that?

1    A.   Code 33 basically means emergency traffic, clear the air.

2    Q.   What's the significance of that in a pursuit such as I've

3    described in the hypothetical?

4    A.   Well, you have obviously shots fired, you have a critical

5    situation.  What you don't want to do is have other officers

6    come on the air and say, I'm at this location, I'm at that

7    location, because they tend to step on the officer that's

8    initiating the pursuit.

9         And shots have been fired, you want to have him to

10   have command of the air so he can give out more information; in

11   other words, where the vehicle's going, whether he's been hit

12   or not, if a citizen has been hit or injured.  So he has to

13   have the air and the other officers have to stay off the air.

14   And that's one of the radio codes that's pretty much universal

15   throughout California, is a Code 33.  Guard your air.  Don't

16   say anything.

17   Q.   Is that important for safety reasons for the officers?

18   A.   It's more for safety reasons for everyone.

19   Q.   And if someone else got on the air with something that

20   wasn't as important as the lead officer's pursuing directions,

21   might they lose the vehicle?

22   A.   Oh, yeah.

23   Q.   Might important information not be imparted to the other

24   officers?

25   A.   That's correct.

Cameron - Direct

1    Q.  I want you to further assume that the pursuit continues

2    from Scott up to Turk Street?

3    A.  All right.

4    Q.  And at this point, we have another group of police

5    officers, and generally they're stopped at Pierce heading north

6    on Pierce.  Do you have that in mind?

7    A.  I do.

8    Q.  This would be -- these would be officers in an unmarked

9    unit.

10   A.  Okay.

11   Q.  And that the officers in the unmarked unit have heard the

12   entire radio broadcast up to that point.

13   A.  All right.

14   Q.  And they're attempting to respond to assist the pursuing

15   officers.

16   A.  All right.

17   Q.  And the officer -- let's say the driver of this vehicle

18   sees the pursuit coming his way the wrong way down Turk Street

19   at speeds around 50, 60 miles an hour?

20   A.  I understand that.  Okay.

21   Q.  Are you familiar with Turk Street?

22   A.  Yes, I am.

23   Q.  When I say the "wrong way," it would be a one-way street

24   and would be going the wrong way down both directions.

25   A.  I understand.

1   Q.  And this individual's already fired twice at pursuing

2   police officers.

3   A.  Yes, sir.

4   Q.  And I want you to further assume that the driver of the

5   vehicle at this intersection of Pierce and Turk takes his gun

6   out and aims one shot at the oncoming vehicle and fires one

7   shot not at the vehicle but at the driver in order to terminate

8   that pursuit.

9   A.  Okay.

10  Q.  Do you have that in mind?

11  A.  I do.

12  Q.  With that factual scenario, Mr. Cameron, based on your

13  training and experience, how would that relate to the training

14  that you provide for police officers as to whether that would

15  be an appropriate time to use lethal force to stop that -- the

16  driver of that vehicle?

17  A.  I think based on all the information the officers received

18  at that point -- that the individual threatened the female with

19  a gun, that they're in a high-speed pursuit with him, that he's

20  fired back at a police officer on two occasions, that he's

21  obviously very recklessly driving the wrong way down, in this

22  case, Turk Street -- that constitutes a variety of things:

23  First-party threat, second-party threat, fleeing felon.  So

24  it's all the categories, and the officer's perfectly

25  appropriate in attempting to terminate the pursuit by

Cameron - Direct

1    terminating the driver.

2    Q.  So in your training the police officer, if you were

3    reviewing that factual circumstance, what would you say as to

4    whether it was appropriate or not for the officer to fire a

5    round at the driver in an the attempt to stop the pursuit?

6    A.  Perfectly appropriate.

7    Q.  You mentioned the fleeing felon rule.  Would that apply?

8    A.  Yes, sir, it would.

9    Q.  How about the high-speed pursuit rule?

10   A.  Yes, sir.

11   Q.  That would be applied?

12   A.  Yes, sir, it would.

13   Q.  In your mind, how close of a call is it whether the officer

14   would be justified in using lethal force?

15            MR. GALIPO:  I'll object as to use of the term "how

16   close of a call."

17            THE COURT:  Overruled.  I think it's not a close call

18   at all.  I think it's very appropriate at that point.

19   Q.  Now, I'm going to ask you a few questions about that

20   hypothetical and a few different aspects of that.  Do you have

21   that in mind?

22   A.  I do.

23   Q.  Let's say, hypothetically, that the officer who fired this

24   shot never actually saw the individual shooting but just heard

25   over the radio that the driver of the SUV was shooting at

1    pursuing police officers.  Would that make any difference in

2    your mind?

3    A.  Not at all.  Officer's operating on that information and

4    belief.

5    Q.  Let's say, hypothetically, that the driver of the police

6    vehicle at the time he saw the pursuing vehicle was not 100

7    percent sure that there wasn't a passenger, let's say, hiding

8    in the back seat that he couldn't see.

9    A.  Really makes no difference.

10   Q.  Why not?

11   A.  Because you've got a fleeing felon.  You got the individual

12   that attempted to murder a police officer.  You've got somebody

13   that's totally disregarding the rules of the road and the

14   citizens that are on the road.

15   Q.  Let's say that we have a situation where officers, before

16   they could use lethal force as the situation we just described,

17   had known absolutely, 100 percent, that there were no people

18   hiding in the back seat.  How would that affect the officer's

19   ability to act as a police officer?

20          MR. GALIPO:  I'll object as mischaracterizing the

21   witness's testimony as phrased.

22          THE COURT:  I'll sustain.

23   Q.  How would it affect the police officer's ability to do his

24   job that before he could fire his shot in that situation the

25   officer had to be 100 percent sure there was no one hiding in

1    the back seat?

2    A.   They'd never be able to do their job.

3    Q.   Why not?

4    A.   Because they'd always be second-guessing themselves, and

5    saying, Gee, I wonder if somebody's in there and I shouldn't

6    shoot; and, consequently, you let a fleeing felon get away.

