```
 1                                    Volume 24

 2                                    Page 4849 - 5036

 3                  UNITED STATES DISTRICT COURT

 4                 NORTHERN DISTRICT OF CALIFORNIA

 5           BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

 6   -------------------------------)
                                    )
 7   MARYLON BOYD, individually     )
     and as Executor of the Estate  )
 8   of CAMMERIN BOYD, deceased,    )
     et al.,                        )
 9                                   )
                     Plaintiffs,     )
10                                   )
          v.                         )  No. C 04-5459 (MMC)
11                                   )
     CITY AND COUNTY OF             )
12   SAN FRANCISCO, et al.,         )
                                     )
13                   Defendants.     )  San Francisco, California
                                     )  Friday, September 21, 2007
14   -------------------------------)

15
                        TRANSCRIPT OF PROCEEDINGS
16
     APPEARANCES:
17

18   For Plaintiffs:          DALE K. GALIPO
                              21800 Burbank Boulevard
19                            Suite 310
                              Woodland Hills, California 91367
20
     For Defendants:          Office of the City Attorney
21                            City and County of San Francisco
                              1390 Market Street
22                            Suite 600
                              San Francisco, California 94102
23                       BY:  BLAKE P. LOEBS
                              SCOTT WIENER
24                            ERIN BERNSTEIN

25
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

4850

1    <u>Friday, September 21, 2007</u>

2                                                            <u>(9:45 a.m.)</u>

3            (The jury enters the courtroom)

4            THE COURT:  Good morning, ladies and gentlemen.

5            JURORS:  Good morning.

6            THE COURT:  We're ready to proceed with the

7    defendants' closing argument.

8            Mr. Loebs, are you ready to go forward at this time?

9            MR. LOEBS:  Yes, your Honor.

10           THE COURT:  Very good.

11           MR. LOEBS:  Good morning.

12           JURORS:  Good morning.

13           MR. LOEBS:  Cammerin Boyd, and no one else, is

14   responsible for the events that happened on Larch Way on

15   May 5th, 2004.  Cammerin Boyd took the mind-altering drugs that

16   he was on that day.  Cammerin Boyd didn't go to Atlanta as his

17   family wanted him to do.  Instead, he took this loaded gun into

18   San Francisco (indicating).

19           Cammerin Boyd then went to the Tenderloin and

20   attempted to grab and kill Ms. Williams with a gun, this loaded

21   gun (indicating photograph).  Cammerin Boyd then went to find

22   Tatanika Hogan, a woman he had no information about, someone he

23   didn't know.  And then he threatened to kill her several times

24   with this gun, pointed it at her head, a gun we now know was

25   loaded.  She was so terrified what he was doing she was

1    contemplating how she wanted her children to find her body.

2              After she fled from him in terror and was lucky enough

3    to contact police, Cammerin Boyd was the one that led the

4    police on that high-speed chase.  He didn't pull over, he

5    didn't stop, he didn't surrender.  And during the chase, he is

6    the one that fired this gun attempting to murder the officers

7    that were pursuing him.  And we know this for a fact.

8              They then brought this horribly dangerous situation to

9    Larch Way.  A place that he knew was heavily populated, had

10   children, families there.  He drove this pursuit right to that

11   area.  He stopped.  He stopped where he would have the

12   confrontation with the police.  And he knew there would be a

13   confrontation.  How could he not?  You're firing at police,

14   you're threatening a woman with a gun, and now you stop your

15   vehicle; of course he knew what was going to happen next.

16             He then, after doing all this activity, he got out of

17   his vehicle and he refused to get on the ground.  Not because

18   he couldn't, but because he was not about to surrender.  He

19   then put his hands up and put them down, knowing what the

20   consequences of that could be.  He put his hands to his

21   waistband, when he had tried to murder a police officer a few

22   moments before, he's surrounded by police officers, pointing

23   their guns at him ordering him to the ground, and he puts his

24   hands to his waistband.

25             Then he doesn't get on the ground, doesn't keep his

1   hands in the air, instead he returns back to his SUV where he

2   knows his loaded gun is waiting.  Then he sits in the SUV and

3   he reaches not just once but twice into the interior of the

4   SUV.

5          And finally, at that moment, he is shot and killed by

6   the police officers.

7          Cammerin Boyd left Officer Paine no choice.  He had no

8   choice.  Officer Paine and the other officers there gave

9   Cammerin Boyd every opportunity to surrender.  In fact, you

10  heard from Mr. Cameron that they had given him far more

11  opportunities than they should have; at great risk to their own

12  personal lives and safety, they were trying to arrest him.

13         In this situation the officers have two means to try

14  to apprehend the suspect.  They have their voice commands and

15  they have their guns.  They can't use anything else when the

16  situation's gotten this serious.  They used their voices for

17  all that they were worth.  They yelled at him, all of them, to

18  get on the ground.  To keep your hands up.  And he didn't do

19  it.  Why are they doing that?  Because they don't want to have

20  to shoot this individual.  They don't want to have to do it.

21  He forced Officer Paine to do that.

22         Now, as a result of Cammerin Boyd's conscious and

23  deliberate actions that evening, there are many victims that

24  were left in his path.  Ms. Williams, who was threatened at

25  gunpoint.  She didn't want to get involved in this.  She didn't

 1   want to even be here testifying.  She didn't want to tell

 2   anyone that this had happened to her.  She's a victim that

 3   shouldn't be forgotten.

 4          Tatanika Hogan was threatened at gunpoint as well.

 5   Imagine having a loaded gun pointed at your head and someone

 6   telling you, I am going to kill you.  I am going to kill you.

 7   And then she begged for her life, even brought up her children

 8   thinking maybe that will help.  I'll appeal to this person as a

 9   human being, tell him about my children, maybe that will help.

10   And what did she say his reaction was?  He seemed to get off on

11   it.

12          Other victims of Cammerin Boyd that evening would be

13   the officers.  The officers he tried to murder.  You heard

14   Officer Elieff testifying about this event.  Three years later.

15   You can tell when you listen to that CAD and you hear his voice

16   calling out the pursuit, and when you heard his voice saying,

17   "Shots fired, he shot at me," you could see how emotional he

18   got on the stand.  That's because this was a life-threatening

19   event.  Sure, they're police officers and, sure, they try to

20   train for these types of situations, but they're people and

21   they matter, and Cammerin Boyd was trying to murder them.

22          Other victims:  Officer Stearns, Officer Kane.  They

23   were also being shot at by Cammerin Boyd in the pursuit.  And

24   in addition, Officer Paine and Officer O'Malley.  Cammerin Boyd

25   put Officer Paine in a terrible position of having to shoot and

1  take another person's life.  They did all they could do to

2  avoid that from happening.  Cammerin Boyd made them do it.  He

3  is also a victim of Cammerin Boyd's activities that evening.

4         But in addition, we also have the residents of Larch.

5  They were just in their homes minding their own business.  They

6  didn't ask for this incident to come to Larch Way.  They didn't

7  ask to be a witness to some parts of these events.  They didn't

8  ask to then be dragged into this by the Police Watch and

9  Marylon Boyd and everyone else that had some sort of an agenda

10  against the police.  They were just sitting there minding their

11  own business, and in 60 seconds or so they saw parts of this

12  unfold in front of them, which understandably could be

13  terrifying to see, they would be worrying their children, they

14  could not know what happened.  But who did that?  Did the

15  police?  Did Officer Paine stage this?  Did he plan this at

16  Larch Way or did he bring it there?  No, it was Cammerin Boyd.

17  He did.

18         Now, in his closing remarks, Mr. Galipo said that this

19  is a very difficult case.  It's not.  It's a very easy case.

20  It's a difficult subject.  It's a terrible subject.  But it's a

21  very easy case.  It's only difficult if Mr. Galipo was able to

22  convince you to ignore the facts and ignore the law.

23         So the question will be, when Cammerin Boyd was on

24  Larch Way, did he pose a lethal threat?  Did he pose an

25  imminent, lethal threat?

Summation - Mr. Loebs

1          Now, plaintiffs will have you think that he was just a

2     guy who wanted to trade cars with Miss Hogan.  Do you remember

3     that?  At least twice Mr. Galipo brought that up.  Well, didn't

4     he just want to trade cars?  You heard her videotape testimony.

5     You saw her break down in tears when she was pointing out and

6     identifying Cammerin Boyd, this man, the top middle, as the

7     individual who's threatening to kill her trading cars?  Does

8     Mr. Galipo think that you completely ignore the testimony, that

9     you didn't listen to anything that happened in this case?

10    Trading cars?

11         And what was the other suggestion?  That he wasn't a

12    lethal threat, he wanted to surrender.  He wanted to comply,

13    but he just didn't do it because he had prosthetic legs.  Or

14    the alternative, he had prosthetic legs that allowed him to

15    surrender the few days before, but those were the good

16    surrendering prosthetic legs, not the ones he had on that day;

17    so he was just in a bad situation and he just wasn't able to

18    surrender.  We all know that argument for what it is.  Gravity

19    applied to Cammerin Boyd that day as it applies to everyone

20    else.

21         If you have officers pointing their guns at you and

22    you have fired at them attempting to kill them, which is hard

23    for any of us to imagine, and they're ordering you to the

24    ground at gunpoint, you get to the ground.  If you don't, you

25    know what the likely consequences will be.  They can't take any

1    more chances.  They can't take -- they shouldn't take as many

2    chances as they did with their own lives and their own personal

3    safety.

4          Couldn't get to the ground?  He would have to go to

5    the SUV and put his hands where his loaded gun is to get to the

6    ground?  And officers are supposed to believe that?  They're

7    supposed to accept that, Oh, he said, I can't get down.  They

8    heard that.  Let's let him go back to where his gun is, he's

9    got prosthetic legs, let's let him go get his gun.  Or be in

10   that area.  He's just a guy who can't get to the ground.

11         Or, in the alternative, was Cammerin Boyd an extremely

12   dangerous, crazed, drugged out, violent man on a path of

13   destruction who had to be stopped before he killed someone?

14         Now, Mr. Galipo talked a bit about the burden of

15   proof.  And I'm going to talk with you about it as well.  And

16   in order to explain that, it's important to understand this is

17   a civil trial.  And it's not a criminal trial.  Mr. Galipo is

18   represents the plaintiffs.  The plaintiffs have the burden.

19   This isn't a trial about Cammerin Boyd and whether he engaged

20   in criminal activity.  It's not about sentencing Cammerin Boyd.

21   The plaintiff has the burden of proof, and what the burden of

22   proof is is that you have to come to this jury with a case this

23   serious, where in some sense you're accusing police officers of

24   executing a man.

25         If you're going to come into this court before you and

1    accuse officers of something that serious, you'd better have

2    the facts to support it.  You can't just ask questions.  You've

3    got to have answers.  You can't just try to poke holes in the

4    defense theory and just examine Mr. Jason for eight hours and

5    think, Well, this little bit of evidence, well, what about

6    that.  That's not a theory.  That is not meeting the burden of

7    proof.  The plaintiffs have the burden of proof.

8           And isn't it interesting that the only time you ever

9    saw any diagram that attempted to show you what Larch Way

10   looked like was through the defendants.  The only time you had

11   a witness who attempted to describe with a tape measure device

12   where the wound paths were on Cammerin Boyd was through the

13   defendants.  Isn't it interesting that the defendants took,

14   even though they didn't have it, the defendants took on the

15   burden -- not the burden, but the defendants showed you what

16   happened in this instance.  And the plaintiffs, they just asked

17   questions.  It was all just about confusion and misdirection.

18          Lastly, plaintiffs have to have a theory of the case.

19   You probably are asking yourself in opening, what are they

20   saying happened?  You know, what are they claiming these

21   officers did?  Were his hands up or were they -- was he putting

22   his hand in the car?  Which was it?  They have to make up their

23   minds.

24          The defendants, although we presented a lot of

25   evidence and I'll argue today quite extensively about what that

Summation - Mr. Loebs

1    evidence I believe shows, the defendants don't have the burden

2    to prove anything to you.  Anything.  If no one said anything

3    in this case, if we just stood up here and stared at you for

4    six weeks, you'd be obligated to find for the defendants.

5          Plaintiffs have to sway you and convince you that on

6    that day, Officer Paine and Officer O'Malley -- who I don't

7    understand why Officer O'Malley is in this case, but Officer

8    Paine and Officer O'Malley, they have to convince you that they

9    used unreasonable force.  They have the burden of convincing

10   you of that.

11         And that goes back to my next question:  What is their

12   theory?  We've had six weeks of trial.  They had lots of

13   depositions, lots of interviews, for years, to figure out what

14   the theory was they were going to present to you in this trial.

15   And they still haven't figured it out.  I don't know what their

16   theory is.  Is it that Officer Paine executed Cammerin Boyd

17   while his hands were up surrendering?  Well, they brought some

18   witnesses to say that.  And we know from the physical evidence

19   that's impossible.  But they still seem to be arguing that.

20         Or that Officer Paine overreacted when Cammerin Boyd

21   was moving his hands in the vehicle.  Maybe that's their

22   theory.  I don't know.

23         But one thing was clear in Mr. Galipo's closing

24   remarks yesterday:  That regardless of which theory or some new

25   theory that they're pursuing, there's one overriding argument

Summation - Mr. Loebs

1   that they're making.  And that is that all of the evidence that

2   hurt the plaintiffs' case is explained by a conspiracy.  That's

3   what Mr. Galipo told you yesterday.  It's all a conspiracy.

4   All the police officers got together.  Dr. Smith got together.

5   All of it, just so plaintiffs couldn't prevail in this lawsuit

6   because they knew the individual that was shot, the mother was

7   a lawyer.  That's how they explained all the evidence that is

8   bad for them in the case.

9         Now, there's a maxim with trial attorneys about how

10  you can tell when someone has a weak case.  The maxim is, if

11  you're strong on the facts, you argue the facts.  If you're

12  strong on the law, you argue the law.  If you're weak on the

13  law and the facts, you just argue.

14        But there's a new one that should be added as well.

15  If even arguing and misdirection isn't enough, then you get to

16  the lowest form of argument you can, and that is, conspiracy.

17  Sure, all the evidence stacks up against us.  It all looks like

18  we have no case at all.  The explanation is, it's a conspiracy.

19        And what are they arguing about the conspiracy?  The

20  gun was planted.  This is simply amazing.  They're arguing the

21  gun was planted in the car.  Well, there's one fact that I

22  don't know how they're going to explain -- well, this is a

23  little bit of a different issue.  But if the gun's planted, and

24  everyone's saying he's reaching under the seat, why wouldn't

25  they stick it under the seat?  Why would they stick it in the

1    open door?

2            But more importantly, what about the bullet that was

3    100 percent positively identified to this gun that was found in

4    Cammerin Boyd's car that was found in an apartment on Scott

5    Street?

6            You've seen this diagram a bit before.  Here's the

7    apartment, on the second floor, Apartment Number 1, that had

8    this bullet found inside the apartment.  Fired from this gun.

9    Now, how, if the police planted the gun in Cammerin Boyd's

10   vehicle, did they get a bullet from this gun, this .45 caliber

11   Hi-Point, in that apartment?  Of course they didn't.  Of course

12   there's no conspiracy to plant the gun.

13           But the reason the plaintiffs have to argue that the

14   gun was planted is because when you're evaluating whether

15   there's an imminent lethal threat, knowing he shot at police

16   officers and you know there's a gun right in that car, inches

17   away from his hand, you'll know that any movement he makes

18   while he's in that car, any movement, as Mr. Cameron explained

19   to you, any movement, poses an imminent lethal threat.  So

20   contrary to all common sense, contrary to all facts, and

21   completely ignoring that the bullet from that gun was found on

22   Scott Street, they have to argue the gun was planted.  And.

23           What's their evidence of that?  That on that evening,

24   8 o'clock in May, which is not broad daylight, 8 o'clock in

25   May, in the 30 seconds or so when the officers had to evaluate

1    this incredibly high tense situation, that when they were

2    looking at Mr. Boyd in the car, they didn't see and recognize

3    the butt of this gun for what it was.  That's their entire

4    basis for the theory that the gun was planted.

5            Now, in order for that theory to work, I'm going to go

6    through all the different individuals that have to not only be

7    not remembering, not only be confused, but have to outright

8    have lied to you.

9            Officer Jonas, if you recall, he testified that he

10   arrived on the scene when officers still had their guns drawn.

11   The shots had just been fired.  He was one of the first ones,

12   if not the first one, to the vehicle, and he immediately saw

13   the gun in this location in the pocket of the door.  So for

14   their conspiracy theory to start out the gun was planted,

15   Officer Jonas has to be a liar.  Not just mistaken, he has to

16   be a liar.  In fact, he said he actually guarded the gun

17   because he realized its significance.

18           Officer Mason, who also saw the gun shortly after the

19   shots were fired, he has to be a liar too.

20           Also remember Inspector Gee, he's the individual that

21   took possession of the gun, that counted the rounds in the gun,

22   that found the safety off and one in the chamber, that kept it

23   in his possession until he examined the gun.  He must be lying

24   too.

25           Sergeant Riggle, who also saw the gun at the scene,

Summation - Mr. Loebs

1    according to their conspiracy theory, must have lied.

2              In addition, you have Officer Paine and O'Malley,

3    Elieff, Stearns and Warnke, they apparently all got together

4    and decided to tell the same story and make up some turning

5    motion because it's a conspiracy.  That's what the plaintiffs

6    are asking you to believe.

7              This was also interesting.  I believe Mr. Galipo said

8    Dr. Smith seems like a nice man, or words to that effect, and

9    then he called him a liar.  Then he said that he's part of the

10   conspiracy, too, because he met several times with Inspector

11   Spillane and apparently got Dr. Smith's opinion that the gun --

12   that the shots happened while Mr. Boyd was seated in the SUV

13   based on the wound paths.  An injury to the left hand,

14   apparently that's just to help the police officers.  That's not

15   really his opinion because he's part of this conspiracy too,

16   apparently.

17             And isn't it interesting that their own expert,

18   Dr. Bonnell, we must have got to him as well.  If you remember

19   his testimony, he testified about the wound paths and the

20   trajectories, and his testimony was identical to that of

21   Dr. Smith's.  He agreed that the wound path through the left

22   leg, that the left leg was parallel to the ground, would be a

23   downward trajectory of 5 to 10 degrees.  He also testified that

24   if the left hand was connected to that wound, it would be down

25   lower than the exit wound, which, if seated on the floorboard,

1    would be 23 inches off the ground, and the hand would have to

2    be lower than that for the wound paths to be the same.

3          But another interesting thing Dr. Bonnell testified

4    to, as I also asked him about the path through the abdomen.  I

5    said, You're sitting there, with your understanding of the

6    wound path through the abdomen and the trajectories, is it

7    possible for someone to be seated as I am now, leg parallel to

8    the ground, and the body twisted to the left, the left hand in

9    this location, to sustain those wound paths?  And he said, Yes,

10   that's consistent.  That's the testimony of Mr. Jason, the

11   testimony of Dr. Smith and the testimony of Dr. Bonnell.

12         And here's an interesting thing:  If you think back to

13   yesterday's closing arguments, one name you never heard

14   mentioned one time.  Not even once.  Is Dr. Bonnell.  Who the

15   plaintiffs called.  They said, here is an expert about wound

16   paths and trajectories.  Listen to what he has to say.  This is

17   important, you can rely on this.  And then what he says

18   completely undermines their case and their theory.  So sweep

19   him out of the way, don't mention his name anymore.  I guess

20   he's part of the conspiracy.

21         In order for there to be no gun in Mr. Boyd's car, it

22   must mean that he didn't have a gun that day and he wasn't

23   threatening anyone with a gun.  Because, otherwise, what

24   happened to it?  Did he throw it out the window?  No evidence

25   of that.  Was it just a coincidence that a gun was recovered, a

Summation - Mr. Loebs

1    black gun such as this, that Miss Williams said was pointed at

2    her head?  Well, their explanation for that, although

3    Mr. Galipo didn't quite come out and say it, is that, well,

4    Ms. Williams, she must have cut a deal somehow to get leniency.

5         You heard her testimony by videotape.  And you will be

6    evaluating whether she is credible, or whether she seemed like

7    she wanted to be here involved in this situation, and whether

8    she was telling the truth to get something, or was she telling

9    the truth or is she telling a lie, as far as conspiracy goes.

10        Miss Hogan also, she's got to be part of it as well.

11   Apparently, since they're not together, to say the incident

12   didn't happen to Miss Hogan, that's when he resorts to trading

13   cars, just a big misunderstanding.  Maybe Cammerin Boyd was

14   just showing her the gun.  Just, would you trade cars with me?

15   She got the wrong idea when the gun was pointed at her head,

16   that he wanted to kill her.  Apparently when he had a gun and

17   pointed it at Ms. Williams and Ms. Hogan, and then they're

18   saying this is a different gun, I guess, pulled out of the sock

19   of a police officer?  I don't know.

20        Lieutenant Spillane, they're suggesting maybe that

21   he's the mastermind of this whole conspiracy.  I guess

22   Mr. Jason, he's also involved too because of the high velocity

23   blood spatter that he saw in examining the vehicle, which

24   incidentally their expert Mr. Firestone didn't even examine.

25   They come in here and say there's no high velocity impact

Summation - Mr. Loebs

1    spatter there because our guy looked at some poor photographs.

2    He couldn't see it.

3         Why didn't you come look at the car?  Two reasons come

4    to mind.  One is they know what they would find.  If the

5    evidence is harmful to your case, ignore it.  Don't look at it.

6    Because if he came and looked at that car and he found the same

7    thing, then you would have another perhaps, if you knew what he

8    was talking about, another Dr. Bonnell situation.  But don't

9    look at the car.  In fact, with Mr. Firestone, don't look at

10   anything.  Don't go to the scene, don't examine the physical

11   evidence, and when he first gave his opinions, don't even look

12   at photographs.  Give us an opinion without doing that because

13   we don't want the facts to interfere with what you're going to

14   say.

15        This gets to my next thought, that it's not really

16   about conspiracy, it's not about anything other than trying to

17   confuse you, trying to deceive you with what the evidence is,

18   misdirection through the questioning of the witnesses the way

19   they were questioned.  Almost like this case is flipped on its

20   head and the defendants have the burden, and they think they

21   can just poke holes here and there, and say, Huh, I wonder

22   about that, maybe that the bit of blood, maybe that doesn't

23   make sense.  Or what about this.  And then at the end of the

24   day, what are you supposed to do with that?  They're hope is,

25   they're all confused, we'll just give the plaintiff the big

1    verdict, we're all confused.

2              That's not how the burden of proof works.  They have

3    an obligation to convince you of what happened.

4              Misrepresentation is also a huge part of the

5    plaintiffs' attempt to prevail in this case.  And let me give

6    you one of the most clear examples if you recall yesterday,

7    Mr. Galipo made a big point out of telling you, I wanted to get

8    it right.  So I got an order of trial transcripts of the

9    critical witnesses' testimony, because I wanted to make sure I

10   represented correctly to you exactly what they said.

11             And then he brought out the transcript of Joe Campos,

12   whom you all heard testify.  And you heard the way in which he

13   testified.  And you may have noticed during the direct

14   examination, Mr. Galipo was very careful never to ask him

15   whether at the time the shots were fired, whether he was

16   sitting or standing.  He also never asked him questions about

17   he's in the area of the open door, he's around the open door,

18   what happened next?  Never asked him that question.  In fact,

19   one time Mr. Galipo slipped, and Mr. Campos did say he was

20   sitting, Mr. Galipo quickly went onto something else because he

21   did not want to hear that.

22             You didn't learn that at the time the shots were fired

23   that Mr. Campos saw Cammerin Boyd seated in the SUV until I did

24   my examination of him.  And just asked him, he said, Yeah, he

25   was sitting down as I am now, with his leg parallel to the

1   ground as I'm sitting right now.  He was seated, and didn't use

2   the term "floorboard," but what does this matter.  He was

3   seated on the edge of that car and he described precisely how

4   he was doing that.  But only because I asked him those

5   questions.

6        But then Mr. Galipo, because he didn't get by with the

7   confusion of the witness during his direct examination, because

8   he didn't get him to say what he wanted, then he comes to you

9   in his closing arguments and he completely misrepresents what

10  Mr. Campos's testimony was.  If you recall yesterday,

11  Mr. Galipo came up here yesterday and said, Do you know what

12  Mr. Campos said?  He said that Cammerin Boyd was standing with

13  his hands raised.  Well, you know, Mr. Campos did say that.

14  But you know when he said that?  That was when he saw Mr. Boyd,

15  outside of the car, taking off his do-rag.

16       This is what Mr. Galipo read to you:  "When he had his

17  hands up, where was he in relation to the vehicle?

18       "Next to it.

19       "And he was standing when he had his hands up?

20       "Yes."

21       Later discussion:  "When the individual had his hands

22  up at that time, if you can recall, was his do-rag already off?

23    "A  Yes.  That's when he walked forward and took it off, he

24  had his hands, he went like that, motioning, tossing the do-rag

25  down towards the ground, somewhere right here.

1      "Q   And then he went back at some point, he was in the area

2   of the open driver's door.

3      "A   When he went back."

4           That's what he's talking about when he was standing

5   with his hands up.  When he was taking the do-rag off walking

6   around by the side of the car.

7           Mr. Campos could not have been more clear when asked

8   that Cammerin Boyd was seated.

9           And here's another portion of his testimony Mr. Galipo

10  didn't read to you:

11     "Q   And after you saw him walk back to the open driver's

12  door, what did you see him do next in terms of his body

13  position?

14     "A   He leaned on the driver's door, making a seat position.

15          "In a seat position?

16          "Yeah.

17          "When you say 'seat position,' you mean sitting like

18  you are now?

19          "Yes.

20          "With your legs like they are parallel to the ground?

21     "A   Yes."

22          That's what Mr. Campos testified to.

23          But that doesn't serve the plaintiffs' purposes, so

24  they couldn't confuse him in trial so they misrepresented to

25  you what he actually said hoping you maybe didn't pay

Summation - Mr. Loebs

1    attention, hoping maybe I wouldn't catch it.  I don't know.

2                Now, one other thing I want to discuss before I talk

3    in some detail about the verdict form and the questions you're

4    going to answer in this case and how the facts came in with

5    respect to that issue.  Is a comment that Mr. Galipo made that

6    I feel I just have to address.  He said to you that the reason

7    that he called Mr. Campos to testify is -- implied it was out

8    of some civic duty he felt to give you all the facts, give you

9    all the information, even if it's harmful to his case, put it

10   all in front of you so you can judge the case as it is.  Didn't

11   want to hide from any of the evidence.

12               Well, if that's true, then why when Mr. Galipo was

13   examining Mr. Campos didn't he ask him whether he was sitting

14   or standing when he was back in the SUV?  Why did he dance

15   around that question and wait for me to ask it?  If that's

16   true, why did Marylon Boyd go to Mr. Galipo and tell him he

17   didn't have to testify (sic) when he had a court-ordered

18   subpoena compelling him to testify.  Why do that if you're

19   interested in getting all the information, all the facts to the

20   jury?

21               And isn't it interesting that she never took the stand

22   and denied that.  She never said, No, as a lawyer, I didn't,

23   you know, and intimately involved in this case, I didn't go to

24   a key critical witness in this case and tell them not to honor

25   their court subpoena.  I didn't do that.  She didn't say that

Summation - Mr. Loebs

1    at all.  And her failure to say that speaks volumes.

2            Why did they call Mr. Campos?  That's the way the

3    trial has worked.  The plaintiffs get to go first.  And if they

4    can call a witness first, they get their first crack at him.

5    They can confuse him, they can trip him up, get him to say

6    something he doesn't mean to say.  And, hopefully, that will

7    help their case.  That's why they called him.  Not out of some

8    interest to give you all the facts, and you know that.

9            Now, a few other examples that I'd like to give that

10   completely run in the face of this suggestion that they're

11   interested in giving you all the facts of the case so you can

12   evaluate it.  Remember the 1993 incident in which Cammerin Boyd

13   lost his legs?  The 140-mile-an-hour CHP pursuit.  If you

14   remember back to the beginning of this case, you heard from

15   four plaintiffs' witnesses talking about the accident, talking

16   about how tragic it was.  None of them mentioned anything about

17   how that accident occurred.  None of them.

18           Even Ms. Boyd, when she was talking to you about it in

19   detail, about the effect it had on Cammerin Boyd's life, never

20   mentioned at all how that happened.  That didn't come up until

21   cross-examination.  Then she hemmed and hawed, maybe it wasn't

22   a high-speed chase, she didn't know.  You didn't really learn

23   about it until we called the CHP officer that Marylon Boyd sued

24   for the loss of her son's legs because he was running at 140

25   miles an hour from the police.  Is that trying to give you all

Summation - Mr. Loebs

1   the facts so you can judge a case?

2          In addition, it's interesting that plaintiffs didn't

3   call Fatima Wilson.  Fatima, who's been a witness in this case

4   from the very beginning, was interviewed at least four times,

5   had her deposition taken at length.  Plaintiffs certainly knew

6   who she was.  And she had met the family members, she talked

7   with everybody.  She had met many times with the attorneys,

8   she'd met with the investigators.  Why didn't they call her?

9   Because she says at the time the shots were fired, Cammerin

10  Boyd was reaching into the vehicle like he was trying to get

11  something.  And they didn't want you to know that.

12         Why didn't they call Officer Elieff?  Why didn't they

13  play the dispatch tape for you?  That certainly would be

14  information if someone's trying to give you all the facts you

15  want to hear.  Why did you have to wait until the defendants'

16  case to hear that?

17         But some of those issues are a little bit beside the

18  point, as to what the plaintiffs' attorneys was doing or what

19  their approach was to the case and why they took the case.

20         What matters in this case is what you're going to

21  answer when you get back and you're evaluating the case in your

22  deliberations.  And the first question you're going to have to

23  answer on the verdict form is Question Number 1, and it reads

24  exactly like this:  "Have plaintiffs proven by a preponderance

25  of the evidence that either Officer Timothy Paine and Officer

Summation - Mr. Loebs

1    James O'Malley used unreasonable force on Cammerin Boyd on

2    May 5th, 2004, on Larch Way?"

3            Right away one thing you will notice is that this

4    relates to what happened on Larch Way.  There is no claim being

5    made that the shot that Officer Paine fired at Pierce and Turk

6    was an unreasonable use of force.  And when we get to the

7    verdict -- the jury instructions, I think you'll see why.

8    Because it's absolutely clear that Officer Paine's entitled to

9    and it was appropriate to take that shot to stop the threat of

10   Cammerin Boyd at that time, both in terms of the fleeing felon

11   rule and the high-speed pursuit rule, and we'll talk about that

12   in a bit.

13           But this is the question you'll have to answer.  And

14   on the verdict form you'll have a space where you answer it yes

15   or no as to Officer Paine.  And then you'll answer yes or no as

16   to Officer O'Malley.  And again, why Officer O'Malley is

17   involved in this, I don't have -- I'll guess, but we'll leave

18   that for a later discussion.  Because there's no suggestion

19   Officer O'Malley ever, his bullets ever struck Mr. Boyd.

20   Mr. Boyd was out of the car well after Officer O'Malley fired.

21   He was standing around uninjured, still not surrendering, and

22   then Officer Paine, it is agreed and stipulated to, fired the

23   lethal shots.  So why he's been here and had to have been

24   dragged through this, I'm not sure.

25           But this is the question you'll have to answer.

1          And now what I'd like to talk about, since it's really

2     the focus of the whole case, as to Question Number 1 as it

3     relates to Officer Paine, and that question is, Did plaintiffs

4     prove that Officer Paine used unreasonable force?

5          Now, for much of the presentation I want to make

6     today, I'll talk about first what the standards are for

7     evaluating use of unreasonable force.  And Mr. Galipo referred

8     to those a bit in his closing remarks.

9          Then I'd like to talk about what is evidence and what

10    is not.  In other words, how to evaluate the evidence that came

11    in related to that issue.

12         And then later on, as you'll see through the

13    presentation, I'm going to talk about the various evidence that

14    came in and whether it supports plaintiffs' establishing that

15    Officer Paine used unreasonable force or whether it doesn't.

16         So, first -- next, let's talk about what the test is

17    for unreasonable force.  You heard Mr. Cameron and Mr. Galipo

18    describe this as an objective standard.  It's an objective

19    standard.  It's not what the officer had in mind at that

20    moment.  For good or bad, that's not what you're evaluating.

21    What you're evaluating is if you take a hypothetical officer,

22    not just an individual but a hypothetical police officer, and

23    put them in the same position and understanding what that

24    officer understood or knew through his own personal

25    observations, or through those that he learned through the

1   police communications, you put yourself in Officer Paine's

2   shoes and say, Under those circumstances, was it appropriate to

3   use lethal force?

4           Some of the things that you'll be instructed that you

5   must keep in mind when doing this evaluation is that officers

6   must make split-second decisions.  They often don't have the

7   luxury of time.  We have been litigating this case for years.

8   You have been listening to this case for six weeks, which is a

9   long time.  You've heard mountains of evidence.  We've had

10  piles of exhibits and blowups you've been evaluating.  And

11  you're trying to evaluate something that happened in maybe 10,

12  15 seconds.  10 or 15 seconds.  That's the amount of time,

13  probably even less than that, that Officer Paine had to make

14  this decision.

15          Officers, when they're making decisions, don't have

16  the luxury of time.  They have to act right away.  And one of

17  the most important factors to consider is that they do not have

18  the benefit of 20/20 hindsight.  This will be specifically in

19  the instructions you receive.  They have to make a decision

20  based on what they have, the facts they know, at the time.  Not

21  based on 20/20 hindsight.  And Mr. Cameron, I think, explained

22  that pretty well.

23          Another factor that is irrelevant to the objective

24  analysis is what is Cammerin Boyd thinking.  Now, we've

25  presented some evidence through Dr. Keram and through other

