Pages 1 — 161

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE


MARYLON BOYD, ET AL.,      )
                             )
            Plaintiffs,   )
                             )
     v.                  )   NO. C 04—5459 MMC
                             )
CITY AND COUNTY OF       )
SAN FRANCISCO, ET AL.,    )
                             )
            Defendants.   )
_____)

San Francisco, California
Thursday, July 12, 2007

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:        Law Office of Dennis Cunningham
                    115 A Bartlett Street
                    San Francisco, California  94110
            BY: DENNIS CUNNIGNHAM, ESQ.


For Defendants:        Office of the City Attorney
                    City and County of San Francisco
                    1390 Market Street
                    Sixth Floor
                    San Francisco, California  94102
            BY: SCOTT D. WIENER, ESQ.
                    BLAKE LOEBS, ESQ.
                    Deputy City Attorneys


Reported By:          BELLE BALL, CSR, RMR, CRR
                    Official Reporter

1   THURSDAY, JULY 12, 2007

2                                                    9:06  A.M.

3                  P R O C E E D I N G S

4        THE CLERK:  All rise.  This court is now in session,

5   the Honorable Maxine Chesney presiding.  Please be seated.

6        THE COURT:  All right, good morning.  Mr. Cunningham,

7   you are appearing --

8        MR. CUNNINGHAM:  Good morning, Your Honor.

9        THE COURT:  -- for Mr. Galipo.

10        MR. CUNNINGHAM:  I'm here for Mr. Galipo today, yes.

11   He's on trial, I guess, in Los Angeles.

12        THE COURT:  Now, we had received some information

13   that -- I see Plaintiff's Counsel have deigned to appear.

14        MR. CUNNINGHAM:  Defense.

15        THE COURT:  Or Defendant's Counsel, rather.  All

16   right, please come forward.  I've called the case already.

17        UNIDENTIFIED MAN:  I apologize --

18        THE COURT:  Pardon me?

19        UNIDENTIFIED MAN:  We were in the other courtroom.

20        THE COURT:  You didn't receive a call?

21        UNIDENTIFIED MAN:  No.

22        THE COURT:  It was my understanding Ms. Lucero called

23   all Counsel.  Oh, well, have a seat.  Or, whoever's with you can

24   have a seat.

25        I'm just hearing now from Mr. Cunningham, as to why

1    Mr. Galipo isn't here.  And, he's apparently in trial in Los

2    Angeles.  We had received some information that he might be in

3    trial.

4            And, I believe that Ms. Lucero had advised him that if

5    he was, and if he was seeking in any way to change the time or

6    date of the hearing, that he would have to file some type of

7    motion for relief.  We never received any motion.

8            So, --

9         **MR. CUNNINGHAM:**  All I know, Judge, is I got a call

10   from Ms. Sarmiento yesterday.  And, she asked me if I could

11   appear, and I said I would.

12           She said that Mr. Galipo had asked the Court to appear

13   by phone, but that didn't seem practical, apparently, on

14   something like this.

15        **THE COURT:**  No, not at all.  Not at a hearing of this

16   nature.  In fact, I don't think I've ever actually conducted a

17   hearing by phone in a contested hearing.

18           **MR. CUNNINGHAM:**  I don't see how you would do it.

19        **THE COURT:**  But if I were going to do so, I don't

20   think it would be in a hearing such as this, where we would have

21   potential examination of a witness, on the matters.

22           **MR. CUNNINGHAM:**  Uh-huh, uh-huh.

23        **THE COURT:**  Now, I believe that the Defendant is ready

24   to proceed.  Are you not?

25           **UNIDENTIFIED MAN:**  Yes, Your Honor.

1          **THE COURT:**  You have your witness here?

2          **UNIDENTIFIED MAN:**  Yes, we do, Your Honor.  Dr. Keram

3    is right there.

4          **THE COURT:**  Well, it would be my intent to go forward

5    with the hearing.

6          **MR. CUNNINGHAM:**  I'm willing to go, Judge.  I've made

7    some study overnight of the materials.  I was aware of the

8    motion.

9          As the Court knows, I've been kind of just an added

10   starter in this case, just kind of a backup, and I'm really not

11   expecting to participate much more.

12         But, just to hold up the Plaintiff's end today, I

13   could do that.

14         **THE COURT:**  All right, well, you're apparently the

15   designated hitter.

16         **MR. CUNNINGHAM:**  Yes.

17         **THE COURT:**  All right.

18         **MR. CUNNINGHAM:**  The pinch-hitter.

19         **THE COURT:**  Very good, then.  Well, we'll go ahead

20   with the hearing.

21         Now, just so that it's clear what we're about this

22   morning, at the initial pretrial conference, the Court heard

23   many motions in limine.  And made many rulings.

24         In fact, I stayed pretty late, trying to get as many

25   rulings as possible for the parties, only to find -- on the hope

1    that they might be able to resolve the matter by settlement, if

2    they have the Court's rulings in place.

3            I understand there was essentially no settlement

4    conference, that Judge James, having been apprised of the

5    parties' positions, determined there was no value in conducting

6    a settlement conference, and didn't.  So all that effort on the

7    Court's part to get the rulings in place was for naught.

8            In any event, we do have a number of rulings, but a

9    number of those rulings are -- are made contingent upon whether

10   the Defendant is allowed to pursue a defense of suicide by cop

11   in this case.  And in particular, to pursue it in the manner in

12   which they seek to do so.

13           So, the proceedings today will -- will be essentially

14   a hearing as described in effect in *Daubert V. Merrell Dow*, to

15   determine whether it would be appropriate to submit this issue

16   to the jury.

17           And it appears to the Court that the linchpin of the

18   Defendants' defense in this regard is Dr. Keram, who is going to

19   be examined today --

20           **MR. CUNNINGHAM:**  Uh-huh.

21           **THE COURT:**  -- with respect to her views, as I felt

22   that her report and declaration, even combined, didn't fully

23   apprise the Court of the underpinnings of her opinion.

24           **MR. CUNNINGHAM:**  Okay.

25           **THE COURT:**  Okay.  So, that's what we are going to

1     proceed with here, in this hearing, today.  And then following

2     that particular inquiry, and whatever pertains to that issue,

3     the Court then intends to take up the few remaining procedural

4     matters relevant to the conduct of the trial in general that we

5     were unable to get to meaningfully at the last pretrial

6     conference because of time constraints.

7              **MR. CUNNINGHAM:**  Uh-huh.

8              **THE COURT:**  So.  Okay.  So, everyone then is ready to

9     proceed as outlined?

10             **MR. WIENER:**  Yes, Your Honor.  Scott Wiener.  I'll

11    give you a card in a minute.

12             **THE COURT:**  And you are appearing with?

13             **MR. WIENER:**  Appearing for Defendants.

14             **THE COURT:**  And along with --

15             **MR. LOEBS:**  Blake Loebs, Your Honor.

16             **THE COURT:**  All right, thank you.  Now we have all

17    Counsels' appearances at this time.

18             And, it would seem to me as far as how we should

19    proceed in the conduct of the hearing, that the witness would be

20    called and sworn, then Mr. Wiener, you could examine the witness

21    to the extent you would feel appropriate, I would give

22    Mr. Cunningham an opportunity to ask some relevant questions.

23             The Court may well have questions of the witness as

24    well.  I can let you know in advance the Court's chief concern

25    in this matter.  All right.  And, it's as follows.

1          It in all likelihood will be that the witness will

2   show without too much effort that there is a phenomenon

3   recognized in the psychiatric and other communities sometimes

4   described as suicide by cop.  In other words, there are people

5   out there who wish to end their life, and have found that

6   confrontation with police, provoking a shooting, is one way to

7   do it.

8          All right.  The issue will be the application of that

9   particular concept to the particular facts of our case, which

10  may not actually meet what I'd call a classic example of suicide

11  by cop.  So, that's the focus of the Court's inquiry.

12         All right.  Do you want to call your witness?

13         **MR. WIENER:**  Yes, Your Honor.  The defense calls

14  Dr. Emily Keram.

15         **THE COURT:**  All right.  And, Doctor, if you will just

16  come up to the witness stand.  Before you are seated, the clerk

17  will swear you in.  I think -- well, right over here is easier.

18         **THE WITNESS:**  My file is here.

19         **THE COURT:**  Oh, all right.  Fine.  If you would like

20  to bring that over there with you, you may do that as well.

21               (Witness placed under oath)

22         **THE CLERK:**  Please be seated.  State your full name

23  for the Record, and spell your last name, please.

24         **THE WITNESS:**  My name is Emily Alyssa -- A-L-Y-S-S-A

25  -- Keram.  K-E-R-A-M.  M.D.

1    **EMILY ALYSSA KERAM, M.D.,**

2    **called as a witness for the DEFENDANTS,**

3    **having been duly sworn, testified as follows:**

4    **DIRECT EXAMINATION**

5    BY MR. WIENER:

6    Q    Good morning, Dr. Keram.

7    A    Good morning.

8    Q    Dr. Keram, what do you do for a living?

9    A    I'm a psychiatrist.

10   Q    And can you describe your educational background to become

11   a psychiatrist?

12   A    Completed my undergraduate degree at Duke University with a

13   bachelor of science in zoology in 1981.  I graduated from the

14   University of North Carolina, Chapel Hill, School of Medicine

15   with a medical degree, in 1988.

16       I completed a training, a psychiatric residency training at

17   the University of North Carolina School of Medicine, in 1992.

18   In the last year of my residency, I completed a fellowship in

19   forensic psychiatry with the United States Department of

20   Justice.

21       So, I finished that in June of 1992, as well.

22   Q    And what is a fellowship of forensic psychiatry?

23   A    It's a year-long course, the curriculum of which is set out

24   by our standardization board, where people who have an interest

25   in larger to be forensic psychiatrists evaluate criminal and

1    civil cases attend classes at a law school, and also didactic

2    curriculum within the fellowship program, itself, across the

3    spectrum of material that a forensic psychiatrist might

4    encounter in a forensic practice.

5    **Q**    And when you refer to forensic psychiatry, can you just

6    describe what you are referring to?

7    **A**    Forensic psychiatry involves working in any issue, any

8    mental health issue that arises in a legal context.  So it's

9    actually a fairly broad field.

10   **Q**    And does it involve sort of looking backward to review what

11   happened and analyzing it?

12   **A**    Yes.

13   **Q**    Okay?

14   **A**    That scenario arises within a variety of contexts within

15   forensic psychiatry.

16   **Q**    And are you board-certified as a psychiatrist?

17   **A**    Yes, I'm board-certified in psychiatry neurology, which is

18   our general board certification.  I'm also certified in forensic

19   psychiatry.

20   **Q**    And, are you licensed as a medical doctor in the State of

21   California?

22   **A**    Yes, I am.

23   **Q**    Okay.  And when did you receive your license?

24   **A**    I think I got my California license in either 1990 or 1991;

25   I'm not sure when.  I would have to look at my CV.

1    **Q**    And when did you receive your board certification in

2    psychiatry and neurology?

3    **A**    I believe that was in 1993 or '94.

4    **Q**    Okay.

5    **A**    I'm sorry, I don't have a copy of my CV with me.

6    **Q**    And if you need to refer to a document just let us know?

7    **A**    Okay.

8    **Q**    Can you just give the Court an overview of your practice as

9    a psychiatrist since you became board-certified?

10   **A**    Initially I was in private practice full-time and the

11   majority of my work was treating patients.  I did some criminal

12   and civil forensic work in addition to my clinical work.

13        In 1996, I left my private practice to become the clinical

14   director of a VA clinic that was opening in Santa Rosa,

15   California, where I live.  And, at that time, the VA didn't

16   allow their doctors to practice outside of the VA, so I limited

17   my work then to full-time work at the VA.

18        The majority of my work at the VA was clinical care, seeing

19   patients but about 25 percent of my time was devoted to

20   administrative duties, getting the clinic set up and then

21   running the clinic.  At some point during the time I was there

22   from '96 to 2000, the federal law changed and we were allowed to

23   do some forensic work -- well, work outside of the VA.  So, I

24   again started to do criminal and civil cases.

25        And then, in 2000, I was recruited to join the full-time

1    paid faculty at UCSF where they were starting a fellowship

2    program in forensic psychiatry identical to the one that I had

3    done in North Carolina.  And so, I was a full-time faculty

4    member there for four years.  During that time, I continued to

5    do civil and criminal litigation.

6         I also broadened my expertise in law enforcement-related

7    contacts with mentally-ill citizens by developing training

8    curricula, and then actually doing training for law enforcement

9    agencies, and I served on a POST committee that developed

10   curricula at that time.

11        I continued to see patients while I was in the University,

12   a full-time university faculty member.  I worked on the

13   inpatient unit, also.

14        In May of 2004, I decided to leave the full-time faculty

15   because the commute was really wearing me down.  So I kept a

16   faculty affiliation, and I still teach some in the fellowship

17   program, but I went back to the VA half time, treating patients.

18   And, continued to do forensic work in the other half of my time,

19   and also to see patients in my own private practice.

20        The majority of the patients that I see in my private

21   practice are law enforcement officers, which was a new area for

22   me, that I took on, as a result of the trainings that I had

23   done, law enforcement officers started to refer themselves to me

24   for treatment.

25   Q    So you are currently seeing patients in a private practice

1      and at the Vet Administration Hospital?

2   **A**     Correct.

3   **Q**     And you are still teaching?

4   **A**     Yes.

5   **Q**     And that is at UCSF?

6   **A**     Yes.

7   **Q**     Have you supervised other psychiatrists in your career?

8   **A**     Yes.  When I -- in addition to supervising the forensic

9   psychiatry fellows.  That also included medical students and

10  residents who would rotate with us.  During the four years that

11  I ran the VA clinic, I supervised all of the psychiatrists that

12  worked there.

13        And, I'm currently in the process of perhaps again becoming

14  the clinical director at that clinic, because that is a job that

15  we just haven't been able to fill consistently since the time

16  that I left.  And then I'll take on the supervision of the

17  clinicians there, as well, again.

18  **Q**     Now, you mentioned before that you have provided trainings

19  outside of the UCSF context.  Can you just describe the

20  psychiatric-related trainings that you have provided, just an

21  overview?

22  **A**     To, to other psychiatrists?  Or to law enforcement?

23  **Q**     Let's start with law enforcement first.

24  **A**     Okay.  I provide a quarterly training in the San Francisco

25  Police Department's crisis intervention training program.

1    That's a week-long program that officers volunteer to attend,

2    that emphasizes law enforcement contacts with mentally-ill

3    citizens.  And I teach almost the entire first day.  So, I do

4    that quarterly.

5         I'm also invited, from -- by other law enforcement

6    agencies, to teach in their -- either their ongoing POST

7    certifications or their academies.  So, I have taught in the Son

8    Jose CIT, the Crisis Intervention Training academy.  I've taught

9    in Sonoma County, taught at the FBI academy.

10        I'm trying to think.  Then, I volunteer with an

11   organization called West Coast Post-Trauma Retreat, where we

12   provide a one-week residential educational program for law

13   enforcement officers and other first responders who have had a

14   critical incident.  And I come in and teach about PTSD and

15   treatment for PTSD and first responders.

16   Q    Okay.  And, how about the trainings you provide to other

17   psychiatrists outside of the UCSF complex?

18   A    I'm a member of the American Academy of Psychiatry and the

19   Law, and I've chaired three committees of that organization.

20   And I currently chair the law enforcement liaison committee.  I

21   regularly submit to make presentations at the annual meeting

22   that we hold in October each year.

23        And, I have presented on a variety of law

24   enforcement-related issues there.  Everything from how to

25   conduct a psychological autopsy and suicide by cop to how to

1    design a training curriculum for law enforcement officers

2    regarding their contacts with mentally-ill citizens.

3    **Q**    And, have you served on any POST, POST committees?

4    **A**    Yes.

5    **Q**    Ask you to describe --

6    **A**    As I mentioned, it was either in 2000 or 2001, somewhere in

7    that time, I was appointed to a POST committee that was

8    established by the California Legislature called the MDD

9    Committee, a mentally- and developmentally-disabled committee.

10        Our committee was charged with developing a curriculum that

11   we would then make -- POST would then make available to every

12   law enforcement agency in California, and other agencies as

13   well, regarding law enforcement contacts with mentally ill

14   citizens and developmentally disabled citizens.

15   **Q**    And what does POST stand for?

16   **A**    It's the a California Commission on Peace -- excuse me,

17   Peace Officer Standards and Training.

18   **Q**    Okay.  Now, I want to ask you some questions about your

19   background relating to what we have been referring to as suicide

20   by cop.

21   **A**    Uh-huh.

22   **Q**    Do you have experience in this area?

23   **A**    Yes, I do.

24   **Q**    And have you treated patients who have contemplated or

25   talked to you about a desire to commit suicide by cop?

1    **A**    Yes, I have.  In fact, one of my patients actually

2    initiated a suicide by cop, but fortunately it wasn't successful

3    in provoking lethal force.  He was hit with a less lethal round,

4    which brought the incident to an end.

5              **THE COURT:**  You didn't hear the witness?

6                        (Off-the-Record discussion)

7    BY MR. WIENER:

8    **Q**    You might want to place the mic like an inch or two closer

9    to your mouth.

10          And, have you -- have you treated suicidal patients

11   generally, including patients -- suicidal patients unrelated to

12   suicide by cop?

13   **A**    Yes.

14   **Q**    Can you estimate how many suicidal patients you have

15   treated over the years?

16   **A**    That would be very difficult.  I think at the VA, all

17   together, you know, I've seen close to about 700 patients.  The

18   majority of which are combat trauma PTSD veterans, the majority

19   of which now are -- all throughout the time I have been at the

20   VA have been Vietnam vets.

21          And unfortunately, they have a very high incidence of

22   suicidal ideation, and some of them go on to develop an intent

23   and a plan.  So, I would -- and of course, in my private

24   practice I saw suicidal patients as well, and suicidal patients

25   with a variety of diagnoses.  So it's been hundreds of suicidal

1  patients over the course of my career.

2  **Q**    Okay.  And can you -- have you written any publications

3  related to suicide by cop?

4  **A**    Yes, I have.

5  **Q**    How many?

6  **A**    I've written one publication that was published in the

7  general literature on suicide by cop and then the training

8  curricula that I've written involves also a curricula on suicide

9  by cop.

10  **Q**    And have you provided trainings to anyone, police officers

11  or otherwise, relating to suicide by cop?

12  **A**    Yes.  I have.

13  **Q**    Can you please describe that?

14  **A**    The first time that I presented to a law enforcement

15  audience on the topic of suicide by cop was at the FBI academy,

16  where I presented my paper on suicide by cop at a conference

17  that they were holding on suicide and law enforcement.  That was

18  in, I believe, 1999 or 2000.

19      And then, the quarterly training that I give at the

20  San Francisco Police Department's crisis intervention training

21  involves a lecture on suicide by cop each quarter, and I think

22  we have been doing that training for approximately five or six

23  years now.

24      I've given lectures on suicide by cop to the San Jose

25  Police Department, CIT Academy, and also to law enforcement

1    agencies in Sonoma County.

2    **Q**    Are you familiar with the literature, the professional

3    literature relating to suicide by cop?

4    **A**    Yes, I am.

5    **Q**    And you have reviewed that literature?

6    **A**    Yes, I have.

7    **Q**    And are you familiar with the -- with peer-reviewed studies

8    that have been conducted relating to suicide by cop?

9    **A**    Yes, I am.

10   **Q**    So let's talk about what suicide by cop is.

11          **MR. WIENER:**  And Your Honor, at any point if I'm going

12   into an area that Your Honor doesn't need to hear about, or

13   that's already been adequately covered elsewhere, if Your Honor

14   would just let me know --

15          **THE COURT:**  Well, I would say that you probably do not

16   have to conduct an examination of the length that you might

17   conduct if someone were hearing about this for the very first

18   time.

19          In the same light, as I say, I am interested in the

20   application of the concept to this particular event, and in

21   detail.  So, to the extent that when you are inquiring of

22   Dr. Keram about background information, if it's relevant to what

23   you are going to be inquiring into on the more specific issue,

24   then that's fine.  I'm not trying to cut you off here.

25          And I appreciate, though, the question, because

1    obviously you don't want to take more time than you need on a

2    particular point.  Your last question was what, again?

3           **MR. WIENER:**  I was about to go into the general

4    phenomenon of suicide by cop.

5           **THE COURT:**  That's fine.  We may as well hear some of

6    that at this point, just to lay the foundation.

7           **MR. WIENER:**  Okay.  And I would just note for the

8    Record that Dr. Keram's report and the declaration, which do

9    contain a fair amount of background on suicide by cop, are a

10   part of the Record, as well as her CV, in terms of our

11   oppositions.

12          **THE COURT:**  All right.  I will consider those as part

13   of the totality of the Record.

14          **MR. WIENER:**  Okay, great.  Thank you, Your Honor.

15          **THE WITNESS:**  Mr. Wiener?

16          **MR. WIENER:**  Yeah.

17          **THE WITNESS:**  There's one area in which I've worked

18   regarding suicide by cop that is not reflected on my CV, which I

19   would like to mention.

20   **BY MR. WIENER:**

21   **Q**   Would you please mention that.

22   **A**   I participated as the principal investigator on a study of

23   suicide by cop that we conducted in -- I think it was 2003, in

24   our psychiatry and law program at UCSF.  That study, although we

25   presented the data at the American Academy of Psychiatry and the

1   Law, was never published.

2       We encourage our fellows each year, we require them

3   actually to do a research project, and then to write a paper for

4   it.  The Fellow who did that particular project hasn't finished

5   the paper yet on it, although we -- she and I did present the

6   data at the annual meeting of the American Academy of Psychiatry

7   and the Law.  In order to present there, the submissions that

8   are made for presentation do undergo peer review.

9   **Q**    Okay, great.

10  **A**    And may I -- may I also interrupt for just one minute?

11  **Q**    Of course.

12  **A**    Would it be possible for me to get a glass of water?

13              **MR. WIENER:**  Yes.  I should have offered.

14              **THE COURT:**  We're not in our regular courtroom, so the

15  amenities might not be quite up to snuff here.

16              All right so that was the one addition that you wanted

17  to place in the Record.

18              **MR. WIENER:**  Okay, thank you Your Honor.

19              **THE COURT:**  Okay.

20  **BY MR. WIENER:**

21  **Q**    Dr. Keram -- so, you are drinking.

22       What is suicide by cop?

23  **A**    Different definitions for suicide by cop exist, depending

24  on the area in which it's described.  The POST definition for

25  suicide by cop is an incident in which an individual poses the

1    risk of serious harm or death in order to intentionally provoke

2    the use of lethal force by law enforcement officers.

3    Q    And how long has suicide by cop been recognized -- or, I

4    should rephrase that.  Is suicide by cop a recognized phenomenon

5    in the psychiatric field?

6    A    Yes, it is.

7    Q    And for how long has it been a recognized phenomenon in the

8    psychiatric feel?

9    A    Are you asking when the first cases of suicide by cop,

10   looking back, may have occurred, as described?  Or when people

11   actually started calling it suicide by cop, and writing

12   literature on suicide by cop?

13   Q    Let's start with when the psychiatric field began to

14   recognize the phenomenon and study it.

15   A    There was a paper published, I believe, in the late

16   Fifties, called Victim-Precipitated Homicide, which described

17   the phenomena of somebody dying intentionally, suicide at the

18   hands of another.  That was the first time in the scientific

19   literature that that concept arose.

20        The application of victim-precipitated homicide to law

21   enforcement interactions was formally described as suicide by

22   cop in approximately 1984.  And, you start to see papers

23   published in both the scientific literature and the law

24   enforcement literature in the Nineties through to today.

25   Q    Okay.  And, when is -- has anyone that you are aware of

1   gone back and looked historically to see how early they can find

2   examples of suicide by cop?

3   **A**    Yeah.  The -- many of the studies were retrospective

4   analysis.  And actually, in my own preparation for authoring or

5   co-authoring practice guidelines for the conduct of insanity

6   defense evaluations, I found a very early case of suicide by

7   cop, dating back to 1798.

8   **Q**    And, I believe that's described in your declaration.

9   **A**    Okay.