7    Q.   And I wanted to add a hypothetical that never at any point

8    during the radio call or the chase did anyone ever say there

9    was another individual in the vehicle, that never at any point

10   did the officer who fired the shot see more than one individual

11   in the vehicle, other than the driver; and that when the

12   officer announced, "Shots fired, shots fired, he shot at me,"

13   assuming those facts, if an officer is in a position that we

14   described, seeing the vehicle going, say, 50, 60 miles an hour

15   the wrong way down Turk with vehicles in pursuit, in your mind,

16   would it be reasonable for that officer to think that there is

17   one occupant in the vehicle?

18   A.   I think it would be very reasonable.

19   Q.   With the hypothetical I just gave you, if the officer

20   did -- if his shot was successful and he did strike the driver

21   and incapacitate him -- first of all, let me ask you this:

22   When an officer is using lethal force, they are trained to stop

23   the threat or shoot to kill?

24   A.   They're trained to stop the threat.

25   Q.   What's the difference?

1    A.   If I trained you to kill, it would be a harder thing to do,

2    Number 1, but there'd be no reason to do that.  We train

3    officers to stop the immediate threat.  Once the threat stops,

4    there is no reason to continue to use deadly force.

5    Q.   So let's say in this situation that the officer's, his shot

6    is successful and he does strike the driver of the vehicle, in

7    your analysis is there some risk that the vehicle might go out

8    of control at that point?

9    A.   There could be.

10   Q.   How does that relate to your opinion as to whether or not

11   the use of lethal force against the driver would be appropriate

12   in that circumstance?

13   A.   I still think it would be appropriate.  If you can stop the

14   vehicle from doing the things it was doing, shooting at police

15   officers, perhaps hitting civilians on the street, or running

16   into, say, a family of six in a Volkswagen coming the right way

17   down Turk Street, and you weigh that against the fact that I

18   incapacitate the driver, the driver crashes into a pole,

19   crashes into a wall, I think one outweighs the other.

20   Q.   In the factual scenario I just gave you, this driver who's

21   just been fleeing through San Francisco, going the wrong way on

22   occasion, at this point driving the wrong way 50 to 60 miles

23   down Turk, would you say that individual at that point was

24   driving under control?

25   A.   Not at all.

1    Q.  Let say, hypothetically, in the same situation, through

2    good fortune or whatever, through the time of the pursuit, even

3    though the individual almost hit a bicyclist, went on the left

4    of a MUNI bus, crossed over the dividing line at Divisadero,

5    was going the wrong way down Scott Street, fired twice at the

6    police officers and is going the wrong way down Turk at about

7    60 miles an hour, but at that point, no one had been injured,

8    would it be reasonable for the officer at Pierce and Turk to

9    assume that no one would be injured by the contact with this

10   driver?

11   A.  No, not at all.

12   Q.  You talked before about the importance of officers being

13   able to make decisions when it's necessary to use lethal force.

14   A.  Yes, sir.

15   Q.  In terms of the decision that this officer would have made

16   at this time in the hypothetical, how would that relate to your

17   opinion about the ability of officers who are well trained to

18   make split-second decisions?

19   A.  Well, based on the information that he had at the time,

20   he's made a split-second decision that he's going to take a

21   shot at the driver and hopefully incapacitate the driver.

22   Q.  Now you specified a shot at the driver as opposed to a shot

23   at a vehicle.  Why did you do that?

24   A.  Well, Number 1, there's no handgun around me that can

25   penetrate the engine block of a –– to stop a car, and there's

1   no handgun around me that can take a tire out of a car.

2   Q.  I watch in movies all the time where they shoot the tires

3   out.

4   A.  That doesn't work in reality.

5   Q.  Okay.  So when you're training officers, do you train them

6   in this sort of situation that they shoot to disable the

7   vehicle?

8   A.  No, they shoot to disable the driver.

9   Q.  I would assume further in this hypothetical I just gave you

10  that when the officer took the shot, and it would have been

11  after the two previous shots had been fired by the driver of

12  the SUV, that the officer made the decision not to go on the

13  air and announce to the pursuing officers or anyone else that

14  was listening that he had actually fired the shot at Pierce and

15  Turk.  How would that fit in with your understanding of how you

16  train police officers?

17  A.  That fits in with the Code 33.  I mean, if he had hit the

18  driver and the vehicle was coming to a stop, then certainly he

19  would go out on the air and say, I shot the driver, the vehicle

20  is coming to a stop, or, I shot the driver and the vehicle

21  crashed.  But they're still under the Code 33.  He didn't stop

22  the driver and the vehicle still continued the reckless driving

23  it was participating in.

24  Q.  Say, hypothetically, that in the officer's mind he was

25  thinking that his shot, which would have been the third shot in

1  this pursuit, was not important enough information to go out on

2  the air and possibly interrupt the transmission by the pursuing

3  officer, would you believe that would be an appropriate

4  decision for that officer to make?

5  A.  I think that was a good decision.

6  Q.  I want you to further assume with respect to this

7  hypothetical that after this officer took this shot at Pierce

8  and Turk, he in his vehicle followed the pursuit down Turk

9  Street, until the pursuit got to Webster Street and then

10  Buchanan, and then the officer with his partner continued down

11  Eddy Street and then got on Laguna, took a right on Laguna, and

12  then eventually at some point this officer stopped his vehicle

13  right near Larch, the beginning of Larch.  Do you have that in

14  mind?

15  A.  I do.

16  Q.  Hypothetically, assume that from the time the officer fired

17  the shot, that he did not take his gun and pause and put it in

18  his side holster, undoing his seat belt before, engaged in the

19  pursuit; rather, keeping his weapon out so he could be involved

20  actively in the pursuit.  Do you have that in mind?

21  A.  I do.

22  Q.  How would that fit within the training that you would

23  provide for a police officer with respect to appropriate use of

24  firearms?

25  A.  I think you're dealing with a major crime in progress.  And

1   you don't want to delay by trying to holster your weapon at

2   that point.  I mean, a semi-automatic pistol is a safe pistol,

3   in that mode.

4   Q.  So in your training, would you at all fault the officer for

5   keeping his weapon out until -- all the way until he arrives at

6   the Larch Way entrance that I described?