```
 1    witnesses that relate to whether Cammerin Boyd was suicidal or
 2    not.  But in terms of evaluating what the officer did and
 3    whether what the officer did was appropriate, not only don't we
 4    consider that issue, that really goes to whether he was
 5    reaching or not, but even if Cammerin Boyd wasn't attempting to
 6    reach for a gun, even if he had in his mind that, I'm just
 7    going to put my hand over here for whatever reason, I'm going
 8    to just grab something under the seat, I want to show the
 9    officer some sunglasses or I'm getting tired of having my hands
10    up, I want to put them down over here, or I want to get down to
11    the ground, whatever he had in his mind when he moved his hands
12    when they were up to inside the vehicle is irrelevant.  Because
13    it all has to do with the perception of the officer and the
14    threat that they see at that time.  And that's the way in which
15    you have to evaluate the officers' actions:  What did they see?
16    What did they perceive?
17            Another factor that's important in evaluating the test
18    for unreasonable force, which plaintiffs again have the burden
19    of proving, is you only consider the force that's used as to
20    Mr. Boyd.  There have been arguments that have been made about
21    mythical passengers in the SUV.  Well, maybe you shouldn't have
22    shot because you hadn't cleared the SUV to make sure there
23    wasn't anyone inside.  Completely irrelevant.  Because this
24    case is brought by Cammerin Boyd's family, and it's about the
25    force used as to him.  Not to anyone else.
```

1          Also, it's not as to mythical or bystanders on Larch.

2   You cannot evaluate, you're not permitted to evaluate, the use

3   of force in this case in terms of whether or not it presented a

4   danger to anyone else other than Cammerin Boyd.  And you'll be

5   instructed on that.

6          Another factor that's relevant that will also be part

7   of your instructions is that this is not an issue of good or

8   bad tactics by the police officers.  For example, you've heard

9   a lot of testimony about whether -- where Officer Paine was and

10  whether he had cover at the time that he fired his shots.  The

11  argument could be that because he's more exposed, he was put in

12  more fear by a sudden movement by Cammerin Boyd.  That is

13  irrelevant.

14         The only thing you're allowed to evaluate is whether

15  or not Cammerin Boyd's actions and his movements would have put

16  a reasonable officer in imminent fear of death or serious

17  bodily injury.  That's what you're to evaluate.  And whether he

18  should have had cover, whether he had cover, where the officers

19  were positioned, should they have called out on the radio and

20  said something to someone, should they have -- one officer told

21  another what was happening, although we discussed those things,

22  and we presented evidence that everything the officers did was

23  appropriate, that really doesn't factor into evaluating this

24  issue; and that is, Did Officer Paine use reasonable force?

25  And as I said, there will be a specific instruction related to

1    that as well you'll receive.

2            Now, in evaluating this issue, and that is, Did the

3    plaintiffs prove that Officer Paine used reasonable force,

4    there are several things that I think you need to consider.

5    Putting yourself in Officer Paine's shoes, with the information

6    that he had that was available at the time, and what he

7    observed, what he had heard over the radio, it would be

8    reasonable for Officer Paine to believe that Boyd had a gun in

9    the SUV.  I think that is pretty much undisputed.  That in that

10   circumstance it's reasonable for him to believe that Cammerin

11   Boyd has a gun in the SUV and that he's prepared to use it to

12   kill police officers.

13           It's also reasonable to assume Mr. Boyd moving his

14   hands into the SUV would be an imminent threat.  Why is that?

15   If it's reasonable that he has a gun in the SUV, then moving

16   his hands into the SUV is an imminent lethal threat.  And how

17   do we know this?  Well, in evaluating it, you look at how it

18   would appear to the officer based on the movement.  Or any

19   movement.  The hands are up, the hands are somewhere, and he

20   makes a movement, how is that going to appear to the officer?

21   Now, what he was actually reaching for, what was he actually

22   doing, but how would that appear?  And I believe that's

23   undisputed that that's the test as well.

24           And next we'll look at -- do these one at a time.  As

25   I said, what Boyd was thinking is irrelevant.  Mr. Clark

1    actually agreed that this would be the standard, that if

2    Cammerin Boyd, after everything is happening, is back in the

3    SUV and he makes a move into the SUV, then the officers would

4    be entitled to use lethal force at that time, and they do not

5    have to wait and see a gun.

6              Mr. Cameron made this clear as well, that that's the

7    way in which police officers are trained.  That an individual

8    has fired at police, is not compliant with commands, and makes

9    any move into the vehicle where the officer reasonably believes

10   a gun is located, then the officer's entitled to use lethal

11   force.  That is the imminent threat.

12             And as I mentioned earlier, how many chances did the

13   officers have to give Mr. Boyd?  He was out of the car.  He

14   didn't get to the ground.  He's out of the car, he had his

15   hands up, he didn't keep them up.  He came back to the car

16   where his loaded gun was.  Now he's sitting in the car and he

17   has his hands where the officers can see them.  If he does

18   anything else at that point, probably before then, he'd given

19   the officers more than ample cause to fire.  But at that point

20   if he does anything with those hands, moving towards the car in

21   any way, the officers, Officer Paine, is entitled to use lethal

22   force to stop that threat.

23             And the question is, How much more did the officers

24   have to do to risk their lives to get him an opportunity to

25   surrender?  What else did they have to do?  What else could

1   they have done?  They're yelling at him, he's not obeying them.

2   He's reaching into the car and Officer Paine lets him reach

3   once, still doesn't shoot.  So with respect to this issue, when

4   Mr. Boyd is moving his hands into the SUV, would that be an

5   imminent lethal threat?  I think the answer is yes, of course

6   that would be, under these circumstances.

7          So -- and as I explained further, Officer Paine did

8   not have to see a gun in Boyd's hands before firing.  This is

9   undisputed, as Mr. Clark reluctantly agreed to that, and

10  Mr. Cameron explained that as well.  So the test is not whether

11  or not he had a gun in his hand.  The test is going to be

12  whether he moved his hand into the SUV.

13         Now, next what I'd like to talk about, now we've

14  talked about the view of the evidence as to what is the -- what

15  is the factual issue that you're going to need to resolve in

16  this case as to Officer Paine's conduct.  What is the fact

17  that, when you go back to the jury room, are you going to try

18  to figure out?  What is the critical fact that happened?  I

19  believe the critical fact that was explained is, when Officer

20  Paine fired, did Mr. Boyd move his hands in the vehicle?

21  That's the issue.  That's the fact that you have to elaborate.

22  And really, that's it.

23         Now, so this Question 1 as to Officer Paine:  Did

24  plaintiffs prove that Boyd was not moving his hands into the

25  SUV when Officer Paine fired?

Summation - Mr. Loebs

1          Now I have it phrased this way with the "not"

2     highlighted in blue because that's the plaintiffs' burden.  In

3     order to prevail, they have to show that he did not move his

4     hands into the SUV when Officer Paine fired.  Because if he

5     did, then that is an imminent lethal threat for the reasons I

6     explained before.  Officer Paine not only is entitled to but

7     should fire his weapon to stop that threat.

8          So that's the critical factual issue you'll have to

9     decide.

10          Now, before I get into the actual evidence in the case

11    that relates to that factual question, I want to talk for a

12    minute about what is evidence and what is not.

13          What is evidence?  You probably have a pretty good

14    idea of that already.  And what is not.  What is evidence?

15    Testimony of credible witnesses is evidence that you can rely

16    on in evaluating this critical factual issue as to whether

17    Cammerin Boyd is moving his hand into the vehicle when Officer

18    Paine fired.

19          Physical evidence.  Obviously evidence you can

20    evaluate.

21          The opinions of qualified experts.  Also evidence you

22    can evaluate on this critical issue.

23          What is not evidence?

24          Opening statements, closing statements, what I'm

25    telling you, what Mr. Galipo told you, is not evidence.  I'm

1    discussing the evidence with you, but what I say does not count

2    as evidence.  What Mr. Galipo says does not count as evidence.

3    And that's true for the entire course of the trial.  The

4    questions that I ask, the questions that Mr. Galipo asks are

5    not evidence.  It might sound like there's some basis for it.

6         For example, Mr. Galipo asked Officer Moody, did you

7    ever put a gun to Cammerin Boyd's head and threaten to kill

8    him?  Officer Moody said, No.  You hear that question, say,

9    Boy, he must have some basis for asking that?  Turns out he

10   didn't have any.  But the question itself doesn't count.  It's

11   the answer.  And you've heard a lot of times a lot of instances

12   where there was a question asked with inflection or tone of

13   this is evidence the attorneys are providing or it's something

14   the attorney knows because otherwise why would he ask the

15   question that way.  He doesn't count.  It's misdirection and

16   confusion.  What counts is what the witnesses tell you.  That's

17   evidence.

18        Insinuations, gestures, especially the gestures

19   that we've had many of that the witnesses aren't following when

20   they're answering the question.  So how were his hands when you

21   first saw him?  How many times did we see that?  After he got

22   out of the car and you saw him, what did he do next, suggesting

23   that what Mr. Galipo is doing is the witness's testimony, which

24   it wasn't at all, in most instances.

25        Insinuations to the questions about tone of voice by

1    the attorney, that Mr. Galipo is incredulous at the answer he's

2    getting.  Not evidence.

3           Hypotheticals based on made-up facts.  Also not

4    evidence.  I'll give you a couple of examples.  When Mr. Galipo

5    was talking about Ms. Williams, he posed hypotheticals to, I

6    think it was Dr. Keram.  He said, Would someone doing a U-turn

7    be an indication that they were suicidal?  And he's talking

8    about the incident with Miss Williams.  She never said it was a

9    U-turn.  She said he was spinning donuts in front of the

10   Tenderloin police station.  A U-turn is completely made up in

11   the question.  But it doesn't count as evidence.

12          And this is perhaps the most glaring example of what

13   is not evidence through an attorney's questioning.  Death

14   threats at gunpoint to Miss Hogan became merely a request to

15   trade cars.  If you remember the first time this came up, I

16   believe it was Mr. Brass, Mr. Galipo said, Well, what if, you

17   know, instead of pointing a gun at someone and threatening to

18   kill them, the person merely asked to trade cars; would that be

19   a crime?  He said, No.  And I think Mr. Galipo said, I forgot

20   to put the gun part in.  It's kind of important.  Well, it

21   isn't in there.  He did the same thing with Dr. Keram, if you

22   recall.  He called it a request to trade cars.  Not evidence.

23          The next presentation, which is really the reason I

24   have this up here and why I'm doing closing argument this way,

25   is because I want to present to you in sort of a visual form a

 1    graphic that will show the question, the important question the

 2    plaintiffs have to prove to you to prevail, and on one side the

 3    evidence that comes in to support it, and on the other side the

 4    evidence that's against it.

 5            This is rather important.  The argument by plaintiffs'

 6    counsel was that reaching into the SUV is merely lowering the

 7    hands.  When we were evaluating the movements of Mr. Boyd, it's

 8    the movement that matters.  It's not anyone's description as to

 9    what they thought was in his mind; it's the movement.  And the

10    movement is all the officers see and all they know.  And that's

11    how you evaluate whether it's a lethal threat.

12            So this is the structure I'm talking about that I want

13    to use to discuss the evidence that came in in this case.  And

14    the question I have is, Number 1, Did plaintiffs prove that

15    Boyd was not moving his hands into the SUV when Officer Paine

16    fired?  That's the critical factual issue that you need to

17    resolve one way or the other.  And the plaintiff has the burden

18    on this.  There is no dispute about that.  And what I'll talk

19    about is the evidence that was presented by the plaintiffs that

20    they thought answered this question in the affirmative, that

21    the suggestion was, Okay, here, listen to this evidence, this

22    will prove this critical issue, and that's the reason we should

23    prevail.

24            And then we'll talk about the evidence that went

25    against that proposition.  And the reason it's structured this

1    way is because the plaintiff has to prove this point.

2    Plaintiffs have to win.  They have to load up this side of the

3    ledger.  They have to tip the balance more than 50/50 and

4    convince you that this proposition is true.

5           Now, what I'd like to talk about first are the Larch

6    Way witnesses.  And if you recall in my opening remarks, I

7    suggested that in evaluating the witness testimony and the

8    evidence in this case, it's important to keep in mind the

9    perspective that those witnesses had.  At this point I'm not

10   talking about bias or anything like that.  I'm just talking

11   about the perspective they had when this incident came into

12   their home.  When this came into their backyard.

13          And other things, factors that have influenced that

14   perspective.  And this is true of all of the Larch Way

15   witnesses.  Their perspective.  They saw maybe 60 seconds at

16   most, the tail end of this incident.  They had no idea that he

17   had a gun in the car or he'd been shooting at the police.  No

18   idea.  They were just at home, minding their own business,

19   working on their computer, doing whatever, and this came

20   roaring into their neighborhood.  They didn't know what

21   happened before.  The reason why that's important is because

22   when they're looking at this event, they don't have nearly the

23   same information the police officers do in being able to

24   evaluate whether a movement poses a lethal threat.  They don't

25   know that he has a gun.  They don't know he's recently

Summation - Mr. Loebs

1    attempted to murder police officers.  They don't know that he

2    had threatened Tatanika Hogan with a gun.  They don't know

3    anything about that.  They just see what maybe looks like a

4    traffic stop coming into the neighborhood.

5         And also their perspective of course, there are a

6    number of outside influences that may alter their perspective.

7    If you recall the testimony was that right after this incident

8    happened, that neighborhood was descended upon by an

9    organization called Police Watch.  According to testimony, this

10   organization had people out interviewing, taking pictures,

11   right away.  Because this is an organization that is hostile to

12   police and they wanted to get involved in this incident from

13   the get-go.  And they did.

14        The other outside influence is Marylon Boyd and her

15   campaign.  She called it Campaign for Justice for Cammerin

16   Boyd.  We have to keep this in perspective now.  This is a

17   person who is an attorney, who actually does these types of

18   cases for a living.  Whose son was involved in the incident.

19   And she goes out of her way to have contact with the percipient

20   witnesses that would be testifying in this case.  She goes out

21   of her way to talk to them about what happened.  She goes to

22   the candlelight vigils with them.  She even talks about having

23   Mario Rogers and Otis Harris in her campaign, two witnesses to

24   this event.  What does that mean in terms of their perspective

25   when they come here to testify?

1          In addition, talked about -- I think it was with Miss

2     Cranshaw, I believe, that Miss Cranshaw was at one of these

3     rallies, and Ms. Boyd went out of her way and introduced Miss

4     Cranshaw to Cammerin Boyd's two beautiful young daughters.  How

5     can that not have an effect on anybody?  I'm sure it had an

6     effect on you, when you met them.  These two delightful girls.

7     They're absolutely charming.  And to see them and then be a

8     witness as to what happened with their father, how can that not

9     affect you and make you perhaps want to help them out?  That's

10    the influences that Ms. Boyd potentially brought to bear on the

11    witnesses in this case.

12          And let's not forget what she did with Mr. Campos.  As

13    a result of her activity, she had him so terrified and his

14    mother so terrified that she wouldn't let him testify in this

15    case despite repeated court orders.

16          MR. GALIPO:  Your Honor, I'm going to object as

17    mischaracterizing the testimony in this case.

18          THE COURT:  All right.  Again, ladies and gentlemen,

19    there was testimony on this subject, and you will be the final

20    determiners of reasonable inferences that can be drawn from

21    Mr. Campos's testimony.  I'll overrule.

22          MR. LOEBS:  The other factor that I want to discuss

23    that relates to the perspective of the Larch Way witnesses is

24    they knew each other well and they talked about it a lot.  And

25    of course they did this right after this happened.

Summation - Mr. Loebs

1   Understandably.  And they had very little information about

2   what had occurred.  And they're probably all trying to make

3   sense of it, perhaps.  Many of them maybe had bad contacts with

4   the police before, didn't have the most positive view of the

5   police, and that may have influenced them as well.  And let me

6   just give you one example of that, and, again, I'm not

7   necessarily saying that the people on Larch Way are horrible or

8   bad -- anything like that.  It has to do with their

9   perspective.

10          Some of the witnesses testified that when they heard

11   the gunshots being fired, they went to their windows and came

12   out wanting to see what's happening, and they heard the police

13   ordering them to get back inside.  The police officers said,

14   Yeah, we did that because shots were being fired, this is

15   extremely dangerous, we don't want anyone to get hurt.  We

16   don't want anyone to get -- you know, we see people, we tell

17   them to get out of the way.  Officer Paine, that's the first

18   thing he did when he got to the scene.  He saw some people

19   huddled, he said, Get out of here, get out of here, because

20   that's what a police officer's role is, is to help protect the

21   public, to protect the people on Larch Way from what was

22   happening on their street.

23          But many of the witnesses, if you'll remember, their

24   perspective was that they wanted to see what was happening,

25   that they thought that the police telling them to go away was

1   because they didn't want them to see.  That gives you an idea

2   of the different perspective that people that testified on

3   Larch Way have when it comes to viewing police officer

4   activity.

5           Now, let's talk about the first witness.  And I won't

6   go through in the order in which every witness testified, but I

7   will do that when we talk about the Larch Way witnesses.  Just

8   for simplicity.  And also because it's been a while since we

9   heard these witnesses testify.  And so I wanted to discuss the

10  way in which their testimony came up.

11          And, again, using this ledger, Did the plaintiffs

12  prove that Cammerin Boyd was not moving his hands into the SUV

13  when Officer Paine fired?  That's the critical issue.  Let's

14  talk about the first witness that the plaintiffs brought to

15  discuss that critical fact.  That's Mr. Harris.  You notice I

16  have a question mark by his name because we're going to talk

17  about whether he and his testimony actually helped prove this

18  proposition with the plaintiffs actually having the burden.

19          Mr. Harris.  Remember his story.  He told you that he

20  lived, this says 652, but that's wrong.

21          MR. GALIPO:  672.

22          MR. LOEBS:  Yeah, he lived at 672.  He lived at 672,

23  which on this exhibit is right here (indicating).  Just so we

24  can get some idea.  And then he first told you he was taking

25  his garbage out somewhere around here when he first saw the

1   activity on Larch.  Somewhere around this location.  And that's

2   next to 652.  So when I indicate here that he was at 652, I

3   don't mean that to mean that's where he lived, but that's where

4   he was when he told you he first saw the events that transpired

5   on Larch.

6          According to Mr. Harris, Mr. Boyd had his hands raised

7   the entire time.  Never once moved them.  Mr. Harris told you

8   he saw the entire incident from beginning to end, never saw him

9   take his shirt off, never saw him lower his hand to his belt,

10  never saw him use his hands in an attempt to get down, never

11  saw him move his hands in any way toward any part of the car.

12  He's the only one that says that.

13         Next, he says that Mr. Boyd never walked to the back

14  of the SUV.  And he says again Mr. Boyd never, ever lowered his

15  hands.  And that when this was happening, he was facing the

16  officer who fired the lethal shots.  That's Mr. Harris's

17  testimony.

18         Now, I want to discuss Mr. Harris's bias as it relates

19  to your hearing his testimony in this case.  And this is a bias

20  against -- as it relates to the San Francisco Police

21  Department.

22         As you heard, Mr. Harris has had 150 felony arrests in

23  San Francisco.  150.  And 75 misdemeanor arrests.  That's a lot

24  of negative contact with the San Francisco Police Department.

25  That's an enormous amount of negative contact with the

Summation - Mr. Loebs

1   San Francisco Police Department.  Mr. Galipo in his remarks

2   attempts to pass this off as a '60s thing?  I don't know where

3   he got that.  Completely made-up fact.  You remember

4   Mr. Harris, he was in prison, in state prison, until 1996.  A

5   '60s thing?  The Haight-Ashbury era that you have 150 felony

6   arrests?  Was that the summer of?  That's completely made up.

7        Mr. Harris admitted on examination that he had been

8   shot at by the San Francisco Police Department.  He also told

9   you that he went to jail for eight years, in his mind doing

10  nothing.  This all relates to how much can you rely on what

11  Mr. Harris tells you.  Does he have a bias?  And Mr. Harris

12  admits proudly that he is part of the Campaign for Justice for

13  Cammerin Boyd.  That he will yell out as loud as he can for

14  anyone to hear what he believes about this case.  That he goes

15  to meetings, he goes to hearings.  He's part of the campaign.

16       And remember he also said that he helped put cameras

17  on Larch Way; not to protect against the crime that's happening

18  there, which he said is frequent and violent, but to watch the

19  police.

20       So when you're listening to his testimony, he comes to

21  you with this bias, you have to evaluate what he says on that

22  basis.

23       Next I want to talk about his credibility, which is a

24  little bit different from bias.  Bias could just be, you know,

25  what you have, what you bring to bear before you say anything

 1    about the case.  Someone could have a bias, but they could

 2    still, despite that bias, they could tell the truth and you

 3    could perhaps believe it.  I would have expected them to maybe

 4    shade things one way, but they were credible to me.

 5            So the next issue I want to talk about is his

 6    credibility with respect to what he told you.  And I submit

 7    that he was not credible in the least.  You see I use the word

 8    "lie."  It's a strong word.  I hesitate to use it in describing

 9    any witness's testimony.  People sometimes have a strong

10    reaction against using that word.  And I've been told, Don't

11    tell the jury that someone is lying.  Say they misrepresented.

12    But there's really no other way to describe what Mr. Harris

13    did.

14            And this is the big one.  Remember when I showed you

15    the map here about where Mr. Harris said he initially was?

16    Right by Mr. Rogers at around 652, right in this location?

17    Which, as you can see, is a long hall, you know, a lot to look

18    through to see what's happening at the SUV.  He told you that

19    he moved after the first shots were fired, that he moved from

20    that location and went all the way down the sidewalk, all the

21    way to 620.  620.  Right here (indicating).  According to

22    Mr. Harris's testimony, he was standing shoulder to shoulder

23    essentially with Officer O'Malley.  Right in the thick of it.

24    And he said, Well, I wasn't really taking a risk because I

25    thought the shots have been fired, things are calming down, and

1    he said that children are coming back in to play, I had visions

2    of birds starting to chipper.

3          That is a complete lie.  And how do we know that?

4    Because his friend, Mr. Rogers, testified, you know, no, he

5    wasn't down there, he was right with me the entire time.

6    Mr. Rogers who lives at 652, lives right here, said he was

7    there talking to his friend Otis Harris, and he was there the

8    entire time, he was there when the shots were fired.  Which

9    really doesn't that make the most sense, anyway?

10         But Mr. Harris, because he wants to be involved in

11   this, he has this idea that he's the protecter of Larch Way,

12   the protecter of Larch Way against the police.  If he's up

13   here, he's not going to be much of a witness, so he's got to

14   put himself right in the thick of it, even though it's

15   ridiculous in the few seconds between the first series of shots

16   and the last that he's going to be running into the thick of

17   it.  Probably into the line of fire with police offices.

18         So we know where Mr. Harris -- from Mr. Rogers that

19   Mr. Harris lied to us about where he was.  So what else did he

20   lie about?  Again, it's a strong word, and I recognize that.

21         If you remember, he described a situation where

22   because he was a witness to the incident in Larch Way, that

23   police officers came to him, beat him half to death, planted

24   drugs on him and then went into his house and stole all this

25   videotape that he had that showed the police doing outrageous

Summation - Mr. Loebs

1   things on Larch, having their guns pointed at the citizens,

2   slapping high fives, kicking Cammerin Boyd's legs, he caught it

3   all on tape, and he says because the police officers knew about

4   it, they came to his house and they beat him nearly to death.

5           I asked him about it.  I said, Did you file a lawsuit

6   as a result of that?  Seems like something like that happens

7   you might want to complain to someone about it.  Did you file a

8   lawsuit?  He said, No, I didn't file a lawsuit.  You didn't sue

9   Officer Nelson?  No, I didn't.  Turns out that's an absolute

10  lie.  We have in evidence the lawsuit that he filed signed in

11  his own hand that's in evidence in his own hand.  You'll see

12  what's in there.  It doesn't say anything about videotapes

13  stolen from his house what happened at Larch Way, but it is a

14  lawsuit that he filed out of that incident that he lied about.

15          Why would he do that?  Well, it's a lawsuit against

16  the San Francisco Police Department.  Similar defendant in this

17  case.  It's a lawsuit against the San Francisco Police

18  Department.  He knew that if you knew he's filing a lawsuit

19  against the department same time he's testifying regarding use

20  of force, you might think he has a bias.

21          He also lied, quite remarkably, about his history of

22  arrests.  He told you through his deposition that he had not

23  been arrested after 1980.  He'd actually spent time in prison

24  well after 1980.

25          This was a big one.  When he was testifying, he told

Summation - Mr. Loebs

1   you through Mr. Galipo's testimony, that he, with his good

2   vantage point at 620, could see the inside of this door and he

3   could tell for sure there was no gun there.  And that no one

4   even said there was a gun for like 30 minutes after the

5   incident happened.  And then they found the gun at some other

6   location.  He said, I could see it.  There was no gun there.

7        If you recall in his deposition testimony that I read

8   back to him, he said exactly the opposite.  That from where he

9   was he couldn't tell one way or the whether there was a gun in

10  the pocket of the door.

11       That's not just a simple misunderstanding or faded

12  recollection.  Even though I hesitate to use the word, that is

13  a lie.  It's not just a lie about these other issues, it's

14  similar to the first lie.  It's a lie to you about what

15  happened.

16       He also said that the officers never, ever gave first

17  aid to Mr. Boyd.  We know that's not true.  He said no one gave

18  first aid to Mr. Boyd after the shots were fired.  You heard

19  the testimony from the captain with the emergency services that

20  testified about the first aid that was provided within minutes

21  after the shooting.  You heard testimony from Officer Mason

22  about the first aid that was provided.  And Officer Jonas as

23  well.

24       But equally important is that Mr. Harris's description

25  of the events is grossly inconsistent with the physical

Summation - Mr. Loebs

1    evidence.  Remember what he's saying.  He's saying that Officer

2    Paine is standing directly across from him, and that when the

3    shots were fired he had his hands up, and he did not move, and

4    he was facing directly across from him.  Well, we know what the

5    wound paths are.  And they're completely inconsistent with

6    that.

7            I was going to use the larger diagram with the nature

8    of the injuries and the anatomical position, but I'll just use

9    the corner of this.  I couldn't put my hands on it.

10           You'll see in this representation that Mr. Jason did

11   that, if you recall -- actually I'm going to try to find it.

12   It's important enough.

13           (Pause)

14           This is marked for identification as Exhibit V-8.  If

15   you recall, Mr. Jason prepared this representation of the wound

16   trajectories to Mr. Boyd standing in an anatomical position.

17   And you'll also recall Dr. Smith in his testimony reviewed

18   Exhibit V-8, and he said that is a fair representation of his

19   opinions as to the trajectories in Mr. Boyd's body as well.  So

20   this is what we're talking about in terms of the wound paths.

21           This would be -- this is the shot to the abdomen, of

22   course.  This is the leg, and that's the hand.  There's no way

23   someone standing like this when the shots were fired that

24   they're going to sustain any, any of those injuries.  Because

25   according to Harris, he was facing directly at Officer Paine,

1    had his hands up when the shots were fired.  That doesn't fit

2    with any of the injuries that Mr. Boyd sustained.

3              So as to Mr. Harris's credibility, I have a bit more

4    with him, and the reason for that is because he was the

5    plaintiffs' first witness.  They said, This is the guy we want

6    you to believe.  This tells the story about how it happened.

7    When Mr. Galipo at the end of his presentation was talking

8    about how Officer Paine probably didn't -- never even thought

9    that Mr. Boyd is going for a gun because he didn't look for one

10   afterward so it's probably never even in Officer Paine's mind,

11   what that means is, if that's true, then Officer Paine executed

12   an individual who was just trying to surrender and had no

13   qualms about it.  That's what Mr. Galipo is suggesting.

14             And what witness testified most closely with that that

15   the plaintiffs would ask you to believe?  That's Mr. Harris.

16   That's why I'm spending as much time as I am on this testimony.

17   And also because it happened a long time ago, and I want it to

18   be fresh in your minds as to whether he's a credible witness as

19   to anything or not.

20             But there are a few other things I want to remind you

21   of as well.  Do you remember some of the crazy stories that he

22   told you about what happened?  For example, his testimony was

23   that when he sees shots were fired, he described it as a

24   Gestapo-like military operation.  His testimony was that just

25   before Officer Paine fired, all of the surrounding officers,

1    just before the shots were fired, turned their guns on the

2    residents of Larch, away from Mr. Boyd, turned their guns on

3    the residents of Larch as if ordering them back into the house

4    so they couldn't see what was happening.  Like it was done like

5    clockwork.

6          He even said one of the officers had a gun pointed at

7    his wife.  And, interestingly enough, when Mr. Harris was

8    describing these activities -- again, he's claiming that he is

9    somewhere that he wasn't -- he said he was right here, he's

10   describing officers all over pointing the guns at individuals,

11   and he says he saw that seconds before the shots were fired.

12   Not only couldn't he do that, but how ridiculous is that?  But

13   that was his testimony.  That was plaintiffs' lead witness.

14   They said, Believe this guy.  He proves our case.

15         Talked about the videotapes being stolen by the SFPD.

16   If there were videotapes showing individuals with their guns

17   drawn pointing them at the residents of Larch, officers

18   slapping five, anything like that, don't you think you'd have

19   that?  Wouldn't he have that?  Doesn't have anything like that.

20   It's just made up.

21         How about the description of the Bay View officers'

22   behavior.  Remember this was awhile ago he was testifying.  But

23   he said after the shots were fired, they left uncovered the

24   upper part of Cammerin Boyd's body for a half hour or so while

25   officers from the Bay View came down and taunted Mr. Boyd on

1    the ground.  They were laughing, they were saying, Good shot,

2    wish I could have been here, that's one for us.  Officer

3    Espinoza, who'd been murdered a few months before, would be

4    proud.

5            It's absolutely ridiculous.  And that's the witness

6    they want you to believe.  Talked about the officers not only

7    giving high fives, rejoicing at what had happened, but then

8    they started kicking Cammerin Boyd's legs.  I ask you, How

9    credible is that?

10           But despite Mr. Harris having no credibility, there

11   are a few things he said that were of some significance, and

12   I'm not necessarily believing anything he said because nothing

13   he said was credible, but there were a few things that came out

14   of his testimony that were really damaging to the plaintiffs'

15   case.  Remember when he was testifying I asked him

16   specifically, Are you saying the hands were up, he never moved

17   in any way before the shots were fired?  He said, That's right.

18   He didn't duck, he didn't wobble, he didn't move at all,

19   standing still, hands up, and the shots were fired?  He said,

20   Absolutely, that's right.

21           Well, that's not what he told the OCC when he was

22   interviewed months before.  In fact, he told them, and I read

23   this to you impeaching his testimony, that just before the

24   shots were fired he saw Cammerin Boyd duck or wobble and move.

25           MR. GALIPO:  I apologize, but I'm going to object as

1    mischaracterizing the evidence in this case.

2            THE COURT:  I'm going to overrule, as I have been, and

3    I would also point out that in each instance that counsel who

4    is making the objection will have an opportunity to address

5    this in their own argument.  So I will overrule.

6            MR. LOEBS:  If this is important to you and there's a

7    concern I've misrepresented this, all you have to do is look

8    for this in the transcript and you will find it.  When he was

9    interviewed by the OCC, he told them that just before the shots

10   were fired, he saw Cammerin Boyd duck and wobble, which is

11   contrary to what he told you when he was testifying in trial.

12           Also he says Cammerin Boyd was laughing just before

13   the shots, he was laughing, he was mocking the officers.

14   Again, I don't know if we can count on anything Mr. Harris said

15   as true, but isn't that an unusual description of this event if

16   Mr. Boyd was behaving as Mr. Harris has indicated?

17           The other thing he said, which I don't know if you put

18   any credibility in it or not, but from his description he's got

19   Cammerin Boyd standing there with his hands out, Officer Paine

20   coming up with his gun drawn, and then something happens, and

21   Officer Paine started backing up and yelling, "Down, down, down

22   down, down," or words to that effect.  He's just standing there

23   with his hands up?  Why would Officer Paine react that way?

24   Apparently spooked by something Cammerin Boyd did?  I don't

25   know if maybe Otis Harris when he was back with Mario Rogers,

1   if Mario Rogers was even there, saw any portion of this and

2   just made up the rest?  Maybe that's what he saw because he did

3   see Cammerin Boyd move into the vehicle, and he saw Officer

4   Paine fire as a result, and that's what would explain this

5   testimony.  Perhaps.

6          The other thing that he said that was interesting, and

7   again I don't know if we can put any stock into it, is that

8   Cammerin Boyd, when he was pulling into the Larch Way, told

9   him, "The police are trying to kill me, the police are trying

10  to kill me."  Well, if that happened, and I'm not suggesting

11  that it did, how would he know that?  How would he know that

12  the police are going to kill him, unless he is going to take

13  action to make sure that that happens?  He's been shooting at

14  the police attempting to kill them.  He's coming to Larch Way.

15  Why wouldn't he just think, if I surrender, they'll take me

16  into custody as they've done many, many times before in my

17  life.  Why would he think they're going to kill me, unless he

18  had in mind making them do exactly that?  How else would he

19  know that?

20         So as to Mr. Harris, I did spend a long time on him,

21  and I won't be as lengthy with other witnesses, but as to

22  Mr. Harris, did he help plaintiffs prove this important

23  proposition, the proposition of the case, that Boyd was moving

24  his hands into the vehicle -- was Mr. Boyd moving his hands

25  into the vehicle when Officer Paine fired?  Did he help prove

1  that that did not happen?

2          He didn't.  He doesn't fit on the "yes" side of the

3  ledger.  In fact, if anything, he established that they didn't.

4          The next witness I'd like to talk about is Mr. Rogers.

5  Now, in talking about Mr. Rogers and the other witnesses, I'm

6  going to go through sort of the same type of analysis as to

7  their testimony.  Again, Mr. Rogers, he was at 652.  He said

8  that Mr. Boyd has his hands raised some of the time, not all of

9  the time.  Different than Mr. Harris.  He told you that he did

10 see Mr. Boyd walk away from the door.  And that he was facing

11 Officer Paine.  And that different than Mr. Rogers, he said

12 that Mr. Boyd was in the door area and almost seated when he

13 was shot.  But he had his hands still up.  That was Mr. Rogers'

14 story.  That's what he told you.

15         Now, like with Mr. Harris, I want to talk about

16 Mr. Rogers' bias that he brought into testifying in this case.

17 He himself also had many, many prior problems with the

18 San Francisco Police Department.  Many arrests and convictions.

19 But interestingly with Mr. Rogers, he essentially admitted to a

20 bias through this, admittedly on his part, essentially racist

21 remark that all officers look alike.  Even plainclothes

22 officers.  I asked him about that before he knew I had that

23 statement; said if someone says that, what kind of statement is

24 that?  That's a terrible thing to say.  Turns out, those words

25 came out of his mouth.  So not only do we have circumstantial

Summation - Mr. Loebs

1    evidence of his bias, we actually have his own words.

2            Also, if you recall, Mr. Harris, according to

3    Ms. Boyd, is part of the Cammerin Boyd campaign.  Although

4    Mr. Harris, if you recall, he denied it -- or Mr. Rogers, he

5    denied it.

6            Now, with respect to Mr. Rogers, also on his bias,

7    remember that he went to school with Lois and with David Boyd,

8    relatives of Cammerin and Marylon -- Ms. Boyd, excuse me.

9            So in terms of Mr. Rogers' bias, many convictions,

10   admitted bias, part of the campaign, and he knows relatives and

11   went to school with relatives of Mr. Boyd.

12           Now, let's talk about some of Mr. Rogers' credibility

13   issues.  And, again, I'm going to suggest to you that he is not

14   credible.

15           Has a felony robbery conviction in 1997.  Something

16   you're allowed to take into consideration in reviewing a

17   witness's credibility.  You'll receive instructions on that.

18   He had the crazy story about Mr. Boyd whipping his shirt around

19   his head.  I don't know whether that's true or not.  He's the

20   only witness that testified to that.  He also said that after

21   this happened, no one even came up to Mr. Boyd and checked for

22   a pulse to see if he was alive.  No one gave him first aid.  No

23   one checked for a pulse.  And I asked him, If that would have

24   happened, were you at a vantage point where you could have seen

25   it?  And he said, Yes.  So he's saying not only he didn't see

1    it, So you're saying it did not happen?  He said, Yes, that did

2    not happen.  Imagine that, a shooting event that occurs and no

3    one goes up to even see if the individual's still alive.  Well,

4    if for no other reason, wouldn't they do that for their own

5    safety to make sure there was no longer a threat?  Wouldn't

6    they do that to see if they needed to give first aid, call an

7    ambulance?  Of course they would.  Of course they did.

8           That's not credible.

9           And as with Mr. Harris, Mr. Rogers' description of how

10   the event happened is grossly inconsistent with the physical

11   evidence of the injuries to Mr. Boyd.  Again, looking at V-8,

12   there's no way that an individual could be seated with their

13   hands up facing the individual, and that's what Mr. Rogers'

14   testimony was, that he was facing the individual, shoulders

15   facing him, when the shots were fired, even had him do a

16   diagram where he showed exactly the way in which he was

17   oriented.  Seated, going to sit with his hands up, there's no

18   way that individual can receive these wounds.  That was

19   Exhibit V-8.

20          So one last thing, it's interesting that he and his

21   friend, Mr. Harris, have the same crazy story about the high

22   fives happening after the shooting occurred.  I have a lot more

23   to say about that as it relates to other witnesses,

24   particularly Miss Wilson, as to how that story came to be.

25          So now the question is, with Mr. Rogers, what did he

1   really see?  Because there's another issue that was presented

2   through his testimony.  He was pretty far away.  In other

3   words, I showed you -- this is a -- this is not a -- this is a

4   copy of a blowup that's in evidence.  And I took some pushpins

5   to generally represent where the witnesses were in this case.

6   I'll have a closer version of this when you get to Larch Way.

7   Because this is generally Mr. Rogers and Mr. Harris.  They're

8   represented by these two dots here.  This is, of course, the

9   area where everything happened.  I'll talk about who these

10  witnesses are in a bit.  This would be Officer Stearns, Officer

11  Elieff, Officer O'Malley, Officer Paine, this would be Joe

12  Campos.  This would be Officer Warnke.  And this is

13  Ms. Jackson.  I believe this is Miss Wilson here and Mr. Ingram

14  up here (indicating).

15          But the point of this and the reason why it's on this

16  big diagram and hard to see is because Mr. Rogers and

17  Mr. Harris are way down here.  They don't even make the

18  close-up diagram.  They're off the chart.  So you have to ask,

19  what did he really see about what was happening from way back

20  here?  Which is where he admitted he was, the entire time.  At

21  least till the last shots were fired.

22          But that gets to the next issue, and that is -- now

23  I'll get to that in a moment.  But remember his story that he

24  told about when he saw Mr. Boyd first get out of the vehicle?

25  He described something that no one else did, that Mr. Boyd

4905

1    first got out of the vehicle, he then reached with both of his

2    hands into the vehicle as if he was trying to get someone out

3    of the vehicle.  Well, if that would have happened, he would

4    have been shot then.  Perhaps if Mr. Rogers did see some of the

5    event, maybe in his mind he has the order confused and he's

6    really describing what happened at the end.

7          But to say that Mr. Boyd got out of his car and then

8    reached into the vehicle with both hands as if to grab someone

9    and pull them out, you know, wouldn't you think the officers

10   would be looking for something like that?  And isn't that a lot

11   like what Officer Paine, Officer O'Malley, Officer Elieff,

12   Officer Stearns, Fatima Wilson and Joe Campos, isn't that a lot

13   like what they described happened when the last shots were

14   fired?

15         But there's a question as to what he observed.

16         Also significant is he was asked this question, and it

17   was by Mr. Galipo:  Did he reach inside just before he was

18   shot?  And his answer wasn't no.  No, not at all.  I have a

19   clear view.  He didn't.  His answer was, Not that I recall.

20   That's a little bit weaker than saying, I have -- I absolutely

21   know for sure that didn't happen.  Not that I recall.

22         This is also an interesting thing with Mr. Rogers.  If

23   you recall, he says that when he was first observed, heard what

24   was happening, he was upstairs, he was playing cards with Dana.

25   And he heard the shots and he went to the window and he ducked

1    for awhile waiting till the shots were done.  Then he looked

2    out to see what was happening.  And then if you recall,

3    Mr. Rogers, he's a somewhat older gentleman didn't move around

4    very well when he was testifying.  But according to him, after

5    the first series of shots, he then went down -- went through

6    three rooms, down two flights of stairs, got outside, between

7    the first series of shots and the second, and was able to

8    observe everything that happened.  You can't do it in that

9    amount of time.  Even if you're running.

10        So the question is, what did he really observe?  Is it

11   possible that what happened, he's heard the shots, he came

12   outside, he's standing there with his friend, by 652 right here

13   with his friend Mr. Harris, they're part of an exciting event,

14   they're talking about what happened, they see very little, but

15   they want to become involved, and then they come up with their

16   versions of events, that don't match each other or anyone else,

17   or the physical evidence?

18        So there's a real question as to what he observed, if

19   anything, aside from just credibility.

20        And another thing that he did admit that while this is

21   happening, he's not all looking at Mr. Boyd.  He's standing

22   there talking with his friend, Mr. Harris.

23        So in evaluating Mr. Rogers' testimony, similar to

24   Mr. Harris, despite his strong bias against SFPD and his lack

25   of credibility, there are some things he says give you pause as

1    to whether what he saw and whether maybe he did see part of

2    this event as described by the police officers, Mr. Campos and

3    Miss Wilson.

4           And that is he saw Boyd reaching into the car, but he

5    described it at a different time.  And also, as I said, he lost

6    sight of both his hands, and the officers were yelling at him

7    to get down on the ground while he was reaching into the car.

8    He admits that Mr. Boyd was not complying with the officers'

9    orders.

10          So Mr. Rogers.  Given all that he discussed.  His

11   bias, his lack of credibility.  His inability to perceive

12   anything that happened in this event, how far away he was, does

13   he help plaintiffs prove Boyd was not moving his hands into the

14   SUV when Officer Paine fired?  I submit to you that he also

15   does not, and he goes on the "no" side of the ledger.

16   Plaintiffs have yet to bring any credible evidence to support

17   this important proposition.

18          The next witness that I'd like to talk about is

19   Michelle Cranshaw.  Going through the same analysis.  Does she

20   support plaintiffs' proposition?  Where does she live?  625.

21   Now --

22          THE COURT:  While you're getting that board together,

23   I'm just looking at the clock.  Now, it's 11:30.  We started at

24   approximately a quarter to, it was probably closer to 10 to

25   10:00 before you actually got started.  Can you just give me