10  **Q**    Now, how many, if you can estimate, how many peer-reviewed

11  articles have been written relating to suicide by cop?

12  **A**    In the medical literature, there are approximately ten.

13  There are chapters in books which are not peer-reviewed, per se,

14  but are written by people who have been -- who have published

15  literature that has been peer-reviewed.

16  **Q**    Can you estimate how many non-peer-reviewed publications

17  relating to suicide by cop exist?

18  **A**    I know of approximately four.

19  **Q**    And, have there been studies, scientific studies performed

20  relating to suicide by cop?

21  **A**    Yes.

22  **Q**    And, I'm referring to peer-reviewed studies.

23  **A**    Yes.

24  **Q**    And, can you estimate how many?

25  **A**    If you'll will wait for just a minute, I'll take my papers

 1    out on suicide by cop, and look at the ones that were -- where

 2    they actually reviewed cases.

 3    **Q**    Yes.

 4              **THE COURT:**  All right.

 5              **THE WITNESS:**  And, of course, the research that we

 6    did, while not being peer-reviewed for submission, was reviewed

 7    by our research committee within the fellowship program.

 8              **THE COURT:**  If I could ask, for clarification

 9    purposes, when you say "studies," what would that entail in this

10    particular type of field?  A study on suicide by cop?

11              **THE WITNESS:**  Yeah.  I appreciate the question.

12    Because obviously, when people write about suicide by cop they

13    may be studying different parts of the phenomena.  So --

14              **THE COURT:**  Are they collecting data?

15              **THE WITNESS:**  Yeah.

16              **THE COURT:**  In other words, sometimes you think of a

17    study as an experiment.  This is not an experiment.

18              **THE WITNESS:**  No, no.  No, we don't want a control

19    group that we don't shoot at and a study group that we do.

20              **THE COURT:**  Right.  Well, the nature of the study

21    would be what, then?  What are people doing in these studies?

22              **THE WITNESS:**  Probably the best way for me to

23    demonstrate that is to go through the studies that I brought,

24    very briefly.

25              **THE COURT:**  Okay.

1          **THE WITNESS:**  The largest study that's been published

2     to date on suicide by cop is a paper that was published in 1998,

3     called Suicide By Cop.  And the first author is Hutson,

4     H-U-T-S-O-N.

5          What the researchers did was go to the largest law

6     enforcement agency in the United States, which is Los Angeles

7     County Sheriff's Office, and look at ten years of

8     officer-involved shootings, from 1987 to 1997.  And, over that

9     period of time, there were, I believe, approximately -- between

10    440 and -- 430 and 440 shootings.

11         They were interested in developing what we call

12    selection criteria, which is way of defining a subpopulation of

13    a population of people who had committed so sides by cop and

14    then looking at those incidents and those individuals to see

15    what they could learn about them.

16         **THE COURT:**  Did they start with the presumption that

17    the particular shooting had been intentionally provoked as a

18    suicide by the decedent, and then went back and looked at their

19    history?

20         **THE WITNESS:**  That's an excellent question.  And every

21    researcher who wants to do this type of analysis has to answer

22    that question satisfactorily for peer review.

23         What the researchers in this study did was take those

24    437-odd shootings, and apply a definition of suicide by cop that

25    was very, very strict.  Very strict.  Much -- well, not "much,"

1    but it's hard to quantify these things.  More strict than the

2    POST definition.

3              So that they could take out a subset of people that

4    they felt were confident -- who they felt confidently

5    represented people who were committing a suicide by cop.  And if

6    you like, I can tell you what their definition or requirements

7    were.

8              **THE COURT:**  Yeah, that would be good.

9              **THE WITNESS:**  Okay.  I'm, sorry but I haven't gotten

10   bifocals yet, so I'm going to be taking my glasses on and off.

11             **THE COURT:**  Walgreen's will do it.

12             **THE WITNESS:**  Thank you.  Okay.  (As read) "To be

13   included in the study as suicide by cops, all cases met the

14   following criteria:  One, evidence of suicidal intent; two,

15   evidence the individuals specifically wanted officers to shoot

16   them; three, evidence they all possessed a lethal weapon or what

17   appeared to be a lethal weapon; and four, evidence they

18   intentionally escalated the encounter, and provoked officers to

19   shoot them in self-defense, or to protect civilians."

20             And then the authors expand on what they meant by each

21   of those four factors.

22             **THE COURT:**  All right.  Evidence of suicidal intent,

23   evidence that the officers specifically -- what was that?  The

24   second one?

25             **THE WITNESS:**  Specifically wanted officers to shoot

1    them.

2              THE COURT:  Okay.  And, then the decedent had a lethal

3    weapon, and intentionally escalated the encounter?

4              THE WITNESS:  Or what appeared to be a lethal weapon.

5              THE COURT:  Okay.

6              THE WITNESS:  And that's important.

7              THE COURT:  All right.  So, they could have a fake

8    gun.

9              THE WITNESS:  Right, exactly.  Yeah.

10             THE COURT:  And that they intentionally escalated.

11             THE WITNESS:  Correct.

12             THE COURT:  Now, going back to your POST definition,

13   the definition that you gave for POST is essentially "An

14   incident where an individual poses a risk of death in order to

15   provoke lethal force by the officers."

16             What you're describing here for the deceptive is not

17   so much, as I understand it, a difference in the definition, but

18   rather, the evidence that someone considered sufficient to

19   support a finding that that definition had been met.

20             In other words, what evidence would have to be

21   available before someone could draw the conclusion that someone

22   had provoked the police in order to shoot them.

23             THE WITNESS:  I'm going to respond to your concern --

24   which I think is a very valid one -- with my researcher hat on.

25             THE COURT:  Okay.

1          **THE WITNESS:**  Researchers will set an extremely high

2     threshold for selection criteria, even if it means that some

3     cases that actually do meet what we are looking for may be

4     excluded, because we want to maximize the number of cases that

5     are -- that we feel to, as close to 100 percent as we can, are

6     going to be the population that we want to study.

7          **THE COURT:**  I think the difference -- what I'm just

8     trying to clarify here is if -- if someone said, "What is

9     suicide by cop," you would say "Somebody wanted the police to

10    kill them."  Okay.  Essentially.

11         How do you know that is the -- is what, it seems to

12    me, the study was -- was using?  In other words, if someone just

13    said, "Well, I think that's what someone was doing," that would

14    count as sufficient evidence to meet the definition of suicide

15    by cop for this study.  This study was requiring certain indicia

16    of that.

17         **THE WITNESS:**  Uh-huh.

18         **THE COURT:**  It just seemed to me that one's a

19    definition and one is a group of factors from which one draws a

20    conclusion that somebody was trying to get themselves killed.

21         **THE WITNESS:**  I understand.  And I think that the

22    difference -- the different definitions arise because of the

23    different functions that they serve.  For example --

24         **THE COURT:**  No, that's not my question.  Okay.  I may

25    be wrong on this.  It just sounds like we're not talking about

1    definitions.  All right?

2              We are talking in one -- in other words, you said

3    there are different definitions.  Maybe this is the word that

4    people use in your field.  To me, one sounds like a dictionary

5    definition, and the other sounds like how you then prove it up.

6    All right?  You prove it up because somebody had X, Y, Z.

7              But what you are saying is in order to -- maybe you're

8    simply divining suicide by cop in this study, by the events that

9    have been ticked off.  The evidence.

10             **THE WITNESS:**  Okay.  You are making an absolutely

11   excellent point, and I really appreciate your clarification,

12   because I think I under -- I think I misunderstood what you

13   meant, and I now understand.

14             Okay.  I think most psychiatrists would call these

15   four factors selection criteria, and not definition.

16             **THE COURT:**  Right, but I thought you called it a

17   definition.  I missed your testimony, then.  You're calling it

18   selection criteria.

19             **THE WITNESS:**  Correct, correct.

20             **THE COURT:**  Okay.

21             **THE WITNESS:**  Yeah.  I think I was using "definition"

22   in a very loose, loose way.  So I will call it "selection

23   criteria."

24             **THE COURT:**  That's what threw me off.  It may be that

25   you just used the used the word to define selection criteria, or

1    something like that, and that caused me to think that this was

2    one of the different definitions.  Because earlier, you had said

3    there's different definitions for SBC.  I was going to come back

4    and ask you what those were.  And, I understood you to be giving

5    me one.  But actually, they're taking -- were they taking the

6    POST definition, and then using this selection criteria?

7            THE WITNESS:  No.  This paper predated the POST

8    definitions.

9            THE COURT:  Okay.  So they're just -- they are taking

10    this evidence.  All right.  If it's present, then somebody got

11    into the study as being someone who had committed essentially

12    what you're calling suicide by cop, all right.

13            And now they are going to look at the factors that led

14    up to it?  Or what?

15            THE WITNESS:  They looked at a variety of different

16    factors in the study.  They looked at --

17            THE COURT:  For what purpose?  They have already now

18    defined the group.

19            THE WITNESS:  Right.

20            THE COURT:  So, for what purpose were they looking at

21    the factors?

22            THE WITNESS:  Their purpose was to -- I think all of

23    our purposes, who study this area, is to see whether or not we

24    can identify anything that will help family members, community

25    members, clinicians, and law enforcement officers to identify

1    these potential cases earlier --

2              THE COURT:  Before the event.

3              THE WITNESS:  Correct.  And to offer assistance to

4    those different parties about how they might manage them, across

5    that spectrum, from families to friends to clinicians to law

6    enforcement officers.

7              THE COURT:  Well, what I would like to do is take the

8    criteria -- are these selection criteria that you accept as

9    valid selection criteria to put someone in the suicide by cop

10   category?

11             THE WITNESS:  I think that -- I think that if somebody

12   meets those four criteria, that they are almost certainly a

13   suicide by cop.  I don't know that I would have chosen those

14   exact selection criteria.

15             THE COURT:  Okay.  Well, this really -- and why I'm

16   focusing on this is the crux of the question I have with respect

17   to our case.

18             In other words, you've set out criteria, evidence of

19   suicidal intent.  And I assume that is either -- something that

20   is separate and distinct from the event, itself?  Or not?

21             THE WITNESS:  It can be.  And different researchers

22   will approach that differently.  Some will look at the presence

23   of risk factors for suicide outside of the event.

24             THE COURT:  But we're talking about suicidal intent,

25   like one could be a note that somebody found later.  It could be

1    that in counseling, somebody said "I really feel like I want to

2    kill myself," or something like that.

3              THE WITNESS:  Absolutely.  But many people who suicide

4    don't make direct expressions.  So you also have to be aware of

5    risk factors that are present.

6              THE COURT:  Yeah, but we are talking evidence.

7    Evidence of suicidal intent.

8              THE WITNESS:  Risk factors are evidence.

9              THE COURT:  Okay.  That's one.  Two is evidence that

10   they specifically wanted the officer to shoot them.

11             THE WITNESS:  Correct.

12             THE COURT:  Three, the person had a lethal weapon, or

13   appeared to have one.

14             THE WITNESS:  Uh-huh.

15             THE COURT:  And four, that they intentionally

16   escalated the encounter.  My question is if you take those

17   factors, you apply them to what you know about our case, do they

18   match up?

19             THE WITNESS:  My opinion, they do.

20             THE COURT:  All right.  That's what I want to hear

21   about.  Because at first blush, it doesn't seem like that to me.

22             MR. WIENER:  All right.  Shall I get directly to that,

23   Your Honor?

24             THE COURT:  Start with that, and then go back if you

25   need to.  I'm not saying they are all missing, but at least at

1    first blush it doesn't look like we have evidence of suicidal

2    intent, that the person specifically wanted the person to -- the

3    officers to shoot them -- well, you have the reaching, possibly,

4    and the intentional escalation, maybe, so those are the things

5    that I would like to see if they -- how the witness matches

6    those.

7              **MR. WIENER:**  Sure.

8              **THE COURT:**  Because otherwise we are starting to stray

9    from what appears to be at least a legitimate definition of

10   suicide by cop.

11             **MR. WIENER:**  Okay.

12   **BY MR. WIENER:**

13   **Q**    Dr. Keram, let's focus on those four elements.  Let's start

14   with the first one, evidence of suicidal intent.

15        Now, you indicated before that that can be -- that kind of

16   evidence can be taken from things that happened before.

17   **A**    Correct.

18   **Q**    Can you infer or gather evidence of suicidal intent from

19   the actions of the person at issue during the encounter with the

20   police?

21   **A**    Yes.  But I believe they actually started earlier than that

22   particular encounter.

23   **Q**    Okay.  In this case, but as a general matter, can you infer

24   that intent, as a scientist, from the actual encounter with the

25   police?

1   **A**     Yes.

2   **Q**     Do you believe, based on your review of the record in this

3   case, that Cammerin Boyd met this first criteria, evidence of

4   suicidal intent?

5   **A**     Yes.

6   **Q**     Can you please explain why you believe that.

7                      (Witness examines document)

8   **A**     I tend to think chronologically.  The combination of his

9   behavior in the manner in which he came to law enforcement

10  attention, and then firing twice at law enforcement officers is

11  indicative of suicidal intent.  The statement that he made at

12  the scene that were heard both by -- I believe it was Officer

13  Elieff and the witness named Campos, where he said "You can just

14  shoot me now" or something to that effect is evidence of

15  suicidal intent.

16       His behavior in being noncompliant with law enforcement

17  commands while law enforcement officers had their weapons drawn

18  and pointed at him, and were shouting commands at him, that

19  non-compliance is evidence of suicidal intent.  And then, his

20  actions in reaching into the car, not once but twice, are also

21  evidence of suicidal intent.  And I want to emphasize that my

22  basis for saying that those things are evidence of suicidal

23  intent is based on my review of forensic cases that had been

24  referred to me, and other reviews of other cases that were

25  suicide by cops.

1   **Q**    And how about the Oakland incident from three days before?

2   Did that give any indication of suicidal intent?

3   **A**    Yes, it did.  At that incident, he also told law

4   enforcement officers to shoot him.

5          **THE COURT:**  Just so I can clarify, when did Mr. Boyd,

6   according to the police, tell the San Francisco officers that

7   they could shoot him?  When did that occur?

8          **MR. WIENER:**  It was when he first arrived on Larch

9   Way, if I'm not mistaken.   Mr. Loebs can --

10          **MR. LOEBS:**  It was while he was in Larch Way, after he

11   was out -- according to Joe Campos, who had a view from the

12   third floor, he heard Mr. Boyd say that -- "You can shoot me,

13   shoot me if you want" or something -- I don't have the quote

14   right here.  And Officer Elieff heard a similar comment.

15          **THE COURT:**  While he had his hands up?

16          **MR. LOEBS:**  Right now I can't recall whether he -- the

17   testimony is that he had his hands up at the time.  His hands

18   were up and down a few times during the interaction.

19          I can't recall whether it was while he had his hands

20   up.

21          **THE COURT:**  I actually don't remember that part about

22   him -- I remember the Oakland incident, and the challenge,

23   essentially, described in that event.

24          I didn't remember that there was one in the

25   San Francisco -- there may well have been, I'm not suggesting

1    there wasn't.  I was just asking if someone to refresh my memory

2    about when it happened, because I don't have that really clear.

3              MR. LOEBS:  I'm, you know, 100-percent confident that

4    Joe Campos, the fact witness in this case, had testified in both

5    his interview with the police and in his deposition testimony,

6    that Mr. Boyd said that during this incident, on Larch Way.

7              THE WITNESS:  And, may I say something about that,

8    Your Honor?

9              THE COURT:  Sure.  Oh, sure.

10             THE WITNESS:  You know, obviously, when an expert is

11   looking at evidence, you have to consider, you know, the source

12   of the evidence, and try to weigh it for credibility as best you

13   can.  But what I found to be interesting about the report, the

14   two reports that Mr. Boyd made, statements asking the officers

15   to shoot him, on Larch Way, was that they came from two

16   witnesses who were very far apart, distance-wise.

17             Mr. Campos was in his home, and I believe, on the

18   third floor, looking down.  Mr. Loebs, you can correct me if I'm

19   wrong.  And he had -- he had a full view of Mr. Boyd.  And he

20   could --

21             THE COURT:  We're not going to deal with credibility.

22             THE WITNESS:  Okay.  That's fine, Your Honor.

23             THE COURT:  I don't think it's really even for the

24   expert to necessarily do that.

25             THE WITNESS:  Absolutely.

1      **THE COURT:**  You would get a hypothetical, or be given

2      the facts.  Ultimately, if you testify in the trial, you really

3      won't be able to rely on what was in the depositions.  It's

4      going to be what the witness came out with in court.  Because

5      that's all the jury is going to have.  And then, that's what you

6      would base your opinion on.  But, you have to review somewhere,

7      and prepare somewhere, and that's the purpose of looking at a

8      deposition.

9          Okay.  As I understand it, you've got "You can shoot

10     me now," that was said at the time.  And then you have the

11     comments made to the Oakland officer, whatever was said.  I

12     forget exactly whatever was said.

13     **MR. WIENER:**  "Go ahead and" -- demanding that they

14     shoot him.

15     **THE COURT:**  Yeah.  All right.  But I do want to make

16     clear that I am not prepared to simply accept that you can take

17     all the facts in an event, start extrapolating from those facts,

18     and then say that's evidence.

19         What I understand is they're using what would be --

20     maybe I'm wrong.  If you start saying evidence is anything from

21     which you can infer a suicidal intent, then that isn't really

22     the same as saying direct evidence of suicidal intent, which

23     could be a note, an expression of wanting to take one's own

24     life, or something of that nature.

25         If the study used this broader definition, then I

1    would like to know if that's typical of studies, because

2    ultimately what we're going to determine is whether this is some

3    idiosyncratic view, or whether it's something that is used

4    regularly in the psychiatric community.

5              So, if -- maybe we could go back to suicidal intent

6    in -- in any of the others, and just determine what other

7    studies have felt would be evidence of suicidal intent,

8    generally.

9              **MR. WIENER:**  All right.  Well, and perhaps Dr. Keram

10   can address the distinction that the Court just made.

11   **BY MR. WIENER:**

12   **Q**    If -- if you understand that?

13   **A**    I don't -- I don't --  I don't want to seem like a

14   sycophant, but I very much appreciate your -- your questioning,

15   because it's the exact same process that I went through over the

16   years of learning about this phenomena.

17              **THE COURT:**  Okay.

18              **THE WITNESS:**  So, let me just go through each study,

19   and tell you.

20              **THE COURT:**  All right.

21              **THE WITNESS:**  In this particular study I was

22   mentioning to you, the Hutson study, there's a table that's

23   labeled "Evidence that Suicidal Individuals Specifically Wanted

24   Law Enforcement Officers to Shoot Them During the Suicide by Cop

25   phenomena."  And of course --

1          **THE COURT:**  Wait a minute.  That's number two.  Right?

2          In other words, number two is evidence they

3   specifically wanted the officer to shoot them.  That could be a

4   declaration, "Shoot me, shoot me."  All right.  That would be

5   one, which you, I guess, have here, in our case as described.

6          But how about number one?  The evidence of suicidal

7   intent.  What --

8          **THE WITNESS:**  Okay.  I'm sorry.

9          **THE COURT:**  What was the study used for that?

10          **THE WITNESS:**  Okay.  In the Results section, that's

11   described.  It says (As read), "Evidence of suicidal intent for

12   all suicide-by-cop individuals consisted of verbal communication

13   to family or friends in 65 percent of cases, in exhibiting

14   suicidal characteristics or behavior in 43.5 percent of cases,

15   verbal communication to officers in 27.1 percent of cases, and

16   written communication in 4.3 percent of the cases.  All cases

17   demonstrated suicidal intent by one or more of the above-listed

18   methods."

19          **THE COURT:**  Give any examples?

20          **THE WITNESS:**  Pardon me?

21          **THE COURT:**  Do they give any examples?

22          **THE WITNESS:**  Not -- not -- I don't -- you know, I'd

23   have to go through this paper.  This was not a case report --

24   you know, it's not going to be a case report where --

25          **THE COURT:**  I'm not even thinking about this one

1    study, alone.

2              **THE WITNESS:**  Uh-huh.

3              **THE COURT:**  I'm thinking more in terms of -- maybe I

4    could just ask you, are the factors that were used in the Los

5    Angeles Sheriff's Office population here, are those

6    traditionally used by psychiatrists in identifying whether

7    someone did commit suicide by cop?

8              **THE WITNESS:**  Yes.

9              **THE COURT:**  Okay.  And, in using those factors, is

10   there some commonly-accepted group of behaviors that would

11   constitute, quote-unquote, evidence of suicidal intent?

12             In other words, we know this -- this study, in kind of

13   a broad definition, used verbal communication.  In other words,

14   what somebody said to family or friend.  We don't know exactly

15   what that would be.  And also, to the officers, we don't know

16   exactly what that might be.  But, something.

17             And then, behavior exhibiting suicidal

18   characteristics, we don't quite know what that would be, either.

19   I mean, it's a very broad category.

20             **THE WITNESS:**  Yes.

21             **THE COURT:**  So, I'm just wondering, are there any

22   commonly-accepted behaviors within that broad --

23             **THE WITNESS:**  Yes.  I'll refer to a second study that

24   does have case reports in it.

25             **THE COURT:**  Okay.  Okay.

1          **THE WITNESS:**  This is a study that was authored by

2     Kris Mohandie and Reid Meloy, that was published in 2000, called

3     "Clinical and Forensic Indicators of Suicide by Cop."

4          The first case that they report is a suspect who had

5     killed his girlfriend several days prior to returning to his

6     former workplace, and shooting a co-worker.  He had made it

7     known in conversations with witnesses that he would, quote, "Not

8     go back to jail," end quote.

9          I -- researchers in the area of suicide by cop accept

10    expressions that the person will not go back to jail or prison

11    as evidence of suicidal intent, as this paper reflects.

12          **THE COURT:**  Is that typical?

13          **THE WITNESS:**  It's actually a fairly common finding,

14    that the person will either express it directly, or will be

15    facing a -- a lengthy sentence.

16          And in fact, the researchers who work in California

17    have specifically commented on the increasing percentage of

18    suicide-by-cop cases over time, and wondering if the passage of

19    the three-strikes law, which seems to parallel that development,

20    is a factor in that development.  And, that's specifically

21    mentioned in the literature.

22          **THE COURT:**  So, evidence of suicidal intent, it seems

23    to me, wouldn't be limited to suicide by cop.  In other words,

24    psychiatrists generally are looking at evidence of suicidal

25    intent.

1              **THE WITNESS:**  Absolutely.  The first question that

2       anybody worth their salt who is referred this type of case for

3       analysis looks at is, was this person suicidal?  And if they're

4       not, then it's not going to be a suicide by cop.

5              In fact, I was just referred a case last month where

6       that was the referral question, and the decedent didn't clear

7       that first threshold, given the material I had.  And I -- you

8       know, it was my opinion to the -- to the defense attorney.

9              But, --

10             **THE COURT:**  Okay.  So, I think what you are saying, if

11      I understand, then, is from a medical standpoint -- and assuming

12      the researchers in the L.A. study were coming at it from a

13      medical standpoint, and I gather that they were --

14             **THE WITNESS:**  They were.  Yes.

15             **THE COURT:**  All right.  That what a medical doctor

16      might deem, quote-unquote, evidence of suicidal intent, might be

17      a broader set of behaviors than what a layperson, simply looking

18      at overt behavior, might think was evidence of suicidal intent.

19             **THE WITNESS:**  Correct.

20             **THE COURT:**  The layperson might mean something more

21      direct than what a medical doctor might consider, quote-unquote,

22      evidence of suicidal intent.  Is that fair to say?

23             **THE WITNESS:**  It's absolutely fair to say.

24             **THE COURT:**  All right.

25             **THE WITNESS:**  In addition, it's not just laypeople,

1     but police officers as well.

2                    **THE COURT:**  Yeah.  Well, they're laypeople.

3                    **THE WITNESS:**  Okay.  Non-medical people.  Okay.

4                    **THE COURT:**  I'm distinguishing doctors from other

5     people.

6                    **THE WITNESS:**  Right.

7                    **THE COURT:**  We'll just put it that way.  All right.

8                    **THE WITNESS:**  Right.  So for example, things that

9     might catch my eye in reviewing a case, you know, somebody else

10    might just pass right over.  Yeah.