7   A.  No, not at all.

8   Q.  Now I'm going to ask you to assume some additional facts

9   with respect to a hypothetical, and that is that when the

10  pursuit continues and the individual driving the SUV failed to

11  yield in any way when the officer fired at the driver, and the

12  pursuit continued down Turk, again still at high rates of

13  speed, left on Webster, right on Eddy, then into Buchanan

14  Street.  Do you have that in mind?

15  A.  I do.

16  Q.  And for the rest of my discussion about the pursuit, I want

17  you to assume that at the time of this incident, from when the

18  vehicle turns onto Buchanan until later when the ambulance is

19  called after the last series of shots are fired, that 96

20  seconds transpires.

21  A.  Okay.

22  Q.  The rest of what I am talking about happens within a span

23  of 96 seconds.

24  A.  All right.

25  Q.  Mr. Cameron, I'm going to show what's been admitted in

Cameron - Direct

1    evidence as V5-01, and this is just a top view of Larch Way so

2    you can have the hypothetical facts in mind.

3    A.   Okay.

4    Q.   And you understand the left side, this would be Buchanan?

5    A.   Yes.

6    Q.   And on the right-hand side, my right now, this would be

7    Laguna?

8    A.   Yes, sir.

9    Q.   And this would be an overhead view of the small street of

10   Larch?

11   A.   Yes.

12   Q.   Do you have that in mind?

13   A.   I do.

14   Q.   Let's assume, as we were describing before, that the

15   officers' in the unmarked unit, the driver goes to this area

16   I'm pointing to on the right-hand side of Laguna and brings his

17   vehicle to a stop.  The officers' vehicle.

18   A.   All right.

19   Q.   And at that point, the officers wait and see if the pursuit

20   comes through Laguna, so he pauses at that point so as not to

21   be running -- hit by the pursuit.  Do you have that in mind?

22   A.   I do.

23   Q.   And at that point, the passenger officer exits the vehicle.

24   A.   All right.

25   Q.   And now for the next few hypotheticals I'm going to focus

1    on the passenger officer.  Do you have that in mind?

2    A.  I do.

3    Q.  We'll call him Officer O'Malley.

4    A.  Okay.

5    Q.  So, hypothetically, then Officer O'Malley gets out of the

6    vehicle and he runs up the south side of Larch.

7    A.  Okay.

8    Q.  I guess I said south pointing to north.  The north side of

9    Larch.

10   A.  Okay.

11   Q.  Looking at Exhibit F-9, I want you to further assume that

12   Officer O'Malley, who runs up the north side of Larch, gets to

13   the location that I have that's indicated here that has a tree

14   in it behind this red car.  Do you have that in mind?

15   A.  I do.

16   Q.  And at that location, the -- Officer O'Malley sees the

17   driver in the SUV.

18   A.  All right.

19   Q.  And the driver in the SUV is not even in this location or

20   this location (indicating), but is stopped somewhere behind the

21   vehicle here, sort of the shadow vehicle in F-9.

22   A.  All right.

23   Q.  And that Officer O'Malley in that location yells, orders

24   the driver of the SUV to show his hands.

25   A.  Okay.

1   Q.  The driver's right-hand window is down.  The driver makes

2   eye contact with Officer O'Malley.  The driver looks in his

3   mirrors, which would give him a view of the vehicles, the

4   police vehicles behind him.  And then the driver of the SUV

5   does not raise his hands as ordered by Officer O'Malley but

6   instead begins to drive his vehicle forward.

7   A.  All right.

8   Q.  And at that point, Officer O'Malley makes a decision to

9   shoot to stop the driver of the SUV.  Do you have those facts

10  in mind?

11  A.  I do.

12  Q.  Assuming those hypotheticals, how would that course of

13  action fit within the training that you would give police

14  officers as of the use of lethal force?

15  A.  Again, based on the information that Officer O'Malley has

16  amassed during the pursuit, shots fired, the initial contact,

17  now in the alley, the individual driving the vehicle, not being

18  compliant, he doesn't know where the gun is, the individual is

19  still considered a fleeing felon.  It's appropriate at that

20  point to use deadly force.

21  Q.  And what would be the reasons that you think, in your

22  opinion as you were training police officers, would be

23  appropriate for Officer O'Malley, given that factual situation,

24  to fire at the driver in an attempt to use lethal force?

25  A.  Well, you have --

1    Q.  Strike that.  I said to attempt to use lethal force.  I

2    misstated.  To stop the threat.

3    A.  You have a first-party threat.  I teach the officers that

4    when someone in a high-risk type situation starts looking at

5    you and looking where other officers are, they're trying to

6    orientate themselves.  So if I'm looking straight ahead, I'm

7    not orientating myself.  But as soon as I'm looking at you, I'm

8    orientating myself, because now I know where you are and I can

9    take a shot at you.

10            The same as looking in the mirrors.  Again, if there

11   were officers running up to the rear of the vehicle, I'm going

12   to know that.  So I'm orientating myself to them.  So I have

13   both a first-party threat, a second-party threat, and then the

14   fleeing felon rule.

15   Q.  Let's talk about the first-party threat.  And this time, in

16   the hypothetical that I'm giving you, the officer would have no

17   reason to believe that the gun is anywhere else other than

18   inside the vehicle still with the driver.  Do you have that in

19   mind?

20   A.  I do.

21   Q.  And the officer has ordered the individual to raise his

22   hands and the individual is not complying.

23   A.  All right.

24   Q.  Does that pose a first-party threat as you talked about a

25   threat to the officer himself?

1    A.  Certainly.

2    Q.  Why?

3    A.  Well, I don't know where the gun is, and I can't see the

4    hands and that's a bad combination.

5    Q.  You talked before about the training that you give officers

6    as to whether they should wait to see a gun actually pointed at

7    them before they would fire.

8    A.  That's correct.

9    Q.  Does that apply to this situation?

10   A.  Yes, particularly with the eye contact.  Now I know he's

11   orientating himself to me.