```
 1    some estimate while we're between witnesses, essentially, here,

 2    when would be a good place to break?  At a quarter to the

 3    reporter will have been reporting for about two hours.

 4            And, again, I just might mention, ladies and

 5    gentlemen, I might have said this in connection with the

 6    opening statements, I don't recall, it takes a greater toll on

 7    the reporter to write down these kinds of statements because

 8    there's no break while a witness looks at something or just in

 9    between the question and answer, just keeps going.  So I don't

10    think we could exceed another 15 minutes before we would need

11    to take a break.

12            MR. LOEBS:  We could take a break now.  I don't know

13    if I would finish my discussion of Miss Cranshaw within 15

14    minutes.

15            THE COURT:  What would you expect might be the total

16    amount of time remaining on this argument?  Just an estimate.

17            MR. LOEBS:  The total time for my closing remarks?

18            THE COURT:  Well, to go, you know.  Which is how much

19    more are we talking about, another hour or --

20            MR. LOEBS:  Probably more than that.

21            THE COURT:  More than an hour.  Okay.

22            MR. LOEBS:  That's my idea.

23            THE COURT:  I think there's a good chance we won't be

24    able to complete your argument in the morning session.

25            MR. LOEBS:  I think that's true.
```

```
 1          THE COURT:  We actually could have started at 9:30,
 2     but I didn't want to keep you waiting, and then we were unable
 3     to start because everybody else wasn't here at 9:30.  That
 4     might have made a little bit of difference.
 5          Okay, let's take the break now this is an appropriate
 6     place.  15 minutes, ladies and gentlemen.  Please remember my
 7     admonition.
 8          (The jury exited the courtroom)
 9          (In open court; jury not present)
10          THE COURT:  I want to just make one comment:  There
11     was some evidentiary matter that counsel wanted the Court to
12     deal with, and apparently it isn't affecting the closing
13     arguments at the moment.  Do you anticipate it may affect the
14     rebuttal argument or --
15          MR. GALIPO:  Possibly not.  What it is, your Honor,
16     there were some photographs of Mr. Boyd with his family that
17     were part of Exhibit 1 and 2, and I'm going to work today with
18     Mr. Wiener to make sure we resolve that.
19          THE COURT:  All right.
20          MR. GALIPO:  That's the only issue, and I don't think
21     we're going to need to take up the Court's time because
22     Mr. Wiener told me he had an objection to a few, and I think
23     I'm okay with his objection.
24          THE COURT:  I'll leave that to you, if you're able to
25     resolve it, fine.  And at some point we'll put the ruling on
```

```
1    regarding the instructions.

2              All right, thank you.

3              MR. GALIPO:  Thank you.

4              (Morning recess)

5              (In open court; jury not present)

6              DEPUTY CLERK:  Please come to order.

7              MR. GALIPO:  Does the Court have an idea what time

8    we'll go to?

9              THE COURT:  This afternoon or now?

10             MR. GALIPO:  Over the next hour or so.  For lunch.

11             THE COURT:  Maybe 30, 40 minutes now, and then break

12   for lunch, come back.  You know we started at an awkward time,

13   so it doesn't fit exactly, but we needed to take some break

14   this morning.

15             (The jury entered the courtroom)