11                   **THE COURT:**  Okay.  So, when I say "layperson," I'm

12    distinguishing a doctor -- and in particular a psychiatrist, a

13    psychologist trained in the area -- from other people who don't

14    have that training.

15                   So, it may be that when doctors -- not just yourself,

16    personally, but psychiatrists -- see a certain set of behaviors,

17    that they may draw an unreasonably medical inference that this

18    person is suicidal, that a person not trained in the field would

19    not draw.

20                   **THE WITNESS:**  Correct.  And that was absolutely

21    evident in Mr. Boyd's case.

22                   **THE COURT:**  All right.  So, then, you might then --

23    have we covered the factors that you feel are evidencing of

24    suicidal intent?

25                   We have the -- well, we have the firing at the

1   officers.  That does seem to overlap somewhat with escalating

2   the encounter.

3          **THE WITNESS:**  Yes.  It is.  But -- but because

4   escalating the encounter is in the service of the eventual

5   suicide.

6          **THE COURT:**  They're not mutually exclusive.

7          **THE WITNESS:**  No.  Not at all.

8          **THE COURT:**  So you can double-count, I gather.

9          All right.  Keep going.

10  **BY MR. WIENER:**

11  **Q**   And then, I think we've covered specific desire to be shot

12  or -- is there anything -- or, can you just describe why you

13  believe that he had a -- he exhibited a specific desire to be

14  shot?

15  **A**   Let me just back up and finish up the evidence of suicidal

16  intent.

17  **Q**   Oh.  Sorry.

18  **A**   Because it's not just a set of beha- -- you asked me about

19  the incident.

20  **Q**   Yes.

21  **A**    It's not just a set of behaviors.  It's also looking for

22  risk factors.

23         Mr. Boyd -- Mr. Boyd's risk factors -- I'm assuming, as a

24  basis for this opinion, that he was looking at a lengthy prison

25  term.  And that is a recognized risk factor for suicidal intent.

1    Not only in suicide-by-cop cases, but in other cases, as well.

2        In addition, he had just passed a very significant

3    anniversary.  The loss of his legs occurred at the end of April

4    in 1993 or -- yeah, April of 1993.  It was approximately

5    April 20th or 23rd.  And he had the incident in Oakland on

6    May 2nd, and then in San Francisco on May 5th.

7        And, a psychiatrist really can't ignore that fact, because

8    anniversaries of trauma of that magnitude are known to bring up

9    all of the issues that the individual has experienced since that

10   time.  And we can see that Mr. Boyd's trajectory in his life

11   really came -- took a completely different direction after that

12   loss.

13       So that's -- that loss, even though it occurred eleven

14   years earlier, is felt more keenly around anniversary times.

15           **THE COURT:**  Well, I know that people certainly are

16   aware of certain anniversaries, of deaths, for example, and

17   families and things of that nature.

18           Do they actually have in their mind, either

19   consciously or subconsciously, this idea of an annual event,

20   or -- each year?

21           **THE WITNESS:**  Yes.

22           **THE COURT:**  Going back to when they suffered some

23   other problem?

24           **THE WITNESS:**  Absolutely.  Your Honor, it is almost a

25   daily event for me, in my clinic with the Vietnam veterans,

1    where they will tell me something like, "I'm coming up to my bad

2    time of year."  And they'll note that -- they'll need an

3    increase of sleeping medication or something for agitation, or

4    that we'll spend a lot more time talking about survivor's guilt,

5    or if they've lost a limb or -- or more than one limb, that

6    we'll be talking more about that, at that time.

7              THE COURT:  Is the bad time of year triggered, then,

8    by an event that occurred at about that time of year, although

9    many years earlier?

10             THE WITNESS:  Yes.

11             THE COURT:  But, some terrible thing that happened to

12    them.

13             THE WITNESS:  Yes, yes.

14             THE COURT:  Or someone close to them.

15             THE WITNESS:  Absolutely.  So, for a substantial

16   proportion of my Vietnam vets, it's around the Tet Offensive,

17   which we usually think of as, you know, 1968.  But the fact is

18   there was a Tet every year.  So it's not just the people who

19   were in country that year.

20             And now, actually, I'm seeing it in my Iraq vets, and,

21   well, where I had a guy, a Marine sniper who was in the Battle

22   of Fallujah -- the November battle.  And that one -- there were

23   several Battles of Fallujah.

24             On the anniversary of that, he got extremely agitated,

25   irritable, had insomnia, was very depressed, and became

1    suicidal.  Had no idea why.  Had no idea why.  And, I put it

2    together for him, and he sort of deflated the anxiety.

3             THE COURT:  All right.  So this, again, is a

4    recognized phenomenon.

5             THE WITNESS:  Yes.  Absolutely.  It's written about in

6    trauma literature.

7             THE COURT:  All right.  I think you were -- she was

8    adding to any other factors that -- or evidence of suicidal

9    intent.  Were there any others that you --

10            THE WITNESS:  No, not that I can think of right now.

11            THE COURT:  Okay, all right.

12   BY MR. WIENER:

13   Q    Let's move on to the specific desire to be shot, and I

14   know we might have covered this, to an extent.

15        Can you describe your bases for believing that Mr. Boyd,

16   based on what you reviewed, met that criteria?

17   A    Okay.  This may be an example where some of his behaviors

18   are going to catch my eye in a way that may not catch a

19   layperson's eye.

20        The fact that he engaged in behavior that appeared to be

21   directed toward the goal of taking a hostage is very significant

22   to somebody working in suicide by cop.  The fact that he shot at

23   officers during -- well, the fact that he initiated a pursuit

24   and then shot at officers during the pursuit is evidence that he

25   wanted officers to shoot them, as is his behavior on Larch Way.

1          Coming to a stop, then moving towards Officer -- Moody, I

2    believe it was.  I'm sorry, was it -- it was one of the officers

3    coming from Laguna -- O'Malley.  I'm sorry, it was Officer

4    O'Malley.  The fact that he was noncompliant with commands, with

5    law enforcement commands while they had their weapons pointed at

6    him.

7          Then the behavior that he exhibited in moving for his

8    waistband is something that's mentioned in the suicide-by-cop

9    literature as an attempt to draw fire, as well as the apparent

10   attempts to take something from the car, and repeated attempts,

11   when it doesn't work -- if you accept my hypothesis that he's

12   trying to draw fire, you know, the repeated efforts with an

13   escalating level of urgency or intent.

14         And, I've seen that in other cases of suicide by cop, as

15   well.  And that's a reason why that particular behavior would

16   grab my eye.  And I can explain, for each one of those, why I

17   think that that's evidence that he wanted the officers to shoot

18   them -- to shoot him.

19             **THE COURT:**  Why don't we look at

20   the appear-to-be-taking-a-hostage one, which is more unique, and

21   the repeated reaching toward the car.

22             **THE WITNESS:**  May I ask you a question, Your Honor?

23             **THE COURT:**  Uh-huh.

24             **THE WITNESS:**  Why do you say it's more unique?

25             **THE COURT:**  Well, appearing to take a hostage, as

1    opposed to just wanting to kidnap someone.  In other words,

2    you've drawn the conclusion, really he didn't want to take this

3    woman, he was doing it for some reason -- ulterior reason, as I

4    gather.

5            In other words, there are people who take people, and

6    then they get them, and they either take their money or they

7    commit sexual offenses, or they do something that that person

8    wouldn't have wanted them to do if they weren't being threatened

9    with a weapon.  And it isn't because they want to get killed by

10   a police officer; they actually want to do whatever they are

11   doing, for whatever odd reason.

12           Here, the idea is that although he purported to be

13   trying to kidnap a woman, he really wasn't -- that wasn't really

14   what he wanted to do, in the sense that he didn't really want to

15   get her and do something with her of the traditional criminal --

16           **THE WITNESS:**  I see what you are saying.

17           **THE COURT:**  All right.

18           **THE WITNESS:**  Yes.

19           **THE COURT:**  And also you called her a hostage, as opp-

20   -- which I ordinarily think of as a bargaining chip, as opposed

21   to just a victim.  Okay.  So, it was those two things.

22           **MR. WIENER:**  Your Honor, if I may, I had a different

23   understanding of what Dr. Keram may have meant by saying

24   "appearing to" --

25           **THE COURT:**  "Take a hostage"?

1          MR. WIENER:  I don't know, maybe she can clarify what

2     she meant by saying "appearing to take a hostage."

3          THE COURT:  Sure.

4          THE WITNESS:  I just wanted to be very clear that I

5     don't have a crystal ball, and so, I'm looking at a variety of

6     explanations for the behavior that he engaged in around that

7     incident.  And we can also talk about the Tiffany Williams

8     incident as well.

9          So, what I'm doing is looking at a variety of

10    different explanations, but I can't tell you for sure which one

11    best -- well, I can tell my opinion about which one best

12    represents his intent, but I can't tell you with certainty which

13    one really does represent his intent.  And that's why I say

14    "appearing."

15         THE COURT:  Okay.  In testing whatever opinion would

16    be given by Dr. Keram, the Court is looking, as I said, not

17    simply at what her own personal view is, but whether that view

18    is arrived at by way of an analysis that is shared by someone

19    other than just herself.  All right.  And traditionally, some

20    number of recognized people in the field.

21         THE WITNESS:  Yes.

22         THE COURT:  So, if -- if there are a number of

23    behaviors -- and some of them are classic, and you want to say

24    those are classic, and then you want to say the others are

25    perhaps less often talked about, or you have drawn some

1   conclusion based on extrapolating from something else, that's

2   fine, too, but these are what you have described as evidence of

3   -- I think we're on No. 2.

4           **THE WITNESS:**  Yes.

5           **THE COURT:**  Just, simply wanted the officers to shoot

6   him.

7           **THE WITNESS:**  Yes.

8           **THE COURT:**  Right.  Okay.  And some of the things

9   were, he said, "Shoot me."  That seemed pretty good.

10          **THE WITNESS:**  Uh-huh.

11          **THE COURT:**  And then, you have some behaviors that

12  are, let's say, contested, but if in fact the jury finds that

13  they occurred, such as that he stopped in the car and then moved

14  again toward Officer O'Malley, you would describe that, I

15  gather, as provocative in some way.

16          Maybe he just wanted to get out of there.  We don't

17  know, exactly.  It might not be as strong evidence as, you know,

18  "Shoot me, shoot me."

19          Then you have moving towards his waistband.  That

20  would seem, again, provocative.  You had appearing to go for an

21  object in the car, and then trying it more than once when it

22  didn't work.  And I thought that was something I might want to

23  hear a little more about.

24          **THE WITNESS:**  Uh-huh.

25          **THE COURT:**  And the first one which struck me was

1    appearing to take a hostage.

2              THE WITNESS:  Okay.  Let me tell you what the

3    literature says, and let me tell you how I think Mr. Boyd fits

4    in.

5              THE COURT:  Great.

6              THE WITNESS:  The liter- -- what we know is that law

7    enforcement contacts that involve a hostage situation have a

8    higher degree of likelihood of ending in a fatality than those

9    that don't.

10             Okay.  What we saw on the second -- well, let me just

11   say what the literature says.  Okay?

12             THE COURT:  Okay.

13             THE WITNESS:  Suicide-by-cops scenarios frequently

14   arise in situations in when there's either a domestic-violence

15   call, or a hostage situation, or a hostage/barricade situation.

16   So -- those are recognized phenomena in the suicide-by-cop

17   literature.

18             THE COURT:  Does this come up on the spur of the

19   moment?  Or does somebody get a whole plan together to do this?

20             THE WITNESS:  It completely depends on the individual.

21   And, that's such a good question.  I can tell you sort of how

22   have I think about the categories, and how I do my training on

23   the different categories of when intent develops.  But we can --

24             THE COURT:  Like we also, like Dog Day Afternoon,

25   something where someone -- a movie or somebody gets --

1          THE WITNESS:  Yes, yes.

2          THE COURT:  -- essentially has no choices, but they

3     didn't plan it that way.  They planned to have a successful

4     robbery.  It went wrong.  And then it's a question of what do

5     you do at that point?

6          THE WITNESS:  Absolutely.

7          THE COURT:  And that's different than a plan laid out

8     well in advance, to fail.

9          THE WITNESS:  Right.

10          THE COURT:  In a hostage situation.

11          THE WITNESS:  Right, exactly.  And I believe the -- if

12     you accept --

13          THE COURT:  By the way, Mr. Wiener is too young, you

14     may well be, too --

15          THE WITNESS:  No, no, no, I'm not, I --

16          THE COURT:  -- to know about the movie unless he's a

17     movie buff, but anyway, it's Al Pacino.

18          THE WITNESS:  This is -- this is my Preference,

19     Preference hiding my true age here.  I definitely remember that

20     movie, yeah.  And actually, I remember the incident.  I grew up

21     in New York.

22          THE COURT:  Oh, okay.

23          THE WITNESS:  That was pretty exciting.

24                    (Off-the-Record discussion)

25          THE WITNESS:  Okay.  The original question has to do

1    with two --

2              THE COURT:  The court reporter is reciting lines from

3    the movie.  (Laughter)

4              THE WITNESS:  Okay.  The question is whether or not

5    the presence of taking a hostage -- the action of taking a

6    hostage or a law enforcement officers arriving on the scene

7    after a hostage is taken is a known risk factor for

8    suicide-by-cop cases, and the answer is yes.

9              And it's evidence of suicidal intent, because of the

10   high degree of lethality in hostage-taking situations.

11   Because -- you said bargaining chip.  And unfortunately, here

12   the bargain is a different -- a different negotiation.  It's not

13   "Let me go and give me the million dollars and the plane to

14   Algeria," it's "Kill me."  You know.  And so, the behavior

15   towards the hostage is frequently different, if there is a

16   successful hostage-taking.

17             Now, here is why this particular behavior on

18   Mr. Boyd's part caught my eye.  He had an unsuccessful -- he had

19   several unsuccessful attempts on May 2nd, in initiating a law

20   enforcement pursuit.

21             He -- he twice drove in an area that was heavily

22   populated, so you would expect that the police -- and there was

23   a large police presence there, as well, because it was a Cinco

24   de Mayo festival, at the end of a Cinco de Mayo festival, so a

25   large crowd dispersing, heavy police presence.

1           And he initiated a high-speed pursuit in that context,

2    which the police broke off because he was going 75 to 80 miles

3    an hour, they estimated.  After they broke off that first

4    pursuit, somewhere -- and officers' estimates are a little bit

5    different, but some are between nine and 12 minutes later, he

6    comes back to close to that original area, and exhibits the

7    exact same behavior.  A pursuit is again initiated.

8           **THE COURT:**  Right.

9           **THE WITNESS:**  And again broken off.  And then he comes

10   back a third time, and they are able to stop him from leaving.

11          What he has learned -- what I infer that he has

12   learned in that situation, is "Crowd isn't good enough."  Okay.

13   Than -- the reason the hostage is significant to me is that --

14          **THE COURT:**  Is it they won't give up the chase if

15   there's somebody else in the car?

16          **THE WITNESS:**  That's -- that's my thought, or that if

17   he demonstrates that he's willing to take a hostage -- you know,

18   he's not successful either with Tiffany Williams or Tanika

19   Hogan, in getting them into the car.  But he has demonstrated a

20   willingness to take a hostage at gunpoint.

21          And that -- that puts something into the mind of a

22   police officer, that it wouldn't put into the mind of an

23   ordinary citizen.

24          **THE COURT:**  In this particular instance, though, there

25   -- he doesn't grab a person in the immediate presence of the

```
 1   police.

 2              THE WITNESS:  Correct.

 3              THE COURT:  And so, how would he anticipate, if you

 4   will, that he would come to the attention of the police, if he

 5   simply grabs someone and put them in the car, and then drove

 6   around with a gun pointed at them so they wouldn't jump out, or

 7   scream, or do anything to call attention to the police.

 8              THE WITNESS:  Yeah.  Yeah.  Well, you're asking a

 9   hypothetical.  And, you know, I could tell you what my opinion

10   about it is.

11              THE COURT:  Are you saying that he never intended to

12   get the person in the car at all?

13              THE WITNESS:  Its possible.

14              THE COURT:  Well, of course, anything's possible.

15              THE WITNESS:  Yes, yes.

16              THE COURT:  You know, we are dealing here with -- I

17   guess what you are saying is that hostage taking is a recognized

18   concept in suicide by cop.

19              THE WITNESS:  Correct.  It's a recognized risk factor

20   of suicidal intent, of wanting the officers to shoot you.

21              THE COURT:  All right.

22              THE WITNESS:  And so he is demonstrating at least two

23   behaviors that indicate to the police that he's dangerous,

24   violent, may involve other people, and will shoot at them as

25   well.  So, he's putting into the minds of an officer what he may
```

1    not be putting into the mind of a citizen who is witnessing

2    this.

3             **THE COURT:**  Yeah, if an officer were there.  But there

4    isn't any officer there.

5             **THE WITNESS:**  They don't have to be there.  They get

6    it on the radio.

7             **THE COURT:**  If somebody calls them.

8             **THE WITNESS:**  Well, Ms. Hogan did.

9             **THE COURT:**  Yes.  So, she did call, because he didn't

10   actually take her --

11            **THE WITNESS:**  Right --

12            **THE COURT:**  -- as a hostage.

13            **THE WITNESS:**  Yes, of course.

14            **THE COURT:**  Now there's nobody in the car, there's

15   nobody to use as a bargaining chip.

16            **THE WITNESS:**  Right.

17            **THE COURT:**  There's just somebody driving around at

18   high speed again, which was his failed attempt in Oakland.

19            **THE WITNESS:**  Uh-huh.  Well, he may have been

20   thinking -- I mean, it's certainly possible that he was thinking

21   that it was better to scare her and then let her go, so she

22   could go call the police.

23            **THE COURT:**  To make him look more dangerous than he

24   looked earlier, as just a bad driver?

25            **THE WITNESS:**  Yes.

1          **THE COURT:**  Okay.  All right.  So, it really wouldn't

2     be a typical hostage, exactly, situation, but --

3          **THE WITNESS:**  But not atypical for a suicide-by-cop

4     scenario.

5          **MR. WIENER:**  Atypical?

6          **THE WITNESS:**  Right.  Not atypical.

7          **THE COURT:**  Right.  Because we can all hypothesize,

8     without being doctors, what was going on in this person's mind.

9          **THE WITNESS:**  Yes.

10          **THE COURT:**  And think of all manner of scenarios, and

11     probably write a few movie scripts, ourselves, in the process.

12     So the question is really whether -- whatever your inferences

13     are from his behavior, whether these are inferences that would

14     be drawn in some routine or recognized way --

15          **THE WITNESS:**  Yeah.

16          **THE COURT:**  -- by the doctors, and maybe this one

17     doesn't fit tightly in that picture --

18          **THE WITNESS:**  I think other doctors would note that,

19     and would note the importance of the attempt at taking a

20     hostage.  Whether it was goal-directed or -- regardless of what

21     the goal was.

22          I'm not sure that a citizen would have the same

23     attachment to it that a researcher would.

24          **THE COURT:**  No, I don't think they would.

25          **THE WITNESS:**  Yeah, yeah.

1          **THE COURT:**  Okay.  How about this appearing to take

2     the objects?  How did that play in to your --

3          **THE WITNESS:**  Well, I mean, obviously he shot at the

4     officers twice during the pursuit.  And then, he went for his

5     waistband, which is another behavior that is described in the

6     suicide by cop.

7          **THE COURT:**  When was that -- if I could ask

8     Mr. Wiener, in the encounter does he go for his waistband?

9          **MR. LOEBS:**  There was a witness observation of him

10    reaching in that area when he was outside of the car.

11         **THE COURT:**  Before the hands went up?  Or --

12         **MR. WIENER:**  I think it was after they went down the

13    first time.

14         **MR. LOEBS:**  I think, Your Honor, there's different

15    testimony.  There's many witnesses.

16         **THE COURT:**  Exactly.

17         **MR. LOEBS:**  One police officer says he saw his hands

18    go down to his waistband at some point.

19         **THE COURT:**  But he doesn't --

20         **MR. LOEBS:**  -- taking off his shirt, which is a motion

21    down to the waistband as well.  When the officers were pointing

22    their guns at him, and saying, "Keep your hands in the air, get

23    on the ground," he was doing other things which was not

24    compliant with that.

25         **THE COURT:**  Okay.  Okay.  All right.

1          **THE WITNESS:**  May I have some more water, please?

2          **THE COURT:**  Yeah.  Mr. Loebs, you're apparently in

3    charge of the water here.  Thank you.  We usually have a

4    pitcher, but again, this is a temporary courtroom we're using.

5          Okay.  Do you want to go to some of the other ones,

6    then?  You were on Two.  We know he had a gun, so Three is --

7          **MR. WIENER:**  And Your Honor, can I just follow up

8    about the hostage issue?

9          **THE COURT:**  Yes, yes.

10   **BY MR. WIENER**

11   **Q**    In terms -- as recognized in the literature, and amongst

12   psychiatrists, what is the precise purpose of hostage-taking or

13   attempted hostage-taking in terms of precipitating a suicide by

14   cop?

15        In other words, what is, at least as recognized in the

16   literature, the linkage between doing that?

17   **A**    Several-fold.  The links are coming to police attention.

18   That -- that's often, you know, the way the call starts.  And

19   then, threatening the hostage as the means of creating the

20   impression of imminent lethal threat to a citizen, that

21   precipitates the use of lethal force by law enforcement.

22   **Q**    And does a failed hostage-taking, whether it's

23   intentionally failed or unintentionally failed, can that lead to

24   the result of coming to police attention?

25   **A**    Yes.  So can a hostage fleeing.

1   Q    And, the Tiffany -- the attempted kidnapping of Tiffany

2   Williams --

3   A    Excuse me.  I'm free-associating to another case that I was

4   involved in.

5   Q    Yeah.

6   A    We had a shooting in Sonoma County, I think it was in 2000,

7   in about April of 2000.  The -- the jurisdiction was in the

8   Sonoma County Sheriff's Office.  The 911 call was a woman

9   calling from her home, and saying that she was being held

10  hostage in her home by a knife-wielding assailant.  The -- the

11  Sheriff's Deputies went over there.

12       And, a series of events occurred that led them to enter the

13  home, to break down the door and enter the home.  They were met

14  by a woman coming at them holding a knife in a knife-pick

15  fashion (sic) and they shot and killed her (Indicating).  That

16  woman was the person who made the 911 call.

17       So, the notion of creating in law enforcement's mind that

18  there's a hostage is a known way of bringing yourself to

19  law-enforcement attention.

20       And, one other fact about that particular case that was

21  very interesting.  I didn't -- I didn't enter that case as a

22  consultant for law enforcement or the plaintiff's attorney.  The

23  family of the woman who died sued her psychiatrist.

24       And -- this is such a sad case for everybody involved.

25  The -- so, the malpractice company asked me to take a look at

1    the file.

2        The boyfriend reported that just prior to this event, there

3    had been a shooting on the Oakland Bay Bridge that was thought

4    to have perhaps been a suicide by cop, and it was reported very

5    heavily on our local news channel.  When the couple -- the

6    boyfriend and the woman that died -- watched the news that

7    night, she said to him, "You know, that's what I'm going to do.

8    I'm going to commit a suicide by cop, you know.  That will do

9    the job right."  She had been suicidal for some time.

10       But, he unfortunately never communicated that to the

11   psychiatrist.  Neither did she.

12           **THE COURT:**  The last one, intentionally escalating,

13   you have quite a bit on that already.

14           **MR. WIENER:**  Right, yeah.  Your Honor, if I may, just

15   two quick things?  I promise I'll be fast.

16           **THE COURT:**  Okay, sure.

17   **BY MR. WIENER:**

18   **Q**    Did the proximity of Tiffany -- of the Tiffany Williams

19   incident to the Tenderloin Police Station have significance for

20   you, in terms of your opinions?

21   **A**    Absolutely.

22   **Q**    Can you please describe them?

23   **A**    There is greater opportunity that the cars are going --

24   that, you know, police officers are going in and out of the

25   area.  It's an area where there is, you know, undercover police

1    officers, and heavy -- you know, a more heavy presence then,

2    say, some other neighborhoods in San Francisco.