12   Q.  You're saying that the individual, when the officer can't

13   see his hands, he's refusing to show his hands, could very well

14   have his hands on a gun at that moment?

15   A.  That's correct.

16   Q.  And how difficult would it be for an individual, if he had

17   his hands on a gun at that moment, to raise it up to shoot and

18   perhaps kill my hypothetic officer?

19        MR. GALIPO:  I'll object as assuming facts not in

20   evidence, that the individual had his hand on a gun when

21   Officer O'Malley shot.

22        THE COURT:  I think your question is posing as an

23   answer, or posing an answer.  I'll sustain.

24   Q.  What the officer would reasonably believe at that time as

25   opposed to what the individual was actually doing, would you

4586

1  train an officer that he should have in mind that that

2  individual may very well have his hand on his gun at that time?

3  A.  I certainly would.

4  Q.  Why?

5  A.  Because I don't know where the gun is, and I don't know

6  where the hands are, and I have the past history of the

7  individual shooting police officers.  And now I have the

8  individual making eye contact with me.  And I know the lag time

9  statistics that I train the offices in and the officers have

10  been trained in.  That, again, the best they can do is a tie.

11  Q.  Okay.  And you had trained the officers that in that

12  situation it would be appropriate to use lethal force?

13  A.  I would.

14  Q.  You also mentioned in terms of this hypothetical situation

15  the fleeing felon rule also may come into play?

16  A.  Yes, sir.

17  Q.  Explain that, please.

18  A.  The vehicle's starting to move forward.  And nothing says

19  that if Officer O'Malley doesn't take the shot at that point

20  that the vehicle's going to now speed away and continue a

21  pursuit that again may injure or kill someone.

22  Q.  Let me ask you a question about that:  In the hypothetical

23  the vehicle starts to move forward, but at the time the officer

24  fires his shot the vehicle's not moving very fast.  Does that

25  matter at all in your analysis?

1          MR. GALIPO:  I'll object as to vague as to the speed

2   of vehicle.  "Not very fast."

3          THE COURT:  Overruled.

4   A.  Makes no difference.

5   Q.  Let's say very slowly.

6   A.  Makes no difference.

7   Q.  Let's say under five miles an hour.

8   A.  Makes no difference.

9   Q.  Why not?

10  A.  Because, again, if he doesn't take the shot at that point,

11  the vehicle may totally speed off and we lose the vehicle and

12  start the pursuit all over.

13  Q.  So --

14         MR. GALIPO:  I apologize, your Honor.  I'm going to

15  object to the characterization of the fleeing felon rule as

16  calling for a legal conclusion by this witness as this question

17  and answers are stated.

18         THE COURT:  As I understand it, the witness is

19  describing what he believes are good police practices.  There

20  was a witness who testified on that subject during the

21  plaintiffs' case.  And this is a witness that's testifying on

22  that subject in the defendants' case.  As I do not understand

23  him to be giving legal opinions in any way, however, but solely

24  to describe what he believes is proper police conduct under the

25  practices and training that they give officers.

```
 1                MR. GALIPO:  Thank you, your Honor.

 2                THE COURT:  Okay.

 3    BY MR. LOEBS:

 4    Q.  Is that correct, Mr. Cameron, that that's what you were

 5    talking about, how you train officers with respect to the

 6    principles that we've been talking about?

 7    A.  Yes, sir, it is.

 8    Q.  Now, again --

 9                THE COURT:  I just want to stop you for a second.

10                MR. LOEBS:  I'm sorry.

11                THE COURT:  It's 2 o'clock.  How long do you expect to

12    be on your examination on direct of Mr. Cameron?  You're in

13    Larch Way.

14                MR. LOEBS:  All right.

15                THE COURT:  You haven't gotten to Officer Paine yet.

16                MR. LOEBS:  Yes.

17                THE COURT:  How long is that going to be?

18                MR. LOEBS:  Actually, if I can confer -- not that I

19    would be trying to take the remaining time, but I would like to

20    just check to see what our time is in terms of -- I have a

21    sense now without doing that check, but based on a check, I

22    might have to amend.

23                THE COURT:  You may go off the record for a moment

24    with Miss Lucero and/or your unofficial timekeeper, Miss

25    Bernstein.
```

1             (Off the record)

2             MR. LOEBS:  Your Honor, probably about a half hour or

3   so, maybe a little bit more.

4             THE COURT:  Or so.

5             MR. LOEBS:  Yes.

6             THE COURT:  The reason I ask, the reason I ask is

7   because we're trying to figure out how much time we're going to

8   need for the close of the evidence, if you complete your

9   examination, Mr. Galipo might have some idea or a better

10  idea -- he hasn't done his cross-examination yet, but he'd have

11  a better idea of whether he is or isn't going to call a

12  rebuttal witness based on whatever happened today and/or

13  earlier.

14            If in fact the parties are able to conclude the

15  evidence relatively early on Thursday, we could start the

16  arguments on Thursday.  They can include Friday, if that works

17  for the jurors.  I can instruct the jurors.  They can begin

18  their deliberation on Friday.  Proceed for as long as they

19  wish.  And not knowing when they would go out or how that would

20  work, also coming back on Monday, if necessary.  But at least

21  be a lot closer to our schedule of this week.  Then it was --

22  looking at the beginning of this morning, which was a fairly

23  gloomy prediction as far as our schedule, so that's what I'm

24  trying to see at this time.

25            Now, we do have a calendar at 2:30.  Not going to be

1    with you.  It's going to be with all these other people that

2    have their cases scheduled at 2:30.

3              When did we come out, Miss Lucero, from the break?

4              DEPUTY CLERK:  12:43.

5              THE COURT:  Well, it would be kind of a long stretch

6    for the reporter if she could hold out at least for a period

7    beyond now, and if Miss Lucero can deal with that and still get

8    ready for the other conference -- calendar then.

9              DEPUTY CLERK:  I'm fine.

10             THE COURT:  How about the reporter?

11             COURT REPORTER:  I'm fine.

12             THE COURT:  Everyone is willing to contribute to the

13   effort, so why don't we at least get you going as far as you

14   can on Larch and with whatever the next set of questions are.