16             THE COURT:  Okay, thank you, ladies and gentlemen.

17             Back to Mr. Loebs.

18             MR. LOEBS:  Before I start again the presentation, you

19   probably have some sense the manner of which I'll go through

20   the evidence, and you have some sense of how many more

21   witnesses we have to talk about.  And I want to let you know

22   that I will go through these witnesses more quickly than I have

23   now that we've discussed the general outline that I've been

24   talking about, without belaboring each small point.  So I do

25   not intend this to be a six-hour closing or even close to that.
```

1           One fact that, for whatever reason, I forgot to

2      mention related to the plaintiffs' theory that the gun was

3      planted.  There was no gun in the car.  Mr. Boyd didn't have a

4      gun, wasn't shooting at anyone.  The testimony of Miss Natasha

5      Gatto, if you remember her, she was the woman that was with her

6      friend, either -- I can't remember if they were going to or

7      coming back from a rock climbing trip, and they were just

8      standing outside in the street when the first shot was fired

9      and saw the SUV -- she saw the SUV going right past her.  And

10     not only did she describe seeing an individual take his hand

11     and put it out of the car and shoot, but she actually was able

12     to pick Mr. Boyd out of a line-up, top middle, and identify him

13     as the individual that did that.

14          In order for their conspiracy theory to ring true, not

15     only do all those witnesses I talked about have to be lying,

16     but Miss Gatto has to be lying as well.  Not just mistaken.  Or

17     maybe their suggestion is there was another SUV driving on May

18     5th, 2004, another black SUV with an individual firing a gun at

19     about 8:00 p.m. in the same location, and she just confused one

20     for the other, and the individual looked just like Cammerin

21     Boyd.

22          I was going to talk about Miss Cranshaw next.  Now

23     that we're not talking about Mr. Rogers and Mr. Harris, we get

24     onto the smaller board.  This is an exhibit.  The other version

25     is in evidence.  It's the same exhibit I just added for

1    purposes of closing argument some markers that generally depict

2    the locations where witnesses said they were at the time shots

3    were fired.  Now I'm talking about Miss Cranshaw.  She's over

4    here (indicating), and she is living at 625.  And you know 625

5    is right here.  I don't, you know, know which window she's in,

6    this one or this one, so I just put her in this location

7    (indicating).  I'm don't know if I identified the exact window,

8    but rather her address, but for purposes of this discussion

9    we're talking about Miss Cranshaw and what she could see and

10   what she testified to.

11           And you'll notice, as I'm showing you this exhibit now

12   for the first time, we have Mr. Ingram at 648.  Mr. Rogers and

13   Mr. Harris wouldn't even make this diagram, they're over to my

14   left, so they don't show up here.  And then this would be

15   Miss Wilson, Fatima Wilson, she would be around here.  Over

16   here we have Joe Campos, 618.  Covered up by this, but 618,

17   with obviously the best view of what happened.  Ms. Jackson

18   over here around, I think, 612 or 610.  I think it's 610, where

19   she was living.

20           And then other officers, Officer Stearns, Officer

21   Elieff, taking cover behind this vehicle.  And then you have

22   Officer O'Malley taking cover, this is again when the final

23   shots were fired, behind the red SUV.  Officer Paine discussed

24   his location here.  And this is Officer Warnke where he said he

25   was in relation to the SUV when the shots were fired.

Summation – Loebs

1    So that's what this is designed to just generally

2    approximate so you can get an idea of where everyone was in

3    relation to other things.  Again, with no intent to be exactly

4    precise as to the described locations.

5    We're talking now about Miss Cranshaw and where she is

6    in relation to the SUV, and she was at 625.  What she said

7    happened, according to her point of view, that she saw Mr. Boyd

8    standing outside of the SUV, and when his left hand dropped to

9    his side, that's when the shots were fired.  That was her

10   testimony.  And the right hand was up.  That's what she said.

11   She said that he was standing facing the officer who fired.

12   And then I want to discuss -- that's her version --

13   discuss her issues as to bias.  Now, like the other witnesses

14   we just discussed, she also has had arrests by San Francisco

15   police officers.  Which, of course, can lead to bias against

16   them.  In fact, she also had expressed bias against the

17   San Francisco Police Department.  And this had to do with her

18   thoughts and impressions before this incident happened.  She

19   told you that she thought a whole lot of police officers in

20   Northern Station should be fired.  That's the bias that she

21   came in with in viewing this incident.

22   She's also one of the individuals I talked about who

23   was influenced by Ms. Boyd.  Miss Cranshaw, I'm not saying

24   sought out that influence, but who could avoid it.  She was

25   introduced to the little girls at the candlelight vigil

Summation - Loebs

1    mourning the loss of their father, that's going to have a

2    powerful impact on anyone in reviewing the evidence and what

3    they saw.

4           Next, before she ever gave any statement, her first

5    statement to anyone, she didn't talk to Homicide or OCC or

6    anyone else, even though she knew they were interested in

7    getting her testimony.  The first time she talked to anyone

8    about what she saw was in January of this year.  And that was

9    after many, many meetings with plaintiffs, plaintiffs'

10   attorneys, the plaintiffs' investigators, and then isn't it

11   somewhat interesting that in January 2007, after perhaps the

12   plaintiffs have learned that the left hand can't be up like

13   this (indicating), the other witnesses have said, can't be,

14   because of the fiber evidence, it has to be lower, well, here's

15   a witness that says okay, the left hand was lowering.  We'll

16   talk about whether even that's consistent with physical

17   evidence in a moment.

18          And also remember she's Miss Wilson's cousin.

19          Next I want to talk about the credibility of Miss

20   Cranshaw.  She admitted to you that in 2007, she had a

21   conviction for fraud.  That's something you can take into

22   account in evaluating whether this witness when they're giving

23   an oath to tell the truth, whether that's something that they

24   would keep in mind when giving their testimony.  Felony

25   conviction for fraud.  "Fraud" means lying about stuff.

Summation – Loebs

1       The next thing that she said that I would suggest

2  suggests that she's not very credible is that she testified

3  that just before the shots were fired by Officer Paine, she

4  didn't know him by name, but the officer who fired the shots,

5  she said she could tell, and this is a quote, that he had a

6  trigger-happy look in his eyes.  A trigger-happy look.  And

7  it's not something according to her that she just sort of

8  reconstructed afterwards.  According to her, she saw this and

9  exclaimed to her sister, Look, that officer has a trigger-happy

10  look in his eyes, he's going to shoot one, before this

11  happened.  You have to ask yourself, how likely is it that

12  someone witnessing this event is going to have that perception?

13  How credible is that?  And that she exclaimed that to her

14  sister before the shots were fired.

15       In addition, talked about the crazy story about the

16  high fives and the officers celebrating after the shots were

17  fired.  This is unquestionably an incredibly tense, traumatic

18  event for everyone that's involved.  To suggest that these

19  officers were slapping five and celebrating after the shots

20  were fired is absurd.  And with Miss Cranshaw, she adds to the

21  story that's been building throughout the neighborhood.  Now

22  she says there were five to six officers involved, slapping

23  five, and rejoicing after these shots were fired.  That's not

24  credible.

25       And again, her story, even though she has the hand

1    dropping a little bit, is grossly inconsistent with the

2    physical evidence.  That doesn't match any of the trajectories,

3    hand dropping like this (indicating) doesn't match.  That

4    doesn't explain the abdominal wound.  It doesn't explain the

5    injury to the leg.  Doesn't explain the injury to the hand.

6    It's not even close.  And no one testified that it was.

7    Dr. Bonnell didn't.  Mr. Jason didn't.  Dr. Smith didn't.  It

8    simply doesn't work and doesn't make sense.  And didn't happen.

9           And her story, of course, is grossly inconsistent with

10   Mr. Harris, hands up all the time.  Mr. Rogers, hands up and

11   seated.  And wasn't it interesting when she was testifying that

12   she was absolutely adamant that she wanted to say she could

13   tell in her mind, saw that hand dropping to the left, that she

14   could tell he wasn't reaching for anything, he was just trying

15   to brace himself.  Now, why would she be so adamant about using

16   the word "bracing" instead of reaching?

17          And isn't it curious that when we talk about Fatima

18   Wilson's testimony, you'll hear the same thing.  That she was

19   going to do anything she could to not say the word "reaching."

20   And when we talk about Fatima Wilson's testimony, it's

21   interesting that her desire to change from the word "reaching"

22   in her prior statements to "bracing" came about after she had

23   multiple contacts with plaintiffs' attorneys and multiple

24   contacts with their investigator.

25          MR. GALIPO:  I'll object as mischaracterizing the

1    evidence regarding multiple contacts and meetings with

2    plaintiffs' attorneys.

3         THE COURT:  Again, ladies and gentlemen, I'll leave

4    you to your own recollection in that regard.  Overruled.

5         MR. LOEBS:  So as to Miss Cranshaw, what did she

6    really observe?  As I indicated, on this exhibit, she's right

7    here.  She's on the other side of the SUV.  She has to look

8    through it.  If she's standing in the wing of the door, she has

9    to look through it to see anything that's happening in that

10   location.

11        Also, point out, despite lack of credibility and bias

12   against the police, she did say he was moving his left hand,

13   which we don't think that her description of how he was when he

14   was moving his left hand is consistent with the physical

15   evidence, but if you'll recall Mr. Cameron's testimony about

16   what threat level the officers were facing from an individual

17   who had fired at police officers now to return to his car that

18   the officer would reasonably believe he had a loaded gun, put

19   yourselves in that officer's position, you have an individual

20   who's not going to the ground, who's not keeping his arms

21   raised, takes his t-shirt off, has reached to his belt and now

22   reaching his left hand towards the inside of the car.  Would

23   that be an imminent threat of serious injury or death to those

24   officers?  I suggest that it would.

25        She also indicated, although she wanted to use the

1    word "bracing" instead of "reaching", she couldn't tell when

2    she saw movement of his left hand whether he was reaching for a

3    gun or reaching to brace himself; and, of course, it's from the

4    officer's perspective.  How could they tell, how could they

5    know that, and is that a chance that they would take with their

6    very lives?

7            So with Miss Cranshaw, does she support the plaintiffs

8    on this point that they must prove?  No, she doesn't.

9            Next witness I want to talk about is Miss Jackson.

10   Now, Miss Jackson, as I discussed before, she's here

11   (indicating).  And again, I don't know exactly which window, we

12   don't know exactly which window she was in.  But she lived in

13   610, so I put her to the closer window, give her the benefit of

14   the doubt.  And she may have been, had an opportunity to

15   observe some of these events if she'd been looking in this

16   direction when the critical event occurred.  And on her direct

17   testimony, she says she saw at the time the shots were fired,

18   she told you she saw him standing with his hands up when the

19   shots were fired.  That's what she told you on her direct

20   testimony.  Facing the officers, hands up, much like Mr. Harris

21   described.

22           Now I want to talk about her issues as to bias.  She

23   knows David Boyd, a relative of Ms. Marylon Boyd and Cammerin.

24   She talked about Mr. Harris and Fatima Wilson and Michelle

25   Cranshaw about what they saw.  She also attended the vigils on

1    her street.

2         Now I want to talk about the credibility issues with

3    respect to Miss Jackson's testimony.  This is the big one, for

4    her.  On cross-examination, she admitted that she was not

5    looking at Mr. Boyd or even his direction when the shots were

6    fired.  She testified that she's concerned about her children,

7    which is understandable, over to her left in this area

8    (indicating).  That's where her attention is focused.  And it

9    was the sound of shots that caused her to look back over to the

10   SUV.  So she didn't see what happened.

11        And she said her attention was drawn away, maybe 5, 10

12   seconds.  5 or 10 seconds is perhaps the entire time, maybe a

13   little bit more, that Officer Paine was even in position where

14   he was.  She did not see what happened.  And it's interesting

15   that that's not what she told you on her direct testimony.

16   That came about through cross-examination, because I talked to

17   her before her deposition and that's what she told me.  So she

18   had to admit what she told you previously, that she saw him

19   with his hands up when he was shot, and she didn't see that at

20   all.

21        And, again, her story, much like Mr. Harris's, does

22   not match the physical evidence of the wound path.

23        Another thing she said is no one ever searched the

24   car.  We know that's not true.  You heard several police

25   officers say that after this happened, the first thing they did

1   was check the car.  They cleared the car.  Officer Warnke

2   testified to that.  Officer Jonas testified to that.  But Miss

3   Jackson said no one ever searched the car.

4        So the question is, what did she really observe?  She

5   had similar testimony about going up and down the stairs, as

6   Mr. Rogers did.  Didn't seem to make sense.  She even talked at

7   one point how she was concerned for her children; she heard the

8   shots, went down the stairs and then locked the door, which I

9   guess would be locking her children outside, and then came back

10  up to observe what happened.  I don't know if that happened or

11  not.  But that's awfully bizarre if it did.

12        And, of course, she testified that she was not looking

13  at Mr. Boyd when the shots were fired.  So really what

14  relevance does her testimony have in this case.  And she's the

15  one if you recall that said she heard Mr. Boyd say, "I'm

16  paralyzed, I'm paralyzed."  Of course, he didn't say that.  Of

17  course, he's not paralyzed.  Did she just mishear and think it

18  was something else?  She also said she heard this from when he

19  was inside the car, that no one else says.  For whatever

20  reason, she's trying to help the plaintiffs in this case, and

21  she didn't get her story right.

22        So Miss Jackson.  What does she say?  Despite her lack

23  of credibility, she does admit she heard officers yelling at

24  Mr. Boyd to get down on the ground.  Which seems to be

25  undisputed that the officers were yelling at the top of their

1    voices for him to do that.

2            But this was really important.  Because remember

3    Miss Wilson, remember they had different names for each other.

4    Miss Jackson went by the nickname of "Tootsie".  And

5    Miss Wilson went by the nickname of "Woo Woo" or "Wo-Wo", but

6    when I asked Miss Jackson in her testimony, Did you ever tell

7    anyone that at the time the shots were fired that you saw

8    Mr. Boyd reaching into the car?  She said, No.  I said, Did you

9    tell Fatima Wilson that that happened?  She said, No.  And I

10   think I used her nickname to remind her of who Fatima Wilson

11   was, and she said, I know who that is.  Did you ever tell her

12   that you saw Mr. Boyd reaching into the car just before he was

13   shot?  She said, No.

14           But then we heard the testimony from Fatima Wilson,

15   the witness that plaintiffs did not call, and she told you

16   through her deposition testimony that, yes, she had a

17   conversation with Miss Jackson, and Miss Jackson did tell her

18   that she saw what Miss Wilson saw; and that is, that at the

19   time the shots were fired, Mr. Boyd was reaching into his

20   vehicle.  So with respect to this question again, does Miss

21   Jackson support plaintiffs' case?  I submit the answer is, not

22   at all.

23           The next witness I'd like to talk about is Mr. Ingram.

24   Mr. Ingram was an interesting witness for sure.  If you recall,

25   I'll show you where he lives in relation to the scene.  He says

1    he was in 648, which is back here (indicating), and during the

2    incident he never left his unit.  And that he observed what

3    happened from his window.  And he's over here.  And this was

4    what he told you.  This was his version of events.  And this

5    was, again, plaintiffs were calling this individual suggesting

6    to you, Here's someone that will support our case.  Here's

7    someone that will prove to you that Mr. Boyd was not reaching

8    into the vehicle at the time the shots were fired.  They call

9    Mr. Ingram.

10           Well, what did he actually testify to?  He said he saw

11   Mr. Boyd reach twice to the left into the SUV before the shots

12   were fired.  He told you that after the second reach that the

13   shots were fired within a blink of an eye, and both hands of

14   Mr. Boyd were going into the vehicle with that second reach.

15   Both hands.  That's what Mr. Ingram testified to.  And

16   Mr. Ingram said, from his perspective, he lost sight of both of

17   Mr. Boyd's hands when he reached into the vehicle, just before

18   the shots were fired.

19           Now, there were some issues with respect to Mr. Ingram

20   and whether he had some bias against the police, and suggests

21   he did, he'd been arrested several times by the SFPD, and we'll

22   see later how that bias may have come into play in the way he

23   tried to shape the story against the police.  We'll talk about

24   Mr. Ingram's credibility.  I have a question mark there because

25   I'm not suggesting that nothing he had to say is credible or

1    that he's a dishonest man.  But the issue of him stealing his

2    mother's car did come up, and that's something you can evaluate

3    in terms of a witness's credibility.

4              With respect to the bias, Mr. Ingram, like

5    Miss Wilson, like Miss Cranshaw, again seemed coached to say

6    that it wasn't reaching, really.  He wanted to use the term

7    "bracing."  Bracing, moving both his hands to the left inside

8    of the car, he thought that was just bracing, rather than

9    reaching.  All right.  Because he realizes that because he's

10   testifying that he saw him reaching into the vehicle when he

11   was shot, then the shooting was completely justified.  And for

12   whatever reason, he doesn't want to say that.  Although he is

13   honest enough to be able to say what he saw and what he didn't

14   see, in most respects.

15             What did he really observe?  He says he doesn't recall

16   the hands being up during the time of the shooting.  Which is,

17   of course, I guess one of the reasons they're calling him, but

18   he says he doesn't remember that.

19             He did talk about the high five story.  If you

20   remember this.  And this gives a window to how this crazy story

21   got started and spread throughout this community.  In trial, he

22   testified that, Yeah, I saw that, I remember it.  And he

23   described it in detail, that there were five or six officers,

24   they were slapping five.  It was -- really bothered him when he

25   saw it.

1     And then later, if you recall, in his

2  cross-examination, and using his deposition, said, Now,

3  Mr. Ingram, are you sure that you saw that?  As opposed to just

4  being something that someone told you?  And then in his

5  deposition, he admitted, and we read that to you, that he

6  wasn't sure at all that he really saw that.  That it might just

7  be that he had heard it from somebody, and he's getting the

8  things confused as to what he actually saw and what he heard,

9  what people in this community were talking about.  We'll call

10  that the myth that grew out of the Larch Way incident.  And he

11  indicated in his deposition that at least from his perspective,

12  the source of the story of the high fives was from Dana, the

13  woman he was playing cards with.  And he admitted that she has

14  a tendency to say things that aren't true.

15     So how reliable is Mr. Ingram's recount of the high

16  five story, which really doesn't have that much bearing on the

17  case other than as to the witness's reliability?  At least in

18  his deposition, Mr. Ingram was -- and I'm not saying that he

19  even had a different recollection here and was trying to

20  deceive you, but at least in his deposition he admitted that he

21  didn't really know where that information came from.

22     Now, accepting Mr. Ingram's testimony, a witness they

23  called to prove that issue to you, his testimony was absolutely

24  devastating to the plaintiffs' case and their theory of the

25  case.  If you believe Mr. Ingram, then Mr. Boyd reached twice

1    into the car with both of his hands before the shots were

2    fired.  And that's the same thing you're hearing from Officer

3    Paine, from Officer O'Malley, from Officer Elieff, Officer

4    Stearns, and Joe Campos.  That's devastating to the plaintiffs'

5    case.

6          And he lost sight of his hands both times.  Officers

7    are yelling at him louder during the second reach.  And if you

8    remember, he said it was his impression that Mr. Boyd was

9    definitely not doing something the officers wanted him to do.

10   They were increasing their volume, they were yelling.  In other

11   words, it was his sense that the officers didn't say, Would you

12   mind reaching into your car, please, sir?

13         Again, Mr. Ingram testified that the second reach was

14   a bigger movement, a more drastic movement to the car.  Just

15   like what the other credible witnesses are saying.

16         And, finally, that Mr. Boyd was shot within the blink

17   of an eye after the second reach into the car.

18         If you believe Mr. Ingram's testimony, plaintiffs

19   cannot prevail.

20         So a witness they called, Mr. Ingram, does he help

21   support this proposition?  I submit that he does not.

22         Now, the next witness I want to discuss, and that is

23   Mr. Campos.  Plaintiffs called him in their case.  And

24   Mr. Galipo suggested to you it was because he wanted to be fair

25   and give you all the evidence.  I suggest to you another

1    motivation they may have for calling him, to try to trip him up

2    because they knew how devastating his testimony was to their

3    case.  And how credible and believable he was as a witness.  So

4    they didn't want him to come on and tell a story first.  They

5    wanted to be able to mix him up, maybe get him confused, make

6    fun of him because he doesn't know what a floorboard is.

7           Let's talk about Mr. Campos's testimony.  His

8    perspective.

9           He was in 618, and that's the number that's right

10   under here.  He was in 618.  He unquestionably had the bird's

11   eye view of this event.  He saw everything and everything was

12   completely within his vision to see.  If you recall, Mr. Galipo

13   attempted to suggest that everything Mr. Campos could see

14   Officer Paine could see as well, and then I objected, of course

15   that doesn't make any sense, and Mr. Galipo said, Well,

16   technically maybe Mr. Campos was on the third floor.  It's not

17   technically he's on the third floor.  He was in the third floor

18   window, and he had a vastly different and better view than

19   Officer Paine who was on the ground.

20          So as to whether Mr. Campos could see both hands when

21   Mr. Boyd was reaching, how does that relate to what Officer

22   Paine can see on the ground?  And we'll discuss that in a

23   moment, a few minutes later, but does that really matter?

24   Mr. Campos is so clear about what he saw in terms of seeing

25   Mr. Boyd reach.  He thought he was reaching for something.  The

1    second movement that he made was more drastic than the first.

2    And that's when the shots were fired.

3            But let's talk just for a minute about Mr. Campos's

4    view, and this is Exhibit Y-501.  If you recall, we had -- or

5    Mr. Jason went to Mr. Campos's apartment after there was no one

6    living there any longer, and took photographs that show

7    Mr. Campos's view.  And that's this program right here, V5-01.

8    And this area right here.  That's where we're talking about,

9    the SUV.  That's where Mr. Campos was when he saw this entire

10   event unfold.

11           You'll notice the north sidewalk is under here, not

12   directly in his line of sight, but directly in his line of

13   sight is this entire area.  No one with a better vantage point,

14   including the officers.

15           So let's talk about what Mr. Campos's testimony was.

16   We discussed he had the best view.  It was suggested he was the

17   defense witness, our witness, on the side of the SFPD.  You

18   will have to evaluate how credible you found his testimony, and

19   whether he seemed like he was eager to be here, whether he

20   seemed like he injected himself into this controversy because

21   he really wanted to help the police department.  Or was he just

22   an individual who got caught up in this like everyone else and

23   he's telling you what he saw.

24           You remember how he came to be involved in this case

25   in the first place.  He saw what happened and he told his

1   mother, and he didn't want anyone else to know that he saw what

2   occurred.  And his mother told him, No, this is important, you

3   saw what happened, you need to tell the police.  You need to

4   talk to them about what happened.  So because of that, he did.

5   Reluctantly, he did.  And he told the story to Homicide

6   inspectors, even knowing at that time the area in which he was

7   living, that his testimony would be favorable to the police

8   because of what he saw, knowing that if people knew about that,

9   he would be at risk for his own personal safety.  He did it, in

10  part because of his mother's bidding.

11          And then what happened?  Mrs. Boyd made the danger to

12  Mr. Campos and his family very real.  When she went to his

13  house outside in front of anyone who could be listening on

14  Larch and told him that he didn't have to go to his deposition,

15  not only did he take that as an understanding he didn't need to

16  go and he didn't go, but when he communicated this to his

17  mother -- or actually she's standing right there with him --

18  she became terrified for his safety.  And she refused to let

19  him participate any longer.  She would not let him tell his

20  story again.  Because she was afraid for her safety and for her

21  family's of what might happen if people knew Mr. Campos's

22  testimony.

23          MR. GALIPO:  Your Honor, I'm going to object as

24  mischaracterizing what the state of mind was of Mr. Campos's

25  mother.  She never testified.

1          THE COURT:  There was limited testimony regarding

2     Mr. Campos's mother.  I don't know if it went as far as this,

3     but again, ladies and gentlemen, you will have to decide

4     whether this is a reasonable inference or not to be drawn from

5     the testimony.

6          MR. LOEBS:  Mr. Campos also testified that based on

7     that contact, he himself became fearful for the reasons I

8     described before in that if people knew in the neighborhood

9     that he was giving testimony that could be favorable to the

10    police, he knew that could endanger his life as well.  So he

11    refused to be involved anymore in this incident.  And would not

12    give his testimony.

13          Finally, he moved.  There were court orders.  His

14    deposition was allowed to take place here in this building

15    going through metal detectors.  And he finally told his story

16    on the record that could be used in the trial.

17          And then, of course, he came to trial and told and

18    said the same thing to you.

19          Now, Mr. Campos's testimony, if you accept that and

20    nothing else, plaintiffs cannot prevail.  He told you that

21    Mr. Boyd was seated, sitting, with his back to the door.  Not

22    on the seat.  But he was in a sitting position with his back to

23    the door.  He didn't say or use the word "floorboard" because

24    apparently he doesn't know or use that word to refer to the

25    area where Mr. Boyd was seated.  So what?  You heard his

Summation - Loebs

```
1   testimony.  He said Mr. Boyd was seated just like he is now, in

2   that witness chair, with his legs just like they were, parallel

3   to the ground.  Facing out of the car.

4        And isn't that exactly the same position that Officer

5   O'Malley described, Officer Stearns, Officer Elieff?  And isn't

6   that similar to exactly the same position that Dr. Smith told

7   you that Mr. Boyd was in when he was shot?  And Mr. Jason.

8   Based on their analysis of the physical evidence.  That's what

9   Mr. Campos testified to.  He didn't say he was standing.  He

10  said he was seated.

11       Now, whether he's seated or standing or leaning,

12  that's not the most important issue in the case.  Really

13  doesn't even matter that much.  It's the reaching.  It's the

14  hands moving in the vehicle.  That's what matters.  And that's

15  what Mr. Campos's testimony was and that was powerful.  He said

16  first when Mr. Boyd was back in the vehicle, he was looking,

17  looking around.  Looking to the left, as if to grab for

18  something.  And he turned quickly, and the officers' voices

19  raised in volume and he came back around with his hands up.

20  Just like what Officer Paine described.  Just like what Officer

21  Elieff and Officer Stearns told you.

22       Then he said Mr. Boyd started looking over his

23  shoulder again like he was looking for something, like he

24  wanted to do something.  And then he made a second bigger

25  movement into the car with both hands -- and this is
```

```
 1    critical -- he testified that he saw both hands move into the
 2    car in front of the driver's seat.  Exactly the same location
 3    where we find all the blood evidence.  The same location where
 4    his hand must have been for the trajectory to match with the
 5    left leg, thigh injury, and just like what Mr. Campos said.
 6          Also the same description of Officer Paine, the same
 7    description of Officer Elieff, Officer Stearns.
 8          And he said that when this occurred, that's when the
 9    shots were fired.  Mr. Boyd was shot when he was reaching into
10    the car.
11          Now, one other thing Mr. Campos said that I didn't
12    mention here, is that he had the window open, he could hear
13    what was being said.  And you heard Mr. Boyd say words to the
14    effect of, "Shoot me, shoot me if you want to, or you can shoot
15    me."
16          Officer Elieff testified he heard the same thing.  Now
17    that's the relevant to when we're talking about the issues
18    related to the suicide-by-cop stuff.  That doesn't mean that he
19    is reaching in the vehicle because Mr. Campos heard that, but
20    that is important testimony that he gave on that issue.  So
21    we'll talk about that later, but did plaintiffs prove this
22    proposition with testimony of Mr. Campos?  Absolutely not.
23          Now, the next witness on Larch that I'd like to talk
24    about, I believe should be the last, and that's Miss Wilson.  I
25    made some reference to her before.  Let's talk about her
```

1   testimony.  First, we'll talk about where she was.  Because her

2   name and Officer Warnke's name start with the same letter, I

3   put a "WI" for Miss Wilson.  She was in 638.  So that's

4   approximately here.  She could have been in a different window,

5   approximately this location (indicating), and I want to talk

6   first, before we get into her version of events, about her

7   issues related to bias.

8           She attended the candlelight vigils, which we said

9   could obviously influence a percipient witness.  She actually

10  helped Mrs. Boyd by taking photographs, was given a camera by

11  Mrs. Boyd to help participate in her work on this case.  Which

12  I submit is a very odd thing to do with a percipient witness.

13  She added testimony about the high fives to try to help the

14  case.  If you recall, she had this story about seeing the high

15  fives, but then when we went back to her earlier interviews

16  that she gave, shortly after the incident, she was asked if she

17  saw anything happening, what were the officers doing, did you

18  see anything else; she said no.  Didn't say anything about the

19  high fives then at all.  Had the opportunity to discuss it, was

20  asked what did the officers do, what did you see them do next,

21  did you see them do anything else -- didn't say a word about

22  it.  The high five testimony didn't come up until years later

23  at her deposition.

24          And isn't it interesting with her testimony how she

25  was coached, seemed to be coached in the same way to say, I saw

1    him with both hands go into the SUV, with his back to me, his

2    back to the officers, both hands in the SUV, with his back to

3    the officers.  But she said at some point, He wasn't reaching,

4    he was just bracing himself.  Wasn't reaching for anything.

5    Just bracing himself.  She obviously wanted to help plaintiffs'

6    case.

7            But she didn't.  Her testimony, even with her strong

8    bias, is devastating to plaintiffs' case, because what she said

9    is that Mr. Boyd appeared at the time of the incident without

10   benefit of 20/20 hindsight, same kind of situation the officers

11   are in, at the time of the incident, it appeared to her that he

12   was reaching with both hands for something when he got shot.

13   And isn't that exactly what the analysis of the imminent lethal

14   threat would be from someone who the officers reasonably

15   believed had a loaded gun in their car, that they were willing

16   to shoot at police?

17           Now, Mr. Galipo suggested that what she was describing

18   was similar to what Mr. Bradshaw described.  You know, if

19   someone wanted to sit, their hands might go back to either side

20   and maybe brace themselves on something to help them sit.  Not

21   as an emergency situation, but that's the way someone with

22   prosthetic legs might want to sit.  Arms to the side.  That's

23   not her testimony.  Mr. Galipo suggested that it was in his

24   closing arguments, and that's simply false.  She testified that

25   when she saw Mr. Boyd's hands go into the vehicle, she saw both

1   hands go into the vehicle with his back to the officers, not to

2   the side, bending over; both hands into the vehicle, with his

3   back to the officers.

4           I had her at her deposition, and which is

5   Exhibit C2-42, indicate where from her vantage point, which was

6   a bit away, where she saw both of his hands go with his back to

7   the officers, and she put an "X" in this location where she saw

8   both of his hands.  That's her "X."  That is an imminent lethal

9   threat.  That justifies the officers seeing that action, firing

10  their weapons to stop that threat.  And that, I submit, is the

11  reason why you did not hear from Miss Wilson in the plaintiffs'

12  case.

13          THE COURT:  Now, when you finish Wilson, that will be

14  a time that we should break, because it's now about 12:35.

15          MR. LOEBS:  I'm very close.  Very close.

16          THE COURT:  As I say, you can finish up this

17  discussion, and then between witnesses that's when we'll break.

18  All right.

19          MR. LOEBS:  All right.  Just a couple more things.

20  This witness discussed that it's not the side, his hands were

21  not in front.  But as I said, she's the one that testified she

22  talked with Tootsie, Miss Jackson, about what she had observed,

23  and Miss Jackson told her that Miss Jackson saw the same thing

24  when Mr. Boyd was shot, that she also saw Mr. Boyd reaching

25  into the car with both hands when the shots were fired.

1          Now did Miss Wilson's testimony support the

2     plaintiffs' case?  And I think as you might guess, I believe

3     the answer is no.

4          That concludes the discussion of the Larch Way

5     witnesses.  And we'll take our break, and we'll come back and

6     I'm going to talk about the other witnesses, the police

7     officers and the physical evidence.

8          THE COURT:  Okay.  Ladies and gentlemen, let's make it

9     an hour again.  I think we can still conclude -- well, before

10    you leave, let me just make sure.

11         Thinking back.  A quarter to, 25 to 2:00, and then how

12    much more are we looking at with your argument, do you think?

13    I'm sorry, just an estimate.

14         MR. LOEBS:  I'll attempt within the lunch break to try

15    to cut out some of what I had to discuss.  So if we come

16    back --

17         THE COURT:  Just approximately.  I mean, I could try

18    and make the lunch break shorter.

19         MR. LOEBS:  That might help, if it's not inconvenient.

20    I'd certainly try to finish my, I think --

21         THE COURT:  Within about how much more time,

22    approximately?

23         MR. LOEBS:  An hour and a half?

24         THE COURT:  Okay.

25         MR. LOEBS:  That was my prelunch estimate.  I'll try

```
1    to shorten it.

2             THE COURT:  If it were an hour and a half, and we came

3    back at -- I'll just round it off to quarter to 2:00 for a

4    moment just because I'm trying to do it easily.  If it were an

5    hour and a half, from then, then we would be talking about

6    3:15, and that wouldn't leave too much time for Mr. Galipo.  I

7    would like, if possible, to conclude the arguments today rather

8    than have him come back and then have another part on Monday.

9             MR. LOEBS:  I'll make it within an hour, your Honor,

10   if that would --

11            THE COURT:  That would help.  Why don't we -- can you

12   live with 45 minutes for lunch, ladies and gentlemen?  Okay.

13   We'll take a 45-minute lunch break.  What does that come out

14   to?  25 after.  Thanks you.  Okay, 25 after 1:00 -- no, that's

15   not right, Mr. Wiener.  20 after.

16            Okay, 20 after; is that correct?  I'll say 20 after.

17            JUROR:  It's in between.

18            JUROR:  We can do that.

19            THE COURT:  Thank you very much, ladies and gentlemen.

20            (Luncheon recess)

21            (In open court; jury present)

22            THE COURT:  Thank you for being back promptly, ladies

23   and gentlemen.  We'll continue with Mr. Loebs' closing.