3    **Q**     And, did the proximity of the Tatanika Hogan incident to

4    the location of Officer Mason, on another call, did that have

5    any significance for you?

6    **A**     Yes, it did.  Although, you know, we don't know positively

7    that Mr. Boyd was aware that they were there.  It was very

8    close, you know, a number of blocks away from the initial

9    contact with Tiffany Williams.  So, a failed effort to bring

10   yourself to law enforcement attention is then followed by

11   another effort.

12   **Q**     The location of Tatanika Hogan, the second kidnapping

13   attempt, the proximity of that kidnapping attempt to the

14   location of Officer Mason, did that have any significance?

15   **A**     Oh, I'm sorry.  Officer Mason --

16   **Q**     The person who took the report from Tatanika Hogan.

17   **A**     Right.  Well, for several reasons.  I mean, he had been in

18   that area, and stopped prior to this incident.

19               **THE COURT:**  "He" being --

20               **THE WITNESS:**  Mr. Boyd.

21               **THE COURT:**  He had been stopped prior?  Was.

22               **THE WITNESS:**  Not on that date, you know.

23               **THE COURT:**  Had he been stopped in that area by police

24   earlier?

25               **THE WITNESS:**  I believe he had.

```
 1              THE COURT:  Okay.  That might not be a fact I'm
 2   totally aware of.
 3              THE WITNESS:  Okay.
 4              THE COURT:  But I don't want to belabor this point,
 5   because we're not here to take her trial testimony, and every
 6   incident in the witness's opinion.
 7              What we are here to do is see whether the opinion is
 8   sufficiently based in recognized medical or psychiatric
 9   principles to not simply represent a validation of the
10   Defendant's theory of what happened here.
11              MR. WIENER:  Right.
12              THE COURT:  All right.  That's essentially what we are
13   doing.
14              MR. WIENER:  I brought that up in response to
15   Your Honor's indication that there were no police immediately
16   there, because Officer Mason was quite close to where the Hogan
17   incident happened.
18              THE COURT:  Can't you just say to the witness,
19   "Weren't there police around," or "Were there police around?"
20              THE WITNESS:  Yeah.
21              THE COURT:  We're not going to get into concerns about
22   leading questions.
23              MR. WIENER:  Okay.
24              THE COURT:  So, that would shorten things up.  All
25   right.  Now, in any event, in any event, so, some of the factors
```

1    you've described, then, you would say are traditionally used.

2    All right.

3            One of the points that is made by the Plaintiff in

4    this case is that the behavior of Mr. Boyd on the scene at the

5    time that he is shot and just before, is inconsistent with

6    suicide by cop.  That his behavior is of a surrendering nature,

7    not trying to get himself shot.

8            How does that apparent surrender or actual intent at

9    the moment to surrender fit into the picture of wanting to get

10   shot?  Why didn't he just come out of the car with the gun in

11   his hand?  That would be quick, and fast, and someone would say

12   "Put it down," and he wouldn't; he'd be dead.

13           **THE WITNESS:**  Right.

14           **THE COURT:**  So why go through this whole other set of

15   behaviors, if you will?

16           **THE WITNESS:**  Right.  There are three scenarios that

17   are described in the suicide-by-cop literature that explain why

18   people -- why all people who committed suicide by cop don't just

19   come out, you know, with the gun, you know.

20           **THE COURT:**  All right.

21           **THE WITNESS:**  Which certainly happens, but not in the

22   majority of cases.

23           **THE COURT:**  All right.  Well, that is an interesting

24   factor.  And why don't you pursue that for a moment.

25           **THE WITNESS:**  Okay.  So, there are three.  One is that

1    the -- the person who -- people who suicide are frequently

2    ambivalent throughout the course of the act.  Regardless of

3    their choice of method.

4             In fact, of all of the patients that I have had who

5    have attempted suicide, even if their attempts were fairly

6    lethal and they -- they're alive by the skin of their teeth, a

7    lot of them describe -- most -- the majority describe being very

8    ambivalent about it:  "Should I?  Shouldn't I?  Should I

9    shouldn't I?"  I really have had only one patient telling me,

10   "I'm pissed off that I'm alive, I was really dead set on this."

11            So, that ambivalence combined with the fact that this

12   event, this suicide-by-cop event is not a walk in the park for

13   the person involved.  They are tremendously agitated and

14   tormented inside.  And, that slows things down as well, the

15   thinking, you know, about it.  So, I think that ambivalence and

16   the difficulty of what they're about to do, if they're dead set

17   on it, combine to make their behavior -- their intent less

18   obvious.

19            **THE COURT:**  Has this been recognized in the

20   literature?

21            **THE WITNESS:**  Yes.  Yes.

22            **THE COURT:**  That it's not simply that you plan it out

23   in the way that you might be planning a dinner party, so to

24   speak, and carry it out in that fashion.

25            **THE WITNESS:**  Absolutely.

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  And then, there are two other reasons

3     why --

4          **THE COURT:**  Okay.

5          **THE WITNESS:**  One is that -- that are described in the

6     literature.  One is that people who had animosity towards law

7     enforcement may be playing a very sadistic psychological form of

8     warfare with law enforcement.

9          And, you know, I didn't really believe this,

10    although -- you know, I grew up in a fairly household, I didn't

11    really understand the intense animosity that people could have

12    until, you know -- I started asking my patients back when I

13    started working in this area if they had thought about

14    committing a suicide by cop.  And then, those that did, I would

15    try to, obviously, talk out of it.

16         One of them was a Vietnam veteran who had been in the

17    Hells Angels for many, many years.  I had had some success with

18    another veteran, trying to talk him out of his suicide by cop by

19    trying to get him to empathize with the experience of a law

20    enforcement officer.  So with this guy, you know, I said, "Okay,

21    take me through your scenario."  And he took me through the

22    whole thing, up until he got shot.

23         And I said "Okay, fine."  You know, "What happens

24    next?"

25         And he goes, "Well, what do you mean, 'What happens

1   next?'  I'm dead."

2          And I'm like, "Yeah, you're dead, but what about the

3   cop?"

4          And he looks at me, and he goes -- excuse me for this

5   -- he says, "Fuck the cop, Dr. Keram.  Don't you get it?  I hate

6   the fucking cops."  Okay.  And he said, "I want to fuck up as

7   many of them on the way out as I can."

8          Okay.  And -- and he went into this whole scenario of

9   how they had tormented him, and harassed him unfairly over the

10  years, and -- you know, when he was going out, the reason he was

11  picking suicide by cop as his method of going out was to inflict

12  psychological harm and damage in a cat-and-mouse game with them,

13  as possible.

14          THE COURT:  Why would he think that they would care?

15  In other words, if these are people who the decedent perceives

16  of as sadists, why would it bothers them -- why would the

17  decedent would think it would both them that they had managed to

18  finally kill him?

19          THE WITNESS:  Because he had killed people.  He is a

20  Vietnam veteran who had killed people.  And his PTSD -- he had

21  killed people who were trying to kill him, okay?

22          THE COURT:  Okay.  You're saying that he is projecting

23  his own feelings of distress in having killed people on someone

24  who he doesn't perceive as being empathetic at all.

25          THE WITNESS:  No, see, here's the deal, okay?  He's

1    going to appear unarmed, okay, and -- you know, he had created

2    this whole scenario where --

3              **THE COURT:**  Are we talking about Mr. Boyd now?

4              **THE WITNESS:**  No, no, no, no, no.  We're talking about

5    my patient.

6              **THE COURT:**  Your Vietnam man.

7              **THE WITNESS:**  Yeah, yeah.

8              **THE COURT:**  All right.

9              **THE WITNESS:**  Yeah.

10             **THE COURT:**  Okay.

11             **THE WITNESS:**  You know, the whole flow was to inflict

12   damage on the -- psychologically on the officer by, in the end,

13   appearing armed but not being armed.  And also, you know,

14   creating the -- the internal affairs investigation, and maybe

15   there would be a DA investigation --

16             **THE COURT:**  So, some of the collateral consequences --

17             **THE WITNESS:**  Yeah.  This guy had thought it through.

18   Up to and including, even, civil litigation.

19             **THE COURT:**  All right.  So, but in any event, even if

20   what you -- you appear to be saying is there may be collateral

21   consequences that would work to the detriment of the officer,

22   having to be investigated and things like that.

23             **THE WITNESS:**  Yes, yes.

24             **THE COURT:**  Even if the officer really didn't feel bad

25   about shooting him, but he thought the officer would feel bad.

1          **THE WITNESS:**  Your Honor, I -- I don't think that it's

2     correct at all to think that -- that people who hate law

3     enforcement see law enforcement as unfeeling in general.

4          **THE COURT:**  Okay.  All right.  So, now, is this just

5     your one Vietnam patient?  Or is this something that's appeared

6     in the literature --

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  -- and written about in some way --

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  -- as motivation for using this particular

11    method as opposed to jumping off a building, or something like

12    that.

13         **THE WITNESS:**  Yes, it is.  It's written in the

14    literature.  And in fact, it's about to be published again in

15    the literature in a chapter that Kris Mohandie, who I mentioned

16    earlier, has prepared for publication, as -- as one of the

17    reasons that people pick suicide by cop.

18         **THE COURT:**  So, the idea of inflicting distress, sort

19    of PTSD, on the -- on the police officer --

20         **THE WITNESS:**  Yes.

21         **THE COURT:**  All right, is another reason why one would

22    appear to be surrendering.

23         One could just be you're ambivalent --

24         **THE WITNESS:**  Uh-huh.

25         **THE COURT:**  -- and you don't really know from moment

1    to moment what you want to do.

2              THE WITNESS:  Uh-huh.

3              THE COURT:  The other is that this may be a contrived

4    behavior, to cause the officer later to think about how they did

5    something wrong.

6              THE WITNESS:  Uh-huh.

7              THE COURT:  And then, there's a third -- reason?

8              THE WITNESS:  Yes.  There's a third reason, which was

9    originally described in the literature in 2007 by an author

10   named Homant -- H-O-M-A-N-T, his first name is Robert -- that a

11   recognized reason why people choose suicide by cop as their

12   method of suicide is to so that their family members can profit,

13   either through life insurance policies or by resultant civil

14   litigation against the agency.

15             In which case, because of the exclusion in life

16   insurance policies against suicide, and the need for the event

17   not to look like a suicide if it's civil litigation against an

18   agency, for the person to appear to be surrendering, for them to

19   not want it to look like a suicide.

20             THE COURT:  Now.  This is a key feature.  And I would

21   like to just follow up briefly with you.  This is something that

22   has been recognized in the literature.

23             THE WITNESS:  Yes, yes.

24             THE COURT:  In any peer-reviewed articles?  Or --

25             THE WITNESS:  I'm not familiar with the publication

1    that Dr. Homant published that article in.  But it is -- it is

2    also recognized as a risk factor in this article by Kris

3    Mohandie.  But that hasn't been published yet.

4           **THE COURT:**  On the effort to benefit your family, but

5    appear -- but need to appear as if you weren't committing an

6    outright suicide.

7           **THE WITNESS:**  Correct, correct.  And I have to say

8    that it's mentioned in the suicide literature, that -- that

9    doesn't refer to suicide by cop, in the case of life insurance

10   policies.  And, I don't know if Mr. Boyd had a life insurance

11   policy or not.

12          **THE COURT:**  I don't think we have any evidence of

13   that, or I haven't heard it yet.

14          **THE WITNESS:**  Yeah.

15          **THE COURT:**  But, let's look at that a little bit,

16   then, from the broader spectrum.  In other words, if you look at

17   suicide by cop as a subset of suicide in the bigger population

18   of just suicides, has this particular phenomenon of not wanting

19   to look like you were committing a suicide been recognized?

20          **THE WITNESS:**  Absolutely.

21          **THE COURT:**  And, has that been recognized in

22   peer-reviewed articles?

23          **THE WITNESS:**  Absolutely.

24          **THE COURT:**  All right.

25          **THE WITNESS:**  And, I can expand on that if you like.

 1          **THE COURT:**  That's fine.  Why don't you do that.

 2          **THE WITNESS:**  Okay.  People, for a variety of reasons,

 3   want to make their suicide not look like a suicide, so they make

 4   it look accidental.  The reasons, as I mentioned, you know, in

 5   the suicide-by-cop literature have to do with life insurance or

 6   the civil litigation.

 7          But there are other reasons as well.  People --

 8          **THE COURT:**  The insurance would apply to almost any --

 9   any insured suicide, would it not?

10          **THE WITNESS:**  Certainly.  Yes.

11          **THE COURT:**  All right.

12          **THE WITNESS:**  People who come from religious families

13   don't want their loved ones, when they suicide, to think that

14   they are damned to Hell.

15          So you see things -- see, I don't like the term

16   "suicide by cop."  I prefer the term "suicide by proxy."  You

17   know, nobody's ever going to adopt that.  I just came up with it

18   one day.

19          **THE COURT:**  Maybe it will catch on.

20          **THE WITNESS:**  Well, I'm not planning on glory here.

21   So, --

22          **THE COURT:**  You just --

23          **THE WITNESS:**  Yeah.  So here's what happens, okay?

24   There are other ways in which a suicidal person can get another

25   person to actually do the act.  So, there's actually literature

1    on this.

2           In train engineers, people who drive like AmTrak

3    trains, where people have, quote-unquote, accidents on the

4    track, and there's literature of looking at how many of those

5    might be suicides and what are -- same thing, using the same

6    type of techniques that we use when we look at officer-involved

7    shootings.

8           Other things are single-person car accidents.

9           **THE COURT:**  Well, these are the actual events.

10          **THE WITNESS:**  Right.  Oh, you're asking why.

11          **THE COURT:**  The motivation would be, one, it's against

12   their religion.

13          **THE WITNESS:**  Right.  They don't want to stigmatize

14   the family.

15          **THE COURT:**  All right.

16          **THE WITNESS:**  What I have always said to any of my

17   patients who are suicidal is that we know that one of the

18   biggest risk factors for suicide is a suicide in the family.

19   Especially a first-degree relative.

20          Okay.  So, people may choose to suicide by proxy, if

21   you will accept that term, in order to either not cast that

22   stigma or that increased risk on to friends and family members.

23          **THE COURT:**  Do you have any -- you have offered a

24   variety of explanations, and the ambivalence could cover just

25   about anybody.

1          So, going back to the -- the -- you know, religious

2     one for just a moment, do we have any evidence in the record as

3     to whether Mr. Boyd or his family were observant in any

4     religion?

5          **THE WITNESS:**  Do you want to speak to that?  Or do I

6     speak to that?

7          **THE COURT:**  Do you know?

8          **THE WITNESS:**  Oh, yes.  Yes.  I mean, it's

9     something that I didn't --

10         **THE COURT:**  I wasn't sure you -- was something you

11    had, one way or the other, in the record.

12         **THE WITNESS:**  Yeah.  I didn't comment on it in my

13    report.

14         **THE COURT:**  I don't think you did.

15         **THE WITNESS:**  No, I didn't.  Although, it's certainly

16    something that I thought about.  You can't put absolutely

17    everything in your report.

18         Here's the deal.  Mr. Boyd was described by his mother

19    as being involved in a youth ministry that also involved music.

20    And there was some indication that she believed that he may have

21    pursued that as a profession, you know, as gainful employment.

22         So, of course, although I didn't mention it in my

23    report -- because, here's the thing.  What I tried to do was

24    confine my report to evidence that came from Mr. Boyd, directly.

25    Okay.  That I could tie to him directly.

1          And I didn't have a statement from him that said "I

2    want to be a youth minister and make lots of money," you know,

3    or "make my money that way."

4          **THE COURT:**  What would you say is the definition of a

5    youth minister?  What is a youth minister?  To you.

6          **THE WITNESS:**  To me, it could be a spectrum of things.

7    From somebody who leads a youth group within -- who's not

8    ordained, but who leads the youth group.

9          **THE COURT:**  Within a church or other religious group?

10         **THE WITNESS:**  Exactly.  Or someone who is an ordained

11   minister.  And I'm sorry, I didn't review this part of the file

12   in preparation for today.  But Mr. Wiener may know of other

13   evidence of his religious beliefs.

14         **MR. WIENER:**  Various family members who talked about

15   his desire to become a minister.

16         **THE COURT:**  All right.  Some indication that he had a

17   belief, and perhaps one that was more important in his life than

18   it might be in --

19         **THE WITNESS:**  Right.

20         **THE COURT:**  -- someone else's.  Okay.

21         **THE WITNESS:**  And, I may have been overly careful in

22   only including things in my report that I felt came from him,

23   directly.

24         **THE COURT:**  Well, no, I think you -- you put a fair

25   amount of things in the report.

1          One of the things that had caught my attention, one of

2     the reasons I'm asking you about some of these matters, is that

3     there almost appear to be an inconsistency with one of your

4     opinions.

5          One of the bases for or motivation for suicide by cop

6     that you had described was -- actually, you had described it in

7     our discussion this morning, which is not yet afternoon,

8     fortunately.  You had described it in connection with why one

9     might want to make it appear that it was not an outright

10    suicide.  And, that was the idea of playing a cat-and-mouse game

11    and a mind game with the officer.

12         I think you might have said in your report that one of

13    the motivations just for suicide by cop in general is a desire

14    to cause distress or post-traumatic distress to the officer.

15         **THE WITNESS:**  Uh-huh.

16         **THE COURT:**  Yet the example that you gave in your

17    report, if I'm not incorrect -- I could quickly look at it --

18    was of someone who had left a note to be opened later that told

19    the officer, "Don't feel bad about it," you know, "This is the

20    only way I could think of to end my life," which seemed

21    inconsistent with the view that people are doing this in order

22    to cause distress to officers.  But not all of them may be doing

23    it to cause distress.

24         **THE WITNESS:**  Okay.  That -- I put that note in my

25    declaration.  And the reason why was I -- I didn't know what

1  your concerns were in this *Daubert* hearing.  So the only reason

2  I put that in there was to demonstrate to you that suicide by

3  cop is a recognized phenomena.  It wasn't something that I made

4  up.

5          **THE COURT:**  Oh.  In other words, this was somebody

6  admitting, essentially --

7          **THE WITNESS:**  Yes, exactly.  Exactly.

8          **THE COURT:**  -- to having --

9          **THE WITNESS:**  Exactly.

10         **THE COURT:**  Okay.

11         **THE WITNESS:**  But it wasn't something that

12  psychiatrists just dreamed up, that actually -- you know, that

13  is the absolute most clear example we have of intent.  That

14  note.  And all of us have a copy of it, you know, who work in

15  this field, you know.

16         **THE COURT:**  As validation, direct validation of what

17  happened?

18         **THE WITNESS:**  Absolutely.

19         **THE COURT:**  And can happen.

20         **THE WITNESS:**  Exactly.  And we use it to educate

21  people that this is a real phenomena.  And if a family member

22  says something, to take it seriously.

23         **THE COURT:**  Okay.  Now, I don't know if, Mr. Wiener,

24  you had other areas you wanted to cover.  I can tell you what my

25  concern was in going into this hearing, and what I think has

1    been presented, in light of what we've done here, today.

2          All right.  As I said at the beginning, I am -- and I

3    want to give Mr. Cunningham a chance to ask some questions, too.

4    But, just so that you know for your inquiry, I said from the

5    beginning I did not question it very strongly, I was happy to

6    hear more information on it, but I was assuming for purposes of

7    this discussion that there is a phenomenon recognized by others

8    than simply Doctor -- my mind just went blank.

9          **MR. WIENER:**  Keram.

10         **THE WITNESS:**  Keram.

11         **THE COURT:**  -- Keram.  I wanted to say Kramer.  I knew

12   that was wrong.  Okay, Keram.  I knew that there was a general

13   recognition, or at least appeared to be such beyond this one

14   individual psychiatrist, of the phenomenon known as suicide by

15   cop.  In other words, people who get somebody else to kill them.

16   And in particular, law enforcement.

17         What I was concerned about is her determination in

18   this instance that a suicide by cop had in fact occurred.  And I

19   also was interested in whether the factors, to the extent that I

20   had them in the report and in her declaration, upon which she

21   relied -- I was interested in whether those were simply

22   something of an *ex post facto* construct, or whether this was

23   something that again is -- these are factors that have been

24   recognized, not just in Mr. Boyd's case, for example, but in

25   others as well, by people recognized and working in the field.

1          One of the things that I wasn't absolutely clear on in

2     advance, and still perhaps have not asked a question in this

3     regard, is the degree to which this opinion is being offered.

4     And, and also, is the opinion a diagnosis, or is it something

5     else?  So I would like to clarify that.

6          And then I'm going to turn the matter over, I think at

7     this point, to Mr. Cunningham to ask some questions if he has

8     some, and then I will announce my view on the subject.  Okay.

9          Because, I think that we've covered the factors that

10    Dr. Keram has relied on.  And she has done a great deal to

11    describe for my benefit why some of the factors that might have

12    seemed to a layperson, which is myself, perhaps not in keeping

13    with suicide by cop, to be factors that cannot only be in

14    keeping but are perhaps emblematic of a suicide by cop.

15         And so, I don't think at this point I want to hear

16    more from you on that, unless there is something very telling

17    that you have there in your list of questions.

18         And while you are thinking about that, I would like to

19    ask the Doctor, is the opinion you are offering something that's

20    described in your field as a diagnosis or as something else?

21         **THE WITNESS:**  I wrote two opinions in my report.  And,

22    you know, I'm prepared to testify to both of them.  One was

23    about his diagnosis.  And the other is whether or not, in my

24    opinion, this was a suicide by cop.

25         **THE COURT:**  All right.

1          THE WITNESS:  Suicide by cop is not a diagnosis.  It's

2     a method of suicide.

3          THE COURT:  Okay.  And is it fair to say you were

4     essentially, then -- you know, I don't want to put you on the

5     level of an auto accident reconstructionist, but you are

6     reconstructing, to a certain extent, the mental state of someone

7     that resulted then in the event that occurred.

8          THE WITNESS:  Correct.  And, could I expand on that?

9          THE COURT:  Sure.

10          THE WITNESS:  Psychiatrists and forensic psychiatrists

11     are frequently asked to do what we broadly call retrospective

12     mental state examinations.  Probably the most common context in

13     which they occur are in insanity defense evaluations, in which

14     we're asked to reconstruct somebody's mental state at the time

15     of the commission of the offense.

16          And, we may be looking at that issue anywhere from

17     days to years -- and I just did a case where the crime was

18     committed in 1993, so I was looking back about 14 years.  This

19     guy recently confessed.  So, that's probably the most common.

20          But we also do them in cases of testamentary capacity

21     -- retrospective testamentary capacity.  Sometimes we get

22     referred the person to determine that they're competent to make

23     their will, while they're still alive, if there is a concern

24     that they have.  Like if they have a much younger wife and older

25     children, for example.

1          So, you know, there are recognized procedures.  And

2     these -- this type of evaluation is very old, because the

3     insanity defense is very old.

4          **THE COURT:**  Okay.  And so, this falls into that type

5     of analysis.

6          **THE WITNESS:**  Yes, correct.

7          **THE COURT:**  Okay.  Then, are you giving an opinion to

8     a reasonable degree of medical certainty?  Or what is the level,

9     then, to which you are offering?

10          **THE WITNESS:**  Well, I will tell you that it is my

11     opinion to a reasonable degree of medical certainty that

12     Mr. Boyd committed a suicide by cop.

13          **THE COURT:**  All right.  Now, I think it would be

14     appropriate to turn the questioning over to Mr. Cunningham, and

15     then to have you come back if you need to.

16          **MR. WIENER:**  Can I ask one clarifier?

17          **THE COURT:**  Sure.

18          **MR. WIENER:**  Excuse me, Your Honor.

19     **BY MR. WIENER:**

20     **Q**    With respect to the testamentary capacity cases, I think

21     you -- you referred to situations in which they are still alive?

22     **A**    Yes.

23     **Q**    But, is the method you just described also applied to

24     situations in which someone dies, the will is in probate, and

25     you have to opine as to testamentary capacity of the deceased

1   person who wrote the will?

2   **A**    That's the more common type of testamentary capacity

3   evaluation we do.