15             MR. LOEBS:  Thank you, your Honor.

16             THE COURT:  Okay.  Do you want someone to tell you

17   where you are?

18             MR. LOEBS:  I think I have my note.

19   BY MR. LOEBS:

20   Q.  With respect to the -- I think it was the last area I was

21   talking about, that has to do with the speed of the vehicle

22   moving forward as that applies to the fleeing felon rule?

23   A.  That's correct.

24   Q.  And your understanding as to how you teach police officers

25   and how you instruct the POST and how you've written the

Cameron – Direct

1    Learning Domains regarding the use of force and lethal force.

2    Do you have that in mind?

3    A.   Yes, sir, I do.

4    Q.   Does the speed at which the vehicle was beginning to move

5    forward, after the officer had instructed the individual to

6    show his hands and he failed to do so, matter in terms of your

7    analysis of how that works with the fleeing felon rule?

8    A.   No, not in my opinion.

9    Q.   Why not?

10   A.   It just doesn't.  Like I mentioned, he's shown total

11   disregard, the driver of the SUV shown total disregard to the

12   officers' lives and for the lives of the citizenry, and you

13   won't want that pursuit to start again.

14   Q.   Should the officer wait until the vehicle is going faster

15   before he takes a shot?  Is that what you would have trained

16   him to do?

17   A.   No, it's easier to hit someone in a slow moving vehicle

18   than in a fast moving vehicle.

19   Q.   And the fact that obviously the engine is running, the keys

20   are the engine, and the car is moving forward, does that affect

21   your opinion as to whether an officer in this position might

22   think a vehicle would be fleeing a scene?

23   A.   Yes, sir.

24   Q.   Why so?

25   A.   Again, engine running, vehicle's moving, and the driver's

1   totally disregarding the orders given by the officer.

2   Q.  Let's say in this hypothetical that there may or may not

3   have been a vehicle that somewhat or was partially blocking the

4   exit on Larch.  Would that matter in your analysis?

5   A.  No, sir.

6   Q.  Why not?

7   A.  Well, again, an SUV is a powerful vehicle.  And depending

8   on the size of the other vehicle can certainly without remorse,

9   because there's no remorse shown, drive right through that

10  vehicle and move it out of the way.

11  Q.  So in terms of your opinion, would you say that it would be

12  reasonable for the officer, based on how you would instruct the

13  officers to think, that if that vehicle continued and left

14  Larch, that it might be a potential threat of serious bodily

15  injury or harm to others?

16  A.  Certainly.  The same thing can happen that just happened.

17  Q.  Now, I want you to assume in this hypothetical that at the

18  time that this officer's making this decision and chooses to

19  make this shot, and it's just one shot, that other officers in

20  the vehicles that are indicated in this diagram are also in

21  Larch.  And, that they've taken -- just as or just at the time

22  that this shot is fired by Officer O'Malley, other officers are

23  attempting to take cover behind various vehicles.  Do you have

24  that in mind?

25  A.  I do.

1    Q.  And then officers that are, while they're attempting to

2    take cover, that they perceive this shot as being a shot coming

3    from the driver of the SUV as opposed to a police officer.

4    A.  All right.

5    Q.  Do you have that in mind?

6    A.  I do.

7    Q.  And that perceiving of the other officers then, what they

8    believe to be returned fire, fire and shoot the -- attempting

9    to shoot the driver of the SUV.

10   A.  All right.

11   Q.  And the shot that was actually this officer's shot, they

12   believed to be the shot from the driver of the SUV.

13   A.  All right.  I've got that in mind.

14   Q.  Having those facts in mind, how, if at all, does that

15   relate to how you would train officers as to the reasonableness

16   of the officer's taking the initial shot?

17   A.  The officer taking the initial shot?

18   Q.  Yes.

19   A.  It wouldn't change anything.

20   Q.  Why not?

21   A.  Because you'd still have the same threat level.

22   Q.  When you talk about hindsight 20/20, how does that relate

23   to the situation you just described?

24          MR. GALIPO:  I apologize.  I'm going to object to the

25   question as vague and ambiguous as to what Officer O'Malley was

1  aware of at the time.

2          THE COURT:  I'm sorry, what's the ground of your

3  objection?

4          MR. GALIPO:  The hindsight 20/20.

5          MR. LOEBS:  Speaking objection, your Honor.  Object to

6  his making a speaking objection.

7          THE COURT:  What's the basis?

8          MR. GALIPO:  It was unclear in the hypothetical what

9  Officer O'Malley was aware of at the time he took the shot with

10 regards to the other officers.

11         THE COURT:  It doesn't sound like a hypothetical.

12         MR. GALIPO:  That's why it was unclear.

13         THE COURT:  I'll just sustain the objection.  It

14 sounds argumentative, the question.

15         You're talking about police practice.  We're not

16 talking about making factual determinations here.  There have

17 been a number of questions asked and answered that are

18 essentially questions of fact for the jury.  Not put in the

19 form of expert opinion.  I'm going to sustain that last

20 objection.

21 BY MR. LOEBS:

22 Q.  In the training that you would do with respect to police

23 officers -- I'll strike that.

24         THE COURT:  In other words, if this witness has

25 particular knowledge beyond what a layperson may have, someone

1   who's in the -- involved in police practices and training and

2   experience, he may be able to add something to a question of,

3   for example, whether a car going the wrong way down a street is

4   dangerous or not.  But it's unlikely that he can, the way

5   you've asked it.

6           In other words, all you're asking him is what a juror

7   can find themselves without expert input:  Is it dangerous to

8   run a red light, is it dangerous to go the wrong way on a

9   one-way street?  Yes.  You'll have to ask him things that go

10  particularly to his expertise, and if there's something that he

11  knows that the average person wouldn't know, then you can

12  elicit that.  Even though it may sound in the first instance

13  like somebody would know as much as the witness on that

14  subject.

15  BY MR. LOEBS:

16  Q.  Mr. Cameron, with respect to the training that you do and

17  the expertise you have with respect to officers in shooting

18  situations, what sort of expertise do you have in training

19  officers based on officers in shooting situations?