24            MR. LOEBS:  Good afternoon.  When -- in my last

25   remarks I was talking about the testimony from the witnesses on
```

 1   Larch Way as to how it relates to this critical issue I've

 2   talked about before.

 3          Now I'd like to talk about the testimony from the

 4   police officers.  And, first of all, with respect to the police

 5   officers, as with the other witnesses, their perspective of

 6   these events is also something important to keep in mind in

 7   evaluating the evidence.  And one thing I'd like to remind you

 8   of is with respect to the police officers, they knew what was

 9   happening with respect to this event.  They knew information, a

10   lot of information, that the people on Larch did not.  They

11   knew that Mr. Boyd was wanted for threatening a woman with a

12   gun.  They knew that he was fleeing from the police at high

13   speeds.  They knew that he had shot at the pursuing officers.

14          They knew that he had a loaded gun or had reason to

15   believe he had a loaded gun in the SUV.  They knew he was

16   willing to use that gun to kill them.  Their lives depended on

17   being focused on Mr. Boyd's actions and looking for any

18   indication that he might be bringing that gun to bear or going

19   near where that gun might be, to protect their lives, the lives

20   of their partners and the lives of people that lived on Larch

21   Way from Mr. Boyd.

22          So in evaluating their testimony, many of them were

23   called by plaintiffs.  Regardless of who calls a witness, let's

24   talk about how it relates to that important issue.

25          Sergeant O'Malley.  Sergeant O'Malley's testimony, if

1    you recall, he was very clear, Mr. Boyd was not following the

2    orders that were given.  He was seated on the floorboard after

3    he turned back to the SUV.  He reached twice into the car with

4    both hands.  Sergeant O'Malley lost sight of Mr. Boyd's hands

5    when he reached into the car.

6           In particular, I want to focus on the second time.

7    The officers were yelling even louder at Mr. Boyd at the time

8    he was reasoning into the vehicle, the second time.  Mr. Boyd

9    had a look of resignation on his face before the second reach,

10   similar to what other witnesses have described.  Sergeant

11   O'Malley described the second reach that Mr. Boyd made as a

12   bigger, more aggressive movement to his left into the car.

13   Sergeant O'Malley thought for sure he's going for the gun this

14   time.  And Sergeant O'Malley testified to you that he

15   hesitated, and he gave him a chance he shouldn't have.  And in

16   fact, the evidence will be at some point or another all the

17   officers at that scene hesitated and gave Mr. Boyd every

18   chance, in fact more than they should, to surrender and be

19   taken into custody.

20          Sergeant O'Malley testified as well that he had his

21   finger on the trigger and was about to shoot when he heard

22   Officer Paine's shots.

23          So with respect to Sergeant O'Malley's testimony, how

24   did that relate to plaintiffs' burden?  Pretty clearly, he

25   didn't support their case.

Summation – Loebs

1            Officer Paine, let's talk about his testimony.

2    Officer Paine explained to you that he is a specialist.  That's

3    a part of the San Francisco Police Department.  It's one

4    percent of the police force.  These officers are permitted to

5    carry assault rifles in their vehicle.  Why?  Because they have

6    specialized training with weaponry.  They use weapons and

7    they're familiar with weapons more often than other officers.

8    They have physical fitness requirements other officers do not.

9    They train to make that critical shooting decision more often

10   than other police officers.

11           Part of what they do in the specialist unit is protect

12   visiting dignitaries such as heads of state.  Officer Paine

13   testified to that.  In terms of trying to analyze this case, if

14   it mattered, which it doesn't, as to why might Officer Paine

15   have fired sooner than others, perhaps it's because he has this

16   specialized training that allowed him to make that critical

17   decision at that point.  But even in Officer Paine's situation,

18   he hesitated.  He waited.  He gave Mr. Boyd more chances than

19   he should have.  And they all put their lives at risk at some

20   point because making that decision, even when someone's doing

21   something you know might threaten your life, is an incredibly

22   hard thing to do.

23           But finally, when Mr. Boyd reached in that second

24   time, Officer Paine fired.

25           Officer Paine's testimony.  Boyd reached twice to the

Summation - Loebs

1   left with both hands.  Officer Paine yelled at him, "Don't

2   reach, stop what you're doing, put your hands in the air."

3   Why?  Is it because he wants to shoot him that he's yelling at

4   him?  No, he's trying to use the only other weapon he has at

5   his disposal to stop Mr. Boyd, and that is his voice.  When

6   that failed, he had no choice.

7        Office Paine testified that just before Mr. Boyd

8   reached the second time, it looked like a light bulb went off

9   in his head.  And then he made the second move.  Officer Paine

10  testified that Mr. Boyd's second reach was bigger, a more

11  drastic movement into the car, and they lost sight of both

12  hands during the second reach.  With his hands going to the

13  left side into the interior of the vehicle, which is what

14  Officer Paine told you.  Officer Paine fired because he

15  believed that Mr. Boyd was reaching for a weapon.

16       Given all that he knew, this individual would now come

17  back to the vehicle, where the weapon was located, where he had

18  every reason to believe the weapon still was.  He knew that

19  Mr. Boyd had fired at police officers before, and when he saw

20  him making the move into the car, he had no choice but to fire

21  his weapon.  No choice.  And the person who gave him that

22  choice, was Mr. Boyd.

23       So with respect to Officer Paine's testimony, does

24  that support the plaintiffs' case?  No.  It does not.

25       Officer Stearns.  What did he tell us?  He also

1    testified that he saw Mr. Boyd reach twice to his left into the

2    vehicle.  He lost sight of both hands when he did that.  He was

3    yelling as the other officers were, louder when he made the

4    second reach.

5         And just for your perspective quickly, Officer Stearns

6    where he's located is right here (indicating.)  Officer Paine

7    is here.  Officer O'Malley is here.  All with a clear visual of

8    what Mr. Boyd is doing and where he was in the SUV.

9         Officer Stearns also testified that he saw a bigger

10   movement into the car.  And remember that when we're talking

11   about the officers and their attention to what's happening, the

12   witnesses on Larch Way, Mr. Rogers talking to Mr. Harris, they

13   may have other things they're doing.  Their lives are being

14   interrupted perhaps, maybe they're distracted by something.

15        For these officers, there's nothing more important

16   than focusing on what they see happening in front of them.

17   Because their lives depend on what they see happening in front

18   of them.  That's a different perspective from the witnesses on

19   Larch.  And when these officers are describing what they saw,

20   you heard them testify and you can evaluate whether you thought

21   they were making it up, whether they seemed truthful, whether

22   they seemed in fear that their lives might be taken if Mr. Boyd

23   brought a weapon to bear.  That's something for you to

24   evaluate.

25        And you heard Officer Stearns' testimony.  When he

1   talked about how he was about to shoot but didn't, and what he

2   thought about the fact that he hesitated, you can evaluate

3   whether that seemed truthful, whether that seemed like it was

4   something he was making up on the stand.

5           Officer Stearns testified that he was sure Mr. Boyd

6   was reaching for a gun.  Based on everything he knew, and as I

7   said, based on the information that no one on Larch had.

8           So does Officer Stearns testimony support plaintiffs'

9   case?  Support their burden?  Not at all.

10          Officer Warnke.  Now, plaintiffs' counsel in his

11  closing suggested a lot to you about Officer Warnke, Listen to

12  Officer Warnke.  If you listen to what he had to say, that will

13  help prove our case.

14          Let's talk about what Officer Warnke testified to.  He

15  testified that he saw Mr. Boyd make one or two, I think maybe

16  even he said three quick movements into the car turning to his

17  left.  The third movement was bigger in that where Officer

18  Warnke was situated, we're talking now looking at the exhibit,

19  Officer Warnke is back in the rear of this parking stall,

20  somewhere around here, and where he was on the third movement

21  he lost sight of Mr. Boyd except all perhaps his lower legs and

22  maybe the side of his head.  And at that time he thought for

23  sure that Mr. Boyd was reaching into the car for a gun.

24          You should ask yourself, if we believe Officer

25  Warnke's testimony, does that support plaintiffs' case?

Summation - Loebs

1    Officer Warnke also testified at that moment when he saw

2    Mr. Boyd turn to the left, and his body was shielded by the

3    door, he was about to shoot through the door because he

4    realized the threat was so great.  So does Officer Warnke

5    support plaintiffs' case?  Not at all.

6            Now, you will notice when I have talked about some of

7    these witnesses that there are aspects of their testimony that

8    I haven't discussed, plaintiffs' counsel focused on.  About

9    exactly how someone was positioned.  About how they were bent.

10   About where a hand was at this time, where a hand was at that

11   time.  Whether Officer Paine saw the -- Mr. Boyd exactly the

12   same position or remembered it that way as the other officers

13   did.  I'll talk about those issues when I talk about what I

14   refer to as the red herrings in this case.  That is, issues

15   that don't really matter that are designed to distract you from

16   this critical issue.

17           Because really in terms of whether Mr. Boyd was moving

18   his hands into the SUV when Officer Paine fired, what does it

19   matter exactly how his physical position was in terms of these

20   officers' recollection?  Whether he was somewhat in a relaxed

21   leaning position, whether they remembered his knees being

22   exactly at 90 degrees?  This is a fast evolving crisis event

23   for these officers, and they're being asked to recount it in

24   infinite detail, some time later.

25           So what really matters in terms of what they recall?

Summation – Loeb

1    The reaching is what matters.  The movement into the car is

2    what matters.  And in term of their consistency as to what they

3    describe, it's very consistent.  It's generally the same thing.

4    We have Officer O'Malley, Officer Stearns and Officer Elieff,

5    haven't gotten to him yet, describing the very same situation,

6    being able to see the move into the car, making the turn to the

7    left.  Officer Paine says he recalls it a little bit different,

8    but does that matter?  Does that mean that he didn't see him

9    reach into the vehicle?  No, that's just an issue to distract

10   you from what are the merits of the case.

11        So we talk about Officer Elieff.  Officer Elieff's

12   testimony.  You recall he, like Mr. Campos, heard Mr. Boyd say,

13   "Shoot me if you want to."  He also saw Mr. Boyd reach twice

14   into the SUV.  The second reach, again, he saw being a bigger

15   movement to the left and the right hand was following.  He also

16   thought for sure that Mr. Boyd was reaching for a gun.

17        And remember that Officer Elieff, who got caught up in

18   this mess, who was the loan officer in the lead pursuit

19   vehicle, who was being shot at by Cammerin Boyd, had the

20   presence of mind, even though he's only five months off

21   probation, to be driving a vehicle with one hand calling in a

22   pursuit with the other, and then out of his car confronting

23   this dangerous individual on Larch.  You heard his testimony

24   about how even today, how traumatic this event is for him to

25   recall.  So Officer Elieff, did his testimony help plaintiffs

1    establish their burden?  No.

2            Now, I've talked about the police officers, and I want

3    to go back to Dr. Keram in this part of the analysis, part of

4    my presentation as well.  Now, obviously we've talked about all

5    the police officers who have testified.  But Dr. Keram's

6    analysis and her opinion was important in this case, and that

7    is, if you knew nothing else, if you knew just about the

8    pursuit and what happened on Larch Way, you might be thinking

9    to yourself, What an odd thing to be doing?  I mean, he's out

10   of the car doing something like surrendering, maybe, he's got

11   his hands up, he's got his hands down, he goes back to the car,

12   then the officer says he's going for a gun?  What chance would

13   he have to get away with that?  If he brings a gun to bear, all

14   the officers that are surrounding him, what possible chance

15   does he have to get away?  Is he going to shoot all the

16   officers?  Why would someone do that?  Why would they do that?

17           And the answer, we believe Dr. Keram looked at this

18   very carefully, and it's an unfortunate part of life, it's ugly

19   to think about.  But Dr. Keram explained to you that in her

20   opinion, this was a suicide by police.  And she didn't just

21   come to this decision rashly and without looking at any

22   evidence.  She looked carefully at everything she could about

23   what happened in this incident.

24           Her testimony explains Mr. Boyd's bizarre behavior

25   that night.  First, she discussed why would he be suicidal?

Summation - Loebs

1    Well, she explained his life was not going well at that point.

2    He was facing a 15 to 28-year prison sentence.  It was coming

3    up shortly.  And he did not have a good time in prison.  No one

4    would, but it's exceptionally bad for Mr. Boyd.

5         When he entered Larch Way, before he made that final

6    decision, that final movement in the car, he had to know that

7    what he had done that day was going to cause him to spend the

8    rest of his life in jail.  He had accosted Miss Williams and

9    threatened her with a gun.  Mr. Brass explained what the

10   consequences of that could be.  He then accosted Miss Hogan and

11   threatened to kill her with the same gun that we now know is

12   loaded.  Mr. Brass explained what the consequences of that

13   would be.  And then he attempted to murder police officers.

14   That alone would get him life in prison.  We're not even

15   counting the high-speed chase and that he's fleeing from a

16   pursuit.  We're not even considering that.

17        So when he is sitting in Larch and whatever he's

18   thinking, he's making the decision, Do I do this or not?  Do I

19   make a move that causes the police to shoot and kill me?  I've

20   already gone to my belt, they didn't shoot me.  I have taken my

21   shirt off, they didn't shoot me.  I have reached once into the

22   SUV, I haven't been shot.  Now, do I do it?

23        He had to know at that time, If I let them take me

24   into custody, I will spend the rest of my life in jail.  Not

25   something that he or anyone would want to do.

1              And so that's what he did.

2              Now, Dr. Keram explained, because you heard this

3       testimony, go through it rather quickly, that there was -- the

4       question was, was there evidence that he was suicidal or not?

5       The very last evidence the plaintiffs put on were to call

6       Mr. DuFauchard and to call Mr. Boyd's ex-wife.  To say they

7       didn't think he was suicidal.  He wasn't behaving suicidally.

8       He didn't have any problems like that in his life.  Well, isn't

9       it interesting who they didn't call to discuss that?  Ms. Boyd

10      did not take the stand and talk at all about that issue.  And

11      she could have.  Her silence on that speaks volumes.

12             Isn't it also interesting that when Dr. Keram wanted

13      to get the psychological record related to his psychiatric

14      treatment Mr. Boyd had, the plaintiffs denied her ability to do

15      that.

16             MR. GALIPO:  I'll object, your Honor, as assuming

17      facts not in evidence, that there were any psychiatric records

18      or psychiatric treatment.

19             THE COURT:  I'm not sure I heard the exact phrase just

20      a minute.  Well, there isn't the statement that there were.  I

21      don't know if there's any evidence, but there was a record,

22      there was evidence that she sought to get any record if there

23      was one.  And the Court will inform the jury as to the law

24      regarding that at the time.  I'll overrule.

25             MR. LOEBS:  With respect to her request to get the

1    records, the evidence came in that the plaintiffs filed a

2    motion to stop that from happening.  Why would you do that if

3    there are no records?  No reason to make a motion if there's

4    nothing there.

5            And then in cross-examination, Mr. Galipo made a big

6    deal of whether she saw any records related to Mr. Boyd having

7    suicidal ideations.

8            Dr. Keram explained why would someone choose to have

9    the police end their life.  Presented evidence Mr. Boyd did not

10   like the police.  He blamed them for losing his legs in 1993.

11   Filed a lawsuit against the CHP officer whom you saw testify

12   about the 140-mile-an-hour, high-speed chase.  He blamed them

13   for everything that was wrong in his life.  He gets arrested,

14   he sues them.  He's in jail, he sues them.  Evidence of his

15   hatred for the police is contained in each word he wrote about,

16   talking about murdering police officers and having with that a

17   picture of a murdered police officer.  You heard that from

18   Officer Moody.

19           Another motivation for why someone might choose to

20   have the police help end their life is that they get someone

21   else to pull the trigger.  Dr. Keram explained that.  She also

22   talked about why then.  Why would it happen at that moment.

23   You remember the testimony you heard through the deposition

24   that was read of Lois Boyd, Ms. Boyd's sister.  Ms. Boyd's

25   sister said that the night before this happened, the family was

1  trying to fly Cammerin Boyd out of the state to Atlanta because

2  they were fearing for his life with contact with police.  And

3  instead of going on that flight, he took his gun, got in the

4  SUV, unbeknownst to his mother or Lois Boyd, and came into

5  San Francisco for the rampage that we've talked about.  That,

6  as Dr. Keram described, is abnormally abnormal behavior.

7         He knew his criminal trial was coming up soon.  Maybe

8  28 years in jail.  And Dr. Keram explained he just passed the

9  anniversary of the CHP accident in which he lost his legs.  And

10  we got to Larch, as I explained, he's facing life in prison.

11  So what evidence does she have to support her opinion?

12        Now, one thing I'm going to talk about in terms of the

13  burdens in this case is the defendants do not have the burden

14  to prove anything.  When you go back and look at the jury

15  verdict, there will not be a question you have to fill out as

16  to whether Mr. Boyd committed suicide by police.  This evidence

17  was offered to help explain why he would have been doing the

18  actions that he did.  Why is it more likely that he's not just

19  giving up, that he's not just surrendering, that he's actually

20  taking it to another level to force the officers to shoot him?

21        And what evidence did Dr. Keram have to support this?

22  She talked about Oakland the few days before.  She talked about

23  this as a practicing event where he enticed the police to chase

24  him, not just by driving by once but several times, getting

25  them to pursue him.  Sometimes they even broke off the pursuit

1    and he came back again to the same area.  And then when they

2    finally had their hands on him, he was repeatedly begging for

3    the police to kill him.

4              This also explains his actions in San Francisco a few

5    days after the incident in Oakland, when now he's doing the

6    same thing trying to get more attention, the most negative

7    attention you can get, because he's at the Tenderloin police

8    station spinning donuts, then he attempts to accost a woman or

9    does accost a woman at gunpoint, then he goes to another

10   location next to Northern Station and accosts another woman,

11   threatens to kill her at gunpoint.  Doesn't leave the City.

12             Now he gets the police attention he's looking for.  He

13   engages in a high-speed pursuit.  And then he gets all the way

14   back to where he started in Larch and he gets out of the

15   vehicle.  One thing that occurred to me, and I think I

16   discussed it before, if he was saying to people, either before

17   to his mother or to the officer we had testify that said he

18   seemed to be paranoid about the police, or to people on Larch

19   that the police were trying to kill him, or that they were

20   going to kill him, why would he be thinking that?  Unless he

21   had in mind that's what he was going to make happen.

22             Another thing to consider is the high-speed pursuit

23   he's engaged in doesn't make any sense.  Can't -- from really

24   any standpoint.  What is he doing?  He's running from the

25   police.  He's shooting out the door of his car at pursuing

1    officers.  Can anyone think that's going to stop the police

2    from pursuing him, or just encourage them to do?  And with his

3    limited mobility, what does he think's going to happen when he

4    gets to the end?  He can't get out and run somewhere like

5    someone else might.  He knows this is setting this up for a

6    confrontation with the police, and that's what happened.  And

7    that's why I wrote down here, Was he really fleeing after all?

8    Or was he just inviting the police to a location where this

9    could happen?

10          Dr. Keram's opinion was that it was a suicide by

11   police.  And she also talked about the drugs that he was

12   taking, how that might affect his behavior.  Dr. Mendelson

13   spoke to this as well.  She explained that the drugs that he

14   had could have caused a depression after they had worn off.

15   Dr. Mendelson talked about the possibility of psychotic

16   behavior you can get from some of the drugs he had in

17   combination.  And that the drugs were affecting him.

18          This was confirmed by Miss Williams who said he looked

19   like he was on all sorts of drugs that she could identify.  She

20   had some experience with that.  And by Miss Hogan.  She said

21   the same thing.  There's no evidence these two people knew each

22   other and put their stories together.  They're two different

23   people who were accosted at two different times by this

24   individual, and they had the same impression of his state of

25   mind and whether or not he was on drugs.

1          Officer Paine said he also thought the behavior that

2     he saw on Larch looked like someone who was under the influence

3     of something pretty serious.

4          Dr. Lemos talked about the amount of drugs in his

5     system.  Dr. Mendelson talked in detail about how they could

6     affect someone.

7          So with respect to did plaintiffs prove this point?

8     Of course with Dr. Keram, they didn't.  Dr. Keram established

9     that when this incident got to Larch, Mr. Boyd was not about to

10    surrender.  He was going to do what he needed to do to get the

11    police to shoot him.  As hard as that is to imagine someone

12    doing, Dr. Keram painstakingly explained that this phenomenon

13    exists, and these are the types of behavior someone engages in

14    when they're doing that behavior.

15         So I want to talk about -- we talked about

16    Dr. Bonnell.  And before we can get into a discussion about

17    him, I'm going to shift the focus to talking about the physical

18    evidence, because that's what Dr. Bonnell talked to you about,

19    the physical evidence.  I'm not spend as much time on this,

20    we've spoken on this already.  Dr. Bonnell's perspective --

21    from a physical evidence perspective, rather, physical evidence

22    has no bias.  It is what it is.  It can be examined, it can be

23    studied, it can be looked at, it can be photographed, it can be

24    reviewed.  It can be retested.  It can be reexamined.  It just

25    needs to be properly evaluated by qualified experts.  That's

1    the importance of physical evidence.

2           And Dr. Bonnell.  His perspective.  Remember, he was

3    retained by the plaintiffs.  They called him to the stand.  His

4    testimony was devastating to the plaintiffs' case.  Because he

5    established through their own witness that the trajectories

6    were just as Dr. Smith described, just as Mr. Jason understood,

7    and that they would accommodate the gunshot wounds from an

8    individual in Officer Paine's position firing these shots with

9    an individual seated on the floorboard of this vehicle with a

10   gunshot wound going first into the left leg.  That was

11   Dr. Bonnell's testimony, that would be the first injury, then

12   into the left hand, the same gunshot wound, and then the next

13   shot into Mr. Boyd's side in the abdominal area between the 9th

14   and 10th rib.  That was Dr. Bonnell's testimony.

15          He talked about the angle if he's seated being 5 to 10

16   degrees downward position.  He talked about the exit wound

17   being lower than the entrance wound in terms of an individual

18   being seated on the running board of the SUV, the running board

19   being about 19 inches off the ground.  Dr. Bonnell said that

20   the entrance wound to the left leg would be 24 inches off the

21   ground.  And it's his opinion the exit wound would be 23.

22   That's lower.

23          He also talked about the abdominal injury, that being

24   a 5- to 10-degree downward angle.

25          Now, just for a minute let's talk about some of the

```
 1   plaintiffs' -- the witnesses the plaintiffs call to support

 2   their case and whether that's consistent with what we're

 3   talking about here in terms of the abdominal injury.

 4   Dr. Bonnell testified in order for the 10- to 15-degree

 5   downward angle, someone would have to be tilted to the right

 6   about 10 to 15 degrees.  Or they could be lower, such as

 7   seated, and there wouldn't be nearly as much tilting to

 8   accommodate that.  That's not consistent with any of the other

 9   witnesses that testified in this case.  That Mr. Boyd was

10   standing up and tilted to the right when he was shot in the

11   abdominal area?  No one says that.

12           In addition, the 5- to 10-degree downward angle when

13   the leg is parallel, that's like this (indicating).  That is

14   not accommodating someone standing in position unless they're

15   doing something like this, which obviously there's no testimony

16   about.

17           As I said before, Dr. Bonnell's testimony was

18   devastating to plaintiffs' case, which as I suggested before is

19   probably why you didn't hear his name mentioned by plaintiff in

20   closing argument.

21           The one thing that he said which is factually wrong in

22   terms of his opinion is he said that if the muzzle was 12 feet

23   away, however, and about 5 feet high off the ground, then he

24   thinks that doesn't work with this shooting event because the

25   angle of the trajectory would have to be 30 to 45 degrees.
```

Summation - Loebs

```
1    That is mathematically absolutely provably wrong.  If the

2    entrance wound is 24 inches off the ground and the height of

3    the muzzle of the gun is 5 feet, and the barrel of the gun is

4    12 feet away, that's an angle of about 10 degrees, not 35 to

5    40.

6            So on that, although he didn't say he did the

7    trigonometry, he said he would have to -- maybe if he had, he

8    wouldn't have had this opinion at all in this case.

9            So that's the only area in which he testified on this

10   issue that is really irrelevant, because it's just a

11   mathematical error on his part.

12           And as he testified in his opinion, and I think it's

13   been everyone's opinion, every expert that's testified, in a

14   rapid fire situation, shots would tend to rise.  I believe

15   Mr. Clark said that, Mr. Jason said that, Mr. Cameron said

16   that, and even plaintiffs' expert, Dr. Bonnell, said that.  No

17   evidence or testimony to the contrary.  In a rapid fire

18   situation the first shots would be lower and the shots would

19   rise.