4               **THE COURT:**  I assumed that was what you were talking

5   about.  The person's gone, and now the family's cut out of the

6   will, and the --

7               **THE WITNESS:**  Uh-huh.  Uh-huh.

8               Your Honor, may I take a very brief break?

9               **THE COURT:**  Yes.  Tell you what.  Why don't we take

10  ten, is that agreeable?  Come back at 10:00, or a little after,

11  and we will take up Mr. Cunningham's questions.  Very good.

12              Thank you.  And you are free to step down whenever you

13  like.

14              **THE WITNESS:**  Thank you very much.

15                      (Recess from 10:54 to 11:06 a.m.)

16              **THE COURT:**  All right.  Dr. Keram, take the stand,

17  please.  I was thinking of some other things, and I'm going to

18  pass for a moment and let Mr. Cunningham go ahead.

19              **MR. CUNNINGHAM:**  All right, Judge.  You do stop me at

20  any time.

21              **THE COURT:**  No, that's all right.

22              **MR. CUNNINGHAM:**  But, you know, if it's easier --

23              **THE COURT:**  Okay.

24

25

1          **CROSS EXAMINATION**

2     BY MR. CUNNINGHAM:

3     **Q**     Good morning, Dr. Keram.

4     **A**     Good morning, Mr. Cunningham.

5     **Q**     My name is Dennis Cunningham.  I'm here as a pinch-hitter

6     for the Plaintiffs.  So, I'm trying to be a quick study, if you

7     will, and -- and, please help me out if I'm off-beam.

8          I just want to get an idea, I think the Court just referred

9     to the notion, this is -- suicide by cop is not a diagnosis of

10    any kind in the psychiatric field, it's an explanation for an

11    event or a phenomenon, right?

12    **A**     You could compare it to suicide by gunshot wound, suicide

13    by hanging.  It's the method of suicide.

14    **Q**     And, not anything more than that, would you say, then?  It

15    doesn't have a philosophical overlay in the sense of where the

16    practitioner has to come from in trying to analyze it?

17    **A**     It depends on what the practitioner's role is in the case.

18         As a clinician, when I have patients who are contemplating

19    committing a suicide by cop, I try to help the person help me

20    understand what their reasoning is behind both the suicide and

21    the suicide by cop, in order to individually tailor a treatment

22    plan to get them not to do it.

23    **Q**     Uh-huh.

24    **A**     So their philosophies may be quite different in terms of

25    why they're picking a suicide, why they're choosing suicide by

1    cop, and how I can best intervene to make them not want to do

2    that.

3    **Q**    Okay.  And, is it right to say that this is a fairly new,

4    fresh field in the psychiatric area?  I know you have referred

5    to a case that you found that was back in the 18th century, but

6    as far as some systematic study of it that's aimed at trying to

7    pin down a phenomenon that can be identified with expertise and

8    certainty, that would qualify as evidence?

9    **A**    I wouldn't consider it to be -- I think your word was

10   "fresh."  The -- the phenomena of victim-precipitated homicide,

11   as I said, was first described in 1959.  And so you do see in

12   the literature going back that far -- which is now getting

13   harder and harder to access -- that there are mentions of people

14   who provoke their deaths by law enforcement officers.

15       As I mentioned earlier, the term "suicide by cop" was

16   coined in around 1984.  And the literature that reflects actual

17   study of the phenomena begins well over ten years ago.

18   **Q**    Okay.  I guess that's my point, is, as a subject of study

19   and isolating as a phenomenon that can be studied, that's a

20   ten-year-old deal?

21   **A**    Approximately, yes.

22   **Q**    And, have you had a number of cases in which you were

23   called upon to give an opinion, retrospectively, where the

24   person has passed away, as to whether or not this was suicide by

25   cop?

1    **A**    I have been asked to evaluate that in two contexts.  One

2    was in a research project that a northern California law

3    enforcement jurisdiction asked me to do.  And the other is in

4    the context of civil litigation.

5    **Q**    Uh-huh.  And, how many civil cases have you worked on where

6    this was an issue?

7    **A**    You know, I don't keep count of the different types of

8    cases that I've done, but maybe a dozen.  That would be a rough

9    estimate.

10   **Q**    And of those, were there particular ones where you were or

11   were not certified as an expert, and testified in court, with a

12   jury?

13   **A**    Only one of those cases went to trial.  The majority were

14   either dismissed on summary judgment, or settled.  And, in the

15   case that went to trial, I was qualified as an expert by the

16   judge.

17   **Q**    And you did testify, then?

18   **A**    Correct.  I don't recall if that case -- most of these are

19   the 1983 -- I want to say '83 or '85, you know, the federal

20   cases.  But I -- I can't recall.  It may have been a state case.

21            **THE COURT:**  1983.

22            **THE WITNESS:**  Okay.  Thank you.

23   **BY MR. CUNNINGHAM:**

24   **Q**    And was your opinion in that case that there had been a

25   suicide by cop?

1    **A**    Yes.  There had been cases in which I felt it wasn't a

2    suicide by cop, but those didn't proceed to trial.

3    **Q**    I understand.  Roughly, if you know, how many other

4    practitioners are engaged in this specific study, have worked on

5    this problem?

6    **A**    Before I answer your question, I need to correct.  I'm kind

7    of a stickler for details.  And so, even though this might not

8    be relevant in the least, I just want to correct the Record.

9    **Q**    That's fine.

10   **A**    One of the cases to which I was referred with the specific

11   question as to whether or not this was a suicide by cop, I said

12   no.  But it did proceed to trial, and I was asked to testify

13   about whether or not the decedent had been dangerous.  So, it

14   was a violence risk assessment.  Yeah.

15        Now I don't have to stay up and night thinking that I --

16   you know, in Federal Court, have something that's not true.

17   **Q**    Okay.

18   **A**    So, okay.  There are -- there are probably -- oh, I don't

19   know, maybe -- I mean, at the conference that we had with

20   suicide and law enforcement, there were maybe 50 people there.

21   And most of them had worked in the area of suicide by cop.  In

22   the psychiatric and psychological research community, there are

23   probably over a dozen people who study the area.  Some publish,

24   some don't.  And then there are a number of law enforcement

25   officers, also, who work in the area.

1    **Q**    Studying that?

2    **A**    Uh-huh.

3    **Q**    And there is at least this beginning body of literature on

4    the subject.  I think you said there were four studies out now

5    that are recognized?  Is that right?

6    **A**    No, there are more than that on suicide by cop.

7    **Q**    Okay.  And, the one that you discussed, the Hutson, is it

8    fair to say that's the main one now, or the most substantial

9    one?

10   **A**    It's the largest one in terms of the number of subjects

11   that they looked at.  But other studies provided information

12   about other aspects of the phenomena.  So -- it's the main one

13   in terms of probably what psychiatrists would call demographic

14   information or descriptive information about the events.

15        But then there are other studies that look more at motive,

16   say, for example, or method of the event.

17   **Q**    Okay.  My notes say that you have said 430 to 440 -- or 437

18   shootings that were included in the L.A. Sheriff's Office study?

19   **A**    Correct.

20   **Q**    And how many of those were thought to be or thought to

21   possibly be suicide by cop?

22   **A**    It was eleven percent, so, I think it was about 40

23   shootings.

24   **Q**    That -- where this possibility was raised?

25   **A**    Where the researchers felt that the file indicated that the

1    person or the event met their four selection criteria.

2    Q    And, and then they would look at each case according to the

3    criteria, and go wherever they went with the studies?

4    A    Right, exactly.  They were collecting a large number of

5    data points.  And we actually replicated that exact study.

6    Q    Uh-huh.

7    A    With a little bit of a different twist on it.

8    Q    Okay.  And, and you talked about the selection criteria.  I

9    take it that those would be more or less analogous to elements

10   of a determination that suicide by cop had occurred.

11       Is that fair?  I mean, maybe --

12   A    We went through this in the morning.

13   Q    I might be borrowing a legal type of term there, but --

14   A    The only thing I can say is, this is -- I really enjoy

15   working sort of with the interface of different fields.  But

16   really, what the researchers were doing was trying to just

17   develop what we call selection criteria for inclusion in the

18   study, so that when they looked at the subjects that they pulled

19   up, they felt very confident that those were, indeed, suicides

20   by cop.

21   Q    Because that criteria had been met in each case?

22   A    Correct.

23   Q    All of them?

24   A    Correct.

25   Q    Okay.  So --

1    **A**    Now, they -- because they had such tight criteria, when you

2    develop selection criteria, you want them to be at a higher

3    threshold than, say -- you want beyond a reasonable doubt, you

4    know.

5    **Q**    Okay.

6    **A**    So, we know that we are excluding cases that may in fact

7    meet the definition.

8    **Q**    Would meet the definition without meeting each of those

9    four criteria?

10   **A**    Right.  I shouldn't have said met the definition.  That may

11   have, in fact, been suicides by cop, or whatever it is that

12   you're trying to isolate.

13   **Q**    Okay.  But this is not -- just to sum up this part of it,

14   we're not talking about something where there's a tremendous

15   volume of study and experience, such as with PTSD or something

16   like that, that's been developed over a larger time with a lot

17   more people involved in it.  Right?

18   **A**    Compared to the PTSD literature, there is less literature

19   than there is in suicide by cop.

20   **Q**    Okay.  If -- if we look at those four criteria that you

21   have discussed, the evidence of the intent risk factors, do

22   risk -- when you discuss risk factors, that -- that equate -- am

23   I right to say that equates to the indicia of the intent, right?

24   Whatever they might be?

25   **A**    Correct.  Yes.

1    **Q**    Okay.  And that are detectible in some concrete way,

2    retrospectively, after the event?

3    **A**    Correct.

4    **Q**    And, and in that respect, when you are analyzing a case

5    like this, you are also dealing with different versions, I take

6    it, of what the event was.  What happened, what was said, what

7    the gestures were, all that kind of stuff.  Correct?

8    **A**    Yes.

9    **Q**    And how do you select which versions that you follow in

10   making your analysis, in a given case such as this?

11   **A**    Uh-huh.  I think of it as trying to provide the best

12   explanation for the evidence as it stands.  There may be things

13   that contradict what you end up thinking is the best

14   explanation.  It's rare that every single piece of -- especially

15   when you are looking at lots of eyewitnesses, or, say, in a

16   clinical case, you know, all of the data that -- of the

17   patient's chart.

18   **Q**    Uh-huh?

19   **A**    But what you're trying to do is create the most consistent

20   diagnosis or scenario or explanation.  And recognizing,

21   absolutely, that there will be factors or evidence or symptoms

22   or whatever, that -- that may either not support or -- you know,

23   be neutral, or directly contradict your opinion.

24   **Q**    Uh-huh.  And, and in giving the opinion, then, how do you

25   allow for that problem?  I mean, you had to choose one version

1    or the other, right?

2    **A**      Yes, correct.

3    **Q**      To undergird the opinion.

4    **A**      Correct.

5    **Q**      Do you then qualify the opinion?  If this is true -- you

6    know, if he said so and so, yes; if he said such and such, no?

7              **THE COURT:**  I want to make sure that you and the

8    witness are on the same question.  All right?

9              I understand Mr. Cunningham's question to be where

10   there are disputed facts, how do you deal with the fact that

11   there are disputed facts?

12             **THE WITNESS:**  Uh-huh.

13             **THE COURT:**  In other words, are you asked by, for

14   example, Mr. Wiener to assume a certain set of facts to be

15   correct, and give your opinion, and then you can also say, well,

16   what if such and such wasn't the case, what if it was like the

17   other witness said, would that change your opinion, or things

18   like that.

19             **THE WITNESS:**  Uh-huh.

20             **MR. CUNNINGHAM:**  Right.

21             **THE COURT:**  I wasn't sure that you weren't doing the

22   following, that you were thinking that he was asking you if you

23   have an opinion, based on the facts -- and there are certain

24   facts that are not necessarily disputed, but just may not

25   support your opinion, that -- how do you deal with it?

1          And so, those are two different questions.

2          THE WITNESS:  Uh-huh, correct.

3          THE COURT:  One is you have disputed facts, and do you

4     simply accept one set of facts because you're asked to do that,

5     and form your opinion on it.

6          The other question is, let's say there's undisputed

7     facts, but some of the facts are less indicative of whatever the

8     opinion is that you arrived at, what you do with that.  So,

9     those are two different questions.

10          And I'm not sure, which one were you thinking he was

11     asking?

12          THE WITNESS:  I may have misunderstood, but I thought

13     the second.

14          THE COURT:  And I think he's asking the first.

15          MR. CUNNINGHAM:  I thought -- I was more thinking of

16     the first.  I'm sorry if I wasn't clearer.

17          THE COURT:  No, that's okay.  That's why I honed in on

18     this.

19          MR. CUNNINGHAM:  I mean, maybe we should get them

20     both, Judge, you know, in terms of trying to pin this down.

21          THE COURT:  That's fine.  I think she's answered the

22     second, --

23          MR. CUNNINGHAM:  Yes.

24          THE COURT:  -- which is that she considers them and

25     decides whether it changes her opinion, or whether it's a factor

1    that isn't so strong to change her opinion.

2              On the other -- ordinarily, witnesses are told to --

3    pretty much to assume certain facts, because if you have

4    disputed facts, for example, if someone says "I was going 30

5    miles an hour," and somebody says "They were going 50 miles an

6    hour," your opinion may be to decide how fast they were going,

7    or, your opinion may be to assume that the person was going

8    30 miles per hour, and then give an opinion based on that.

9              **THE WITNESS:**  Yeah.

10             **THE COURT:**  And then, somebody might ask you whether

11   your opinion would be different if you assumed the contrary,

12   that it was 50.

13   **A**

14             **THE WITNESS:**  Right.

15             **THE COURT:**  So, here we have certain facts in dispute.

16   When his hands were up, when his hands were down, did he say

17   this, did he say that.

18             So then the question is, in this case, perhaps, did

19   you -- were you asked to assume certain facts to be true?

20             **THE WITNESS:**  Yeah, I think -- I think what happens,

21   usually when I do a forensic case, and certainly in this case,

22   is the two questions you asked me happen chronologically, only

23   in reverse order.

24             I go through all the things that I have, and I form my

25   opinion.  And, I send my report in.  And then, either at

1    deposition or at trial, somebody will say, "Did you assume this?

2    Did you assume that?  Well, what if it isn't present?"

3           And then I have to think, well, what if it isn't

4    present?  Then I have to answer the question.

5    **BY MR. CUNNINGHAM:**

6    **Q**    Uh-huh.  But you don't do that operation at the stage of

7    writing the report.

8    **A**    Sometimes I do.  Like, for example, in this case -- well, I

9    think I qualified it, actually.  There's some concern about

10   whether or not, indeed, Mr. Boyd was the person who was present

11   at the Tiffany Williams incident.  And so, you know, I think --

12   and there were other things like that.

13          So, usually, my report, I said assuming this is the case,

14   then -- you know.

15   **Q**    Uh-huh, okay.  All right.  All right.  So --

16   **A**    I was careful to -- you know, to try to designate that.

17   **Q**    Uh-huh.

18   **A**    Yeah.

19   **Q**    All right.  I apologize.  I went through the report very

20   quickly and I haven't, I know, plumbed all of its detailed

21   wisdom.

22          But I'm thinking here, and also on the lines of the Court's

23   inquiry earlier, that specifically with -- or particularly with

24   respect to this intent, which I take it, I mean, that's more or

25   less the most important factor when you are trying to analyze

1    this, right?  What do we have to show that this is what the

2    person was trying to do.

3    **A**    Uh-huh.

4    **Q**    And, so, there, I take it, you would also have to focus

5    carefully on ambiguities in the evidence, or possible

6    conflicting versions of the evidence.

7    **A**    If they affected intent, certainly.  Yes.

8    **Q**    Like, for example, where there's apparently testimony -- I

9    think I know of this -- that the independent witness and one

10   officer said that he said something after he got -- or about the

11   time he got out of the car or -- I'm not sure if it was before

12   or after he got out of the car, "You can just go ahead and shoot

13   me now."

14   **A**    Yes.

15   **Q**    Now, that's a statement, in and of itself, that could be

16   made with different intent, correct?

17   **A**    Absolutely.

18   **Q**    That could be sarcastic, right?

19   **A**    Absolutely.

20   **Q**    It could be hostile, and just challenging in a way that had

21   nothing to do with wanting to be killed, fair?

22   **A**    Absolutely.

23   **Q**    So, that's something you would have to assign to the

24   ambiguous section of the evidence that you are analyzing, right?

25   **A**    You could certainly do that.

1    **Q**    And, whereas, I take it, that -- well, would you find the

2    same ambiguity in the fact that he had apparently shot at the

3    police in the -- in the course of this pursuit that had just

4    ended?

5    **A**    Well, yeah, I looked at any -- what I tried to do was think

6    of the different possible explanations for his behavior.

7    **Q**    Uh-huh.

8    **A**    And so, I considered the fact that -- given he was under

9    the influence of the MDA, that he may have been psychotic at the

10   time.  That, either acute intoxication -- psychotic from an

11   acute intoxication, or a long-standing use of a hallucinogen can

12   lead to psychosis.

13   **Q**    I'm sorry?

14   **A**    A long-standing use, yeah.  I didn't mean to say

15   "hallucinogen" -- of amphetamine-like substances can lead to a

16   permanent psychosis.

17   **Q**    Uh-huh.

18   **A**    So, I did address that in the report, in terms of trying to

19   explain various behaviors with other hypotheses.  But in the

20   end, I didn't -- so, I guess, you know, to answer your question,

21   yes.  I did -- I did consider that that might have been an

22   ambiguous event.

23   **Q**    The possibility of psychosis, in and of itself, with or

24   without the drugs, would not necessarily support suicide by cop,

25   right?  As opposed to some other kind of antisocial behavior

1   that he -- or antisocial motive, and intention that he may have

2   been acting on at this time.

3   **A**    There are known cases of psychotic individuals provoking

4   suicides by cop.

5   **Q**    I'm sure that's true.  But there -- there are certainly

6   known cases of psychotic individuals reacting hostilely, with

7   hostility or confrontatively with cops, where they weren't

8   trying to get killed; they had something else on their mind,

9   trying to kill a cop or whatever?

10  **A**    I'm sure there are.  I don't -- you know, because I'm sort

11  of, you know, referred cases that are --

12  **Q**    I understand.

13  **A**    Yeah, I haven't seen any of those yet.  But they probably

14  do exist.

15  **Q**    And that, again, is an ambiguity in the evidence of intent

16  in this case.  Correct?  The shooting.

17  **A**    That, meaning shooting at the police?

18  **Q**    Yes.

19  **A**    Yes.  Yeah.  I mean, ambiguity in -- I hate getting into

20  what the definition of "is," but I'm kind of like that.  You

21  know, if you mean by "ambiguity" that there could be possible --

22  that there could be more than one explanation for it?

23  **Q**    Yes.

24  **A**    Yes.

25  **Q**    And contrary explanations, with respect to the specific of

1    suicide by cop.

2    **A**    Yes.

3    **Q**    Okay.  And, and, you and the Judge discussed the subject of

4    the -- of -- apparent attempt to take a hostage.

5    **A**    Yes.

6    **Q**    And, and as reflected in the evidence in this case --

7    primarily, I take it, from Ms. Hogan's deposition, right?  And

8    her account of that event?

9    **A**    Yes.

10   **Q**    Is that where you got that?

11   **A**    There were other witnesses, yes.

12   **Q**    Uh-huh.  And, I agree with you, the evidence on the earlier

13   incident -- I forgot that woman's name, Williams, is that --

14   **A**    Yes.

15   **Q**    That certainly -- I mean, it's ambiguous as to what

16   actually took place, let alone what the intention was, correct?

17   **A**    Well, not that it didn't -- it's not ambiguous that it took

18   place.  It's ambiguous that it was Mr. Boyd.

19   **Q**    Uh-huh.

20   **A**    Yeah.  I should say, it's not definite that it's Mr. Boyd.

21   **Q**    Well, with respect to Ms. Hogan, is it your -- well, is it

22   your opinion, or was it your determination in looking at the

23   evidence, that this was in fact an attempt to get a hostage in

24   the process of setting up a suicide-by-cop situation?

25   **A**    It's my opinion that the interaction with Ms. Hogan was an

1    attempt to bring himself to law enforcement attention.  It's --

2    I can say that to a reasonable degree of medical certainty.

3    **Q**    Uh-huh.

4    **A**    And he did that by appearing to intend to have her enter

5    his car.  As I said earlier about this incident -- I think it

6    was about this incident -- I'm not a mind-reader.  So I don't

7    know if he really intended to get her into his car or not.

8         It's my opinion that he intended to make her believe and

9    the police believe that he wanted her in the car.

10   **Q**    Was there not some evidence which might also suggest that

11   he wanted to get ahold of her car, and change cars, himself?

12   Get her out of her car and --

13   **A**    Yes, yes.

14   **Q**    So that would be another explanation at variance with

15   the --

16   **A**    Yes.

17   **Q**    -- opinion.

18   **A**    Yes.

19   **Q**    Is there anything else about the -- I'm sorry.  The point

20   about attempting to take a hostage, I think you're saying, is

21   the -- is the -- the function of it is to bring yourself to law

22   enforcement attention, get the cops involved.

23   **A**    Correct.

24   **Q**    In -- in that context of trying to get killed by the cops,

25   at least.

1  **A**    Correct.

2  **Q**    So, it's -- I mean, my problem there is that it kind of

3  reads bad -- it's kind of tautological, isn't it, that if he's

4  saying that that's why he was doing it, he was doing it because

5  he wanted to -- he -- I'm making the interpretation that he was

6  trying to take a hostage, and he was doing it in order to get

7  the cops after him so that he could set up a situation where he

8  could get shot, as opposed to a different interpretation of what

9  he was trying to do, and a different interpretation of why he

10  was doing it, and a different interpretation of what his

11  ultimate intent was.

12  **A**    Well, I think what psychiatrists do, whether we're

13  confronted with a patient with a set of symptoms and we're

14  comparing it to the diagnostic criteria for a diagnosis, or

15  whether we're looking at known characteristics of suicide-by-cop

16  scenarios and we're presented with a file with a lot of

17  information, is to review that file with the characteristics of

18  suicide-by-cop scenarios in mind, and see -- its like a Venn

19  diagram.  Is there an overlap, or not?

20  **Q**    Uh-huh.

21  **A**    So the way I would answer that question is no, it's not

22  tautological at all.  That's not how we approach it.  We don't

23  -- "tautological" to me means -- circular reasoning?

24  **Q**    Right.

25  **A**    Yeah.  It's not circular reasoning, at all.  It's

1    evaluating a known -- evaluating the information that you have

2    regarding the event against the known characteristics of suicide

3    by cop events and seeing if they match, and to what degree they

4    match.

5    **Q**    All right.  And, and in that context, at least, obviously

6    the person bent on suicide by cop has to bring the cops to him

7    to begin with.

8    **A**    If it's a premeditated suicide by cop.  There are other

9    categories of suicide by cop, in which a person --

10   **Q**    Okay, that rise on the spur of the moment?

11   **A**    Well, the -- there are two other categories.  One are the

12   person who is suicidal before the arrival of law enforcement.

13   And then there's a suicide-in-progress call, so, the

14   suicide-by-cop plan develops on the scene, but the suicide

15   ideation, intent, and an alternate plan has already begun.

16   **Q**    Uh-huh.

17   **A**    The other is the person who doesn't mean to draw himself to

18   law enforcement attention, and is not suicidal, and doesn't have

19   a suicide-by-cop plan before they come to law enforcement

20   attention, but who, when confronted with law enforcement,

21   develops both suicidal ideation, with a suicide-by-cop plan as

22   the method.

23        Mr. Boyd doesn't fall into either of those categories.

24   **Q**    Okay.  But some, where it arises because he's cornered, and

25   then it comes to this --

1    **A**    Correct.  It's my opinion that he does not fall into either

2    of those categories.

3    **Q**    And, if we're following these factors, and using them as

4    the indication that this is suicide by cop (Indicating)?

5    **A**    Correct.

6    **Q**    And, and, let's see if there's anything -- the other items

7    that I think you mentioned as showing the intent -- the

8    statement "You can shoot me now," the shooting at the cops,

9    noncompliance with the commands that they made -- this is after

10   the car was stopped and he gets out?  Is that right?