20          THE COURT:  His expertise is not an issue.  Your

21  questions are.  Okay.  I'll sustain per the last one.

22  Q.  With respect to your work and your training of police

23  officers, as to how you would instruct them as to when they can

24  use lethal force, when you are training them as to how to

25  evaluate when lethal force is or is not appropriate, you

1   mentioned something before about 20/20 hindsight in the

2   training that you give.

3   A.   Yes, sir.

4   Q.   And the relevance of that is what?

5   A.   That the officers don't need to second-guess themselves if

6   they find out something after the fact.  When they make the

7   shooting decision, in a deadly force situation, after -- based

8   on the information they had at that precise moment.

9   Q.   Now, I want to ask you some additional questions with

10  respect to the hypothetical that I just gave you.  I want you

11  to assume that when the officer did make this shot, that before

12  making the shot, he didn't go out over the radio and say, on

13  his PIC radio, I'm about to shoot.  Have that in mind?

14  A.   I do.

15  Q.   How would that fit within the way in which you would train

16  police officers?

17  A.   I've been doing this 38 years, and I've never told an

18  officer that they do that, that I'm taking the shot.  Unless

19  it's a sniper.  If you have a sniper situation, again, but

20  other than that, no.

21  Q.   Now, hypothetically again, with respect to the factual

22  scenario I just described, let's say that the officer who fired

23  that shot and then moved his location for a different area,

24  I'll describe it as the rear of this SUV on 620, and that at

25  some point after, his partner, who was driving the vehicle,

Cameron – Direct

1   also approached in this generally area around 618 on this

2   street, and that the officer who fired the first shot did not

3   then say to his partner, Hey, you heard those shots fired, I

4   was the one that fired that first shot, just wanted to let you

5   know that, and he didn't do that during the course of this

6   incident, how would that fit with your understanding of the

7   propriety of the training of police officers?

8   A.   I think you're in a very critical situation that's rapidly

9   evolving and you don't want to spend time saying, Yeah, it was

10  me that took that shot and I moved from that vehicle over to

11  this vehicle.  You have to focus on the individual that's in

12  the SUV.

13  Q.   Now I want to continue with the hypothetical, and at this

14  point I want to focus on the other officer.  And let's say,

15  hypothetically, that the other officer had pulled the vehicle

16  up somewhere on Larch, perhaps pointing into Laguna somewhat,

17  and got out of the vehicle, and he continued up the south end

18  of Larch and at some point crossed over to the north side and

19  put himself in position around 618, which I'll show you in more

20  detail.  Turning to Exhibit V5-02.  And the -- this other

21  officer puts himself in approximately the position of about 618

22  on the sidewalk where I've pointed to.  Do you have that in

23  mind?

24  A.   I do.

25  Q.   Actually before I get to that, we're not talking about that

1    officer yet, at 618.

2    A.  All right.

3    Q.  I want to ask you some questions about the driver of the

4    SUV and the commands being given by the other officers.

5    A.  All right.

6    Q.  Let's say, hypothetically, that, again focusing on the

7    driver of the SUV, that after the shots that I talked about

8    were fired, the driver of the SUV opens the door and exits the

9    vehicle.

10   A.  All right.

11   Q.  And that officers, after he gets out of the vehicle, are

12   yelling at the individual to show his hands and get down on the

13   ground.

14   A.  All right.

15   Q.  And in the hypothetical we have multiple officers yelling

16   those commands, "Raise your hands, get your hands up, get down

17   on the ground."  Do you have that in mind?

18   A.  I do.

19   Q.  Now, do you have -- and then the individual at some point

20   does have his hands up, sometimes they're down, walks to the

21   back end of the SUV, does not get on the ground, instead takes

22   off his t-shirt and throws it, and at some point then starts to

23   walk back towards the SUV, towards the open door of the SUV.

24   Do you have that in mind?

25   A.  I do.

1   Q.  And, hypothetically, let's say during that exchange, the

2   interchange where the individual gets out of the SUV, and is

3   being ordered to put his hands up, puts them up for a moment,

4   brings them down, doesn't leave them up, takes off his shirt.

5   Assume that no officer ever ordered him to take off his shirt.

6   Perhaps assume also that he turns around in a 360.  Officers at

7   this time are yelling at him to get on the ground and put his

8   hands up.  Do you have that in mind?

9   A.  I do.

10  Q.  Now, with respect to the commands that officers give in a

11  felony traffic stop, do you have some expertise as to that?

12  A.  I do.

13  Q.  Ordinarily, how should a felony traffic stop proceed if

14  things go as to plan, with the police officer?

15  A.  If everything goes the way the police officer planned, the

16  person that they're ordering out of the vehicle and down on the

17  ground does everything they say, and usually one officer will

18  give commands.  But if the people or persons aren't doing what

19  the officer says, there's no problem.  In other words, it's not

20  inappropriate for multiple officers to give commands because

21  sometimes the suspect or individual will key in on one

22  particular tone of voice.  And then that person can take over

23  the commands.  But until that time, if that time happens at

24  all, multiple officers can give commands as long as they're not

25  giving conflicting commands.  In other words, "Put your hands

Cameron - Direct

1    up, get down on the ground, get down on your knees, put your

2    hands behind your head."  Those kinds of things.  As long as

3    they're consistent, it's not a problem.

4    Q.  In terms of conflicting commands, if the commands would be

5    yelling, the individual was taking off his shirt, walking back

6    by the SUV, were "Get on the ground and get your hands in the

7    air," do you have that in mind?

8    A.  I do.

9    Q.  Are they conflicting?

10   A.  No.

11   Q.  Why not?

12   A.  They're "Get down on the ground; put your hands up", or,

13   "Get your hands up; get down on the ground."  They're

14   synonymous.

15   Q.  How is that synonymous?  Can you get down on the ground and

16   have your hands up?

17   A.  Yes, usually you tell a person to get down on the ground

18   and keep their hands up.

19   Q.  Why is that important for an officer to have an individual

20   do that?