20           And based on that, Dr. Bonnell said the first shot

21   would be to the left leg, in the left hand, and if there's a

22   connection between the left leg and the left hand, the left

23   hand has to be below the waist.  And also he testified that the

24   crumpling opinion that Mr. Galipo tried to elicit from him

25   would be an unlikely event, an unlikely scenario, that he's
```

1    shot, falls, and just has to line up his left leg parallel to

2    the ground, hand below it, he said that would not be likely.

3         So did plaintiffs prove their case through the

4    testimony of Dr. Bonnell in this discussion of the physical

5    evidence?  No.  Proved the opposite.

6         Next I'd like to talk about Dr. Firestone as to

7    whether he's credible or not on any issues in this case.  I'd

8    like to discuss that.  You remember what he admitted to in his

9    testimony.  That when he first reached his opinions in this

10   case, not only had he never been to the scene of the incident,

11   not only had he never looked at the SUV, which he's still never

12   done, not only did he never look at any of the physical

13   evidence before he forms his opinions, he'd never even seen any

14   photographs of the SUV, the blood evidence or anything related

15   to this case.

16        And yet he was called upon by plaintiffs to give

17   opinions about trajectories and other issues in this case, with

18   no information.  Regardless of whether he has a PhD, what does

19   that matter if the opinion he reaches is only as good as the

20   information he has, and he has no relevant information?

21        As I said, he formulated his opinions without even

22   seeing any photos of the scene or the SUV.  To this day, he

23   still hasn't looked at the SUV.  Which is amazing.  There's no

24   other piece of evidence more important.  If you have to examine

25   blood spatter or trajectories or seating position or how

1    someone could configure in that car, and he couldn't be

2    bothered to come up here from Los Angeles to look at this

3    evidence?  I submit the reason for that is he knows what he

4    would find if he did, and it would be precisely consistent with

5    what Mr. Jason told you.

6         And remember when he said this, that the reason he

7    couldn't come up here is because of a geographical barrier?

8    That was just flat out ridiculous.  He's in Los Angeles.  He

9    can come up here to testify, but he can't go out of his way to

10   look at any of the critical evidence, the clothing, the

11   bullets, the casings, the gun, the scene?  Why would they call

12   an expert to come and tell you his opinions when it's based on

13   nothing?

14        Something else about Dr. Firestone.  I wrote here that

15   he doesn't know up from down.  What I'm referring to is he

16   thinks the anatomical position when he's reviewing an autopsy

17   report is of someone lying on their back.  Not someone upright

18   on their feet.  If you don't understand the most basic thing

19   about how to read an autopsy report, when you read in

20   Dr. Smith's description of the left leg injury that someone's

21   in the anatomical position, that the wound path is going up,

22   you're going to have no idea what he's talking about unless you

23   know that relates to the body in this position.

24        If you think it relates to them on the ground, you may

25   think it means up to the sky, which is actually what

1    Dr. Firestone thought, and apparently no one disabused him of

2    that before he came and testified about his opinions about the

3    trajectories.  If you remember, he had the individual

4    hypothetically sitting on the ground with the left leg parallel

5    and the hand up here.  Why did he do that?  That's because he's

6    got no idea how to read an autopsy report.  That's who they

7    brought here to offer opinions to you about this case.

8           When I talked before about what you do when you have a

9    terrible case, you try to deceive the jury.  It's all about

10   slight of hand, and there's no better example of it than

11   Dr. Firestone.

12          Let's talk about Dr. Firestone's opinion about blood

13   spatter analysis.  There was no evidence presented by the

14   plaintiffs that he knows anything about this.  He has no

15   education in it.  No experience.  No certifications.  He

16   doesn't even know the name of red or white blood cells.  He

17   doesn't know the size or shape of free falling blood.  How can

18   he come in and do an evaluation of blood spatter in this

19   vehicle when he knows nothing about blood spatter and he hasn't

20   seen the vehicle?  He just looks at some photographs and just

21   makes stuff up?  He can't name even one organization that

22   studies blood spatter analysis.

23          And this may speak to it more.  This probably explains

24   a bit why that is.  This isn't what he does.  He does

25   slip-and-fall work.  Auto accident work.  He's not a blood

1    expert.  He's not a crime scene analyst.  He's not a shooting

2    reconstructionist like Mr. Jason.  He's never fired a gun in

3    his life, and he's going to give opinions about weapons?  About

4    the injuries sustained by an individual?

5            And if you recall his presentation, Mr. Jason who was

6    examined extensively because he had the audacity to prepare a

7    diagram to help illustrate his opinions, why didn't they have

8    anything with Mr. Firestone?  Here's Larch Way, here's what it

9    looked like, here's what I'm saying about the way the bodies

10    are positioned and how he can't be in that SUV, and you'd have

11    to have two shooters and the shooter would have to move.  He

12    used a tape measure in court to illustrate that on Mr. Galipo.

13    How effective was that?  When he was doing the demonstration on

14    Mr. Galipo, all he had to do to make the trajectories line up

15    was turn to the left.  He could have done this well in advance.

16    He could have done something to demonstrate his opinions.  He

17    did it on the fly here in court.

18            Why didn't he use a single exhibit to illustrate his

19    opinions?  I have a theory.  His opinions made no sense.  They

20    were based on the wrong information.  And when you're just

21    making things up, the last thing you want to do is clarify what

22    you're talking about.  Clarity is your enemy when you're making

23    things up.  That was Dr. Firestone.

24            So did Dr. Firestone help prove this proposition?  No.

25            Let's talk about Dr. Smith.  We covered Dr. Smith

1  already.  I'll be brief.  His testimony, he said that the angle

2  to the leg would be downward in a seated position, same as

3  Dr. Bonnell.  He said that anatomically the angle through the

4  abdominal injury would be downward, and he had no reason to

5  disagree with Dr. Bonnell's estimate of 10 to 15 degrees.  He

6  said the wound paths only work if seated on the floorboard.

7  That was his opinion.  And the significant thing about this

8  opinion by Dr. Smith is, it wasn't based on an analysis of the

9  blood.  Like Mr. Jason's opinion was.  It was based on the

10 wound paths alone and the possible seating configurations in

11 this vehicle.  That was Dr. Smith's opinion.

12         And if you recall, I had Dr. Smith look at

13 Exhibit U-5, although it wasn't in evidence at that time, and I

14 asked him, looking at this photograph with the individual

15 seated as he is now in the SUV, would that be consistent with

16 your opinions as to the trajectory from -- through the

17 individual as indicated in this exhibit?  He said, Yes.  Then I

18 asked him, Okay, now let's say, would this be consistent with

19 the trajectories coming from a single focal point?  He said,

20 Yes.

21         Although you hadn't seen the exhibit yet, I also asked

22 Dr. Smith to comment on Exhibit W-8.  I said, Dr. Smith, based

23 on your analysis of the wound trajectories of Mr. Boyd and your

24 understanding of the configuration of the SUV, how does this

25 relate to your opinions regarding his configuration in the SUV?

1  And he says, Yep, that's my opinion.  He says, That would be

2  consistent with my analysis of the injuries and the way in

3  which a body would be positioned to sustain these injuries in

4  this vehicle.  That's Exhibit W-8.

5       So did Dr. Smith support plaintiffs' case?  Not at

6  all.

7       Miss Springer.  Remember she testified about the

8  fibers.  I think her testimony is completely undisputed.

9  Remember what I talked about physical evidence in that it's

10  something that can be tested and retested.  If the plaintiffs

11  had any questions or concern about her analysis, they could

12  have tested it themselves.  They could have had their expert

13  come in, no, no, she's all wrong, they don't match.  Why didn't

14  they?  Because they are a match.  The fibers found in the left

15  hand are the fibers found in his pants, his boxer shorts, and

16  the only way that could happen is if the bullet went through

17  the left leg and into the left hand.  I think that's

18  undisputed.

19       And the significance of that fact, especially coupled

20  with the testimony the first shot would have been through the

21  left leg, is that that means we can position precisely where

22  the left hand was at the time Officer Paine fired the first

23  shot, and it wasn't like this, it wasn't raised, it wasn't to

24  the side.  It was down to the left below the waist inside of

25  the SUV.  Which is, of course, the issue in this case.

1          So Miss Springer?  No, she does not support

2     plaintiffs' case.

3          Mr. Jason.  You've heard his testimony at length

4     recently, and it was very long, and I will let you know right

5     now I'm not going to go through that in detail because I hope

6     you have it fresh in your mind.  His qualifications.  This is

7     what he does.  He is a blood spatter expert.  He is a crime

8     scene expert.  He is a shooting reconstructionist.  He is not a

9     trip-and-fall, auto accident analyst.  He's an expert on these

10    issues.  He went to the scene many times.  He examined the SUV.

11    Which you wouldn't think I'd have to say is significant but the

12    plaintiffs didn't.  And he reviewed all the physical evidence

13    himself.

14         He provided the only diagrams and exhibits to help

15    illustrate his opinions in this case.  His testimony, the

16    angles match.  The decedent's position with the left hand

17    reaching inside the car.  The blood on the floorboard is

18    consistent with the injury to the left hand.  The blood on the

19    floorboard, the wound to the left hand injury is consistent

20    with high-velocity impact spatter, which is significant.

21         Now the plaintiffs have made a big deal about the

22    blood.  And the reason for that is that if there's blood in

23    that car from an injury to his left hand, you know that's where

24    his left hand was.  And regardless of anything else, we know

25    that his hand was reaching inside the car when he was shot.  So

1    they have to attack that evidence.  They do it with

2    Dr. Firestone who doesn't know anything about it -- he didn't

3    look at it.  So they try to do it through eight-hour

4    cross-examination of Mr. Jason.

5         And the one thing they come up with is the napkin

6    issue.  They don't give you any answers about what that means,

7    but they come up with the napkin issue again and again and

8    again and again.  Mr. Jason says the napkin had to be from

9    something else.  It was tucked in behind.  It couldn't have

10   been from whatever the event was that caused the blood in front

11   of the seat.  So what?  What do we do with that?

12        The plaintiffs would suggest, throw the baby out with

13   the bath water.  If the napkin was from some other event, maybe

14   the Oakland incident, he had cuts and scrapes, but if that's

15   from some other event, this blood on the front of the seat,

16   that has to be from something else too.  Not so.  Not so.  The

17   reason for that is, that you have the high velocity impact

18   spatter.  You have the blood exactly consistent with where the

19   left hand was located by eyewitnesses, and by Dr. Smith, and

20   with respect to Dr. Bonnell's analysis.  And what are they

21   suggesting happened to create that blood?

22        Real briefly.  What are they suggesting as an

23   explanation that created the blood in the same area where the

24   left hand would have been when it was shot?  Are they saying --

25   I guess Mr. Galipo suggested, well, maybe he was shot with the

1    bullets, you know, that were fired earlier.  Maybe -- what else

2    do we know about Pierce and Turk?  Maybe that bullet hit him.

3    We know that's not true.  Then what hit him?  Well, his left

4    hand got shot earlier.  Did his hand get shot twice?  Because

5    we know his hand got shot when the bullet went through his left

6    leg and through his left hand.  Did he get shot twice in the

7    hand?  You have to have a blood-producing event to create high

8    velocity impact spatter to create blood in that area.

9          They say what is the cause or source of that blood

10   other than the explanation Mr. Jason had.  There is really no

11   other explanation.  Someone else had their hand in the location

12   that was shot?  And left a trail of contact blood?  They're

13   saying he had a bloody shoulder, got left down there and left

14   high velocity impact spatter?  If you examine their questions

15   to the logical conclusion, they make no sense.  They're just

16   questions.  Mr. Jason explained this is all consistent with the

17   physical location that an individual would be reaching to the

18   left under the front of the seat.  And the blood evidence is

19   significant in that respect.

20         He also testified he was first shot in the left leg

21   and the left hand.

22         Now, again talking about plaintiffs' attacks on

23   Mr. Jason, they knocked his diagram because they got an earlier

24   version of it.  That's irrelevant.  They had -- recounted

25   earlier witnesses' testimony.  That's what Mr. Galipo said in

1    his closing remarks.  That's not the case.  Mr. Jason explained

2    when he was looking at this event he didn't discount testimony,

3    he just looked at the physical evidence to see from that if he

4    could reconstruct what happened.  And he was able to.  And as

5    it turns out, that matches the testimony of every credible

6    witness in this case.  Every one of them.

7         The other knock on Mr. Jason, that only he could see

8    the high velocity impact spatter.  Well, their expert didn't

9    even try.  He just looked at photographs.  Mr. Jason took high

10   resolution, high intensity photographs to show those to you,

11   and it was clearly visible on his photographs.  And what's

12   their explanation of how it got there?  I don't know, I guess

13   Mr. Jason planted that.  Maybe that's part of the conspiracy.

14        Now, this was an issue that was raised quite a bit by

15   plaintiffs' counsel.  That here we've got -- and he said in

16   closing, this is the smoking gun, for lack of a better term.

17   Here's this photograph that shows the door at 55 degrees.  This

18   is really important.  Because if that's the angle of the door,

19   then of course Officer Paine couldn't have been where he said

20   he was, and that means Mr. Boyd wasn't in the car.

21        Let's go back a second.  Listen.  Think about what

22   he's talking about.  That picture was taken by Inspector Gee

23   after the door had been opened and closed.  That wasn't

24   intended and didn't represent the position of the door at the

25   time the shots were fired.  There's no evidence it did.

1          Mr. Galipo can try to run with that and say, Aha, this

2     means he couldn't have been seated in the door.  No, at best

3     maybe it means the door was fully open.  Kind of the way most

4     people would get out of the car.  Kind of the way most people

5     would leave the door open after they got out of the car.  And

6     it fits precisely with the wound paths and the wound

7     trajectories.  As explained by Mr. Jason, he said the door's

8     fully opened or if it's at 55 degrees, if it's fully opened,

9     look at how that relates to every witness's testimony?

10          Officer Warnke is standing in the position essentially

11    where the door's pointed with the door between him and

12    Mr. Boyd.  Officer Paine has a clear view into the SUV and his

13    trajectories match the trajectories of the wound paths to

14    Mr. Boyd.  Officer O'Malley has a clear view into the SUV.

15    What does plaintiffs' counsel suggest you'd have to do to make

16    that so it doesn't work?  Close the door.  Doesn't make any

17    sense.  That's not the way you try to figure out what happened

18    is to come up with some explanation that makes it impossible.

19    We need to know -- Mr. Jason testified as to the 55 degrees,

20    that might still be the case.  But you don't work backwards

21    from a photograph that has no foundation as the angle of the

22    door.  And that's what plaintiffs' counsel's suggesting.

23          Mr. Galipo's cross-examination of Mr. Jason suggests

24    that the thigh wound location is somewhere different than

25    described by Dr. Bonnell and Dr. Smith and Mr. Jason.  There's

1    absolutely no foundation for that other than Mr. Galipo's

2    questions.  Which as I pointed out, his questions are not

3    evidence and they were refuted by everyone.  This is a downward

4    trajectory with the exit wound lower than the entrance wound.

5         So Mr. Jason, did he help to prove the plaintiffs'

6    case?  No.

7         Now, that's the analysis of my analysis of the

8    evidence that was presented in this case as of this critical

9    issue.  And let's look at it all together and see how it mounts

10   up the plaintiffs in terms of their ability to prove this,

11   which they have the burden, versus the defendants.  This will

12   be the "yes" side.  We'll fill this up with all the evidence

13   plaintiffs have to support their burden in this case, and that

14   is they proved that Boyd was not moving his hand into the SUV.

15   So we'll fill that up with all the evidence.

16        That's done.

17        Now we'll fill it up with all the defendants'

18   evidence.

19        That's the way this case presented.  That is

20   overwhelming.  Mr. Galipo talked about this being a difficult

21   case.  It's far from just difficult.  The only way he can

22   convince you of anything other than this is to have you

23   disregard the evidence, not pay attention, and turn off your

24   common sense.

25        So with respect to Question Number 1, which is really

1   the whole question in this case, all the facts regarding

2   Question Number 1, that relates to whether plaintiffs can prove

3   that Boyd was not moving his hands into the SUV when Officer

4   Paine fired.  The answer to that question is clearly, no.  They

5   cannot prove that.

6          So going back to the verdict form, if you remember

7   awhile ago I showed you what that looked like and how it will

8   look, how it will look to you in the jury room.  This is the

9   exact language, I've read it to you before.  This is a question

10  you'll have to answer as to Officer Paine, and this is what I

11  suggest -- and Officer O'Malley -- this is what I suggest

12  should be the response.

13         Now I mentioned before briefly that in this case there

14  are a lot of facts and issues that came up that I didn't

15  discuss that fit either side of that analysis and that happens

16  in every trial.  And in this trial there are a bunch.  And

17  these are red herrings, and I think everyone knows what a red

18  herring is meant to indicate, but something to distract you

19  from the main focus that takes you off the trail and look at

20  something else, and perhaps you get confused and come up with a

21  wrong result.  That's what a red herring is.

22         Let me talk about some of those with you for awhile.

23  Number 1, Mr. Boyd had prosthetic legs, and getting down for

24  him would not have been as easy as other individuals.  It does

25  not matter.  It's irrelevant.  Why did we call an expert to

 1   testify about that?  Because we knew they'd raise the issue and

 2   we knew you'd want to hear someone talk about that issue.  And,

 3   yes, of course, someone getting down on the ground, they could

 4   fall.  In this case, Mr. Boyd could kneel.  He could put his

 5   hand up against something that doesn't look like he's reaching

 6   for a gun.

 7        But the evidence is what he did not have to do is go

 8   back to that SUV and put his hands inside the vehicle, which

 9   would look like he's reaching for a weapon.  But the reach,

10   it's a red herring, because even if he had to, it doesn't

11   matter.  Because the question is, How does it appear to the

12   officer is?  When they're there and they're confronting an

13   individual who's tried to murder police officers using his gun,

14   they believe the gun's in the car, and that person for whatever

15   reason goes back and puts their hand in the SUV, even if in

16   their mind they're doing it for completely innocent reasons,

17   that doesn't matter.  They can't be given that chance.  That's

18   why that's a red herring.

19        Whether Officer Paine was in the parking stall or on

20   the sidewalk, irrelevant.  Does not matter.  Officer Paine says

21   he was on the sidewalk.  According to the analysis done by

22   Mr. Jason, the wound paths, everything still works the same.

23   Even if he is as close as 12 feet away.  The angle then would

24   be 10 degrees, instead of 6 1/2.  If he's back 24 feet on the

25   sidewalk, it doesn't matter.  A red herring designed to

 1   distract you from what really matters in this case.

 2           Officer Paine did not have cover.  Through Mr. Cameron

 3   explained why that is not the issue, it does not matter.

 4           No shell casings were found in the parking stall.  So

 5   what?  What are you supposed to do with that?  Does that mean

 6   Officer Paine didn't fire?  Does it mean he wasn't anywhere in

 7   that location?  Mr. Jason, the only expert that testified about

 8   shell casings and what they might mean, said, No, where the

 9   shell casings are located is completely consistent with where

10   he was, Officer Paine's location as I described.

11           Did you hear testimony from anyone else that that's

12   not true?  If it wasn't true, don't you think they would have

13   brought someone in?  Shell casing expert?  Or maybe had

14   Dr. Firestone.  He's willing to lend expertise to just about

15   anything.  He can say, Yeah, I'm a shell casing guy too, and,

16   no, those don't match.  This was all done through the testimony

17   of Mr. Jason and his testimony was, it's consistent.  That's a

18   red herring.

19           The do-rag.  I still don't know why this issue has

20   come up so much and why you've heard about the do-rag again and

21   again and again.  What relevance does that have, if at all,

22   with whether Mr. Boyd was reaching into the car or moving into

23   the car at the moment he was shot?  It does not.

24           The white t-shirt.  Again, a red herring.  What does

25   it matter what happened to the white t-shirt?  What bearing

1    would that have on any fact you need to resolve in this case?

2         Mr. Campos did not see Officer Paine or Officer

3    O'Malley.  Well, we showed what his view would be.  When

4    Mr. Campos is looking out his window, they'd be right

5    underneath him.  And he'd be looking at of course what's

6    happening in the SUV.  It's completely irrelevant.  Does that

7    mean that Officer Paine and Officer O'Malley weren't there?

8    No, it means that Mr. Campos's attention was focused on the

9    SUV.  As he described.  A complete red herring.

10        Another one that Mr. Galipo focused on quite a bit in

11   his closing remarks, and that is Mr. Campos could see both of

12   Mr. Boyd's hands when he was shot.  Well, he's on the third

13   floor.  And the test as to whether you can use lethal force and

14   whether there's an imminent threat doesn't depend on whether

15   the officer can see the individual's hands.  If the individual

16   is making a motion that the officer believes is consistent with

17   going for a gun, the officers entitled to use lethal force,

18   especially when you have someone who's fired at police officers

19   before.  The officer can't allow them to do that or they're

20   risking their life, and the lives of their partner and everyone

21   else around them.

22        No one saw the gun until immediately after the

23   shooting in the map pocket.  A complete red herring.  So what?

24   Does that mean Mr. Boyd was not reaching into the vehicle?  No,

25   it means the officers didn't notice it at that time.  And if

1    they had, this would be different.  Because if they saw where

2    that gun was and they saw Mr. Boyd go back to the SUV, seeing

3    the gun in this location, it's even more of a threat if they

4    saw it.  Imagine that.  He's out of the car, he walks back.

5    And his right hand is going to be inches away from this weapon.

6    The danger that these officers were in, now using 20/20

7    hindsight, the danger they were actually in from Mr. Boyd

8    killing them with that weapon is frightening.

9            And the plaintiffs claim is, Well, but he's reaching

10   to the left and not the right.  So officers shouldn't have been

11   concerned?  Well, thank goodness, he was just reaching to the

12   left and he didn't know where his gun was at that time.

13           Now, one of the suggestions is, well, why is he

14   reaching to the left if his gun is in the map pocket?  Here's a

15   possible scenario.  He's driving erratically through

16   San Francisco.  He's on drugs, which we know.  He's involved in

17   a high-speed pursuit.  He shoots at police officers that are

18   pursuing him, and then when he is getting to Larch, he's got to

19   do something with his gun.  He puts it down.  Does he remember

20   whether he put it under the seat?

21           This is a rental car.  It's not his.  He's not very

22   familiar with where things are.  He puts it to the side, it

23   goes in the map pocket perhaps, and then when he gets out, he

24   opens the door, and now he wants to find his gun, and he's

25   going back and he's looking for it, he doesn't recognize that

1    as his gun (indicating) perhaps or he doesn't see it, just like

2    the other officers don't at twilight on May 5th, 2004.  And he

3    starts looking for it.  Because he wants to bring it to bay on

4    the officers as he'd done earlier that day.  Two minutes

5    earlier.

6          Mr. Campos talks about him looking to his left like

7    he's looking for something.  He reaches to his left like he's

8    going for something.  Then he puts his hands to his left again

9    like he's searching for something.  I'd submit he was searching

10   for that gun.  And under the seat you'll see, there's

11   photographs of black metal objects.  Maybe he thought that was

12   it.  Maybe he was reaching for one of those.  Who knows?  But

13   from the officers' perspective, it does not matter.  So no one

14   saw the gun in the map pocket until immediately after the

15   shooting?  Not relevant.

16         Did the officers describe every detail exactly the

17   same?  No, they don't.  And you wouldn't expect them to.

18         Officer Paine came in here, and if there was this

19   grand conspiracy about how everyone was situated and what he

20   was going to say, Officer Paine said, You know, I don't really

21   know whether he was seated or leaning or not.  Why would he say

22   that?  Because that's the truth.  You know, recalling this

23   dramatic event, that detail isn't fresh in his mind.  The

24   reaching is.  His life being in danger is.  But that detail is

25   not.  Does that matter?  That's a red herring.

1          And think for a minute, if you would, about the

2     differences in the Larch Way witnesses that the plaintiffs are

3     asking you to completely discount.  We have hands up, never

4     moved.  We have sitting down in the SUV.  We have leaning to

5     the left.  We have bending over with a back to the officers,

6     hands in.  People that are seeing these events even when

7     they're honestly trying to recount them are going to have some

8     differences in how they describe them.

9          The critical issue is the move into the vehicle with

10    the hands, and on that every officer is consistent; on that

11    every witness on Larch Way is consistent.

12         The condition of Boyd's body and his legs after he was

13    pulled from the car.  It does not matter.  He was moved.  Just

14    like the 55-degree angle of the door after the door was closed.

15    Why would you focus on that?  It doesn't have any bearing

16    because it was moved after the shots were fired.  You can't do

17    any analysis from that.

18         The location of the gun when Mr. Boyd was reaching.

19    We discussed that.

20         Mr. Boyd took his shirt off.  It may be an indication

21    he's taunting the officers with his hands to his waist.  But it

22    doesn't have anything to do with whether he reached into the

23    vehicle or moved his hands into the vehicle.

24         Boyd had his hands up some of the time.  Well, you

25    heard Mr. Galipo recounting his view that Mr. Boyd is

1   compliant.  He leaves out a whole lot.  He's ordered to get out

2   of the car.  He got out of the car.  Well, that's after they

3   shot at the car.  He's out of the car, he puts his hands up.

4   But he puts them down and he puts them to his waist.  He leaves

5   that out.  He says, all right, then they order him to get on

6   the ground, and then he doesn't.  Okay, then that's not that

7   big a deal because he has prosthetic legs.  That's a huge deal.

8   If you have officers with their guns trained on you, your life

9   is in jeopardy if you don't comply, and you're ordered to get

10  on the ground, you get on the ground.  It doesn't matter if you

11  get a scraped elbow or a scraped chin because if you don't, you

12  know you might get shot.  Because of what you've done to

13  provoke the incident.  You get on the ground.

14          The blood on the napkin, we've talked about that.

15          The officers were yelling commands at the same time.

16  Well, of course they were.  They wanted to get Mr. Boyd to

17  comply.  They wanted to get him to comply with voice commands

18  because they didn't want to have to resort to their weapons.

19          You can't get under the seat from the side.  No one

20  says you could.  It's completely irrelevant.

21          Officer Paine and O'Malley saw Elieff before the

22  shooting.  Apparently that's not being raised anymore as part

23  of the conspiracy.  I don't know.  There were questions to them

24  about, Well, didn't you see Officer Elieff on a tow before this

25  happened?  What is that about?  Unless they're saying they were

1    all in cahoots ahead of time to stage this execution.

2    Apparently that theory's dropped out.  But that's completely

3    irrelevant.

4            Another question:  The defense did not test every

5    piece of evidence or everything imaginable.

6            Of course not.  Who can?  Does it matter?  I mean,

7    with respect to the fiber evidence, we have fibers from the

8    pants, the jeans, the jeans seam, the boxer shorts, both in

9    terms of the polyester and the color, and the bullet in the

10   left hand.  Does it matter that we don't also have other fibers

11   located in the fiber analysis in the bullet in the left hand?

12   Of course not.

13           We talked about this, that no one knew that Mr. Boyd

14   was alone until the car was cleared at the end.  That's

15   irrelevant.

16           The SUV could have crashed if Officer Paine's shot at

17   Pierce and Turk hit Mr. Boyd.  That was discussed.  That's not

18   to be considered.  And as I pointed out, the plaintiffs are no

19   longer even making a claim regarding the shot at Pierce and

20   Turk as being the use of force, and you'll hear instructions as

21   to why that is, because in a high speed pursuit, if an officer

22   believes that that pursuit continues and that it may cause

23   someone to lose their life, a bystander die as a result, the

24   officer is allowed to use lethal force to stop that pursuit.

25           That was Mr. Cameron's testimony.  That would be an

1    instruction you'll receive.  In addition, you'll receive an

2    instruction that an officer has a felon that is fleeing, and if

3    allowing that individual to escape will pose a threat to future

4    individuals, the officer can use lethal force to stop that

5    individual.  That's the fleeing felon rule.  That also applies

6    to Officer Paine's shot at Pierce and Turk.  That's why that's

7    not in the case anymore.

8              Did Officer Paine actually see Mr. Boyd shooting from

9    his vehicle?  That's irrelevant because he's allowed to rely on

10   the information he obtains from the police radio.

11             Did Officer Paine announce his shot at Pierce and

12   Turk?  That's irrelevant.  Tactics and decisions don't matter.

13   They're not -- their claim isn't based on the shot at Pierce

14   and Turk anyway.  And Mr. Cameron explained to you why that's

15   completely appropriate police behavior.

16             So those are the red herrings that relate to that

17   first issue and the most important issue in this case, and that

18   is whether the time the shots were fired, was Mr. Boyd moving

19   his hands into the vehicle?  All of the red herrings, those are

20   all irrelevant pieces of information, although they came up at

21   the trial, they don't relate to how you analyze that question.

22             Now, one individual we've not talked about, and I'm

23   getting close to being done, is Officer O'Malley.  You might be

24   wondering, why is he a defendant in this case?  He's wondering

25   the same thing.  In order to maintain a claim against Officer

1   O'Malley, here's what they have to prove:  That he used

2   unreasonable force.  All right.  First thing they have to prove

3   is, did they prove that Boyd would not be a danger to others if

4   he escaped on Larch?  That is the fleeing felon rule, because

5   that's when Officer O'Malley fired his shot.  If at the time he

6   fired that shot, and it's virtually undisputed the car was

7   moving when he fired that shot, if he allowed him to escape,

8   would he be a danger to others?  Unquestionably, he would be.

9          The next issue is, all right, even if the fleeing

10  felon rule doesn't apply, Officer O'Malley is still allowed to

11  fire his weapon at Mr. Boyd if he believes, reasonably believes

12  Boyd had access to a gun in his car.  Remember Officer

13  O'Malley's testimony.  The car came to Larch and it was

14  stopped.  He came up.  He saw Mr. Boyd.  He ordered him to put

15  his hands up.  Mr. Boyd didn't comply.  Looked in the mirror.

16  Then looked at Officer O'Malley.  Began to drive forward.

17         Under those factual scenarios, as Mr. Cameron

18  explained, that officer is allowed to and should use lethal

19  force to stop that individual.  With the understanding that

20  that individual had fired at police before, and this

21  individual, by moving his vehicle, would be considered a

22  fleeing felon.  Doesn't matter what the speed is.

23         So what's the evidence that they presented related to

24  whether Boyd would be a danger to others if he escaped?  As to

25  Officer O'Malley.  Mr. Clark testified about that a little bit.

1   Do you remember what he said about the shot that Officer Paine

2   took at Pierce and Turk?  He said, Well, wait a second, okay,

3   he might be fleeing, the car's going 60 miles an hour, so don't

4   shoot at him, that's too dangerous.  Going too fast to shoot.

5   Going 60 miles an hour.  Don't shoot at the driver of that

6   vehicle.  Too dangerous.

7           Then he says, Okay, got the same vehicle, now he's on

8   Larch.  And now he's moving forward slowly.  And Mr. Clark

9   says, Oh, don't shoot now.  He's going too slow to shoot.

10  Don't shoot at the driver.

11          I'd suggest that that's sort of like the three bears.

12  That the first one's too little, the second one's too big, and

13  so you have to wait until the vehicle's going just right before

14  you can shoot.  Of course that's not the law.  Of course that's

15  not the standard.  Mr. Cameron explained that to you.

16          So did Mr. Clark support this proposition?  No, he

17  doesn't.

18          So that's really the only evidence they offer.

19  There's no credible evidence that Officer O'Malley's shot was

20  unreasonable.

21          Other evidence that relates to whether if Boyd escaped

22  he would be a danger to others.  We know from the radio

23  dispatch that that would be true.  We know from Officer Paine's

24  testimony that would be the case.  Mr. Cameron's testimony.

25  Common sense.  And we know that from Officer O'Malley's

1    perspective, when that vehicle started to move forward, he had

2    to reasonably believe that he was trying to escape Larch.  And

3    if he's allowed to do so, he will create a greater danger and

4    threat to the lives of people in San Francisco.  And so his

5    obligation as a police officer is to stop that threat if he

6    could.  That's why he took a shot.

7         Now, in terms of whether or not the vehicle was moving

8    at the time the shot was fired, Mr. Harris says it was moving.

9    And I'm talking about it was stopped, and it started moving

10   again.  Mr. Rogers also testified the vehicle stopped and

11   started to move again before that shot was fired.

12        Ms. Cranshaw, she testified the vehicle was stopped

13   and started to move again when the shot was fired by Officer

14   O'Malley.  Officer O'Malley, of course, testified to that.

15   Mr. Jason established through his analysis in Exhibit F-9,

16   which is in evidence, that the vehicle had to have moved when

17   Officer O'Malley fired his shot.  And the reason for that is

18   because of the trajectory of Officer O'Malley's shot, lands

19   here (indicating).  That means Officer O'Malley would have been

20   in this location and the vehicle could not have been here.  It

21   had to be further back, which means that it moved.

22        Now, the next question related to Officer O'Malley is,

23   did plaintiffs prove that -- oh, we answered this question.

24   This is the end of that question, did plaintiffs prove that

25   Boyd would not endanger others' lives if he escaped?  I submit

1   the answer to that is, No.  There's no evidence to support

2   plaintiffs' claim.

3          The next issue is, did they prove that it would be

4   unreasonable for O'Malley to believe that Boyd had access to a

5   gun?  We talked about that in some detail.  There's no credible

6   evidence to support it.  And the radio dispatch, Officer

7   O'Malley, Officer Cameron, established that of course it would

8   be reasonable to believe he had access to a gun.

9          So with respect to Officer O'Malley's issues, what are

10  the red herrings?  Officer O'Malley did not announce his shot

11  before or after on Larch.  Mr. Cameron explained that's

12  ridiculous.  That's not what police officers do.  It does not

13  matter.

14         Officer O'Malley's shot on Larch could have hit

15  someone other than Boyd.  You remember the analysis in this

16  case has to do with the use of force as to Mr. Boyd and

17  Mr. Boyd alone.  So this is irrelevant.

18         Officer Paine's car may have partially blocked

19  Mr. Boyd's exit.  Also irrelevant.  Mr. Cameron explained that

20  a vehicle like this you cannot count on the fact that a

21  vehicle, even if it's stopped at the exit, would stop an SUV if

22  that driver wanted to leave.

23         Other officers fired at Boyd's car thinking Officer

24  O'Malley's shot was from Boyd.  That also, as I explained

25  through Mr. Cameron, is irrelevant.  You evaluate Officer

Summation – Loebs

1    O'Malley's shot based on what he knew at the time.  Not based

2    on any actions taken by anyone else afterwards.  For the

3    example talking about 20/20 hindsight.  Talking about Officer

4    O'Malley's shot.  Did he see a threat from Boyd?  I believe

5    there's no evidence to suggest otherwise.

6           Boyd was driving slowly when Officer O'Malley shot.

7    Irrelevant.  Does that mean that you're driving slowly, you

8    can't shoot because there's a rule under five miles an hour

9    you're not fleeing?  Just needs to step on the gas more?  Or

10   maybe he was about to.  Officer O'Malley appropriately took

11   that opportunity to try to stop this very dangerous threat.

12          The pursuit would eventually end.  That's what

13   Mr. Clark told you.  You don't need to shoot at him.  Don't

14   shoot at him at Pierce and Turk.  Don't shoot at him on Larch,

15   because eventually it's going to end.  Maybe he'll run out of

16   gas, maybe he'll run out of bullets.  But at what cost to the

17   people of San Francisco if the officers don't do something to

18   stop Mr. Boyd.

19          As I was discussing this, I thought of one other red

20   herring I didn't mention in terms of Officer Paine's shot, and

21   that came up a bit and that is, plaintiffs argue that, well,

22   Officer Paine was the only one that shot at Mr. Boyd.  They

23   have the other officers there, saw the same things, they didn't

24   shoot.  Doesn't that mean Officer Paine is unreasonable?  Of

25   course it doesn't.

Summation - Loebs