11   **A**    I'm trying to think if there were commands before -- yeah,

12   I mean, there were commands before he gets out of the car, as

13   well, so it's -- you know, from the time the officers start

14   yelling commands at him.

15   **Q**    But the command then was "Get out of the car," right, and

16   he got out?

17   **A**    Yes, yes.

18   **Q**    So, that's -- there's compliance.  I mean, we're talking

19   about compliance, and we're talking about it in the context of

20   either suicide by cop or an attempt to surrender, right?

21   Generally speaking, that's the dichotomy we are dealing with

22   here, right?

23   **A**    And there may be other possibilities that we haven't

24   thought of, as well.

25   **Q**    Uh-huh.  Are you thinking of any of them now?

1    **A**    No.

2    **Q**    Okay.  And I can't think of any, either --

3    **A**    Yeah.

4    **Q**    -- in the context of the case, or the issue that we're

5    facing here --

6    **A**    Yes.

7    **Q**    -- that, that -- and let me ask you this.  In arriving at,

8    and holding, and maintaining, and then coming to court and

9    swearing a mighty oath, and telling the jury that you believe

10   that they should conclude that this was suicide by cop and not a

11   botched surrender attempt, or a place where the cop, you know,

12   lost his cool and did something too quick, or whatever

13   alternative set of explanation -- or explanation is involved in

14   the alternative facts, right?

15        This is -- so, in that respect, then, then, is it fair to

16   interpret all -- interpret the actions that you know of that he

17   made, in terms of the commands, as escalating the confrontation?

18   **A**    Absolutely.

19   **Q**    And, and why do you say that?

20   **A**    Because -- and every researcher on suicide by cop

21   emphasizes this point.  There -- every suicide-by-cop event

22   needs to be evaluated by looking at the sum total of the

23   behaviors in that event.

24        So, you can't divorce his actions before and after the --

25   you know, any one particular behavior on his part, in order to

1    arrive at your opinion about whether or not it's a suicide by

2    cop.

3    **Q**    Well --

4    **A**    So, if you look at the pattern of his behavior, it's an

5    escalation.

6    **Q**    Uh-huh.  An escalation, along the track of accomplishing

7    the purpose of suicide by cop?

8    **A**    Toward that goal.  It's an escalation of -- of increasing

9    threat perceived by law enforcement officers, and decreasing --

10   well, increasing length of time of the event as well, you know,

11   so the officers aren't sure what's going on.

12   **Q**    Building up the pressure on the officer?

13   **A**    Well, not bringing the event to a conclusion.  I don't know

14   if it's fair to say "building up the pressure," but keeping them

15   in that situation.

16   **Q**    Okay.  Okay.  Did you -- in this context, did you determine

17   that it was not true that he had a problem with getting on the

18   ground?

19   **A**    I saw in the Oakland Police Department report -- and I was

20   very careful to check to make sure those reports were written on

21   the same day, on the 2nd, and they were written on the 2nd.  So

22   it's not like, you know, Oakland went to help their

23   San Francisco buddies, you know.

24        So, assuming those were original reports, and dated

25   correctly, --

1          THE COURT:  Interesting cross-check on your part,

2    actually.

3          THE WITNESS:  I'm very suspicious.

4          THE COURT:  You were concerned that, having once heard

5    there was a shooting, --

6          THE WITNESS:  Yes.

7          THE COURT:  -- the Oakland police may have changed

8    their report to --

9          THE WITNESS:  Yes, absolutely.

10         THE COURT:  Or made a report --

11         THE WITNESS:  Absolutely, yeah.

12         THE COURT:  Interesting.

13         THE WITNESS:  Yeah.  So, I mean, I have my own level

14   of paranoia.  And I hope all of us experts do, you know.

15         THE COURT:  Well, that's fine.

16         THE WITNESS:  So, --

17         MR. CUNNINGHAM:  Built-in.

18         THE WITNESS:  So, there were many officers who

19   described Mr. Boyd getting out of the car, and one said "Laying

20   down on the street," one said, I think, "Spontaneously proning

21   himself."  I think that was an Oakland officer who said that.

22   So, I assumed that he could, yes.

23         Also, I have to say, you know, working in the VA, I

24   treat a large number of amputees and double-amputees, you know.

25   And they -- they don't have any trouble doing that.  And these

1    are BKA -- I mean -- yeah, BKA amputees like Mr. Boyd was.

2              **THE COURT:**  BKA?

3              **THE WITNESS:**  Sorry.  Below the knee.  Below-the-knee

4    amputees.  There's above-the-knee amputees, and below-the-knee

5    amputees.

6              **THE COURT:**  He is a below?

7              **THE WITNESS:**  A below-the-knee amputee.  But also,

8    above -- I mean, I don't know why I made that distinction.

9    Above-the-knee amputees as well, so --

10             **THE COURT:**  Okay.

11   **BY MR. CUNNINGHAM:**

12   **Q**    Uh-huh.  So, it was based on your -- your analysis of the

13   Oakland reports that made you think that there's something fishy

14   about a hesitation that was reported on getting to the ground?

15   **A**    Well, it was two things.  It was that the Oakland Police

16   had observed that exact behavior three days before, and it was

17   knowing -- you know, working with a large number of amputees,

18   given that I work with war veterans.

19   **Q**    So you were just inherently suspicious of the notion that

20   he would have a problem?

21   **A**    I think that's fair to say.  Yes.

22   **Q**    I mean, suppose he might have had an abscess in one of his

23   legs, and he had some pain in it or something like that.  Would

24   that cause him to hesitate?

25   **A**    Well, first of all, we looked at the autopsy report.  Or I

1    shouldn't say "we," I don't know who "we" is.  It's me.

2         I looked at the autopsy report.  And, you know, if you look

3    at the scene of the leg, there were only minor problems, that

4    shouldn't have caused mobility issues.

5    Q    Okay.  Okay.  And what about the possibility that he was

6    being given contrary commands by different officers at the same

7    time?

8    A    That's not un- -- well, okay.  First of all, that's not

9    uncommon.  But not necessarily contrary.  I mean, usually what

10   people are told is "Show me your hands," you know, "Keep your

11   hands up, keep your hands out, and get on the ground."

12        And those things aren't really contrary.

13   Q    Well, if you needed -- if you thought, or if you needed --

14   if you thought, because you're an amputee, you thought you

15   needed to brace yourself down with your hands, and you're told

16   to put your hands in the air, then you're being told two things,

17   right?  "Get down" and --

18   A    Yeah, but you know, I can't -- I can't tell you the number

19   of cases that I've worked on where people were told both those

20   things and did, you know, one or the other, and stayed in one or

21   the other of those positions.

22   Q    Uh-huh.  Okay.

23   A    So, I didn't -- I did not consider the fact that he was --

24   or he may have been given commands for two different things to

25   be significant in terms of the way he did act later.  You know,

1    after those -- or while those commands were being made.

2    **Q**    I'm sorry, the way he acted while the commands were

3    being -- according to --

4    **A**    What was important to me was that he wasn't obeying either

5    one of those commands.

6    **Q**    Well, he had his hands in the air, didn't he (Indicating)?

7    **A**    He didn't keep them in the air, though.

8    **Q**    Let me back up for a minute.  When you're talking about

9    this particular sequence, from the time that he opens the door

10   and gets out of the car to the time he's shot, are you -- are

11   you dealing with different versions of what happened there?  Or

12   is it one consistent version?

13   **A**    No, there are different versions.

14   **Q**    And, what is your version, as a result of the study of the

15   different versions?

16   **A**    The assumption that I made was that he came out of the car,

17   law enforcement had their weapons drawn on him, and were

18   shouting commands at him.  And, it appears that he raised his

19   hands and then lowered them towards his waistband (Indicating),

20   at least one of them.

21        He may have taken off his shirt.  It's not clear.  He may

22   have made a 360-degree turn.  At some point, he made a statement

23   that Officer Elieff and Mr. Campos heard, you know, "You can

24   just go ahead and shoot me."

25        And then he sat on the floorboard of the vehicle, and

1    reached into the vehicle, I believe with his right hand

2    (Indicating), and came out.

3        Now, when he came out, one of the officers -- I think it

4    was O'Malley -- described him as seeing -- seeming to be dazed.

5    But then, his demeanor changes, and he appears much more

6    focused, as if, you know, he's -- he's not dazed any longer.

7    And then he reaches in with more deliberation (Indicating).

8        And at that point, Officer Pierce had come abreast of him

9    and had a good view, an unobstructed view of him.  And as he

10   went in -- I don't know if he was on his way out, exactly what

11   point in that motion -- Officer Pierce shot him.

12   **Q**    Officer Payne?

13   **A**    Payne.  I'm sorry.  P–A–Y–N–E.

14   **Q**    I'm just wondering if there was a third officer there.

15   **A**    I think there was a Pierce Street in the pursuit.

16           **THE COURT:**  Yeah, there was.

17           **MR. CUNNINGHAM:**  No problem.

18           **THE COURT:**  Let me just ask you, how many more

19   questions do you think you have here, Mr. Cunningham?

20           **MR. CUNNINGHAM:**  Not a whole lot, Judge.

21           **THE COURT:**  Let me just tell you that I hadn't

22   intended this to be an open opportunity for discovery.  Okay.

23   In other words, --

24           **MR. CUNNINGHAM:**  I can understand that.

25           **THE COURT:**  We're not really here to just simply test

1    the witness's opinion on cross-examination, which of course will

2    be certainly available if the witness is allowed to testify.

3         **MR. CUNNINGHAM:**  Uh-huh.

4         **THE COURT:**  But really, the more basic question of

5    whether the witness's testimony would meet the standards that

6    are required, under the *Daubert* test --

7         **MR. CUNNINGHAM:**  Uh-huh.

8         **THE COURT:**  -- Kumho Tires, since this isn't perhaps

9    the question --

10         **MR. CUNNINGHAM:**  Scientific, right.

11         **THE WITNESS:**  It is Kumho, yes, that's --

12         **THE COURT:**  And I'm a little concerned that we may

13    just go on at some length.  One of the questions that did come

14    up and has answered one of my questions was the effect of drugs,

15    which I had neglected to ask.

16         And I also had one other question that I just wanted

17    to pose, which is, my understanding is, I don't believe he ever

18    sought professional help, Mr. Boyd, before this.

19         **THE WITNESS:**  No, that's not true.

20         **THE COURT:**  Is that --

21         **THE WITNESS:**  He had psychiatric treatment, and there

22    are psychiatric records.

23         **THE COURT:**  Oh.

24         **THE WITNESS:**  But, the Plaintiff's attorney made a

25    motion to have those, I guess -- I don't know if "excluded" it

1    is right word.  So, I don't have access to those, even though I

2    asked for them.

3            THE COURT:  I see.  All right.  Now, that, I was not

4    aware of.  So, you do not know whether those records contain,

5    for example, any expressions of despondency or suicidal ideation

6    of any sort.

7            THE WITNESS:  Correct.

8            MR. CUNNINGHAM:  Uh-huh.

9            THE COURT:  All right. I believe we do not have any

10   testimony or record that he made comments of that nature,

11   however, to any -- just friends or family.  Would that be --

12           THE WITNESS:  That's my understanding.  I have to say

13   that in preparing for this hearing today, I prepared with the

14   knowledge that I had to test my opinion against the *Daubert*

15   issues.

16           THE COURT:  Yes.

17           THE WITNESS:  So I didn't review the -- excuse me.  I

18   didn't review the entire file again, as I had done back, you

19   know, January, February, Mar- -- so --

20           THE COURT:  Well, assuming there were no -- that

21   there's no evidence, at least in the lay records, so to speak,

22   of making those kind of comments, does that -- does that comport

23   in any way with the history of suicide-by-cop participants, so

24   to speak?  That either is recognized in literature or otherwise?

25           THE WITNESS:  Right.  The literature is not -- the

1    literature recognizes that there are a proportion of -- not only

2    in suicide-by-cop cases but other suicides, other types of

3    suicides -- that there are people who do not make statements of

4    suicide, or intent to -- or hopelessness, you know, things that

5    we think of being indicative of suicidal risk.

6            Nor -- the other thing is that the literature also

7    recognizes that there's a fairly substantial proportion of

8    people who suicide who have no psychiatric diagnosis,

9    whatsoever.  Very interesting studies, I think, that were done

10   on that.

11           **THE COURT:**  Okay.  Thank you.

12   **BY MR. CUNNINGHAM:**

13   **Q**    But that's suicide in general, not particularly suicide by

14   cop, is that right?

15   **A**    Well, actually both.  There is literature on both.

16   **Q**    There is some?

17   **A**    Yeah.

18   **Q**    Of this type, not the spur of the moment time or something

19   else?

20   **A**    In the report that that's looked alternate they didn't

21   differentiate between the different three categories.

22           **MR. CUNNINGHAM:**  Judge, you know, I understand what

23   you said before, and I have was only exploring this in the sense

24   of this general principle of ambiguity, in other words,

25   alternative explanations, and alternative theory of the conduct.

1      **THE COURT:**  Yes that is why I let you go on at some

2    length in that respect.  In other words I think the witness

3    acknowledges that for any one of the behaviors, one could argue

4    that there is another explanation.

5      **MR. CUNNINGHAM:**  Uh-huh.

6      **THE COURT:**  In fact, perhaps a number of different

7    explanations.  But when you take the whole picture together is

8    what I understand she's saying, and you have these overlaps, and

9    then that gives rise to the conclusion that she is drawing, as

10   the most reasonable medical evaluation.

11     **MR. CUNNINGHAM:**  And I suppose that what the Plaintiff

12   wants to do is counterpose a specific theory that accounts for

13   all the factors in a different way.

14     **THE COURT:**  Yes.  And in fact, there are two different

15   things that are going on here, and why this Witness's testimony

16   would be relevant at all, it's as -- it's relevant to explain

17   why someone may have behaved in the way that the officers say

18   the witness -- I'm sorry, the decedent did behave, as opposed to

19   the way that the witnesses on whom the Plaintiff relies say the

20   decedent behaved.

21     In other words, the theory is as follows, from the

22   Plaintiff's standpoint.  The Plaintiff's witnesses testified

23   that the decedent consistently, in all respects, surrendered

24   throughout the encounter, someone over-reacted, and blew him

25   away in the course of his surrender.

1          **MR. CUNNINGHAM:**  Uh-huh.

2          **THE COURT:**  The officers say there were all these

3    other behaviors.

4          The Plaintiff then argues, that is not believable,

5    what the officers say, because nobody would act that way.  It's

6    not logical, it doesn't match up to any way that anybody would

7    ordinarily conduct their behavior and life.

8          **MR. CUNNINGHAM:**  Uh-huh.

9          **THE COURT:**  This theory is being offered not to

10   justify a shooting -- you can't shoot someone just because they

11   want you to.  I mean, we know that.  I mean, you can't say, "All

12   right, he wanted to be killed, and he is killed, and so that's

13   the end of the case."  No.  It's not being offered for that

14   purpose.

15         It is being offered to explain why someone may well

16   have acted in the way described by the police, under the

17   circumstances.  And that's -- that's the reason this testimony's

18   being offered by the Defendant.

19         My question is whether or not there was sufficient

20   support for this opinion, both as a general matter and as a

21   specific matter as applied to this case, and whether this is an

22   opinion that would find support in the relevant psychiatric

23   community and expert community, and not simply an idiosyncratic,

24   essentially, assessment made by the one doctor that just did

25   not -- was kind of free-floating, away from the body of

1    psychiatric literature and findings and testing, and that's why

2    we were here.

3            There is no question that the opinion, as almost any

4    expert opinion, can be cross-examined at the time of trial.

5            **MR. CUNNINGHAM:**  Yes.

6            **THE COURT:**  If it's admitted.  And all manner of

7    questions asked about -- of the nature that you are asking as

8    well, and others, and then arguments made about why it's less

9    likely that it went down the way that the police said, and less

10   likely that this opinion should be accepted, and why it's more

11   likely that it happened just the way other people said it

12   happened.

13           **MR. CUNNINGHAM:**  Uh-huh.

14           **THE COURT:**  And that's what the trial would be about.

15           **MR. CUNNINGHAM:**  But your -- the Court is more or less

16   in a 403 position here, right?  In terms of whether or not to

17   allow this corroborating or purported corroborating evidence?

18           **THE COURT:**  Well, there are two different questions.

19   One is, does the opinion meet the *Daubert* test.  And that's why

20   I stopped you when I did, because it looked like at this point,

21   you were not focusing -- frankly neither was Mr. Wiener at the

22   beginning.  That's why I just sort of stopped him.  All right.

23   He was going to lay out the whole opinion in great detail, and

24   show how strongly the witness felt about it.

25           And that isn't really why I'm here.  My task is to

1    determine whether there are other people out there that might

2    legitimately hold this position, and take -- I'm sorry, take the

3    position and hold the opinion --

4         **MR. CUNNINGHAM:**  Uh-huh

5         **THE COURT:**  -- that this witness does in the relevant

6    psychiatric community.  All right, that it's not just something

7    that she's coming up with that nobody else would legitimately

8    arrive at.

9         And, and that's really summarizing *Daubert* in a far

10   too simplistic way, and I would intend to make a better record

11   on that, if I do allow the testimony.

12        But, essentially, I'm just trying to explain the

13   difference between testing her opinion just as -- as -- as one

14   might do of any opinion that's offered, and testing it against

15   the *Daubert* standard.

16        **MR. CUNNINGHAM:**  Uh-huh.

17        **THE COURT:**  That's why I stopped Mr. Wiener and why I

18   stopped you where I did, after it appeared to me that we had

19   gone into her ability to explain to you why, even if there's an

20   ambiguity, it doesn't necessarily mean that the opinion cannot

21   be legitimately held.

22        And then, of course, you can argue whatever you wish.

23   If you have anything to show that the studies on which she

24   relied should be discredited, whether there's any reason to

25   suggest that there's a large body of people who don't accept the

1    concept of suicide by cop, or the application of the factors on

2    which she has primarily relied in testing the behavior against a

3    reconstruction of suicide by cop, anything of that nature, I

4    don't want to take that away in any way from the inquiry.

5          What I don't want to do is just get into a -- what

6    I'll call traditional cross-examination of -- an opposing

7    party's said.

8          **MR. CUNNINGHAM:**  All right, Judge.  I've got to say, I

9    really haven't had the opportunity to make much of a study at

10   all.

11         **THE COURT:**  I'm aware of that, although Mr. Galipo

12   could have and provided that to you, if that information exists

13   out in the world.  I'm assuming if you don't put it in, it

14   doesn't.

15         **MR. CUNNINGHAM:**  Let me ask the Doctor, since I'm

16   otherwise at a loss for any source --

17         **THE COURT:**  I think you do pretty well.

18         **MR. CUNNINGHAM:**  I take it she is principled enough to

19   tell us --

20         **THE WITNESS:**  Yes.

21   **BY MR. CUNNINGHAM:**

22   Q    The opposite side of the question here, that in terms of

23   reservations in the profession about this kind of evaluation of

24   situations like this, where -- and maybe you could help by

25   explaining -- I know you talked about, you know, the

1    circumstances in which analysis of suicides are necessary, you

2    know, in other contexts, like the will and something like that.

3         But I'm a little at a loss to understand where a

4    suicide-by-cop analysis is relevant, except in the defense of a

5    lawsuit.

6    **A**    Oh, no, that's not the case at all.  In fact, the reason I

7    got interested in this area -- although I first learned about it

8    by being referred cases to try to figure out what was going on

9    with the decedent, although it wasn't for the purpose of

10   testifying -- you know, trial consultation.  It was a city

11   attorney who cares about his citizens and his police department.

12        But, the primary reason I think people look at this is for

13   prevention.

14   **Q**    Uh-huh, prevention --

15   **A**    Of these incidents.

16   **Q**    With patients?  Or with cops?

17   **A**    Both.

18   **Q**    Uh-huh.

19   **A**    You know, when I train law enforcement officers, I say to

20   them, "Look.  Suicide by cop is not a law enforcement problem."

21   Which is, you know, a very inciteful thing.  I-N-C-I-T-E-F-U-L.

22   They -- you know, they're like, "What do you mean?"  You know.

23   **Q**    Yes.

24   **A**    But I say, "Look, by the time it gets to you, the failures

25   have occurred in several areas."  Number one, somebody didn't

1    recognize that the individual was suicidal, or if they had

2    mentioned that they were, you know, somebody didn't bring it to

3    clinical attention.

4         And if they did bring them to clinical attention, I -- I

5    will tell you something very interesting.  And, this is one of

6    my missions in prevention.  Clinicians do not routinely ask

7    suicidal patients if they are thinking about committing a

8    suicide by cop.  I never did that until I started to work in

9    this area, despite working with a large number of patients who

10   are acutely suicidal.

11        I would say that -- "What is your plan for suicide?"  And

12   then would say, "Gunshot."  Or "I'm going to -- you know, I live

13   up in Sonoma County."  The thing up there is to drive off

14   Highway 101 into Goat Rock.  I mean, that's everybody's dream.

15        It was only until I said directly, "Have you ever thought

16   about a suicide by cop," that my patients who were thinking

17   about it said "Yes," even though I had asked them previously.

18   Q    Uh-huh.

19   A    You know, "What's your planned method of suicide?"  Nobody

20   had disclosed that to me.

21   Q    Had they told you something different?

22   A    Yes, yes.

23   Q    Or said they didn't --

24   A    Yeah, yeah.

25   Q    But then when you ask this, then they said, "Well, that's

1    what I'm really thinking about"?

2    **A**    Well, I'll tell you, it was like a heart-stopping moment,

3    because the very first time I ever -- you know, I decided after

4    I believed that suicide by cop really existed, you know, I had

5    to get convinced first, that would I then ask my suicidal

6    patients if they ever thought about it.

7        So, the first guy I asked says to me -- he looks -- he

8    looked shocked, first of all, as if I'm mind-reading, you know.

9    He says, "I have to tell you, not only am I planning for it, but

10   I'm actually practicing for it."  Which, you know, that -- that

11   made my heart stop.  Because I didn't know what to do, then.

12   **Q**    Uh-huh.

13   **A**    But, to get back to your question, no.  I think for most of

14   us who work in this area -- you know, most of my time in law

15   enforcement-related issues is not spent on forensic cases, it's

16   spent on training, okay.  Training both mental health clinicians

17   and law enforcement officers, to try to reduce this type of

18   event.

19   **Q**    But, there, you are not trying to arrive at an opinion

20   that's going to stand up in a court of law, you are trying --

21   you have a possibility that you're dealing with, and a

22   phenomenon that clearly you have come to believe in, and you are

23   trying to train people, and get people, and counsel people --

24   **A**    It starts with, actually, a higher threshold.  Not what's

25   going to stand up in a court of law, but what's going to stand

1      up in research, you know, because as I said, we have a tighter

2      definition for selection criteria than -- you know, than -- you

3      try to get to beyond a reasonable doubt.

4           And the reason is that -- what's the basis for training?

5      The basis for training either clinicians or law enforcement

6      officers is what we have learned from these events.  So, we have

7      to be able to identify who is committing a suicide by cop, and

8      study them, before we can develop any training curricula.

9  **Q**     Uh-huh.  Okay.  Are there -- have there been papers written

10     debunking the phenomenon, or qualifying it in such a way, that

11     you are aware of?

12  **A**     No.

13  **Q**     Okay.

14              **MR. CUNNINGHAM:**  Let me just look here, Judge.

15              **THE COURT:**  Sure.  I thought you asked a lot of good

16     questions.  I particularly liked your discussion about being

17     tautological.

18              **MR. CUNNINGHAM:**  Uh-huh, thank you.

19              **THE COURT:**  Both on the same page, on that one.

20  **BY MR. CUNNINGHAM:**

21  **Q**     In terms of the -- I guess this really goes back to the

22     intent, and then to the connection between the element of intent

23     and that of a deliberate or purposeful escalation in the process

24     of the -- or in the course of an event, to try to, you know,

25     push the supposedly desired outcome, denouement.

1      And you spoke also about -- I think that you said it's

2   common to detect that the subject is ambivalent, and I can

3   imagine that certainly make fundamental sense in a human way,

4   that you are still full of fear, you are still full of whatever

5   feelings brought you to suicidal ideation in the first place.