21   A.  Number 1, I've isolated the hands so I can see what the

22   hands are doing.  And Number 2, I'm going to cut down the

23   mobility and isolate the individual by putting him on ground.

24   Q.  You said when the individual is following the instructions

25   of the officer, that it may be appropriate to have one officer

Cameron - Direct

1    issuing the commands when they're following the instructions?

2    A.  Yes, that's correct.

3    Q.  The hypothetical I've just described with the individual

4    getting out of the SUV, hands in the air some of the time,

5    sometimes down; add further in the hypothetical at some point

6    he puts his hands to his waistband, perhaps either pulling his

7    pants down or pulling out his belt; and in addition, we talked

8    about the taking off the shirt, would that be in your view,

9    based on the training you do of police officers, compliant with

10   the commands of the police officers?

11   A.  No, not with what the police officers are saying.

12   Q.  And why would that not be compliant?

13   A.  Well, if you're telling him to put his hands up and get

14   down on the ground and he's moving his hands, reaching down to

15   the waistband as you described, reaching down to the pant area,

16   he's not complying with what the officers are asking him to do.

17   Q.  So if the officer says "Hands up," it doesn't mean hands up

18   once and you can do what you want with them?

19   A.  No, it's, "Put your hands up, put your hands up over your

20   head."

21   Q.  And hand -- over the head, why is that important?

22   A.  You like the hands as far away from the waistband, because

23   obviously the area most readily available for secreting a gun

24   are around the waistband area.

25   Q.  Now, in terms of the -- again, this is the same

1   hypothetical in terms of this individual and the driver's

2   conduct beforehand before he gets to Larch Way, in terms of

3   this individual as he gets out of the SUV and lowers his hands

4   to the waistband, what in terms of your training of police

5   officers would that represent in terms of the level of threat,

6   if any, to a police officer that perceives that conduct?

7   A.  Again, that's a higher threat level because the hands

8   aren't where I want them and they're moving to an area where

9   weapons are most readily placed.  And again, from the training

10  I would tell the officers at that point they better start

11  thinking about making a shooting decision because it takes

12  them, best case, a second with the gun in their hand and for

13  the suspect knowing that they're going to go for a gun to shoot

14  the officer, it takes two-thirds of a second.  So you're going

15  to be playing catch up.

16  Q.  So in terms of the training that you would provide police

17  officers, this individual who had fired at police officers

18  before, they don't know where the gun is and they see him lower

19  his hand to his waistband, would you train an officer that it

20  could be appropriate to shoot at that time?

21  A.  I would.

22      MR. GALIPO:  Object as leading; also incomplete

23  hypothetical.

24      THE COURT:  Overruled.

25  Q.  I'm sorry, your answer?

4603

1   A.  I would.

2   Q.  And I also asked you some questions about the individual

3   taking off the shirt.  How would that relate to in terms of

4   those movements of the hands when the officers are telling him,

5   "hands in the air, get on the ground," how would that relate to

6   how you would train officers with respect to that threat level?

7   A.  Again, if the hands are going down to the waistband area,

8   whether grabbing the shirt or grabbing the pants or whatever

9   they're doing, that's where guns are kept.  And, again, you're

10  going to play catchup if you don't make the shooting decision.

11        Like I mentioned before, I can't make the decision for

12  you.  But at least intelligently, I can educate you to make the

13  decision for yourself.

14  Q.  Okay.  Now, I want to further with this hypothetical, let's

15  say the individual who had walked some distance away from the

16  SUV either turns around or backs up and goes back to the open

17  area of the driver door.

18  A.  All right.

19  Q.  In terms of the threat level that you would train officers,

20  what would that represent in your mind?

21  A.  Again, it's a high threat level.  If the individual in your

22  scenario or your hypothetical backed up, and I could still see

23  the hands, okay, I'm going to be very cautious, but I'm not

24  going to shoot at that point.  But if the person walks towards

25  the vehicle and they're body's blocking the hands, then I'm

1    going to start thinking about making a shooting decision.

2    Q.  Why would you train officers that it would be a concern to

3    them that an individual who's out of the car, you can't see a

4    gun in his hands at that point, is now turning back to the open

5    door of the vehicle?

6    A.  Because you don't know where the gun is within the confines

7    of the vehicle.

8    Q.  And assume further that the officers are yelling at the

9    individual as loud as they can to get on the ground and keep

10   his hands up.  How would that -- and instead of doing that, he

11   returns back to the open driver's door area?

12   A.  Again, you have a high threat level because the person's

13   not being compliant and you have the past history of what the

14   person's done already, and you don't know where the gun is and

15   you don't know what their intention is.

16   Q.  Let's assume that although the individual engaged in the

17   conduct we just described, that, in the hypothetical, that none

18   of the officers fired while the individual's outside of the SUV

19   at this point.

20   A.  Okay.

21   Q.  And he's actually allowed to return to the open door area

22   of the SUV.  Do you have that in mind?

23   A.  I do.

24   Q.  And now we're going to talk about the other officer,

25   Officer Paine, hypothetically gets in a location I described

```
1    around about 618 on the sidewalk.

2    A.  All right.

3    Q.  Do you have that in mind?

4    A.  I do.

5    Q.  And in that location, that say, hypothetically, the

6    individual somehow seats or positions himself in the SUV with

7    his chest essentially facing out towards the officer.

8    A.  All right.

9    Q.  And the officer sees the individual lower himself in the

10   SUV in the manner I just described.  Do you have that in mind?

11   A.  I do.

12   Q.  In terms of the threat level that would pose, in terms of

13   an officer's decision to shoot, what opinion would you have

14   regarding that?

15   A.  Well, the person lowering themselves down and not knowing

16   where the gun is poses a threat level.  If I can see the hands

17   at that point, I'm okay with that.  And until the individual

18   starts moving the hand where I can't see them.

19   Q.  Now, with respect to the training you give police officers,

20   is it possible that you could see the individual's hands, but a

21   weapon could be merely inches from their hands?

22   A.  That's correct.

23   Q.  And in that type of situation, could just seeing the hands

24   be enough to know that there's not a sufficient threat level?

25   A.  Well, you have a threat level.  But threat level coupled
```

1    with some movement would be what I tell the officer.  I mean,

2    be ready at that point.  Don't be compliant, thinking the

3    person is going along with what you're asking them to do.