```
1              First, someone's going to shoot first.  Second, you
2     don't evaluate a decision to shoot as to whether other officers
3     did or didn't.  If that was the case, no officer can make that
4     decision on their own.  They'd have to say, Okay, Officer
5     O'Malley, I think I'm going -- I'm about to take a shoot.
6     Okay, one, two, three, let's go.  You can't have officers
7     function as police offices if that's the standard.
8              And also you're talking about different officers
9     perceiving different things from different locations.  Some
10    have cover.  Officer Paine does not.  The threat is right in
11    front of him.  He probably has the best view of the officers.
12    And you need to consider these officers all have different
13    levels of experience.
14             You heard Officer Elieff testify.  He was five months
15    out of probation.  Expecting him to have the same response time
16    as Officer Paine is unrealistic.  And it's completely
17    inappropriate, as you'll be instructed, to be evaluating that
18    decision based on whether other officers did or did not make
19    the decision at the same time.
20             You did hear from officers that said they were about
21    to shoot.  They were about to shoot.  Officer Warnke said, I
22    was going to shoot; Officer Paine fired first.  Plaintiffs will
23    have you think, well, that means there must be something wrong
24    with what Officer Paine did.  But just imagine if it was the
25    other way around.  Imagine if at the same moment that Officer
```

1   Paine fired, all the other officers also fired and shot

2   Mr. Boyd.  Do you think the plaintiffs would be in here saying,

3   Okay, he was shot 15 times, but that's not excessive because

4   they all shot at the same time, they must have perceived the

5   threat at the same time?  Of course not.  This case needs to be

6   analyzed from Officer Paine's perspective and a reasonable

7   officer in his perspective and what the threat level was.

8       There's one –– this is the answer I would suggest as

9   to the question of –– as to Officer O'Malley.  We already

10  talked about the issue with respect to Officer Paine.  And I'd

11  submit the answer for Officer O'Malley is clearly no.

12      And also this next issue:  Mr. Galipo suggested there

13  was no dispute in this case regarding causation.  Well, that's

14  not quite true.  Because Officer O'Malley's still in this case.

15  There is no evidence that Officer O'Malley's shot struck

16  Mr. Boyd.  So what is the claim against him?  What are they

17  saying that he did?  Even if, let's say, even assuming that

18  there was an unreasonable shot for him to take, it didn't cause

19  any damage.  It didn't cause any harm.

20      Well, this is where their claim gets really bizarre.

21  They're claim in this case is, All right, we accept that, his

22  shot didn't cause any harm.  But their argument is, Officer

23  O'Malley's shot caused Officer Paine to shoot.  That is what

24  they're saying.  There's absolutely no evidence to support

25  that.  After Officer Paine, Officer O'Malley fired his shot.

 1   Mr. Boyd is out of the car.  No other officers fired after he's

 2   out of the car.  Until Officer Paine did.  He was walking

 3   around, he went back to the door.  Then Officer Paine arrived

 4   on the scene.  Officer Paine didn't say, When I got there, I

 5   just started blasting away because I heard shots.  He didn't

 6   say anything like that at all.  He said the reason he shot, and

 7   the evidence is, because he saw Mr. Boyd make a move into the

 8   vehicle with his hands.  It has absolutely no bearing and no

 9   relation to Officer O'Malley's shot.

10         So you'll be asked this question about Officer

11   O'Malley, and this is Question Number 2 that relates to

12   causation, and I would submit we didn't even get there because

13   the previous answer here will have you stop on the verdict

14   form.  Once you complete this, you won't have to answer any

15   further questions.  You sign the verdict form and you return

16   it.  You won't get to the causation issue if that's what you

17   find.

18         So I know that is a lot of evidence.  It's been a long

19   case.  And I have a few more comments, but there's one bit of

20   evidence I'd like to discuss with you, and -- before I'm done

21   talking about the evidence, and that is, you've heard a lot of

22   testimony from witnesses about what they saw and what happened,

23   and you've heard a lot of evidence about testimony, physical

24   evidence and what this means.  But there's one bit of evidence

25   that is so critical and defines this moment and the level of

1   threat so specifically that none other can match it.   And

2   you've heard it in the opening.   And you've heard it when

3   Officer Elieff testified.   And that is the dispatch tape.

4           Now, I was debating whether I would play it for you

5   again, and then I stood back and I thought, Wait a second, this

6   is evidence of the contemporaneous comments and actions by the

7   situation that Mr. Boyd created.   They're alleging that the gun

8   was planted, that apparently shots weren't fired, that I guess

9   that Officer Elieff imagined what was happening.   I have to

10  play this again.   There is no bit of evidence more powerful and

11  more compelling than the dispatch tape.

12          So with that, I'd ask you to listen once again to the

13  dispatch tape, which before I play it, will be in evidence.

14  And you can listen to it as much as you'd like.   And one of the

15  things that you can listen for is the sound of the gunshot

16  before you hear Officer O'Malley (sic) say, "Shots fired, shots

17  fired, he shot at me."   Listen for the sound of a crack just

18  before he makes that comment.   And Mr. Jason said he could hear

19  it, and I believe that you will as well.   But that's something

20  you might want to pay attention to, and you might want to

21  rewind it a couple of times to listen for that sound.

22          (Audiotape played)

23          MR. LOEBS:   Can you pause it?   It's been a long trial,

24  and I may have misused names here and there.   It's an awful lot

25  of facts to keep straight.   Mr. Wiener advised me that I had

1    mentioned that Officer O'Malley was the one that said shots

2    fired.  Of course, that's not what I meant.  It's Officer

3    Elieff.  And thank you for bringing that to my attention.

4              Now I can play it, I think, by hand.

5              (Audiotape played)

6              MR. LOEBS:  I just have a few more comments.  I'm not

7    going to be directing those comments toward the specific

8    evidence right now.  I talked before about the burden of proof

9    and if you understood that plaintiffs have it, defendants

10   don't.  That's why the plaintiffs get to go first.  They need

11   to prove their case.  They need to put on the evidence that

12   establishes that the use of force in this case was

13   unreasonable.  They get all sorts of advantages in the case.

14   They get to call the witnesses first.  They get to --

15   plaintiffs get to go first in opening statement.  They get to

16   go first in closing argument, and plaintiffs get to go last.

17   In other words, plaintiffs' counsel will have the last word.

18             And I am sure that Mr. Galipo will bring up things

19   that he didn't mention in his opening that he could have -- his

20   closing remarks that he could have, that I won't have the

21   opportunity to address.  And when that happens, you have to ask

22   yourself, I wonder why he's bringing that up now?  Didn't he

23   want the defense to have a chance to response to what his

24   comments were?

25             And I'll ask you, when you hear his remarks, to think

1    to yourself, if you could, What would the defendants say if

2    they had a chance to respond to his remarks?  Because they will

3    go unanswered.  When I'm done in just a couple of moments, I

4    won't have another chance to address you.

5              So you can keep that in mind.

6              I would like to make sure that on behalf of Officer

7    Paine, Officer O'Malley, Erin Bernstein, Scott Wiener, and all

8    of the people that worked on this case with respect to the

9    defendants, thank you for the time and attention you have given

10   to this case.  It has been a long case.  A lot of the testimony

11   has maybe not been as tasking as others.  And we respect the

12   jury process, and it can't work without people such as

13   yourselves that are willing to give up huge portions of your

14   life to come and listen to the evidence and make your

15   evaluation based on what you think is correct.  And it's

16   enormously important, and regardless of the verdict that you

17   reach, everyone with respect to the defendants appreciates the

18   time and the effort you put in in this case.

19             Now, two more things that I'd like to talk about

20   before I'm completely done.  One of the -- as Her Honor has

21   pointed out several times, it's never appropriate for defense

22   counsel to address plaintiffs' counsel and ask them questions

23   or respond to them during the trial in any way.  And there are

24   many things, many questions that come up in this trial that if

25   I could have asked, I would have.  And I was thinking in

1   preparing this case and my closing remarks there may be some

2   questions that you have that you might -- because you're not

3   also asking questions of counsel.  There are some things in the

4   case as they presented it that don't make sense that may not

5   relate to all the critical issues in the case, but it would be

6   nice to have some answer to.

7          And what I have done is I have prepared a list of a

8   few questions, hoping that plaintiffs' counsel could take some

9   time in his rebuttal remarks, the opportunity to address.  I'm

10  sure that he won't.  I'm sure he'll take these questions and

11  he'll put them aside, and when he does that, just ask yourself,

12  Boy, weren't those important questions, or doesn't that matter?

13  Why is he not addressing those?  He won't.  I'm sure he won't.

14  But here's mine.

15         I'll go through these fairly quickly.  First, do

16  plaintiffs really think that we the jury were paying so little

17  attention to the evidence that plaintiffs could refer

18  repeatedly to Boyd pointing a gun at Hogan's face and

19  repeatedly threatening to kill her as an innocent car trade?

20         Second, given the testimony of Natasha Gatto, Tatanika

21  Hogan, Tiffany Williams, Officer Elieff, Jonas Mason and

22  Inspector Gee, and the ballistics match on the gun in Boyd's

23  car, how can plaintiffs argue with a straight face that the gun

24  was planted?

25         Number 3, shouldn't we think it's outrageous that

1  Marylon Boyd went to Joe Campos's home and attempted to get him

2  not to testify?  Why shouldn't we believe that she also could

3  influence other witnesses?

4        Number 4, how can we believe anything Marc Firestone

5  says given he formed his opinions before he even looked at any

6  photographs and given that he never looked at any physical

7  evidence and never inspected the SUV and never went to Larch

8  Way?

9        Number 5, didn't Dr. Bonnell, who's hired by

10  plaintiffs, completely support defendants?  Is that why

11  plaintiffs didn't even mention is name in their closing?

12        Number 6, do you really expect the jury to believe

13  anything that Otis Harris said?

14        Number 7, why did Mr. Galipo say in his opening that

15  16 witnesses would tell the jury that Boyd had his hands up and

16  that no officers would say they saw him seated?

17        Number 8, if we believe any of the following

18  witnesses, shouldn't we find for the defendants?  That would be

19  Officer Paine, Sergeant O'Malley, Officer Stearns, Officer

20  Elieff, Officer Warnke, Dr. Smith, Mr. Campos, Miss Wilson,

21  Mr. Jason.

22        And I should include in there as well, Mr. Ingram.

23        Now, I doubt he'll address these, but in case he wants

24  to, I'll leave them here for his use.

25        Now these truly are my final comments:

1              In plaintiffs' closing remarks, he suggested that your

2    verdict doesn't matter to these officers.  Officer O'Malley was

3    promoted to sergeant.  Their lives will go on.  Your verdict is

4    intensely important to these officers.  They are being accused

5    of certainly executing a man who had his hands up and was

6    surrendering.  This is an intensely important case.  And what

7    you say on this issue will affect them for the rest of their

8    lives --

9              MR. GALIPO:  I'll object.

10             MR. LOEBS:  -- despite Mr. Galipo's --

11             MR. GALIPO:  There's no evidence of that at all, your

12   Honor.

13             THE COURT:  I think the argument goes to mental state,

14   so to speak.

15             MR. LOEBS:  Yes.

16             THE COURT:  I'll overrule.

17             MR. LOEBS:  Just the accusation alone is incredibly

18   significant for these officers.  They've had to sit through

19   this entire trial, listening to things that Mr. Galipo said

20   about them.  Listening to Mr. Clark say that they're immature.

21   Listening to witnesses, Mr. Otis Harris essentially saying that

22   Officer Paine executed someone with his hands up.  They've had

23   to sit there patiently and listen to all that testimony.  This

24   case has been going on for years.  This happened May 5th, 2004.

25             And don't let Mr. Galipo tell you that it's not

```
1    appropriate to these officers and their families.

2              Based on the evidence that's been presented to you,

3    I'd suggest that there is only one verdict that you can reach

4    in this case.  And that is completely exonerate these officers

5    as they were doing their duty, risking their lives, for the

6    citizens of San Francisco, and that they should be honored for

7    what they've done.  Not persecuted.  And that we should be

8    proud to have officers like them protecting all of us.

9              Thank you.

10             THE COURT:  Thank you, Mr. Loebs.  That concludes the

11   defendants' closing remarks.

12             Now, obviously, we'll need to take a break.  And I

13   don't know whether you will be able to finish today,

14   Mr. Galipo, and if you are not able to, then we will conclude

15   on Monday with your remaining final remarks.  We do need to

16   take a break now of some sort for the reporter.  That's going

17   to take us to around, I'm just rounding it off at 3:20.  And if

18   we do that, do you think you could conclude by somewhere in the

19   vicinity of 4:30, or do you feel that given everything and the

20   very long argument by Mr. Loebs that you will need more time?

21   And if you do, then I would probably break earlier than 4:30

22   because it's been a long day for the jury.  Do you want to

23   think about it?

24             MR. GALIPO:  Yeah, your Honor.

25             THE COURT:  I'll leave that to you.
```

```
1          MR. GALIPO:  What I would recommend is if I get to

2     4:00, and I think I could finish on or before 4:30, I'll keep

3     going.  And if I feel it's just too much and I'm not going to

4     be able to do it, I'd rather just finish the first half hour or

5     so Monday morning.

6          THE COURT:  Okay.  All right.  So ladies and

7     gentlemen, please take a break till 20 after.  That's not a

8     full 15 minutes, but I'm trying to get us to move along here,

9     if we can.  Thank you.

10          (The jury exited the courtroom)

11          (Afternoon recess)

12          (In open court; jury not present)

13          MR. GALIPO:  My inclination, your Honor, is probably

14     around 4:00 or so, but let's see how it goes.

15          THE COURT:  Okay.

16          (The jury entered the courtroom)

17          THE COURT:  All right, ladies and gentlemen, thank

18     you.  There's a good chance just from what Mr. Galipo has said

19     to me we probably won't conclude today, but he's going to look

20     for an appropriate place to break.

21          And, Miss Chan, are you able to get coverage for

22     Monday?

23          JUROR:  Yes.

24          THE COURT:  Thank you very much.

25          Mr. Galipo?
```

1          MR. GALIPO:  Yes.  Thank you.

2          Good afternoon, everybody.  I told you it would be a

3    sad day for me.  But I listened carefully, as you did.  As you

4    can see, I don't have the dream team.  I don't have all their

5    fancy blowups and diagrams, and I don't have experts that I

6    paid 50,000, $40,000 to.

7          I also noticed I didn't have any people on my side at

8    the end.  You had the left side and the right side, and it

9    seemed like everyone ended up on the other side.  And I didn't

10   realize there were so many red herrings in the case.

11         But let me say this.  I'm going to, first of all,

12   address all these issues, and I think if I dodged that, some of

13   you are going to wonder why I didn't.  If I wait till Monday

14   morning, I might forget what they are if they're not right in

15   front of me.

16         I would like to do a few things today.  There were

17   some representations that I misrepresented the testimony from

18   Tiffany Williams or Tatanika Hogan, and I found the cites for

19   that.  As I said, whatever decision you make based on today, as

20   long as it's based on the law, on the evidence, I respect that.

21   But I'd be unhappy if you thought I tried to pull the wool over

22   your eyes as to what the evidence was or tried to misrepresent

23   the law to you, because that is in no way my purpose.  I hope

24   you understand that.

25         There was also reference that I completely

1  misrepresented the testimony of Mr. Campos, and I went through

2  that again too.  I don't know if I'm going to do that now.  I

3  might do that first thing Monday morning.  But I have the page

4  numbers in case any of you feel you need to re-reference that

5  during deliberations.

6        With respect to the law, without any disrespect to

7  Mr. Loebs, I think some of the comments he made about the law

8  that you're going to actually get and apply to this case is

9  different from what he says.  He made certain suggestions.

10 You'll see in the instructions that the Judge is going to give

11 you that this is the law on that and that is the law on this,

12 and I hope you understand you have to go by the law that the

13 Judge gives you, because I or the other side can say this is

14 the law but it might not be.  Or it might be our spin on what

15 we think the law is.

16        I would say this:  That the suggestion that someone

17 should be proud or honored to shoot a disabled, unarmed man at

18 the time of his shooting I think is not what this case is

19 about.  And I also believe still that what's important for your

20 evaluation is what Officer Paine knew and what happened from

21 his perspective.  Including what he heard at the time on Larch

22 Way.

23        And there's been a big suggestion that the plaintiffs

24 are trying to mislead you and distract you, and think about how

25 much evidence was presented by the defendants on issues outside

Summation – Galipo

1    of Larch Way.  Think about how much of this six weeks was spent

2    on talking about stuff other than what happened on Larch Way.

3    And think about why.  I rested my case in the third week.

4    We've now been here six weeks.

5            Who did they really add to the equation in their

6    defense?  The only other police officer that I can think of,

7    and maybe I'm missing someone because I'm a little tired right

8    now, that witnessed the incident was Officer Elieff, that was

9    called in their defense.  And that's an interesting thought

10   right there.  Because we know that Officer Warnke came with

11   Officer Damato and Officer Ghiselli.  They weren't called.

12           Think about it.  If they had seen Mr. Boyd sitting or

13   reaching for a weapon, they were there, why wouldn't they be

14   called by the defense?  They work for the police department.

15   They were present when it happened.  Why?  Is it maybe because

16   they saw him standing or saw something different?  How about

17   Officer Caine?  Why wasn't he called?

18           So when you think about the defense case, okay, you

19   have a chance to call all your officers now to say exactly what

20   happened, who did they call?  You have now had the chance to

21   call all the percipient witnesses, and we know from the

22   evidence that so many were interviewed, we didn't want to make

23   it a 12-week trial for sure, but they called one, that I can

24   think of.  Synell or Fatima Wilson.

25           And what is the real issue here?  You know the Fourth

1   Amendment says police officers cannot use unreasonable force.

2   And then they have special rules with deadly force.  It's

3   unreasonable to use deadly force unless you're in immediate

4   fear of death yourself.  But who decides that?  As a society,

5   who decides that?  Probably folks like you.  Because we know

6   this is not a criminal case.  We know there's no disciplinary

7   proceeding going on.

8           MR. LOEBS:  Objection, your Honor -- forget it.

9           THE COURT:  Pardon?

10          MR. LOEBS:  Never mind.

11          THE COURT:  All right.  Okay.  Go ahead.

12          MR. GALIPO:  So what remedy would anyone have,

13  anybody, that had a loved one, anyone, shot and killed by the

14  police, other than to try to seek some justice or clarification

15  from a group of people to say, Look, police officers do have

16  tough jobs.  No question about it.  But sometimes someone may

17  overreact.

18          And there was a suggestion that Mr. Galipo's claiming

19  there's a major conspiracy.  Well, I don't remember claiming

20  that.  He's saying Officer Paine executed him.  I don't

21  remember saying that.  I think Officer Paine overreacted.

22          MR. LOEBS:  Objection as to Mr. Galipo --

23          MR. GALIPO:  I'll rephrase.

24          I know the evidence, one inference from the evidence

25  that you can apply is that Officer Paine overreacted.  He's

1    human.  Like anyone else.  But if he did overreact, there's

2    nothing in the instructions that says plaintiffs had to prove

3    he had a bad intent or wanted to kill him or this is a murder

4    charge.  It's -- all it says was the use of deadly force was

5    unreasonable, at that moment.  And I want to try to hopefully

6    bring you back home to that thought.

7         Before I forget, there's so many things going through

8    my mind as I sat there and watched along with you -- any

9    attorney presenting a case to look back and say, Gee, how come

10   Dr. Firestone didn't have those photographs at the time, that

11   looks ridiculous, or whatever the case may be.

12        But we'll get to that.  It's interesting that the main

13   piece of Mr. Jason's testimony is high velocity blood spatter,

14   which I have to tell you you don't need to be an expert or an

15   attorney or a doctor to say if you can't even see it on the

16   photograph, it's not there.  I mean, you know, otherwise, they

17   would have had this up and said, See that cone pattern, you see

18   this fine mist, you see these 30 particles forming this -- it's

19   just not there.  And if that's the whole basis -- and you heard

20   that they retained Mr. Jason in 2005 and Dr. Keram, how are the

21   plaintiffs going to compete with that without having some

22   experts to counter their experts?  How am I not going to ask

23   questions to test the validity really of what they're saying?

24   How are you going to make an informed decision?

25        Now, maybe all my questions weren't the best in the

1   world.  Some you might have thought, well, that's something to

2   think about.  But I at least have to put that out there for you

3   so that you have both sides.

4            Let me try to answer these questions so no one here

5   thinks I'm dodging -- I don't want to say bullets.  That would

6   be a bad term.

7            Number 5 -- I'll go in reverse -- didn't Dr. Bonnell,

8   who was hired by plaintiffs, completely support defendants?  Is

9   that why plaintiffs didn't even mention his name in their

10   closing?

11            Well, I'll address both of those.  First of all, I

12   didn't give a five hour closing, so I might not have mentioned

13   everyone's name, and if I didn't, I apologize for that.

14            Second of all, Dr. Bonnell did not completely support

15   the defendants.  I mean, first of all, I wanted someone to

16   explain to you the basic wound evidence because up to that

17   time, where were the wounds, what was their trajectory, to get

18   an idea.  But Dr. Bonnell clearly said that it could have

19   happened with him in a seated position, if he was turned

20   enough, etc., etc., trajectory-wise, and it could have happened

21   with him standing outside the car.  He was given countless

22   hypotheticals, and of course Mr. Loebs was doing the ones he

23   wanted to do, and I was doing the ones I wanted to.

24            But Dr. Bonnell said first shot could have been to the

25   abdomen.  Could have sustained the leg and the hand shot going

1    down.  Dr. Smith said the same thing.  Nobody got up here, even

2    Mr. Jason said that and said, with a hundred percent certainty,

3    this is the only way it could have happened.

4            One thing that wasn't addressed, interestingly, in the

5    closing by Mr. Loebs is the graze wound.

6            Now that's something for you to look at.  I'm not a

7    medical doctor, but those pictures, one might think, you know,

8    look supportive of something that might -- a bullet might have

9    hit his head.  I don't know.  But why would Dr. Smith, a

10   trained medical doctor, write in his report after two months,

11   that wound is suggestive of a graze-type gunshot wound, and

12   then we come to court as if, well, I put that in there, but I

13   don't think it is one at all.  That's not consistent.  Why

14   would a medical doctor say something suggestive of something in

15   an official report, and then suggest in court that, I wrote

16   that, but I was thinking of something completely different?

17           Dr. Bonnell told us it was a graze wound.  And now the

18   jury is supposed to take Mr. Jason's word on it who's not a

19   medical doctor at all?  Who's not a forensic pathologist?

20   Because he says it's not a graze wound.  We're supposed to

21   throw out everything the doctors say?  Is that reasonable?  You

22   have to decide.

23           Number 6.  Do you really expect the jury to believe

24   anything that Otis Harris said?

25           Well, Otis Harris has bad.  There's no question about

 1   it.  Does that mean -- see, if Otis Harris was the only one

 2   saying that he was outside the car, not inside, or his hands

 3   were visible, or he wasn't reaching into the car, that might be

 4   different.  Someone could say, My God, 10 people came in here

 5   and said -- and they're percipient witnesses, they're not

 6   biased on the side of the police -- and they have this guy

 7   reaching under the seat of the car, and here comes Otis Harris,

 8   and he says something completely different, and then we find

 9   out all this stuff about him.  Well, then clearly you can say,

10   we can't believe this guy.

11          But it's for you to decide.

12          I think much of what he says makes sense.

13          MR. LOEBS:  Objection, your Honor.

14          MR. GALIPO:  I'll rephrase.

15          I think you can find that a lot of what he says makes

16   sense.  Perhaps you might find he overdramatized and he

17   remembers things a certain way, that's fine.

18          I'll go to the next one.  Why did Mr. Galipo say in

19   his opening statement that 16 witnesses would tell the jury

20   Boyd had his hands up?

21          Well, first of all, I can tell you I didn't say that.

22   If you want to get a copy of my opening statement, that's fine.

23   I never said that 16 witnesses are going to come in here and

24   tell you that Mr. Boyd had his hands up.

25          Next.  If we believe any one of the following

Summation - Galipo

1    witnesses, shouldn't we find for the defendants?

2              And before I address that point and these witnesses,

3    which I will very quickly or try to, let's think back to the

4    verdict form.  Three questions.  First question is -- and, by

5    the way, the oldest trick in the book is to put the verdict

6    form up and tell the jury how they should fill it out.

7              Here.  Here's what you need to do, put "no" here and

8    "no" here, and then you can go home.

9              I'm not worried that the jury's going to deliberate in

10   that fashion.

11             The first question is, was the force used

12   unreasonable?  And one of the things you really have to think

13   about here, this is deadly force.  To kill someone.  I mean you

14   can say it's to stop a threat.  But when you're aiming center

15   mass at someone, I think it's pretty clear you're either going

16   to seriously injure them or kill them.  And that's why the law

17   has such special requirements on deadly force.  As opposed to

18   macing someone or using a Taser or hitting them with a baton or

19   whatever it might be.  Deadly force has very, very special

20   requirements, and the requirement is, getting imminent or

21   immediate threat of death.

22             And obviously, one could think of many examples of

23   someone having a gun in their hands or pulling the gun out of

24   their waistband and you can see it.  But even though we've

25   heard everything about reaching and turning and moving, the

1    law, when you really read it carefully, about an imminent

2    threat and when you use your common sense, I would hope that

3    your decision will be based on this:

4           If he looked like he was reaching for a weapon, then

5    the defendants should win.  Movement of hands is not enough.

6    Everyone knows you have to move your hands to get down.  We've

7    heard from the experts, even not obeying verbal commands is not

8    enough.  Put your hands up.  They don't put their hands up, you

9    can't shoot them.  Get down on the ground.  They don't get down

10   quickly, you can't shoot them.  Even in this scenario.  Even

11   based on everything that came in.

12          If you're going to judge the case, well, he moved a

13   little bit.  If the officer could see his hands or could see

14   that his hands were going in an area, their whole case was

15   based on him reaching underneath the seat of the car.  That is

16   the defense's whole case.  They've got these fancy diagrams and

17   experts, and this is it.  And I can assure that you that an

18   inference you can probably find from the evidence, it started

19   with the bloody napkin.

20          You might recall when you're talking about Mr. Jason's

21   first deposition, and this is after he'd been working on the

22   case for, you know, first deposition I think was May 8th -- I

23   know that because that's my birthday -- May 8th, 2007.  And we

24   said, Well, remember in your first deposition, Mr. Jason, where

25   you thought that his hand was in contact with that bloody

1  napkin underneath the seat, and that's how you were in part

2  saying that's where his hand had to be?  Yes.  And then we had

3  a lot of questions on it?  Yes.  And then you reconsidered it?

4  Yes, I changed my opinion.  I looked at the napkin I considered

5  its location, the trajectory, the trajectory, the side of the

6  seat.  The hand could not have been where the napkin was.

7         Now if he was definitely reaching under the seat to

8  any movement at all, you should find for the defense.

9         And you're people with life experience before you ever

10 came here.  Did anyone think, as bad as this scenario is, that

11 if someone's surrendering and they move their hand at all, even

12 in an apparent attempt to maybe get down or some movement,

13 unless their hand is close to a weapon or about to grab a

14 weapon, you kill them?  I don't think anybody believed that

15 then or believes that now.

16        So when you are really deciding what the issue in this

17 case is, I hope that the issue is if it looked like he's

18 reaching for a gun, hey, I'm going to be the first one to say,

19 why shouldn't –– if that's really what it was –– but I have to

20 tell you something:  I think, and there has been no evidence to

21 the contrary, that all the officers there were trained on when

22 to use force.  Every officer there.  They learn it in the

23 police academy.  They learn it on the job.  That is part of

24 their expertise.  If someone is reaching for a weapon or has a

25 weapon under the facts of this case, a trained police officer

1   is trained to shoot.  Mr. Cameron told you.  He talked about

2   training and training and training.

3           And by the way, I have to tell you and some of his

4   comments were somewhat scary because Mr. Cameron would have

5   everyone shooting everyone.  But be that as it may, one officer

6   shot.  That is important in this case.  Now does that mean, as

7   Mr. Loebs suggested, that he should confer with the other

8   people?  Of course not.  But if they all were looking at the

9   same thing and all knowing what they knew on that police radio,

10  if he had really appeared to be reaching for a weapon, two,

11  three or four officers would have fired at the same time.  They

12  didn't.  And that speaks volumes.  I mean, it would be

13  different if there was only one officer there.  Or if no one

14  else had their gun pointed at him.  Or if they were all so

15  poorly trained they didn't know it.

16          So if we believe any of the following witnesses,

17  shouldn't we find for the defendants?  Some facts are

18  undisputed.  He didn't have a gun in his hand.  He didn't have

19  a gun on his body.  We know in the area he was reaching at

20  least now there was no gun.  Even if someone said he was

21  reaching towards the seat.

22          Officer Paine and Sergeant O'Malley, to say that they

23  may be a little biased..., they're defendants.  I'm not going

24  to stand up here and call anyone a liar, including them.  But

25  they may be a little bit biased as to what they've said, even

1   by the time of their first Homicide statement they had an

2   attorney, they had a representative.  I mean, this is a formal

3   process.  And what do you think they're going to say at the

4   time of their Homicide statement?  Meet with the lawyer and

5   say, Just tell them that you overreacted and you shot the guy,

6   even though you didn't think he was reaching for a weapon.

7          Oh, okay.  Or do you think they might say, Well, did

8   he have a gun on him?  No, on his person?  No.  Was he in or --

9   well, just say he looked like he was reaching.

10         And let me tell you something, and I'll read it

11  perhaps first thing Monday morning.  But Officer Paine clearly

12  says in his deposition, and Officer Paine must have had a view

13  of him.  We know he shot him.  He's not in that position.

14  Which is also pretty interesting.  Don't you think if they

15  really wanted to nail down that he was in that position, they

16  would have shown the folder to Mr. Campos when he was here?

17  Why didn't they?  Because they didn't know what the heck was

18  going to come out of Mr. Campos's mouth next.

19         Officer Stearns.  You may recall there was reference

20  to Officer Stearns' Homicide statement where he never even said

21  the person was sitting on the floorboard.  What's the purpose

22  of giving a statement four or five hours after something

23  happens but giving all the important details when it's fresh in

24  your mind?  Which is another amazing thing.

25         You may remember Officer Mason who supposedly pulled

1  the body back and saw the gun.  Can I say that gun's planted?

2  No.  I'm not going to stand here before you and say, I can

3  prove to you that there's some master conspiracy here and that

4  gun was planted.  Could it have been moved from one area to

5  another?  Maybe.  I don't know.  It's shocking that officers

6  with this training in these circumstances would have not seen

7  it.  Even up to the time they left the scene.  Even up to the

8  time of the statement.

9           And you know what's amazing and you might remember

10  this:  Officer Mason said, Yes, I saw the gun there, and I

11  asked him and he admitted it.  Did you review your Homicide

12  statement?  Yes.  At the time of your Homicide statement, did

13  you tell them that you saw a gun in the door when you

14  approached the door and pulled the body away from the car?  No.

15  And then the comeback was, Well, you weren't asked that

16  question.

17           But almost at the end of every statement they're like,

18  anything else you think's important?  How could that not be

19  important?

20           Officer Elieff comes in, and I feel for him.  Don't

21  get me wrong.  The poor guy.  That's a scary position to be in.

22  But his -- and then what did you see, like I said before, he

23  was so precise.  I mean, who would describe someone's body

24  Position 3 years later, and what was his position?  His left

25  butt cheek, his left buttock was on the floorboard, but not his

1   right, and he was...."  I mean, it was almost like rote.  Did

2   you meet with Mr. Loebs recently?  Yes, as a matter of fact, I

3   did.

4           So how credible is that?

5           And we know he didn't shoot.

6           Officer Warnke.  You know, something interesting about

7   Officer Warnke I thought of when Mr. Loebs was making his

8   comments.  Which might tell you a little bit about his body

9   positioning.  He said Officer Warnke was considering shooting

10  through the door.  That might tell you something about his

11  point of view from where he was standing.  If he was

12  shooting -- going to shoot through the door, that would mean he

13  couldn't see presumably on the other side of the door.  And if

14  Officer Paine was three feet or five feet to his right, it

15  might give us a little information as least of Officer Paine's

16  perspective.

17          The reason, of course, from our position he raised

18  that issue, you know the whole trajectory thing, I

19  understand -- I can't prove that the door was open 55 degrees.

20  But what we do know is that that's the degrees that Mr. Jason

21  did his tests at.  If you're an expert and want to duplicate,

22  he did it at 55 degrees with the model.  But the thing that

23  was -- you may find troubling, is that if an expert makes a

24  diagram and positions a vehicle and positions a door and turns

25  it over to the attorney they've been working for for a long

1    time and then changes it, not in terms of the color of the

2    cars, but in terms of the angle of that door, and didn't expect

3    the other attorney to have that, you weren't supposed to ever

4    see that, you have to consider that.

5            We know Officer Warnke didn't fire.  Is there any

6    suggestion he just got off probation?  In fact, for whatever

7    reason, they didn't even take cover.  Now, that's not where the

8    case starts and stops.  Because perhaps when they got to that

9    position, it looked like he was surrendering and they were

10   comfortable there.  But it at least tells you what their mind

11   frame was as to whether or not they thought he had a gun or

12   not.

13           Dr. Smith told us that this could have been the first

14   shot, the abdomen or chest, and it could have happened that

15   way.  Now it's true that he likes the sitting position and he

16   said a lot of things favorable to the defense, but one would

17   expect it perhaps, he has the same employer.  But he said it

18   could have happened that way too.

19           Mr. Campos I'll get to.

20           Ms. Wilson, now it's true, her testimony was a little

21   bit different, but you might remember when Mr. Clark was on the

22   stand, and I said, Let me give you some hypos.  Because I knew

23   different witnesses had different stories and I knew you as a

24   jury, one of the things you're going to talk about, what do you

25   think really happened?  And once you figure that out.  You say

1  what's the law?  Let's work through this, fine.

2         But she has his hands going, as you saw with the blue

3  "X", on the side of the seat.  And I think it's pretty clear

4  that that area certainly was visible to the officers when he

5  walked away from the car, and nobody said they thought there

6  was a gun in that area.  Not to the side of the seat.  So if

7  that's where his hands went, and they were visible, did anyone

8  here say, "Kill him?"  Did anyone here say that the officer was

9  about to shoot at that very moment, so kill him right then?

10        I hope not.  I don't know.  That's something you're

11  going to have to think about.

12        Now, Mr. Campos.  And I must tell you that Mr. Jason

13  was on for about a whole day with Mr. Loebs, and he's basically

14  telling everyone, telling the Court and the jury, this is how

15  it had to happen.  This is it.  You know, I don't need any

16  witnesses to tell you how it happened.  Well, one take on it

17  you may have is the reason that he didn't rely or testify he

18  didn't rely on any of the depositions or statements is because

19  they all or most of them were all contrary to his findings.  So

20  then I would say, well, how about all these witness statements

21  that said it happened a different way?  How about Officer

22  Paine's deposition on page so-and-so?  When he says the person

23  wasn't even in that position?

24        Mr. Campos -- I don't know if I should do this now

25  or -- I think what I'll do is refer to Mr. Campos first thing

1    on Monday morning, because I'll be more organized.

2            But I can tell you this:  I'm going to read to you

3    exact -- exact -- and I'll give out page numbers -- question

4    and answer of Mr. Campos.  And I can tell you I read it again

5    during Mr. Loebs' closing, and he has a hands up, a first

6    movement he says to the left, and then the hands back up, and

7    the first movement, the hands did not go inside the car, did

8    not touch anything inside the car, and he says within a second

9    of the second movement, the shots.  And he was asked

10    specifically, did the hand -- were the hands touching anything

11    in the car at the time of the second movement?  No.  Could you

12    see the hands at the time of the second movement?  Yes.  Did

13    the hands ever go below the waist?  No.

14            So I'll read it carefully for you because I think it's

15    pretty important.

16            And the other thing that was interesting from Officer

17    Paine's testimony, you remember yesterday I was going about

18    the -- I guess it's called the A post where the left hand hit

19    the A post and went down, but Officer Paine's testimony, and

20    this is referring to the time just before the shooting, "At

21    that point is his back to the driver's seat?"  Answer:  "Yes."

22            That should tell you right then he couldn't have been

23    in that position when he fired.  If his back's towards the

24    driver's seat.

25            At that point I asked him point black, Was he sitting

1    on the floorboard?  I don't believe so.  Did you have a clear

2    view?  Yes.

3            Now I'm asking him, Well, how much time between the

4    first turn to the left and the second turn?  He said, he's

5    estimating, he's not sure, maybe 5 to 10 seconds.  Second time

6    he shot him.

7            Let's see -- now this is an interesting question.

8    Because we know by his own admission that he, from his

9    testimony, that Mr. Boyd went to his left and came back, and he

10   could see both of his hands and he didn't shoot him.  Because

11   he could see he had nothing in his hands.

12           And so I said, Okay, how much time passed from the

13   time he turned to his left the second time until the time you

14   shot him?  Maybe a second.

15           This is where I'm getting into this overreaction.

16           And then I'm following up.  I say:  "Sure?"

17           He says, "Say that again."

18           I say, "Sure?  You told us I believe that it was about

19   a second in between the time he turned to his left a second

20   time and you shot.  Is that correct?

21       "A  About that.

22       "Q  Okay.  And you told us that the first time he turned to

23   the left, he turned back within a second, approximately,

24   correct?

25       "A  That's my recollection."

1          So you know, these quick movements and coming right

2     back is a lot different than getting in a car and look like

3     you're reaching around for a gun.  And that's what I'm hoping

4     you'll focus on.  Because if the question you're going to ask

5     yourself, did he move at all, did he move at all, shoot him,

6     well, you know, I probably don't have a chance.  If he moved at

7     all.  But you're not going to get anything in this instruction

8     that says if someone moves, you can shoot him.

9          Some other things that weren't covered in the blood

10    evidence, and I don't want to go into details, to expect

11    someone to make all these different hand movements after

12    they're shot, you have to decide what you think about that.  I

13    couldn't imagine someone being shot and putting their hand down

14    and moving it this way and moving it that way.

15         All right.  Let me address these other questions real

16    quick.  And then I'll -- I'll get some rest, and on Monday

17    morning I'll be -- okay.

18         Did the plaintiffs -- this is painful even to read

19    these questions -- did the plaintiffs really think we were

20    paying so little attention to the evidence that plaintiffs

21    could refer, repeatedly, to Boyd pointing a gun at Hogan's face

22    and repeatedly threatening to kill her as an innocent car

23    trade?

24         Well, I don't recall -- I'm not downplaying it, so

25    that you're clear of that, again.  I think no matter how it

1    happened, it could be viewed as a significant event.  But that

2    doesn't justify a killing on Larch Way where someone might find

3    that he wasn't reaching for a gun at the time he was killed.

4            Now, the only thing that was strange is in part of the

5    testimony read, and I'll refer to it Monday morning, is that

6    she testified she got the impression maybe that he wanted me to

7    leave my keys in my car, and I thought maybe he wanted my

8    car -- which was kind of strange.  Of course, and then I

9    started thinking about his paranoia, that someone's following

10   him and let's switch cars and who knows.  But you know what, it

11   doesn't matter.  It really doesn't matter.

12           The ballistic evidence.  I can't tell you.  I told you

13   that in the beginning.  I can't tell you that wasn't his gun.

14   I can't say that.  It's just mind-boggling in some ways that

15   gun being in there and no one seeing it.  But you know what, at

16   the end of the day, I guess we can put that on the red herring

17   list, because no one saw it.  And we all know he wasn't

18   reaching for it.  Which really kind of gets the suicide-by-cop

19   theory in a strange way, because if the guy really wanted to be

20   shot, why not, you know, reach for the gun.  Make it look good.

21           Anyways, now, I'll address these two, and then if it's

22   okay with everyone, we'll take our break.  Shouldn't we think

23   it's outrageous that Marylon Boyd went to Joe Campos's home and

24   attempted to get him not to testify?  Why shouldn't we believe

25   that she also attempted to influence other witnesses?

1          Now, this is an example, at least from plaintiffs'

2    perspective, of trying to distract you from what happened on

3    Larch Way.  Trying to get you not to like Marylon Boyd or to

4    suggested something really bad.  I mean, this really is

5    suggesting that she was threatening Mr. Campos.  I think you

6    all know, you heard the evidence, Mr. Campos was subpoenaed

7    multiple times for his deposition.  He didn't want to go.  It

8    had nothing to do with Marylon Boyd.  Even got a question and

9    answer, which I'll read Monday.  The reason he didn't want to

10   go to all those depos is mom didn't want him to go.  He didn't

11   want to go.  It had nothing to do with Marylon Boyd.  I mean,

12   perhaps when the Court wanted to find out why he didn't show

13   up, it might have been convenient to say, Well, she said I

14   didn't have to go, so I just thought I didn't have to comply

15   with all these subpoenas.

16          I can assure you from the evidence nobody was

17   threatened.

18          MR. LOEBS:  Your Honor, that's inappropriate,

19   Mr. Galipo, especially on this topic.  Move to strike his

20   comments, your Honor.

21          THE COURT:  Well, when you say nobody was threatened,

22   I can assure you --

23          MR. GALIPO:  There is no evidence.

24          MR. LOEBS:  Your Honor, motion to strike.

25          MR. GALIPO:  I'll reword it if I need to.

1          THE COURT:  You can't testify from counsel table.

2          MR. GALIPO:  I'll reword it.

3          THE COURT:  All right.

4          MR. GALIPO:  Mr. Campos never said, ever, that Marylon

5    Boyd threatened him.  He said he heard her say, he claims.  She

6    denied it, that --

7          MR. LOEBS:  Your Honor, that's inappropriate.  There's

8    no testimony as to that.  She didn't testify on the subject.

9          THE COURT:  Ms. Boyd, I don't believe, testified about

10   this matter.  To the extent she may have, I'll overrule and --

11   if the jury can consider this.

12         MR. LOEBS:  She did not testify.

13         THE COURT:  Then the jurors will keep that in mind and

14   check their own record on that regard.

15         MR. GALIPO:  I thought she may have, and it's been so

16   long, I can't say for sure.  You'll have to go by your notes or

17   your recollection.

18         But what we do have is Mr. Campos saying, Well, she

19   said I didn't have to go.  His claim.  And so I didn't go.

20         All these witnesses, by the way, and this is

21   important, they all had all kinds of statements.  You gathered

22   that from the evidence.  From very soon after this happened

23   there were all kinds of witness statements.  It's not like two

24   or three years later someone's trying to be influenced.  They

25   all gave statements.  And you can rest assured that if any of