6   And so, there would be -- it wouldn't trouble you to -- in a

7   situation where you are concluding that suicide by cop occurred,

8   that there was also evidence that the person was ambivalent in

9   the course of the event about going through with it.

10  **A**    Absolutely.

11  **Q**    But what about a person who may have had it on his mind,

12  and then changes his mind completely?  I mean, a person whose

13  ambivalence flees, and he's saying, "Don't shoot me, don't shoot

14  me"?

15  **A**    Absolutely.  We have cases of that.  In the L.A. County

16  Sheriff's Office, the retired Commander is a guy named Barry

17  Perrou, who I train -- we do trainings together sometimes on

18  suicide by cop.

19      And, he commanded that unit for over ten years. So you can

20  imagine the number of this type of event that he responded to.

21  And some of them were able to end successfully, with the person

22  surrendering to the police.

23  **Q**    Uh-huh.  And in the studies or in the literature, are there

24  cases where, then, there's been a discussion with the person

25  where -- that didn't die, who breaks down the process he or she

1    went through in changing their mind in what started out as an

2    event that might have gone that way?

3    **A**    Yeah.  Not -- not in the scientific literature, but there

4    are a couple of very famous people in our community, who

5    survived suicide-by-cop attempts, and who have been interviewed

6    and talk about their thinking and their reasoning, and that type

7    of thing.

8    **Q**    Uh-huh.  And, were those -- is it fair to say --

9    **A**    I have to say that I actually have a patient that survived

10   an attempted suicide by cop as well, so I've talked to him.

11   **Q**    And did he say, "I changed my mind, and I was intent on

12   trying to surrender at that point"?

13   **A**    No.  He didn't change his mind -- my guy didn't change his

14   mind.  He got bean-bagged, and he was frail.  He's an older man.

15   That knocked him out.

16   **Q**    I see.  So, he just didn't pull it off.

17   **A**    Yeah.  He didn't pull it -- he was intoxicated, frail, and

18   got bean-bagged, yeah.

19   **Q**    I thought you had -- you had one person who was pissed off

20   afterwards, that they weren't -- that they hadn't succeeded.

21   **A**    He was -- he'd be pissed off.  He was pissed off, this man,

22   you know -- you know, if his cat looked at him, he was pissed

23   off.

24   **Q**    All right.  But in any event, there's certainly nothing in

25   the phenomenon and nothing in the study of it that would say

1    that in a given case it isn't perfectly logical that a person

2    who may have been going in that direction and may have had that

3    kind of thing on his mind, or may have talked that way three

4    days before to other people, other cops, at this point, faced

5    with the cops, and they're pointing their gun, he says "No" --

6    **A**    Right.

7    **Q**    And then --

8              **THE COURT:**  Mr. Cunningham, that's a great closing

9    argument.

10             **MR. CUNNINGHAM:**  All right, Judge.  I must be near my

11   close, then.

12                        (Laughter)

13             **THE COURT:**  That's a good point.

14             **THE WITNESS:**  It was good.

15             **THE COURT:**  The jurors can believe everything that

16   this witness says, right down to the last second, when he gets

17   blown away, has changed his mind, is fully surrendering, fine.

18   Just the way --

19             **THE WITNESS:**  Yeah.

20             **THE COURT:**  Okay.  You can make your argument to the

21   jury.

22             **MR. CUNNINGHAM:**  I suppose that would be what it would

23   come down to.  I mean, I think in this context, Judge, of what

24   we are doing here today, the point for the Plaintiff's point of

25   view is that -- is that it's too uncertain.

1          **THE COURT:**  Yes.

2          **MR. CUNNINGHAM:**  To meet the Kumho standard or the

3   standard or the Daubert/Kumho standard, in the sense that the

4   set of contrary possibilities that fits the profile of

5   surrender, at least from the crucial point on, from where the

6   cop still is -- you know, he's at the ready, but he's not called

7   upon to respond to a gesture or words or something that takes

8   him past the Shoot/Don't-Shoot point.

9          That it's -- at least in the facts of this case, as

10  you pointed out at the beginning, that you -- it's too hard to

11  apply a scientific standard or a quasi-scientific standard to

12  this set of facts, even based on the notion that there is -- and

13  apparently, and I don't really -- I don't see any basis for

14  contesting it, doesn't make any sense to try to contest a notion

15  that this is something that has come to the attention of the

16  profession, both professions, that they are concerned about it,

17  that certainly in the training and the prevention context, this

18  is certainly an important thing to deal with.

19         But there is a paucity of cases where the

20  determination has been made in a legal context.  There are a set

21  of factors here, I called them elements, that I think it's fair

22  to say -- even though the Doctor was clear that, you know, the

23  standards for research study are more rigorous, perhaps, than

24  they might be here.

25         **THE COURT:**  Uh-huh.

1          **MR. CUNNINGHAM:**  But still, that you would have to

2     have a profile of factors, you would have to have criteria that

3     would have to be met.

4          And if they are, in a given case, also subject to

5     alternative explanation that's coherent from one end to the

6     other, then it seems to me that disqualifies it.  Or that raises

7     a question in the context of the *Daubert* principle, that would

8     have to give the Court pause before she would allow an expert.

9          And certainly, the Doctor is showing you that she is a

10    powerful expert, and would be a very persuasive witness.  And

11    therefore, the 403 issue is really rife here.

12         And I understand that the Court apparently has gone

13    down that road with respect to some of the other evidence that

14    would apply in the context of trying to corroborate the

15    officers' version of what happened, and as against a character

16    evidence problem --

17         **THE COURT:**  Yes.

18         **MR. CUNNINGHAM:**  And in the context of that -- is it

19    the Palmquist case, the Seventh Circuit case?

20         **THE WITNESS:**  Yes.

21         **THE COURT:**  Yes.  She says yes.

22         **MR. CUNNINGHAM:**  And another case that I read or

23    looked at part of yesterday, the Sherrod (Phonetic) case?

24         **THE COURT:**  The Palmquist, yes.

25         **MR. CUNNINGHAM:**  Palmquist relied on Sherrod.  And

1    Sherrod said, you know, this is -- you're going too far away

2    from the objective test, when you let this kind of stuff in.

3              **THE COURT:**  Okay.  Well, let's do one thing at a time

4    here.

5              **MR. CUNNINGHAM:**  Okay, yeah.  I don't want to go too

6    far.

7              **THE COURT:**  The first thing is -- the first thing I

8    want do is just deem the evidence submitted, at this point, on

9    the issue.

10             **MR. CUNNINGHAM:**  Okay.

11             **THE COURT:**  And allow the Doctor to step down, if she

12   would like to.

13             **THE WITNESS:**  Thank you.

14             **MR. CUNNINGHAM:**  Okay.  I'll rest.

15             **THE COURT:**  That's all right.  I think we have

16   explored all of the relevant issues, so I'm going to allow her

17   to step down.

18             **MR. CUNNINGHAM:**  Thank you, Doctor.

19             **THE COURT:**  And then I'll take the argument on the

20   point, but we may as well let her step down.

21             She can either sit at Counsel table, or wherever

22   comfortable in the courtroom.

23             **THE WITNESS:**  I'll sit with my students.

24             **THE COURT:**  That's fine.  Let's just wait for the

25   witness to step back, and give her a chance, and then I'll hear

1    argument.

2              I think I understand your point, Mr. Cunningham.

3              **MR. CUNNINGHAM:**  All right, Judge.

4                        (Witness excused)

5         **THE COURT:**  Okay, now, what we have here, then, as I

6    indicated, was the initial question of the meeting of the

7    *Daubert* standard.

8              Now, Mr. Cunningham has been brought into these

9    proceedings at the eleventh hour, and I think has made a number

10   of points that are very good and very interesting.

11             I do want to make it clear, though, because he was not

12   at all present during any of the other hearings that we had,

13   that the purpose of this hearing at the moment is not to discuss

14   the admissibility under 403, for example, or the admissibility

15   of the opinion or the admissibility -- of the opinion or the

16   admissibility of other evidence that could be brought in if this

17   opinion comes in, in -- and that 403 evaluation -- perhaps 403

18   as related to the *Daubert* test, all right.

19             But not the 403 in connection with other evidence that

20   may come in, if this -- if this theory is allowed to proceed.

21        **MR. CUNNINGHAM:**  Uh-huh.

22        **THE COURT:**  Okay.  Because, I heard a number of

23   motions in limine about all manner of the evidence that does not

24   directly pertain to the shooting, itself, on the day in

25   question.

1           **MR. CUNNINGHAM:**  Yes.

2           **THE COURT:**  And whether that should come in or not.

3  And, some of the rulings were dependent upon whether the Court

4  would allow the issue of suicide by cop to be raised in the

5  case.

6           **MR. CUNNINGHAM:**  Uh-huh.

7           **THE COURT:**  And, I don't want to really revisit those,

8  because I have made those rulings at some length, --

9           **MR. CUNNINGHAM:**  I understand, Your Honor.

10          **THE COURT:**  -- and in some detail.  However, I want

11  you to know that the issue of 403 in connection with that

12  evidence was very carefully reviewed, and it's one of the

13  reasons that I am being so careful about whether or not to allow

14  this opinion.

15          Because, if it does come in, it brings in as

16  supporting evidence, a variety of behaviors.  Now, some of those

17  behaviors may come in, anyway.  In other words, we may have a

18  situation where the Plaintiff's argument in this case boils to

19  the following: Our witnesses are more believable that there was

20  a consistent set of behaviors evidencing surrender than the

21  back-and-forth kind of -- kind of ping-ponging back and forth

22  kind of behavior, surrender-not surrender behavior that is

23  described by the police.

24          Now, I had said to the Defendants earlier, why do we

25  need suicide by cop?  You have the simple fact the person was

1    under the influence of drugs, to a certain extent.  Wouldn't

2    that explain erratic behavior?

3          You have, for example, erratic behavior surrounding

4    the event earlier.  Perhaps that could simply come in to show

5    this is a person that isn't really acting logically at this

6    stage in his life, whatever's going on.

7          For all of those behaviors, the Plaintiff has various

8    explanations:  The drugs really weren't of a level to cause

9    serious impediment; the other behavior itself shouldn't come in;

10   and it was too different than what we have here.

11         In other words, the union filing factor that the

12   defense ended up relying on very strongly was the issue of

13   suicide by cop, which has a -- if not a diagnosis, at least, I

14   think a matter of medical opinion to justify it, as opposed to

15   simply hypothesizing by the defense counsel, or the jury

16   speculating.

17         The argument as I understand it that you're making,

18   Mr. Cunningham, is that there are so many other explanations for

19   each of the behaviors in which Mr. Boyd either engaged

20   indisputably, or there's at least someone who says he engaged in

21   them.  There's so many other explanations, that this really does

22   not hold up.

23         And, you know, you also had a question of the witness

24   about the tautology of the underpinnings.  And that was

25   something that came to my mind earlier, and particularly wanted

1    to explore with the witness in connection with the various types

2    of evidence that was relied upon in the Los Angeles Sheriff's

3    Office study, because at first it sounded to me like there was a

4    certain circular reasoning or bootstrapping here.

5         **MR. CUNNINGHAM:**   Uh-huh, that's (Inaudible).

6         **THE COURT:**   And that's why I spent a fair amount of

7    time questioning the witness about it.  In response to the

8    question, is this too iffy, in other words, whether or not other

9    doctors relied on it, and if they rely on it for their medical

10   practice or otherwise, or in training police, is it too iffy?

11        Certainly I have thought about that, and it seems to

12   me, however, that the witness has said that yes, for any

13   individual behavior, there may be a variety of explanations.

14   For any individual behavior, there may be different

15   interpretations as to what the individual was even doing or --

16   or saying, as an objective matter.

17        Was the statement about "Kill me" made as a sincere

18   statement?  Was it made sarcastically?  Was it a challenge,

19   perhaps, to bait the officers into shooting him?  There's a

20   variety of things that you could say.

21        But what the witness is saying is that if you take the

22   various standards that are required to be looked at, and you

23   apply them to the totality of the events here, that she can

24   arrive at an opinion to a reasonable degree of medical

25   certainty.  And that's not an unreasonable opinion.

1          And then, of course, the job of anyone who would hear

2    the opinion and it was used against them would be to pick it

3    apart, and perhaps show then the flaws in the opinion, or at

4    least room for discussion.  But, in terms of it being just too

5    iffy in general, I would say no, that I think that it would pass

6    the test in that respect.

7          But then I still have to look at all of the *Daubert*

8    factors.  And the first question is whether or not this is

9    scientific knowledge.  Yes, it is, scientific it's coming from a

10   medical doctor with a very high level of training and experience

11   in the field that she is testifying about.

12         And two, will it assist the trier of fact to

13   understand or determine a fact in issue?  Now, when you cited to

14   <u>Palmquist</u>, Mr. Cunningham, that case was decided on a different

15   issue.

16         What that case decided was that since the officer had

17   no knowledge of what this person wanted the officer to do, or

18   any idea that the person was operating under a state of mind of

19   suicide by cop, it could not have any bearing on the

20   reasonableness of that officer's testimony, because the

21   officer's reasonableness can only be based on what that officer

22   was aware of and knew.

23         Here, the idea of the person being a suicide,

24   essentially, is not offered as justification for anything the

25   officer did.  It is offered as an explanation as to why the

1    officer is telling the truth, as opposed to the witnesses who

2    testify contrary to the officer.

3           In other words, to explain why this very type of

4    scenario is likely to have been the product of a state of mind

5    on the part of the decedent to commit suicide, and to engage in

6    behavior that would carry it out in such a way that it would not

7    necessarily appear at first blush to be a suicide, and/or

8    because he was simply ambivalent at one point or another

9    throughout the encounter as to what he should do.

10           All right.  As you point out, someone could start out

11    with a total plan to commit suicide by cop, and at the eleventh

12    hour just say, "Hey, I'm abandoning the plan, and I'm going to

13    surrender."  And that would be your explanation to the jury as

14    to why the Plaintiff's witnesses are likely telling the truth,

15    even if the jury were to accept everything that the Doctor has

16    said.  That's what trials are about.

17           But my job as a gatekeeper, as described in *Daubert*,

18    is to determine whether the jury should hear the testimony at

19    all.  It was a case originally designed to weed out what is

20    commonly referred to as junk science, where jurors hear an

21    expert with credentials say anything at all, and because they're

22    credentialed, they're likely to accept it, simply by reason of

23    the person delivering the message.  And, that the Court has an

24    obligation to see that that does not happen.

25           It is a ruling under Rule 104 of the Federal Rules of

1    Evidence in that respect, to determine whether the matter should

2    be submitted to the jury, a foundational inquiry.  I'm not

3    making a final test as to whether the opinion should be accepted

4    or not.  That, of course, is for the trier of fact.

5         So, I will say the following.  I started out rather

6    skeptical of this whole subject.  And in particular, its

7    application to this case.  Having heard Dr. Keram, however, I

8    have determined certain things from her testimony.  One, I think

9    she is a principled witness.  She is highly trained, and has the

10   expertise.

11        She does not appear to be favoring one side or the

12   other as a -- a manner that would color her opinion in any way.

13   I think that's evidenced by some of the things she said about

14   running her own cross-checks against the evidence on which she

15   was about to rely.

16        She has testified with respect to the factors that the

17   Court is required to look at.  One of them is whether or not the

18   opinion can be tested.  Well, it can't be tested in the sense of

19   running a scientific experiment.  We know, however, that there

20   have been a number of studies conducted, and at least one very

21   large one.

22        There is also the question of whether or not the

23   theory has been subjected to peer review and publication.  There

24   has been peer review and publication.

25        And the Court is to consider the known or potential

1    rate of error.  We didn't really get into how we would do that

2    in this kind of analysis, but the witness did say that in fact,

3    the selection criteria were designed to err on the fact -- on

4    the side of exclusion.  In other words, there may be people who

5    were in fact committing suicide by cop who were excluded, in an

6    exercise of caution to make the bar relatively high.

7           It's the same as if one is running some type of a

8    medical examination and test where the test tends perhaps not to

9    pick up as many people as actually have the disease.  So, here,

10   there may be people who have the disease, in a sense, and have

11   been excluded by the test.  So, the standard is higher.

12          General acceptance, certainly there's been a number of

13   articles written, and also there have been discussions in

14   textbooks.  According to the witness, there's been no one who

15   has debunked the theory, for example.  And I think she would

16   tell you if there had been contrary articles or studies, because

17   I accept that she is answering the questions quite candidly, and

18   acknowledging some of the concerns that were raised by others

19   throughout the inquiry.

20          So, I do think that the criteria under *Daubert* have

21   been met, and that the opinion is an important one to the case.

22   Any time that an opinion is offered or evidence is admitted that

23   goes to support one party's case strongly, it will be

24   prejudicial, in effect, to the other side.  So the question in a

25   prejudicial analysis is, is that prejudice unfair?

1          **MR. CUNNINGHAM:**  Uh-huh.

2          **THE COURT:**  Is it unfairly prejudicial?  And the

3    argument here by Mr. Cunningham is that there's so many

4    questions that could be raised with respect to the opinion, that

5    its probative value is outweighed by the prejudicial effect of

6    bringing in so much ability to consider what was in his mind and

7    also to bring in other evidence.  But I have made that weighing

8    process as well, or engaged in it, and I do not think that the

9    balance tips in favor of being overly prejudicial in this

10   instance.

11          Again, as I have to say, that I did not come into this

12   inquiry with any conception as to whether the testimony would be

13   admitted or not.  It's one of the reasons that I conducted the

14   inquiry here, and I -- I'm satisfied that the witness's

15   testimony does -- does pass muster under *Daubert*.  So I will

16   overrule the objection to her being allowed to testify on the

17   subject.  Okay.

18          Then, that leaves us with the -- whatever rulings I

19   made that were contingent on this finding.  I think that those

20   are already in the Record.  In other words, if I said it would

21   be admissible, if I allowed the *Daubert* -- under *Daubert* allowed

22   the opinion to be given, then I'm not going to go back and

23   revisit all those rulings.

24          So, I think that we have covered that.  I also want to

25   say that even though Mr. Cunningham came in to this hearing,

1    being asked to appear at the last minute, that he raised some

2    very good questions, and certainly his presentation in no way

3    suffered, in the Court's view, from the timing of his requested

4    appearance on the matter.

5         The witness has said there is no evidence out there or

6    opinions that would refute, if you will, --

7         **MR. CUNNINGHAM:**  Uh-huh.

8         **THE COURT:**  -- the studies that she has relied on.  I

9    would assume that even though you were called into this hearing

10   late in the proceedings, Mr. Cunningham, that Counsel for the

11   Plaintiff, and in particular, Ms. Sarmiento and Mr. Galipo, who

12   have been with the case for a long time -- although

13   Ms. Sarmiento has now withdrawn as counsel, but they have known

14   about this issue for a long time.

15        **MR. CUNNINGHAM:**  Yes, yes.

16        **THE COURT:**  And Mr. Galipo has expressed the view that

17   this is a very serious blow to the Plaintiff's case, if this

18   evidence were to be admitted.

19        And I -- I cannot believe that if he held that view

20   for some time now, that he has not made an effort to inquire

21   into the evidence that would counter a finding under *Daubert*.

22   And I don't mean cross-examining in the fashion that we had some

23   of here today, and certainly would go on if the evidence is

24   admitted, but rather to show that the opinion doesn't meet the

25   *Daubert* standard, in that the scientific community does not

1    accept either, in the general or the specific, one or the other.

2            So --

3            **MR. CUNNINGHAM:**  I think that's fair, Your Honor,

4    under the circumstances.  I don't know, nor have I -- I haven't

5    had the opportunity to discuss it with Mr. Galipo.

6            I take it that if -- you know, even at this late

7    stage, if some bombshell were found and brought to the attention

8    of the Court, that there would be a determination --

9            **THE COURT:**  I would consider it.

10           **MR. CUNNINGHAM:**  -- looked at again, of course.

11           **THE COURT:**  I would consider it, assuming that it

12   wasn't available at the time that we had this lengthy hearing,

13   and if it were available, then I would have to determine whether

14   it was appropriate, nonetheless, to reconsider, in light of it.

15           But, again, if he had it, I believe that he would have

16   given it to you.

17           **MR. CUNNINGHAM:**  (Inaudible) seen in the memorandum,

18   Your Honor.

19           **THE COURT:**  I'm relying on that, as well.  And the

20   witness's testimony on this point.

21           So, we have, though, some other things to take up.

22   And I don't know if you are in a position to address these.

23           But, one of them is the number of jurors, and the

24   challenges that we will have.  We -- we touched upon this at the

25   last calling.  And I think we agreed pretty much on -- nine?

1    Was that it?

2              **MR. WIENER:**  I believe so, Your Honor.  I believe

3    Your Honor indicated --

4              **THE COURT:**  Well, you know, we have the potential of a

5    four to six-week trial here.

6              **MR. CUNNINGHAM:**  Uh-huh.

7              **THE COURT:**  All right.  There's also questions about

8    the length of the trial, and we will get to that in a minute.

9    But I wouldn't think that we would need more than nine jurors.

10   Six is the minimum, as you know.

11             **MR. CUNNINGHAM:**  I've heard it said, Judge, actually

12   in the Oakland building, that they believe they lose one juror a

13   week.  I don't know if that's been proven out or not.

14             **THE COURT:**  Yeah, then we would have a huge jury.  And

15   of course, you can't have more than 12.  So --

16             **MR. WIENER:**  Your Honor, I think we had requested more

17   than nine, and Your Honor had not agreed to that.

18             **THE COURT:**  Well, I think nine, at least.  For now,

19   I'm saying nine.  We can -- we could make a last-minute

20   determination if we had to, but I would say nine.

21             And I would give the parties one extra challenge each,

22   so, four challenges per side.  Ordinarily, you would only have

23   three.

24             **MR. CUNNINGHAM:**  Uh-huh.

25             **THE COURT:**  Okay.  I do not have a usable statement of

1    the case to be read to the jury for purposes of voir dire.  Now,

2    by that, I don't mean that I want a long description of every

3    single issue in the matter.

4           What I'm trying do is explain to the jury that this

5    isn't a contract case, it's not an auto accident, it's not

6    someone who didn't get paid or got fired from work.  It is what

7    it is.  And, something very generic.  And I'm going to need that

8    statement no later than a week before.

9           Now, we're starting the trial on the 9th?

10           **MR. CUNNINGHAM:**  Uh-huh.

11           **THE COURT:**  All right.  And I'm going to need that

12    statement no later than August 2.  Now, let's see.  2 would be a

13    Thursday, I guess.  I don't know.  I don't have my calendar.

14           **MR. WIENER:**  I think so, Your Honor.

15           **THE COURT:**  That's correct?  All right.  If you are

16    absolutely unable to arrive at an agreed-upon brief statement

17    describing the case for the jury, then what I would like is your

18    respective submissions, and I will do something which would

19    probably be different than both of them, but who knows?

20           But mostly, I just want to tell them this case arises

21    from a shooting that resulted in the death of the person shot,

22    on X date, in San Francisco, by the Police Department.  You

23    know, something of that nature.

24           And that the Plaintiff alleges that the police used

25    excessive force and unnecessary force in the shooting, and the

1    Defendant denies that, and -- whatever else you want to say

2    about it, briefly.

3              In other words, we're not trying the case in the

4    statement.  I just want them to know what kind of case it is,

5    very, very generally.

6              The other matter, then, -- oh, I do want to say in

7    connection with the time that was allotted, at the last calling,

8    I suggested to the parties a time of -- time limits of 40 hours

9    each.  The Defendant went back and decided that they couldn't

10   live with 40 hours on their side.  The Plaintiff does not

11   disagree with the 40 hours.

12             Forty hours would result in about a four-week trial,

13   exclusive of closing arguments, voir dire, deliberations and

14   what have you.

15             What the defense has done is written me a letter.  I'm

16   going to say this once, and then I don't really want to say it

17   again.  Don't send me letters.  Okay.  If you have a point to

18   make, put it in some type of filed document other than a letter.

19             I have considered this, in the interest of time.  I'm

20   not going to, in the future.  So, if you have something that you

21   wanted to have the Court read, then you can call it "Defendant's

22   Request for Additional Time," and file it, all right, as a legal

23   document.  But not a letter, because I don't rule on letters.