4    Q.  And in terms of the individual returning back and going

5    back and sitting somehow inside or leaning inside of the SUV,

6    where the officer believed the gun to still be because they

7    haven't seen it anywhere else, what does that do in terms of

8    the officer's threat level at that point?

9    A.  If the person's facing the interior of the vehicle, and in

10   that direction, again, I say better think about that shooting

11   decision, and you better think about that tie.

12   Q.  The "tie" meaning that the time?

13   A.  Right.

14   Q.  Continue with the hypothetical and the individual's now

15   seated, and then the individual turns to the left towards the

16   interior of the vehicle, with both of his hands.  Do you have

17   that in mind?

18   A.  I do.

19   Q.  With respect to the training that you would give police

20   officers as to the use of lethal force, what were you training

21   the officer at that point as to whether the use of force at

22   that time would be justified?

23        MR. GALIPO:  I apologize.

24   A.  I'd tell him it was justified.

25        MR. GALIPO:  Object as an incomplete hypothetical,

1    whether the hands are visible and the speed of the turning.

2            THE COURT:  I'll overrule.  And that could be a

3    subject of cross-examination.

4    A.  I would tell him at that point it would be appropriate to

5    use deadly force.

6    Q.  Why?

7    A.  Because again, like I mentioned, it doesn't take that long

8    to obtain a gun and turn and shoot the gun.  And again, the

9    officer's going to play catch up because they're thinking, you

10   know, exactly what is he doing, and he can't wait to see the

11   gun and the actions are being consistent with the actions the

12   individual could use to produce the gun.

13   Q.  Let's say, hypothetically, and for whatever reason the

14   officer hesitates and he doesn't fire at the moment the

15   individual first turns to the left into the interior of the

16   vehicle.  Do you have that in mind?

17   A.  I do.

18   Q.  And the individual comes back out and, in other words,

19   turns back around and the officer can see his hands?

20   A.  I have that in mind.

21   Q.  And during this whole movement in the vehicle, the officers

22   are continuing to yell in an even louder voice, "Get on the

23   ground, keep your hands up."  Do you have that in mind?

24   A.  I do.

25   Q.  And that then the individual is sitting there, somehow

Cameron – Direct

1   positioned inside the SUV, again turns to the left, and this

2   time the officer loses sight of the left hand, perhaps the

3   right as the individual turns.  Do you have that in mind?

4   A.  I do.

5   Q.  In terms of the officer's decision to use lethal force at

6   that time, how would you train officers in that regard?

7   A.  I train at that point they would be justified in using

8   lethal force and they better not wait until the person turns

9   back again.  In fact, if I found out about turning back again,

10  I'd bring him back for a critique.

11  Q.  You'd what?

12  A.  Bring him back for a critique.

13  Q.  Why is that?

14  A.  Because they basically put themselves in jeopardy, put

15  their partners in jeopardy, put the citizenry in jeopardy

16  and --

17  Q.  And you say "back for a critique," you're saying that would

18  not only be an appropriate use of force, but you think it would

19  be inappropriate not to?

20  A.  Exactly.

21  Q.  And when you were training police officers, is that part of

22  what you're trying to train them to do, to make decisions like

23  that?

24  A.  Oh, yes.

25            THE COURT:  Are you at a breaking point?

1          MR. LOEBS:  Yes, your Honor.

2          THE COURT:  And how much do you estimate you have left

3    then?

4          MR. LOEBS:  I think maybe 15, 20 minutes, but I might

5    be able to -- I might be able to reduce that.

6          THE COURT:  All right.  Ladies and gentlemen, we're

7    going to break for the calendar that's starting at 2:30 or just

8    after 2:30 at this point.  Please remember my admonition.  We

9    are closer and closer to the end of the case.  Tomorrow I'll

10   give you a better idea then what's happening.  I'm going to

11   meet briefly with counsel after you leave this afternoon.

12   Thank you.

13          (The jury exited the courtroom)

14          (In open court; jury not present)

15          THE COURT:  Mr. Cameron, you may step down if you

16   like.  I'll see you tomorrow at 9 o'clock.

17          THE WITNESS:  9 o'clock?

18          THE COURT:  9 o'clock.

19          THE WITNESS:  Thank you.

20          THE COURT:  The jurors have left.  I want to go off

21   the record and have counsel come up to the podium so I can

22   discuss with you what our situation is, and let the court

23   reporter -- I guess we'll be changing the guard, right?  Let

24   her do whatever she needs to do to make that arrangement.

25          (Adjourned until September 20, 2007, @ 9:00 a.m.)

1                    <u>INDEX OF EXAMINATION</u>

2     Examination of:                            Page

3     EMILY ALYSSA KERAM (cont.)

4     Direct By Mr. Wiener . . . . . . . . . . . .4412

5     Cross By Mr. Galipo  . . . . . . . . . . . .4467

6     Redirect By Mr. Wiener . . . . . . . . . . .4527

7     Recross By Mr. Galipo  . . . . . . . . . . .4529

8     DON STUART CAMERON

9     Direct By Mr. Loebs  . . . . . . . . . . . .4534

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE OF REPORTER

3

4          I, Connie Kuhl, Official Reporter for the United

5    States Court, Northern District of California, hereby certify

6    that the foregoing proceedings in Case No. C 04-5459 (MMC),

7    Marylon Boyd, et al., City and County of San Francisco, et al.,

8    were reported by me, a certified shorthand reporter, and were

9    thereafter transcribed under my direction into typewriting;

10   that the foregoing is a true record of said proceedings as

11   bound by me at the time of filing.

12         The validity of the reporter's certification of said

13   transcript may be void upon disassembly and/or removal from the

14   court file.

15                         _Connie Kuhl_

16   _____

17                    Connie Kuhl, RMR, CRR

18                  Thursday, December 20, 2007

19

20

21

22

23

24

25