```
1   these witnesses gave favorable statements to the defendants,

2   they'd be here.  They would all be here telling you, This guy

3   was reaching under the seat of the car, we all thought he was

4   reaching for a gun.

5                MR. LOEBS:  Objection, your Honor, it's an

6   inappropriate reference to facts not before the jury.

7                MR. GALIPO:  Well --

8                MR. LOEBS:  Inappropriate insinuation about what

9   witnesses said.

10               MR. GALIPO:  Would you like me to reword it, your

11  Honor?

12               THE COURT:  Just looking at what you said.

13               I don't think you can say who gave witness statements,

14  unless it's in the evidence.  If you want to argue that a

15  witness who was present during any of the events could have

16  been called by either party, then you can do that.  But you

17  cannot put before the jury that there were statements.  There's

18  no evidence that the -- as to those statements, to my

19  knowledge.  And if there are not, then it would not be

20  appropriate.  I don't even know if there are any statements.

21  So -- okay.  And neither do the jury.

22               MR. GALIPO:  Let's put it this way:  I think one can

23  make an inference from the evidence that there was a thorough

24  investigation, including talking to any potential witnesses.

25               Lastly, and then I'll break for the day, if it's okay.
```

1    Can we believe anything Marc Firestone says given that he

2    formed his opinions before he even looked at any photographs

3    and given that he never looked at any physical evidence, never

4    inspected the SUV, never went to Larch Way?

5            Let me break this down.  I already addressed that.

6    Listen, I will concede that clearly he should have had

7    photographs earlier on.  But you might recall he looked at an

8    exemplar vehicle, and I was trying to get some ideas from the

9    evidence he talked about, about the configuration.  By the time

10   he testified in court, and he had many hours of deposition

11   testimony, he had looked at photographs, he had looked at a lot

12   of evidence.  In part, he was addressing the opinions of

13   Mr. Jason.  Because that was part of what he was asked to do.

14           We know Roger Clark, for example, saw all the

15   evidence, went to Larch Way, saw the car.  Mr. Cameron, we

16   never heard did that.  Does that mean we throw everything they

17   say out the window?  How many experts here didn't go to the

18   scene, didn't look at the car, didn't go through every piece of

19   physical evidence?  Does that mean we should disregard

20   everything they say?  It's a fact to take into consideration

21   for sure.  But I don't think it totally means that -- one

22   inference from Dr. Firestone's testimony was some of it was a

23   matter of geometry.  Depending on where someone was positioned,

24   what trajectories and what angles.

25           So, I wanted to answer those questions.  I appreciate

1   your patience all day today.  I know it's been a long day.  I

2   will conclude hopefully in fairly short order on Monday

3   morning, and then you can finally start your deliberations.

4           Thank you all very much.

5           THE COURT:  Thank you, Mr. Galipo.

6           Ladies and gentlemen, our schedule for Monday then

7   would be to start at our regular time of 9 o'clock, complete

8   Mr. Galipo's closing statement.  Then I will have about a half

9   hour of instructions to give you orally, which I'm required to

10  do.  You don't necessarily have to take notes during that part

11  because you will each have a set yourself of the instructions

12  in writing after you go in the jury room.  We'll provide those

13  to you so that you can refresh your recollection as to what was

14  given to you.  I don't want to give them to you now.  I'm

15  giving them orally because one person will be flipping and

16  looking and going back and may miss whatever I have to say, but

17  you will have them so you don't have to commit them absolutely

18  to memory just because I'm saying them orally in court.

19          Then you'll also receive the exhibits that have been

20  admitted, and if you don't receive an exhibit that was

21  commented upon, it's either because it wasn't admitted or there

22  was some reason not to send it in to the jury room.

23          I'll be talking to the lawyers about that.  You may

24  not get them immediately when you get to the jury room because

25  we may not have resolved all that.  I'll try and do some of

1    that after you leave this afternoon with counsel.  But until

2    all arguments are concluded, we won't put all the exhibits

3    together.

4              So in any event, we're not going to see you until

5    Monday.  Have a very nice and safe weekend.  And then we'll

6    resume at 9 o'clock.

7              Please remember my admonition in its entirety.  Again,

8    this is a fairly sensitive point at this break in the

9    proceedings.

10             Thanks again.

11             Counsel please stand by.

12             (The jury exited the courtroom)

13             (In open court; jury not present)

14             THE COURT:  The jurors have left the courtroom.  There

15   are certain things I think that have to be put on the record.

16   This is as good a time as any because I don't want to lose time

17   on Monday.  It was four hours of closing argument essentially

18   by the defendants, and I don't remember Mr. Galipo's length,

19   but the jurors were -- I guess a couple of hours, but whatever

20   we had a lot of time to -- with the jury.

21             So one of the matters is the matter of the

22   instructions in the verdict form.  The Court is prepared to

23   instruct the jury orally and to provide the jurors in written

24   form a set of instructions that represents a distillation, an

25   agreement by counsel of what is proper to be given at the close

1    of this case.  Each side originally had asked for certain

2    separate instructions.  And also the parties had submitted

3    agreed-upon joint instructions.  As it turned out in our

4    off-the-record instruction conference there were certain joint

5    instructions that either one party or the other didn't agree

6    to, or that both parties agreed shouldn't be given, at least in

7    the form they originally agreed to.

8            There were also various rulings the Court made that

9    affected the propriety of giving any particular separate

10   instruction.  And so the question is whether the parties agree

11   that the Court can give the instructions that are currently

12   titled "Jury Instructions" and are numbered 1 through 29?

13           MR. WIENER:  Yes, your Honor.

14           MR. GALIPO:  Yes, I agree with the ones that are in

15   the packet.  The only other issue was that, and I think the

16   Court's adjudicated it, was regarding the negligence and

17   contributory negligence.

18           THE COURT:  Yes, if the Court determined that a

19   particular cause of action or a particular defense, if that was

20   the case, was not proper to submit to the jury, then by

21   agreeing to the instructions in the current form, the party who

22   did not wish to give up that particular cause of action or

23   defense is not deemed to have waived their objection to that

24   particular ruling by the Court not to submit that matter to the

25   jury.  But once that matter is not being submitted to the jury,

```
 1   in particular and as an example the cause of action for

 2   negligence, once it's being submitted, then that party is not

 3   asking that the Court instruct on a cause of action that the

 4   Court isn't giving, but they're not giving up their objection

 5   to the Court not giving it, that particular cause of action to

 6   the jury.

 7            I also have a verdict form, and that verdict form was

 8   again a matter of discussion, and I believe that the current

 9   form as set forth in the format that was prepared for

10   everyone's use, ultimately by defendants' office, is agreeable

11   to both sides.

12            MR. GALIPO:  That's correct.

13            THE COURT:  Is that correct?

14            MR. GALIPO:  Yes.

15            THE COURT:  Mr. Loebs?  Mr. Wiener?

16            MR. WIENER:  That's correct, your Honor.

17            THE COURT:  Ultimately, the defendants took the

18   laboring on here in creating the packets of instructions on

19   their word processor.

20            MR. GALIPO:  And I thank them for that.

21            THE COURT:  And the Court appreciates their efforts in

22   that regard because there was quite a bit of discussion and

23   quite a bit of amendment to the instructions before we arrived

24   at the final set.  So I wanted to get that clear.

25            Now I also heard reference during Mr. Loebs' closing
```

1    to the jury being able to play the tape of the chase in the

2    police communications line in the jury room.  Does that mean

3    you both have agreed a tape player can go in there?  Because

4    they're not going to play anything without a tape player.

5          MR. LOEBS:  We have the TV, the actual exhibit.  We've

6    agreed that could go in.

7          THE COURT:  You put that in there and you have to send

8    a whole TV in that has to be set up?  That seems like a rather

9    awkward situation.

10          MR. GALIPO:  What we haven't talked about, but I would

11    recommend is the following:  If they make a specific request

12    for it during deliberations, then we can figure it out.  I'm

13    quite concerned if we send TVs and VCRs in there, they could be

14    spending a lot of time on that.  I think we should wait for a

15    specific request.

16          THE COURT:  If it were just on a tape, I could send a

17    tape player in.  If you want to do that, that's a possibility,

18    to perhaps stave off them asking to hear something where the

19    shots are fired or whatever.  But the TV I think is a bit much.

20          MR. LOEBS:  We had a computer monitor they could play

21    it on.  It's rather small.  They can do the same thing, then

22    they could see the actual evidence.

23          THE COURT:  No, I think that would be a way of

24    display.  But it just becomes, I think, rather overemphasized,

25    if you want to put it that way.

5024

1          I wouldn't disagree about the tape player if you have

2  it just on a cassette or some other way of just playing it that

3  way.  But if we had the full-blown model here, then it might be

4  awkward.  It's been played numerous times.  We've played it in

5  opening, closings, and along the way more than once during the

6  presentation.  Clearly if the jurors have any question about

7  what's on that tape, they can ask to have it played.  Again.

8          But if you want to submit a small player and tape,

9  then I'd consider doing that.

10          MR. LOEBS:  Okay, your Honor, we'll work on that over

11  the weekend.

12          THE COURT:  Okay.  Then as to the evidentiary matter

13  concerning the photos, you probably haven't had a chance to

14  finalize your discussion on that, Mr. Galipo?

15          MR. GALIPO:  I will talk to Mr. Wiener about it.

16  We'll have it squared away by Monday morning.

17          THE COURT:  As to what exhibits are actually in and

18  what aren't and what can go in the jury room, this has been

19  for, lack of a better word, a chaotic presentation as far as

20  the marking of the exhibits, and I really don't know at this

21  time exactly where all the exhibits are and what they've been

22  marked with since they weren't formally premarked in most

23  instances and were marked on the run by counsel in the middle

24  of their respective examinations.

25          So I think that you're going to have to get together,

```
1   it might be appropriate for you to come maybe a half hour early
2   on Monday, and try to figure out what you agree is in and out.
3          Would you need Miss Lucero for that?  Because I don't
4   really want her to be here early if she doesn't have to.  She's
5   hardly had any kind of break to do anything for the last six
6   weeks, and she has a lot of other work besides the work on this
7   case.
8          MR. GALIPO:  I don't think so, your Honor.  In fact,
9   she was kind enough I think to give both sides a list.
10         THE COURT:  Her list?
11         MR. GALIPO:  Yes.
12         THE COURT:  Well, we could open the courtroom up at
13  8:30, and I think it would be a good idea to see what you've
14  got in and out of the case.
15         MR. GALIPO:  I think the main question is going to be,
16  how many and what blowups, if any, to go in that the Court has
17  to decide, is the main issue.
18         THE COURT:  In the main, I would think it would be
19  blowups of exhibits that are hard to follow in small form for
20  everybody.  In other words, to pass around and are in some
21  fashion and have been used rather throughout the proceedings.
22  So that the jurors are used to seeing certain exhibits in
23  blowup form.
24         That I would think wouldn't be V5-01 and 02.  Maybe
25  the one with the shadow car, I forget what that is.  F-9 or
```

1    something.

2              MR. LOEBS:  F-9.

3              THE COURT:  None of these are in any logical series.

4              What do you think about U, whatever it is, 5 or

5    whatever, the one with the person in the car.

6              MR. GALIPO:  I'd rather not have it in.  Just because

7    it gives undue emphasis to that one position, and I think we've

8    had testimony that it was just general, not specific, and I

9    think it would be misleading to have it sitting there in the

10   jury room throughout the deliberations.

11             THE COURT:  The only reason to use it or to give it,

12   and I'll think about it, is that it has played a certain role

13   in the case and it has been shown a lot to the jury, and if

14   they're in the jury room and one person tried to point

15   something out and nine people are crowding around a little

16   photo, it starts to get awkward.

17             Both of you have made quite a bit of that, you know,

18   photo, both in terms of trying to show where someone was, where

19   they could have been, independent of the model in the picture,

20   it's the one picture that kind of shows well the interior and

21   layout at least in great part, so if there are substitutes for

22   that where somebody can actually look at the car easily and

23   discuss as a group -- otherwise, I don't know they're going to

24   tack it up somewhere, put it in the middle of the table, and

25   crowd around or get close enough, and I think it's going to be

1    awkward.  So there are a lot of features that show up better in

2    the blowup, whether it's, you know, the bolt thing or the -- I

3    don't know.

4           Now, any photo with the bloody bolt cover, the blood

5    on the floor, what's your view about that?

6           MR. GALIPO:  I would be opposed to those, the blowups,

7    going in.  The regular exhibits, fine.  But all the blowups, I

8    would be opposed to.

9           THE COURT:  I'll consider it.  It may be appropriate

10   just that go in as a single exhibit.

11          MR. LOEBS:  That's fine, your Honor.

12          THE COURT:  I don't know that the jurors all have to

13   scrutinize, and it's hard really -- does anything show up

14   better in the blowup?  Well, you agree, so...

15          MR. LOEBS:  Yes.

16          THE COURT:  All right.  I was just wondering for the

17   ease of viewing.  Blowing up blurry isn't any better than small

18   blurry.

19          MR. GALIPO:  I should be agreeing to the one blowup

20   where I don't think you can see the spatter, but I think it

21   would be fair to either do the group of them or none of them as

22   far as the blood.  So my reference between the two would be to

23   not.

24          THE COURT:  All out.

25          MR. GALIPO:  As far as the blowups.

```
 1              THE COURT:  Are there any more blood blowups?  Does
 2     anybody want to put in blood blowups.
 3              MR. LOEBS:  No, your Honor.
 4              THE COURT:  So that's -- you're in accord on that.
 5     Anything else that comes to mind in terms of blowups that may
 6     be in dispute?
 7              MR. LOEBS:  Just that there is the one blowup, the
 8     diagram that Mr. Jason did that you termed the robotic.
 9              THE COURT:  Oh, the robotics.
10              MR. LOEBS:  We talked about that at length, and you
11     were very careful about how we discussed this issue, and we're
12     not offering that in evidence other than as it illustrates
13     Mr. Jason's testimony.
14              THE COURT:  It's not being offered at all?
15              MR. LOEBS:  That's what we discussed at the time, and
16     that's where we stand.
17              THE COURT:  So that's not a concern.  Anything else
18     that you can think of?
19              MR. GALIPO:  The only other issue I'm wondering, if we
20     conclude with the argument, instructions, which we clearly will
21     first thing Monday morning --
22              THE COURT:  I hope to.
23              MR. GALIPO:  -- believe it or not, I have a trial
24     scheduled for Tuesday with pretrial conference in the afternoon
25     at 3 o'clock.  So I'm wondering if I had Mr. Cunningham, for
```

1   example, stand in for me during deliberations, would the Court

2   have any thoughts on whether I could fly to LA in the afternoon

3   or --

4            THE COURT:  Let me make a couple of suggestions.  I

5   don't care how many lawyers are here for either side, but

6   whoever is here has to be fully knowledgeable about any issue

7   that might come up and prepared with the authority to make any

8   kind of decision on behalf of the client.  I do not know that

9   you can saddle Mr. Cunningham with that particular set of

10  obligations.  What I would recommend to you, do you have any

11  idea how long that conference might take?

12           MR. GALIPO:  Well, not long.  Maybe a half hour.

13           THE COURT:  Okay.  Let me just stop you right there.

14  Is there no way that you could -- or couldn't you contact the

15  judge and opposing counsel in that matter and see whether or

16  not they could conduct it by phone.

17           MR. GALIPO:  Absolutely, I will try.  We've already

18  been informing them of the situation.  We were hoping we would

19  get finished by the end of the day today, but it didn't quite

20  work out.

21           THE COURT:  No, I think that was out of your hands

22  once the defendants argument went for as long as it did.  So I

23  would suggest that you try to do that by phone.  I mean, the

24  alternative is essentially to say, Judge Chesney won't let me

25  out of here, and I really don't want to gratuitously interfere

```
 1   with another court's proceeding.  If we don't have to.  So that
 2   would be my thought as a compromise.
 3            MR. GALIPO:  I will try, and I can tell you that I've
 4   had good past experience with this particular federal judge,
 5   and I think if we -- I don't know if you know her, it's Judge
 6   Virginia Phillips down in the Riverside federal court, but if
 7   we need to place a call, we'll figure it out Monday morning.
 8            THE COURT:  You know, there's the attorney's lounge.
 9   And I think that has some rooms that can be used relatively
10   privately.
11            MR. GALIPO:  I would be willing to do it if they would
12   be, and we'll cross that bridge on Monday.
13            THE COURT:  Certainly the Court, I'm sure, would
14   prefer to have you there in person.  There's no question about
15   it.  When's your trial supposed to start?
16            MR. GALIPO:  Tuesday.
17            THE COURT:  Okay.  It's kind of a close pretrial
18   conference, isn't it?  It's like part of the trial.
19            MR. GALIPO:  What happened it was last week, but they
20   continued it because I was here.
21            THE COURT:  And again, you might have considered
22   whether there was any way to set that up at the end of a day,
23   such as 4:15, but if it's a long conference -- when is it
24   scheduled for; what time, do you know?
25            MR. GALIPO:  It's --
```

1          THE COURT:  You don't remember?

2          MR. GALIPO:  I believe it's 3:00.  There's actually

3    two of them in the afternoon because I have two trials

4    scheduled one week apart, if you can imagine that.

5          THE COURT:  I'm assuming these are more than one-week

6    trials.

7          MR. GALIPO:  They're actually relatively -- several to

8    five day trials each.  They're not like this thing.

9          THE COURT:  In any event, you're a busy man.  I

10   recognize that.  Obviously in demand.  All I can suggest is

11   that you make that first effort, because I really would not

12   feel very comfortable, as much as I like Mr. Cunningham, and I

13   have seen how he's done being tossed into the breach, but

14   there's a whole trial record here.  He has not been there.  We

15   may need your assistance in finding things.  I don't want to

16   make those kind of decisions by the Court and the defendant,

17   and then have essentially a unilateral or bilateral as opposed

18   to trilateral decision on that.

19         MR. GALIPO:  I will try to make arrangements, your

20   Honor.

21         THE COURT:  With all that in mind, anything else

22   before we break to the weekend?

23         MR. LOEBS:  Yes, your Honor.  The issue that

24   Mr. Galipo raised in his closing where he stated Marylon Boyd

25   testified that she did not have this conversation with

1    Mr. Campos is completely false.  She did not mention anything

2    about that.  In fact, we raised that as a rebuttal issue

3    because we were concerned because he called Mr. Campos in his

4    case, we were concerned he was going to try to call Ms. Marylon

5    Boyd in his rebuttal case to address that issue.  We argued to

6    the Court that that would be improper rebuttal and he couldn't

7    do that.  Having failed to do that, he then recommended falsely

8    to the jury that she gave testimony.  And we'd ask that the

9    Court do something appropriate in that regard with respect to

10   closing argument.

11          THE COURT:  What's your thought about this,

12   Mr. Galipo?  Ms. Boyd's testimony was interrupted, I think, in

13   some way by Mr. Clark.  And then she was back on at some point

14   after the grandchildren.  Mr. Campos, I think, came after she

15   did.  So how and when did she address this point?

16          MR. GALIPO:  I'm trying to see -- if I could have just

17   one moment.

18          THE COURT:  Okay.  Because if he came after she did,

19   how could she have commented about it unless she was, you know,

20   trying to head something off at the pass, and I don't see that

21   that happened.

22          MR. GALIPO:  First of all, my recollection was that

23   there was commentary about it.  I cannot specifically say

24   without looking.  I certainly when I said that believed there

25   was.  I think my client recalls general comments, but she

1    doesn't specifically recall.  Obviously, I know they've been

2    having the transcript prepared.  I don't know if they have the

3    notes --

4             THE COURT:  Let me say this:  Mr. Campos did testify

5    about this and was examined by you in that respect.

6             MR. GALIPO:  Right.

7             THE COURT:  And essentially took you out of the

8    picture at least as a speaker.  I don't know if he took you out

9    in terms of a bystander or not, but he took you out of the

10   immediate conversation.  But I don't know that there was ever

11   any expressed denial with respect to Ms. Boyd.

12            But let me say this:  I'm not going to step in at this

13   point.  These jurors have been taking extensive notes.  These

14   jurors are, if they see that Marylon Boyd testified, and the

15   next witness is Joe Campos, and that she never got back on the

16   stand, I don't think that they would be so obtuse as to not

17   recognize that she didn't address the matter.  And I don't

18   really want to pull this one point out and comment about it.

19            What I do want to comment about is that it is not

20   appropriate to inject one's own personality or personal views,

21   shall we say, personality is fine, you have lots of that, and

22   that's fine, Mr. Galipo, but your own personal state of mind in

23   the argument is not proper.  The defendants sat back, and they

24   didn't object, even though I made it clear to them that the one

25   time I overruled their objection did not mean that you could

1    just get up and say, I think, I say, I did, it was my plan.

2         Okay.

3         Perhaps they figured they'd just come back and use

4    that to their own benefit.  And they did comment to a certain

5    extent in that regard.

6         But at this point, it really is not proper for you to

7    put your personal spin on the evidence.

8         MR. GALIPO:  I'll be careful to phrase it that this is

9    what the evidence shows on this point or this is the evidence

10   on that point.

11        THE COURT:  You really can't say, I can assure you

12   there's no evidence out there.  Or in my personal view, this

13   shot was unwarranted or things like that.  It's not fair

14   argument frankly.

15        Now if they didn't like you, then probably the

16   defendants wouldn't care because they figured the jurors really

17   don't care what you have to say and what you think.  But I'm

18   going to assume they do care, and in that regard it's

19   particularly important that you not make those kind of

20   comments.

21        So what else, about anything, before we break for the

22   weekend?

23        All right.  Are you going to come in at 8:30 then and

24   square this away?

25        MR. GALIPO:  Yes.

```
1              THE COURT:  The reason I say that is these people are
2    really going to want to get going once they get into that jury
3    room, and if we keep them waiting for any protracted period of
4    time for all those exhibits, they're going to be unhappy.
5              MR. GALIPO:  Can we go off the record for our court
6    reporter now or --
7              THE COURT:  I think so.
8              MR. GALIPO:  I just feel bad for her, she's been going
9    all day.
10             THE COURT:  That's true.  Okay.  We're off record, and
11   that's it for this afternoon.
12             (Adjourned to Monday, September 24, 2007 @ 8:30 a.m.)
13                                  oOo
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                              CERTIFICATE OF REPORTER

3

4          I, Connie Kuhl, Official Reporter for the United

5    States Court, Northern District of California, hereby certify

6    that the foregoing proceedings in Case No. C 04-5459 (MMC),

7    Marylon Boyd, et al., City and County of San Francisco, et al.,

8    were reported by me, a certified shorthand reporter, and were

9    thereafter transcribed under my direction into typewriting;

10   that the foregoing is a true record of said proceedings as

11   bound by me at the time of filing.

12         The validity of the reporter's certification of said

13   transcript may be void upon disassembly and/or removal from the

14   court file.

15                         *Connie Kuhl*

16         _____

17                         Connie Kuhl, RMR, CRR

18                         Thursday, December 20, 2007

19

20

21

22

23

24

25