24             Now, in this instance, what the Plaintiff has done is

25   endeavored to figure out how many witnesses they're going to

1    need.  Part of their need for witnesses they attribute -- I'm

2    sorry, the Defendant -- that they attribute to the Plaintiff's

3    lack of cooperation in stipulating to certain facts that they

4    believe are irrefutable.

5           I don't know if that's true or not.  And I might ask

6    for some examples of that from Defendant's Counsel, now.

7    Mr. Loebs?

8           **MR. LOEBS:**  Yeah.  In fact, Your Honor, June 21st, we

9    sent a letter to Plaintiff's counsel, listing a number of

10   issues, and in which we requested a stipulation about facts,

11   foundational issues.  And we've received no response.

12          In fact, it's been very difficult on our part to get

13   any response from Plaintiffs on a number of issues.  I know

14   Mr. Galipo was very busy, but it's -- unless he's here and we're

15   talking with him, it's very difficult to get any type of a

16   response.

17          **THE COURT:**  Give me an idea of some examples of issues

18   that you hope to shorten up the presentation on, by getting some

19   kind of an agreement or stipulation.

20          **MR. LOEBS:**  The authenticity of the bullet found in

21   Mr. Boyd's left hand.

22          **THE COURT:**  Now, authenticity?

23          **MR. LOEBS:**  That that bullet that was examined by the

24   experts was the bullet that was found in his left hand at the

25   autopsy.

1          **THE COURT:**  You were talking about, essentially, a

2     chain-of-custody issue, perhaps.  In other words, that the

3     bullet that ended up being tested is the bullet that was found

4     in his hand.

5          **MR. LOEBS:**  Yes, Your Honor.

6          **THE COURT:**  You know, without calling the witness who

7     took it out of his -- saw it in his hand, took it out of his

8     hand, put it in an envelope, and delivered it somewhere.

9          How many extra witnesses will you have, if there is no

10    stipulation to that extent, do you think?  I mean, how much are

11    you saving, in terms of witnesses?

12         **MR. LOEBS:**  I think in terms of overall witnesses that

13    would testify related to the preservation and the chain of

14    custody of evidence, we listed that there were be eight

15    witnesses that would be doing that.

16         **THE COURT:**  On all issues.

17         **MR. LOEBS:**  On all issues.  So this was just one

18    issue, that would be one witness who would be testifying about

19    that.  But if we had to go through the bullets, the clothes, the

20    shell casing, the fibers, the DNA, the weapons, there would be

21    eight different individuals who would be needed for the

22    foundation of the chain of custody, just for those issues.

23         And that was part of our letter to Plaintiff's

24    Counsel, June 21st, asking for -- if we could have stipulations

25    as to those matters, and evaluating how long it would take to

1    put on the evidence.

2          THE COURT:  I can't recall if there's any real issue

3    as to contamination of evidence in this matter.  Mr. Cunningham

4    doesn't know.  But, would you please convey the Court's desire

5    to have some response given to Counsel for Defendant.

6          And, I can put a time limit on that, for Plaintiff to

7    get back to the Defendant on this matter, because they do have

8    to line up witnesses and determine whether they need them or

9    not.  And I don't know that the Plaintiff has submitted any

10   similar requests or inquiries to Defendant.

11         Mr. Loebs says no.

12         MR. CUNNINGHAM:  I don't know that, either.  And I

13   don't know when Mr. Galipo's trial is expected to be over.

14         I do want to understand, in this context, that we are

15   talking about chain of custody and authentication of the items

16   of evidence, as opposed to other matters like was this the

17   bullet that came out of the leg into the hand (Indicating).

18         That's still subject to --

19         THE COURT:  Yes.  Trajectory, he's not talking about

20   here.

21         MR. CUNNINGHAM:  Okay.

22         THE COURT:  He's talking about, as I understand it --

23   well, if there is an issue about -- how many bullets were

24   recovered from --

25         MR. LOEBS:  There were two bullets recovered from

1    Mr. Boyd's body.

2              **THE COURT:**  One is recovered from what?

3              **MR. LOEBS:**  The left hand.  And the other was

4    recovered from inside his body (Indicating).

5              **THE COURT:**  Okay.  I do not know whether there is a --

6    a legitimate dispute as to whether a bullet that the police have

7    marked and put in an envelope or something, saying it came out

8    of the chest or abdomen, isn't actually the one that came out of

9    there, and maybe it came out of somewhere else.  I don't know.

10             **MR. CUNNINGHAM:**  Uh-huh.

11             **THE COURT:**  And if there is a legitimate concern, then

12   I think that you -- you know, may not want to stipulate.

13             But to the extent that there is no real issue on the

14   point, then you might want to agree that the testimony from the

15   analyst, who does whatever testing he or she did, could be given

16   without the need to track the exhibit from Point A to Point B,

17   just in the interest of everyone's time, and --

18             **MR. CUNNINGHAM:**  Okay, Judge.  I'm sure that Mr. Loebs

19   and I -- that the parties -- and I'll try to help this process

20   as much as I can, coming in at this stage, to get what's sort of

21   able to be stipulated to, done.

22             **THE COURT:**  Okay.

23             **MR. CUNNINGHAM:**  And make clear what, you know, the

24   bases for not stipulating, if that's the problem.

25             **THE COURT:**  All right.  So, that was one thing.

1        **MR. LOEBS:**  Yes.

2        **THE COURT:**  The other was -- are there any other

3    categories of stipulation, other than -- chain of custody is

4    what I'm calling it.

5        **MR. LOEBS:**  I do have a letter to the Plaintiff's

6    Counsel, where I list out each one of those items that we

7    request stipulation --

8        **THE COURT:**  Yeah, but other than that concept of

9    keeping track of what went from where to where, do you have any

10   other types of foundational stipulations, or otherwise?

11       **MR. LOEBS:**  The photographs of the scene, authenticity

12   of the photographs of the scene, that they are of the scene.

13   The photographs taken of the vehicle.  The audio tape of the CAD

14   dispatch.  That is, the audio tape of this event.

15       A number of interviews were done through the OCC and

16   by the DA, that we wouldn't need to call the foundational people

17   to establish that that's what they are, that they are interview

18   tapes that we could use --

19       **THE COURT:**  Now, wait a minute.  Tapes of interviews,

20   this would be for what?  Impeachment?

21       **MR. LOEBS:**  Impeachment of a witness.  If we needed to

22   -- if they said something, and then we have the DA interview

23   tape of the witness -- not that it's admissible, but that it is

24   what it purports to be.  And that is the interview that was done

25   of that witness on a certain date.

1          So, that's why I refer to these as authenticity.

2          **THE COURT:**  Well, if you were -- let's say you had a

3   witness on the stand, and they said X.  And you've got them on

4   tape, saying Y.

5          All right.  Were you planning then to just -- you

6   know, you can play a piece of the tape, and say to the witness,

7   "Isn't that you?  Isn't that what you said?"  You know.

8          So, I don't know if you need anybody else coming in or

9   not.  But --

10         **MR. LOEBS:**  Unless they say it's not.

11         **THE COURT:**  Well, if they say it's not, then you --

12   maybe they don't want to stipulate it is.  Yeah.  I don't know.

13   But that's something that, I guess, you could talk to them

14   about.

15         And the other, the photographs, ordinarily were you

16   planning on just lobbing these photographs into evidence?  Or

17   were you going to have a witness on the stand, asking them about

18   them?

19         **MR. LOEBS:**  Well, they're used for a variety of things

20   with different witnesses.  Sometimes they're used for the

21   experts' evaluation.

22         **THE COURT:**  I see.

23         **MR. LOEBS:**  What we were hoping to avoid is having to

24   call a witness to lay a foundation for the photographs,

25   themselves.  Because there's no dispute, I don't think, that

1    these are photographs that were taken of the scene or of the

2    vehicle.

3              I just wanted to not have to trouble the Court with

4    those type of foundational witnesses.

5         **THE COURT:**  To lay a foundation for a photograph, it

6    is not my understanding that you have to call the photographer.

7    All right.

8              In other words, if a witness says, "This accurately

9    depicts what" -- whatever it is that you want to ask them about,

10   that's okay.  You don't have to have a photographer saying "Yes,

11   I was there, taking the picture."

12             In the same light, if you're going to use a photograph

13   with an expert who wasn't there, and is asked to assume this is

14   the position of something, then you might need a stipulation,

15   because you wouldn't have anyone who would be in a position to

16   say whether that correctly reflects something or not.

17        **MR. LOEBS:**  And, Your Honor, that's the primary use

18   that the Defendants seek for the photographic evidence.

19        **THE COURT:**  Okay.  Then, maybe you want to explain to

20   them, the Plaintiff's Counsel, who took it.  And if they have

21   certain disagreements about either the timing of the photographs

22   or otherwise, it may be that they want to dispute it.  I don't

23   know.

24        **MR. CUNNINGHAM:**  I don't know, either.

25        **THE COURT:**  And, you know -- okay.  It's not quite the

1    same as just calling or not calling the custodian of records

2    from, you know, San Francisco General Hospital, or something

3    like that.  Okay.

4          Then what we have here is a long list of witnesses,

5    that totalled up to something like 53 witnesses, many of whom

6    are experts.  And, the Defendants are requesting at least 70

7    hours, which is almost twice what the Court had proposed.

8          Now, it does seem to me there's got to be some way

9    that some of these things can be shortened up a bit.  For every

10   one of these Oakland car chases -- and I grant that there were

11   three -- is it that one patrolman from each of those cars can't

12   say what happened?  You need both of them from each of those

13   events?

14         **MR. LOEBS:**  If -- referring to the essentially two

15   Oakland incidents that happened in 2004, that's what you're

16   referring to, where we list five witnesses related to those two

17   different incidents, I think Mr. Wiener can speak directly to

18   the witnesses.  It would be necessary to talk about the

19   different events that are relevant that occurred.

20         And, we did our best to make this as narrow as we

21   could, about -- one witness about the criminal history, and

22   there are five witnesses that we designated for that issue.

23         But Mr. Wiener gave this a lot of thought, and he

24   could address the Court as to why they would be necessary, on

25   the two different -- because there are two incidents in Oakland,

1    close in time.

2              **THE COURT:**  I might be willing to give you some

3    additional time.  For example, in the sense of this expert

4    witness that we had on the stand.

5              Given that she's going to be allowed to testify, she's

6    going to be a relatively lengthy witness, to lay a foundation as

7    to what her expertise is, what her opinion is based on,

8    et cetera, et cetera.

9              And she was on the stand on what I'll call -- what

10   could have been either the equivalent of a regular direct or an

11   abbreviated direct, it was hard to tell, because we -- I wasn't

12   asking her the questions that you necessarily would be asking

13   her in the trial.

14             But, it took about two hours to do that, for just the

15   initial inquiry, from about -- a little after 9:00 to a little

16   after -- well, no, it was actually less than that.

17             **MR. WIENER:**  Two and a half hours.

18             **THE COURT:**  No, I don't -- how long?

19             **MR. WIENER:**  I think it was more like two and a half

20   hours, Your Honor.

21             **THE COURT:**  Two and a half?  Hmmm.  We started at

22   about 9:10 or so with her.  And we took a break before 11:00,

23   didn't we?

24             **MR. CUNNINGHAM:**  It was just before 11:00.

25             **THE COURT:**  Yeah, so it was actually a little less

1    than two hours.  But, it took a fair amount of time.  And then,

2    of course, there would be cross, and then there would be

3    redirect.  And so, you know, you could say that that witness

4    could take up a fairly decent chunk of time.

5            But, 40 hours is a lot of time.  And so, many of these

6    witnesses, it seems to me, would be reasonably brief.  Okay.  We

7    have the rap lyrics stop, and I wasn't quite sure, for example,

8    why you needed two witnesses on the rap lyrics stop.

9            **MR. LOEBS:**  Mr. Wiener --

10           **MR. WIENER:**  Your Honor, that's because one of the

11   officers actually found the lyrics and the paper, and then

12   provided them to the other officer, who then spoke to Mr. Boyd

13   about it.

14           **THE COURT:**  Okay.  So, but it's fairly short.  In

15   other words, a fairly short encounter.  By the way, it's

16   objected to, but I overruled that objection, Mr. Cunningham.

17           But, it's essentially going to be that he was stopped,

18   and that -- it doesn't require a lot to say whatever was the

19   reason they pulled him over.  And in searching the car, they saw

20   in plain view or whatever it was, they say they see this thing,

21   one of them gets it, gives it to the other one, the other one

22   talks to him about it.  It doesn't take more than probably five

23   minutes for each witness on direct.  It doesn't seem like it

24   would take a lot of time.

25           Other witnesses may take longer to describe an event,

1  such as Ms. Hogan or Ms. Williams, but again, it's relatively

2  straightforward.

3          Now you have a lot of witnesses out of Larch Way, six

4  witnesses.  You have some question about the collection of

5  exhibits and that, chain of custody.  Although, all of those can

6  be laid pretty quickly in terms of what the witness would say.

7  The -- the one incident where he is ultimately stopped in

8  Oakland would take more time to describe.

9          **MR. LOEBS:**  The May 3rd incident.  Or.  May 2nd

10  incident.

11          **THE COURT:**  Whichever one in which he, ostensibly,

12  gets on the ground without help, challenges them to kill him, or

13  shoot him, et cetera.

14          The experts could take some amount of time here,

15  trajectory analysis and --

16          **MR. LOEBS:**  If I may, Your Honor.

17          **THE COURT:**  -- things of that nature.

18          **MR. LOEBS:**  Because there weren't motions with respect

19  to the Defendant's experts on some of these issues, I don't know

20  if we really apprised the Court as to the sophistication or the

21  complexity of something else that's contained in the testimony

22  of these experts.

23          **THE COURT:**  Uh-huh.

24          **MR. LOEBS:**  For example, I know the deposition

25  testimony isn't necessarily a guide, but with the testimony of

1    Alexander Jason, he went on for two days just in explaining his

2    opinions, because he does an evaluation of the bullets fired,

3    Mr. Boyd's positioning --

4              **THE COURT:**  At a deposition, though.

5              **MR. LOEBS:**  Yeah.  And he will do that at trial, as

6    well.

7              **THE COURT:**  But that will be on your tab, however.

8              **MR. LOEBS:**  Yes.  I understand that.  But, it's a

9    very -- there is an awful lot of information that has been

10   considered and evaluated by the experts in case.

11             And he would --

12             **THE COURT:**  How long --

13             **MR. LOEBS:**  How long would that -- I think that would

14   be most of the day.

15             **THE COURT:**  You are saying that the trajectory witness

16   would last most of the day.  And if the day were five hours,

17   just to say that, you would say that he would be on the stand

18   for five hours?  Or he would be on direct and redirect for five

19   hours.

20             **MR. LOEBS:**  I think, altogether.

21             **THE COURT:**  Altogether.  All right.  That witness

22   might be similar to Dr. Keram in length, then.

23             **MR. LOEBS:**  I believe so.

24             **THE COURT:**  Okay.  Some of the others might well just

25   be an hour on your examination of them.  You say you have 14 of

1    these witnesses, I think, experts?

2            **MR. LOEBS:**  Yes.

3            **THE COURT:**  Okay.

4            **MR. LOEBS:**  The other of the experts that would take

5    more time, Your Honor, would be, I believe, the fiber analysis

6    expert.  Ironing that would be closer to three hours.  Assuming

7    that --

8            **THE COURT:**  Just to give their opinion?

9            **MR. LOEBS:**  Well, it depends -- it may be briefer.

10   I'm not sure what the Plaintiffs are intending to do with

11   cross-examination.

12           **THE COURT:**  I think your examination -- I was going to

13   say, your examination should be relative straightforward.  You

14   got the thing from whoever obtained it, you did whatever test

15   you did.  Oh, well, you have to ask them their expertise and

16   qualifications, and that could take, you know, a while.  Then

17   they got it, they ran their test, and they arrived at an

18   opinion.

19           Now you're going to get an hour's worth of

20   cross-examination about why it is a bad opinion.  And then you

21   come back, and you do whatever you're going to do with it.  But

22   it shouldn't be too, too long.

23           I'll tell you what I would be willing to do, and I

24   really question the wiseness of this, but I would be willing to

25   give you ten more hours.  But that's it.  And it goes for both

1    sides, you know.  Because if these witnesses are going to be

2    giving particularly sophisticated and lengthy testimony, then it

3    is fair that the Plaintiff would need time to conduct meaningful

4    cross on that, if they want.  Maybe they just want to leave it

5    alone.  But, that's for both sides.

6          But, I'm not going to do more than that, and I think I

7    probably shouldn't even give you that, but I'm going to give it

8    to you, because -- partly because how long Dr. Keram took.  And

9    seeing that an expert can, you know, on an issue like this, eat

10   up a fair amount of time.

11         But, now, if it turns out that as we go through this,

12   you are moving apace, in a reasonable fashion, and you still

13   can't do it, and you have only called the very necessary

14   witnesses, and not larded on a bunch of expert people, you know,

15   you can make some heartfelt plea, but I wouldn't rely on it

16   getting granted.  So, you've got to do your best.

17         **MR. WIENER:**  And Your Honor, the 50 hours, does that

18   include opening and closing?

19         **THE COURT:**  It would include opening.  It would

20   include opening.

21         **MR. WIENER:**  But not closing?

22         **THE COURT:**  But not closing.  Okay.  And I recognize

23   that the -- frankly, the -- oftentimes the Plaintiff has the

24   laboring oar in laying out the most facts in an opening

25   statement.

1                  In this case, they may leave a lot of things out, or

2      they may try and counter them in the opening statement.  If they

3      leave them out, you are going to be left with picking up the oar

4      at that point, and putting in additional facts.

5                  But if I'm just outright wrong in this, I'll concede

6      that at such a time as it is apparent to me.  I could be wrong

7      and it will never be apparent to me.

8                  But in any event, you shouldn't count on extra hours,

9      keeping in mind that you are getting a much, much longer chunk

10     of hours than the ordinary case gets.  And as you say, this is

11     not and ordinary case.  But, nonetheless.

12                 So we have now upped those hours by a quarter, to 50.

13     Okay.

14                 **MR. LOEBS:**  Your Honor, --

15                 **THE COURT:**  Yeah.

16                 **MR. LOEBS:**  Assuming there's some level of cooperation

17     with some of the foundational witnesses, is that assumed in the

18     50 hours?

19                 **THE COURT:**  Pardon?

20                 **MR. LOEBS:**  Is there an assumption of within the 50

21     hours there would be some level of cooperation with the

22     Plaintiffs --

23                 **THE COURT:**  Not particularly, because I'm assuming

24     that the foundation would be pretty straightforward, and

25     wouldn't take a lot of time to lay.  And so, I mean, I don't

1    know -- how many people did they -- they ship these things

2    through?  Do you know?  Whether there's any

3          MR. WIENER:  Well, there's just a lot of different

4    pieces of evidence that --

5          THE COURT:  Yes, but each one could be pretty quick.

6          MR. LOEBS:  Well, this case did go through a number of

7    hands.  And it would just -- just takes some time to put one --

8    -- one witness on the stand.  I couldn't imagine a five-minute

9    testimony, that it just takes some time just to call the witness

10   and present their testimony.

11         THE COURT:  Well, you know, if you can -- when the

12   witness is called, if you -- first of all, you can find out if

13   the Plaintiff is going to stipulate.  If the Plaintiff doesn't

14   stipulate, then you can begin your examination and suggest that

15   you are now asking whether they are willing to stipulate to the

16   chain of custody, or -- well, no you can't really ask them that,

17   that's not fair.  I guess --

18         MR. LOEBS:  I wrote that down, too.

19         THE COURT:  No, you won't be able to do that.  I guess

20   you are just going to have to proceed then to lay it and do the

21   best you can with that.

22         I will say that the Plaintiff has gotten a real

23   advantage out of having this *Daubert* hearing, because the things

24   that this witness has testified to, that have been really very

25   supportive of both her integrity as a scientist and as -- I

1    suppose, the thoroughness with which she approached her task, if

2    they had been asked in the first instance in front of the jury

3    by the Plaintiff all of these things that will be coming out on

4    cross-examination, the Defendant can still bring them up on

5    direct but they won't have as much force and effect as if they

6    came out on cross as they did in this hearing, which the

7    Plaintiff is now not going to ask those questions on

8    cross-examination.

9         So, they did get a benefit of that, and as a trial

10   tactic, it wasn't initially intended by the Court that that

11   happen, but I think, the side effect of what happened here.

12        So anyway, I don't know that we can do too much more

13   in this session.  If there is anything else that you need to ask

14   me about, ask now because we have been here a long time, and I

15   want to avoid a break if we can avoid it.

16        **MR. WIENER:**  Your Honor so is the record is clear we

17   do not agree, we object to 50 hours if that is wasn't apparent

18   before.

19        **THE COURT:**  Yes.  Well, I heard that, and yes -- you

20   don't want me to go back to 40.  You are objecting to the 50

21   versus 70, right?

22        **MR. LOEBS:**  Yes, Your Honor.

23        **THE COURT:**  Okay.

24        **MR. LOEBS:**  And if I could just say one thing, just so

25   the Record is clear, that one of the other facts that will take

1   a lot of time in the defense's presentation of this case is that

2   the five individual officers that all used to be Defendants are

3   all involved in this incident, from beginning to end.  And, that

4   will be -- it'll take a while for their testimony.

5          THE COURT:  Well, that's if you want to ask them every

6   question, from beginning to end, and end up with all the

7   inconsistencies that that can't help but produce.

8          And, it seems to me that to the extent that anybody

9   has essentially different information, it's good to get that

10  out.  To the extent that they are just along for the ride on

11  something that somebody else said, you may or may not want to

12  ask them about it.  That's up to you.

13         Okay.  Anyway, I think that's probably all that we are

14  going to do this morning.  It's been quite a bit, actually.

15         And, I do thank Mr. Cunningham for coming in and

16  appearing.

17         MR. CUNNINGHAM:  Thank you, Judge.

18         THE COURT:  And carrying forward.

19         MR. CUNNINGHAM:  Sorry I wasn't able to sell you on my

20  point of view, but I agree with the Court that the hearing was

21  valuable for both sides.

22         THE COURT:  All right.  Thank you.

23         MR. CUNNINGHAM:  And I will report --

24         THE COURT:  Okay.  I doubt very much, by the way, that

25  this ruling has any bearing on your ability to try and arrive at

1   some resolution of the case without a full-bore trial, because

2   after I made all my other rulings, it didn't have any effect.

3        If you thought that it would have any effect, I would

4   ask that you go back to Judge James, and I would ask her to try

5   and find time for you.

6        **MR. CUNNINGHAM:**  Judge, I'll do my best to facilitate

7   all of the processes of communication that are necessary between

8   the sides, between now and trial time.  And, certainly not

9   excluding that possibility.

10        **THE COURT:**  All right.  I would just say, if it has

11   any bearing on the discussion, then I would encourage you to

12   contact Judge James.  I don't want to waste her time.  She's

13   very busy.

14        **MR. CUNNINGHAM:**  Yes.

15        **THE COURT:**  So, I don't know if you have any thoughts

16   on this, Mr. Wiener or Mr. Loebs.

17        **MR. WIENER:**  No, Your Honor.

18        **THE COURT:**  Okay.  I take that as it probably won't be

19   anything other than a waste of her time.

20        **MR. CUNNINGHAM:**  I agree.

21        **THE COURT:**  But, I would still ask you, before you

22   leave today, to just briefly touch base about what you are or

23   are not going to do in that respect.  Okay.

24        **MR. CUNNINGHAM:**  Okay.

25        **THE COURT:**  So that, then, would conclude this session

1    at this time.

2              **MR. CUNNINGHAM:**  Thank you, Your Honor.

3              **MR. LOEBS:**  Thank you, Your Honor.

4              **THE CLERK:**  Court is in recess.

5                        (Conclusion of Proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in Case No. C 04-5459 MMC, Marylon Boyd, et al. v. City and County of San Francisco, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____/s/ Belle Ball_____

Belle Ball, CSR 8785, RMR, CRR

Wednesday, October 1, 2008